### UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE VERITAS SOFTWARE CORP. SECURITIES LITIGATION | Case No. 04-CV-831 (SLR)<br>Consolidated Action<br><br>**Consolidated Amended Class Action Complaint** |
| THIS DOCUMENT RELATES TO:<br>All Actions | DEMAND FOR JURY TRIAL |

Lead Plaintiffs Tay Siew Choon and Mark Leonov, by their undersigned attorneys, on behalf of themselves and all other persons similarly situated ("Plaintiffs"), for their Consolidated Amended Class Action Complaint, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon an investigation that included a review of the public documents and press releases of Veritas Software Corporation ("Veritas" or the "Company"), reports by the media and securities analysts about the company, and interviews with numerous Veritas employees who worked at Veritas facilities.

### NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased the common stock of Veritas between April 23, 2003 and July 6, 2004, inclusive (the "Class Period"), against Veritas and its officers Edwin J. Gillis ("Gillis"), Gary L. Bloom ("Bloom") and John Brigden ("Brigden"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). As set forth in detail below, during the Class Period, Veritas made a series of material misrepresentations concerning Veritas' business and financial results, including recognizing revenue improperly on deals that had not closed, and on so-called contracts that were unsigned by the customers or lacked necessary terms such as the price and the total amount to be paid, all in violation of generally accepted accounting principles ("GAAP") and Veritas' own announced revenue recognition policies. In addition, Defendants knowingly issued projections which they knew were false or misleading in order to prop up the price of Veritas' stock. The Individual Defendants profited handsomely from

these misrepresentations, as Defendants Bloom and Gillis sold large amounts of their Veritas shares at inflated prices, receiving more than $4.8 million during the Class Period.

## JURISDICTION AND VENUE

2.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

3.      The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

4.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act because Defendant Veritas is incorporated in Delaware.

5.      In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

6.      Lead Plaintiffs Tay Siew Choon and Mark Leonov purchased shares of Veritas common stock during the Class Period at artificially high prices, as set forth in the accompanying certifications previously filed with the Court, and have been damaged as a result of Defendants' misconduct and securities law violations as alleged herein.

7.      Defendant Veritas is a Delaware corporation that maintains its principal place of business in Mountain View, California. The Company was founded in 1989. Veritas describes itself as one of the ten largest software companies in the world, and the leading provider of storage management software for data protection, application availability, and disaster recovery. The Company trades under the symbol "VRTS" on the NASDAQ National Market System ("NASDAQ").

8.      Defendant Gary L. Bloom ("Bloom") :

        a.      Defendant Bloom joined Veritas in 2000 and was, at all relevant times, the Company's Chairman of the Board, President, and Chief Executive Officer. According to

2

the Company's website, Gary Bloom oversaw "all corporate and board functions and directs the company to ensure the attainment of sales and profit goals and maximum return on invested capital. He is responsible for devising current and long-range plans and objectives, and represents VERITAS in relations with its customers and the business and nonbusiness communities".

        b.      Defendant Bloom signed materially false statements filed with the Securities and Exchange Commission ("SEC"), including Veritas' Forms 10-K and 10-Q filed during the Class Period.

        c.      Defendant Bloom reviewed and approved the materially false and misleading Veritas press releases more particularly described below.

        d.      Defendant Bloom also made numerous materially false and misleading statements described below about Veritas on conference calls with analysts and to news media that were incorporated into analyst reports and news stories.

        e.      During the Class Period, while in possession of material undisclosed adverse information about Veritas, Defendant Bloom sold 54,500 shares of his personally held Veritas stock for proceeds of $1,927,702.

    9.      Defendant Edwin J. Gillis ("Gillis"):

        a.      Defendant Gillis was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer. At all times, according to the Company's website, "Gillis was responsible for overseeing all aspects of the Company's financial management, control, reporting, planning, and investor relations." Defendant Gillis joined Veritas in November 2002 at the request of Defendant Bloom, after the former Chief Financial Officer resigned in October 2002.

        b.      Defendant Gillis signed numerous materially false statements filed with the SEC, including Veritas' Forms 8-K, 10-K, and 10-Q filed during the Class Period.

        c.      Defendant Gillis reviewed and approved the materially false and misleading Veritas press releases more particularly described below.

    d.  Defendant Gillis also made numerous materially false and misleading statements described below about Veritas on conference calls with analysts and to the news media that were incorporated into analyst reports and news stories.

    e.  During the Class Period, while in possession of material undisclosed adverse information about Veritas, Defendant Gillis sold 90,000 shares of his personally held Veritas stock for proceeds of $2,878,758.92.

  10. Defendant John Brigden ("Brigden"):

    a.  Defendant Brigden joined Veritas in November 2001 at the request of Defendant Bloom, and was, at all relevant times, the Company's Senior Vice President, General Counsel, Chief Compliance Officer and Secretary. At all relevant times, according to the Company's website, he was "responsible for overseeing all legal matters, including corporate governance, intellectual property, contracts, strategic partnerships, disputes, and corporate transactions."

    b.  Defendant Brigden had specific responsibility for overseeing and reviewing contracts for Veritas' products and services, and determining whether, and how much, revenue could be properly recognized and included in the financial results issued during the Class Period and described below.

  11. Defendants Bloom, Gillis, and Brigden are referred to collectively herein as the "Individual Defendants."

  12. The Individual Defendants were, at all relevant times during the Class Period, controlling persons of Veritas within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants were top officials of Veritas and possessed the undisclosed adverse information about Veritas' business, accounting policies, financial condition, and present and future business prospects through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the board and committees thereof, and through reports and other information provided to them in connection therewith.

13.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Veritas' public filings, press releases and other publications as alleged herein are the collective actions of the Individual Defendants. Each of the Individual Defendants, by virtue of his high-level position with Veritas, directly participated in the management of Veritas, and was directly involved in the day-to-day operations of Veritas at the highest level. Each of the Individual Defendants was involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other publications. Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases, and statements detailed herein and is therefore primarily liable for the representations contained therein.

14.    As officers, directors, and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the NASDAQ Market, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to Veritas' financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Veritas' publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.    The Individual Defendants, because of their positions of control and authority as officers and controlling persons of Veritas, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Veritas during the Class Period.

5

16.     Each of the Individual Defendants was privy to confidential proprietary information concerning Veritas and its business, operations, prospects, growth, finances, and financial condition as alleged herein. Each of the Individual Defendants was aware of or recklessly disregarded that materially false or misleading statements were being issued regarding Veritas, and approved or ratified these statements in violation of the federal securities laws. The Individual Defendants caused, allowed and/or participated in the wrongdoing complained of herein in order to continue and prolong a distorted and misleading appearance of Veritas' continued profitability and financial condition and prospects.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Veritas common stock during the period between April 23, 2003 and July 6, 2004, inclusive (the "Class"). Excluded from the Class are the Company, its officers a nd directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which the Company has a controlling interest or of which the Company is a parent or subsidiary.

18.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impractical. The Company has more than 431 million shares of common stock issued and outstanding as of May 28, 2004. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

b.      Whether Defendants had a duty to disclose certain information;

6

c.      Whether Defendants acted knowingly or recklessly in making materially false and misleading statements or in failing to correct such statements upon learning that they were materially false and misleading during the Class Period;

d.      Whether the market price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

e.      Whether members of the Class have sustained damages and, if so, the proper measure of damages.

20.      Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of federal law as complained of herein.

21.      Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

22.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impractical. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL WITNESSES

23.      Many of the factual allegations contained in this complaint are attributable to the results of interviews with the following former employees of Veritas, who provided information on a confidential basis:

a.      Confidential Witness # 1 was an inside sales manager for the southeast region, and was so employed at Veritas during the Class Period until the end of the first quarter of 2004.

7

       b.     Confidential Witness # 2 was part of sales management at Veritas during the Class Period through most of the second quarter of 2004.

       c.     Confidential Witness # 3 worked in the legal department at Veritas throughout 2003 and had contract review responsibilities.

       d.     Confidential Witness # 4 worked in the legal department at Veritas during the Class Period, had responsibilities related to the negotiation of licenses, and had regular interaction with the finance department throughout the Class Period until the end of the first quarter of 2004.

       e.     Confidential Witness # 5 was a sales staff administrator at Veritas during the Class Period until the end of the 2003 and was involved with new contracts.

Each of the these Confidential Witnesses has first-hand, personal knowledge of the facts and circumstances attributed to that witness and alleged herein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

    24.     On April 23, 2003, Defendants issued a press release announcing, *inter alia*, Veritas' financial results for the first quarter of 2003 (the "First Quarter 2003 Press Release") The First Quarter 2003 Press Release stated, in pertinent part:

> VERITAS ...today announced financial results for the quarter ended March 31, 2003. Revenue for the quarter ended March 31, 2003 was $394 million, compared to revenue of $370 million for the same period a year ago. GAAP net income for the quarter ended March 31, 2003 was $43 million, or $0.10 per share, diluted, compared to a GAAP net income of $44 million, or $0.11 pershare, diluted, for the same period a year ago. Non-GAAP diluted earnings per share for the quarter ended March 31, 2003 was $0.17, compared to $0.16 for the same period a year ago.

The price of Veritas stock increased from a closing price of $20.28 on April 23, 2003 to $22.15 on April 24, 2003, on substantially higher volume.

    25.     On May 14, 2003, Defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the first quarter of 2003 (the "First Quarter 2003 10-Q"). The First Quarter 2003 10-Q reported the financial results set forth in the First Quarter Press Release. The First Quarter 2003

10-Q was signed by Defendant Gillis, and Defendants Bloom and Gillis signed certifications as to the truth of the representations in the First Quarter 2003 10-Q.

26.    On July 23, 2003, Defendants issued a press release announcing, *inter alia*, Veritas' financial results for the second quarter of 2003 (the "Second Quarter 2003 Press Release") The Second Quarter 2003 Press Release stated, in pertinent part:

> VERITAS ...today announced financial results for the quarter ended June 30, 2003. Revenue for the quarter ended June 30, 2003 was a record $413 million, compared to revenue of $365 million for the same period a year ago, representing 13% growth year over year. GAAP net income for the quarter ended June 30, 2003 was $49 million, or $0.11 per diluted share, compared to GAAP net income of $26 million, or $0.06 per diluted share, for the same period a year ago. Non-GAAP diluted earnings per share for the quarter ended June 30, 2003 was $0.19, compared to $0.14 for the same period a year ago. Non-GAAP diluted earnings per share exclude the effect of purchase accounting adjustments, such as the amortization of developed technology, amortization of other intangibles, in-process research and development expense, stock-based compensation expense, and the effect of other special items, such as the loss on strategic investments and related adjustments to provision for income taxes. A quantitative reconciliation of the differences between GAAP diluted earnings per share and non-GAAP diluted earnings per share is included in this press release.

The price of Veritas stock increased from a closing price of $27.91 on July 23, 2003 to $30.20 on July 24, 2003 on substantially higher volume.

27.    On August 19, 2003, Defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the second quarter of 2003 (the "Second Quarter 2003 10-Q") The Second Quarter 2003 10-Q reported the financial results set forth in the Second Quarter Press Release. The Second Quarter 2003 10-Q was signed by Defendant Gillis, and Defendants Bloom and Gillis signed certifications as to the truth of the representations in the Second Quarter 2003 10-Q.

28.    On October 22, 2003, Defendants issued a press release announcing, *inter alia*, Veritas' financial results for the third quarter of 2003 (the "Third Quarter 2003 Press Release") The Third Quarter 2003 Press Release stated, in pertinent part:

> VERITAS ...today announced financial results for the quarter ended September 30, 2003. Revenue for the quarter ended September 30, 2003 was a record $451 million, compared to revenue of $366 million for the same period a year ago, representing 23% growth year over year.

> GAAP net income for the quarter ended September 30, 2003 was $77.6
> million, or $0.18 per diluted share, compared to GAAP net income of
> $36.2 million, or $0.09 per diluted share, for the same period a year ago.
> Included in GAAP net income are charges related to amortization of
> intangibles and stock compensation of $5.1 million, net of taxes, write
> off of debt issuance costs in the amount of $3.1 million, net of taxes,
> and adoption of FASB Interpretation Number 46, "Consolidation of
> Variable Interest Entities", in the amount of $6.2 million, net of taxes.

The price of Veritas stock closed at $35.29 on October 21, 2003 on 4.7 million shares, $33.94 on

October 22, 2003 on 10.3 million shares and $35.70 on October 23, 2003 on 17.4 million shares.

29.    On November 14, 2003, Defendants filed with the SEC a Form 10-Q reporting Veritas'

financial results for the third quarter of 2003 (the "Third Quarter 2003 10-Q"). The Third Quarter 2003

10Q reported the financial results set forth in the Third Quarter Press Release. The Third Quarter 2003

10-Q was signed by Defendant Gillis, and Defendants Bloom and Gillis signed certifications as to the

truth of the representations in the Third Quarter 2003 10-Q.

30.    On January 28, 2004, Defendants issued a press release announcing, *inter alia*, Veritas'

results for the fourth quarter of 2003 and year-end 2003 (the "Fourth Quarter and Annual 2003 Press

Release"). The Fourth Quarter and Annual 2003 Press Release stated, in pertinent part:

> VERITAS ...today announced financial results for the quarter ended
> December 31, 2003. Revenue for the quarter ended December 31, 2003
> was a record $513 million, compared to revenue of $406 million for the
> same period a year ago, representing 26 percent growth year over year.
> Revenue for the year ended December 31, 2003 was $1.77 billion,
> compared to revenue of $1.51 billion for the same period a year ago,
> representing 18 percent growth year over year.

> GAAP net income for the quarter ended December 31, 2003 was $105.3
> million, or $0.24 per diluted share, compared to GAAP net loss of $49.4
> million, or $(0.12) per diluted share, for the same period a year ago.
> Included in GAAP net income are charges related to amortization of
> intangibles and stock compensation of $4.4 million, net of taxes, for the
> quarter ended December 31, 2003 and amortization of intangibles and
> special charges related to facilities restructuring, totaling $123.8 million,
> net of taxes, for the same period a year ago.

In addition, Defendant Bloom was quoted as saying:

> "Our outstanding fourth quarter performance is a culmination
> of a record-breaking year. We attribute this success once again
> to our focused execution on our growth strategy of expanding
> our product portfolio, delivering these products on a broad

10

> range of hardware and software platforms to further our heterogeneous advantage, and extending our reach worldwide by investing in sales and service capacity around the globe," said Gary Bloom, chairman, president and CEO, VERITAS Software. "The continued investment in our business, coupled with our focus on driving our product strategy through the eyes of the CIO, places VERITAS in a strong position for growth in 2004. While our growth depends on a continued IT spending recovery, our business is strong and we expect to drive the company to a target of $2 Billion in revenue in 2004." (Emphasis added)

In the January 28, 2004 announcement of Fourth Quarter 2003 financial results, Defendants also disclosed that they expected First Quarter 2004 earnings to decrease. The price of Veritas stock dropped from a closing price of $36.47 on January 28, 2004 to $32.24 on January 29, 2004, on substantially higher volume.

31.    Defendants' statements regarding its revenue, net income, and earnings per share, described in paragraphs 24-30 above, were materially false and misleading because these financial results included revenue that had been recognized from purported contracts which had not been signed, and for which actual terms were not agreed at the time the revenue was recognized, in violation of GAAP, as more particularly described below, and, as partially disclosed on March 15, 2004, and June 14, 2004, Veritas' revenue, net income, and earnings per share for each and every quarter of 2003 and for the year 2003 had been reported in violation of GAAP.

32.    On March 15, 2004, Defendants issued a press release (the "March 15, 2004 Press Release") announcing that its previously reported financial results had been overstated throughout 2003, and would be restated, although they attributed the overstatement to errors made prior to 2003, and did not yet admit that revenue had been improperly recognized during 2003. The March 15, 2004 Press Release stated, in pertinent part:

> VERITAS ... today announced that it will delay filing its annual report on Form 10-K for the year ended December 31, 2003, to restate the Company's financial statements for the years ended December 31, 2001 and December 31, 2002. The restatement is the result of an internal investigation, initiated by management and under the supervision of the audit committee

of the Board of Directors, with the assistance of independent legal and accounting experts. The financial statement for the year ended December 31, 2003 will be revised to reflect corrections of the prior periods and the settlement finalized today of tax audits related to the Company's 2000 acquisition of Seagate Technology.

On a preliminary basis, the restatement is expected to decrease 2001 revenues in the range of $1 million to $5 million from the previously reported $1.49 billion and to increase 2002 revenues in the range of $5 million to $10 million from the previously reported $1.51 billion. The Company expects that 2001 GAAP net loss will decrease and non-GAAP net income will increase in the range of $5 million to $10 million from the previously reported GAAP net loss of $642 million and non-GAAP net income of $291 million. The Company expects that 2002 net income will decrease in the range of $5 million to $10 million from the previously reported GAAP net income of $57 million and non-GAAP net income of $256 million. As a result of the adjustments to the prior periods, the Company also expects, on a preliminary basis, that revenues for the year ended December 31, 2003 will decrease in the range of $10 million to $15 million from the previously announced $1.77 billion. Net income for the same period is expected to decrease in the range of $15 million to $20 million from the previously announced GAAP net income of $274 million and non-GAAP net income of $353 million. (Emphasis added)

The investigation began as an internal matter reviewed in accordance with the Company's corporate governance processes, which ultimately led to an independent forensic accounting and legal investigation under the supervision of the audit committee of the Board of Directors. This investigation concluded on March 12, 2004 and identified certain accounting practices not in compliance with generally accepted accounting principles during 2002, 2001 and prior periods under the direction of former financial management. These practices included the incorrect deferral of professional services revenue and the unsubstantiated accrual of certain expenses, which had a positive impact in some periods and a negative impact in others. In addition, accounts receivables and deferred revenue were overstated by approximately $7 million at June 30, 2002. The expected adjustments for 2003 are primarily a consequence of correcting errors from the prior periods. (Emphasis added)

Announcement of these extraordinary restatements of the Company's financial results for 2001-2003 was accompanied by representations that the errors underlying the restatements were attributable to the misconduct of prior management:

> "Upon conclusion of the investigation, we decided that restating our reported financial statements was the appropriate course of action," said Gary Bloom, president, chairman and CEO. "The Company is committed to accurate financial reporting and our financial leadership has been substantially improved since the arrival of Ed Gillis, our chief financial officer, in November 2002."
>
> ....
>
> "While today's announcement is unfortunate, it does not change the fundamental strength of our business, as we drive the company to a target of $2 billion in revenue in 2004," Bloom continued. "We remain comfortable with our guidance for the first quarter, which included revenue in the range of $455 to $470 million and diluted earnings per share of $0.17 to $0.20, on a GAAP basis, and $0.18 to $0.21 on a non-GAAP basis."

The price of Veritas stock dropped from a closing price of $31.01 on March 12, 2004 to $29.14 on March 15, 2004 and $27.29 on March 16, 2004, on substantially higher volume.

33.     The statements made by Defendants on March 15, 2004 were materially false and misleading by concealing the inclusion in 2003 of revenue and earnings of contracts which had not been signed and for which actual terms were not agreed, as described in detail below. In addition, the statements were materially misleading in stating that the accounting errors were attributable to the conduct of prior management, when, in fact, current management were continuing to engage in accounting improprieties (including Defendant Brigden, who had been General Counsel since 2001).

34.     On April 21, 2004, Defendants issued a press release announcing, *inter alia*, Veritas' financial results for the first quarter of 2004 (the "First Quarter 2004 Press Release"). The First Quarter 2004 Press Release stated, in pertinent part:

> VERITAS Software Corporation (NASDAQ: VRTSE) today announced financial results for the quarter ended March 31, 2004. Revenue was $487 million, compared to revenue of $394 million for the same period a year ago, representing 24 percent growth year over year. GAAP net income for the quarter ended March 31, 2004 was $103.0 million, or $0.23 per diluted share, compared to GAAP net income of $42.5 million, or $0.10 per diluted share, for the same period a year ago. Included in GAAP net income are charges of $1.5 million, net of taxes, for the quarter ended March 31, 2004, and $27.6 million, net of taxes, for the same period a year ago, related to amortization of

13

> intangibles, in-process research and development, stock-based compensation and gains/losses on the sale of strategic investments.

In addition, Defendant Bloom was quoted as saying:

> "<u>Our strong first quarter financial results demonstrate the fundamental strength of our business strategy and the benefit of an improvement in IT spending,</u>" said Gary Bloom, chairman, president and CEO, VERITAS Software. "Through our strategic acquisitions and continued investment in organic product development, VERITAS <u>continues to deliver a successful portfolio of products to enable utility computing.</u> This quarter, we further extended our leadership in backup and storage software solutions, with some of the most significant upgrades to VERITAS products in the past 10 years. We remain focused on the fundamentals of our business and we are highly motivated to drive the company past our $2 billion revenue target in 2004." (Emphasis added)

In addition, Defendant Gillis was quoted as saying:

> "<u>Building on the strength of a solid first quarter,</u> we continue to view 2004 as an important growth year for VERITAS and expect revenue for our second quarter to be in the range of $490 million to $505 million and diluted earnings per share to be in the range of $0.21 to $0.23 on a GAAP basis." (Emphasis added)

On April 21, 2004, during a conference call (the "April 21, 2004 Conference Call") with analysts, investors, Defendant Gillis was quoted as saying, in pertinent part, that "Veritas won 246 deals worth more than $100,000, averaging about $190,000, in the quarter." The price of Veritas stock increased from a closing price of $27.82 on April 21, 2004 to $29.42 on April 22, 2004, on substantially higher volume.

35.    The statements on April 21, 2004 announcing the financial results of Veritas' First Quarter 2004 were materially false and misleading because Veritas' earnings were still based on contracts which were not signed and did not have complete terms as of the end of the quarter, as the conduct described above continued. On March 31, 2005, Veritas delayed (for a second time) its 2004 annual financial report and announced that an audit had found flaws in its accounting, including "significant deficiencies" in its order entry processes and its review of software license transactions.

14

36.    On May 5, 2004, at the Veritas Analyst Day in Las Vegas in conjunction with its annual users conference, Veritas announced to analysts that it reiterated its second quarter earnings guidance of $490 MM - $505 MM and $0.22-$0.24 according to a Piper Jaffray "Company Note" dated May 6, 2004.

37.    On June 14, 2004, Veritas issued a press release announcing the filing of its delayed annual report on Form 10-K for the year ended December 31, 2003 and its delayed quarterly report on Form 10-Q for the quarter ended March 31, 2004 (the "June 14, 2003 Press Release"), admitting for the first time that there had been premature and improper revenue recognition in 2003, that the downward adjustments for 2003 would be greater than previously announced, and that the First Quarter 2004 results would be adjusted downward. The June 14, 2003 Press Release stated, in pertinent part:

> VERITAS ... today announced that it has filed its Form 10-K for the year ended December 31, 2003, including restated financial statements for 2002 and 2001, the corresponding interim periods for 2002 and 2001 and the interim periods ended March, June and September 2003. The company has also filed its Form 10-Q for the quarter ended March 31, 2004. The company announced on March 15, 2004 that these filings would be delayed as a result of the restatement of its financial statements for 2002 and 2001 and the revision of its previously announced financial results for 2003.
>
> As a result of the restatement, the company has adjusted its financial results as follows: -
>
> For the quarter ended March 31, 2004, the company reported revenue of $486 million, a decrease of $1 million from the previously announced $487 million. Net income for the quarter was $100 million, a decrease of $3 million from the previously announced $103 million. -
>
> For the year ended December 31, 2003, the company reported revenue of $1.747 billion, a decrease of $24 million from the previously announced $1.771 billion. Net income for 2003 was $347 million, an increase of $73 million from the previously reported $274 million. Excluding the effect of the Seagate tax settlement, which increased net income by $95 million, net income would have decreased by $22 million.
>
> The company also confirmed its previous guidance for the quarter ending June 30, 2004. The company expects revenue to

> be in the range of $490 million to $505 million and GAAP
> earnings per share to be in the range of $0.21 to $0.23.
> (Emphasis added)

38.    On June 14, 2004, Veritas filed with the SEC its Form 10-K Annual Report for

2003 (the "2003 10-K")  The 2003 10-K reported the financial results set forth in the June 14,

2004 Press Release, and also stated, in pertinent part:

> We also made adjustments to 2003 that are unrelated to errors
> in prior periods. These 2003 adjustments, which related
> primarily to the deferral of revenue associated with several
> multiple element arrangements, decreased user license fees and
> services revenue by $4.4 million and $0.7 million, respectively.
> The adjustments unrelated to errors in prior periods are
> expected to be recognized as revenue in 2004.

Defendants Bloom and Gillis signed the 2003 10-K, and also signed certifications as to the truth

of the representations in the 2003 10-K.

39.    On June 14, 2004, Defendants filed with the SEC a Form 10-Q reporting

Veritas' financial results for the first quarter of 2004 (the "First Quarter 2004 10-Q"). The First

Quarter 2004 10-Q reported the financial results announced in the June 14, 2004 Press Release.

The First Quarter 2004 10-Q was signed by Defendant Gillis, and Defendants Bloom and Gillis

signed certifications as to the truth of the representations in the First Quarter 2004 10-Q.

40.    Defendants' representations in the 2003 10-K and First Quarter 2004 10-Q about

Veritas' historic results continued to be materially false and misleading because, as set forth

above, they:

        a.    included overstated earnings and failed to disclose that the earnings had

been achieved through recognition of revenue from contracts in violation of GAAP, and

        b.    concealed that Veritas' wrongful activities had not only occurred under

prior management but under current management as well.

41.    Defendants' misrepresentations concerning Veritas' financial results, described

in paragraphs 32 - 40 above were made knowingly or recklessly because, among other things:

16

a.       According to Confidential Witness # 4, the legal department was responsible for deciding when revenue could be recognized and reported.

b.       According to Confidential Witness # 3, Defendant Brigden approved contracts (knowing that they would therefore be included in revenue recognition) despite the facts that they lacked essential terms such as the price, and in some cases were unsigned by the customers. The revenue results for a quarter were determined before the quarter had ended, and the "fake" contracts were approved and recognized as revenue. At one point, when Confidential Witness # 3 protested that the contracts were incomplete, Defendant Brigden said to Confidential Witness # 3: "What's the difference?  We already know what the numbers for the quarter are." Defendant Brigden also fired highly regarded and honest employees and brought in employees who would do whatever he wanted, and began to insist on reviewing the large price contracts, such as with IBM, himself and not letting other contract reviewers handle them. Confidential Witness # 3 saw some of the large price contracts, and they lacked critical terms such as the price. Booking revenues on contracts that had not been signed, or lacked essential terms such as the price, was standard practice at least through 2003, according to Confidential Witness # 3.

c.       According to Confidential Witness #5, during the Class Period at least through 2003 there was great pressure from Veritas' management to report revenue sufficient to meet earnings estimates, and as a result, sales personnel would "all the time" write up and process contracts without essential terms and customer signatures, in order to meet revenue targets and "bolster the numbers."

42.     In the announcements during March - June 2004, Defendants combined partial disclosures of negative material information about improper revenue recognition with very positive but false information about Veritas' financial condition and projected earnings, which blunted the negative impact on the share price, including but not limited to the statement in the June 14, 2004 Press Release that "[t]he adjustments unrelated to errors in prior periods are

17

expected to be recognized as revenue in 2004," and the affirmations and reaffirmations of projections of revenue and earnings for the Second Quarter of 2004 (which would end on June 30, 2004) which Defendants made on April 21, 2004, May 5, 2004 and June 14, 2004. Defendants were thus able to maintain the artificial inflation in Veritas' shares.

43.     The announcements of earnings guidance for the Second Quarter 2004 on April 21, 2004, May 5, 2004 and June 14, 2004 - which was only sixteen (16) days before the quarter was to end on June 30, 2004 - were knowingly false and misleading because:

a.     The guidance was premised upon a base of revenue that included revenue from contracts which had not been signed but had already been included in revenue and earnings in earlier quarter.

b.     According to admissions made by Defendant Bloom in a conference call with analysts on July 27, 2004 concerning Veritas Second Quarter 2004 earnings release, at which Defendants Bloom and Gillis made the entire presentation and answered all of the questions posed by analysts/investors, Defendants knew prior to making their projections of Veritas' revenue and income for the Second Quarter of 2004 that U.S. direct enterprise transactions worth over $100,000 each were a critical measure for Veritas' business, that such transactions had decreased from 286 for the quarter ended December 31, 2003 to 246 for the quarter ended March 31, 2004, and that their projections were dependent upon closing more of such U.S. direct enterprise transactions than they had closed in the prior quarter.

c.     According to admissions made by Defendant Bloom during the conference call with analysts on July 27, 2004, throughout the Second Quarter of 2004, the problems stemming from the restatement and accounting issues "did require significant time and attention from our executive team" and were therefore having an impact on sales, which had been concealed from investors.

d.     As Defendant Bloom also admitted during the July 27 conference call, Defendants knew during the second quarter that "customer buying patterns in enterprise

18

accounts became more cautious during the second quarter, leading to longer sales cycles and a smaller average deal size."

e.    As a result of the foregoing, Defendants knew that Veritas would need well over 246 direct enterprise transactions worth over $100,000 in the U.S. in the Second Quarter 2004 to achieve the forecast, but that there was no basis for believing that Veritas could achieve that level, nor did Defendants believe that such a level could reasonably be achieved. In fact, even with the sales at the very end of the quarter, Veritas only obtained 201 of these transactions during the entire Second Quarter of 2004, as disclosed on the July 27, 2004 conference call with analysts.

44.    On July 6, 2004, only three weeks after the Company confirmed its second-quarter 2004 expectations of revenue in the range of $490 million to $505 million and GAAP earnings per share in the range of $0.21 to $0.23, Veritas shocked the market by announcing that the Company's second-quarter 2004 revenues would actually be "in the range of $475 million to $485 million" and that its GAAP earnings per share would "be in the range of $0.17 to $0.19." As a result of this news, on July 7, 2004, the Company's share price plunged 36% from $26.55 to $17.00 on heavy trading volume. According to statements made by Defendants Bloom and Gillis on the conference call with analysts on July 27, 2004 and in a presentation to analysts/investors on August 11, 2004, the reason for Veritas' revenue and earnings shortfall was a shortfall of approximately $30 million in the U.S. direct enterprise business, resulting from closing only the 201 contracts over $100,000.

## ADDITIONAL SCIENTER ALLEGATIONS

### Veritas' Deteriorating Financial Condition During the Class Period

45.    As set forth below, during the Class Period Veritas' financial condition deteriorated due to diminishing demand and sales:

a.    A key part of Veritas' strategy during the Class Period was to convince existing customers to purchase upgrades, renew their maintenance licenses and buy consulting

19

services, according to Confidential Witness # 1. Upgrades were the largest source of new revenue from existing clients, and in order to sustain that source of revenue, Veritas had to continually have fresh new products and ideas in the pipeline, according to Confidential Witness # 2. Confidential Witness # 1 explained that to obtain the new products to use as upgrades, Veritas was forced to buy small companies who had products that could be used as upgrades to Veritas' software products. Most of the upgrades were from the storage/high availability products and APM (application product management) line, according to Confidential Witness # 1. Most of the revenue from existing customers came from the sale of the upgrades according to Confidential Witness # 1.

       b.      According to Confidential Witness # 1, in 2003 and 2004, the Company had seven major upgrades in the APM area, but they sold poorly, resulting in sales that were only a small fraction of what Veritas had projected internally would sell.

       c.      Another disappointing sales effort during the Class Period was with respect to consulting services. Defendant Bloom's business model depended on increased revenue from consulting services, which never materialized, according to Confidential Witness # 1. The Company instructed the sales people in 2003 that 10 percent of sales should be coming from consulting services area. Confidential Witness # 1 also said that based on what the Veritas executives were telling the salespeople, consulting services revenue must have been part of the revenue estimates, but that consulting service revenue was a minuscule percentage in 2003, it did not grow at any meaningful level, and there was no reasonable basis to consider that consulting service revenue could be such an important revenue component.

       d.      According to Confidential Witness # 2, Veritas was also unsuccessful in many of its attempts to renew existing business in 2003 and 2004, including their efforts to renew contracts with their large company clients, due to poor customer service, the lack of integration of customer service effort into the sales effort, and the fact the large companies were experiencing fiscal difficulties.

        e.      According to Confidential Witness # 3, demand for new licenses also dropped in 2003 and did not recover during the Class Period. And, according to Confidential Witness # 1, at the end of the first quarter of 2004, practically none of the sales people had met their quotas for the quarter.

        f.      As a result of the downturn in demand, and the resulting need to cut costs, was also evidenced by the fact that even though, people who left during the first quarter of 2004 were not replaced, despite the fact that Veritas was understaffed, according to Confidential Witness # 4.

46.      Sales by Defendants Bloom and Gillis of their personal shares of Veritas stock also support a strong inference that Defendants' misrepresentations were made with scienter. During the Class Period, Defendants Bloom and Gillis sold shares as follows:

| Defendant | Date | Shares Sold | Price | Approx. Proceeds |
|---|---|---|---|---|
| Bloom | 11/10/03 | 4000 | $38.69 | $154,754.00 |
| Bloom | 11/10/03 | 3500 | $38.70 | $135,460.00 |
| Bloom | 11/24/03 | 4000 | $35.96 | $143,844.00 |
| Bloom | 11/24/03 | 3500 | $35.89 | $125,597.00 |
| Bloom | 12/08/03 | 3500 | $36.50 | $127,757.00 |
| Bloom | 12/08/03 | 4000 | $36.49 | $145,950.00 |
| Bloom | 12/22/03 | 4000 | $36.32 | $145,260.00 |
| Bloom | 12/22/03 | 3500 | $36.31 | $127,079.00 |
| Bloom | 01/05/04 | 4000 | $36.99 | $147,973.00 |
| Bloom | 01/05/04 | 3500 | $36.99 | $129,459.00 |
| Bloom | 01/12/04 | 5000 | $40.00 | $200,000.00 |
| Bloom | 01/20/04 | 5000 | $40.11 | $200,550.00 |
| Bloom | 01/20/04 | 3500 | $39.92 | $139,708.00 |
| Bloom | 01/20/04 | 4000 | $39.92 | $159,664.00 |
| Bloom | 02/02/04 | 3500 | $33.41 | $116,943.00 |
| Bloom | 02/17/04 | 3500 | $32.95 | $115,328.00 |
| Bloom | 03/01/04 | 3500 | $30.57 | $107,000.00 |
| **Bloom** | **TOTAL** | **65,500** | | **$2,422,326.00** |

| Defendant | Date | Shares Sold | Price | Approx. Proceeds |
|-----------|------|-------------|-------|------------------|
| Gillis | 11/10/03 | 99 | $38.67 | $3,828.00 |
| Gillis | 11/10/03 | 2500 | $37.90 | $94,750.00 |
| Gillis | 11/10/03 | 1400 | $38.66 | $54,124.00 |
| Gillis | 11/10/03 | 1001 | $38.65 | $38,688.00 |
| Gillis | 11/10/03 | 2500 | $38.50 | $96,250.00 |
| Gillis | 11/10/03 | 2500 | $37.95 | $94,875.00 |
| Gillis | 11/24/03 | 2500 | $35.92 | $89,800.00 |
| Gillis | 11/24/03 | 50 | $35.97 | $1,798.00 |
| Gillis | 11/24/03 | 2450 | $35.96 | $88,102.00 |
| Gillis | 11/26/03 | 5000 | $38.10 | $190,500.00 |
| Gillis | 12/08/03 | 5000 | $37.00 | $185,000.00 |
| Gillis | 12/16/03 | 300 | $36.62 | $10,986.00 |
| Gillis | 12/16/03 | 100 | $36.61 | $3,661.00 |
| Gillis | 12/16/03 | 2100 | $36.60 | $76,860.00 |
| Gillis | 12/16/03 | 2500 | $36.54 | $91,350.00 |
| Gillis | 12/29/03 | 4700 | $36.75 | $172,725.00 |
| Gillis | 12/29/03 | 300 | $36.75 | $11,025.00 |
| Gillis | 12/29/03 | 5000 | $36.88 | $184,400.00 |
| Gillis | 01/05/03 | 5000 | $37.00 | $185,000.00 |
| Gillis | 01/05/03 | 5000 | $37.33 | $186,650.00 |
| Gillis | 01/20/04 | 100 | $40.10 | $4,010.00 |
| Gillis | 01/20/04 | 4600 | $40.12 | $184,552.00 |
| Gillis | 01/20/04 | 300 | $40.13 | $120.00 |
| Gillis | 01/20/04 | 5000 | $40.17 | $200,850.00 |
| Gillis | 02/06/04 | 2500 | $33.05 | $82,625.00 |
| Gillis | 02/06/04 | 2500 | $33.11 | $82,775.00 |
| Gillis | 02/06/04 | 5000 | $33.49 | $167,450.00 |
| Gillis | 02/18/04 | 100 | $33.64 | $3,364.00 |

22

| Defendant | Date | Shares Sold | Price | Approx. Proceeds |
|---|---|---|---|---|
| Gillis | 02/18/04 | 4900 | $33.63 | $164,787.00 |
| Gillis | 02/18/04 | 2500 | $33.15 | $82,875.00 |
| Gillis | 02/18/04 | 2500 | $33.14 | $82,850.00 |
| Gillis | 03/04/04 | 5000 | $30.75 | $153,750.00 |
| Gillis | 03/04/04 | 5000 | $31.00 | $155,000.00 |
| **Gillis** | **TOTAL** | **90,000** | | **$3,225,380.00** |
| | | | | |
| **Bloom and Gillis** | **TOTAL** | **155,500** | | **$5,647,706.00** |

47.     The sales by the Individual Defendants Bloom and Gillis during the Class Period were unusual in their timing. Defendants Bloom and Gillis did not sell any Veritas shares at any time prior to the Class Period, although they had been officers of Veritas for years (Bloom since 2000). In addition, many sales by Bloom and Gillis were made during late December 2003 and in January 2004 after the results for the Fourth Quarter 2003 were known but before announcements of results. In addition both Bloom and Gillis sold stock after January 28, 2004 and before March 12, 2004, when an investigation of Veritas' accounting errors was in progress but had not yet been reported publicly.

48.     The sales by the Individual Defendants Bloom and Gillis were all part of combined transactions where they exercised options for about $16.00 a share and then immediately sold them at the artificially inflated prices set forth above, not retaining any shares. Individual Defendants Bloom and Gillis sold 65,500 and 90,000 shares, respectively, and after selling their stock owned only 3,392 and 994 shares respectively.

49.     In June 2003, Veritas used 7.3 million shares of its common stock, valued at $210.6 million as a result of the artificial inflation caused by Defendants' misrepresentations, as part of its acquisition of Precise Software Solutions, Ltd.

50.     Individual scienter is also strongly inferred because of the nature and timing of the Change of Control agreements entered into by the Individual Defendants with Veritas. Although the Individual Defendants had been in control of Veritas for years, and Veritas (through Defendant Bloom) publicly stated in late 2003 that it was seeking to be an acquirer of other companies, the Individual Defendants entered into Change of Control agreements in March 2004, in the midst of accounting investigations, because the Individual Defendants recognized that the price of the shares would likely fall upon the disclosure of Veritas' problems, thereby making Veritas an attractive candidate for acquisition. The Change of Control agreements executed by each of the Individual Defendants guaranteed them windfall financial benefits including accelerated vesting of options upon a change in control. In the event of an Individual Defendant's departure within twelve months of the change in control, the Individual Defendant is guaranteed salary continuation and 100 % of target bonuses, among other benefits. None of the analysts had been talking about Veritas as an acquisition candidate before, but analysts recognized that Veritas might be acquired after the drop in price of Veritas' shares, as noted by Piper Jaffray in its Company Note dated July 6, 2004:

> Even though there has been no talk of it to our knowledge we believe there could be some potential for a takeout of VERITAS at this historically low valuation. With the top executives signing a change of control agreement in March of 2004 (same date as the restatement announcement) we feel they see potential for a take out and wanted to protect themselves in case a change of control occurs.

51.     Defendants' misrepresentations of earnings throughout 2003 and the first quarter of 2004 were material. Not only was the improper recognition of revenue (and resulting overstatements of earnings) material as a portion of reported earnings but the improper recognition of revenue was done for the purpose of enabling - and in fact enabled - Veritas to meet or exceed estimates of earnings published by the Company and various analysts.

52.     As a result of defendants' materially false and misleading statements during the Class Period, Plaintiffs and other Class members suffered damages because the price of the

24

Company's securities was artificially inflated when Plaintiffs and other Class members purchased them as a result of Defendants' material misrepresentations, and the inflation in the price of Veritas' stock was removed at or before the end of the Class Period, including as Defendants' misrepresentations or their effects became known.

## Fraud on the Market Presumption

53.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations or failed to disclose material facts regarding Veritas' financial situation during the Class Period;

b.    the omissions and misrepresentations were material;

c.    the securities of the Company were actively traded at all relevant times on the NASDAQ, an efficient and open market; Veritas stock was followed by numerous analysts and traded in a market with numerous market makers;

d.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.    Plaintiffs and the members of the Class, without knowledge of the misrepresented facts, purchased their Veritas stock while the price was artificially inflated due to Defendants' misrepresentations; and

f.    The price of Veritas' stock reflects the effect of news disseminated in the market.

54.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## The Safe Harbor Provision is Inapplicable

55.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be materially false and misleading herein all relate to then-existing

25

facts and conditions. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Veritas who knew that those statements were false when made.

## COUNT I

### For Violations of Sections 10(b) and Rule 10b-5 Thereunder

#### *(Against All Defendants)*

56.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Veritas securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

58.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Veritas securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Veritas as specified herein.

60.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Veritas value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Veritas and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Veritas securities during the Class Period.

61.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

27

62.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Veritas operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

63.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Veritas securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Veritas publicly-traded securities were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Veritas securities during the Class Period at artificially high prices and were damaged thereby.

64.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Veritas was experiencing, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired, their Veritas securities,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule l0b-5 promulgated thereunder.

66.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**For Violation Of Section 20(a) Of The Exchange Act**

*(Against the Individual Defendants)*

67.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of Veritas within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are materially false and misleading. The Individual Defendants signed false and misleading Form 10-Q's and Form 10-K's filed with the SEC and certified the truth of the representations contained therein. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

29

69.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.    As set forth above, each of the Defendants culpably participated in the misrepresentations.

71.    As set forth above, Veritas and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

Dated: May 27, 2005

Respectfully submitted,

**ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.**

By: _____

Norman Monhait (DSBA # 1040)
Citizens Bank Center, Suite 1401
19 Market Street
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel. (302) 656-4433
Fax (302) 658-7567

*Liaison Counsel for Plaintiffs*

**GOODKIND LABATON RUDOFF
& SUCHAROW LLP**
David J. Goldsmith, Esq.
Shelley Thompson, Esq.
100 Park Avenue
New York, New York 10017
Tel. (212) 907-0700
Fax (212) 818-0477

**SCHATZ & NOBEL, P.C.**
Andrew M. Schatz, Esq.
Barbara F. Wolf, Esq.
One Corporate Center
20 Church Street, Suite 1700
Hartford, Connecticut 06103
Tel. (860) 493-6292
Fax (860) 493-6290

**WECHSLER HARWOOD LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq.
488 Madison Avenue
New York, New York 10022
Tel. (212) 935-7400
Fax (212-753-3630

*Co-Lead Counsel for Plaintiffs*

31