new licenses dropped in 2003 and did not recover. CW#4 allegedly had responsibilities relating to negotiation of licenses and interacted with finance until the end of first quarter (April 21, 2004). He or she claims that, as a result in drop in demand, people who left in the first quarter were never replaced. Since both of these sources allegedly left VERITAS' employ prior to the Second Quarter 2004, neither of them could have personal knowledge of the factors contributing to VERITAS' Second Quarter shortfall. Like CW#1, neither CW#3 nor CW#4 is alleged to have participated in VERITAS' revenue forecasting process or to have had any knowledge of the state of VERITAS' sales on a nationwide or worldwide basis.

Indeed, the only confidential witness allegedly employed in the Second Quarter 2004 is CW#2, who was allegedly "part of sales management" in VERITAS through most of Second Quarter 2004. CW#2 recounts VERITAS' allegedly unsuccessful attempts to renew existing business because of poor customer service, lack of integration of customer service and sales effort, and fiscal difficulties of larger customers. Not only is CW#2's account devoid of any details, such as the names of dissatisfied customers who did not renew their business, but also CW#2 fails to explain how any of these alleged problems contributed to the quarterly shortfall. *See Party City*, 147 F. Supp. 2d at 301 (dismissing case where plaintiffs failed to allege how supposed deficiencies in internal financial and accounting systems affected the financial results); *see also In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 549-50 (8th Cir. 2004) (affirming dismissal where "facts alleged show that one or two projects were not going well, that one geographic sector of Amdocs' business was underperforming, . . . that some offices were experiencing layoffs, and that some employees were unhappy. Without any allegations

regarding the effect these compartmentalized conditions had on the *overall* demand and visibility experienced by Amdocs, the plaintiffs' complaint fails to meet the Reform Act's heightened pleading standard for falsity.").

      **B.**      **Plaintiffs Fail To Plead Adequately That Defendants "Actually Knew" The Q2 2004 Guidance Was False When Made**

Since plaintiffs failed to plead falsity adequately, they also fail to plead facts raising a strong inference that any of the defendants acted with the required state of mind. *See Karacand v. Edwards*, 53 F. Supp. 2d at 1252-53 ("Where plaintiffs fail to plead falsity, *a fortiari* they have not established that defendants knew those statements were false.") (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)); *Winer Family Trust v. Queen*, No. 03-4318, 2005 U.S. Dist. LEXIS 652, at *43 (E.D. Pa. Jan. 13, 2005) (holding that without sufficient allegations that statements were false, "the court cannot infer that Defendants acted negligently, much less with scienter, in making the challenged statements") (attached hereto as Exhibit G).

To plead scienter adequately in connection with forward-looking statements, plaintiffs must allege facts demonstrating that defendants had "actual knowledge" of alleged falsity. 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiffs offer no allegations demonstrating that any of the defendants actually knew VERITAS' guidance for the Second Quarter 2004 was false when made. Indeed, since VERITAS' Second Quarter 2004 revenue fell only $5 million short of the low end of the range previously estimated ($490 million), it strains credulity that defendants had actual knowledge of the 1% miss beforehand.

Instead of pleading facts demonstrating actual knowledge, plaintiffs resort to allegations that defendants must have known of the miss beforehand by virtue of their positions. It is well-established, however, that an inference of fraud cannot be made by virtue of an officer's position at the company. *See Advanta Corp.*, 1998 WL 387595, at *7 (*citation omitted*) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions."); *Alpharma*, 372 F.3d at 149 (rejecting allegations that rested upon the premise that individual defendants were liable simply by virtue of their positions within the defendant corporation).

Similarly, plaintiffs attempt to rely on "motive and opportunity" allegations to plead the requisite fraudulent intent. Yet, none of the defendants sold any stock in the three-month period between April 21, 2004 (the day guidance for the Second Quarter 2004 was first announced) and July 6, 2004. *See Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (no inference of scienter when sales occurred prior to alleged fraudulent increase in stock price); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094-95 (9th Cir. 2002). *See also Party City*, 147 F. Supp. 2d at 313 ("A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."); *In re AFC Enters. Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (sales "well in advance" of negative disclosure do not support a strong inference of scienter); *In re Keyspan Corp. Sec. Litig.*, 01 CV 5852, 2003 U.S. Dist. LEXIS 20964, at *25 (E.D.N.Y. Nov. 21, 2003) ("Where the alleged insider trading occurs either well after any of the alleged false statements, or well before the public revelation of bad news . . . courts have

consistently found the inference of scienter to be attenuated.") *(citations omitted)* (attached hereto as Exhibit H).

### IV. PLAINTIFFS FAIL TO PLEAD ADEQUATELY LOSS CAUSATION WITH RESPECT TO THEIR ACCOUNTING CLAIMS

Plaintiffs' remaining accounting fraud allegations can be disposed of in their entirety because plaintiffs fail to plead adequately loss causation.

To plead a claim under Section 10(b), plaintiffs must plead that the alleged misrepresentations proximately caused the decline in the security's value. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000). As this Circuit has previously held, "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that this is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price." *Id.* at 185 *(citation omitted)*.

The Supreme Court has recently confirmed the pleading requirements for loss causation in *Dura Pharmaceuticals, Inc. v. Broudo v.*, 125 S. Ct. 1627 (2005). In *Dura*, defendant Dura Pharmaceuticals, Inc. ("Dura") announced that its earnings would be lower than anticipated as the result of slow drug sales. Plaintiffs filed suit shortly thereafter. Approximately eight months later, Dura announced that the Federal Drug Administration would not approve its asthmatic spray device. Plaintiffs then alleged that their economic losses were attributable to alleged spray device misstatements because plaintiffs had allegedly paid artificially inflated prices for Dura stock when these misstatements were made. *Id.* at 1629-30. The Supreme Court disagreed, holding that

24

loss causation requires plaintiffs to allege a proximate, causal connection between the alleged misrepresentation and the subsequent decline in the price of their stock. *Id.* at 1631-32, 1634.

In reaching its decision, the Supreme Court recognized the important securities law objective of protecting investors against "those economic losses that misrepresentations actually cause," rather than transforming the securities action into a "partial downside insurance policy" against losses in general. *Id.* at 1633-34.[16] The *Dura* plaintiffs failed to satisfy this requirement because they alleged only that their losses consisted of "artificially inflated" purchase prices but failed "to claim that Dura's share price fell significantly after the truth became known." *Id.* at 1634.

Here, plaintiffs filed their initial complaint on July 7, 2004, just one day after VERITAS announced that its revenue and earnings would be lower than anticipated as the result of weakness in U.S. enterprise sales. VERITAS' stock price declined from $26.55 to $17 on this announcement. ¶44. Approximately 10 months later, plaintiffs filed the CAC, claiming that VERITAS' financial statements issued between April 23, 2003 and April 21, 2004 were false by virtue of alleged improper revenue recognition. ¶¶1, 31, 33. Plaintiffs allege that they suffered losses as a result of the issuance of these allegedly false financial statements "because the price of the Company's securities was artificially inflated when Plaintiffs and the other Class members purchased them as a result of Defendants' material misrepresentations, and the inflation in the price of

---

[16] *See also* S. Rep. No. 104-98, 1995 U.S.C.C.A.N. 679, 686 (1995) (with the Reform Act, Congress sought to ensure "that plaintiffs prove that the loss in the value of their stock was caused by the Section 10(b) violation and not by other factors").

Veritas' stock was removed at or before the end of the Class Period, including as Defendants' misrepresentations or their effects became known." ¶52.[17]

Under *Dura*, plaintiffs must allege not only that their losses consisted of "artificially inflated" purchase prices but also that VERITAS' "share price fell significantly after the *truth* became known." *Dura*, 125 S. Ct. at 1634 (emphasis added). VERITAS did not address revenue recognition, let alone the accuracy of its previously filed financial statements. VERITAS' July 6, 2004 announcement disclosed a quarterly shortfall in its previously issued guidance. Consequently, the only alleged "truth" that could have caused VERITAS' stock price to decline on July 6, 2004 was the missed forecast announcement. Plaintiffs' losses, therefore, could not have been caused by alleged improper revenue recognition as a matter of law. *See D.E. & J. Ltd. Partnership v. Conaway*, Nos. 03-2334, 03-2417, 2005 WL 1386448, at *6 (6th Cir. June 10, 2005) (affirming dismissal on loss causation grounds where plaintiffs failed to allege that Kmart's bankruptcy announcement disclosed any prior misrepresentations to the market) (attached hereto as Exhibit I); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401 (D.N.J. 2004) (dismissing allegations relating to alleged scheme to overstate revenue where plaintiffs filed the complaint after the company announced that it would sustain reduced earnings in 2002, but plaintiffs failed to allege "a causal nexus between the [] scheme and the drop in NUI's stock price following the October 18, 2002 announcement.").

---

[17] Plaintiffs do not – and cannot – allege a claim premised on losses resulting from VERITAS' announcement on March 15, 2004 that it would restate its financial results because both Co-Lead Plaintiffs purchased their VERITAS securities *after* this announcement was made. *See Semerenko v. Cendant Corp.*, 223 F.3d at 181 (holding that it was unreasonable for class members to rely on prior financial statements following disclosure of accounting irregularities).

Since VERITAS' July 6, 2004 announcement did not reveal that any previously issued financial statements did not comply with generally accepted accounting principles (GAAP), their losses have no causal connection to the alleged improper revenue recognition, and their accounting fraud allegations should be dismissed.[18]

## V.   PLAINTIFFS FAIL TO PLEAD ADEQUATELY A CLAIM BASED ON ALLEGED IMPROPER REVENUE RECOGNITION

Plaintiffs also fail to plead adequately that VERITAS' financial results were false, fail to plead sufficient facts to support their assertions of falsity, and fail to plead adequately facts demonstrating that defendants were deliberately reckless in issuing these financial statements on account of alleged improper revenue recognition.

Plaintiffs allege that VERITAS' financial results for 2003 and the first quarter of 2004 were misstated because they contained revenue that had been allegedly recognized improperly from contracts which were either unsigned or lacked essential terms. ¶¶1, 31, 33. Plaintiffs also claim that VERITAS' restatement, announced on March 15, 2004, failed to disclose this alleged improperly recognized revenue, as well as the alleged involvement of current management. ¶¶33, 40.

To satisfy the Reform Act and Rule 9(b) with respect to alleged accounting fraud, plaintiffs must allege specifics such as the dates, transactions, customer names and amounts by which revenue was allegedly misstated. *See In re Loewen Group Inc. Sec.*

---

[18] *See also In re Parmalat Sec. Litig.*, No. 04 MD 1653, 2005 U.S. Dist. LEXIS 12553, at *77-78 (S.D.N.Y. Jun. 28, 2005) (finding causal nexus between disclosed liquidity crisis and outside auditors' prior issuance of certification of financial statements, which failed to disclose risk posed by massive undisclosed debt) (attached hereto as Exhibit J); *In re Initial Public Offering Sec. Litig.*, Nos. MDL 1554, 21 MC 92, 2005 WL 1529659, at *3 (S.D.N.Y. Jun. 28, 2005) (holding that the common thread in the Second Circuit decisions is that the loss must be foreseeable and be caused by the materialization of the concealed risk) (attached hereto as Exhibit K).

27

*Litig.*, No. 98-6740, 2003 WL 22436233, at *10 (E.D. Pa. July 16, 2003) (dismissing case where plaintiffs failed to "plead facts that would demonstrate which accounts were unlikely to be collectible, when and by what level the accounts receivable figure on Loewen Group's books should have been decreased, why the allowances Loewens Group set aside for uncollected accounts receivable were unreasonable or how many accounts were in fact uncollectible.") (attached hereto as Exhibit L); *see also Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999) (*citations omitted*) (holding that improper revenue recognition allegations must include "some particular transaction in which revenues were improperly recorded, the name of the customer, the terms of the specific transaction, when the transaction occurred, and the approximate amount of the fraudulent transaction.").[19]

Here, plaintiffs fail to identify a single contract that was unsigned or for which material terms had not been agreed to prior to revenue recognition. *Compare In re SCB Computer Technology, Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 347-49 (W.D. Tenn. 2001) (finding claims sufficient where plaintiffs alleged that company had overstated revenues by $1,877,000, of which amount at least $1,650,000 was improperly recognized on unexecuted contracts relating to the sale of computer equipment leases to Quest). Moreover, plaintiffs fail to allege the amount by which revenue was purportedly overstated. Without this critical detail, there is no way of knowing whether or how the

---

[19] *Cf. In re K-Tel International, Inc. Sec. Litig.*, 300 F.3d 881, 889-93 (8th Cir. 2002) (affirming dismissal and stating, "[w]hile the allegations contained in the complaint may withstand standard notice pleading, such allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets.").

alleged improper revenue recognition affected VERITAS as a whole. *Revlon*, 2004 WL 2210269, at *16 ("The complaint here describes the financial misstatements it alleges as 'material.' It fails, however, to even attempt to approximate the magnitude or degree of those misstatements in relation to Revlon's total financial picture."); *Midway Games*, 332 F. Supp. 2d at 1169-70 (dismissing complaint where plaintiffs failed to plead amount of alleged overstatement due to reserve accounting or net effect on the company's earnings).

Plaintiffs also allege no facts to support their claim that VERITAS recognized revenue improperly. Instead, they again base their allegations on alleged former employees but fail to provide sufficient facts to demonstrate these sources would possess the knowledge they claim. Plaintiffs rely principally on CW#3, an alleged former employee in the legal department who had "contract review responsibilities." ¶23(c). CW#3 allegedly told plaintiffs that Mr. Brigden approved contracts "knowing they would therefore be included in revenue recognition" although they lacked essential terms, such as price, and, in some cases, were not signed. According to CW#3, Mr. Brigden said, at one point, "What's the difference? We already know what the numbers for the quarter are." ¶41(b).

Plaintiffs' allegations premised on CW#3's account fail to meet the pleading requirements because they fail to allege any particulars. *See Chubb Corp.*, 394 F.3d at 152-54 (rejecting accounting fraud allegations based on former employee accounts where, among other things, plaintiffs failed to provide any particulars regarding "the amount by which reserves were distorted, or how much revenue was improperly recognized."); *Freed v. Universal Health Services, Inc.*, 2005 WL 1030195, at *9 (same). Plaintiffs fail to identify a single contract that Mr. Brigden supposedly approved

29

notwithstanding the lack of a customer signature or a material term. They also fail to allege how many contracts of this nature he supposedly approved, when they were approved or their amounts.[20] Completely absent from the CAC is any indication when and how this allegedly improperly recognized revenue affected VERITAS' financial statements. Since VERITAS' financial statements for 2003 were certified by its independent auditors, CW#3's account is even more suspect. Ex. B at 140.

Plaintiffs also rely on CW#4, an individual who allegedly worked in the legal department, had responsibilities relating to the negotiation of licenses, and regularly interacted with the finance department. CW#4 asserts that "the legal department was responsible for deciding when revenue could be recognized and reported." ¶41(a). Plaintiffs fail to allege any basis for this assertion, which is not remotely plausible since revenue recognition is an accounting function, not a legal function – as reflected in VERITAS' public filings identifying revenue recognition as one of VERITAS' critical *accounting* policies. *See* 2003 10-K at 47, 102, Ex. B.

Finally, plaintiffs refer to CW#5, a former sales staff administrator employed at VERITAS until the end of 2003 who was allegedly "involved with" new contracts. ¶23(e). CW#5 claims that sales staff would "all the time" write up and process contracts without essential terms and customer signatures to meet targets and "bolster the

---

[20] While CW#3 identifies IBM by name, his or her allegation relating to IBM is comprised solely of the assertion that Mr. Brigden reviewed large contracts himself, "such as [] IBM." ¶41(b). There is nothing fraudulent about a General Counsel's reviewing the terms of large transactions. CW#3 does not assert that any revenue from IBM was recognized improperly. Even if this assertion were made, identifying the name of one customer does not begin to satisfy the particularity requirements for a Section 10(b) claim. *Revlon*, 2004 WL 2210269, at *13 (rejecting allegation that Revlon overstated its sales by shipping and booking unordered sales where the only detail provided was the name of one customer that had allegedly received unordered product).

numbers." ¶41(c). CW#5's account is unreliable because plaintiffs fail to allege where CW#5 worked, how he or she was "involved" with new contracts, what it means to "process" contracts, or how, as a sales staff administrator, CW#5 would have any involvement with the finance department or the revenue recognition process. Plaintiffs fail to identify by name, date or number, any of these supposed contracts. Since CW#5 does not contend that VERITAS recognized revenue from any of these contracts written up by salespeople, his or her account cannot support a claim for securities fraud.[21]

## VI. PLAINTIFFS FAIL TO PLEAD ADEQUATELY FACTS RAISING A STRONG INFERENCE OF FRAUDULENT INTENT ON THE PART OF ANY OF THE DEFENDANTS

Since plaintiffs fail to plead falsity adequately, they also fail to plead facts raising strong inference that any of the defendants acted with the required state of mind. *See supra* at 18. Plaintiffs fail to comply with the Reform Act's scienter pleading requirements in any event.

The Reform Act requires that plaintiffs, "with respect to each act or omission . . ., state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). To plead scienter adequately, plaintiffs must allege with particularity facts that "constitute circumstantial evidence of either reckless or conscious behavior" or facts "establishing a motive and an opportunity to commit fraud." *Advanta*, 180 F.3d at 534-35. Recklessness, in turn,

---

[21] Plaintiffs cannot assert that the Court should examine the totality of these CW allegations to determine whether they meet muster. The Third Circuit has recognized, "[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the [Reform Act]. Consequently, Plaintiffs' argument that particularity is established by looking at the 'accumulated amount of detail' that their unparticular source allegations provide when considered as a whole is unavailing." *Chubb Corp.*, 394 F.3d at 155-56.

involves "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Advanta*, 180 F.3d at 539 (adopting definition in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (citation omitted)). The Third Circuit requires that such allegations be supported with facts stated "with particularity" and must give rise to a "strong inference" of scienter. *Advanta*, 180 F.3d at 535. Plaintiffs cannot allege a strong inference by "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme." *Id.*

To plead adequately that defendants acted with recklessness in an accounting case, plaintiffs must allege *particular* transactions in which revenue was recognized improperly by or at the instruction of each defendant. *Alpharma*, 372 F.3d at 150 (dismissing Section 10(b) claim premised on recklessness where plaintiffs alleged that the defendant set "lofty" sales goals and pressured sales representatives to meet them but failed to identify particular shipments to warehouses carried out at this instruction). It is not sufficient to allege that defendants knowingly made false statements or to impute the knowledge of a subordinate to a defendant. *Id.* (citing *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 827-28 (8th Cir. 2003)). Plaintiffs must link VERITAS' executives or the individual defendants to the particular incidents of wrongdoing.

Plaintiffs fail to plead facts raising a strong inference that defendants acted recklessly or consciously with respect to revenue recognition. Here, plaintiffs fail to explain how CW#3 allegedly knew that Mr. Brigden knew revenue would be recognized from these contracts he approved. Instead, plaintiffs attempt to plead scienter through

32

"motive and opportunity" allegations, comprised largely of Messrs. Bloom's and Gillis's stock sales. ¶¶46-48. Courts will not, however, infer scienter from the mere existence of stock sales by corporate officers. *Advanta*, 180 F.3d at 540. Rather, the stock sales must be unusual in scope or timing to raise the requisite strong inference. *Id.*; *Alpharma*, 372 F.3d at 152 (refusing to impute false accounting practices to defendants based on stock sales where complaint failed to allege sales "were unusual in scope (e.g., compared to their total level of compensation or the size of previous sales) or timing (e.g., compared to the timing of past trades).").

Here, the only individual defendant as to whom plaintiffs allege any knowledge or participation is Mr. Brigden. Mr. Brigden, however, did not sell any stock. Where certain officers failed to sell any stock, there is a doubt that sales by others were motivated by the intent to profit from inflated stock prices. *Advanta*, 180 F.3d at 540; *see also Alpharma*, 372 F.3d at 152 (noting lack of sales by controlling shareholder); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1039-40 (N.D. Cal. 2000) (inference of scienter negated for all defendants where CEO, who allegedly made false statements, did not sell stock), *aff'd*, 2002 WL 465161 (9th Cir. 2002).

Moreover, stock sales in small percentages do not raise a strong inference of deliberate intent. *Advanta*, 180 F.3d at 541 (dismissing allegations where officers sold only 5% and 7% of holdings and stating, "[f]ar from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated prices, these facts suggest that they had every incentive to keep Advanta profitable"). Here, Mr. Bloom sold only 1.71% of his total stockholdings, including options exercisable within 60 days. *See* Declaration of Christina L. Costley filed herewith, at ¶5. Mr. Gillis sold 34% of his total

33

stockholdings. *Id.* at ¶6. As publicly-disclosed in SEC filings, however, both Mr. Bloom and Mr. Gillis made their trades pursuant to 10b5-1 trading plans. Exs. L, M. The existence of such a plan negates any inference of fraudulent intent because the sales are executed in accordance with a pre-defined schedule, rather than at the instruction of the selling officer. *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (*citaion omitted*) (sales pursuant to SEC Rule 10b5-1 trading plan "could raise an inference that the sales were pre-scheduled and not suspicious"); *see also SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1322 (N.D. Ala. 2003) ("[I]t is a defense to an allegation of a violation of Section 10b and Rule 10b5-1, if the person making the purchase or sale demonstrates that the purchase or sale that occurred was made pursuant to a plan." (citing 17 C.F.R. §240.10b5-1(c)(1)(C))).

Further, it is clear from Messrs. Bloom's and Gillis's trading that they sold stock after VERITAS publicly issued an earnings release. Ex. H. As courts have recognized, "[t]rading following public announcements simply evidences compliance with the securities laws." *Party City*, 147 F. Supp. 2d at 312 (*citation omitted*); *see also See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings[.]").

Plaintiffs also allege that VERITAS was motivated to commit accounting fraud so it could use 7.3 million shares of its stock to acquire Precise Software Solutions, Inc. in June 2003. ¶49. A corporation's desire to increase its stock value as part of an acquisition is the type of general motive allegation that could be leveled at any for-profit entity. Thus, it is not a sufficient basis upon which to maintain a claim for securities

fraud. *Alpharma*, 372 F.3d at 152-53; *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004) (citing cases); *see also In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 583-84 (D.N.J. 2001) (dismissing allegation that defendants were motivated to commit fraud to effectuate acquisition).  In those rare situations where courts have found motive sufficiently alleged in connection with an acquisition, those transactions were completely stock-based. *See, e.g., NUI Sec. Litig.*, 314 F. Supp. 2d at 412.  Here, however, VERITAS did not acquire Precise using only VERITAS common stock.  Rather, the stock portion of the transaction comprised just $210.6 million of the total consideration of $715.1 million. 2003 10-K at 115, Ex. B.

Finally, plaintiffs cannot infer fraudulent intent from the "Change of Control" agreements defendants entered into in March 2004. ¶50.  These agreements provided defendants with certain guaranteed compensation if VERITAS were acquired within 12 months.  Plaintiffs allege that defendants entered into these agreements knowing that the price of VERITAS stock would likely fall "upon the disclosure of [its] problems" and VERITAS would, therefore, be an attractive acquisition candidate.[22] *Id.*  The motive to obtain change of control payments is no different than the generalized allegation that defendants were motivated by a desire to maintain or increase their compensation, "a

---

[22] Although VERITAS did enter into an acquisition agreement with Symantec Corporation in December 2004, each of its individual defendants named in this action is expected to continue his employment with the combined entity.  Thus, none of them will benefit from the change of control provisions.  *See* www.symantec.com/corporate/bios.html.

desire [that] can be imputed to all corporate officers." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (*citation omitted*).[23]

## CONCLUSION

For each of the foregoing reasons, defendants respectfully request that the Court dismiss the CAC against them.

|  |  |
|---|---|
|  | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL:<br>Nina F. Locker, Esquire<br>Peri Nielsen, Esquire<br>Wilson Sonsini Goodrich & Rosati, PC<br>650 Page Mill Road<br>Palo Alto, California  94304-1050<br>Tel: (650) 493-9300 | By: /s/ Peter J. Walsh<br>Peter J. Walsh, Jr. (DSB ID No. 2437)<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>Wilmington, Delaware 19801<br>Tel: (302) 984-6000<br>Email:  pwalsh@potteranderson.com<br><br>*Attorneys for Defendants VERITAS Software Corporation, Edwin J. Gillis, Gary L. Bloom and John Brigden* |

Dated July 20, 2005

690685v3/28298

---

[23] Since plaintiffs fail to plead a predicate violation of Section 10(b), their Section 20(a) claim must also be dismissed. *Advanta*, 180 F.3d at 541.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, Peter J. Walsh, Jr., hereby certify that on July 20, 2005, I caused true and correct copies of the foregoing OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT to be electronically filed with the Clerk of the Court using CM/ECF which is available for public viewing an downloading, and which will send notification of such filing to the following counsel of record:

> Norman M. Monhait, Esquire (DSB ID No. 1040)
> Rosenthal, Monhait, Gross & Goddess, P.A.
> 919 Market Street, Suite 1401
> Post Office Box 1070
> Wilmington, Delaware 19899-1401
> Tel: (302) 656-4433
> Email: nmonhait@rmgglaw.com

I hereby further certify that on July 20, 2005, I have caused the foregoing document to also be delivered by FedEx/Next Business Morning Service to the following non-registered participant:

> Christopher J. Keller, Esquire
> Goodkind Labaton Rudoff & Sucharow LLP
> 100 Park Avenue
> New York, New York 10017

> /s/ Peter J. Walsh, Jr.
> Peter J. Walsh, Jr. (DSB ID No. 2437)
> POTTER ANDERSON & CORROON, LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, Delaware 19801
> Tel: (302) 984-6000
> Email: pwalsh@potteranderson.com

690685v3/28298