# EXHIBIT B

LEXSEE 2000 U.S. DIST LEXIS 15369

IN RE SPLASH TECHNOLOGY HOLDINGS, INC. SECURITIES LITIGATION; This
Document Applies to: ALL ACTIONS

No. C 99-00109 SBA

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

*2000 U.S. Dist. LEXIS 15369; Fed. Sec. L. Rep. (CCH) P91,250*

September 29, 2000, Decided
September 29, 2000, Filed

**DISPOSITION:** [*1] Defendants' Motion to Dismiss
GRANTED in part and DENIED in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CLARENCE F. SCOTT, JUDY WU,
Plaintiffs: Edward P. Dietrich, Milberg Weiss Bershad
Hynes & Lerach LLP, Los Angeles, CA.

For CLARENCE F. SCOTT, JUDY WU, Plaintiffs:
Bruce G. Murphy, Law Offices of Bruce G. Murphy,
Vero Beach, FL.

For CLARENCE F. SCOTT, JUDY WU, Plaintiffs:
William S. Lerach, John K. Grant, Stanley S. Mallison,
Milberg Weiss Bershad Hynes & Lerach LLP, San
Francisco, CA.

For SPLASH TECHNOLOGY · HOLDINGS, INC.,
SPLASH TECHNOLOGY, INC., KEVIN K.
MACGILLIVRAY, JOAN P. PLATT, TIMOTHY
D. KLEFFMAN, CHRISTINE A. BEHESHTI,
defendants: Steven M. Schatz, Gidon M. Caine, Steve
S. Nikkhou, Catherine H. Winterburn, Melissa M.
Mac Carone, Wilson Sonsini Goodrich & Rosati, Palo
Alto, CA.

For CHARLES W. BERGER, RADIUS INC, defen-
dants: Timothy K. Roake, Shannon White Cogen,
David M. Lisi, Fenwick & West LLP, Palo Alto, CA.

**JUDGES:** SAUNDRA BROWN ARMSTRONG,
United States District Judge.

**OPINIONBY:** SAUNDRA BROWN ARMSTRONG

**OPINION:**

**ORDER**

This matter comes before the Court on the Splash
Defendants' Motion to Dismiss the First Amended
Complaint [# 60-1]. The Court conducted a hearing on
May 2, 2000. Having [*2] read and considered the
papers submitted by the parties, having considered the
arguments advanced by the parties at the hearing, and
being fully informed, the Court hereby GRANTS in part
and DENIES in part Defendants' Motion to Dismiss.

**BACKGROUND**

Plaintiffs, all purchasers of Splash Technology
Holdings, Inc. ("Splash") stock between January 7,
1997 and October 13, 1998, bring a securities fraud
class action against Splash, Kevin K. Macgillivray
("Macgillivray"), the President, Director, and Chairman
of Splash, Joan P. Platt ("Platt"), Vice President,
Finance and Administration, and Chief Financial Officer
of the Company during the Class Period, Timothy
D. Kleffman ("Kleffman"), Vice President, Business
Development and Product Planning, since 7/97 and Vice
President, Engineering Operations, from 1/96 to 6/97,
Christine A. Beheshti ("Beheshti"), Vice President,
Software Engineering, Charles W. Berger ("Berger"),
and Radius, Inc. ("Radius"), who spun-off one of its di-
visions to form Splash and who retained a 20% interest
in the new entity. Only defendants Splash, Macgillivray,
Platt, Kleffman, and Beheshti join in this motion. Radius
and Berger filed a separate motion. This [*3] motion
shall refer collectively to the defendants bringing this
motion as the "Splash defendants." The more generic
term, "defendants," refers to all of the named defen-
dants.

Splash develops, produces, and markets color
servers that provide an integrated link between desk-
top computers and digital color laser copiers. Splash's
products enable the copiers to provide networked color





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 3 of 22

Page 2

2000 U.S. Dist. LEXIS 15369, *3; Fed. Sec. L. Rep. (CCH) P91,250

printing and scanning. During fiscal years 1994, 1995, and 1996, Xerox and Fuji Xerox constituted Splash's sole customers.

In 1996, Radius spun off one of its divisions, the Color Server Group ("CSG"), to form Splash. Prior to 1996, Radius had incurred substantial operating losses -- $131.7 million in F95, $77.4 million in F94, and $20.1 million in F93. Independent auditors concluded in a report for the fiscal year ending 9/30/95 that Radius' ability to continue as a viable entity was in substantial doubt. Radius' limited cash resources limited its ability to purchase inventory, which in turn constrained its ability to manufacture and sell products. (FAC at P 4).

The spin-off of CSG into Splash resulted allegedly from an agreement between Berger, the CEO and President of Radius, Gregory M. Avis ("Avis"), [*4] a Managing Partner of Summit Partners L.P. ("Summit"), Lawrence G. Finch ("Finch"), a General Partner of Sigma Partners, L.P. ("Sigma") and a director of Radius until October 1995, and Macgillivray, who ran CSG. The agreement called for Summit to pay Radius $20 million, Radius to retain a 20% interest in the new entity - Splash, Avis and Berger to serve on Splash's board, and Macgillivray to serve as Splash's CEO and President. (FAC at P 5).

In the fall of 1996, Splash completed its initial public offering ("IPO"), which raised $26.6 million. Per the terms of the IPO, Splash's insiders agreed to a "lock-up" pursuant to which they would not sell any additional shares of Splash stock onto the open market for 180 days from the IPO. (FAC at P 5-7). Although the Splash stock grew quite swiftly from its opening price of $11 per share to a high of $38 on January 31, 1997, the Splash insiders could not reap the benefits of this growth since the lock-up provision prevented them from selling their Splash stock. As the deadline for the expiration of the lock-up provision approached, the value of the shares had fallen. By April 1, 1997, approximately one week before the expiration of the [*5] IPO lock-up, the shares had dropped to a value of $22.375.

With the expiration of the lock-up provision imminent, the defendants allegedly hatched a plan to "artificially re-inflate" Splash's stock. (FAC at P 8). The focal point of the allegedly fraudulent scheme instituted by the defendants was a Secondary Offering of Splash stock. In addition to legal and strategic advantages, the Secondary Offering allegedly promised Splash the opportunity to raise substantial capital on favorable terms that would help carry Splash through a downturn that defendants knew was coming and Splash insiders a chance to line their pockets before the negative news of the downturn became public.

Throughout the spring and summer of 1997, prior to the Secondary Offering, defendants made a number of allegedly false and misleading statements designed to boost the price of the stock. One particularly frequent representation during this time was that Splash's sales would increase 35 percent annually in each of the next five years. (FAC at P 11). The "true facts" allegedly known by defendants at this time refuted this prediction. By February 1997, the defendants allegedly knew that Fuji Xerox was only forecasting [*6] 10% growth. Sometime in the summer of 1997, defendants allegedly learned that Fuji Xerox grew only 5% in the June quarter. Because Fuji Xerox allegedly accounted for 60% of Splash's sales, defendants thus allegedly knew that attaining the sales growth was virtually impossible. (Id.).

Defendants' statements allegedly succeeded in that Splash's stock reached a per share value of more than $43 by July of 1997. A roadshow followed the rise of Splash's stock. During this roadshow, Splash officers Macgillivray and Platt allegedly made new false and misleading statements.

On August 25, 1997, the secondary offering resulted in a sale of 3.25 million shares for total proceeds of $105.6 million. The terms of the secondary offering, however, imposed a new "lock-up" according to which the defendants were prevented from selling any additional shares of Splash stock into the open market until after November 19, 1997, without the written permission of the Underwriters. A flurry of trading activity followed around November 19, 1997. Beheshti sold 8,500 shares for $264,775 on November 17, 1997 and another 5,000 shares for $173,750 on November 21, 1997. Kleffman sold 20,000 shares for $655,800 [*7] between November 19, 1997, and November 20, 1997. Platt disposed of 12,500 shares for $417,250 on November 24, 1997.

After the close of the market on December 11, 1997, less than one month after the late November sales described above, Splash's primary competitor, EFI, announced a revenue and earnings shortfall that it attributed to aggressive reductions of inventory by its customers, delays in purchases associated with product transitions, and weaknesses in Asian economies. (FAC at P 15). In the aftermath of these disclosures, Splash's shares fell by 21% (EFI's stock plunged 60%). When Splash responded to the decline by stating that it "remains comfortable" with previous estimates, its stock rebounded. A subsequent report by Piper stated that Splash's business was growing aggressively and that Fuji Xerox was experiencing strong demand in Asia. (FAC at P 123). Plaintiffs allege that the defendants knew at this time that demand for Splash's products had peaked, Splash's





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 4 of 22

Page 3

2000 U.S. Dist. LEXIS 15369, *7; Fed. Sec. L. Rep. (CCH) P91,250

growth rate had declined and would decline further, and Splash was not insulated from the market conditions reported by EFI. (Id. at P 124).

On January 13, 1997, Splash disclosed that it expected slower growth [*8] in 1998 than in 1997. n1 (FAC at P 17). Splash's stock abruptly fell 44% in the wake of this news. Between January 13, 1997, and October 1998, however, Splash allegedly made new false and misleading statements. Despite allegedly knowing that economic conditions in Japan had resulted in marked declines in Fuji Xerox's orders and that Splash was losing market share in the Xerox distribution channel to a new product pushed by EFI, defendants allegedly continued to send positive messages to the public. Allegedly on the shoulders of Splash's statements, its stock rose from $12 per share on January 15, 1998, to over $25 per share by July 23, 1998. (FAC at PP 21-2).

> n1 Plaintiffs allege even this negative news was false or misleading since defendants knew by October 1997 that Fuji Xerox was forecasting no growth for 1998.

After the market closed on October 13, 1998, Splash made a "stunning" revelation that caused its stock to plunge. Macgillivray stated, "Primarily as a result of the continuing uncertainties in the [*9] Pacific Rim, Japan in particular, we currently expect the 1998 December quarter operating results to be less than those of our 1997 December quarter." (FAC at P 23). On October 14, 1998, Splash's stock closed down 46%.

On January 9, 1999, plaintiffs Scott and Wu filed an action for securities fraud against the Splash defendants (Splash Technology, Inc., Kevin K. Macgillivray, Joan P. Platt, Timothy D. Kleffman, and Christine A. Beheshti), Berger, and Radius. Plaintiff Libros filed an identical action on January 28, 1999. This Court's May 3, 1999, order consolidated both actions.

Pursuant to an August 26, 1999, stipulation, plaintiffs sought leave to amend in the face of motions to dismiss filed by defendants to the original complaint. In the stipulated order granting leave to amend, plaintiffs "explicitly acknowledged [that] defendant may move to dismiss the Amended Complaint with prejudice on the grounds that [plaintiffs] already have received an opportunity to amend their Complaint." At least one of the factors motivating plaintiffs' request to file an amended complaint was the Ninth Circuit's decision in *In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999)*, [*10] which, in plaintiffs' words, "created a brand new definition of scienter and standard for pleading it." Pl's August 10, 1999, Reply in Support of

Motion for Continuance at 2. Plaintiffs filed their First Amended Complaint ("FAC"), a ninety-six (96) page document, on January 19, 2000.

The Splash defendants now move to dismiss with prejudice the First Amended Complaint. The Splash defendants claim: (1) the Reform Act's safe harbor and the Bespeaks Caution Doctrine bar liability for forward-looking statements; (2) the FAC fails to plead all facts upon which it is based; (3) the FAC does not plead with sufficient particularity the circumstances surrounding the allegedly false statements – including the circumstances surrounding the falsity of the statements; (4) the FAC fails to plead facts giving rise to a strong inference of scienter; (5) the Splash defendants are not liable for third party statements; and (6) the claims against non-speaking defendants must be dismissed.

## STANDARD OF REVIEW

### A. Motion to Dismiss Generally

Under *Federal Rule of Civil Procedure 12(b)(6)*, a motion to dismiss should not be granted unless it appears beyond a doubt that the plaintiff [*11] "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); Everest and Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994)*. All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft, 105 F.3d 1288, 1296 (9th Cir. 1997)*.

When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv–Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)*. Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys., 957 F.2d 655, 658 (9th Cir. 1992)*. [*12]

### B. Pleading Requirements in Securities Fraud Actions

The plaintiffs bring this action for allegedly false and misleading statements made in violation of § 10(b) and the Securities Exchange Act of 1934 ("the 1934 Act") and SEC Rule 10(b)(5). Section 10(b) of the 1934 Act prohibits the use of "manipulative or deceptive" activities in connection with the purchase or sale of securities.





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 5 of 22

Page 4

2000 U.S. Dist. LEXIS 15369, *12; Fed. Sec. L. Rep. (CCH) P91,250

*15 U.S.C. § 78j(b)*. Rule 10(b)(5), which specifies what practices are manipulative or deceptive, provides that it shall be unlawful:

> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b–5*. A successful showing of a Rule 10b–5 violation requires four elements: (1) a misrepresentation or omission of a material fact, (2) reliance, [*13] (3) scienter, and (4) resulting damages. *Paracor Finance, Inc. v. General Electric Capital, 96 F.3d 1151, 1157 (9th Cir. 1996)* (en banc).

In order to state claims for securities fraud under Section 10(b) of the 1934 Act and Rule 10b–5, a complaint must meet three pleading barriers. First, it must meet the general requirement established by Federal Rule of Procedure 8(a) that complaints give a short and plain statement of the claim. Second, it must conform with the particularity obligations imposed by Rule 9(b). *In re Glenfed, Inc. Securities Litigation, 42 F.3d 1541, 1545 (9th Cir. 1994)*. Federal Rule of Civil Procedure *9(b)* provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

The Private Securities Litigation Reform Act ("PSLRA") poses the third pleading hurdle. The PSLRA reiterates the particularity obligations of 9(b). First, the complaint must specify "each statement alleged to have been misleading." *18 U.S.C. § 78u–4(b)(1)*. Second, it also must specify the [*14] reason or reasons why the statement was false or misleading. Id. If an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. Id; *In re Silicon Graphics, Inc. Securities Litigation, 970 F. Supp. 746, 763 (N.D. Cal. 1997)*. n2

n2 A bit of confusion arises here. The require-

ments of *15 U.S.C. § 78u–4(b)(1)* apply to statements that are untrue as to a material fact or omit to state a material fact. Violations of 10b–5(a) and (c), unlike 10b–5(b), are not limited to statements. Thus, it would appear that § (b)(1) of the PSLRA does not apply to violations under 10b–5(a) or (c). Plaintiffs allege some primary violations under those sections. (See Pl's Opp'n at 11 *et seq.*). This ultimately is a distinction without a difference. Rule 9(b) applies to allegations of fraud in general, not just fraudulent statements; thus, 9(b) applies to fraudulent acts as well as fraudulent statements. See *Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989)*. Because § (b)(1) of the PSLRA reiterates 9(b)'s requirements, allegations of fraudulent acts must meet the same standard as allegations of fraudulent statements.

Section (b)(2) of the PSLRA still applies to claims premised on fraudulent acts and statements since all three sections of 10b–5 require a state of mind. See generally, *In re Silicon, 183 F.3d at 975–977* (discussing the scienter requirement that applies to all claims under § 10(b) of the 1934 Act).

[*15]

The third element of the PSLRA moves beyond 9(b)'s requirements. When pleading scienter, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at (b)(2). In this circuit, this heightened scienter pleading standard "requires plaintiffs to plead, at a minimum, **particular** facts giving rise to a strong inference of **deliberate** or **conscious** recklessness" – a degree of recklessness strongly suggesting actual intent. *In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970, 979 (9th Cir. 1999)* (emphasis added). A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. Id.

**DISCUSSION**

**I. Safe Harbor and Bespeaks Caution Doctrine n3**

n3 The analysis in this section applies to all defendants, not just the Splash defendants (in their brief, Radius and Berger incorporate by reference this argument). Thus, this section uses the term "defendants" rather than "Splash defendants."

[*16]

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 6 of 22

Page 5

2000 U.S. Dist. LEXIS 15369, *16; Fed. Sec. L. Rep. (CCH) P91,250

## A. Safe Harbor

In addition to introducing a heightened pleading standard for scienter, the PSLRA carved out a safe harbor from liability for forward-looking statements that prove false if the statement "is **identified** as a forward-looking statement and is accompanied by meaningful **cautionary statements** identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C.* § 78u-5(c)(1)(A)(i) (emphasis added); *Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999).* Even if no cautionary statement accompanies the forward-looking statement, the plaintiff must prove that the defendant made the statement with "actual knowledge . . . that the statement was false or misleading." *15 U.S.C. § 78u-5(c)(1)(B)(i); Harris, 182 F.3d at 803.* The purpose behind this safe harbor is to encourage the disclosure of forward-looking information. H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995). Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss. *15 U.S.C. 78u-5* [*17] (e).

### 1. Forward-Looking Statements

A forward-looking statement includes a statement containing a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance. *15 U.S.C. § 78u-5(i)(1)(A)–(C).* In addition, any statement of "the **assumptions** underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. *15 U.S.C. § 78u-5(i)(1)(D)* (emphasis added). A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made. See *Harris, 182 F.3d at 805* (classifying the statement "the challenges unique to this period in our history are now behind us" as a forward-looking statement). Statements concerning historical or current facts are not forward-looking. See *Gross v. Medaphis Corp., 977 F. Supp. 1463, 1473 (N.D. Ga. 1997); In re Valujet, Inc. Sec. Litig., 984 F. Supp. 1472, 1479 (N.D. Ga. 1997).*

The defendants [*18] contend that the statements in Splash's Press Releases and SEC Filings constitute forward-looking statements. n4 The plaintiffs generally contest this proposition as to the press releases n5, although they specifically challenge statements from only *two* press releases. Moreover, in contending that Splash's January 14, 1997, April 15, 1997, October 14, 1997, January 13, 1998, and April 14, 1998 press releases did not contain meaningful cautionary language, plaintiffs implicitly concede that these releases at least

did involve forward-looking statements. (Pl's Opp'n at 21).

n4 Defendants also suggest that the various and sundry oral statements alleged in the complaint also qualify for the safe harbor, although they do not contend that meaningful cautionary statements accompanied these oral statements. Rather, defendants maintain that plaintiffs' failure to plead both the circumstances of and the falsity of these oral statements with particularity and the defendants' scienter in great detail render the absence of the cautionary statements insignificant under *15 U.S.C. § 78u-5(c)(1)(B)(i).* See *infra.* As discussed *infra,* defendants are correct on this point; as a result, the Court need not resolve the parties' dispute about whether *each* oral statement must be accompanied by cautionary language.

[*19]

n5 Plaintiffs apparently concede that the statements in the SEC filings are forward-looking.

The first statement challenged by plaintiffs occurred in a April 15, 1997 announcement concerning the financial results from the first quarter of 1997: "'We're pleased with these financial results,' said Kevin Macgillivray, Splash chief executive officer. 'They're reflective of increased awareness of the Splash advantage, strong product demand, and planned investments in our sales and marketing areas to support Xerox, Rank Xerox, and Fuji Xerox.'" Defendants attempt to argue that this statement is "forward-looking" since it addresses management's plans and objectives for the future. That argument fails. The "planned investments" language seemingly concerns *past* plans not management's future objectives or plans.

The second statement challenged by plaintiffs occurred in a July 15, 1997, press release announcing second quarter financial results: "'We are pleased with these results,' said Kevin K. Macgillivray, Splash Chief Executive Officer. 'They're indicative of a healthy market sector [*20] in digital printing, sales growth in all our geographies, and broader awareness of Splash product advantages." Defendants contend that the truth or falsity of this statement is not discernable until some time after when it was made. This argument also fails. The statement explains why the company obtained its financial results. In contending that the market was healthy, it does not thereby suggest that the market will continue to be healthy. Likewise, declaring that sales growth had occurred does not mean that sales growth will continue.





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 7 of 22

Page 6

2000 U.S. Dist. LEXIS 15369, *20; Fed. Sec. L. Rep. (CCH) P91,250

These statements refer simply to past or, at most, current facts.

Since these two statements are not forward-looking, defendants' attempt to dismiss these allegations hinges on the analysis in section II *infra*, which concerns the pleading requirements of the PSLRA.

### 2. Identifying Forward-Looking Statements

Plaintiffs also contend that plaintiffs failed to identify their forward-looking statements as such. A quick glance at some of Splash's press releases confirms the absence of any language particularly identifying some statements as forward-looking. (See e.g., Dietrich Decl., Exs. 3 and 4; But see e.g., Nikkhou Decl., Exs. [*21] 16 *et seq.*). A statement cannot fall within the safe harbor if it is not specifically identified as forward looking. See *Griffin v. GK Intelligent Systems, Inc., 87 F. Supp. 2d 684, 689 (S.D. Texas 1999)* (J. Atlas).

Defendants implicitly acknowledge their failure to comply with this aspect of the safe harbor for some of the press releases by contending that the safe harbor still applies, even in the absence of the requisite specific identification, for forward-looking statements for which plaintiffs have not alleged with particularity that the statements were knowingly false when made. (Reply at 5–6). Defendants focus the Court on the following statements, however, as containing the requisite specific identification of forward-looking statements: the press releases of May 6, 1997, December 12, 1997, April 6, 1998, July 14, 1998, and October 13, 1998, the prospectus for the 1997 offering, and the 1997 10-K. Plaintiffs do not contend otherwise as to these statements.

### 3. Cautionary Language

The drafters of the PSLRA apparently did not intend boilerplate cautionary language to be sufficient. Rather, "the cautionary statements must convey substantive information [*22] about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." H.R. Conf. Rep. No. 104–369, at 53. The statute does not require, however, a listing of **all** of the important factors nor even of the particular factor that ultimately causes a forward-looking statement not to come true. *Harris, 182 F.3d at 807.*

In the instant case, defendants employed at least two general types of cautionary statements. The language in the April 15, 1997, press release is typical of the one common form:

> For a complete discussion of risk factors which could affect the Company's current and future operating results, see the discus-

sions in the Company's reports filed with the Securities and Exchange Commission, including the Company's Prospectus dated October 9, 1996, the Form 10K for fiscal 1996 and the Form 10Q for the fiscal quarter ended December 31, 1996.

(Dietrich Decl., Ex. 3). Defendants implicitly concede that these warnings are insufficient by focusing only on the warnings in the press releases of May 6, 1997, December 12, 1997, April 6, 1998, July 14, 1998, and October 13, 1998, the prospectus [*23] for the 1997 offering, and the 1997 10-K. (Reply at 5–6). Plaintiffs are correct that the boilerplate language in the April 15, 1997, press release, which refers generally to other documents, is not a sufficient cautionary statement.

On the other hand, plaintiffs mount very little challenge to the cautionary statements in the documents specifically addressed by defendants in pages five to six of their reply as sufficient. In their motion, defendants cited the following cautionary language from the December 12, 1997, press release in which Splash stated that it "remains comfortable with analysts' estimates" for the December 1997 quarter:

> The foregoing information is a forward-looking statement and actual results may differ materially from those contained in the statement. Factors which could affect the above forward-looking statement include . . . the receipt of final orders, the ability to ship orders, the maintenance of gross margins, the proper control of costs and the controlled integration of our recent acquisitions.

(Nikkhou Decl., Ex. 18). This warning specifically identifies substantive factors that may materially affect the results discussed in the forward-looking [*24] statement.

Almost as an afterthought, plaintiffs allege in a terse footnote that the cautionary statements of which the December 12, 1997, press release is an example lack the "exceptional detail" of the press releases found suitable in Harris. Similar to the warning here, the cautionary language in Harris alluded to general important factors such as the risk of competitors, purchasing decisions by customers, unpredictability of price competition, and other economic, competitive, governmental, and technological factors. *Harris v. Ivax Corp., 998 F. Supp. 1449 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999).* The qualitative difference suggested by plaintiffs between the warnings here and in Harris is not present.

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 8 of 22

2000 U.S. Dist. LEXIS 15369, *24; Fed. Sec. L. Rep. (CCH) P91,250

Page 7

Plaintiffs' warnings in the above-designated documents satisfy the standard for a cautionary statement.

### 4. Summary

Based on the above analysis, the safe harbor applies to statements made in the press releases from May 6, 1997, December 12, 1997, April 6, 1998, July 14, 1998, and October 13, 1998. Plaintiffs have raised no specific challenge under *any* of the three prongs of the safe harbor analysis ((1) forward-looking [*25] statement (2) specifically identified as such (3) accompanied by cautionary language). n6

> n6 Plaintiffs' only argument is that knowingly false statements cannot qualify for the safe harbor. The statute does not support this reading. Subsections (A) and (B) of *15 U.S.C. § 78u-5(c)(1)* provide *alternative* means by which forward-looking statements may qualify for the safe harbor as evidenced by the word "or" at the end of *15 U.S.C. § 78u-5(c)(1)(A)(ii)*. Thus, merely because the safe harbor exception extended in (B)(i) depends upon the absence of proof that the defendant knowingly made a false or misleading statement does not mean that the exception in (A)(i) also hinges on the absence of such proof. The legislative history confirms this approach: "The first prong of the safe harbor requires the courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement." H.R. Conf. Rep. 104-369, at 54 (1995) (emphasis added); *Harris, 182 F.3d at 803*. Plaintiffs' authorities failed to appreciate that subsections (A) and (B) are in the alternative. See e.g. *Schaffer v. Evolving Systems, Inc., 29 F. Supp. 2d 1213 (D. Col. 1998)* (assuming that the "actual knowledge" requirement in subsection (B)(i) of *15 U.S.C. § 78u-5(c)(1)* means that the safe harbor refuge of subsection (A)(i) cannot extend to defendants who makes statements with actual knowledge of their falsity).

[*26]

Based on the arguments before the Court, the safe harbor also applies to the prospectus for the 1997 offering and the 1997 10-K. It does not apply to either the April 15, 1997 press release nor the May 15, 1997 press release since these releases do not involve forward-looking statements.

As to the remaining statements, both oral and written, the analysis turns on whether plaintiffs satisfied the heightened pleading requirements imposed by the

PSLRA. In other words, although a forward-looking statement may still qualify for the safe harbor under *15 U.S.C. § 78u-5(c)(1)(B)(i)* even if it is not accompanied by a cautionary statement as long as the plaintiff fails to prove that the person made the statement with actual knowledge that it was false or misleading, the pleading requirements under *15 U.S.C. § 78u-4* dictate whether the plaintiff's pleading sufficiently signals an ability to demonstrate that the defendants possessed the requisite intent when they made the particular forward-looking statement. Stating this point still another way, the absence of a meaningful cautionary statement shifts the focus to *15 U.S.C. § 78u-4* [*27] in order to determine whether the safe harbor may still apply. n7

> n7 Defendants assume that the scienter pleading requirements articulated in SGI also apply when assessing whether plaintiffs may rely on the "actual knowledge" carrot offered by *15 U.S.C. § 78u-5(c)(1)(B)(i)*. Plaintiffs have not offered any alternative for assessing whether plaintiffs have sufficiently pled facts that would indicate that the opening provided under (B)(i) is potentially available.
>
> Defendants also assume that complying with the particularity requirements from *15 U.S.C. § 78u-4(b)(1)* is a threshold requirement before plaintiffs may utilize at the pleading stage the window provided by (B)(i). Regrettably, defendants twice cited to 78u-5(b)(1) in their reply. (See Reply at 3:6 and 6:16). The Court assumes that defendants meant to cite to 78u-4(b)(1).
>
> At least one court has adopted an approach consistent with the assumptions made by defendants. See *In re Advanta, Corp., 1998 U.S. Dist. LEXIS 10189, 1998 WL 387595, *8 (E.D. Pa. 1998)* (emphasizing plaintiff's failure to satisfy the requirements of Rule 9(b) and the PSLRA in assessing whether plaintiff sufficiently had alleged the "actual knowledge" component of (B)(i)).

[*28]

### B. Bespeaks Caution Doctrine

Defendants also seek protection for their alleged forward-looking statements under the bespeaks caution doctrine. This doctrine, although sharing similar theoretical roots with the safe harbor exception, apparently remains as a viable alternative argument available to defendants even after passage of the PSLRA. The PSLRA's legislative history indicates that the PSLRA was not intended to pre-empt any protection for forward-looking statements provided by the bespeaks caution doctrine.

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 9 of 22

Page 8

2000 U.S. Dist. LEXIS 15369, *28; Fed. Sec. L. Rep. (CCH) P91,250

See H.R. Conf. Rep. No. 104-369, at 56 and 53 n.29; *EP Medsystems, Inc. v. Echocath, Inc., 30 F. Supp. 2d 726, 761 (D. NJ 1998).*

The bespeaks caution doctrine provides protection for optimistic projections accompanied by cautionary language containing relevant **specific** facts or assumptions. *In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir. 1994)* ("WOW"); see *Saltzberg v. TM Sterling/Austin Assoc., Ltd., 45 F.3d 399, 400 (11th Cir. 1995)* (requiring "specific warnings of the risks involved"); *Kline v. First Western Govt Sec., Inc., 24 F.3d 480, 489 (3d Cir. 1994).* The doctrine by [*29] definition protects only "affirmative, forward-looking statements." *In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1408 (9th Cir. 1996).* The doctrine arises from the application of two fundamental concepts in securities fraud cases: materiality and reliance. *WOW, 35 F.3d at 1414.* When appropriate cautionary language accompanies forward-looking statements, the materiality of the forward-looking statements and the reasonableness of reliance are impacted. Id.; *United States v. Morris, 80 F.3d 1151, 1167 (7th Cir. 1996); Saltzberg, 45 F.3d at 400.*

Courts in this circuit expressly have held that dismissal under the bespeaks caution doctrine is appropriate on a motion to dismiss but only if "the statements containing defendants' challenged documents include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." *Stac, 89 F.3d at 1408; WOW, 35 F.3d at 1413* (internal quotation and citation omitted).

Defendants make an extensive effort to demonstrate that each of the forward statements alleged by the FAC [*30] to be misleading fit within the bespeaks caution doctrine. (See Splash Mot. at Ex. B). For each such allegedly forward-looking statement, the defendants provide all of the cautionary public disclosures, whether embodied in the same document in which the alleged forward-looking statements were made or in some remote document, that they have made relating to the specific statement. (Id.); see *In re Trump Casino Sec. Litig., 7 F.3d 357, 372 (3d Cir. 1993)* (finding that abundant and meaningful cautionary language in a prospectus implicated the bespeaks caution doctrine). Rather than trouble themselves with a similar analysis, plaintiffs rely on three general responses to defendants' claims: (1) the defendants must have made the cautionary statements in the same document in which they made the forward-looking statement; (2) blanket or boilerplate cautionary statements are insufficient; and (3) fraudulent cautionary statements are insufficient. Although each of these general observations holds some merit, plaintiffs' failure

to apply these observations to each specific forward-looking statement renders their analysis quite superficial.

### 1. Same Document

Courts [*31] have not required that the cautionary language be in the same document as the allegedly false or misleading forward-looking statement. *Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997).* Nevertheless, the requirement that the cautionary language bear a reasonable relation to the alleged misstatement makes it less likely that cautionary language in remote documents will sufficiently qualify the forward-looking statement. Id. In Grossman, the defendant made their allegedly misleading statements in press releases and interviews. Nevertheless, the court considered prior cautionary statements from a registration statement and amendments thereto. Id. The court noted that the allegedly misleading statements were closely related in time and substance to the registration statement and also observed that registration statements bear "considerable legal weight." Id.

In the instant case, plaintiffs allege merely that Splash's oral statements n8 were not accompanied by cautionary statements and specific warnings. This observation begs the question identified by Grossman of whether cautionary statements in remote documents furnished the protection [*32] of the bespeaks caution doctrine. Defendants' painstaking analysis in Exhibit B shows allegedly cautionary language from a number of documents holding significant legal weight, including the 1996 10-K, the December 1996 10-Q, the Registration Statement, and others. Plaintiffs have failed to explain why the Court should not consider statements in these documents as potentially viable cautionary statements.

> n8 Plaintiffs make no mention of written forward-looking statements.

### 2. Sufficiency of Cautionary Language

In order to immunize a forward-looking statement, the cautionary language must be precise and must directly relate to the defendants' forward-looking statement. *Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996).* General statements that fail to disclose specific underlying material information fail to trigger the protection of the bespeaks caution doctrine. *Id. at 1494.* Likewise, boilerplate warnings merely reminding an investor that the investment holds risk [*33] are not sufficient. *Trump, 7 F.3d at 371;* see *Saltzberg, 45 F.3d at 400.* On the other hand, acceptable cautionary language

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 10 of 22

Page 9

2000 U.S. Dist. LEXIS 15369, *33; Fed. Sec. L. Rep. (CCH) P91,250

includes warnings that are specific and are linked to the projections at issue. *Saltzberg, 45 F.3d at 400.*

After generally observing that the cautionary language in this case was insufficient, plaintiffs particularly attack the following three statements by Splash: (1) "there can be no assurance that Splash will continue to compete effectively" (Nikkhou Decl., Ex. 2 at 20); (2) "there can be no assurance that the Company's revenue will continue to grow at similar rates . . . there can be no assurance that the Company will continue to be profitable" (Id.); (3) "results in any period could also be affected by changes in market demand . . . and general market conditions" (Nikkhou Decl., Ex. 2 at 12). Plaintiffs smartly focus on these three "examples." Each statement involves language too general to link specifically with any forward-looking statement. See e.g. *Gray v. First Winthrop Corp., 82 F.3d 877, 884 (9th Cir. 1996)* (holding statements such as "no assurance can be given that the forecasted [*34] results will be achieved" were not specific enough for the court to conclude as a matter of law that a jury could not find the forward-looking statements misleading).

In cherry-picking these examples, plaintiffs ignore a host of more particular cautionary statements. For example, on the issue of competition, Splash warned in its 1996 10-K that its competitors "offer certain unique features and functionality that are not offered by the Company." (Nikkhou Decl., Ex. 2 at 8). On the issue of excess inventories, Splash cautioned in its 1996 10-K that "Xerox and Fuji Xerox may from time to time carry excess inventory of Splash color serves [or] inaccurately project future demand for Splash products . . . which could result in a significant decrease in orders from such customers in subsequent periods." (Id. at 14). On the basis of these examples, the Court cannot indulge plaintiffs' request to paint with a broad brush over defendants' allegedly cautionary statements merely because of three statements that are too general to qualify as adequate cautionary statements.

### 3. Fraudulent or Incomplete Warnings

Courts have exercised caution in applying the bespeaks caution doctrine [*35] at the pleading stage when plaintiffs have alleged that defendants possessed material information, at the time that they provided cautionary statements, that rendered even the cautionary statements themselves fraudulent or at least misleading. *In re Prudential Sec. Litig., 930 F. Supp. 68, 72 (S.D. NY 1996).* Merely including general cautionary language does not excuse a defendant's alleged omission of "known material, adverse facts." *Rubinstein v. Collins, 20 F.3d 160, 171 (1994). Huddleston v. Herman & MacLean, 640 F.2d 534 (5th Cir. 1981), rev'd in part*

*on other grounds, 459 U.S. 375 (1983),* captures the logic behind this approach:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

*Huddleston, 640 F.2d at 544.*

Plaintiffs here hit on a point of vulnerability in some of defendants' cautionary statements. For example, Splash warned in its 1997 10-K that "in the event that [Xerox and Fuji Xerox] change their purchasing patterns in the future, [*36] [Splash's] seasonality may change which could affect the Company's quarterly operating results." Plaintiffs allege, however, that this cautionary statement fraudulently concealed the fact that defendants already knew Fuji Xerox had changed its fiscal year, which would result in a change in its seasonality. Defendants rightly note that the success of that attack, at the pleading stage, depends upon whether plaintiffs have pled the circumstances of this alleged fraud with sufficient particularity and the scienter in great detail.

Plaintiffs potentially expose a fatal weakness in another of defendants' cautionary statements. Defendants allegedly attempt to rely on a cautionary statement – "risks related to the economic circumstances in Japan, could have a material adverse effect on the Company's business" – made on December 29, 1997, to provide coverage for a positive statement made *months earlier* that demand was strong in Japan. Plaintiffs fail to demonstrate, however, that defendants actually made this attempt.

Plaintiffs' third example of a "fraudulent" cautionary warning concerns Splash's statement in its 1996 10-K that "Xerox and Fuji Xerox may from time to time . . . inaccurately [*37] project future demand." Defendants attempt to use this statement (along with others, a fact ignored by plaintiffs) to immunize a forward-looking statement that demand was strong. At the time this cautionary statement was made, however, plaintiffs allegedly knew that Fuji Xerox was not projecting any growth for 1998. The same analysis as above holds. Whether the Court should construe defendants' statement as an appropriate cautionary statement depends in part on whether plaintiffs have pled the circumstances of the statement's falsity with particularity and the scienter with sufficient detail – an analysis forthcoming.

By electing not to conduct a statement by statement analysis comparable to that provided by defen-





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 11 of 22

Page 10

2000 U.S. Dist. LEXIS 15369, *37; Fed. Sec. L. Rep. (CCH) P91,250

dants, plaintiffs leave many of defendants' "bespeak caution" claims unrefuted. Rather than seeking supplemental briefing from plaintiffs on this issue, however, the Court does not need to reach it since dismissal is appropriate for the reasons discussed *infra*. In any future amended complaint, plaintiff shall make a good faith attempt not to include as actionable any statements in conflict with the bespeaks caution doctrine as discussed above.

## II. Failure to State [*38] a Claim under Rule 9(b) and/or PSLRA

In light of the PSLRA, two basic inquiries now arise when courts consider a motion to dismiss a securities fraud claim. The first issue is whether the complaint alleges a manipulative or deceptive practice with sufficient particularity. See *Schaffer v. Evolving Systems, Inc., 29 F. Supp. 2d 1213, 1220 (D. Co. 1998)*. The second issue is whether the complaint states with particularity allegations giving rise to a strong inference of deliberate or conscious recklessness. See id. Defendants have challenged the complaint on both of these grounds.

### A. Information and Belief

Before conducting the two-step analysis, one preliminary observation is merited. When an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. *18 U.S.C. § 78u-4(b)(1); Silicon, 970 F. Supp. at 763*. A complaint, such as the instant one, that fails to demonstrate that plaintiffs have personal knowledge of the facts pled is deemed pled on information and belief. See *Brady v. Anderson, 1998 U.S. Dist. LEXIS 20774, [*39] *11–12 (C.D. Cal. 1998)*. In a such a complaint, failing to allege the sources of the plaintiff's information about internal reports, how the plaintiff learned of the reports, who drafted them, and which officers received them is not adequate. *In re Silicon, 183 F.3d at 985*.

Analyzing whether a plaintiff sufficiently pled the facts forming the basis of his belief in large part parallels the analysis of whether a plaintiff sufficiently pled scienter. See *Silicon, 970 F. Supp. at 766*. If a plaintiff cannot provide a sufficient basis for conclusions he draws about an internal report, then he likely cannot connect any particular defendant to any particular information in the report for purposes of scienter. As the district court in Silicon observed, "the information and belief pleading requirement appears to be an integral part of the [Second Circuit's] strong inference standard for pleading scienter." Given that the Second Circuit's formulation of the scienter pleading standard formed the basis for the PSLRA's heightened pleading requirements,

looking to the Second Circuit for guidance is appropriate. As did the district court in Silicon, the [*40] Court here considers the information and belief analysis as integral to the scienter analysis below. See *Heliotrope, 189 F.3d 971, 979* (finding that plaintiff had failed to plead facts giving rise to a strong inference of scienter since it had not identified any documents, their contents, their preparers, which officers reviewed them, nor the source of plaintiff's information regarding the documents).

To some extent, the information and belief analysis also infiltrates the falsity analysis. Courts have not paid much care to this issue. Because the presence of contemporaneous reports is one way to demonstrate falsity and because pleading with particularity the circumstances of the falsity requires some detailed allegations involving the reports, the information and belief analysis, along with the scienter analysis, naturally seeps into the falsity analysis.

### B. Manipulative or Deceptive Practices

Whereas 10b–5(b) focuses on fraudulent statements, 10b–5(a) and (c) are not by their terms restricted to statements. In this case, plaintiffs allege both fraudulent statements and acts as their requisite manipulative or deceptive practices.

#### 1. False or Misleading [*41] Statements

##### a. False or Misleading Statements to Public

Similar to Rule 9(b), the PSLRA requires the complaint first to specify each misleading statement and then to specify the reason(s) why the statement was misleading. *18 U.S.C. § 78u-4(b)(1)*. In 9(b) terms, the complaint must specify both the circumstances of the statement, including its time, place, and content, and the circumstances indicating the falseness of the statement when it was made. See *Glenfed, 42 F.3d at 1547–8*. When alleging that particular statements were *false* or *misleading*, the complaint must make "specific references to specific facts" as the basis for the falsity allegation. *Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998)*. Moreover, the complaint must allege that the "true facts" arose *prior* to the allegedly misleading statement. *Id at 1250*. This requirement helps guard against pleading fraud by hindsight, see *In re Silicon, 183 F.3d at 988*, and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements [*42] conflict with the **current** state of facts. *Glenfed, 42 F.3d at 1548*. See generally *Ronconi v. Larkin, 1998 U.S. Dist. LEXIS 6364, 1998 WL 230987, (N.D. Cal. 1998)* (J. Legge) ("'Plaintiffs must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two





Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 12 of 22

Page 11

2000 U.S. Dist. LEXIS 15369, *42; Fed. Sec. L. Rep. (CCH) P91,250

permissible judgments, but rather the result of a false-hood,'" citing *Glenfed, 42 F.3d at 1549).*

The most direct way of setting forth an explanation why a statement was false or misleading when made is to identify either (1) inconsistent contemporaneous statements or (2) inconsistent contemporaneous information (such as an internal report) that was made by or was available to the defendants. *Glenfed, 42 F.3d at 1549; In re Oak Technology Securities Litigation, 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168, *3 (N.D. Cal. 1997).* For example, the complaint can allege specific contemporaneous conditions that undermine a defendant's optimistic claims, such as low sales volumes and losses at stores. See *Fecht v. Price Co., 70 F.3d 1078, 1083 (9th Cir. 1995).* When alleging that an internal report existed contemporaneous to [*43] the misleading statements, the complaint should provide an adequate description of the contents of the report, including some specifics from the reports and some facts indicating the reliability of the reports. *Silicon, 183 F.3d at 985;* see *Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 979 (9th Cir. 1999)* (faulting complaint for failing to identify any contemporaneous documents nor their content, who prepared them, and who reviewed them). n9

> n9 Silicon did not crisply differentiate between which of its comments applied to the information and belief standard and which applied to the scienter standard. Heliotrope also blended these analyses, although it implicitly recognized a distinction. After faulting the complaint for failing to plead information concerning internal reports with particularity, the court wrote: **"Nor** does Heliotrope's complaint, considered in its entirety, state facts that create a strong inference of the required degree of intent." *189 F.3d at 980.* The use of the term "nor" suggests that the court's comments concerning pleading the specifics of the internal reports did not relate solely to the scienter issue.

[*44]

In the instant case, the Splash defendants do not contend that the complaint fails to plead the who, what, when, and where of the allegedly fraudulent statements. Rather, defendants fault the complaint for failing to plead with requisite particularity the **falsity** of these statements. The Splash defendants groups its attack into the following five categories: (1) Splash's forecasts; (2) the prospectus; (3) the channel stuffing allegations; (4) general statements of optimism; and (5) statements of historical fact.

i. Splash's Forecasts

As discussed above, the safe harbor applies to some but not all of Splash's forecasts. Because the defendants implicitly conceded that meaningful cautionary statements did not accompany many of Splash's forecasts, the availability of the safe harbor for many of the statements depends upon the scienter analysis below. Even if the safe harbor does not apply for these statements, plaintiffs still bear the burden of the pleading requirements under the PSLRA.

Defendants contend that plaintiffs failed to meet their burden of alleging specific facts establishing that the forecasts were false when made. n10 Plaintiffs direct the Court to paragraphs [*45] 88(e), 88(a), 99(b), 117(a), 177(b), 143(a), 143(b), 143(c), 143(g), 152(f), and 152(l) of the complaint as examples of contemporaneous information showing that plaintiffs' forecasts were false when made. Although each of these allegations contains specific information to varying degrees, none of them provides any specific source for the information contained therein. These allegations fit into two general categories. Many of them make specific factual assertions, which is precisely what is anticipated by the PSLRA, but they neglect to root these assertions in any *particular* source, thus preventing the Court from assessing the reliability of the information. Paragraphs 88(e), 99(b), 117(a), 117(b), 143(a) (in part), 143(b), 143(c) (in part), 143(g), 152(f), and 152(l) are examples of this first category. The second category consists of allegations of specific facts that defendants knew. For these, again, plaintiffs provide either no or merely general details of the source of the information. Paragraphs fitting within this category include 88(a), 143(a) (in part), and 143(c) (in part). Because they have failed to allege with sufficient detail the source of the information [*46] forming the basis of their beliefs, plaintiffs have not pled falsity in a manner sufficient under the PSLRA.

> n10 The parties also immerse themselves in a dispute concerning whether Splash actually exceeded analysts' earnings projections throughout the Class Period. Defendants insist that they did and, therefore, that plaintiffs' allegations make no sense. Plaintiffs enlist the help of an expert, who submits a declaration allegedly discrediting defendants' claim. This dispute, which spills over into defendants' Motion to Strike the declaration of the expert, proves marginally relevant, if that, to the instant issue – whether the statements were false **when made.** The only relevance would arise if defendants could prove that liability may not rest on a forecast that, although false when made, turned out to be correct. Despite insisting that it "defies common sense" to contemplate such a basis for re-

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 13 of 22

Page 12

2000 U.S. Dist. LEXIS 15369, *46; Fed. Sec. L. Rep. (CCH) P91,250

covery, the Splash defendants provide no authority. In contrast, the plaintiffs rally the assistance of a popular opinion from Judge Easterbrook:

> The securities laws approach matters from an ex ante perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to become true. [citations omitted]. Good fortune may affect **damages**, but it does not make the falsehood any the less material.

*Pommer v. Medtest Corp., 961 F.2d 620, 623 (7th Cir. 1992).* Pommer rightly distinguishes between liability and damages, a distinction lost on defendants.

[*47]

Perhaps sensing the vulnerabilities in its specific evidence of adverse conditions, plaintiffs direct the Court to other circumstantial evidence of falsity including a temporal proximity between stock sales and optimistic statements and a temporal proximity between the last optimistic statement and the revelation of bad news. In *Cooper v. Pickett, 137 F.3d 616 (9th Cir. 1998),* a pre-PSLRA case, the court noted the fact "that company officials sold their stock at inflated prices while [the company] expressed optimism for the future" served as circumstantial evidence of the falsity of optimistic statements. *Cooper, 137 F.3d at 626.* In Powers, *infra,* the court relied on the proximity of optimistic statements to the date of the bad news (apparently three weeks apart) as circumstantial evidence of falsity. *Powers, 977 F. Supp. 1031, 1039.*

Plaintiffs' citation to Powers reflects the fundamental confusion pervasive in both defendants' and plaintiffs' briefs. Powers concerned scienter and thus rightly focused on the defendant's knowledge. At this stage in the analysis, the Court is only concerned with objective falsity, not [*48] with defendants' knowledge. With that clarification in mind, proximity between good news and bad news is at least marginally relevant as circumstantial evidence of falsity. In this case, plaintiffs have failed to demonstrate any such temporal proximity. Citing to paragraphs 122–23 and 135, plaintiffs allege: "only one month after expressing comfort with previous EPS and revenue forecasts, defendants admitted that demand had weakened and Splash reduced its forecasted growth by half." The paragraphs cited do not fully support this assessment. In fact, the revenue estimates announced

on December 12, 1997, for the December 1997 quarter actually proved conservative. Compare P 122 with P 125. As for 1998 revenue estimates, the December 12, 1997, disclosure and the January 13, 1998, disclosure do reflect some tension. Whereas in December a Piper report indicated that Splash's business was growing aggressively, the January report predicted slower growth in 1998. These two reports are only slightly in tension in that the December assessment was in the present tense such that circumstances reasonably could have changed in the intervening month. Nevertheless, to the extent the two reports reflect [*49] a good news – bad news dynamic, they serve as some circumstantial evidence of the falsity of the December statement.

The inference of falsity that plaintiffs attempt to draw from the stock sales by the Splash defendants is conclusory. Emphasizing the large volume of Splash shares unloaded in the Secondary offering by defendants, plaintiffs cite to Powers. Unfortunately, plaintiffs fail to connect the stock sales to any particular statement made by Splash or the other defendants. Even if Powers remains a viable approach under the PSLRA scheme, plaintiffs at least, as in Powers, need to draw a temporal relationship between the stock sales and specific optimistic statements. To the extent plaintiffs are relying on statements in the prospectus, the analysis below demonstrates that plaintiffs have not adequately pled the falsity of any statement in the prospectus.

The only optimistic statement for which the plaintiffs have pled some viable circumstantial evidence of its falsity is the December 12, 1997, statement. As for the others, the absence of a viable foundation to plaintiffs' specific allegations of falsity dooms the allegations under the PSLRA. The slight circumstantial [*50] evidence in favor of the falsity of the December 12, 1997 statement probably is not sufficient either.

**ii. Prospectus**

In July 1997, Berger signed a Registration Statement that contained three allegedly false or misleading statements: 1) Splash's quarterly operating results could be affected in the event that the purchasing patterns of Xerox and Fuji Xerox change in the future; 2) no assurance existed as to the future level of sales to Xerox or Fuji Xerox, any decrease in future sales would materially and adversely affect the Company's financial condition; and 3) fluctuations in currency exchange rates could cause price fluctuations which ultimately could result in a reduction in net revenue and profitability. FAC at PP 102–106.

As to the first statement regarding the effect of a possible change in purchasing patterns of Xerox and Fuji

  

2000 U.S. Dist. LEXIS 15369, *50; Fed. Sec. L. Rep. (CCH) P91,250

Xerox, the complaint alleges that "defendants" knew prior to April 1997 that Fuji Xerox was changing its fiscal year, which would change the seasonality pattern to its purchases and would weaken sales in the "3/98 quarter." This allegation fails to meet the requirement for pleading falsity. Most significantly, it fails to allege specifically [*51] the form in which this information was available or revealed, opting instead only to say undifferentiated "defendants" "knew" this information and, repeatedly, that the information came from undisclosed internal operating and budget reports compiled by undisclosed people. Absent specific allegations of the *source* of this information or some contemporaneous statement by defendants reflecting familiarity with this information, plaintiffs have failed to meet the falsity pleading burden. Likewise, plaintiffs, who are pleading on information and belief, fail to plead their basis for allegedly knowing the content of these reports.

A similar analysis holds for the second and third statements regarding future sales and the possible adverse impact from fluctuations in foreign currencies. Although the complaint alleges that economic conditions in Japan *already* had deteriorated, the levels of orders *already* had declined, and fluctuations in currency exchange rates *already* were causing Splash's products to be more expensive, it again fails to **specify** the source/form of this information nor how plaintiffs learned of the information. (See P 105).

### iii. Channel Stuffing [*52]

The FAC alleges that Splash deliberately shipped excessive quantities of its product to Fuji Xerox and Xerox during June 1997 in order to artificially boost revenues and earnings for the quarter ending June 30, 1997. FAC at P 11. Plaintiffs again fail to provide any particular basis for believing this "channel stuffing" occurred. For example, they fail to allege any particular conversation between the customers and Splash. Without such a basis, the allegation of "channel stuffing" is conclusory, and the inference of false statements unavailing. Plaintiffs' authorities are not applicable to the extent they suggest that unusual, unrevealed sales practices designed to artificially stimulate demand are actionable. Conclusory allegations of unusual sales practices are insufficient in the PSLRA world to implicate the desired analysis.

### iv. Puffery

The Splash defendants next challenge the inclusion in the FAC of optimistic statements that are merely "puffing statements." They particularly point to statements in paragraphs 9, 72, 81, 86, 95-96, 111, 125-6, 137, 146, and 150.

Some courts have deemed non-fact based, general expressions of optimism by corporate insiders as not actionable [*53] since analysts and professional investors know how to devalue such information. See *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992). Other courts have rejected this approach, noting that all general expressions of optimism implicitly rest on a factual basis. See *In re Cypress Semiconductor Sec. Litig.*, 1992 U.S. Dist. LEXIS 22480, 1992 WL 394927, 4 (N.D. Cal. 1992) (J. Whyte); *In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. 1444, 1451 (N.D. Ill. 1991) (finding the concept of "puffery" or mere opinion "not useful" but then proceeding to subject the statements to a materiality analysis). *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3d Cir. 1990), represents the most refined approach. Rather than focusing on whether a statement is merely a salesman's puffery or instead a fact-based assertion, Hoxworth emphasizes that the defining question is whether the statement is immaterial, that is whether the statement is so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information. [*54] *Hoxworth*, 903 F.2d at 200.

Hyperbolic statements assigning reasons for and placing adjectives on past results generally are not actionable since they "contain no implicit prediction that those events or conditions will continue in the future." *In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (J. Williams); see also *Lumisys*, 2 F. Supp. 2d at 1245-6 (finding "we were able to perform two successful acquisitions last year" and "1995 was a very good year for Lumisys" to constitute nonactionable vague statements); *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1379 (N.D. Cal. 1995) (finding that "our new Minnesota plant continues its excellent performance and already accounts for 6% of Cypress' revenues" was not an actionable statement since it was an accurate factual account of past performance and did not convey a false or misleading impression of future success). The statements at the center of paragraphs 72, 86, 95-96, 111, 125, and 137 fit into this category. Plaintiff has not alleged that these statements misrepresented past performance. See e.g. P 88. In addition, these [*55] statements use vague words such as "healthy," "strong," and "increased awareness." A reasonable investor would not rely on these vague assessments of past results. These statements are not actionable.

In contrast, the statements alleged in paragraphs 146 and 150 represent forward-looking statements that imply underlying factual premises now contested by plaintiffs and/or represent statements regarding past or current facts implicitly resting on factual assessments now disputed by plaintiffs. As discussed above, however,

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 15 of 22

Page 14

2000 U.S. Dist. LEXIS 15369, *55; Fed. Sec. L. Rep. (CCH) P91,250

plaintiffs failed to plead adequately the circumstances of the falsity of these statements.

### v. Historical Facts

Similar to the analysis above, defendants move to dismiss statements in paragraphs 72, 81, 86, 96, 111, 125, and 146 since they allegedly report historical facts. See *Lumisys, 2 F. Supp. 2d at 1245* ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."). In their opposition, plaintiffs do not mount any opposition to this line of attack. The analysis in the puffery section above already reaches a similar conclusion to that now sought for [*56] all of these paragraphs except for 81 and 146. As with paragraphs 72, 86, 96, 111, and 125, plaintiffs have not alleged facts particularly challenging the accuracy of the assessment of historical fact involved in paragraph 81, which includes in part statements involving historical facts. The historical facts in that statement are not actionable. Although paragraph 146 also includes statements involving historical facts, it conveys the impression of future expansion – a premise challenged by plaintiffs.

### b. False or Misleading Statements to Analysts

The interaction between corporate insiders and third party analysts may serve as the source of at least two forms of liability. First, if the corporate insider provides false or misleading information to the security analyst, then he may be directly liable under 10b–5. See *Cooper v. Pickett, 137 F.3d 616, 623–4 (9th Cir. 1998)* (en banc). Second, if the corporate insider expressly or impliedly adopts or endorses an analysts' misleading or false statements, liability may fall on the corporate insider. *Copperstone v. TCSI Corp., 1999 U.S. Dist. LEXIS 20978, C 97–3495 SBA (1999).* Whereas under the first theory of liability the defendant is liable [*57] for his misleading statements, the second theory imposes liability on the defendant for "the analysts' interpretations of [the defendant's] truthful statements." *Copper, 137 F.3d at 624.*

#### i. False or Misleading Statements to Third Party–Analyst

Because the action in Cooper arose prior to the effective date for the PSLRA, that court, although recognizing that misleading statements made by corporate insiders to analysts could be actionable in securities fraud cases, did not consider the complaint under the heightened pleading requirements established by the PSLRA. *Cooper, 137 F.3d at 628 n.2.* Thus, Cooper does not establish how the Court should evaluate pleadings under the theory of liability it articulated. In light of the PSLRA, the plaintiff, in addition to pleading scienter,

must specify each statement to an analyst alleged to be misleading and the reason or reasons why the statement is misleading. *15 U.S.C. § 78u–4*(b)(1); Copperstone, C 97–3495 SBA, at 11.

In the instant case, the FAC describes statements made by Splash insiders to analysts in two general ways. The first is to accompany either a reprinted [*58] passage from an analyst's report or a paraphrased summary of an analyst's report with the following boilerplate language: "This report was written after [name of analyst] had extensive discussions with Macgillivray and Platt and was based on and repeated information provided by them." (See PP 70, 71, 74, 76, 79, 80, 83, 85, 87, 89, 90, 97, 98, 109, 110, 113, 114, 115, 123, 129, 130, 132, 133, 134, 136, 142, 148, 149, and 151). The second, less frequent method employed by the FAC, is to paraphrase statements made to analysts either, indirectly, by reprinting news articles paraphrasing Splash insiders or, more directly, by paraphrasing comments allegedly made at roadshows or other analyst meetings. (See PP 18, 95, 127, 144–45, and 150). Neither method proves sufficient under the PSLRA pleading burden.

The first method typically fails to identify any specific speaker (i.e. either Macigillivray or Platt), provide the date of the "discussions," nor to specify which parts of the analyst's reports allegedly "repeated" the information provided by the Splash insider. The vague, boilerplate assertions violate the spirit of the particularity requirements in the PSLRA, not to mention [*59] plaintiffs' previously documented failure to allege falsity with particularity. See Opti, C 95–3434, *35 n.12 (faulting plaintiffs' allegations concerning misleading statements to analysts for "failing to allege specifically which of the defendants provided this information, where and when, the content of and in what context the information was provided, and what facts demonstrate that defendants knew the statements were false when made").

The second method is clearly superior to the first method. As previously documented, plaintiffs fail to plead falsity with the requisite particularity. But for that significant deficiency, many of the paragraphs utilizing the second method satisfy the PSLRA particularity requirement (excepting the scienter discussion *infra*). Many of these statements identify the Splash speaker, (see PP 144, 145, and 150), directly quote the speaker, (see 150), and provide or at least strongly imply the date(s) of the statement(s), (see PP 18, 95, 127, 144–5, and 150). Only the statement in paragraph 150, however, combines all of these elements.

#### ii. Adoption or Endorsement of Statements by Third–Party Analyst





Case 1:04-cv-00831-SLR     Document 54-4     Filed 07/20/2005     Page 16 of 22

Page 15

2000 U.S. Dist. LEXIS 15369, *59; Fed. Sec. L. Rep. (CCH) P91,250

Plaintiffs implicitly concede [*60] in their opposition that they are not proceeding on the theory that any Splash corporate insiders are liable for adopting or endorsing third-party statements. The adoption or endorsement theory of liability depends upon a two way flow of information between corporate insiders and third-party analysts. *In re Syntex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996).* An insider is liable under this theory only if he placed his "imprimatur" on the projections in the analyst's report. Id.; *In re Software Publishing Sec. Litig., 1994 U.S. Dist. LEXIS 21481, 1994 WL 261365, *12 (N.D. Cal. 1994).* If information flowed from an insider to the analyst and then to the market without the insider ever receiving the opportunity to endorse or adopt the projection made by the analyst, liability under this theory is unavailing. See id.

In light of the conclusory pleadings dominating the FAC, plaintiffs smartly chose not to rely on this theory of liability. The FAC is replete with language mirroring the following from paragraph 70: "Macgillivray and Platt reviewed this report before it was issued, knowing that it would be publicly issued and affect the total mix of information impacting [*61] Splash's stock price. Subsequent to the release of this report, Splash copied and distributed it, thus adopting it as its own." (See e.g. PP 71, 74, 76, and 79). This boilerplate language fails, as required, to "point to specific interactions between the insider and the analyst which gave rise to entanglement" nor to "state when these interactions occurred." *Stack v. Lobo, 903 F. Supp. 1361, 1995 WL 241448, *8 (N.D. Cal. 1995); see In re Ross Systems Sec. Litig., 1994 U.S. Dist. LEXIS 21263, 1994 WL 583114, *10 (N.D. Cal. 1994).* Thus, plaintiffs have failed to plead adoption with particularity. See *Stack v. Lobo, 1995 WL 241448, *8* (finding that plaintiffs failed to plead adoption with particularity since they did not point to specific interactions between insiders and analysts even though they alleged that particular senior insiders reviewed and approved drafts of analysts' reports).

To the extent the FAC attempts to premise liability on defendants' adoption or endorsement of analyst statements, such claims are DISMISSED without leave to amend.

## 2. Fraudulent Selling Activity

The FAC does not allege that either Mr. Kleffman or Ms. Beheshti made a misleading statement. [*62] Nevertheless, plaintiffs allege that Kleffman and Beheshti are liable as participants in the scheme to defraud because each engaged in insider trading. Defendants ardently contend that non-speaking defendants cannot be liable under Rule 10b-5.

In addition to creating liability for material misstatements, Section 10 of the 1934 Act prohibits the commission of a manipulative act. *Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 177, 128 L. Ed. 2d 119, 114 S. Ct. 1439 (1994); see In re ZZZZ Best Securities Litigation, 864 F. Supp. 960, 971-2 (C.D. Cal. 1994)* (holding that liability under § 10(b) or Rule 10b-5 is not limited to the making of materially false or misleading statements or omissions). Central Bank refused to extend this zone of liability, however, so as to encompass those who aid and abet a person who commits a manipulative or deceptive act. *Central Bank, 511 U.S. at 177.* Conspiracy culpability does not independently give rise to liability under the securities laws. *Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1998)* (en banc). Nevertheless, even in the post–Central Bank [*63] world, allegations that a group of defendants acted together to violate the securities laws may still give rise to liability "as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." Id. In this case, to the extent defendants are arguing that a complaint must fail if it alleges the existence of a scheme even if it alleges that each participant in the scheme committed a manipulative act, their argument fails.

The crucial issue is whether the complaint alleges that the non-speakers, Kleffman and Beheshti, committed a manipulative act. Plaintiffs focus on the stock sales in which these two insiders allegedly participated. As an initial matter, stock sales by insiders who utilize undisclosed material information to their benefit can constitute manipulative or deceptive acts for purposes of § 10 of the 1934 Act. See *Chiarella v. United States, 445 U.S. 222, 229, 63 L. Ed. 2d 348, 100 S. Ct. 1108, 1115 (1980)* (criminal context); *Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1203 (1st Cir. 1996); Neubronner v. Milken, 6 F.3d 666, 669-70 (9th Cir. 1993)* (recognizing insider trading as an implied [*64] private cause of action under § 10(b) and Rule 10b-5). Two problems, one real and one possible, undermine reliance on this theory in this case. First, insider trading claims under § 10(b) and Rule 10b-5 are limited to individuals who traded contemporaneously with the insider; moreover, contemporaneous trading is a "circumstance constituting fraud" that requires heightened pleading. *Neubronner, 6 F.3d at 670.* In this case, plaintiffs have not alleged with particularity that they traded contemporaneously with Kleffman and Beheshti. Second, the general tenor of this FAC is that defendants committed fraud on the market through their false and misleading disclosures. At least one court has found that fraud on the market and insider trading are not easily reconcilable theories in the same case. See *Simon v. American Power Conversion Corp., 945 F. Supp. 416,*

  

Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 17 of 22

Page 16

2000 U.S. Dist. LEXIS 15369, *64; Fed. Sec. L. Rep. (CCH) P91,250

*425 (D. RI 1996)*. After all, whereas the focus in a fraud on the market case is to compensate market participants for "artificial boosts or deflations in stock prices caused by material misrepresentations," the focus in a "disclose or abstain" case is to compensate investors who were exploited by insider [*65] traders as a result of an informational disadvantage. n11 *Id.*

> n11 To the extent plaintiffs are attempting to hold defendants who made no fraudulent statements but who allegedly engaged in insider trading liable for the other defendants misleading statements, such a basis for liability does not arise from an insider trading claim. *Oak, 19978 WL 448168, *12.*

The Court finds that plaintiffs have failed to plead a manipulative or deceptive act by either Kleffman or Beheshti. Whether liability against these defendants may arise from the group published–information doctrine will be discussed *infra.*

### C. Scienter Requirement

The scienter analysis is unnecessary if the Court finds that plaintiffs have failed to plead falsity. *Karacand v. Edwards, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999)* (J. Kimball) ("Where plaintiffs fail to plead falsity, a fortiori they have not established that defendants knew those statements were false"). Because plaintiffs' scienter pleading is deficient [*66] even if they pled falsity with sufficient particularity, the Court hereby identifies with respect to scienter the areas requiring attention in any second amended complaint.

As discussed earlier, a complaint must plead in "great detail" facts demonstrating deliberate recklessness. n12 *Silicon Graphics, 183 F.3d at 983*. In a complaint pleaded on information and belief, failing to allege the sources of the plaintiff's information about internal reports, how the plaintiff learned of the reports, who drafted them, and which officers received them is not adequate. *In re Silicon, 183 F.3d at 985*. Plaintiffs seek to meet its scienter pleading burden by emphasizing defendants' "suspicious" stock sales during the class period and by touting defendants' internal knowledge of Splash.

> n12 For the forward looking statements, plaintiffs must prove that the defendants possessed actual knowledge that the statement was false or misleading when made. *15 U.S.C. § 78u–5(c)(1)(B); Helwig v. Vencor, Inc., 210 F.3d 612, 2000 WL 432432, *7 (6th Cir. 2000)*

[*67]

### 1. Defendants' Internal Knowledge

As a matter of law, courts have attributed critical facts to corporate insiders when assessing scienter and have then concluded, based on this imputed knowledge, the presence of a strong inference of deliberate recklessness. For instance, one court imputed knowledge of the potential incompatibility between two of a company's products, information which would affect the most significant contract in the company's history, to the President/CEO, the Vice President/CFO, and the Chairman of the Board, who had co-founded the company and had served as chairman for eleven years. *In re Ancor Communications, Inc., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)*. Another court attributed to the company and, implicitly, the President/CEO and the CFO knowledge of the key facts concerning a critical transaction. *Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 235 (D. Mass. 1999)*.

Ancor and Chalverus suggest that alleging the existence of undisclosed critical facts in concert with a defendant's prominent role in the corporation may support a strong inference that the defendant acted with deliberate recklessness when he [*68] made allegedly false or misleading statements. Such an approach, however, is not likely viable in the aftermath of Silicon, which bemoaned the absence of details about internal reports – such as their specific content, drafters, and reviewers. *Silicon, 183 F.3d at 985* ("In the absence of such specifics, we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of [the company's] problems that would cause their optimistic representations to the contrary to be consciously misleading."). Silicon explicitly rejected speculating about the insiders' knowledge. *Id.*

In their opposition filed in the instant case, plaintiffs remind the Court that the Splash individual defendants were "hands on" managers, were in "constant contact" with Fuji Xerox and Xerox, and had "direct access" to information from Fuji Xerox and Xerox. On the basis of these allegations, plaintiffs move to impute the critical, allegedly omitted facts to the individual Splash defendants.

The FAC, however, is decidedly boilerplate in its presentation. It repeatedly refers to unspecified "internal corporate documents," unspecified [*69] conversations with unspecified "corporate officers and employees," attendance at unspecified "management and/or Board meetings," unspecified order intake and backlog reports, unspecified disclosures and data from Xerox and Fuji Xerox, and the individual Splash defendants' "hands-on" management of Splash as the source of defendants'



Case 1:04-cv-00831-SLR    Document 54-4    Filed 07/20/2005    Page 18 of 22

Page 17

2000 U.S. Dist. LEXIS 15369, *69; Fed. Sec. L. Rep. (CCH) P91,250

knowledge of the critical facts. (See FAC at PP 30(g), 36, 42, 43, 82, 88, 99, 117, 143, and 152). In listing these unspecified bases for defendants' alleged knowledge, the FAC dramatically parallels allegations in other complaints in unrelated securities actions. n14 (Def's Mot., Ex. E). A comparison of this complaint with the other complaints strongly indicates the boilerplate features of this complaint. Silicon strongly doubted whether unparticularized, boilerplate pleadings could ever raise a strong inference of deliberate recklessness. *Silicon, 183 F.3d at 984.* Finding this complaint sufficient would undermine the particularized pleading requirements for scienter of the PSLRA. See *In re CBT Group PLC Sec. Litig., 1999 U.S. Dist. LEXIS 20685, 1999 WL 124287, *2 (N.D. Cal. 1999)* (J. Whyte) (finding that allegation of insider awareness of [*70] unspecified negative internal reports, including order, backlog, and shipment reports, was insufficient to satisfy Silicon).

> n14 Silicon implicitly approved the district court's taking of judicial notice of five securities class actions in US District Courts containing the same boilerplate allegations of negative internal reports. *Silicon, 183 F.3d at 984 n.13.* The Court here takes judicial notice of the sections of the complaints referenced in Exhibit E of the Splash defendants' motion.

## 2. Stock Sales

Plaintiffs draw the Court's focus to Radius' stock sales as an alternative means for imputing knowledge and scienter to Berger and Radius. Defendants challenge this attempt on a number of fronts.

Unusual or suspicious stock sales by corporate insiders may serve as circumstantial evidence of the requisite scienter but only if the insider trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information. [*71] " *Id. at 986* (internal quotations and citation omitted). Relevant factors to consider when determining whether the trading meets this standard are (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history. Id. Context is important, especially for assessing the weight to attach to the timing of the sales. *Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999).* Although viable circumstantial evidence of scienter, "stock sales alone cannot create a strong inference of scienter." *Lumisys, 2 F. Supp. 2d at 1251.* n15

> n15 Silicon did not hold that insider trading

standing alone can be sufficient to prove scienter. In the passage cited by plaintiffs, Silicon merely holds that insider trading in suspicious amounts or at suspicious times can be **probative** of scienter. Probative and sufficient are not synonymous. The reasoning of Silicon lends itself to readings both supporting and refuting plaintiffs' position. On the one hand, the court concluded that "the stock trading was not . . . suspicious enough to create a strong inference of the required deliberate recklessness," a comment suggesting that in another case trading alone could be sufficient. See *Silicon, 183 F.3d at 987.* On the other hand, the court admitted that the stock sales of one defendant "appeared extremely significant" but then decried the absence of other circumstantial evidence in concluding that the trading did not raise a strong inference of deliberate recklessness. *Id. at 987-8.* A number of plaintiffs' authorities rest a scienter conclusion on stock sales **plus** some other circumstantial evidence of scienter. *Kaplan v. Rose, 49 F.3d 1363, 1379 (9th Cir. 1995)* (finding suspicious stock sales in conjunction with allegations that defendants were aware of material undisclosed negative information about company raised sufficient suspicions of defendants' intent); *Friedberg v. Discreet Logic, Inc., 959 F. Supp. 42, 51-52 (D. Mass. 1997)* (finding that amount and time of stock sale plus "other evidence" provided sufficient circumstantial evidence of conscious misbehavior).

[*72]

In Silicon, six insider officers of the company sold 388, 188 shares for a total of $13,821,053 in proceeds. At the end of the class period, which lasted for approximately fifteen weeks, the six officers collectively retained 90% of their available holdings. *Silicon, 183 F.3d at 987.* Four of the officers sold less than 8% of their available holdings. Id. The other two officers sold 43.6% and 75.3% of their holdings respectively. In analyzing the sales collectively and individually, the court contemplated that any individual's sales could give rise to a strong inference of deliberate recklessness on the part of that individual alone or the other directors. Id. The court concluded that neither the group's sales collectively nor any individual sales gave rise to a strong inference of deliberate recklessness as to any individual nor as to any group. *Id. at 987-8.*

### a. The Principals

#### i. Platt

Platt sold 31.32% of her holdings n16 in Splash

  

Case 1:04-cv-00831-SLR   Document 54-4   Filed 07/20/2005   Page 19 of 22

Page 18

2000 U.S. Dist. LEXIS 15369, *72; Fed. Sec. L. Rep. (CCH) P91,250

stock during the Class Period for a total proceeds of $1,338,550. (FAC at P 54). The total number of shares sold during this time was 47,500. She sold 10,000 shares in connection with the August [*73] 1997 Secondary Offering, 12,5000 shares upon the expiration of the lock-up arising in connection with the Secondary Offering, and 25,000 shares on July 20, 1998.

> n16 The Court includes the individual Splash defendant's stock options in computing this percentage. As Silicon noted, "actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone." Silicon, 183 F.3d at 986-7.

### ii. Macgillivray

Macgillivray sold 25.17% of his holdings in Splash stock during the Class Period for a total proceeds of $2,285,415. The total number of shares he sold during this time was 83,629. He sold 43,000 shares in connection with the 1997 Secondary Offering, 5,000 shares on May 14, 1998, and 35,629 shares during a 7 day period from July 17-July 24, 1998.

### iii. Kleffman

Kleffman sold 47.37% of his holdings in Splash stock during the Class Period for a total proceeds of $3,202,040. The total number of shares he sold during this [*74] time was 117,800. He sold 43,000 shares in connection with the August 1997 Secondary Offering, 20,000 shares between November 19 and November 20, 1997, 20,000 shares on April 17, 1998, 20,000 shares on July 17, 1998, and 14,800 shares over a three day period from August 17-August 20, 1998.

### iv. Beheshti

Beheshti sold 28.46% of her shares in Splash stock during the Class Period for a total proceeds of $1,473,252. The total number of shares she sold during this time was 47,008. She sold 33,508 shares in connection with the Secondary Offering and 13,500 shares in the a four day period (November 17–November 21, 1997) immediately preceding and immediately following the expiration of the lock-up provision arising from the Secondary Offering.

### v. Group n17

> n17 Plaintiffs argue that the Court should include Berger in the "group" since he had the ability to trade Radius' shares even though he had disclaimed beneficial ownership in the shares. The Court should inquire at the hearing into who

should form the "group" for purposes of the scienter stock sale analysis.

[*75]

As a group, these individual defendants sold 295,937 shares over a 92 week period for $8,299,257 in proceeds. Forty-four percent of these sales occurred in connection with the Secondary Offering, another 16% occurred in the days immediately preceding or following the expiration of the lock-up arising from the Secondary Offering, and 27% occurred over a 7 day period in July from July 17, 1998, to July 24, 1998. At the end of the class period, the group retained 67% of their holdings.

### b. Analysis n18

> n18 Because the class period commenced early in Splash's existence, the Court cannot compare the sales in this case to the individual Splash defendants' prior trading history of Splash stock.

The amount of shares sold, whether individually or collectively, is not suspicious in this case in that the collective proceeds were $8,299,257, slight compared to the nearly $14 million in proceeds deemed not sufficiently suspicious in Silicon. Whether collectively or individually, however, the percentage of shares [*76] sold appears suspicious. The group sold 33% of their available holdings, and the individuals sold 31.32%, 25.17%, 47.37, and 28.46% of their holdings respectively. Other courts, albeit applying more forgiving pleading scienter standards, have found lower percentages at least suspicious. Voit v. Wonderware Corp., 977 F. Supp. 363 (E.D. Pa. 1997) (71.9%, 14.9%, and 10.6%); Friedberg v. Discreet Logic, Inc., 959 F. Supp. 42 (D. Mass. 1997) (12% collectively among five individuals but 33% and 50% respectively for two of the individuals); Marksman Partners, L.P., v. Chantal Pharmaceutical Corp., 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20%). One major mitigating factor in this finding is that the Class Period in this case extended approximately ninety weeks, which provides a basis for distinguishing the percentage of shares sold in Silicon, where the class period consisted of a mere fifteen weeks. A second qualification to this finding is that Beheshti sold much of her stock after she resigned from Splash on October 31, 1997, which counsels against placing undue emphasis her sales. See Greebel, 194 F.3d at 206; [*77] In re Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181, 2000 U.S. Dist. LEXIS 12501, at 4 (N.D. Cal. 2000) (J. Fogel).

Suspicious timing is generally absent on these facts. Circumstantial temporal evidence in support of a find-

  

Case 1:04-cv-00831-SLR     Document 54-4     Filed 07/20/2005     Page 20 of 22

Page 19

2000 U.S. Dist. LEXIS 15369, *77; Fed. Sec. L. Rep. (CCH) P91,250

ing of scienter can arise from the "temporal proximity between an alleged misstatement and the later disclosure of inconsistent information." *Friedberg, 959 F. Supp. at 51;* see *Greebel, 194 F.3d at 206–7.* Another relevant factor when assessing the timing of a sale is the price at which the sale occurred since such evidence can bear on whether defendants deliberately attempted to seize on artificially high prices. *Plevy v. Haggerty, 38 F. Supp. 2d 816, 835 (C.D. Cal. 1998).*

In the light provided by these other cases, the trading splurges in August 1997 and November 1997 are only marginally suspicious. As previously discussed, plaintiffs have not adequately pled the existence of any fraudulent statement in the Prospectus and Registration Statement for the August 1997 Secondary Offering. In their papers, plaintiffs insist that the August trades are suspicious given their proximity in time to Splash's highwater trading mark of $47.688 [*78] per share on October 24, 1997. The $47 figure is more than $16 above the amount the individual defendants received in their August sales. The delay between defendants' trades and the onset of the Splash stock's decline combined with the fact that the Splash stock continued to rise to considerable new heights counsels against deeming the timing of the August sales sufficient to satisfy the scienter pleading standard. As for the November sales, plaintiffs contend that the EFI announcement followed approximately three weeks later. The FAC provides no indication that any defendant had inside information concerning the information in the EFI announcement prior to the actual announcement. The suggested link between the November trading activity and the December news is insufficient by itself to satisfy the PLSRA's strict pleading standards.

The heated trading activity in July 1998 is suspicious. These trades occurred approximately eleven weeks before October 13, 1998 – the day that Splash's negative revelations drastically (and negatively) affected the price of its stock. On July 17, 1998, Splash's shares were selling at $24.250. One month later, on August 20, 1998, the shares were selling [*79] at $24.125 but not for long. By September 4, 1998, the price of shares had fallen to $16. The October 13, 1998, announcement coincided with a drop in shares to $7.063. The high volume of sales during the week in July coupled with the temporally proximate subsequent decline in stock value and disclosure of negative news arouses suspicion about the July trades. See *Friedberg, 959 F. Supp. at 51–2* (emphasizing the temporal proximity – as large as two and one-half months – of the stock sales and the announcement of the negative news as circumstantial evidence of conscious misbehavior).

In sum, the stock sales are suspicious in terms of

percentage, although the length of the class period decreases the weight to attribute to that fact, and the sales are suspicious for their timing, although some only marginally so. As a whole, the stocks sales are not sufficient by themselves to raise a strong inference of deliberate recklessness. Even in combination with the generalized pleadings concerning the Splash individual defendants' internal roles in Splash and access to unspecified internal reports, these stock sales may not rise to the pleading level established by Silicon [*80] . The Court need not and does not definitely resolve this issue in that the complaint merits dismissal on other grounds.

## III. Group–Published Information Doctrine

As previously discussed, the FAC does not allege any actionable statements by Mr. Kleffman or Ms. Beheshti. Defendants maintain, however, that these defendants are liable for the Company's statements under the group published information doctrine.

On the basis of a presumption that group–published information is the collective action of officers, the group published information doctrine excuses a plaintiff from the obligation imposed by 9(b) of attributing statements to a particular defendant speaker. See *Glenfed II, 60 F.3d 591, 593.* Group–published information includes prospectuses, registration statements, annual reports, and press releases. *In re Interactive Network, Inc. Securities Litigation, 948 F. Supp. 917, 920 (N.D. Cal. 1996).* Although the group–published information doctrine relieves a plaintiff from alleging that each defendant actually spoke, it does not escape the requirements of 9(b) and the PLSRA. n19 *Oak Technology, 1997 WL 448168,* *10–11. Thus, [*81] it does not affect the requirement that plaintiffs must plead both the circumstances of the alleged misleading statements and the circumstances of the falsity with particularity. Id. at *10.

---

n19 A serious question arises whether the group published information doctrine survives the PSLRA. The PSLRA requires a plaintiff to plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u–4(b)(2).* Some courts have detected inherent tension between a requirement that the complaint allege scienter as to each defendant and a doctrine permitting it to rely on group pleading when asserting that the defendant made the statement for which he must possess scienter. See *Branca v. Paymentech, Inc., 2000 U.S. Dist. LEXIS 1704, 2000 WL 145083,* *8 (N.D. Tex. 2000); Marra v. Tel-Save Holdings, Inc., 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103,* *5 (E.D. Pa. 1999).* Other courts, in-

  

2000 U.S. Dist. LEXIS 15369, *81; Fed. Sec. L. Rep. (CCH) P91,250

cluding some federal courts in California, have concluded that the group published information doctrine survives the PSLRA. See Copperstone, C 97-3495 SBA, at 24; *Schlagel v. Learning Tree Int'l, 1998 WL 1144581,* *6 (C.D. Cal. 1998) (J. Collins). Although the two above-cited cases finding tension between the group-pleading doctrine and the PSLRA are more persuasively reasoned, the Court assumes for purposes of its analysis that the group published information doctrine survives the PSLRA.

[*82]

When a plaintiff attempts to rely on the group-published information doctrine to extend liability to an inside officer of a company, he must plead that the officer was "directly involved 'not only in the day-to-day affairs of [the company] in general but also in [the preparation of its] [allegedly misleading] statements in particular.'" *Oak, 1997 WL 448168,* *11 (citing *Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)).* Plaintiffs have not directed the Court to any allegations in the complaint concerning the roles either Kleffman and/or Beheshti played in the preparation of any allegedly misleading written statement. These defendants are DISMISSED with prejudice.

**IV. Control Person Liability**

If the complaint fails to state a claim against Platt and Macgillivray for their individual statements, plaintiffs' rely on one final alternative theory: control person liability. The complaint alleges that Macgillivray and Platt were control persons of Splash by reason of their stock ownership and management positions. (FAC at P 164).

Section 20(a) of the 1934 Act provides:

> Every person who, directly or indirectly, [*83] controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In order to state a claim for control person liability, plaintiffs must allege (1) a primary violation of the federal securities laws and (2) that the alleged controlling person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation. See *Oak, 1997 WL 448168,* *14; see *17 C.F.R. § 230.405* (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise"). The threshold requirement of a primary violation, of course, means that the complaint must allege the primary violation with the [*84] particularity always required by 9(b) and PSLRA. Id. In order to adequately plead the second element of a control person liability claim, the complaint must plead the circumstances of the control relationship with particularity. Id.

In this case, plaintiffs have failed to plead a primary violation. Therefore, any discussion of control person liability is moot.

**V. CONCLUSION**

The above analysis identifies a number of statements for which dismissal with prejudice is appropriate. Accordingly,

> Because the statutory safe harbor applies to them, the statements made in the press releases from May 6, 1997, December 12, 1997, April 6, 1998, July 14, 1998, and October 13, 1998, in the prospectus for the 1997 offering, and in the 1997 10-K are not actionable. In any future amended complaint, plaintiff shall not include these statements as actionable statements.

> Because they constitute vague assessments of past results, the statements at the center of paragraphs 72, 86, 95-96, 111, 125, and 137 are not actionable. In any future amended complaint, plaintiff shall not include these statements as actionable statements.

> The historical facts included in paragraph [*85] 81 are not actionable in that plaintiffs have not alleged facts particularly challenging the accuracy of said facts. In any future amended complaint, plaintiff shall not include the historical fact portion of that statement as actionable.

Although dismissal with prejudice is a viable option for plaintiffs' other statements, the Court declines to adopt such an approach at this juncture. Rather, the Court specifically instructs plaintiffs as follows n20

  

2000 U.S. Dist. LEXIS 15369, *85; Fed. Sec. L. Rep. (CCH) P91,250

(1) With respect to alleged false or misleading statements made by defendants to the public, any amended complaint must (a) allege in sufficient detail the *falsity* of *each* statement when made and (b) allege the specific source of the information forming the basis of the allegation of falsity and how plaintiffs learned of this information.

(2) With respect to alleged false or misleading statements by a defendant that are embodied in an analyst's report (See PP 70, 71, 74, 76, 79, 80, 83, 85, 87, 89, 90, 97, 98, 109, 110, 113, 114, 115, 123, 129, 130, 132, 133, 134, 136, 142, 148, 149, and 151), any amended complaint must (a) specify each allegedly misleading statement by providing specifics such as the [*86] speaker and the date and by distinguishing which parts of the report repeated the information provided by the speaker, (b) allege in sufficient detail the *falsity* of *each* statement when made, and (c) allege the specific source of the information forming the basis of the allegation of falsity.

(3) With respect to alleged false or misleading statements made by defendants and paraphrased or quoted by an analyst, any amended complaint must (a) specify each allegedly misleading statement by providing specifics such as the speaker and the date, (b) allege in sufficient detail the *falsity* of *each* statement when made, and (c) allege the specific source of the information forming the basis of the allegation of falsity.

With respect to all statements for which leave to amend is extended, plaintiffs in any effort to meet the scienter pleading requirements shall specify the sources of defendants' alleged internal knowledge. With respect to any second amended complaint, the Court reminds plaintiffs of the need to conform to Rule 11.

n20 All statements specifically designated as subject to dismissal with prejudice are hereby dismissed with prejudice regardless of whether this conclusion is subject to a construction that leave to amend is granted as to such statements.

**[*87]**

To the extent the FAC attempts to premise liability on defendants' adoption or endorsement of analyst statements, such claims are DISMISSED with prejudice for the reasons discussed above.

Because plaintiffs have not alleged a viable basis of liability against Kleffman and Beheshti, these defendants are DISMISSED with prejudice.

In conclusion, the first amended complained is DISMISSED. This dismissal is without prejudice except as specifically designated above. Plaintiffs shall file any amended complaint **no later than October 25, 2000**. In filing any such amended complaint, plaintiffs shall make a good faith attempt to comply with both the letter and the spirit of this order.

Plaintiff has not requested leave to *add* any new statements to any amended complaint. Therefore, any amended complaint shall not include new actionable statements.

IT IS SO ORDERED.

Dated: September 29, 2000

SAUNDRA BROWN ARMSTRONG

United States District Judge

