# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 1

C

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Dan GAVISH, Tricia Fontan, Walter Fontan, individually and on behalf of all others similarly situated, Plaintiffs,
v.
REVLON, INC., Rev Holdings Inc., Ronald O. Perelman, George Fellows, and Frank J. Gehrmann, Defendants.
No. 00 Civ. 7291(SHS).

Sept. 30, 2004.

*OPINION & ORDER*

STEIN, J.

Table of Contents

I.  BACKGROUND .................................................... 3
    A. The Parties ............................................... 3
    B. The Scheme to Artificially Inflate Revlon's Stock Price ... 3
    C. The Fraud Allegations ..................................... 5
       1. Aggressively Selling Products .......................... 5
       2. Offering Promotions, Discounts, Rebates ................ 6
       3. Shipping Products Early ................................ 6
       4. Granting Rights of Return .............................. 7
       5. Delaying Issuing Credits to Customers .................. 7
       6. Bill and Hold: Shipping Products After Billing ......... 8
       7. Booking Non-Existent Sales ............................. 8
    D. Misleading Statements ..................................... 9
       1. October 2, 1998 Press Release: Statements 1-5 .......... 10
       2. October 28, 1998 Press Release: Statements 6 and 7 ..... 11
       3. Third-Quarter 1998 10-Q ................................ 12
       4. January 11, 1999 Press Release: Statements 8 and 9 ..... 12
       5. January 12, 1999 Statement: Statement 10 ............... 13
       6. January 28, 1999 Press Release: Statements 11-13 ....... 14
       7. January 1999 to March 1999: Statements 14 and 15 ....... 14
       8. 1998 Form 10-K ......................................... 15
       9. April 7, 1999 Announcement ............................. 15
       10. April 26, 1999 Interview with Fellows: Statements 16-18  15
       11. April 29, 1999 Press Release: Statement 19 ............ 16
       12. First Quarter 1999 10-Q ............................... 17
       13. July 27, 1999 Press Release ........................... 17
       14. Second Quarter 1999 10-Q .............................. 17
       15. The October 1, 1999 Disclosure ........................ 18

II. DISCUSSION .................................................... 19
    A. Standard of Review ........................................ 19
    B. Section 10(b) Claims ...................................... 20
       1. Improper Revenue Recognition ........................... 22
          a. Misrepresentation and Scienter ...................... 24
          b. Materiality of Alleged Overstatements ............... 29
       2. Exacerbation of the Inventory Problem--Channel Stuffing  31

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
**(Cite as: 2004 WL 2210269 (S.D.N.Y.))**

Page 2

```
            a. Falsity ............................................... 32
            b. Scienter .............................................. 34
         3. Misrepresentations as to the Remaining Size of the Inventory
            Problem .................................................. 36
      C. Section 20(a) Claims ........................................ 46

III.    CONCLUSION ..................................................... 46
```

\*1 Plaintiffs have brought this class action alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the 1934") and Rule 10b-5 promulgated thereunder. Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint for failure to plead fraud with sufficient particularity as required by Fed.R.Civ.P. 9(b), for failure to comply with the pleading requirements set forth in the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (codified in various sections of 15 U.S.C.) ("PSLRA"), and for failure to state a claim upon which relief can be granted. For the reasons set forth below, defendants' motion to dismiss the amended complaint is granted.

I. BACKGROUND

Plaintiffs' Amended Class Action Complaint alleges the following relevant facts, which the Court presumes to be true for the purposes of this motion.

A. The Parties

The plaintiffs are individual investors who bring this action on their own behalf and as a class action on behalf of all persons who purchased Revlon, Inc. securities from October 2, 1998 through September 30, 1999 (the "Class Period"). [FN1] In an amended complaint, they allege that they purchased Revlon stock at an artificially high price created by material misstatements and omissions in defendants' representations to the market.

> FN1. An earlier litigation asserted similar claims on behalf of a class of investors who purchased Revlon securities between October 29, 1997 and October 1, 1998. See *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192, 2001 WL 293820 (S.D.N.Y. Mar. 27, 2001).

Revlon is a Delaware corporation and a leading manufacturer of cosmetic, skin care, fragrance, and personal, hair and nail care products. (Compl.¶ 15). Defendant REV Holdings, Inc., as of the date of the complaint, owned approximately 83.0% of the outstanding shares of capital stock of Revlon, representing approximately 97.4% of the voting power of those outstanding shares. (Compl.¶ 16). Plaintiffs name a variety of individual defendants who were involved with Revlon in various capacities as follows: Ronald O. Perelman indirectly owns and controls REV Holdings, Inc. and was Chairman of Revlon's Board of Directors during the Class Period (Compl.¶ ¶ 16-18); George Fellows was Revlon's President, Chief Executive Officer, and Director (Compl.¶ 17); and Frank J. Gehrmann was Revlon's Executive Vice President and Chief Financial Officer. (Compl.¶ 17).

B. The Scheme to Artificially Inflate Revlon's Stock Price

Perelman acquired Revlon in 1986 through a leveraged buy-out. (Compl.¶ 2). The buy-out saddled Revlon with substantial debt, a large portion of which was secured by twenty million Revlon shares pledged by Perelman. (Compl.¶ 2).

During the Class Period, defendants believed that Revlon's debt would have to be alleviated either through refinancing or the sale of the company. (Compl.¶ ¶ 2, 104). In order to refinance or sell the company on favorable terms, defendants needed to maintain for Revlon the "appearance of a healthy company." (Compl.¶ 104). According to the complaint, defendants could not honestly maintain such an appearance, however, given their knowledge and exacerbation of the "bloated retail inventory imbalances which, throughout the Class Period, kept Revlon from realizing the full amount of customer acceptance of Revlon products." (Compl.¶ ¶ 2, 8).

\*2 In order to maintain Revlon's ability to refinance its debt, defendants allegedly tried to make Revlon appear to be in better financial health than it actually was. Specifically, plaintiffs allege that defendants fraudulently: (1) overstated Revlon's sales through accounting practices that violated generally accepted accounting principles or Revlon's own revenue recognition policy; (2) failed to disclose and falsely denied the "trend" that Revlon, in order to prop up short-term sales, was selling more merchandise to retailers than retailers were selling to consumers; and (3) hid or downplayed the extent to which

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 3

Revlon's retail channels remained bloated with merchandise. Potential buyers, refinanciers, and the stock market were thereby misled by material misstatements and omissions into believing the company was much healthier than it was until Revlon revealed the true state of its finances.

The complaint alleges that on October 1, 1999 Revlon revealed the true state of its finances when it "shocked the market" by "admitt[ing]" that "it had not previously reduced the amount of its inventory of Revlon product in the channel as it had represented and had 'decided to accelerate the reduction of U.S. retailers' warehouse inventory levels.' " (Compl.¶ ¶ 79-80). Plaintiffs further quote Revlon's October 1 press release as "admitt[ing]" that " 'instead of the originally planned gradual reduction, the Company plans to achieve the accounts' new, lower inventory targets by reducing the level of shipments through year end.[']" (Compl.¶ 80). Revlon also announced an "operating loss before restructuring charges of between $70 million and $80 million for 1999 and a third quarter net loss before restructuring charges of approximately $3.10 to $3.20." (Compl.¶ 80). The complaint alleges that, as a result of this press release, Revlon stock declined "even further" to "below $12 per share." (Compl.¶ 80).

C. The Fraud Allegations

Plaintiffs allege a series of actions taken by defendants to show that they were intentionally inflating Revlon's revenue and manipulating its accounting.

The complaint lists these specific allegations regarding Revlon's sales and accounting practices during the Class Period (Compl.¶ ¶ 20-32):

1. Aggressively Selling Products

According to the complaint, "[a] former Special Projects Manager at Revlon" reports that "during 1998 and 1999" Revlon was "forcing an excessive amount of products" on its retailers. (Compl.¶ 21(d)). Revlon maintained difficult-to-meet quarterly sales quotas that frustrated its huge sales force and upset its overstocked retail clients. (Compl.¶ 21(d), (o), (r)). In particular, "[a]t one point," a customer named Sally Beauty Supply ordered Revlon to cease product shipments because it did not have any room to store excess Revlon products. (Compl.¶ 21(e)). A former Revlon Territory Sales Manager--who believed that Revlon's quotas were "excessive and unrealistic"--reported that managers in Miami were told in 1998 and 1999 to "load" their retail customers with inventory at the end of each quarter and at year's end. (Compl.¶ 21(g)). Those customers in turn would use Revlon's desire to sell great quantities at quarter's end to negotiate better deals. (Compl.¶ 21(g), (p), (q), (r)). Plaintiffs allege that, as a result of this practice, quarters during the Class Period became "more and more back-end loaded." (Compl.¶ 21(f)).

2. Offering Promotions, Discounts, Rebates

*3 The complaint alleges that Revlon oversupplied its retailers by "offering promotions, special deals, rebates and marketing incentives." (Compl. ¶ ¶ 5, 21(o)-(r), 29, 91). In particular, plaintiffs allege that during relevant time periods, one Territorial Sales Manager stated that she "was advised to offer retail customers discounts ... to encourage large orders," something "she did not think ... was standard practice within the industry." (Compl.¶ 21(g)). Indeed, "[i]t was widely known in the industry that large retail chains, such as Rite-Aid and CVS, would receive a cash discount for agreeing to purchase large amounts of product before the end of the quarter." (Compl.¶ 21(o)). "[L]ater in 1998," the complaint alleges, retail customers "could buy one Revlon item and receive a second Revlon item free." (Compl.¶ 29).

3. Shipping Products Early

Revlon allegedly disregarded shipment dates requested by customers and shipped products earlier. (Compl.¶ 21(b), 22(a)). In particular, plaintiffs allege that, at some unspecified time, Safeway received "many shipments" that Safeway had either not even ordered or "requested to be shipped at a later date." (Compl.¶ 22(a)). As a result, "at a later date," Safeway posted signs at its stores stating, " 'Do not accept shipments from Revlon." ' (Compl.¶ 22(a)). Still "[l]ater in 1998," Safeway's southern California stores stopped purchasing from Revlon altogether. (Compl.¶ 22(a)). Moreover, "[i]n December 1998, Revlon shipped to the Fred Meyer Co .... orders which Fred Meyer Co. had asked to be shipped in January and February 1999." (Compl.¶ 21(b)).

4. Granting Rights of Return

Revlon is further said to have provided "unlimited rights of return" that would allow retail customers to keep excess product that they received at the end of quarters and return it at a later date. (Compl.¶ ¶ 21(h), 22(c), 89). Specifically, "[d]uring the Class Period," [FN2] Revlon allegedly "rolled out [its new Ultima II line] to Longs Drugstores" with "a right to return the merchandise after one year." (Compl.¶ 21(h)). In 1999, Longs Drugstores returned "much of the Ultima II merchandise" it had purchased. (Compl.¶ 21(h)).

FN2. Although accepted as true, this allegation,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 4

like many others in this complaint, appears to be copied directly from the complaint in the action brought by investors who purchased Revlon securities in the year preceding this Class Period. See *In re Revlon*, 2001 WL 293820. According to paragraph 4(d) of the complaint in that action, however, the Ultima II line was rolled out to Longs Drugstore during the first quarter of 1998, not, as the complaint in this action would have it, "[d]uring the Class Period" which begins on October 2, 1998. Other apparently copied allegations do not even bother to adjust dates to match this Class Period. (Compl.¶ 23).

5. Delaying Issuing Credits to Customers

Plaintiffs charge Revlon with delaying issuance of credit to customers who returned products. (Compl.¶ ¶ 21(i), 22(a), 24-26). In particular, "a former employee stated that credits to customers were often delayed, particularly if a merchandise return was made in October or November." (Compl.¶ 21(i)). Moreover, Revlon allegedly contracted with Genco Distribution System ("Genco"), a third-party return center located in Maryland, to process and hold returned product. (Compl.¶ 24). A Revlon employee named Stan Hirsh, who spent several days per week on site at Genco, directed Genco to hold pristine product returns for long periods of time before shipping them back to Revlon manufacturing centers for redistribution, thus delaying the issuance of credits by Revlon. (Compl.¶ 25). In October 1998, Genco received thirty pallets of Revlon merchandise from Marc Glassman, Inc., a return allegedly containing enough product to supply the needs of more stores than were in the Glassman chain. This return was held at Genco for months before it was shipped to a Revlon manufacturing center, as was a trailer load of lipstick returned from Israel in "early 1999." (Compl.¶ 26).

6. Bill and Hold: Shipping Products After Billing

*4 According to the complaint, not only did Revlon ship products early, it shipped them late, after the end of the quarter in which the sales were booked. (Compl.¶ 21(a)). This allegation is based on statements of former Revlon employees that Revlon "rented storage facilities and loaded its semi trailers with merchandise which had not been ordered by its customers" and then engaged in " 'bill and hold' practices pursuant to which customers were billed for product which had not been shipped and which remained in Revlon's control." (Compl.¶ ¶ 21(a), (c)).

7. Booking Non-Existent Sales

The complaint also claims that Revlon booked as sales shipments that no one had ordered. (Compl.¶ ¶ 22(a), 89). This allegedly may have occurred in recordings of sales to Safeway at some unidentified time in 1998. (Compl.¶ 22(a)).

Plaintiffs turn all of the alleged conduct, set forth above, into a mantra of fraud repeated at the end of each paragraph of the complaint which arguably contains a "statement" in an attempt to meet the PSLRA requirement that the complaint "specify ... the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The paragraph that repeats those allegations, based on the allegedly fraudulent conduct, is as follows:

> These statements were materially false and misleading, and were known by the Defendants to be materially false and misleading at the time of their publication, or were recklessly disregarded as such, because the Defendants were manipulating the Company's reported revenue, operating income, net income, and EBIDTA [earnings before interest, taxes, depreciation, and amortization], by actively stuffing the channel with inventory that customers had not ordered, recording as sales shipments to Revlon's own warehouses, delaying recording credits being issued to the customers, realizing "sales" that did not qualify as recognizable revenue, and engaging in improper bill and hold transactions.

(Compl.¶ ¶ 36, 39, 45, 50, 52, 54, 56, 58, 60, 65, 68, 72, 74, 77).

D. Misleading Statements

As set forth above, in order to state a claim for violation of the securities laws based on fraudulent misstatements or omissions, plaintiffs are required to "specify each statement alleged to have been misleading." PSLRA, 15 U.S.C. § 78u-4(b)(1). Plaintiffs have provided a farrago of statements, allegedly rendered misleading in light of the defendants various fraudulent practices with respect to manipulating revenue, by quoting at length from the "reported revenue, operating income, net income, and EBITDA" contained in Revlon's SEC filings during the Class Period and the commentary in those filings, company press releases, and articles from the business and popular press, occasionally using boldfaced type to emphasize those allegations. Below, the Court has summarized the statements that plaintiffs have attributed to defendants in chronological order. Where appropriate, the Court has placed the statements in their original context. See *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir.1996); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir.1991).

*5 In addition to these alleged misstatements, plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 5

have identified one specific omission which they believe Revlon had a duty to disclose to the market: the Class Period "trend" that "sales by Revlon to its customers (into the channel) greatly exceeded sell-through (sales by its customers out of the channel)." (Compl.¶ 98(d)).

1. October 2, 1998 Press Release: Statements 1-5

The consensus analyst estimate for the third quarter of 1998 was that Revlon would have $635 million in net sales and $0.73 in earnings per diluted share. (Compl.¶ 33). On the first day of the Class Period, October 2, 1998, Revlon announced that third quarter results would fall materially short of those expectations. (Compl.¶ 3). Revlon would have only $540 million in net sales and only $0.07 in earnings per diluted share. (Compl.¶ 3).

Fellows explained in Revlon's press release that a "number of factors" had adversely affected Revlon's domestic business:

> Among them are a slowdown in the rate of growth in the mass market color cosmetics category as well as a greater than expected seasonal flattening of share caused by a shift in advertising and promotional activity and delays in some product introductions. At the same time, retailers, particularly chain drugstores, driven by recent consolidation, are pursuing efficiencies by reducing inventory levels.
> The other factors mentioned by Fellows were "the aggregate effect of the weak international economic environment" and "weakness in foreign currencies."

(Glekel Decl. Ex. A).

The company announced a $50 million restructuring to include "the closing of three international plants, a reorganization of the Company's workforce principally outside of the U.S., and other actions designed to reduce costs." Fellows estimated that the restructuring would "result in annual benefits in the range of $25 to $30 million." (Glekel Decl. Ex. A).

Fellows, while acknowledging that "the anticipated results for the second half of the year are very disappointing," nevertheless maintained that "the longer-term outlook for our Company continues to be extremely positive, despite significant challenges in the marketplace" ("Statement 1"). He asserted that "[t]he business fundamentals of our Company are strong" ("Statement 2") and noted, in that respect, the strength of the company's Revlon and Almay brands, that the company's "program to broaden distribution of our Ultima II line is showing significant strength" ("Statement 3"), and that Revlon "expect[s] that as retail inventories are stabilized, our growth will again outpace category growth" ("Statement 4"). Fellows concluded by reaffirming Revlon's business strategy: "[d]espite the challenges we now face," he was quoted, "we are confident that our long-term outlook remains positive and we intend to pursue the fundamental business strategy that fueled our success to date" ("Statement 5"). (Compl. ¶ 3; Glekel Decl. Ex. A).

*6 The October 2 press release labeled some statements therein as "forward-looking statements" made pursuant to the safe harbor provisions of the PSLRA, including "the Company's expectation that once retailer efficiencies have been achieved, growth will outpace category growth." Revlon also noted several factors that "could cause actual results to differ materially from those expressed in the forward-looking statements," including "less than expected growth after retailer efficiencies have been realized." (Glekel Decl. Ex. A).

2. October 28, 1998 Press Release: Statements 6 and 7

On October 28, 1998, another Revlon press release confirmed third quarter results in line with the October 2 estimates. (Compl.¶ 38). "Net sales," Revlon reported, "were $548.6 million for the third quarter of 1998, compared to $581.0 million for the third quarter of 1997," a decline of 3.5% on a constant U.S. dollar basis. (Glekel Decl. Ex. B).

Fellows reiterated that Revlon's "business fundamentals are strong and our outlook for the future continues to be positive" ("Statement 6"). He said, again, that Revlon would address the challenges it faced--including the "slowdown," the "seasonal flattening," "delays in some product introductions," and retailers' reductions of inventory levels--"by pursuing the same business strategy that fueled our success for the prior 19 quarters and through restructuring efforts we have already announced ..." ("Statement 7"). The release also warned that Revlon "expects retail inventory balancing and reductions to affect sales in the fourth quarter and in 1999." (Compl. ¶ 38; Glekel Decl. Ex. B).

The October 28 release identified "the effect on sales of retail inventory balancing and reductions" as a "forward-looking statement" made pursuant to the safe harbor provisions of the PSLRA. Revlon warned that "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions" might "cause actual results to differ materially from those expressed" in the statement. (Glekel Decl. Ex. B).

3. Third-Quarter 1998 10-Q

Revlon filed its third quarter Form 10-Q on November 17, 1998. The filing repeated the figures for net sales,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 6

EBIDTA, operating income, and net income quoted in Revlon's October 28 press release. It identified "the affect on sales of retail inventory balancing and reductions" as a forward-looking statement whose predictive value could be undermined by, among other things, "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. C at 18).

4. January 11, 1999 Press Release: Statements 8 and 9

On January 11, 1999, Revlon announced that it was "expanding its restructuring program, originally announced in October, to further increase efficiencies and enhance the Company's competitive positioning." (Glekel Decl. Ex. D). The "[a]dditional restructuring" announced that day "include[d] manufacturing reconfigurations, personnel realignments and reductions, the disposition of resultant excess real estate, realignment and consolidation of regional activities and other cost saving measures." (Compl.¶ 48).

*7 Fellows commented that Revlon was taking "major steps to re-engineer" Revlon: "By realigning our resources to more closely match the changing needs of our customers, we are building our business for the future" ("Statement 8"). (Compl.¶ 48). Fellows blamed "a number of factors" for 1998 results, "including weaknesses in the international economic environment and continued domestic inventory consolidations." (Compl.¶ 48). Noting that "[w]e expect results in the first half of 1999 to continue to be affected by inventory reductions and uncertainty in the international economic environment," he also expressed confidence "that 1999 will show improved growth after customer inventories are reduced to targeted levels during the first half" ("Statement 9"). (Compl.¶ 48). The January 11 release tagged the statement about expected 1999 results as forward-looking and cautioned that "delays in achieving or lower than expected growth after customer inventories are reduced to target levels" could upset that expectation. (Glekel Decl. Ex. D).

5. January 12, 1999 Statement: Statement 10

On January 12, 1999, an article in *Capital Cities Media, Inc.* quoted Fellows. (Compl.¶ 51). According to the article, Fellows "said that during the course of mapping out last fall's retrenchment [of Revlon], 'opportunities presented themselves to make some additional savings and allow us to realign our supply chain to more closely relate to our customers. Not only can we save money but service our customers better' " ("Statement 10"). (Compl.¶ 51).

6. January 28, 1999 Press Release: Statements 11-13

On January 28, 1999, Revlon announced full-year and fourth quarter results for 1998. (Compl.¶ 53). The company reported net sales in the fourth quarter of $630.5 million, "a decrease of 1.5% compared with the fourth quarter of 1997 on a reported basis or a decrease of 0.4% on a constant U.S. dollar basis." (Compl.¶ 53). Full-year 1998 sales were reported to have "increased 0.6% to $2.25 billion on a reported basis, or 2.7% on a constant U.S. dollar basis ." (Glekel Decl. Ex. E at 5).

The January 28 announcement also confirmed that "Revlon continues to implement its previously announced restructuring program" which, it said, "is expected to provide estimated annualized savings in the range of $30 million to $40 million." It stated that Revlon "is realigning the ways it does business to better serve its customers" ("Statement 11") by, "among other items," developing a "new strategic plan to maximize the potential of the Revlon brand equity, build the Company's portfolio of brands, and expand its relationships with key retailers." Fellows, citing increased market share and the success of the Revlon, Almay, and Ultima II brands, was quoted as assuring the market that "Revlon's fundamentals remain strong" ("Statement 12"). Finally, Fellows expressed "confiden[ce] that our recently announced restructuring program will better align our business processes with a dynamic market" ("Statement 13"). (Compl.¶ 53).

7. January 1999 to March 1999: Statements 14 and 15

*8 On January 29, 1999, *Capital Cities Media, Inc.* reported that Revlon's fourth quarter 1998 earnings per share were ahead of Wall Street's average estimate. (Compl.¶ 55). The complaint alleges that Fellows was quoted in the article as follows: " 'The second half of 1998 was an aberration .... with [sic] this restructuring, we've been bettering the processes of the company. If you plan it properly, it tends to fall into place, [sic] At the end of the day, you end up with a better operation....' " ("Statement 14"). (Compl.¶ 55). In addition, the March edition of *Soap, Perfumery & Cosmetics* reported that Fellows had "attributed some of Revlon's problems to a slowing of sales, citing numbers from October that revealed industry growth had slowed from double digits to 8%" ("Statement 15"). (Compl.¶ 57).

8. 1998 Form 10-K

On March 3, 1999, Revlon filed its 1998 Form 10-K, in which it repeated the figures for net sales, EBITDA, operating income, and net income that it had set forth in its January 28, 1999 press release. (Compl.¶ 59). Under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 7

the heading "Net Sales," Revlon warned that it "expects retail inventory balancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. F. at 16). Revlon identified any statement as to the "effect on sales of retail inventory balancing and reductions" as a forward-looking statement whose accuracy could be undercut by "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. F. at 25-26).

9. April 7, 1999 Announcement

On April 7, 1999, Revlon announced that it would undertake "a review of strategic alternatives available to it to maximize shareholder value." One alternative it said it would look into was the sale of one or more businesses of the company. Revlon anticipated using the proceeds of such a sale to pay down indebtedness. (Compl. ¶ 61).

10. April 26, 1999 Interview with Fellows: Statements 16-18

*Chain Drug Review* interviewed Fellows on April 26, 1999. Fellows reportedly said that "Revlon is going to continue to drive category growth, and we believe it's going to continue to gain share as it has for so long" ("Statement 16"). He also allegedly maintained that "[t]he Company is well on the way to overcoming the inventory problems--many of which were beyond our control--that set us back last year, leaving us to pursue chain drug, discount and supermarket sales with our proven formula for success" ("Statement 17"). Fellows did not think that the sale of one or more parts of Revlon's business was "imperative" for Revlon to "convince Wall Street to get the valuation of the company back where it belongs" ("Statement 18"). (Compl. ¶ 64).

11. April 29, 1999 Press Release: Statement 19

On April 29, 1999, Revlon released its financial results for the first quarter of 1999. (Compl. ¶ 66). "In the first quarter," the company reported, "net sales were $441.1 million, a decrease of 11.4% compared with the first quarter of 1998 on a reported basis or a decrease of 8.8% on a constant U.S. dollar basis." (Compl. ¶ 66). Fellows explained that, "[a]s expected, our sales were adversely impacted by continuing reductions of retailer inventories, as well as slower than anticipated category growth through most of the quarter." (Glekel Decl. Ex. G). The press release also contained the following paragraph ("Statement 19"):

*9 "Our fundamentals are strong: Revlon is one of the world's best known brand names in cosmetics. It stands for high-quality, innovative products and marketing expertise that has helped to create one of the strongest cosmetics franchises in the world," said Fellows. "These fundamental strengths will continue to fuel growth for Revlon."

(Compl. ¶ 66). The release identified "the Company's expectations that its fundamental strength will continue to fuel growth" as a forward-looking statement subject to "difficulties or delays in realizing future growth from the Company's fundamental strengths." (Glekel Decl. Ex. G).

12. First Quarter 1999 10-Q

On May 17, 1999, Revlon filed its Form 10-Q for the first quarter of 1999, which repeated the figures for net sales, EBIDTA, operating income, and net income announced in its April 29 press release. (Compl. ¶ 67). Revlon warned that it "expect[ed] retail inventory balancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. H at 9). It also identified "the effect on sales of retail inventory balancing and reductions" as a forward-looking statement subject to "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. H. at 14-15).

13. July 27, 1999 Press Release

Revlon announced its results for the second quarter of 1999 on July 27, 1999. (Compl. ¶ 71). "Net sales in the second quarter," according to the company, "were $553.4 million, a decrease of 3.8% compared with the second quarter of 1998 on a reported basis or a decrease of 1.2% on a constant U.S. dollar basis." (Compl. ¶ 71). Revlon warned that slow category growth and lowered inventory targets established by the trade in the United States "will extend the time needed to absorb the effects of inventory rebalancing." (Glekel Decl. Ex. I). The company also identified its "assessment of retailers' inventory targets and the time needed to reverse the effects of inventory rebalancing and the Company's anticipation of a stronger second half of 1999" as forward-looking statements subject to several contingencies. (Glekel Decl. Ex. I).

In the same press release, Revlon stated that it was "actively engaged in ongoing discussions with potential purchasers of all or part of the Revlon business." (Compl. ¶ 71).

14. Second Quarter 1999 10-Q

Revlon recapitulated its second quarter results on August 16, 1999, when it filed its second quarter Form 10-Q:
Net sales [in millions] were $553.4 and $575.3 for the second quarters of 1999 and 1998, respectively, a decrease of $21.9, or 3.8% on a reported basis (a decrease of 1.2% on a constant U.S. dollar basis), and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were $994.5 and $1,073.1 for the first half of 1999 and 1998, respectively, a decrease of $78.6, or 7.3% on a reported basis (a decrease of 4.7% on a constant U.S. dollar basis).

(Compl.¶ 76). Revlon explained that, in the United States, "[n]et sales for the second quarter and first half of 1999 were adversely affected by continuing adjustments in inventory levels by retailers, slower than anticipated category growth and competitive activities." (Glekel Decl. Ex. J at 9). The company warned that it "expects retail inventory balancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. J at 9).

15. The October 1, 1999 Disclosure

*10 On October 1, 1999, Revlon allegedly "shocked the market" by issuing a press release which announced (1) that Revlon had "determined not to sell its remaining cosmetics, personal care, fragrances and skin treatment businesses," (2) that Revlon did intend to pursue the sale of its worldwide Professional Products business and its non-core Latin American brands, and (3) the following, which concerns retailer inventory imbalances:

> [W]orking with its customers, the Company has decided to accelerate the reduction of U.S. retailers' warehouse inventory levels. Instead of the originally planned gradual reduction, the Company plans to achieve the accounts' new, lower, inventory targets by reducing the level of shipments through year end. During this process, the Company intends to maintain its previously announced step up in second half spending, designed to drive consumer purchasing and facilitate the inventory reduction process.
> George Fellows, President and CEO, said, "For the past year, the issue of retail inventory imbalances has kept the Company from realizing the full benefit of the continuing consumer acceptance of Revlon products. In order to allow the efficient introduction of new products into the marketplace, we decided to work with our retail partners to put this issue behind us now by foregoing planned sales of both new and established products amounting to approximately $280 million for the third and fourth quarters of 1999 to reduce inventories in accordance with our accounts' months' supply target levels."
> These actions adversely affected third quarter results and will also adversely impact the fourth quarter. Because of this, combined with lower than expected volume and worsening economic conditions in key international markets, the Company said it now expects a 1999 full year operating loss before restructuring charges of between $70 million and $80 million versus earlier forecasts. The Company now expects a third quarter 1999 net loss before restructuring charges of approximately $3.10 to $3.20 per diluted share, net sales of approximately $435 to $450 million, and operating loss before restructuring charges of approximately $120 to $125 million. As a result, the Company will not be in compliance with certain of the financial covenants under its existing Credit Agreement. The Company has begun discussions with its bank lenders and is confident of amending the Agreement on satisfactory terms....

(Compl.¶ 79).

II. DISCUSSION

A. Standard of Review

In most civil cases, a complaint will survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted unless, after accepting all of the well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss." Citibank, N.A. v. Itochu Intern. Inc. 2003 WL 1797847, *1 (S.D.N.Y.,2003) (citing Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996)).

*11 In deciding a motion to dismiss, the Court may deem a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.2000) (internal citations omitted).

B. Section 10(b) Claims

To state a claim for relief pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000); accord Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2d Cir.2001). Moreover, a plaintiff alleging securities fraud in violation of those provisions must satisfy the heightened pleading requirements of the PSLRA and Fed.R.Civ.P. 9(b). In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir.2001). Rule 9(b) provides that in

all averments of fraud "the circumstances constituting fraud ... shall be stated with particularity." This means that a securities fraud complaint "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (internal citations omitted). Moreover, read together, Rule 9(b) and the PSLRA mandate that "plaintiffs must allege ... fraudulent acts and scienter ... with particularity." *Elliott Assocs. L.P. v. Hayes,* 141 F.Supp.2d 344, 353 (S.D.N.Y.2000); *see also Rombach v. Chang* 355 F.3d 164, 172 (2d Cir.2004); *In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 556-557 (S.D.N.Y.2004).

The PSLRA "does not require that plaintiffs plead every single fact upon which their beliefs concerning false or misleading statements are based." *Novak,* 216 F.3d at 313. However, it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n.1; *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 75 (2d Cir.2001) (plaintiffs must "plead with particularity sufficient facts to justify [their] beliefs"); *see also ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 354-59 (5th Cir.2002); *Rothman v. Gregor,* 220 F.3d 81, 89-92 (2d Cir.2000).

Plaintiffs must also comply with the pleading requirements of Rule 9(b) and the PSLRA when alleging that defendants acted with scienter, or fraudulent intent, in order to show "why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d at 306. Plaintiffs can establish the requisite "strong inference of fraudulent intent" either (a) by demonstrating "that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 138-39 (2d Cir.2001) (quoting *Novak,* 216 F.3d at 307, and *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995), respectively) (quotation marks omitted).

*12 In this case, the Court construes the complaint to allege that Revlon misled the market in three ways: (1) by inflating Revlon's reported sales and revenue through various improper accounting techniques; (2) by failing to disclose that Revlon's improper short-term revenue inflation practices and channel stuffing were causing retailers' inventory imbalances to grow and would, in the longer run, force the company to forego significant sales; and (3) by using optimistic public statements to mask the retailer inventory problem.

Defendants agree with plaintiffs that there was an inventory problem during the Class Period; indeed, defendants are eager to point out that they repeatedly warned the market that the inventory problem might continue to affect sales. Therefore, defendants deny that they made material false statements. Specifically, defendants argue that the complaint fails to state with sufficient particularity facts that support a reasonable belief that Revlon (1) overstated sales by engaging in improper accounting and (2) exacerbated the inventory problem through its short-term revenue inflation practices. With respect to the inventory problem itself, the defendants contend (3) that, as a matter of law, their public statements were simply too immaterial to have misled the market.

1. Improper Revenue Recognition

The improper accounting allegations relate to the sales figures (and reported revenue, operating income, net income, and EBITDA) that Revlon reported in its press releases and SEC filings. The complaint claims that Revlon overstated its sales during the Class Period by engaging in practices that breached Generally Accepted Accounting Principles ("GAAP") or its own stated revenue recognition policy. Because plaintiffs make this allegation on information and belief, the PSLRA requires them to state facts with a degree of particularity sufficient to support a reasonable belief that Revlon was in fact overstating sales through improper accounting. *Rombach v. Chang* 355 F.3d 164, 170 (2d Cir.2004) (Thus, plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.") (quoting 15 U.S.C. § 78u-4(b)(1)) (quotation marks omitted). In addition, they must state with sufficient particularity facts constituting strong circumstantial evidence that defendants were overstating sales with scienter. *See Rothman,* 220 F.3d at 90-91 (citing 15 U.S.C. § 78u-4(b)(2)). Because defendants are unlikely to have overstated sales in the manner alleged without being aware of it, the misrepresentation and scienter inquiries are essentially combined. *See id.* at 90.

The *Rothman* case provides some guidance as to the degree of particularity required to support a reasonable belief that a defendant has engaged in misleading accounting. In *Rothman,* the defendant corporation, GT Interactive Software Corp. ("GT"), underwrote the software development costs of small independent software developers by advancing them the royalty payments they expected to earn on future sales of software. *See id.* at 84-85. The plaintiffs alleged that GT misleadingly inflated its earnings by not expensing

advances for particular software titles even after concluding that royalty advances for those titles were unlikely to be recouped by future sales. *See id.* at 89. With respect to the PSLRA's particularity requirements, the court held that GT's public financial statements--which themselves indicated that GT's total capitalized royalty advances increased by the same amount as its new royalty advances--sufficiently supported the inference that GT was not expensing *any* royalty advances at all. *See id.* Moreover, the court held that three other allegations were sufficiently particularized to support the inference that GT was at least reckless to the fact that royalty advances were not likely to be recouped through sales: (1) poor sales of most of GT's software, in comparison with the amount of royalties advanced (as demonstrated by domestic sales figures from a market research firm and the names and sales figures for several front-line software titles); (2) GT's efforts to collect royalty advances from the software developers (as demonstrated by four lawsuits in which GT sought to recover almost forty-four percent of the royalty advances it had capitalized); and (3) GT's sudden decision at the end of the class period to expense over eighty-four percent of the royalty advances it had previously capitalized. *See id.* at 90-92.

*13 In other words, plaintiffs must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase. *See e.g. In re AOL Time Warner, Inc. Sec. and "Erisa" Litig.,* 2004 WL 992991, * 12 (S.D.N.Y. May 5, 2004) (Allegations sufficiently particular to survive a motion to dismiss where "the Amended Complaint contains the date of the transaction at issue, the amount of the allegedly overstated revenue, preliminary details of the accounting for the transaction, and a basis for believing the accounting may have been fraudulent.").

a. Misrepresentation and Scienter

Here, plaintiffs ground their allegations that defendants made material misrepresentations on claims that defendants took certain actions to inflate sales and reported revenue. Thus, plaintiffs conclude that because Revlon intentionally inflated sales figures, defendants knew that their statements about sales, based on the inflated figures, were false.

Plaintiffs are attempting to meet the scienter requirement by pleading circumstantial evidence of defendants' knowledge that the information in its misstatements were false. "To meet this strong circumstantial evidence standard, plaintiffs must 'specifically alleg[e] defendants' knowledge of the facts or access to information contradicting their public statements." *In re Bristol-Myers Squibb Securities Litigation,* 312 F.Supp.2d 549, 562 (S.D.N.Y.2004) (quoting *Faulkner v. Verizon Communications, Inc.,* 189 F.Supp.2d 161, 172 (S.D.N.Y.2002) (alteration in original).

The allegation that Revlon overstated sales through improper accounting is supported through the juxtaposition of two "facts" which they allege on information and belief: first, as demonstrated by certain transactions identified in the complaint, the fact that Revlon engaged in a series of sales practices that are susceptible to misleading accounting, and, second, as demonstrated by Revlon's October 1, 1999 announcement, the fact that Revlon was forced to forego $280 million in sales at the end of the Class Period. Plaintiffs vaguely suggest that the ultimate sales shortfall, when considered in light of the sort of sales transactions in which Revlon was engaging, indicates that Revlon must have been engaging in the improper accounting. There is no question that the existence of the sales drop-off can reasonably be inferred from the October 1, 1999 announcement. Even so, the accounting abuses, and the manner in which they contributed to the sales drop-off, are not alleged with a degree of detail sufficient to support a reasonable belief that Revlon actually engaged in them during the Class Period. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 203 (1st Cir.1999); *cf. Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 80-81 (1st Cir.2002).

The first allegedly fraudulent practice mentioned in the complaint is the shipping and booking of unordered sales. Plaintiffs support the allegation that Revlon engaged in this practice only with the statement that Revlon's customer Safeway, at some unspecified time in 1998 (but apparently prior to "later in 1998"), "received many shipments which had not been ordered or which had been requested to be shipped at a later date." (Compl.¶ ¶ 21(a), 22(a), 89). This allegation is deficient for at least two reasons. First, the complaint's use of the disjunctive "or" greatly diminishes its probative value, as shipping a shipment early is entirely different than shipping an unordered shipment. Second, although plaintiffs are not necessarily required to reveal the identity of the personal sources of their factual allegations, *see Novak,* 216 F.3d at 312-13; *In re Philip Services Corp. Securities Litigation,* No. 98 CIV. 0835, 2004 WL 1152501, at *12-13 (S.D.N.Y. May 24, 2004), the factual allegations must themselves, in their particularity, "provide an adequate basis for believing that the defendants' statements were false," *Novak,* 216 F.3d at 314. This allegation, supported only by the one detail as to the identity of the customer, also fails to provide an adequate basis for believing that Revlon acted knowingly in such a way as to enable it to materially overstate its sales by recognizing sales that had never even occurred.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 11

*14 A second practice that plaintiffs believe circumvented GAAP or Revlon's stated revenue recognition policy is the practice of billing customers for product and then holding the product in Revlon warehouses for a period of time before shipping it (the "bill and hold" allegation). Plaintiffs suspect that this occurred based on the following information: "[f]ormer Revlon employees have stated that," at some unspecified date, "Revlon engaged in 'bill and hold' practices pursuant to which customers were billed for product which had not been shipped and which remained in Revlon's control." (Compl.¶ ¶ 21(c), 21(a)). However, affixing the phrase "former employees have stated" to this otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA. In order for plaintiffs to rely upon confidential sources to meet the pleading requirements of the PSLRA, those sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 493 (S.D.N.Y. July 7, 2004). This case is unlike *In re Initial Public Offering Sec. Litig.*, 220 F.R.D. 30, 32 n.4 (S.D.N.Y. Oct 30, 2003) where plaintiffs were permitted to rely on confidential sources, but the allegations were also supported by overwhelming corroboration in statements alleged by plaintiffs. Here, the absence of any particulars "is indicative of ... excessive generality." *Greebel*, 194 F.3d at 204.

A third practice alleged in the complaint that gave Revlon the ability to engage in accounting abuse is that Revlon allowed customers the right to return excess product. For example, Revlon allegedly "rolled out [its new Ultima II line] to Longs Drugstores" with "a right to return the merchandise after one year," a right which Longs exercised in 1999 for "much" of the Ultima II merchandise it had purchased. (Compl.¶ 21(h), 22(c)). Granting a right of return, however, is not fraudulent unless the seller fails to disclose the practice or, if it is disclosed, fails to maintain adequate reserves for expected returns in accordance with GAAP or the company's stated revenue recognition policy. See *Greebel*, 194 F.3d at 205. Plaintiffs' allegations that Revlon's returns contractor, Genco, received "extremely high levels of returns" in "late 1998 and 1999," including a large return from Marc Glassman, Inc. in October 1998, (Compl.¶ ¶ 24-26), do not raise a sufficient inference that Revlon's overall reserves for returns were recklessly inadequate. Nor does the complaint contain an allegation that Revlon acted to inflate its revenues knowingly or intentionally when establishing the return policy.

Finally, plaintiffs allege that, after receiving returns, Revlon would delay issuing credits to the retailers. A source states that an identified Revlon employee instructed Genco to hold large shipments of returned products (specifically, returns from Marc Glassman, Inc. in October 1998 and from Israel in "early 1999") for long periods of time before shipping them back to Revlon manufacturing centers for redistribution. (Compl.¶ ¶ 24-26). Plaintiffs suspect that this delay in issuing credits--which in and of itself would not constitute a fraud on the market--was accompanied by a corresponding delay in recognizing the accrual of returns because "[a] former employee" stated that "her supervisor specifically advised the sales employees to stop writing credits [for returns] between October and December" of an unidentified year. (Compl.¶ 21(i)). Plaintiffs also fail to meet the pleading requirements of the PSLRA because this source is not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.

*15 If the foregoing series of improper accounting allegations were accompanied by other, more particularized and less inferentially attenuated allegations of material fraudulent conduct, they would perhaps suffice to raise a sufficient inference of wrongdoing. See, e.g., *In re Revlon*, No. 99 Civ. 10192, 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001). However, "offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 566 (S.D.N.Y.2004).

Absent more particularized allegations of knowingly fraudulent conduct, however, the particularized aspects of the complaint in this action plead little more than neutral facts which happen to be consistent with plaintiffs' theory of how Revlon fraudulently overstated its sales, and "a general allegation that the practices at issue resulted in a false report of company [sales] is not a sufficiently particular claim of misrepresentation." *Greebel*, 194 F.3d at 203 (quoting *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996) (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 n.5 (1st Cir.1994)) (internal quotation marks omitted). The plaintiffs fail to make sufficient allegations that at the time of the sales at issue the defendants knew or should have known that the revenue from those sales should have been treated differently and, thus, that the contemporaneous financials were incorrect. See *Faulkner*, 189 F.Supp.2d at 172.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 12

b. Materiality of Alleged Overstatements

Even if the complaint's allegations did establish a sufficient inference of improper accounting, the Court agrees with defendants that plaintiffs have failed to adequately allege that the financial results reported in Revlon's public statements and SEC filings were misleading to a material degree. The test of whether a statement is materially misleading is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang,* 355 F.3d 164, 172 n.7 (2d Cir.2004) (internal citations omitted). At the pleading stage of litigation, "a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 161-62 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988)). " '[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ' *Id.* at 162 (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)); *see also In re Revlon,* 2001 WL 293820, at *9.

*16 Nevertheless, given the particularity requirements of securities fraud pleading, the materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture. *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir.1982) (citing *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 (S.D.N.Y.1977)); *see also Gross,* 93 F.3d at 996; *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 522 (5th Cir.1993); *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 639 (N.D.Tex.1999); *Schick v. Ernst & Young,* 141 F.R.D. 23, 27 (S.D.N.Y.1992). In other words, although there is no "numerical benchmark" for assessing the materiality of misstatements in financial reports, *Ganino,* 228 F.3d at 162-65, defendants (and the court) are still "entitled to be appraised of the approximate amount of overstatement involved." *Jacobson,* 445 F.Supp. at 522.

The complaint here describes the financial misstatements it alleges as "material." It fails, however, to even attempt to approximate the magnitude or degree of those misstatements in relation to Revlon's total financial picture. *Cf. In re Revlon,* 2001 WL 293820, at *10. None of the complaint's allegations of improper sales practices contain a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements. In these circumstances, plaintiffs' conclusory allegations of materiality cannot withstand a motion to dismiss. *Cf. Ganino,* 228 F.3d at 166; *Novak,* 216 F.3d at 303-04; *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994); *In re Revlon,* 2001 WL 293820, at *10.

Plaintiffs point to the section of the complaint which generally pleads GAAP violations, (Compl.¶ ¶ 85-96), and argue that it entitles them to a presumption that the alleged overstatements of sales were material "even in the absence of any quantification." (Pls.' Opp. at 7 (citing 17 C.F.R. § 210.4-01(a)(1))). The complaint's general GAAP allegations, however, are no more particular with respect to the materiality of Revlon's alleged accounting shenanigans than the rest of the complaint, and plaintiffs therefore still face a materiality problem. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150, 45151 (1999) (citing FASB Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, 132 (1980)). Indeed, "[m]inor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law." *In re Segue Software, Inc. Sec. Litig.,* 106 F.Supp.2d 161, 170 (D.Mass.2000) (citing *Greebel,* 194 F.3d at 206); *see also Recupito v. Prudential Sec., Inc.,* 112 F.Supp.2d 449, 459 (D.Md.2000) ("[T]here is a distinction between misleading financial statements ... and ones that are materially so").

2. Exacerbation of the Inventory Problem--Channel Stuffing

*17 Plaintiffs allege that, in addition to dishonest revenue recognition, Revlon engaged in aggressive sales campaigns, especially at the end of quarters. That practice is said to have created a house of cards comprised of overstocked retailers and increasingly back-ended quarters. According to the amended complaint, the house of cards collapsed in the third quarter of 1999 when retailers returned merchandise and refused to make new orders, thereby forcing Revlon to forego material amounts of sales. Plaintiffs allege that Revlon misled the stock market with respect to this situation by breaching its regulatory duty to disclose a "known trend" that was reasonably expected to have a material unfavorable impact on net sales--specifically, that, during the Class Period, "sales by Revlon to its customers (into the channel) greatly exceeded sell-through (sales by its customers out of the channel)." (Compl.¶ 98(d)). *See* 17 C.F.R. § 229.30; *Scholastic,* 252 F.3d at 70; *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 590-91 (D.N.J.2001). In addition, plaintiffs allege that Revlon falsely assured the market through its public statements that it was working down the inventory problem when in fact it was exacerbating it through its continued efforts to

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
**(Cite as: 2004 WL 2210269 (S.D.N.Y.))**

Page 13

stuff inventory into the channel. (Compl.¶¶ 49, 59). For instance, when Fellows expressed confidence on January 11, 1999, that "1999 will show improved growth after customer inventories are reduced to targeted levels during the first half," (Compl.¶ 48), he implied that Revlon was in the process of decreasing the excess inventory in the channel. However, plaintiffs have not set forth with particularity sufficient facts to support this allegation.

a. Falsity

Plaintiffs make their allegation of an undisclosed channel stuffing trend on information and belief. They must therefore state with particularity facts sufficient to support a reasonable belief that the trend existed. *See Novak,* 216 F.3d at 314 n.1; *see also Scholastic,* 252 F.3d at 70-74. To be clear, the ultimate "falsity" question here is not whether plaintiffs have raised a sufficient inference that Revlon aggressively pursued end-of-quarter sales during the Class Period. As the U.S. Court of Appeals for the First Circuit has noted, "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course...." *Greebel,* 194 F.3d at 202. Nor is the question whether "more inventory was in the hands of retailers than commercially warranted." *Aldridge,* 284 F.3d at 81. Revlon repeatedly warned the market that there was. *Cf. Scholastic,* 252 F.3d at 76-77. Rather, the question is whether the information stated in the complaint is sufficiently particularized to support a reasonable belief that, during the Class Period, Revlon was exacerbating this inventory imbalance by selling more inventory to retailers than retailers were selling to consumers and then making misstatements or failing to disclose information about that practice.

*18 The decision of the U.S. Court of Appeals for the Second Circuit in *Scholastic* provides some guidance as to the sort of information that can reasonably support a belief in the existence of a particular sales trend. *See* 252 F.3d at 70-74. In that case, the plaintiffs alleged that the defendant, Scholastic, recklessly failed to disclose that sales of its "Goosebumps" books to distributors and consumers were declining and that, as a result, returns were increasing. *See id.* The court held that the trend was adequately alleged because information in the complaint-- which "cover[ed] over two-thirds of Scholastic's trade business in Goosebumps"--"specifically set[ ] out the distributors through which Goosebumps books were sold, and allege[d] declines in sales as of specific dates, some in terms of percentage and others in terms of quantity." *Id.* at 70-71.

In evaluating whether the complaint adequately alleges that total sales into Revlon's channel exceeded total sell-through from October 1998, the fact that retailers found themselves carrying substantially more inventory than was commercially necessary has some probative value. *See Novak,* 216 F.3d at 312-13. The complaint, however, fails to grapple with Revlon's aggregate reported quarterly sales or any measure of sell-through. *See In re Trex Co. Sec. Litig.,* 212 F.Supp.2d 596, 610 & n.12 (W.D.Va.2002). Moreover, the following allegations, on their own, tend to be either unspecific, innocuous, or both: that (1) some Revlon sales managers faced great pressure to make sales (Compl.¶ 21); (2) some Revlon sales managers were told to offer promotions, special deals, rebates, return rights and large discounts to retailers to induce large orders (Compl.¶¶ 5, 21(o)-(r), 29, 91); (3) at some unspecified time (but prior to "later in 1998") Revlon shipped "many shipments" to Safeway that Safeway had not ordered "or" had "requested to be shipped at a later date" (Compl.¶ 22(a)); (4) in December 1998 Revlon shipped to Fred Meyer Co. "orders" which Fred Meyer had requested be shipped in early 1999 (Compl.¶ 21(b)); (5) Genco received "extremely high levels of returns" in "late 1998 and 1999," specifically 30 pallets from Marc Glassman in October 1998 and a trailer load of lipstick from Israel in "early 1999" (Compl.¶ 26); and (6) "in 1999" Longs Drugstores returned "much of the Ultima II merchandise" it had purchased earlier "[d]uring the Class Period" (Compl.¶ 21(h)).

b. Scienter

Assuming without deciding that the facts stated in the complaint provide a sufficient basis to suspect the existence of the trend of growing inventories, the complaint would still have to state with particularity facts giving rise to a strong inference of defendants' scienter, i.e., that defendants were at least reckless to the fact that Revlon's future sales were being sacrificed for short-term sales.

"Strong inference that the defendant acted with the required state of mind," required by the PSLRA to state a securities fraud claim, may arise when the complaint sufficiently alleges that the defendants: "(1) benefited in concrete and personal way from purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had duty to monitor." *Novak v. Kasaks,* 216 F.3d 300, 311 (2000) (internal citations omitted).

*19 In *Scholastic,* for example, the court concluded that a publisher's scienter as to sell-through to consumers was adequately alleged where there were "detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade," including the defendants' electronic access to retailers' point-of-sale

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 14

data. *Scholastic*, 252 F.3d at 76; see also *In re Trex Co.*, 212 F.Supp.2d at 60.

Here, the aggressive sales practices attributed to Revlon do not by themselves raise a strong inference of scienter as to the existence of the alleged channel stuffing trend. Simply put, "there may [have been] any number of legitimate reasons for attempting to achieve sales earlier," none of which would have necessarily entailed knowledge of the trend. *Greebel*, 194 F.3d at 203. Moreover, the complaint's allegations provide no reason to believe that the aggressive sales campaigns--as opposed to some other factor out of defendants' control which they were less likely to have been aware of, such as retailer consolidation or elimination of already-existing overstock, demand, or competition--constituted the factor that rendered channel inflow greater than channel outflow during the Class Period. These allegations are very similar to the claims in *In re Bristol-Myers Squibb Securities Litigation*, 312 F.Supp.2d 549, 568 (S.D.N.Y.2004), in which the court held, on the basis of similar facts that: "where it is alleged that (i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real customers who paid real money, there is no strong inference that Defendants knew or should have known that the sales should have been accounted for in some way other than the Company's historical revenue recognition upon shipment model, and, therefore, conscious misbehavior or recklessness cannot be inferred." See *Kalnit*, 264 F.3d at 142-43 (discussing *Novak*, 216 F.3d at 304, and *Rothman v. Gregor*, 220 F.3d 81, 90-91 (2d Cir.2000)). Finally, the complaint's totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the channel, (Compl.¶ 7), are insufficiently particularized to support a strong inference of defendants' scienter. See e.g., *Johnson v. Tellabs, Inc.*, 303 F.Supp.2d 941, 966 (N.D.Ill.2004) (collecting cases where allegations of channel stuffing alone were held insufficient to show scienter); *In re Trex*, 212 F.Supp.2d at 608; cf. *Scholastic*, 252 F.3d at 76; *Rombach v. Chang*, 355 F.3d at 176 ("[A] 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'" (internal citations omitted)).

3. Misrepresentations as to the Remaining Size of the Inventory Problem

*20 Plaintiffs allege that the optimistic statements they have culled from defendants' commentary on Revlon's condition masked (1) improper accounting, (2) the channel stuffing trend, and (3) the impact that the inventory problem would have on future sales. As established above, however, the improper accounting and channel stuffing trend have not been adequately alleged; therefore, the Court will now address only whether the statements were misleading with respect to the inventory problem. Moreover, as the existence of that problem was revealed to the market from the beginning of this Class Period, the only viable contention that plaintiffs can make is that defendants' statements lulled the market into believing that the problem was smaller than it in fact was.

As a preliminary matter, some of the more specific statements identified in the complaint are simply not actionable as currently pled. The specific facts the statements proclaim to be true are not alleged to have been false and are not inconsistent with what is alleged to have been true. See *In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752, 1998 WL 150963, at *9 (S.D.N.Y. April 1, 1998) ("Plaintiffs simply fail to allege how these statements are false."). In this regard, the complaint does not state a claim with respect to Statement 3 because it fails to allege the falsity of the fact asserted in that statement B that the Ultima II line was "showing significant strength." Similarly, the complaint does not allege the falsity of the fact asserted in Statement 16-- that slowing industry sales growth was responsible for "some" of Revlon's inventory problems. These relatively specific statements are simply "outside the [broad] sphere of the plaintiffs' allegations of falsehood." *Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir.1999).

With respect to the remaining statements, defendants argue that they are so vague or unspecific or bespoke such caution that they did not alter the "total mix" of information made available to the market, *Ganino*, 228 F.3d at 162, and therefore did not give rise to any duty to disclose the precise severity of the downturn in sales that defendants allegedly foresaw with certainty. In other words, defendants argue that the statements were immaterial as a matter of law. Similarly, defendants contend that the statements cannot serve as the basis of a Rule 10b-5 fraud claim because they are moored within the safe harbor for forward-looking statements created by the statutory breakwater of the PSLRA.

"Materiality is a mixed question of law and fact." *Ganino*, 228 F.3d at 162. "In most circumstances," therefore, "disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996) (citing *Basic*, 485 U.S. at 236). In fraud-on-the-market cases, however, "courts have demonstrated a willingness to find immaterial as a matter

of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Id.; see also Novak, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"), San Leandro, 75 F.3d at 811; In re Time Warner Inc. Sec. Litig ., 9 F.3d 259, 266 n.3 (2d Cir.1993); Raab v. General Physics Corp., 4 F.3d 286, 289- 90 (4th Cir.1993); Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 200- 01 (3d Cir.1990); Zerman v. Ball, 735 F.2d 15, 20-21 (2d Cir.1984); In re Nokia Corp. Sec. Litig., 1998 WL 150963, at *6. This is because "[a]nalysts and arbitrageurs rely on facts in determining the value of a security," Raab, 4 F.3d at 290, and are not duped by "easily recogniz[able] ... self-directed corporate puffery," Shaw, 82 F .3d at 1218.

*21 "Expressions of puffery and corporate optimism do not give rise to securities violations." Rombach v. Chang, 355 F.3d at 174. Immaterial optimistic statements are protected by the "bespeaks caution" doctrine and the PSLRA's safe harbor provision. Under the bespeaks caution doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir.2002). The Second Circuit clarified the scope of the bespeaks caution doctrine as follows: "[w]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Id.

The PSLRA's "safe harbor was modeled in part after, but not meant to displace, the judicial bespeaks caution doctrine." Credit Suisse First Boston Corp. v. ARM Financial Group, Inc., No. 99 Civ. 12046, 2001 WL 300733, at *5 (S.D.N.Y. Mar. 28, 2001). As in the bespeaks caution doctrine, it may provide protection from liability based on a "forward-looking statement," 15 U.S.C. § 78u-5(c)(1), a term defined at 15 U.S.C. § 78u-5(i)(1). Pursuant to the safe harbor, liability may not be imposed with respect to a forward-looking statement if either (1) the statement was "immaterial," 15 U.S.C. § 78u-5(c)(1)(A)(ii); (2) the statement was "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i); or (3) the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading, 15 U.S.C. § 78u-5(c)(1)(B). See In re Independent Energy Holdings PLC Sec. Litig., 154 F.Supp.2d 741, 755 (S.D.N.Y.2001), abrogated on other grounds by In re IPO, 241 F.Supp.2d 281 (2003). The first two inlets of the safe harbor "look[ ] to the statement itself," while the third "looks to the state of mind of the person making the disclosure...." Credit Suisse First Boston Corp., 2001 WL 300733, at *4; see also Harris, 182 F.3d at 803, 807 n.10.

The statements from the October 2, 1998 press release (Statements 1 through 5) ought to be considered together, in context. (Compl.¶ 35). Statement 3 [FN3]--touting the strength of the program to broaden distribution of the Ultima II line--is, as noted above, not alleged to be false at all. Statements 1, [FN4] 4, [FN5] and 5 [FN6] are forward-looking statements accompanied by language warning that Revlon's "growth will outpace category growth" only "as" or "once" "retail inventories are stabilized." As such, they bespeak caution as to the negative eventuality that allegedly came to pass and are immaterial. Statement 4, additionally, is specifically identified as a forward-looking statement and therefore certainly within the safe harbor of 15 U.S.C. § 78u-5(c)(1)(A)(i). Although Statements 1 and 5 are not precisely labeled as forward-looking statements, they are forward-looking statements, and are so vague, general, and hedged that they qualify for the PSLRA's safe harbor for "immaterial" forward-looking statements codified at 15 U.S.C. § 78u-5(c)(1)(A)(ii), see also Colby v. Hologic, Inc., 817 F.Supp. 204, 211 (D.Mass.1993), if not that codified at 15 U.S.C. § 78u-5(c)(1)(A)(i).

> FN3. Statement 3 is as follows: "Our program to broaden distribution of our Ultima II line is showing significant strength." (Compl.¶ 35).
>
> FN4. Statement 1 is as follows: "While the anticipated results for the second half of the year are very disappointing, the longer term outlook for our Company continues to be extremely positive, despite significant changes in the marketplace." (Compl. ¶ 35; Glekel Decl. Ex. A).
>
> FN5. Statement 4 is as follows: "we expect that as retail inventories are stabilized, our growth will again outpace category growth." (Compl.¶ 35).

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 16

> FN6. Statement 5 is as follows: "Despite the challenges we now face, we are confident that our long-term outlook remains positive and we intend to pursue the fundamental business strategy that fueled our success to date." (Compl. ¶ 35; Glekel Decl. Ex. A).

*22 Statement 2--"[t]he business fundamentals of our Company are strong"-- is more problematic, but nevertheless immaterial. The statement contains a present tense verb, and could be read literally to state a "current fact," however vaguely and loosely. In context, however, the word "fundamentals" clearly refers to specific statements of fact that are not alleged to be false--the touting of the strength of the Revlon and Almay brands and the program to broaden distribution of the Ultima II line. Moreover, the last sentence of the paragraph in which Statement 2 appeared cautioned that Revlon's growth would exceed category growth only "as retail inventories are stabilized," and that is the very problem that plaintiffs allege Statement 2 fraudulently downplays. In these circumstances, Statement 2 is "too patently immaterial" to support these plaintiffs' particular fraud-on-the-market claim. Shaw, 82 F.3d at 1219.

Statements 6 [FN7] and 7 [FN8] from the October 28, 1998 press release fare no better. Both are forward-looking statements accompanied by language that bespeaks caution with respect to the continuing "challenge" presented by the inventory problem, to wit: "the Company expects retail inventory balancing and reductions to affect sales in the fourth quarter and in 1999" and "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions" is a factor "that could cause actual results to differ materially." Statement 7 is specifically identified as a forward-looking statement, and is thus protected by the PSLRA safe harbor as well. See 15 U.S.C § 78u-5(c)(1)(A)(i). The forward-looking aspect of Statement 6 is so vague, general, and hedged that it too is within the safe harbor because it is immaterial. See 15 U.S.C. § 78u-5(c)(1)(A)(ii). To the extent that Statement 6's "business fundamentals" comment asserts a current fact, it is patently immaterial on these facts for the same reasons that Statement 2 is immaterial.

> FN7. Statement 6 is as follows: "our business fundamentals are strong and our outlook for the future continues to be positive." (Compl. ¶ 38).

> FN8. Statement 7 is as follows:
> We will address the challenges we face by pursuing the same business strategy that fueled our success for the prior 19 quarters and through restructuring efforts we have already announced, including the closing of international plants, a reorganization of the Company's workforce principally outside the U.S., and other actions designed to reduce costs. The resulting efficiencies are intended to enhance the Company's competitive position and provide estimated annualized benefits in the range of $25 million to $30 million.
> (Compl. ¶ 38).

The January 11, 1999 press release contained Statements 8 [FN9] and 9. [FN10] Both statements are forward-looking. Taken in context, Statement 8 is a vague prediction about the impact of Revlon's specific plans for restructuring, and says nothing remotely specific about the present or future of inventory imbalances. Moreover, Statement 9 itself bespeaks exactly the problem that plaintiffs allege to have been minimized--"[w]e expect results in the first half of 1999 to continue to be affected by inventory reductions." There is, in addition, language warning about "delays in achieving or lower than expected growth after customer inventories are reduced to target levels." Thus, Statements 8 and 9 are immaterial as a matter of law. In addition, they qualify for the PSLRA safe harbor. See 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).

> FN9. Statement 8 is as follows: "By realigning our resources to more closely match the changing needs of our customers, we are building our business for the future." (Compl. ¶ 48).

> FN10. Statement 9 is as follows: "We expect results in the first half of 1999 to continue to be affected by inventory reductions and uncertainty in the international economic environment, but we are confident that 1999 will show improved growth after customer inventories are reduced to targeted levels during the first half." (Compl. ¶ 48).

Statement 10--the January 12, 1999 statement by Fellows reported in *Capital Cities Media, Inc.*--is oddly phrased. Fellows reportedly stated that during the course of mapping out the previous fall's retrenchment, " 'opportunities presented themselves to make some additional savings and allow us to realign our supply chain to more closely relate to our customers. Not only can we save money but service our customers better." ' (Compl. ¶ 51). The complaint may simply fail to state a claim with respect to this statement, as it does not allege that opportunities did not present themselves to Revlon or that Revlon could not have realigned its supply chain,

saved money, or better served its customers. Yet, even assuming that Statement 10's general optimism misleads vis-à-vis the inventory problem, it only predicts the improved health of Revlon looking forward. Given that there is no allegation that Fellows controlled the full text of this statement and that Revlon had warned investors the day before that "[w]e expect results in the first half of 1999 to continue to be affected by inventory reductions," the Court deems Statement 10 to have bespoken caution with respect to persisting inventory imbalances. Thus, it is immaterial under the bespeaks caution doctrine and is protected by the safe harbor of the PSLRA.

*23 Revlon announced its full-year and fourth quarter results and put forth Statements 11, 12, and 13 on January 28, 1999. Statement 12 is another bromide about how "Revlon's fundamentals remain strong." As with Statements 2 and 6, the word "fundamentals" clearly refers to specific statements of fact that are not alleged to be false--an increase in market share in the U.S. mass market and the success of the Revlon, Almay and Ultima II brands. Moreover, just two weeks before, in its January 11, 1999 press release, Revlon had made clear that it expected "results in the first half of 1999 to continue to be affected by inventory reductions." In these circumstances, Statement 12 is too immaterial to support plaintiffs' claim that Revlon fooled the market with respect to the size of its inventory problem.

Statements 11 [FN11] and 13 [FN12] are more specific, positive comments about Revlon's "realign[ment]" and "restructuring" efforts. Assuming that the generality of these comments could somehow mislead with respect to the persistence and magnitude of the inventory problem alleged in the complaint, they are nevertheless forward looking comments. Moreover, when read in context, they quite clearly refer to specific efforts that are not alleged to have fallen short of expectations: with respect to Statement 11's "realign[ment]," the "new strategic plan to maximize the potential of the Revlon brand equity, build the Company's portfolio of brands, and expand its relationships with key retailers;" and, with respect to Statement 13's "restructuring," the aspects of the restructuring program outlined in Revlon's previous announcements. Given these references and Revlon's previous warnings about the continued impact of the inventory problem, Revlon's utterance of these forward-looking statements did not alter the total mix of information in the market so as to oblige Revlon to disclose what it allegedly knew about the continuing magnitude of that problem. See 15 U.S.C. § 78u-5(c)(1)(A)(ii).

> FN11. Statement 11 is as follows: "The Company is realigning the way it does business to better service its customers." (Compl. ¶ 53; Glekel Decl. Ex. E).

> FN12. Statement 13 is as follows: " 'We are also confident that our recently announced restructuring program will better align our business processes with a dynamic market.' " (Compl. ¶ 53; Glekel Decl. Ex. E).

Statement 14 consists, in relevant part, of Fellows's January 29, 1999 comment in *Capital Cities Media, Inc.* that "[t]he second half of 1998 was an aberration .... with [sic] this restructuring, we've been bettering the processes of the company." Fellows' belief that the second half of 1998 "was" an aberration was rendered immaterial for purposes of this complaint by Revlon's repeated warnings in its own official statements about the possible persistence of the inventory problem. Still, the second portion of Statement 14 refers to an already-accomplished "bettering [of] the processes" achieved through "this restructuring." The word "restructuring," however, logically refers to the "restructuring" that Revlon had trumpeted in its prior statements to the market, not the disappearance of the inventory problem. In these circumstances, the vague and loose assertion that "processes" had been "bettered" is "too patently immaterial" to support a claim that defendants misled the market about the extent of their inventory problem. *Shaw,* 82 F.3d at 1219.

*24 Statements 16 through 19 are from Fellows's April 26, 1999 interview with *Chain Drug Review* and Revlon's April 29, 1999 press release. Statements 16 [FN13] and 18 [FN14] are, at best, vaguely optimistic forward-looking statements. They are immaterial in light of Revlon's repeated warnings in its own official statements about the possible persistence of the inventory problem; specific warnings from Revlon at the beginning of March and the middle of May sandwiched the April 26 *Chain Drug Review* article. Statement 19--yet another "our fundamentals are strong" comment--is immaterial for the same reasons as Statements 2, 6, and 12.

> FN13. Statement 16 is as follows: "Revlon is going to continue to drive category growth, and we believe it's going to continue to gain share as it has for so long." (Compl.¶ 64).

> FN14. Statement 18 concerns the report that Fellows did not think that the sale of one or more parts of Revlon's business was "imperative" for Revlon to "convince Wall Street to get the valuation of the company back where it belongs." (Compl.¶ 64).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007
(Cite as: 2004 WL 2210269 (S.D.N.Y.))

Page 18

Statement 17--Fellows's comment in *Chain Drug Review* that " '[t]he Company is well on the way to overcoming the inventory problems ... that set us back last year, leaving us to pursue chain drug, discount, and supermarket sales with our proven formula for success' "--is the most problematic statement in the complaint, as it seems to evaluate the current status of the inventory problem. See Novak, 216 F.3d at 315. Assuming it is the sort of statement which could be found too puffy, plaintiffs have nevertheless failed to allege with sufficient particularity either that it was false when made or that Fellows was reckless to its falsity when he made it. Indeed, "as long as [their] public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." Novak, 216 F.3d at 309. And if "plaintiffs contend defendants had access to contrary facts"--as plaintiffs do here--"they must specifically identify the reports or statements containing this information." Id. (citing San Leandro, 75 F.3d at 812).

C. Section 20(a) Claims

Plaintiffs allege that defendants Perelman, Fellows, and Gehrmann are liable as "control persons" within the meaning section 20(a) of the Securities Exchange Act of 1934. These claims are dismissed because plaintiffs have failed to plead a primary violation of section 10(b). See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir.1994).

III. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the amended complaint is granted without prejudice.

2004 WL 2210269 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,007

**Motions, Pleadings and Filings** (Back to top)

• 1:00cv07291 (Docket) (Sep. 27, 2000).

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.