# EXHIBIT D

LEXSEE 2005 U.S. DIST. LEXIS 6427

In re: Best Buy Company, Inc. Securities Litigation

Civil No. 03-6193 ADM/AJB

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2005 U.S. Dist. LEXIS 6427; Fed. Sec. L. Rep. (CCH) P93,224

April 12, 2005, Decided

**PRIOR HISTORY:** *Meeuwenberg v. Best Buy Co., 2004 U.S. Dist. LEXIS 7686 (D. Minn., Apr. 29, 2004)*

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] Kimberly C. Epstein, Esq., Sylvia Wahba Keller, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; Thomas V. Seifert, Esq., Head, Seifert & Vander Weide, Minneapolis, MN, for Plaintiffs.

Thomas B. Hatch, Esq., Elliot S. Kaplan, Esq., John P. Morgan, Esq., Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for Defendants.

**JUDGES:** ANN D. MONTGOMERY, U.S. DISTRICT JUDGE.

**OPINIONBY:** ANN D. MONTGOMERY

**OPINION:**

MEMORANDUM OPINION AND ORDER

I. INTRODUCTION

On January 12, 2005, oral argument before the undersigned United States District Judge was heard on Defendants Best Buy Company, Inc., Richard M. Schulze, Bradbury H. Anderson, Allen U. Lenzmeier, and Darren R. Jackson's (collectively, "Best Buy" or "Defendants") Motion to Dismiss [Docket No. 52]. In their Consolidated Class Action Complaint ("Complaint") [Docket No. 47], Plaintiffs Louis Meeuwenberg, David Tkach, Stephen Anish, and Christopher Hinton ("Plaintiffs") allege a securities fraud class action. Because Plaintiffs fail to meet the particularity requirements required for pleading a 10(b) or 10b-5 claim under the Securities Exchange Act, Defendants' Motion is granted.

II. BACKGROUND [*2] n1

n1 For purposes of the instant Motion, the facts are viewed in the light most favorable to the nonmoving party. See *Digi-Tel Holdings, Inc. v. Proteq Telecommunications, 89 F.3d 519, 522 (8th Cir. 1996); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994)*.

In January 2001, Best Buy acquired Musicland Stores Corporation, including 1,309 Musicland stores, n2 for approximately $700 million. Lewis Decl. [Docket No. 55] Ex. 13. n3 The Musicland stores were acquired for the purpose of attracting new customers to Best Buy, as well as the ability to cross merchandise product. Compl. P 31. At the time of acquisition, Musicland's sales were primarily based on pre-recorded music. Lewis Decl. Ex. 13. Although sales of pre-recorded music were flat or in decline at the time of the purchase, Best Buy intended to return the stores to profitability with a different mix of products, including DVD movies, video games, and expanded hardware offerings. Id. at Exs. 2, 13.

n2 Musicland includes the Sam Goody, On Cue, and Suncoast chains. The stores will collectively be referred to as the "Musicland stores."
[*3]

n3 Because the exhibits attached to the Lewis Declaration are documents either relied upon by the Complaint or are filed with the Securities and Exchange Commission, the Court will consider these documents, and deny Plaintiffs' Motion to Strike [Docket No. 62]. *In re: K-Tel Int'l, Inc. Securities Litigation, 107 F. Supp. 2d 994, 998-99 (D. Minn. 2000), aff'd, 300 F.3d 881 (8th Cir. 2002)*. The majority of the documents cited by Plaintiffs in their Motion to Strike are not relied upon in the determination of the Motion to Dismiss. Only those cited herein were considered for background factual purposes only.

  

Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 3 of 19

2005 U.S. Dist. LEXIS 6427, *3; Fed. Sec. L. Rep. (CCH) P93,224

Page 2

The market, however, did not share Best Buy's optimism regarding the Musicland purchase. In response to reports of the acquisition, Best Buy's stock price dropped over 20%, from $28.81 to $22.94, apparently over fears that the Musicland store purchase would dilute Best Buy's earnings. Id. at Ex. 27. Over the following year, however, the Musicland stores contributed one cent per share to Best Buy's overall earnings. Id. at Exs. 2, 10. This result [*4] was consistent with Best Buy's predictions. Id. Best Buy credited Musicland's contributions to strong sales of DVD movies and video games in the last quarter of the year. Id. at Ex. 10. In fact, for the entire duration that Best Buy owned the Musicland stores, including the class period, Best Buy's earnings met or exceeded forecast expectations. Id. at Exs. 3-7, 9-10, 16, 18, 20-21, 23, 25.

In December 2002, Best Buy revised its earnings outlook downward for the fourth quarter, "due to an expected operating loss of $80-85 million from our Musicland stores." Id. at Ex. 21. Best Buy's outlook also included consideration of a sale of the Musicland stores: "A more comprehensive review of the business alternatives is underway to determine the overall profit potential of the business as a whole." Id.

### III. DISCUSSION

#### A. Standard of Review

A misrepresentation claim brought under § *10(b) of the Securities Exchange Act of 1934* and *Securities and Exchange Commission Rule 10b-5* must plead the following elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often [*5] analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re: K-Tel Int'l, Inc Securities Litigation, 300 F.3d 881, 888 (8th Cir. 2002)*. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *15 U.S.C. § 78u-4(b)(1)*. In short, the PSLRA "embodies the pleading requirement of *Fed. R. Civ. P. 9(b).*" *K-Tel, 300 F.3d at 889*. Particularity requires an identification of the "who, what, when, where, and how." *Id. at 890* (citation omitted).

Although "scienter is not explicitly required by the statutory text of the Exchange Act. . . it is an acknowledged essential element of a *section 10(b)* and *Rule 10b-5* claim." *Id. at 893*. [*6] The PSLRA, therefore, requires that a pleading must "state with particularity facts which give rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. This includes "such matters as the time, place and contents of false representations, as well as, the identity of the person . . . ." *K-Tel, 300 F.3d at 890* (citation omitted). Recklessness, as well as intentional conduct, satisfies the scienter requirement. *Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1534 (8th Cir. 1996)* (citation omitted). Recklessness is defined as "an extreme departure from the standards of ordinary care, and . . . presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *K-Tel, 300 F.3d at 893* (citations omitted). Motive and opportunity are both relevant to the scienter inquiry, "but particularly important to establishing scienter is a showing of unusual or heightened motive to meet the Reform Act standard." *Id. at 894* (citation omitted). Without a showing of motive [*7] and opportunity, the remaining allegations against the defendants must be particularly strong to constitute an inference of recklessness. Id. Specifically, unsupported allegations that defendants had motives common to all officers and directors — such as keeping the stock price high for the general purpose of increasing compensation or the desire to make the corporation appear profitable – are insufficient to establish scienter. Id. However, if the stock price was artificially inflated for the purpose of selling stock, scienter may be established. Id.

In the instant action, Plaintiffs' allegations fail to meet the heightened pleading requirements of the PSLRA and *Rule 9(b)*. Either the allegations made by Plaintiffs fail to state with particularity why a specific statement is misleading, or Plaintiffs fail to adequately state with particularity facts which give rise to a strong inference of scienter. Moreover, Plaintiffs' allegations do not meet the materiality requirements of a *10(b)* or *10b-5* claim.

#### B. 10(b) and 10b-5 Misrepresentations and Omissions

Plaintiffs allege a number of false and misleading misstatements were made by Best Buy between January 9, 2002, and [*8] August 7, 2002 (the "Class Period"). Plaintiffs' Complaint also alleges that Best Buy failed to disclose the truth regarding the status of the Musicland remerchandising efforts. According to Plaintiffs, these omissions made Best Buy's positive statements false and misleading, resulting in the instant lawsuit. For





Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 4 of 19

2005 U.S. Dist. LEXIS 6427, *8; Fed. Sec. L. Rep. (CCH) P93,224

Page 3

purposes of analysis, Plaintiffs' allegations are divided into four categories — general allegations against Defendants, specific allegations against Defendants, the allegations of the Confidential Informants, and the individual Defendants' stock sales.

### 1. General Allegations

In its overarching allegations, Plaintiffs claim Best Buy failed to disclose material information pertaining to the failure of the Musicland acquisition, particularly Best Buy's failure to disclose that it was cutting prices on products to overcome the "negative price halo." Compl. PP 5, 55. Furthermore, Plaintiffs allege Best Buy failed to disclose to the public severe problems with the efforts to remerchandise and remodel the Musicland stores. Id. Plaintiffs contend that as a result of these omissions, Best Buy's positive statements were false and misleading.

In support of dismissal of [*9] the action, Best Buy argues that Plaintiffs' claims are conclusory allegations not grounded in specific facts. First, Best Buy argues the allegation that it was experiencing "severe and persistent operational and financial difficulties with Musicland" is not reflected in the financial results of the Musicland stores. Even the Confidential Informants relied upon by Plaintiffs are unable to state that the actual financial performance of Musicland differed from what Best Buy reported to the public. Second, Best Buy cites to Plaintiffs' failure to identify facts to support the claim that the Musicland stores were not performing to "internal expectations." Finally, Best Buy argues that Plaintiffs fail to provide any factual support for the contention that by January 9, 2002, Best Buy was aware the Musicland acquisition was a failure and that Best Buy would have to sell Musicland to avoid ongoing losses. Contrary to this allegation, Best Buy argues it actually increased its earnings forecast for the fourth quarter, and then proceeded to improve upon that forecast by a substantial margin. n4 Again, on April 2, 2002, Best Buy provided earnings guidance for the first quarter, and exceeded those [*10] results as well. It was not until August 8, 2002, that Best Buy reported that softening sales across most product categories could affect earnings. Compl. P 78. Plaintiffs do not challenge the reasoning behind the August 8, 2002 announcement, nor do they allege that the reasons given by Best Buy for the tempered forecast were false or misleading.

> n4 In fact, before, during, and after the Class Period, Best Buy met or exceeded its most recent predicted earnings. Only once did Best Buy downgrade its earnings forecast, shortly before the end of the second quarter of fiscal year 2003. Defs' Mem. of Law in Support of Motion to Dismiss at 5 [Docket No. 54].

Plaintiffs' general allegations rely on the more specific allegations of false and misleading statements. Therefore, an analysis of the specific allegations must be undertaken to determine whether the general allegations are pled with sufficient particularity.

### 2. Specific Allegations

In the section "Materially False and Misleading Statements Issued During [*11] the Class Period," comprising paragraphs 51–77 of the Complaint, Plaintiffs reference a number of statements it believes to be false and misleading. Many of the paragraphs, however, do not contain allegations of materially false and misleading statements. Only the paragraphs actually containing allegations are analyzed.

P 51

In Paragraph 51 of the Complaint, Plaintiffs allege a Best Buy press release containing a statement relating to "the benefits of remerchandising many of the Company's Sam Goody stores . . ." is materially false and misleading. Best Buy correctly contends this statement is a forward-looking statement under *Section 10(b)* and *Rule 10b-5. 15 U.S.C. § 78u-5(c)*. Forward-looking statements apply to projections regarding revenue, income, earnings, statements about management's plans or objectives, and statements involving future economic performance. *15 U.S.C. § 78u-5(i)(1)(A-C)*. Consequently, a challenged forward-looking statement must be accompanied by an allegation that the statement was made with actual knowledge that it was false and misleading to survive a motion to dismiss. *In re Navarre Corp. Securities Litigation, 295 F.3d 791, 799 (8th Cir. 2002)*. [*12] Plaintiffs make a general allegation that the "safe harbor" for forward-looking statements does not apply because Best Buy either failed to accompany its forward-looking statements with appropriate cautionary language or made the statements at issue with actual knowledge of their falsity. Compl. P 93. However, Plaintiffs' general allegation, which does not specifically reference any single statement by Best Buy, is insufficient to meet the particularity requirements of the PSLRA.

Here, the statements in the press release are clearly forward-looking. The language itself references future performance, and is accompanied by cautionary language. Specifically, the press release states:

> Statements made in this news release . . . should be considered forward-looking and subject to various risks and uncertainties.

  

Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 5 of 19

2005 U.S. Dist. LEXIS 6427, *12; Fed. Sec. L. Rep. (CCH) P93,224

Page 4

Such forward-looking statements are based on management's beliefs and assumptions regarding information currently available, and are made pursuant to the "safe harbor" provisions . . . . The Company's actual results could differ materially from those expressed in the forward-looking statements. Factors that could cause results to vary include, among others, those expressed [*13] in the Company's filings with the Securities and Exchange Commission. The Company has no obligation to publically update or revise any of the forward-looking statements that may be in this news release.

Lewis Decl. Ex. 8. Here, the cautionary language relates to the future performance of Best Buy; as a result, it addresses the allegedly misleading statement cited by the Plaintiffs. This language is sufficient to render the alleged misrepresentations forward-looking. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir. 1997). To survive the Motion to Dismiss, Plaintiffs must allege the statement was made with actual knowledge of its falsity. No such allegation is asserted.

P 52

In Paragraph 52, Plaintiffs reference another January 9, 2002 press release in which Best Buy reported sales increases at the Musicland stores, stating: "The increase reflected market share growth and the remerchandising of most Sam Goody stores to include more DVD movies, video gaming hardware and software, and consumer electronics." Lewis Decl. Ex. 7. Nowhere, however, do Plaintiffs allege the statement or earnings summaries are false or misleading, nor do they argue the [*14] reasons given by Best Buy for the earnings increase are inaccurate. Therefore, this allegation fails to meet the particularity requirements required by the PSLRA.

P 53

In Paragraph 53, Plaintiffs quote a portion of a transcript of the January 9, 2002 analyst conference hosted by Best Buy. Plaintiffs highlight two sentences from that conference. The first sentence reads: "Sam Goody Stores opened are doing substantially better than the On Cue stores, thus enabling the building of a larger brand identity for Sam Goody and expanding the chain at a more rapid rate." The second sentence states: "All the efforts have been successful and have achieved all of the synergies that were expected in the first year which is a big achievement." With the exception of the second half of the first sentence, these contentions are historical statements which Plaintiffs do not allege to be false. In regard to the claim that Sam Goody could be expanded at a more rapid rate, the statement is forward-looking. Again, Plaintiffs fail to allege with particularity facts which give rise to a strong inference of scienter.

P 55

In Paragraph 55, Plaintiffs list a number of "adverse facts" or reasons upon [*15] which it concludes that Best Buy "lacked a reasonable basis for their positive statements about the Company and their earnings projections, which were materially false and misleading at all times," as alleged in Paragraphs 51-53. Plaintiffs later apply the reasons contained within Paragraph 55 to all the allegations contained within Paragraphs 51-77. However, the averments proffered in Paragraph 55 either do not demonstrate how the referenced allegations are false or fail to demonstrate a strong inference of scienter. Rather, the averments in Paragraph 55 are of a general nature. For example, Plaintiffs allege Best Buy failed to adequately train Musicland personnel in the sale of consumer electronics, the Musicland stores were inadequate in both size and location, and the company was incurring additional costs to rotate inventory. However, the allegations do not reference specific facts sufficient to meet the particularity requirements of the PSLRA or *Rule 9(b)*. Nor do any of the allegations in Paragraph 55 give rise to a strong inference that the Defendants acted with scienter. Plaintiffs' allegations are too vague and general to meet the particularity requirements of the PSLRA.

P [*16] 59

In Paragraph 59, Plaintiffs allege Best Buy's press release of February 29, 2002, in which Best Buy increased its earnings expectations for the fourth quarter to $1.38 per share, was materially false and misleading. Plaintiffs can not demonstrate that this assertion is material, however, as Best Buy's ultimate earnings for the fourth quarter were a reported $1.62 per share, a figure Plaintiffs do not allege to be inaccurate. As a result, it is unclear how this assertion is material, much less false or misleading, and therefore, the averment fails to meet the particularity requirements.

P 61

In Paragraph 61, Plaintiffs cite a March 7, 2002 press release which states in part: "The change in product mix — including more video gaming hardware and software, and devices that play movies and music — drove an increase in the average purchase per customer." Again, Plaintiffs fail to allege with particularity why this statement is inaccurate.

  

Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 6 of 19

2005 U.S. Dist. LEXIS 6427, \*16; Fed. Sec. L. Rep. (CCH) P93,224

Page 5

P 64

In Paragraph 64, Plaintiffs quote an April 2, 2002 press release in which Best Buy announced its financial results for the fourth quarter of fiscal year 2002. The press release states that the Musicland stores met profitability [\*17] targets, and that the strong finish to the quarter built Best Buy's optimism for the year ahead, with expectations of growth in revenues. The press release contains historical statements, which Plaintiffs do not allege were inaccurate, as well as forward-looking statements, which are not alleged with facts sufficient to give rise to a strong inference of scienter.

P 65

In Paragraph 65, Plaintiffs extensively quote various individual Defendants from an investment analyst conference call. The call had been prefaced by cautionary language regarding forward-looking statements. Lewis Decl. Ex. 11. In the transcript of the conference call, the Defendants discuss the past performance results of the Musicland stores, whose earnings exceeded management expectations in the first year. Defendants also noted that sales at Musicland stores outpaced mall traffic figures. Additionally, the Defendants made statements indicating Best Buy expected modest sales growth over the coming year, and intended on continuing to invest and reposition the Musicland stores. As with the other alleged misrepresentations, Plaintiffs fail to allege the historical figures cited by Best Buy were inaccurate, or that [\*18] Best Buy's forward-looking statements were made with recklessness, much less the actual knowledge of their falsity required for forward-looking statements. Furthermore, in other portions of the same conference call, Defendants state that due to a reduction in the number of Musicland stores, it expected Musicland's operating results to drop by $40 million in fiscal year 2003. Lewis Decl. Ex. 11. As a result, Plaintiffs fail to adequately allege with particularity that the conference call statements were false or misleading.

P 66

In Paragraph 66, Plaintiffs cite an April 2, 2002 press release in which Best Buy discusses a marketing test in which the Sam Goody name outperformed the On Cue name in rural areas, and, as a result, On Cue stores would be renamed Sam Goody. Plaintiffs fail to allege the marketing test was false or misleading. The press release also states the name change would allow Best Buy to capitalize on the name change. Moreover, this is a forward-looking statement, accompanied by cautionary language, wherein scienter is not alleged with particularity. Lewis Decl. Ex. 10.

P 67

Paragraph 67 of the Complaint references an analyst conference call later in the [\*19] day on April 2, 2002, in which Defendants stated they did not believe transforming the On Cue stores to Sam Goody stores would cause "a lot of disruption." Again, the conference call was prefaced by cautionary language. Lewis Decl. Ex. 11. Plaintiffs fail to allege this statement was made with actual knowledge of its falsity. Additionally, the vague nature of the statement at issue makes it difficult to identify facts sufficient to establish a strong inference of recklessness in the actions of Defendants, much less actual knowledge of its falsity.

P 70

In Paragraph 70 of the Complaint, Plaintiffs quote a number of forward-looking statements from Best Buy's annual 10-K form filed on May 30, 2002. The paragraphs quoted include a number of statements regarding the prospects, intentions, and business strategies for Best Buy and the Musicland stores. However, the 10-K is accompanied by cautionary language stating that the information contained therein was forward-looking, and subject to numerous factors. As a result, Plaintiffs' failure to allege the 10-K statements were made with actual knowledge of their falsity is fatal to these allegations.

P 72

In Paragraph 72, Plaintiffs [\*20] cite to a June 6, 2002 press release in which Best Buy reported on the latest Musicland results, which included a slight drop in sales. The press release also contains Best Buy's earnings growth expectations for fiscal year 2003. Plaintiffs do not allege the Musicland loss was inaccurate, nor do they state with particularity how the earnings estimates report is false or misleading.

P 73

Paragraph 73 of the Complaint details Best Buy's press release of the first quarter results for the fiscal year 2003, which contained Best Buy's usual cautionary language regarding forward-looking statements. Plaintiffs highlight a statement which reads:

> "Our strong beginning for the year builds our confidence that we can continue to achieve top-quartile growth rates in sales and earnings," Schulze added. "We expect contributions from new store openings, comparable stores sales gains and improved

  

Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 7 of 19

2005 U.S. Dist. LEXIS 6427, *20; Fed. Sec. L. Rep. (CCH) P93,224

Page 6

operating efficiency to drive our growth."

Lewis Decl. Ex. 16. The statement is not material to Plaintiffs' claims. The statement appears in a press release about Best Buy as a whole, and is not directed to Musicland stores. Id. The results also stated Best Buy's expectations for growth [*21] in the second quarter, which included remerchandising efforts at Sam Goody stores. However, Plaintiff's do not allege with particularity how this statement was false or misleading, and fail to allege Defendants had actual knowledge of its falsity.

P 74

Paragraph 74 of the Complaint details an investment analyst conference call in which Defendant Schulze explains that Best Buy recently switched to a new management system, and had increased inventory to address anticipated problems with the transition. Once again, Plaintiffs fail to allege how this statement is false or misleading; moreover, it is unclear how this general statement about Best Buy inventory is material to the Musicland stores.

P 75

In Paragraph 75 of the Complaint, Plaintiffs cite a July 12, 2002, Amendment No. 3 to SEC Form S-3 filed by Best Buy. In the Amendment, Best Buy stated the Musicland acquisition provided Best Buy access to new distribution channels, customers, and the ability to leverage Best Buy's core competencies to the new operations. Plaintiffs fail to particularly allege what is false and misleading about these statements. Additionally, the statement is so general as to render it immaterial. [*22] *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).

P 76

Finally, in Paragraph 76 of the Complaint, Plaintiffs extensively quote from Best Buy's 10-Q filed for the first quarter of fiscal year 2003. The 10-Q contains a number of forward-looking statements, none of which are alleged with facts sufficient to satisfy scienter requirements.

### 3. Confidential Informant Allegations

The Plaintiffs reference a number of allegations made by Confidential Informants ("CIs"). The cumulative effect of these allegations with the above-cited alleged misrepresentations still falls short of the particularity requirements of the PSLRA.

The allegations attributed to the CIs, far from meeting the PSLR requirements of particularity, are rather vague claims made by the CIs. For example, in Paragraphs 39 and 40 of the Complaint, CI 1 states that it was "well-known" throughout the company that the majority of Musicland stores were in "level C or D" locations, and the Musicland real estate was "really bad." Assuming this statement to be true, it does not adequately demonstrate that Best Buy's statements regarding the prospects were false or misleading, much [*23] less that Best Buy acted with scienter. The who, what, when, where and how are missing from these statements which would allow a strong inference to be made that the Defendants acted recklessly, or with actual knowledge that their statements were misleading. *K-Tel*, 300 F.3d at 891.

Plaintiffs also allege, in Paragraph 41, that Best Buy's practice of discounting products in the Musicland stores was misleading since the Defendants knew the practice could not be sustained, and was merely a charade to give the Musicland stores a short-term boost. Again, the specifics of these allegations are missing – in fact, Paragraph 41 merely makes bare assertions, with no apparent facts, much less specifics, to support the allegations. As a result, these allegations also fail to meet the particularity requirements.

Paragraph 43 of the Complaint is slightly more specific in that it names Defendants Schulze and Anderson, and alleges they participated in conference calls updating them on the remerchandising of the Musicland stores. However, CI 2 merely reports that problems occurred during the remerchandising effort requiring substantial modifications. Updates and changes to the remerchandising [*24] plan are not sufficient to make Best Buy's general statements regarding the plan false, or demonstrate a strong inference of recklessness on behalf of the Defendants. CI 2 also alleges, in Paragraph 4, that Defendants Schulze and Anderson were aware of the problems regarding the "negative price halo," or the perception that Musicland products were overpriced, as well as the failure of various strategies to correct the problem. Again, however, the existence of the "negative price halo," coupled with the Defendants' awareness of it and attempts to alleviate the problem, do not meet the particularity requirements to raise a strong inference that the general statements regarding Musicland were false. Best Buy was not required to report every nuance of the remerchandising strategy, and the vague allegations reported by CI 2 are not sufficiently particular to raise a strong inference of recklessness on behalf of Best Buy.

CI 3 alleges that during a meeting in September or October, 2001, Defendant Schulze became upset when told of remodeling issues. He is alleged to have thrown

  

Case 1:04-cv-00831-SLR    Document 54-6    Filed 07/20/2005    Page 8 of 19

2005 U.S. Dist. LEXIS 6427, *24; Fed. Sec. L. Rep. (CCH) P93,224

Page 7

papers at another employee, and stated he was "sick and tired" of "reading reports every day about what is going [*25] wrong." While inflammatory, these statements are too vague to be considered evidence of a strong inference of recklessness. Acknowledging one's frustration with business issues is not the same as making misrepresentations. The statements do not give rise to the requisite strong inference of recklessness. Moreover, business problems alone are not sufficient to establish scienter. See *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001).

The remaining CIs also make allegations about the remodeling and remerchandising efforts. Many of these allegations relate to movement of inventory between Musicland and Best Buy, while others relate to alleged disruptions in individual stores during the remerchandising efforts. Other CIs allege other miscellaneous claims, including problems with "inventory shrinkage" due to shoplifting, and problems at individual stores. Even assuming these allegations are true, they identify isolated issues that can not support a strong inference of scienter in regard to the much broader allegations of fraud alleged by the Plaintiff's.

Because Plaintiff's fail to allege their general, specific, and Confidential Informant claims with the particularity [*26] required of the PSLRA, the Complaint fails.

### 4. Stock Sales and Convertible Debentures

As evidence of motive, Plaintiffs rely on the stock sales of various Best Buy directors and officers during the Class Period. It is undisputed, however, that Defendant Anderson was the only individual Defendant to sell stock during the Class Period. It is highly disputed whether Defendant Anderson's sales were sufficiently unusual to raise an inference of wrongdoing. The Eighth Circuit has held that while "alleging the defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock is sufficient" to demonstrate scienter, the benefit must be more than of a generalized nature to the defendants. *K-Tel*, 300 F.3d at 894-95.

Here, although Defendants allege a number of officers and directors sold shares of stock during the Class Period, they do not allege that Defendants Schulze, Lenzmeier, or Jackson sold any stock or exercised any options during the Class Period. As a result, no inference of scienter can be found against these Defendants in relation to their stock sales. Although Defendant Anderson did sell stock during the Class Period, [*27] the vast majority of his sales are part of his apparent pattern of selling stock on a weekly basis. Such regularity in the sale of stock over a long period of time - both before, during, and after the Class Period - does not raise an inference of scienter. Although Defendant Anderson did make one additional sale of stock in April 2002, comprising 20,000 shares of stock, it is not of a sufficient amount to constitute a strong inference of scienter, as that amount represented less than 2% of Defendant Anderson's holdings at the end of the year. Lewis Decl. Ex. 15.

As the Eighth Circuit has held, "general allegations of a desire to increase stock prices . . . are too generalized and are insufficient" to satisfy the PSLRA particularity requirement. *Id. at 895*. As a result, Plaintiffs' allegations that Defendants acted with the intent to raise stock prices are insufficient to satisfy the scienter requirements. Similarly, Plaintiffs' allegations regarding Best Buy's offering of convertible debentures announced in January 2002 also fail. Although Plaintiffs discuss the offering, they do not allege how it benefitted the individual Defendants, nor do they state with particularity [*28] how any statements made in connection with the offering were false or misleading.

### C. Alleged Exchange Act Section 20(a) Violations

In addition to the *10(b)* and *10b-5* claims, Plaintiffs allege violation of *Section 20(a) of the Exchange Act* against the individual Defendants. "*Section 20 of the Exchange Act* extends liability for fraudulent conduct under *Section 10(b)* to individuals controlling persons found to have committed securities fraud." *In re: Xcel Energy, Inc.*, 286 F. Supp. 2d 1047, 1059 (D. Minn. 2003) (citing *15 U.S.C. § 78t(a)*). Like a *10(b)* or *10b-5* claim, the primary violation under *Section 20* must be plead with particularity as required by the PSLRA. *Vohs v. Miller*, 323 F. Supp. 2d 965, 973 (D. Minn. 2004). Because Plaintiffs based their *Section 20(a)* claims on the same allegations as the *10(b)* and *10b-5* claims, the *Section 20(a)* claims fail for the same reasons as previously discussed.

### D. Plaintiffs' Request to Amend and Materiality

Anticipating that Defendants' Motion to Dismiss might be granted, Plaintiffs request leave to amend their Complaint. n5 Although leave is generally granted [*29] when justice requires, in the instant case, it is not apparent that amendment will cure the Complaint's defects. *Frey v. City of Herculaneum*, 44 F.3d 667, 672 (8th Cir. 1995). Plaintiffs argue that, if allowed to amend, they would add: (1) additional details establishing Defendants' knowledge of the remerchandising issues; (2) more details regarding the remerchandising problems; (3) additional details establishing the credibil-

  

Case 1:04-cv-00831-SLR   Document 54-6   Filed 07/20/2005   Page 9 of 19

2005 U.S. Dist. LEXIS 6427, *29; Fed. Sec. L. Rep. (CCH) P93,224

Page 8

ity of the CIs; and (4) additional details concerning the Musicland stores inventory buildup. Additional details in these areas, however, will not remedy the key issues of lack of particularity in the present allegations. The Complaint does not fail for lack of details regarding the alleged remerchandising problems so much as it fails for a lack of particularity of falsity or scienter.

n5 The Plaintiffs have, in fact, already had an opportunity to recast and recharacterize their Complaint. The initial Complaint was filed on November 20, 2003 [Docket No. 1]. Following the consolidation of a number of individual cases, the Consolidated Class Action Complaint was filed on August 19, 2004. Although both pleadings allege securities fraud, the Consolidated Complaint for the first time raises allegations by the CIs.

[*30]

Plaintiffs' allegations do not meet *10(b)* and *10b-5* materiality requirements. As Defendants noted in their brief and at oral argument, the Plaintiffs have not alleged that any specific financial disclosure or statement from Best Buy was false or misleading, including the August 8, 2002 press release in which Best Buy downgraded its earnings forecast. Although securities lawsuits are not confined to misrepresentations and omissions regarding financial information, Plaintiffs have been unable to provide any Eighth Circuit law as authority for the proposition that misrepresentations of the type alleged by Plaintiffs are material to a *10(b)* or *10b-5* claim. The single case Plaintiffs produced where omissions were found to be the basis of a *10(b)* or *10(b)-5* claim, Rodney v. KPMG Peat Marwick, is not analogous to the instant litigation. *143 F.3d 1140 (8th Cir. 1998)*. In Rodney, Plaintiffs alleged that KPMG, in discussions related to fund investments and risks contained within prospectuses, violated three of its internal investment restrictions. *Id. at 1141*. Here, it is not alleged Best Buy violated any internal rules. Moreover, the omissions in Rodney [*31] related directly to assumptions regarding investments. Here, the alleged omissions regarding the remerchandising program do not directly relate to investments.

A fact is deemed material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1998)* (citation omitted). Even if Best Buy were to have specifically stated there were difficulties with the integration of the Musicland stores, it is not clear that this would alter the mix of information available and important to investors. Musicland's performance and earnings were reflected within Best Buy's overall earnings. Plaintiffs do not allege that these figures were false or that the true figures were omitted. Therefore, the mix of information available to investors would not have significantly changed; and as a result, Best Buy's alleged omissions were not material. Thus, Defendants' Motion to Dismiss must be granted, and Plaintiffs' request for leave to amend the Complaint will be denied.

### IV. CONCLUSION

Based [*32] upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss [Docket No. 52] is **GRANTED**; and

2. Plaintiffs' Motion to Strike [Docket No. 62] is **DENIED**; and

3. Plaintiffs' Complaint [Docket No. 47] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/ Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated: April 12, 2005.





# EXHIBIT E

**Westlaw.**

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 1

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
In re ADVANTA, CORP., Securities Litigation.
No. 97-CV-4343.

July 9, 1998.

*MEMORANDUM*

BUCKWALTER, J.

I. INTRODUCTION

*1 After their stock lost approximately 20% of its value when Advanta Corporation ("Advanta") announced it expected to report a $20 million loss for the first quarter of 1997, plaintiffs, Advanta shareholders, filed this proposed securities class action suit against Advanta and seven of its present and former officers and directors. [FN1] Their three count amended complaint (the "Complaint") alleges violations of Section 10(b) (Count I); Section 20(a) (Count II) and Section 20(A) (Count III, against defendants Greenawalt and Marshall only) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Presently, all defendants move to dismiss Counts I and II and defendants Greenawalt and Marshall seek dismissal of Count III. [FN2] For the reasons that follow, Advanta's Motion is granted and Greenawalt's Motion is granted.

> FN1. Individual defendants are as follows: Richard A. Greenawalt ("Greenawalt"), former President and Chief Operating Officer; Dennis T. Alter ("Alter"), Chairman of the Board; Robert A. Marshall ("Marshall"), former Executive Vice President and Group Executive, Advanta Personal Payment Services; William A. Rosoff ("Rosoff"), Director and Vice Chairman of the Board of Directors; Alex Hart ("Hart"), Chief Executive Officer and Director; Gene S. Schneyer ("Schneyer"), Vice President, Secretary and General Counsel; and John J. Calamari ("Calamari"), Vice President, Finance and Principal Accounting Officer.

> FN2. Defendants, Advanta, Atler, Rosoff, Hart, Schneyer and Calamari, filed a motion to dismiss Counts I and II ("Advanta's Motion"). Defendants, Greenawalt and Marshall, filed a motion to dismiss the entire Complaint ("Greenawalt's Motion") and joined Advanta's motion.

II. BACKGROUND [FN3]

> FN3. The facts are as alleged in the Complaint or taken from documents cited in Complaint, the full text of which are attached to either Advanta's or Greenawalt's motion to dismiss. See *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3d Cir.1997); see also, *San Leandro Emer. Med. Group Profit Sharing Plan v. Phillip Morris Co.,* 75 F.3d 801, 809 (2d Cir.1996) (district court properly considered full text of documents partially quoted in complaint in granting motion to dismiss). Furthermore, plaintiffs have not objected to this Court's consideration of such documents.

Advanta is a leading issuer of standard and gold MasterCard and VISA credit cards. Advanta cards typically carry no annual fee and a credit limit of approximately $6,000. Advanta is popularly known for its ability to attract customers by offering low "teaser" interest rates, about 7%, for a limited period. After the teaser period expires, Advanta raises the interest rate to a higher more competitive amount.

Historically, Advanta enjoyed strong credit quality and low charge-off rates. [FN4] Advanta's 1995 annual report informed shareholders that the company's total number of customer accounts increased by 27%, in 1995, to more than 5 million by the end of the year. The company boasted that its emphasis on acquiring gold card customers, generally better credit risks, helped maintain its "enviable credit quality profile."

> FN4. A "charge-off" occurs when a credit card holder's unpaid balance becomes uncollectible, generally because a borrower is excessively delinquent, defaults, files for bankruptcy or an account is fraudulent. The

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 2

unpaid balance is then "charged-off" against an established reserve.

In a press release issued on July 18, 1996, Advanta announced that earnings for the three and six months ending June 30, 1996, represented an increase of 35% and 25%, respectively, compared to the same periods in 1995. Advanta also reported that "return on equity surpassed the 25% goal for the twenty-second consecutive quarter, attaining 27.7%." This was an increase over both the previous quarters' results and the results for the same quarter in 1995.

Plaintiffs maintain that in an effort to continue its previous growth, Advanta engaged in several practices that severely undermined the company's future viability. Advanta began issuing credit cards with teaser rates and periods significantly lower and longer than industry standard. Advanta increased the number of high risk customers it extended credit to, contrary to representations made in its July 18, 1996 press release, and failed to increase personnel to monitor and enforce collection of such high risk accounts. Thus, by mid-1996 Advanta's credit card charge-off rate had significantly increased.

Additionally, in the third quarter of 1996, Advanta changed its charge-off methodology for consumer credit card bankruptcies to provide the company additional time (from 30 to 90 days) to investigate a bankruptcy before charging-off an account. Plaintiffs allege that the change was simply a way for Advanta to delay reporting the earnings impact of rising charge-off rates from the third and fourth quarters of 1996 to the first quarter of 1997 and to allow individual defendants in the interim to unload shares of Advanta stock at artificially inflated prices. [FN5]

> FN5. According to plaintiffs, during the months of November and December (in which the full negative impact of Advanta's weakened credit quality was masked) defendants Greenawalt, Alter, Marshall and Schneyer "dumped" more than one million shares of Advanta common stock for proceeds in excess of $44 million.

*2 Plaintiffs also note that the change in the charge-off methodology was likely to have little effect in decreasing overall charge-offs. Advanta lacked adequate personnel to conduct additional investigation the extended charge-off period provided for. Moreover, more than three quarters of personal bankruptcies are filed under Chapter 7, freeing the borrower from all debt and rendering additional investigation by the creditor meaningless.

In a news release issued on March 17, 1997, Advanta announced that "[f]or the first quarter, the Company currently expects to report a loss in the area of $20 million, or approximately $0.44 cents per share, compared with earnings of $41 million for the first quarter of 1996." Advanta attributed the loss to "continuing increases in consumer bankruptcies and charge-offs and lower receivable balances than originally anticipated in the credit card business." [FN6] Advanta simultaneously announced that its Board of Directors and senior management "have commenced a thorough and systematic review of its business strategy, growth prospects and operating environment aimed at maximizing the Company's value." In this regard, Advanta listed a number of steps it would take towards increasing revenue and stemming rising credit card losses. Advanta proposed to reprice credit card interest rates, improve collection procedures, shorten its teaser period, tighten underwriting and attract more high-quality credit card holders.

> FN6. Advanta's predictions came true. The company reported a first-quarter net loss of $19.8 million, or 43 cents a share, compared with net income of $41 million, or 91 cents a share in the year-earlier quarter. Additionally, credit card charge-offs were 6.6%, up from 3.2% in the first quarter of 1996.

Immediately, the value of both classes of Advanta stock dropped. Advanta Class A stock dropped from $40.375 per share to $31.875 per share and Advanta Class B stock dropped from $39.6875 per share to $30.375 per share.

Against this background, plaintiffs allege that from August 13, 1996 until March 17, 1997 (the "Class Period"), defendants disseminated a series of materially false and misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) and are liable as "control persons" under Section 20(a) of the Exchange Act (Count II). Additionally, Subclass plaintiff, Jerry Weinberg, seeks to hold defendants, Greenawalt and Marshall, liable as contemporaneous traders under Section 20(A) of the Exchange Act (Count III). Presently, defendants seek dismissal pursuant to Rule 12(b)6, for failure to state a claim, and Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), for insufficient pleading.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 3

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court must primarily consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). The court must accept as true all allegations contained in the complaint and must give the plaintiff the benefit of every favorable inference that can be drawn from those allegations. *See J/H Real Estate Inc. v. Abramson*, 901 F.Supp. 952, 955 (E.D.Pa.1995); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). A complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. *See Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988). Although the fact specific inquiries common to securities cases generally preclude dismissal, courts will nonetheless grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance with Rule 9(b) or the PSLRA. Dismissal is not appropriate, however, merely because a court disbelieves a complaint's factual allegations. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### B. Rule 9(b) and the PSLRA

*3 Because 10b-5 claims by necessity involve allegations of fraudulent conduct, courts have long required that they be pled in accordance to Rule 9(b), which provides in pertinent part that in "all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs, through their pleadings, must inject precision and some measure of substantiation into their allegations of fraud. By way of example, allegations of who, what, when, where and how: the first paragraph of any newspaper story, would satisfy the particularity requirement of Rule 9(b). *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In 1995, in response to debate over the impact of securities fraud litigation, Congress enacted the PSLRA, which substantially modified, among other things the standard for pleading securities fraud claims. The PSLRA places additional burdens on plaintiffs attempting to plead fraud in securities cases. Under 15 U.S.C. § 78u-4(b), a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Failure to meet these pleading requirements results in dismissal. 15 U.S.C. § 78u-4(b)(3).

## IV. DISCUSSION

### A. Count I

Plaintiffs assert claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs must therefore meet the three step test for Rule 10b-5 violations outlined by the Third Circuit Court of Appeals in *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1417 (3d Cir.1997). First, the plaintiff must establish that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Second, the plaintiff must establish that the defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. [FN7]

> FN7. For facts or information to be material for purposes of securities fraud litigation they must be of a type that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Additionally, materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiar for the trier of fact. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 281 n. 11 (3d Cir.1992). Only if the alleged misrepresentations or omissions are so

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 4

obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law. *Id.*

The private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of fact that effect trading on the secondary market. *See In Re Burlington Coat Factory,* 114 F.3d at 1417 (citations omitted).

*4 First, plaintiffs allege that numerous statements from forms filed with the SEC, press releases and annual and quarterly reports were misleading when issued because they failed to reveal adverse business practices adopted by Advanta and negative facts and trends relating to the company's credit card business. Additionally, plaintiffs single out one statement made by Janet Point ("Point"), Vice President of Investor Relations, claiming Point knew her statement was false when issued.

Presently, defendants argue that all statements contained in the Complaint evidence full disclosure and are not misleading and that plaintiffs' allegations concerning such statements fail to meet the heightened pleading standards of Rule 9(b) and the PSLRA. First, I discuss the sufficiency of plaintiffs' general allegations of non-disclosure and then turn to their specific allegations regarding Point's statement.

i. Disclosure of Negative Facts and Trends

Plaintiffs contend that certain statements made during the Class Period are actionable because they fail to disclose negative facts and trends Advanta's officers and directors were aware of and thus left investors with false impressions as to the quality of Advanta's credit card portfolio. Specifically, plaintiffs claim Advanta failed to reveal that: 1) to perpetuate customer growth, the company had relaxed its underwriting standards; 2) in an attempt to retain customers, after the initial teaser period expired, Advanta was not repricing accounts to normal industry standard interest rates; 3) it lacked adequate credit collection capabilities and personnel to follow through on delinquent accounts; and 4) that the extended investigative period provided in the new charge-off methodology was irrelevant as most customers filed Chapter 7 bankruptcy, releasing them from all credit card debt.

Two general categories of statements are attributed with these deficiencies: 1) statements issued by Advanta regarding the 30 to 90 day charge-off change [FN8] and 2) what plaintiffs characterize as overly optimistic reports regarding the quality and future profitability of Advanta's credit card division. I review these groups individually in light of plaintiffs' allegations.

> FN8. Initially, plaintiffs argued that statements regarding the charge-off change were misleading because they did not explain the full negative impact of the change (that charge-off loss reports would be delayed). They abandoned this argument when faced with defendants' motion to dismiss highlighting the fact that, as plaintiffs admit in the Complaint, on at least four occasions Advanta not only disclosed the new method but provided detail as to the exact effect the change would have on reported earnings and losses.

a. Charge-off Statements

Plaintiffs claim the following statements regarding the charge-off change were misleading because they failed to disclose the four adverse conditions listed above.

On September 18, 1996, Advanta Credit Card Master Trust (the securitization vehicle for Advanta) in a Form 8K disclosed the change in the charge-off methodology along with the following explanatory language:
> As a result of this new methodology, charge-offs of receivables held by the Trust were lower in August 1996 than they would have been under the previous methodology and, conversely, delinquent Receivables were higher by a like amount.

On October 17, 1996, Advanta filed a Form 8K stating the following:
> In the third quarter, the Company adopted a new charge-off methodology relating to credit card bankruptcies which provides for an investigative period following notification of the bankruptcy petition of up to 90 days (rather than up to 30-days) prior to charge-off. The longer investigative period, which is consistent with others in the industry, had an approximate $24 million net positive impact for the quarter.

*5 The change is next mentioned in Advanta's third

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243  
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 5

quarter report filed on November 12, 1996:

> In the third quarter of 1996, the Company adopted a new charge-off methodology related to bankrupt credit card accounts, providing for a period of up to a 90-day (rather than a 30-day) investigative period following notification of the bankruptcy petition, prior to charge-off.
> Credit statistics following the paragraph reflected this change in methodology.

Finally, on January 21, 1997 Advanta issued the following:

> As, previously disclosed, the Company adopted a new charge-off methodology relating to credit card bankruptcies in the third quarter of 1996. As anticipated that change had an impact in the fourth quarter 1996 similar to the amount in the third quarter. [FN9]

> FN9. Plaintiffs also cite to Advanta's second quarter Form 10-Q filed on August 13, 1996, which they note makes no mention of the charge-off change implemented in the beginning of the third quarter. They claim disclosure in the second quarter report was necessary as, at the time it was filed, the third quarter, along with the new policy were "well underway." Corporations, however, are not required to disclose events from the quarter in progress in reports regarding the previous quarter. *Zucker v. Quasha,* 891 F.Supp. 1010, 1019 (D.N.J.1995); see also, *In re Burlington Coat Factory,* 114 F.3d at 1432 (company not obligated to update public as to state of quarter in progress). Consequently, consideration of alleged omissions regarding charge-offs in Advanta's second quarter 1996 report is unnecessary.

Defendants correctly note that each statement contains full and accurate disclosure as to the discrete topic of charge-offs and inclusion of such unrelated topics as underwriting, teaser rates, general trends in bankruptcy and collection practices was not necessary to clarify the accounting change. I agree.

When a corporation makes a disclosure, such as Advanta's report of the charge-off change, there is duty to make it complete and accurate. *See U.S. v. Yeaman,* 987 F.Supp. 373, 378 (E.D.Pa.1997)(citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir.1968)). This, however, does not mean that by revealing one fact one must reveal all others that would be interesting or market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead. *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990)(interpreting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d. at 860).

Advanta's coverage of the charge-off change, as cited by plaintiffs, was both complete and accurate. It describes the impact the change will have on both receivables and losses, the company's justifications for the change, and the assurance that the switch conforms with industry standards. There was no need for Advanta to interject into these comprehensive statements the extraneous information plaintiffs assert was lacking. Furthermore, additional explanation of the change is contained in the full text of documents cited in the Complaint. For example, a footnote to the financial highlights section of Advanta's October 17, 1996 Form 8K explains "[t]hird quarter 1996 figures reflect the adoption of a new charge-off methodology. Without this change, managed credit card charge-off and delinquency rates for the third quarter 1996 would have been 4.6% and 3.7% respectively." [FN10]

> FN10. In analyzing securities fraud claims, review of the full text of documents cited in plaintiffs' complaint is appropriate. It prevents plaintiffs from maintaining a claim of fraud by extracting an isolated statement from a document and placing it in a complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. *In re Burlington Coat Factory Securities Litigation,* 114 F.3d at 1426 (citations omitted).

Therefore, I find Advanta's statements regarding implementation of the company's new charge-off policy neither materially false nor misleading and therefore not violative of Rule 10b-5. Accordingly, plaintiffs' 10b-5 claims based on such statements are dismissed pursuant to Rule 12(b)(6). [FN11]

> FN11. Additionally, plaintiffs' argue that the September 18, 1996 statement is misleading because it was issued by Advanta Credit Card Master Trust, rather than Advanta. Although they fail to allege as much, presumably the inference to be drawn is that the report was never made available to Advanta shareholders. Neither party has commented on this subject, yet, for purposes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 6

of Rule 12(b)(6), I will assume the report was unavailable. This consideration, however, does not alter my ultimate conclusion. It is evident from the remaining statements that Advanta's disclosure was sufficient.

b. Positive Portrayals

*6 Next plaintiffs cite to four sources which they assert contain overly optimistic portrayals of the company and fail to disclose negative business practices and information.

First, in its 1996 third quarter report Advanta emphasized "our track record underscores our commitment to excel;" described itself as "a rapidly growing consumer financial services enterprise;" reassured shareholders that "despite a challenging industry environment, we are pleased to report that Advanta produced continued, consistent earnings growth in the third quarter" and noted that "for the fifth consecutive year, return on equity has met or exceeded the 25% level achieved this quarter."

Second, in its Form 10-Q filed on November 12, 1996, Advanta stated "The changes in the delinquency and charge-off rates from year-to year ... reflect the trend in unsecured consumer credit quality which is being experienced throughout the credit industry."

Third, on November 13, 1996 Advanta increased Class A and Class B dividends and commented "this dividend increase reflects management's confidence in the company's earnings momentum and Advanta's continuing commitment to enhancing shareholder value."

Finally, commenting on Advanta's fourth quarter results, announced on January 21, 1997, Alter stated "I am pleased to report that in 1996, Advanta maintained the growth of its current businesses and accelerated its expansion into new ventures."

Defendants maintain that plaintiffs allegations lack specificity regarding disclosure--"the Complaint is silent as to the source, date, recipients, author or any other details about the undisclosed negative information."

Under the PSLRA, a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

On the first page of the Complaint, plaintiffs state that the allegations contained within are based on information and belief, thus they must explain in some detail the basis for such belief. Towards this end plaintiffs claim that by virtue of their positions as officers/directors of Advanta, individual defendants were well aware of negative facts and trends within the company. "Because of Board membership and/or executive positions with Advanta, each of the Individual Defendants had access to the adverse undisclosed information about Advanta's business prospects and financial condition and performance ... and knew that these adverse facts rendered the positive representations made by and about Advanta and its business materially false and misleading."

Additionally, plaintiffs' characterize suggestions for future improvement made in Advanta's March 17, 1997 press release and made by Advanta's founder and Chairman of the Board, Dennis Alter in an article entitled "House of Cards" appearing in the June 1997 issue of Philadelphia Magazine as "admissions" that during the Class Period defendants were aware of Advanta's potential downfalls. In reaction to first quarter losses, both identify a number of potential problem areas for the company and list corrective measures the company may take. The March 17, 1997 press release included the following suggestions: (1) aggressively repricing interests rates for high risk customers; (2) bringing Advanta's credit card fees "more in line with current industry norms;" (3) reducing the teaser period; (4) tightening underwriting; (5) "[m]ore quickly identifying and intervening on potentially troubled accounts;" (6) increasing the number of high quality cardholders; and (7) "[c]ontinuing to develop additional products that offer customers added value, rather than relying solely on low price." Additionally, Atler explained to Philadelphia Magazine "[w]hat happened is when the introductory period ended, we were probably not as aggressive as we could have been [repricing our rates]...."

*7 Taken together, and assuming for present purposes only that defendants had a duty to disclose, plaintiffs support for their belief that defendants were of aware of negative facts during the class period is insufficient. Plaintiffs first "fact", that their positions within the company rendered defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 7

knowledgeable, is merely an unsupported conclusion. A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions, *Rosenbloom v. Adams, Scott & Conway, Inc., 552 F.2d 1336, 1338-39 (9th Cir.1977)* (citations omitted), and plaintiffs have not pointed to specific reports, circulated among defendants, which contained the adverse information defendants are charged with knowing. See *San Leandro Emer. Med. Group Profit Sharing Plan v. Phillip Morris Co., 75 F.3d 801, 812-13 (2d Cir.1996)*.

Additionally, Advanta's after the fact statements recognizing the causes of its first quarter losses do not constitute a basis for charging defendants with prior knowledge. Courts have uniformly rejected such attempts to plead fraud by hindsight, acknowledging that a plaintiff does not state a claim for securities fraud merely because a company discloses, after the fact, that its performance failed to meet expectations. See *Wallace v. Systems and Computer Technology Corporation,* 1997 WL 602808 * 5 (E.D.Pa. Sept.23, 1997); *In re Goodyear Tire & Rubber Co. Sec. Lit.,* 1993 WL 130381 at *2 (E.D.Pa. Apr.22, 1993); *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.1990). During 1995 and 1996 Advanta reassured investors that it was capable of maintaining its earnings momentum. During the Class Period, Advanta continued issuing encouraging messages. Later the company had to report significant losses in its credit card division. Yet, simple comparison of these descriptions does not create underlying factual support for plaintiffs' claims. Plaintiffs' must point to specific facts suggesting that the difference is attributable to fraud. See *In re Donald J. Trump Casino Securities Litigation,* 793 F.Supp. 543, 556-57 (D.N.J.1992); *DiLeo v. Ernst & Young,* 901 F.2d at 627. In the instant case plaintiffs have not brought such facts to the Court's attention. [FN12] Therefore, because they have not alleged circumstances indicating that any of the "positive portrayals" identified in the Complaint were false or misleading, plaintiffs have failed to adequately plead fraud. [FN13] Accordingly, plaintiffs' claims based on these statements are dismissed pursuant to Rule 9(b) and the PSLRA.

> FN12. Furthermore, I note that the uncanny resemblance between plaintiffs' list of undisclosed adverse business conditions and the list of proposed corrective measures contained in Advanta's March 17, 1997 press release only bolsters my conclusion.

> FN13. Because I dismiss plaintiffs claim under 15 U.S.C. § 78u-4(b) for failure to adequately plead facts underlying their fraud claim, I do not address the issue of whether or not plaintiffs have adequately plead scienter as required by 15 U.S.C. § 78u-4(b)(2).

Additionally, I note that review of the full text of documents cited in plaintiffs' complaint demonstrates an effort by Advanta to address plaintiffs' concerns. [FN14] In its third quarter report Advanta notes "[t]he provision for credit card losses for the third quarter of 1996 was $24.2 million compared to $10.6 million for the comparable period of 1995. This increase was primarily ... In response to higher charge-off, impaired asset and delinquency levels." Also, in their 1995 annual report Advanta stated:

> FN14. *In re Burlington Coat Factory, supra* note 10.

*8 Throughout the industry, credit card issuers and other lending institutions experienced deteriorations in credit quality as delinquencies and charge-offs rose. Advanta has enjoyed historically low delinquency and charge-off rates over the past few years. Given the changes in the recent credit cycle, coupled with the sheer size and seasoning of our portfolio, we expect to see delinquencies and charge-offs move upward to more normalized levels.

ii. Janet Point's Statement

Plaintiffs claim that a statement issued by on September 12, 1996 by Janet Point, Vice President for Investor Relations was false and misleading. Point informed the Dow Jones New Service that Advanta expected large revenue increases from repricing more than $5 billion of credit card receivables with current teaser rates of about 7% to what she described as Advanta's normal interest rate of 17%. Yet, in the June 1997 Philadelphia Magazine article, Alter is quoted as saying, "[w]hat happened is when the introductory period ended, we were probably not as aggressive as could have been [repricing our rates] ... Instead of repricing to 18 percent-we repriced closer to 13 or 14 percent in order to retain our image and the luster of being a low-cost provider." Comparison of these two statements, plaintiffs' allege, leads to the inference

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
(Cite as: 1998 WL 387595 (E.D.Pa.))

Page 8

that Point's statement was false and misleading.

Defendants contend that Point's statement is not actionable because it falls within a statutory safe harbor that protects forward-looking statements when the plaintiff fails to prove defendant made them with actual knowledge that they were false. Under the safe harbor that defendants refer to, 15 U.S.C. § 78u-5(c), "a person shall not be liable with respect to any forward-looking statement ... to the extent that ... the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that person that the statement was false or misleading...."

It is apparent that Point's statement meets the definition of a forward-looking statement--"a statement of plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," so I must determine whether it is worthy of statutory protection. In paragraph 33 of their complaint, plaintiffs allege generally that all statements by Advanta, or its representatives referred to in the complaint do not qualify for safe harbor protection because "at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of Advanta who knew that those statements were false when made." Presumably, additional support for plaintiffs' allegations comes from Alter's later "inconsistent" comments to Philadelphia Magazine.

Defendants characterize these allegations as conclusory and assert that they fail to allege the required state of mind, that the speaker had actual knowledge that the statement was false or misleading when made. I agree. Plaintiffs' catch-all allegation that all speakers knew that their statements were false when made is too broad and Alter's comments indicate nothing more than Advanta's failure to follow through exactly as planned on its proposed interest increase, rather than purposeful intent to fool the investing public. Therefore, mindful of the pleading requirements of Rule 9(b) and the PSLRA, I find plaintiffs' allegations as to Point's state of mind insufficient. Accordingly, Plaintiffs' claims of fraud based on such statement are dismissed pursuant to Rule 9(b) and the PSLRA.

B. Counts II and III

*9 Counts II and III are derivative of Count I and therefore are also dismissed. In Count II, the Complaint alleges that individual defendants are liable as "control persons" under Section 20(a) of the Exchange Act. Because, plaintiffs have failed to state and/or to adequately plead a primary violation of the Exchange Act, their "control persons" claims must also be dismissed. See Shapiro v. UJB Fin. Corp., 964 F.2d at 279. Likewise, under Section 20A, an insider who trades shares of stock while in possession of material, nonpublic information is liable to any person who traded contemporaneously with the insider. Generally, to state a claim under Section 20A a plaintiff must establish: (1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act. See e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703-04 (2d Cir.1994); In re VeriFone Sec. Litig., 11 F.3d 865, 871-72 (9th Cir.1993). Accordingly, because plaintiffs have failed to state and/or plead a claim under the Exchange Act their Section 20A claim is also dismissed.

An appropriate Order follows.

ORDER

AND NOW, this 9th day of July 1998, upon consideration of a motion to dismiss Counts I and II of the complaint submitted by defendants, Advanta Corp., Dennis Alter, William A. Rossoff, Alex W. Hart, Gene S. Schneyer, and John J. Calamari (collectively "Advanta" and "Advanta's Motion") and joined by defendants, Richard A. Greenawalt ("Greenawalt") and Robert A. Marshall ("Marshall") (Docket No. 16); a motion to dismiss the entire complaint submitted by Greenawalt and Marshall ("Greenawalt's Motion") (Docket No. 15); Plaintiffs' combined response (Docket No. 20); a reply submitted by Greenawalt and Marshall (Docket No. 26) and a reply submitted by Advanta (Docket No. 27), it is hereby ORDERED that Advanta's Motion is GRANTED and Greenawalt's Motion is GRANTED.

As to Count I, claims based on statements regarding change in Advanta's charge-off policy are DISMISSED, with prejudice, pursuant to Rule 12(b)(6); claims based on Janet Point's statement regarding changes in interest rates are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA; and claims based on remaining general statements regarding Advanta's credit card division are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA. As they derive from Count I,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243
**(Cite as: 1998 WL 387595 (E.D.Pa.))**

Page 9

Counts II and III are also DISMISSED, without prejudice. Any amended complaint plaintiffs seek to file pursuant to this Memorandum and Order must be filed within thirty (30) days of this order, unless that time limitation is specifically extended by order of this court.

1998 WL 387595 (E.D.Pa.), Fed. Sec. L. Rep. P 90,243

**Motions, Pleadings and Filings (Back to top)**

- 2:97cv04343 (Docket) (Jun. 30, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.