# EXHIBIT F

Westlaw.

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

Page 1

Motions, Pleadings and Filings

United States District Court,
E.D. Pennsylvania.
Lloyd FREED, Individually and On Behalf of All
Others Similarly Situated
v.
UNIVERSAL HEALTH SERVICES, INC., et al.
No. Civ.A.04-1233.

May 3, 2005.

Michael T. Fantini, Sherrie R. Savett, Philadelphia,
PA, for Lloyd Freed, Individually and On Behalf of
All Others Similarly Situated.

Neil G. Epstein, Philadelphia, PA, for Universal
Health Services, Inc., Alan B. Miller and Steve G.
Filton.

*MEMORANDUM*

PADOVA, J.

*1 Presently before the Court in this putative class
action is Defendants' Motion to Dismiss the
Amended Consolidated Class Action Complaint. For
the reasons that follow, said Motion is granted.

I. BACKGROUND

This action is brought on behalf of a class of public
investors who purchased the securities of Universal
Health Services, Inc. ("UHS") during the period from
July 21, 2003 through February 27, 2004 (the
"relevant period"). In Count One of the Amended
Consolidated Class Action Complaint (the "Amended
Complaint"), Lloyd Freed (hereafter "Lead Plaintiff")
alleges violations of Section 10(b) of the Securities
Exchange Act of 1934 ("Exchange Act"), as amended
by the Private Securities Litigation Reform Act of
1995 ("PSLRA"), 15 U.S.C. § § 78j(b), 78t(a), and
Rule 10b-5 promulgated thereunder, see 17 C.F.R. §
240.10b-5, against UHS; Alan B. Miller, Chief
Executive Officer of UHS and Chairman of UHS's
Board of Directors; and Steve G. Filton, Chief
Financial Officer of UHS. In Count Two of the
Amended Complaint, Lead Plaintiff alleges
violations of Section 20(a) of the Exchange Act
against Defendants Miller and Filton (the "individual

Defendants"). The essence of Lead Plaintiff's federal
securities claims is that Defendants artificially
inflated the price of UHS stock by issuing public
statements and filing earnings reports that omitted or
misstated material facts concerning UHS's rising
level of bad debts, and by using accounting
manipulations to materially overstate UHS's financial
results. (Am.Cons.Comp.¶ ¶ 3, 5, 7.)

UHS is a Delaware corporation which owns and
operates acute care hospitals, behavioral health
centers, ambulatory surgery centers and radiation
oncology centers throughout North America and
France, and maintains its principal corporate offices
in Pennsylvania. (Id. ¶ ¶ 13, 31, 37.) UHS hospitals
and staff provide services which include general
surgery, internal medicine, obstetrics, emergency
room care, operating room care, radiology, oncology,
diagnostic care, coronary care, pediatric services,
pharmacy services, and physiotherapy and laboratory
procedures. (Id. ¶ 23.) UHS receives payments for
the services it renders from private-sector insurers,
the federal government under the Medicare program,
state governments under their Medicaid programs,
and directly from uninsured patients. (Id.)

In 2001 and 2002, the overall hospital market sector
began to experience a change in the mix of patients,
which led to an increasing level of uninsured patients.
(Id. ¶ 24.) At the same time, insured individuals
became responsible for an increasing percentage of
healthcare expenditures because the burden of health
care expenses was shifting from employers, private-
sector insurers, and state and federal governments to
individuals, while health insurance premiums, co-pay
charges and deductibles were steadily rising. (Id.)
Many hospitals responded to these industry-wide
trends by increasing their levels of bad debt reserves
in 2003. (Id. ¶ 26.) UHS, however, reported that it
was not affected by the changes other hospitals were
experiencing, and decreased its level of bad debt
reserves from 11.9% of revenue to 8.5% of revenue.
(Id.) The Amended Complaint alleges that
Defendants acted recklessly in reducing UHS's levels
of bad debt reserves, and that Defendants kept UHS's
bad debt reserves artificially low by materially
understating the amount of bad debt UHS was
experiencing, thereby overstating UHS's financial
results. (Id. ¶ ¶ 27, 30.)

A. *False and Misleading Statements During the*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

*Class Period*

**\*2** According to the Amended Complaint, Defendants' fraudulent scheme began with a July 21, 2003 press release over the PR Newswire, in which UHS announced that its net earnings per share increased by 19% for the three-month and six-month periods ended June 30, 2003, over the comparable periods in 2002. (*Id.* ¶ 31.) The press release further stated that UHS's operating margin "increased to 16.7% in the three-month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year." (*Id.*) The next day, in response to a question regarding UHS's bad debt expenses during a conference call with investors, Defendant Filton stated that "[w]e actually think that our self-pay utilization as a percentage of overall utilization is pretty much pancake flat between 2003 and 2002 and have not seen significant changes." (*Id.* ¶ 32.) One month later, on August 13, 2003, UHS filed its quarterly Form 10-Q report for the three month period ended June 30, 2003. (*Id.* ¶ 33.) In this report, UHS represented that operating income and operating margins were important measures of UHS's performance. (*Id.*) The report further stated that "[o]verall operating margins ... were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period." (*Id.*)

On October 20, 2003, UHS issued another press release over the PR Newswire, which stated that "earnings per share ... for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002." (*Id.* ¶ 37.) The next day, during a conference call with investors, Defendant Filton represented that "[w]e're not seeing as some of the other companies have mentioned, a real increase in uninsured or at least uninsured after insurance patients or a difficulty in collecting from those patients." (*Id.* ¶ 38.) On November 10, 2003, UHS filed its quarterly Form 10-Q report, which stated that

Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision

for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expenses.

**\*3** (*Id.* ¶ 40.) Thereafter, during the 22nd Annual J.P. Morgan Healthcare Conference held in mid-January 2004, Defendant Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its peers because UHS had not experienced a material adverse change in self-pay revenues in its markets or in the collection rates. (*Id.* ¶ 45.) Defendant Miller further stated that he expected UHS's bad debt ratios to remain stable in the near term. (*Id.*)

The Amended Complaint alleges that these statements proved to have been false because, on February 18, 2004, UHS issued a press release over the PR Newswire which stated that

[t]he Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts. We expect this trend to continue until there is a notable strengthening of the labor market.

(*Id.* ¶ 47.) On March 1, 2004, UHS issued another press release over the PR Newswire in which it announced that

earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year. On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continue to unfavorably impact our bad debt expense. The Company is vigorously addressing each of these areas.

(*Id.* ¶ 49.) In response to this announcement, UHS's stock dropped 21% to $44.88 per share on volume of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 3
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

6.7 million shares. (*Id.* ¶ 54).

B. *"True Facts" and Fraudulent Accounting Practices*

The Amended Complaint alleges that, as early as July 23, 2003, Defendants were aware that UHS's bad debt exposure was increasing due to higher levels of uninsured patients and Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare. (*Id.* ¶ 42(e)-(f).) In addition, the Amended Complaint avers that UHS's operating income was inflated as a result of Defendants failure to (1) make sufficient allowance for the bad debt it was incurring; (2) properly write off uncollectible receivables; (3) properly deduct the appropriate allowance for doubtful accounts from operating income; and (4) comply with generally accepted accounting principles ("GAAP"). (*Id.* ¶ 42(a)-(d).)

In support of these allegations, the Amended Complaint pleads the following "true facts.". First, Defendants were aware that UHS's levels of bad debt were steadily increasing from July 21, 2003 through February 27, 2004. (*Id.* ¶ ¶ 18, 60.) Second, Defendants admitted that the increase in UHS's bad debt reserves for the fourth quarter of 2003 was a "catch up" or "true-up" for insufficient bad debt reserves during the fiscal year 2003. (*Id.* ¶ ¶ 47-56.) Third, the low levels of bad debt UHS had reported were attributable to fraudulent accounting practices, which concealed the true amounts of bad debt UHS was encountering. (*Id.* ¶ ¶ 5, 34, 42, 51, 61, 66.)

*4 The Amended Complaint further charges Defendants with deliberately falsifying UHS's true levels of bad debt and income by violating GAAP and Security and Exchange Commission ("SEC") rules governing the calculation of uncollectible receivables in its financial statements for purposes of inflating UHS's earnings and boosting UHS's stock. (*Id.* ¶ 66.) Specifically, the Amended Complaint avers that Defendants improperly delayed the write-off of uncollectible accounts, intentionally understated UHS's provision for doubtful accounts, decreased UHS's level of bad debt reserves, and failed to disclose UHS's policy of accounting for doubtful accounts. (*Id.* ¶ ¶ 63, 73, 76.) These practices allegedly allowed UHS to materially inflate reported earnings and mislead investors during the relevant period. (*Id.* ¶ 73, 80.)

Defendants have moved to dismiss both counts of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b), as well as under § 78u-4(b) of the PSLRA.

II. LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

III. DISCUSSION

A. *Count One: Rule 10b-5*

Defendants seek the dismissal of Count One of the Amended Complaint, which asserts a securities fraud claim against UHS and the individual Defendants pursuant to Section 10(b) and Rule 10b-5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... of any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002).

1. *Pleading fraud with particularity*

*5 Because a claim under Section 10(b) and Rule

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
**(Cite as: 2005 WL 1030195 (E.D.Pa.))**

10b-5 is a claim for fraud, a plaintiff must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Cal. Pub. Employees' Retirement Sys. v. CHUBB Corp.*, 394 F.3d 126, 143 (3d Cir.2004). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'--that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir.2002) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *CHUBB*, 394 F.3d at 144 (quoting *In re Rockefeller*, 311 F.3d at 216)). The court must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir.1996).

In addition, under the PSLRA, a Rule 10b-5 complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [FN1] the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations-- inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." *In re Rockefeller*, 311 F.3d at 224. "In other words, pursuant to this 'modified' Rule 12(b)(6) analysis, 'catch-all' or 'blanket' assertions that do not comply with the particularity requirements are disregarded." *CHUBB*, 394 F.3d at 145.

> FN1. Lead Plaintiff agrees that the Amended Complaint's "true facts," which are based on the investigation of counsel, are pled on information and belief. (03/09/2004 Tr. at 30.)

As mentioned above, Plaintiffs' 10b-5 claims are based on allegedly false or misleading statements contained in press releases issued by UHS, conference calls between financial analysts and the individual Defendants, and UHS's quarterly and annual earnings reports that were filed with the SEC. The subject matter of the alleged misstatements and misleading information falls into two general categories: (1) statements that UHS was not experiencing an increase in the levels of bad debt during the relevant period; and (2) Defendants' use of improper accounting methods to conceal the rising levels of bad debt and artificially inflate UHS's earnings.

*6 Defendants do not dispute that Lead Plaintiff has identified Defendants' allegedly false and misleading statements with particularity. Defendants instead maintain that Lead Plaintiff has failed to plead sufficient "true facts" specifying why those statements were false. Under the heightened pleading standard imposed by Rule 9(b) and the PSLRA, "it is the 'true facts' recited in the [Amended Complaint] that are of paramount importance ... because they provide the exclusive basis for [Lead Plaintiff's] claims that the various statements made throughout the [relevant period] were materially false and misleading ... and that Defendants knew of the falsity of the statements and financial results." *CHUBB*, 394 F.3d at 145.

A complaint can meet these heightened pleading requirements by providing sufficient documentary evidence and/or a sufficient description of the personal sources which lead the plaintiff to believe that certain statements were false or misleading. *Id.* at 147. Here, Lead Plaintiff has not provided any documentary evidence to support the Amended Complaint's allegations of securities fraud, and instead is proceeding solely on the basis of information received from confidential sources. (*See* 03/09/2005 Tr. at 35.) Lead Plaintiff's reliance on confidential sources to supply the requisite particularity for their fraud claims, therefore, "assumes a heightened importance." *CHUBB*, 394 F.3d at 149.

In assessing the particularity of allegations made on information and belief which are based on statements by confidential sources, courts examine "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id.* at 147. Under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

this standard, "so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources." *Id.* However, a complaint must contain sufficient information about each source "to support the probability that the source possesses the information alleged." *Id.* at 155. Accordingly, complaints that rely heavily on confidential sources to establish the "true facts" must contain information describing the time period during which the confidential sources were employed by the defendant corporation, the dates on which they acquired the information they purportedly possess, and the manner in which they had access to such information. *Id.* at 148.

Lead Plaintiff contends that Defendants were reckless in reducing UHS's bad debt reserves during the relevant period, and that Defendants' statements regarding UHS's consistently low levels of bad debt were false and misleading, because Defendants at the time were aware that UHS's was in fact experiencing an increase in its levels of bad debt. In support of this contention, the Amended Complaint cites to "a former UHS employee from the business office of LCH [Lancaster County Hospital]" who stated that when the area's county hospital closed in the fall of 2002, LCH "immediately began experiencing an influx of indigent patients seeking treatment through the emergency room." (Am.Cons.Compl.¶ 30.) The Amended Consolidate Complaint further alleges that the Edinburg Regional Medical Center ("ERMC") served as the county hospital before being purchased by UHS, and that "[a] former ERMC director explained that ERMC inherited the large indigent patient population from the date of purchase." (*Id.*)

\*7 In addition, the Amended Complaint avers that UHS hospitals had begun to experience increased numbers of self-pay patients as early as April 2003, because ERMC at that time "internally recorded that bad debt was a concern." (*Id.* at 39.) The Amended Complaint does not mention the source from which Lead Plaintiff's counsel received this information. The Amended Complaint does allege, however, that "a former ERMC director confirmed that UHS management had been focusing on the length of stay issued [sic] at the ERMC facility from the beginning of 2003, if not earlier." (*Id.* ¶ 52.) That former director further explained that "the length of stay issue ... was related to the indigent patient population who had no coverage, and likely no ability to pay, from the point of initial service." (*Id.*)

Both the EMRC and LCH sources were employed in two local UHS hospitals, and none of them claim to have information regarding a nationwide increase in the treatment of indigent patients or rising levels of bad debt at UHS facilities in general. Moreover, the Amended Complaint does not allege when the confidential sources were employed by UHS, the dates on which they acquired the information they purportedly possess, or how these former employees had access to such information. *See* CHUBB, 394 F.3d 148. The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess the information that UHS was experiencing an increase in levels of bad debt during the relevant period.

Lead Plaintiff also contends that Defendants acted recklessly when, in face of UHS's alleged rising exposure to bad debt, Defendants failed to increase UHS's bad debt reserves. In support of the contention that Defendants were aware of UHS's rising exposure to bad debt, the Amended Complaint cites to "former UHS personnel employed in the business office of [LCH]," who state that UHS "corporate procedure, unbeknownst to investors, dictated that no accounts less than 180 days old were to be considered bad debt even if an account was known or anticipated to be uncollectible from the date service was provided." (Am.Cons.Compl.¶ 28). Similarly, a "former business office employee at LCH" stated that "UHS's practice was to bill Medicare and Medicaid for all services rendered and recognize all revenue at the time of service even if it was known or anticipated that a large portion of those claims would be denied." (*Id.* ¶ 29) (emphasis deleted).

The Amended Complaint further cites "[f]ormer employees from numerous hospitals" for the proposition that all LCH revenue "was sent to UHS's corporate office in electronic format approximately three to four times per day" and that "bi-weekly and monthly reports tracking accounts receivable and bad debt were provided to the appropriate executives at UHS's corporate headquarters." (Am.Cons.Compl.¶ 50.) The Amended Complaint goes on to state that

\*8 former UHS personnel from the office of the controller at Summerlin Hospital Medical Center [ ] confirmed that each UHS Las Vegas area hospital submitted its financial information, including uncollectible receivable account amounts, to Valley Health Systems, a centralized business office responsible for billing patients, collecting receivables and writing off receivables that were not collected. Valley Health Systems consolidated the financial information from the hospitals and forwarded it to UHS's corporate accounting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

department at least on a monthly basis. (*Id.*) In addition, the Amended Complaint avers that [a] former director of the Midwest Center for Youths and Family Services ("SMCH") stated there are 'no surprises or sudden changes' when it comes to bad debt levels as it is known at the point of service whether a patient is uninsured, and because any indicators for potential bad debt problems would appear in reports submitted to UHS corporate offices for monthly management meetings. (*Id.*)

Notably, though all of these sources were employed in local UHS hospitals, the Amended Complaint fails to allege how they would have had access to information regarding UHS's operations nationwide. Where a complaint relies heavily on former employees who worked in the defendant corporation's local branches for information concerning the defendant corporation's business on a national scale, a "lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic." *CHUBB,* 394 F.3d at 148. The Amended Complaint also fails to allege at what time the confidential sources were employed by UHS, or the dates on which they acquired the information they purportedly possess. *See id.* The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess information regarding UHS's nationwide operating procedures. Accordingly, the Court finds that the Amended Complaint fails to plead the falsity of Defendants' statements during the relevant period with the particularity demanded by the PSLRA.

Lead Plaintiff further contends that Defendants committed accounting fraud when, in violation of the GAAP and SEC reporting requirements, Defendants falsely inflated UHS's earnings and assets as well as stockholders' equity earnings by failing to establish and maintain adequate bad debt reserves during the relevant period. [FN2] The Amended Complaint alleges that Defendants, in violation of the GAAP, delayed the recognition and write-off of uncollectible accounts, understated its provision for bad debt, and failed to restate UHS's previously misstated financial statements. [FN3] In support of these contentions, the only "true fact" the Amended Complaint alleges is that "former UHS employees stated that during the [relevant period], the Company mandated that no accounts less than 180 day [sic] delinquent be written off." (Am.Cons.Compl.¶ 70.)

FN2. Financial results reported in violation of GAAP are presumptively misleading. *See* 17 C.F.R. § 210.4-01(a)(1); *CHUBB,* 394 F.3d at 152 n. 16.

FN3. Specifically, the Amended Complaint alleges that Defendants violated the following GAAP principles: (1) financial reporting should provide information that is useful to present and potential investors in making rational investment decisions; (2) omissions or misstatements are material if the judgment of a reasonable person relying on it would have been changed or influenced by the inclusion or correction of the item; (3) financial reporting should provide information about management's discharge of its stewardship responsibility to stockholders; (4) financial reporting should provide information about an enterprise's financial performance during a period; (5) financial reporting should be reliable in that it represents what it purports to represent; (6) no information that may be necessary to ensure that the report validly represents underlying events and conditions should be omitted; (7) conservatism should be used as a prudent reaction to uncertainty; and (8) contingencies that might result in gains should not be reflected in accounts.

*9 As above, the Amended Complaint does not allege sufficient facts to support the probability that the confidential sources would possess the information they purport to possess. Indeed, the relevant confidential sources are identified only as "former UHS employees." In addition, the Amended Complaint does not rely on any sources, confidential or otherwise, to substantiate its allegations that UHS understated its provision for bad debt and would have been required to restate its earlier financial statements. The Court further notes that, where a complaint alleges that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, the complaint must state what the unreasonable accounting practices were and how those practices distorted the disclosed data. *In re Burlington,* 114 F.3d at 1417-18. Statements of reserve amounts are "fraudulent only if ... the responsible parties knew or should have known that [the amounts of reserve] were derived in a manner inconsistent with reasonable accounting practices." *Christidis v. Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983). Accordingly, a complaint must plead

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

with particularity "the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices." *Id.* To do so, the complaint must "include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." *In re Loewen Group, Inc. Sec. Litig.,* Civ. A. No. 98-640, 2004 WL 1853137, at *11 (E.D.Pa. Aug. 18, 2004). In the absence of such allegations, "neither the increase of allowance toward the end of the class period nor the eventual financial ruin of [the defendant corporation] are proof that defendants committed any acts worse than mismanagement." *Id.* at * 12.

Here, the Amended Complaint does identify with sufficient particularity which GAAP procedures were allegedly violated. However, the Amended Complaint does not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible. *See id.* Similarly, the Amended Complaint does not identify the data, or source of data, that was used to arrive at its conclusions, the amount by which reserves were distorted, or how much revenue was improperly recognized. *See CHUBB,* 394 F.3d at 153. Accordingly, the Court finds that the Amended Complaint fails to plead facts which would support the inference that Defendants were engaging in accounting fraud with the particularity demanded by the PSLRA.

### 2. Failure to State a Claim: Falsity of Statements

*10 The Amended Complaint's failure to plead the "true facts" with the particularity required by Rule 9(b) and the PSLRA supports dismissal apart from Rule 12(b)(6). *CHUBB,* 394 F.3d at 156. Dismissal, however is also warranted pursuant to Rule 12(b)(6) for failure to adequately plead the falsity of Defendants statements. As the Amended Complaint does not comply with the PSLRA's threshold pleading requirements, Lead Plaintiff may not benefit from inferences stemming from the unparticularized allegations mentioned above to establish the falsity of Defendants' statements during the Class Period. However, even if those allegations were accepted, they would not give rise to an inference that UHS was experiencing an increase in bad debt during the

relevant period. Thus, the information provided by the LCH source does not establish that LCH was experiencing a rising exposure to bad debt beginning in July 2003, but merely that the closing of the county hospital one year earlier, in the fall of 2002, "immediately" caused LCH to see an influx of indigent patients. Similarly, the information provided by the EMRC source does not establish that EMRC experienced an increase in levels of indigent patients during the relevant period, or that UHS acquired EMRC, and therefore inherited its unusually high existing levels of bad debt, during that time. Moreover, the mere fact that EMRC "internally" recorded that bad debt was "a concern" at its facility, and that UHS "focused" on the length of patient stays at EMRC in early 2003, does not establish that either EMRC, or UHS as a whole, were in fact experiencing an increase in exposure to bad debt during the relevant period. Indeed, the Amended Complaint itself broadly asserts that "former employees of various UHS hospitals .... report that issues such as length of stay and increase in the numbers of self-pay patients were either non-existent, or had been recognized and discussed well before the [relevant period]." (Am.Cons.Compl.¶ 52.) The confidential sources, therefore, fail to establish that UHS was in fact experiencing an increase in levels of bad debt during the relevant period, much less that Defendants were aware of any such increase.

The only other source the Amended Complaint relies on for the falsity of Defendant's representations are statements made by Defendants' themselves and which, according to Lead Plaintiff, amount to admissions that Defendant's earlier statements were false. [FN4] In support of this argument, the Amended Complaint points to the following statements. First, in a press release issued by UHS over the PR Newswire on February 18, 2004, UHS reported that its provision for doubtful accounts for the fourth quarter of 2003 was 7.8% of net revenues, as compared to 6.9% during the prior year's fourth quarter. (Am.Cons.Compl.¶ 47.) The press release went on to state that UHS "expect[s] this trend to continue until there is a notable strengthening of the labor market." (*Id.*) Second, in a press release issued by UHS over the PR Newswire on March 1, 2004, UHS reported that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the earnings per diluted share recorded in the same period in the prior year. (*Id.* ¶ 49.) UHS explained this development as follows:

FN4. The Court notes that the Amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

Complaint also alleges that general industry trends showed an increase in levels of bad debt throughout the hospital sector during the relevant period. However, Lead Plaintiff has stated that those industry trends are not relied on to establish the falsity of Defendants' statements, but rather were included merely as "a background for ... the entire situation." (03/09/05 Tr. at 29.) The Court agrees that the fact that UHS's competitors were experiencing an increase in bad debt is not relevant to a determination whether Defendants' statements that UHS's levels of bad debt during the relevant period remained comparatively stable were false.

*11 On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continues to unfavorably impact our bad debt expense.
(*Id.*)

Third, the Amended Complaint cites to the transcript of a conference call between the individual Defendants and analysts held on March 1, 2004. During that conference call, Filton stated that "[b]ad debt expense remains a pressure point in our hospital" and that "for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several quarters and for the most part, again, we see across all of our facilities." (*Id.* ¶ 51.) In response to one analyst's question concerning whether there was any catch-up charge in UHS's bad debt numbers, Filton further stated that "the fourth quarter probably contained some intra or catch-up in 2004.... Look, I am sure if we went through the detail we would find some element of catch-up in the first quarter of '04. I do not think it is material." (*Id.* ¶ 53; 03/01/04 Conf. Tr., Defs.' Ex. 20.)

While Lead Plaintiff contends that these statements are admissions which demonstrate the falsity of Defendants' earlier representations, the statements in fact are entirely consistent with Defendants' prior disclosures. Indeed, the fact that pressure on bad debt had been present for several quarters in March 2004 is mirrored by UHS's steady increase in bad debt reserves during the relevant period from 6.83% of net

revenues on June 30, 2003, to 8.42% of net revenues on March 31, 2004. (*See* Am. Cons.Compl. ¶ 66.) Moreover, Filton's statements that the level of bad debt reserves in the fourth quarter of 2004 probably contained an immaterial element of catch-up does not amount to an admission that the statements made by Defendants during the relevant period were false. Courts have long recognized that "fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy." *CHUBB*, 394 F.3d at 158 (internal quotations omitted). The Court, therefore, concludes that even if the information provided by the confidential sources is taken into account, the Amended Complaint fails to establish the falsity of Defendants' statements during the relevant period. Accordingly, Defendants' Motion to Dismiss Count One of the Amended Complaint is granted. [FN5]

> FN5. Because the Court concludes that the Amended Complaint does not plead the "true facts" with sufficient particularity under the PSLRA and does not establish that Defendants' representations during the relevant period were false, the Court does not reach the question whether the Amended Complaint properly attributes the allegedly misleading statements to the Defendants, or adequately pleads the elements of scienter, materiality, and loss causation.

C. *Section 20(a) of the Exchange Act*

Defendants also move to dismiss Count Two of the Amended Complaint, which alleges that the individual Defendants violated Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Plaintiffs alleging a Section 20(a) violation must plead facts showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions. [FN6] *La Fata v. Raytheon Co.*, 207 F.R.D. 35, 45 n. 5 (E.D.Pa.2002). The heightened pleading requirements of Rule 9(b) do not apply to Section 20(a) claims. *In re U.S. Interactive, Inc. Sec. Litig.*, Civ. A. No. 01-522, 2002 WL 1971252, at *20 (E.D.Pa. Aug. 23, 2002) (citing *In re Tel-Save Sec. Litig.*, Civ. A. No. 98-3145, 1999 WL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 9
2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248
(Cite as: 2005 WL 1030195 (E.D.Pa.))

999427, at *6 (E.D.Pa. Oct.19, 1999)); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, Nos. MDL-1446, Civ. A. No. H-01-3624, 2003 WL 230688, at *11 (S.D.Tex. Jan.28, 2003) (concluding that Rule 8 notice pleading standard applies to Section 20(a) claims because "the legislative history behind the controlling person provision of both the 1933 and 1934 Acts indicates that Congress sought to reach persons who tried to evade responsibility under the common law of agency by standing behind the scenes and having 'dummies' under their control commit the primary violations" and "without discovery, it would be extremely difficult to know facts where the controlling person was hiding behind the controlled person"). Here, the Amended Complaint fails to establish an underlying violation by UHS. *La Fata*, 207 F.R.D. at 45 n. 5. Accordingly, Defendants' Motion to Dismiss Count Two of the Amended Complaint is granted.

> FN6. While Lead Plaintiff will also have to prove at trial that the individual Defendants were each "culpable participants" in the underlying fraud, *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 889-90 (3d Cir.1975), "the 'overwhelming trend in this circuit' is that culpable participation does not have to be plead to survive a motion to dismiss." *Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615, 645 (D.N.J.2003) (quoting *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F.Supp. 1003, 1013 (D.N.J.1996)).

D. *Leave to Amend*

*12 Lead Plaintiff has requested that, should the Court grant any part of Defendants' Motion, the Court also grant Lead Plaintiff leave to amend the Amended Complaint. By adopting the PSLRA, Congress has evinced its intent to "provid[e] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir.2004) (quotations omitted). However, "ordinarily, leave to amend is granted when a complaint is dismissed on Rule 9(b) particularity grounds alone." *CHUBB*, 394 F.3d at 165. Here, the Amended Complaint is dismissed not only for failure to comply the particularity requirements imposed by Rule 9(b) and the PSLRA, but also for failure to state a claim pursuant to Rule 12(b)(6). Nonetheless, the Court notes that the Amended Complaint could have been dismissed on particularity grounds alone, the Court was not previously called upon to rule on a motion to

dismiss in this action, and Lead Plaintiff's investigation is ongoing. Accordingly, the Court will permit Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint which, in compliance with Rule 11(b), [FN7] corrects the Amended Complaint's Rule 9(b), PSLRA and Rule 12(b)(6) pleading deficiencies.

> FN7. Pursuant to Rule 11(b) an attorney who presents a pleading to the court certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3).

III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss the Amended Complaint and permits Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint.

An appropriate Order follows.

*ORDER*

AND NOW, this 3rd day of May, 2005, upon consideration of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 29), all submissions received in response thereto, and the argument held on March 9, 2005, IT IS HEREBY ORDERED that said Motion is GRANTED and the Amended Consolidated Complaint is DISMISSED in its entirety. IT IS FURTHER ORDERED that Lead Plaintiff may move for leave to file a Second Amended Consolidated Complaint within thirty (30) days of the date of this Order.

2005 WL 1030195 (E.D.Pa.), Fed. Sec. L. Rep. P 93,248

**Motions, Pleadings and Filings** (Back to top)

• ____2:04cv01233_____(Docket) (Mar. 22, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

LEXSEE 2005 U.S. DIST LEXIS 652

**THE WINER FAMILY TRUST v. MICHAEL QUEEN, et al.**

**CIVIL ACTION NO. 03-4318**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 652; Fed. Sec. L. Rep. (CCH) P93,074*

**January 13, 2005, Decided**

**PRIOR HISTORY:** *Winer Family Trust v. Queen, 2004
U.S. Dist. LEXIS 19244 (E.D. Pa., Sept. 27, 2004)*

**DISPOSITION:** Plaintiff's Motion for Leave to Amend
and File a Second Amended Complaint was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For THE WINER FAMILY
TRUST, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, Plaintiff: DALE
MACDIARMID, GLANCY, BINKOW & GOLDBERG,
LLP., LOS ANGELES, CA. STEVEN A. SCHWARTZ,
KIMBERLY M DONALDSON, CHIMICLES &
TEKELLIS, LLP., HAVREFORD, PA.

For MICHAEL QUEEN, THOMAS MCGREAL,
Defendants: ERIC F. SPADE, FREY, PETRAKIS,
DEEB, BLUM, BRIGGS & MITTS, P.C.,
PHILADELPHIA, PA.

For JOSEPH W. LUTER, IV, MICHAEL H. COLE,
Defendants: ALAN K. COTLER, MILIND M. SHAH,
ROBERT A. NICHOLAS, REED, SMITH, LLP.,
PHILADELPHIA, PA. EDWARD J. FUHR, TERENCE
J. RASMUSSEN, HUNTON & WILLIAMS, LLP.,
RICHMOND, VA.

For SMITHFILED FOODS, INC., PENNEXX
FOODS, INC., Defendants: ALAN K. COTLER,
MILIND M. SHAH, ROBERT A. NICHOLAS,
REED, SMITH, LLP., PHILADELPHIA, PA.
EDWARD J. FUHR, TERENCE J. RASMUSSEN,
HUNTON & WILLIAMS, LLP., RICHMOND, VA.
ERIC F. SPADE, FREY, PETRAKIS, DEEB, BLUM,
BRIGGS & MITTS, P.C., PHILADELPHIA, PA.

For SHOWCASE FOODS, INC., Defendant: ALAN
K. COTLER, MILIND M. SHAH, ROBERT A.
NICHOLAS, REED, SMITH, LLP., PHILADELPHIA,
PA.

For PENNEXX FOODS, INC., Cross Claimant:
FRANK G. MURPHY, ERIC F. SPADE, FREY,
PETRAKIS, DEEB, BLUM, BRIGGS & MITTS,
PHILADELPHIA, PA.

For [*2] MICHAEL H. COLE, JOSEPH W. LUTER,
IV, SMITHFIELD FOODS, INC., MILIND M. SHAH,
REED, SMITH, LLP., PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

  **MEMORANDUM**

**Padova, J.**

  Presently before the Court in this securities class
action is The Winer Family Trust's Motion for Leave
to Amend and File a Second Amended Complaint. As
granting leave to amend would be futile in this case, the
Motion is denied in its entirety.

**I. BACKGROUND**

  On July 24, 2003, The Winer Family Trust (here-
inafter, "Lead Plaintiff") commenced this securities class
action by filing a 38-page, 80-paragraph Complaint
against Pennexx Foods, Inc. ("Pennexx"), Smithfield
Foods, Inc. ("Smithfield"), and several officers and di-
rectors of those corporations. Lead Plaintiff's original
Complaint alleged violations of *Section 10(b) of the
Securities Exchange Act of 1934* ("Exchange Act"), as
amended by the Private Securities Litigation Reform Act
of 1995 ("PSLRA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and
*Rule 10b-5* promulgated thereunder, see *17 C.F.R. §
240.10b-5*, as well as violations of *Section 20(a) of the
Exchange Act*. The original Complaint [*3] also alleged

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 13 of 26

Page 2

2005 U.S. Dist. LEXIS 652, *3; Fed. Sec. L. Rep. (CCH) P93,074

a state law claim for breach of fiduciary duty.

On November 6, 2003, the Court held a case management conference. After the conference, the Court entered an Order requiring Defendants to "submit to [Lead Plaintiff], in writing, a list of any and all perceived deficiencies in the Complaint within seven (7) days." (Nov. 7, 2003 Order.) Pursuant to the Court's Order, the Smithfield Defendants and Pennexx Defendants each timely sent Lead Plaintiff's counsel a detailed letter outlining the "perceived deficiencies" in the Complaint. (Smithfield Defs.' Mem. at 2-3; Smithfield Defs.' Ex. 1.) On November 19, 2003, the Court entered a Case Management Order that had been jointly submitted by the parties. The Case Management Order permitted Lead Plaintiff to file an amended complaint on or before December 22, 2003.

On December 22, 2003, Lead Plaintiff filed a 96-page, 222-paragraph First Amended Complaint ("FAC") on behalf of two separate classes. On behalf of public investors who purchased Pennexx securities during the period from February 8, 2002 until June 12, 2003 (hereinafter, "the Securities Class"), Lead Plaintiff alleged *Rule 10b-5* claims against Pennexx; Joseph W. Luter [*4] IV, executive Vice President of Smithfield and former Pennexx director; Michael H. Cole, associate general counsel of Smithfield and former Pennexx director; Michael Queen, Chief Executive Officer of Pennexx and former Pennexx director; and Thomas McGreal, Vice President of Sales for Pennexx and Pennexx director. On behalf of the Securities Class, Lead Plaintiff also alleged *Section 20(a)* claims against Smithfield and the individual Defendants. On behalf of public investors who currently own Pennexx securities (hereinafter, "the Fiduciary Class"), Lead Plaintiff asserted state law claims for breach of fiduciary duty against Queen; breach of fiduciary duty against Smithfield; aiding and abetting Smithfield's breach of fiduciary duty against Luter and Cole; and successor liability against Smithfield and Showcase Foods, Inc. ("Showcase").

On January 21, 2004, the Pennexx Defendants (Pennexx, Queen, and McGreal) and the Smithfield Defendants (Smithfield, Showcase, Luter, and Cole) each filed Motions to Dismiss the FAC pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. On February 20, 2004, Lead Plaintiff's filed a response in opposition to the Motions [*5] to Dismiss. On April 7, 2004, after the Motions were fully briefed, the Court heard oral argument on the Motions. At the conclusion of the hearing, the Court requested that Lead Plaintiff file a supplemental submission which distilled the 96-page FAC into a comprehensive chart outlining each of Lead Plaintiff's *Rule 10b-5* claims. (4/7/04 Tr. at 79-81.) Lead Plaintiff

submitted the requested chart on April 27, 2004, and the Pennexx Defendants and the Smithfield Defendants thereafter filed a joint response on May 11, 2004.

On June 21, 2004, counsel for the Smithfield Defendants informed Lead Plaintiff and the Pennexx Defendants that Showcase, a subsidiary of Smithfield, intended to shut down operations at its facility on Tabor Road in Philadelphia (hereinafter, "the Tabor Facility") and to remove certain equipment from the Facility. n1 On June 30, 2004, while the Motions to Dismiss were still pending before the Court, Lead Plaintiff filed a motion to conduct limited discovery related to the Tabor Facility, asserting that "a key component of the claims of the proposed class is the nature and extent to which the Smithfield Defendants mis-designed and undermined construction and production [*6] at the Tabor Facility and the extent to which disclosures by the Pennexx and Smithfield Defendants related to the suitability, efficiency, and production capacity of the Tabor Facility were false and misleading." (Pl.'s Mem. at 1.) On July 15, 2004, the Court entered an Order requiring the Smithfield Defendants to provide Lead Plaintiff with "documents related to the design plans, construction, renovation, equipment, and functioning of the Tabor Facility" and to allow Lead Plaintiff two days to copy and inspect the documents. (July 15, 2004 Order.) Pursuant to the July 15, 2004 Order, Lead Plaintiff was also permitted to depose Donald Countryman, Pennexx's former Vice President of Quality Control, and Smithfield's corporate designees under *Federal Rule of Civil Procedure 30(b)(6)*, on the following topics: "the design plans, construction, renovation, equipment[,] functioning and deficiencies of the Tabor Facility; disputes between Pennexx and Smithfield regarding the design, construction, equipment, renovation, functioning and deficiencies of the Tabor Facility; and identification by Pennexx and Smithfield of design, equipment and operational [*7] problems and/or deficiencies of the Tabor Facility." (Id.) Lead Plaintiff and the Pennexx Defendants were further permitted to inspect the Tabor Facility on or before July 23, 2004, the date by which the Court required all of the authorized discovery be completed. (Id.)

> n1 The Tabor Facility was owned and operated by Pennexx during the Securities Class period. As a result of defaults under its credit agreement with Smithfield, Pennexx executed a deed in lieu of foreclosure to the Tabor Facility on June 11, 2003. (Am. Coml. P 160.) At the request of Smithfield, the deed was delivered to Showcase. (Id.)

On September 27, 2004, the Court issued a

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 14 of 26

Page 3

2005 U.S. Dist. LEXIS 652, *7; Fed. Sec. L. Rep. (CCH) P93,074

Memorandum and Order granting in part and denying in part Defendants' Motions to Dismiss the FAC. See *Winer Family Trust v. Queen, 2004 U.S. Dist. LEXIS 19244, Civ. A. No. 03–4318, 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004)*. The Court granted Defendants' Motions to Dismiss with respect to the *Rule 10b–5* claims, except as to the claims against Pennexx based on the challenged [*8] statements and omissions from Pennexx's August 14, 2002, January 30, 2003, and the March 31, 2003 press releases, and the claims against Queen based on the challenged statements and omissions from Pennexx's January 30, 2003 and March 31, 2003 press releases. n2 *2004 U.S. Dist. LEXIS 19244 at *26 & n.18*. The August 14, 2002 press release relates to the departure of George Pearcy, Pennexx's former Chief Financial Officer, and the January 30, 2003 and March 31, 2003 press releases relate to the Tabor Facility renovations.

N2 The Court also granted the Pennexx Defendants' Motion to Dismiss with respect to the breach of fiduciary duty claim against Queen and the Smithfield Defendants' Motion to Dismiss with respect to the breach of fiduciary claims against Smithfield, Cole and Luter. *2004 U.S. Dist. LEXIS 19244 at *26*. The Court denied Defendants' Motions to Dismiss with respect to the *Section 20(a)* claims against Smithfield, Luter, Queen, McGreal, and Cole, as well as the Smithfield Defendants' Motion to Dismiss with respect to the successor liability claim against Smithfield and Showcase. Id.

[*9]

On October 6, 2004, the Court held another case management conference. At the conference, Lead Plaintiff advised the Court that it wanted to file a second amended complaint in order to replead its *Rule 10b–5* claims based on "new information which would show that statements earlier on in the original class period should remain in the case." (10/6/04 Tr. at 31.) After the Smithfield Defendants raised an objection to Lead Plaintiff's filing of a second amended complaint, the Court instructed Lead Plaintiff to file a motion for leave to file a second amended complaint. Lead Plaintiff thereafter filed the instant Motion for Leave to Amend and File a Second Amended Complaint. The proposed Second Amended Complaint ("SAC") is attached as an exhibit to the instant Motion. The instant Motion has been fully briefed by the parties and is ripe for decision.

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 15(a)* provides that a party may amend its pleading after a responsive pleading is served only by leave of the court and "when justice so requires." *Fed. R. Civ. P. 15(a)*. Although *Rule 15(a)* states that leave [*10] should be "freely given," id., the United States Court of Appeals for the Third Circuit ("Third Circuit") has held that "a District Court may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." *In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)* (quoting *Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000)*). The decision whether to grant or deny a motion for leave to amend a complaint is committed to the sound discretion of the district court. *Cureton v. NCAA, 252 F.3d 267, 272 (3d Cir. 2001)*.

## III. DISCUSSION

The SAC alleges both new and modified *Rule 10b–5* claims against Pennexx, Queen, McGreal, Luter, and Cole. Defendants argue that leave to file the SAC should be denied on the basis of (1) undue delay and prejudice, and (2) futility. The Smithfield Defendants also request that the Court order Lead Plaintiff to reimburse them for the costs of responding to the instant Motion.

### A. Undue Delay and Prejudice

Defendants argue that leave to amend should be denied because Lead Plaintiff unduly delayed in filing [*11] the instant Motion, resulting in prejudice to Defendants. Delay alone is an insufficient ground to deny leave to amend. *Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)*. However, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." Id. "The obligation of the district court in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the reasons for delay." *Coventry v. U.S. Steel Corp., 856 F.2d 514, 520 (3d Cir. 1988)*. Prejudice in the context of *Rule 15(a)* means "undue difficulty in prosecuting [or defending] a lawsuit as a result of a change in tactics or theories on the part of the other party." *In re Aetna Inc., Civ. A. No. 1219, 2000 WL 3211286, at *1 (E.D. Pa. Mar. 17, 2000)* (quoting *Deakyne v. Comm'rs of Lewes, 416 F.2d 290, 300 (3d Cir. 1969)*).

Defendants note that Lead Plaintiff obtained the information which forms the basis of the new allegations in the SAC from the limited discovery that the Court permitted [*12] during July 2004. Instead of promptly seeking amendment while Defendants' Motions to Dismiss the FAC were still pending before this Court, however, Lead Plaintiff elected to stand firm on the sufficiency of the FAC until the Court issued its September 27,





Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 15 of 26

Page 4

2005 U.S. Dist. LEXIS 652, *12; Fed. Sec. L. Rep. (CCH) P93,074

2004 ruling. Thereafter, Lead Plaintiff promptly filed the instant Motion, in part to "cure deficiencies" in the Amended Complaint, (see Pl. Mem. at 1), as outlined in the Court's decision, even though these deficiencies were previously identified by Defendants in letters to Lead Plaintiff's counsel, as well as in several submissions filed in connection with the Motions to Dismiss. Defendants maintain that granting Lead Plaintiff leave to file the SAC will cause them to incur additional costs and expenses and will further delay the resolution of this action. Defendants also note that Lead Plaintiff has already had numerous opportunities to plead its case. In response, Lead Plaintiff concedes that the new allegations made in the SAC are based solely on discovery conducted in mid-July 2004, (Pl.'s Mem. at 10–11), yet offers no explanation as to why it waited over two months until the Court issued its decision on the Motions to Dismiss [*13] the FAC to seek amendment.

Although the Court does not condone the apparent "wait-and-see-what-happens" approach taken by Lead Plaintiff in this case, n3 the Court cannot conclude that Lead Plaintiff's delay in filing the instant Motion is sufficiently undue or prejudicial to justify the denial of leave to amend at this juncture. The new allegations in the SAC relate to and integrate with the allegations in the FAC. Thus, the proposed SAC does not reflect a change in tactics or theories by Lead Plaintiff such that Defendants will be forced to substantially revise their present defense strategy. Accordingly, under the present circumstances of this case, the Court declines to deny the instant Motion on the grounds of undue or prejudicial delay.

n3 The Court notes that at least one other district court has denied a motion for leave to amend a securities class action complaint under similar circumstances. In *In re Stone & Webster, Inc. Sec. Litig., 217 F.R.D. 96 (D. Mass. 2003)*, the securities plaintiffs moved for leave to file a 148-page, 450-paragraph second amended complaint after the court had dismissed most of the securities claims asserted in the first amended complaint. *Id. at 97.* The plaintiffs maintained that the second amended complaint would "remedy all of the defects" identified in the court's decision on the motion to dismiss. Id. The plaintiffs conceded that much of the information that they incorporated in the proposed second amended complaint was, in fact, available to them during the pendency of the motions to dismiss the first amended complaint. *Id. at 98.* In denying the motion for leave to the file the second amended complaint on the basis of undue delay, the court stated as follows:

The fact that the plaintiffs chose to oppose the motions to dismiss on the grounds that their complaint was, in their view, sufficiently pleaded, rather than providing the additional information known to them during the necessarily lengthy period during which the motions to dismiss were being considered, smacks of gamemanship bordering on bad faith. A plaintiff shouldering the burden of pleading under the PSLRA cannot pull its punches in this way and then expect a district court to allow that plaintiff another chance once the matter has not only been fully briefed, but actually decided. Considerable effort of the parties and the court was expended in deciding the motion to dismiss: the papers of the parties in support of and in opposition to the motion, the relevant documents at issue, and the pertinent cases created a veritable mountain of documents – a mountain that I laboriously climbed more than once . . . When a plaintiff fails to seek leave to amend after a motion to dismiss has been filed, and is aware of the stringent pleading requirements [of the PSLRA], the logical inference is that the plaintiff intends to stand on his or her complaint. To hold back facts the plaintiffs now characterize as helpful or even crucial to their case . . . strikes me as precisely the sort of 'undue delay' that should result in a denial of leave to amend.

*Id. at 98–99* (internal citations omitted).

[*14]

B. Futility

Defendants also argue that leave to amend should be denied on the grounds that the amendment would be futile. "Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Alpharma, 372 F.3d at 153;* see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1435 n.22 (3d Cir. 1997)* (instructing district court to perform futility inquiry when securities plaintiff tenders proposed amendments to complaint). Thus, futility is governed by the same standard of legal sufficiency as ap-

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 16 of 26

Page 5

2005 U.S. Dist. LEXIS 652, *14; Fed. Sec. L. Rep. (CCH) P93,074

plies under *Federal Rule of Civil Procedure 12(b)(6)*. *Id. at 153–54*. When determining a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential–Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985)*. A *Rule 12(b)(6)* motion will be granted when a plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988)*. **[*15]** Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory, 114 F.3d at 1426* (emphasis omitted).

To state a *Rule 10b–5* claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. *In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002)*. Defendants primarily argue that the proposed amendments fail to adequately allege that any of the Defendants made a misstatement or omission of material fact with scienter.

The scienter element of a *Rule 10b–5* claim requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission alleged to violate the securities laws. *15 U.S.C. § 78u-4(b)(2)*. The Third Circuit has defined "scienter" as "a mental **[*16]** state embracing an intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma, 372 F.3d at 148* (quoting *In re IKON, 277 F.3d at 667*). Scienter may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." n4 *In re Burlington Coat Factory, 114 F.3d at 1417*. To support the requisite "strong inference" of scienter,

> a plaintiff must state facts that, if true, would compel or forcefully suggest that a given defendant acted with the required state

of mind. A plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement was made. However, if the facts alleged do not exclude other **[*17]** plausible explanations that would undercut a plaintiff's circumstantial evidence of scienter, then that plaintiff's facts cannot be fairly said to raise a 'strong inference' that the defendant acted with the required state of mind.

*Nappier v. Pricewaterhouse Coopers LLP, 227 F. Supp. 2d 263, 278 (D.N.J. 2002)* (citation omitted); see also *In re Alpharma, 372 F.3d at 150* ("Indeed, while under *Rule 12(b)(6)* all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences.") (citation omitted); *In re Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004)* ("In requiring a 'strong inference' of scienter, the PSLRA alters the normal operation of inferences under *Fed. R. Civ. P. 12(b)(6)*."). Leave to amend is properly denied as futile where the proposed amendments fail to allege facts that give rise to a strong inference of scienter. *In re Alpharma, 372 F.3d at 154*. n5

> n4 Lead Plaintiff does not attempt to plead scienter by alleging facts that show that Defendants had both motive and opportunity to commit fraud. The Court's scienter analysis is, therefore, confined to whether the SAC sufficiently alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by Defendants. See *GSC Partners CDO Fund v. Washington, 368 F.3d 228, 238 (3d Cir. 2004)* ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.") (quoting *Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)*).

**[*18]**

> n5 In addition to "stating with particularity facts giving rise to a strong inference of scienter," *15 U.S.C. § 78u-4(b)(2)*, the PSLRA requires securities plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is mislead-





Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 17 of 26

Page 6

2005 U.S. Dist. LEXIS 652, *18; Fed. Sec. L. Rep. (CCH) P93,074

ing." *15 U.S.C. § 78u–4(b)(1)*. Moreover, where, as in this case, the allegations regarding the statement or omission are made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." Id. *Federal Rule of Civil Procedure 9(b)* also requires plaintiffs asserting securities fraud claims to specify "the who, what, when, where, and how: the first paragraph in any newspaper story." *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)* (citation omitted). In their opposition filings, Defendants do not specifically argue that the allegations of the SAC are insufficiently particularized under the PSLRA and *Rule 9(b)*. In light of the Third Circuit's recent pronouncements on the stringency of these threshold pleading requirements, see *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 2004 U.S. App. LEXIS 27189, 2004 WL 3015578 (3d Cir. 2004)*, it appears to the Court that at least some allegations of the SAC are insufficiently particularized. For the sake of argument, however, the Court assumes that, with the exception of the group pleading allegations (see note 6, infra), all of the allegations of the SAC are sufficiently particularized under the PSLRA and *Rule 9(b)*. Accordingly, the Court's inquiry is limited to whether the particularized allegations of the SAC sufficiently establish misstatements of material fact and give rise to a strong inference that Defendants acted with scienter in making the challenged misstatements.

[*19]

Plaintiffs' 10b–5 claims in the proposed SAC are based on allegedly false or misleading statements contained in several press releases issued by Pennexx and in several reports that Pennexx filed with the United States Securities and Exchange Commission ("SEC") during the class period. n6 The subject matter of the alleged misstatements falls into three general categories: (1) the initial condition of, and the cost of renovations to, Pennexx's Tabor Road Facility ("Tabor Facility"); (2) Pennexx's deficient internal financial controls and general inability to accurately report the company's financial condition; and (3) Pennexx's underreporting of its losses for the second quarter of 2002. n7

n6 Lead Plaintiff asserts all of its proposed *Rule 10b–5* claims against Pennexx, Queen, McGreal, Luter, and Cole. The Court has previously rejected Lead Plaintiff's reliance on the "group pleading" doctrine. See *Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, 2004 WL*

2203709, at *5–*6. In evaluating each *Rule 10b–5* claim, therefore, the Court will only consider the Defendant(s) who personally made or signed the challenged statements.

[*20]

n7 In its September 27, 2004 Memorandum and Order, the Court dismissed Lead Plaintiff's *Rule 10b–5* claims alleging that Pennexx misled the investing public to believe that demand for Pennexx's case-ready meat products was growing during the securities class period. See *Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, 2004 WL 2203709, at *22*. Lead Plaintiff advised the Court at the October 6, 2004 case management conference that it had new information concerning the falsity of Pennexx's statements about the growing demand for its products. (10/6/04 Tr. at 34–37.) The SAC does not, however, assert any *Rule 10b–5* claims based on the growing demand for Pennexx's products.

1. Tabor Facility

The SAC alleges that Pennexx issued several press releases that misstated or omitted material facts concerning the initial condition of, and the cost of renovations to, Pennexx's Tabor Facility. Lead Plaintiff first challenges Pennexx's February 20, 2002 press release, in which Queen was quoted as stating: "Since the new [Tabor] Facility requires minimal improvement, we will be able to renovate and automate quickly [*21] and plan to be operational in this pristine facility by the second quarter of 2002." (2d Am. Compl. P 52.) Lead Plaintiff asserts that Queen's statement was false and misleading because the Tabor Facility actually required a significant design and construction overhaul requiring a minimum of five months of work conducted by a skilled engineer. Lead Plaintiff previously asserted a *Rule 10b–5* claim based on Queen's statements from the February 20, 2002 press release in the FAC. The Court dismissed the claim because Lead Plaintiff had failed to sufficiently allege facts giving rise to a strong inference that Queen acted with scienter in making the challenged statements from the February 20, 2002 press release. See *Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, 2004 WL 2203709, at *10*. The SAC seeks to cure the deficiencies in the FAC with respect to the challenged statements from the February 20, 2002 press release by alleging new facts based on: (1) the July 20, 2004 deposition testimony of Mike Timmons, a Smithfield engineer and a project leader for the Tabor Facility renovations; (2) Queen's comments during a walking tour of the Tabor





Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 18 of 26

Page 7

2005 U.S. Dist. LEXIS 652, *21; Fed. Sec. L. Rep. (CCH) P93,074

Facility on July 23, 2004; and (3) a budget estimate prepared [*22] by Robert McClain, a Smithfield engineer and a project leader for the Tabor Facility renovations.

During his July 20, 2004 deposition, Timmons testified that the Tabor Facility was in "relatively poor shape" when he began working on the project in March 2002. (2d Am. Compl. P 54(i).) Timmons explained that the Tabor Facility "needed a lot of work to bring it up to food safety standards" and that "there was no refrigeration [in the Tabor Facility] that was functional." (Id. P 54(ii).) Timmons also testified that the Tabor Facility's roof, lighting, floors and floor drains were in poor shape, and that Pennexx "never would be able to run the facility" without substantial renovations. (Id.)

During the July 23, 2004 walking tour of the Tabor Facility, Queen remarked as follows:

> One of the major issues in the plant that started to happen right away was that the floor was coming up. We had a brand new floor put down. [It] was very important from a U.S. Government standpoint that no water lies on the floor. Stagnant water is not acceptable to the Government. As you can see here the floor is cracked and coming up and there's stagnant water in several places . . .
>
> The biggest [*23] problem we had in the [cooler] area was the lighting. We had asked several times. The lighting has been replaced in here since then but it was so dark in here that it was actually a hazard, that you couldn't even see putting boxes away . . . It created a two-fold problem. One, on a safety issue for the employees but it also, people couldn't actually see what was in the boxes they were picking and that causes a big problem . . ."

(Id. P 54(iii).)

The SAC further alleges that, on March 1, 2002 at 5:46 AM, McClain sent the following e-mail to Dan Stevens, Smithfield's Chief Financial Officer, and Bob Urell, Smithfield's Vice President: "I have been unsuccessful in reaching Mike Queen this morning. I will continue to try. However, I am attaching a summary of the cost build-up [for the Tabor Facility] based on the information currently in hand. Please call me if you have any questions." (McClain E-mail of Mar. 1, 2002.) The attached budget estimate, which is dated January 29, 2002, states that renovations to the Tabor Facility would cost $4.2 million and that the entire Tabor

Facility project would cost $18.6 million to $23.8 million. (McClain Estimate at 1-2.) The budget [*24] estimate lists Stevens, Urell, and Queen as recipients. (Id. at 1.)

The Court notes that Timmons did not begin working at the Tabor Facility until March 2002, weeks after Queen made the challenged statements in the February 20, 2002 press release. The SAC does not, in any event, allege that Timmons ever informed Queen of his belief that the Tabor Facility was in poor condition and in need of substantial renovations. At best, therefore, Timmons' testimony merely provides circumstantial evidence that the Tabor Facility was, in fact, in poor condition and needed substantial renovations as of, and likely well before, February 20, 2002. Mr. Timmons deposition testimony does not, however, give rise to a strong inference that Queen acted with scienter in making the challenged statements from the February 20, 2002 press release. See *In re Advanta, 180 F.3d at 539* (noting that "general imputations of knowledge" fail to satisfy scienter requirement).

Queen's admissions during the July 23, 2004 tour concerning the poor quality of the floors and lighting at the Tabor Facility also fail to support a strong inference scienter. Although "a complaint can establish that a statement [*25] was false when made by alleging a later statement by defendant along the lines of 'I knew it all along,'" *Yourish v. Cal. Amplifier, 191 F.3d 983, 996 (9th Cir. 1999)* (internal quotation omitted), Queen's post-class period admissions in this case do not establish that he was aware of the poor condition of the Tabor Facility as of February 20, 2002. Queen's post-class period admissions relate to problems that were identified after the renovations to the Tabor Facility began in May 2002, (2d Am. Compl. P 64), or after Pennexx moved into the Tabor Facility in July 2002. (Id. P 83-84.) For example, Queen remarked during the July 23, 2004 walking tour of the Tabor Facility that Pennexx "had a brand new floor put down" and that "as you can see the floor is cracked and coming up and there's stagnant water in several places." (Id. P 54(iii).) Queen also commented that the Tabor Facility's lighting problems created "a safety issue for the employees" and "people couldn't actually see what was in the boxes they were picking." (Id.)

Queen's knowledge of the January 29, 2002 budget estimate n8 prepared by McClain also fails to support a strong inference of scienter [*26] when considered in context. Queen made the challenged statements in a press release announcing that Pennexx had entered into a preliminary agreement to purchase the Tabor Facility, which the press release described as "a 145,000

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 19 of 26

Page 8

2005 U.S. Dist. LEXIS 652, *26; Fed. Sec. L. Rep. (CCH) P93,074

square foot facility on 10 acres of land in Philadelphia, Pennsylvania." (Id. P 52.) The February 20, 2002 press release also noted that "the company anticipates that the [Tabor Facility] transaction will close within the next 30 days." (Id.) On March 29, 2002, prior to the closing of the Tabor Facility transaction, Pennexx estimated in its Form 10-KSB for the 2001 fiscal year that renovations to the Tabor Facility would cost $2.0 million to $3.0 million and that the total project would cost $10.5 million to $15.0 million. (Pennexx Form 10-KSB at 17, filed Mar. 29, 2002.) Pennexx subsequently filed a Form 8-K in which the company announced that it had finalized the Tabor Facility purchase for $2 million on April 2, 2002. (Pennexx Form 8-K at 1, filed Apr. 17, 2002.)

n8 Although McClain's report is dated January 29, 2002, the version of the report cited in the SAC was not circulated until March 1, 2002, over one week after Queen made the challenged statements from the February 20, 2002 press release. Moreover, the version of the report cited in the SAC was "based on the information currently in hand" as of March 1, 2002. (McClain Email of Mar. 1, 2002.) Nevertheless, the Court will assume that, as of February 20, 2002, Queen had received a copy of an earlier version of McClain's report and that the cost estimates contained therein were at least comparable to the cost estimates contained in the copy of McClain's report that was circulated on March 1, 2002.

[*27]

Queen's February 20, 2002 statements were made, therefore, in the nascent stages of a complex, evolving real estate transaction. Within weeks of announcing its decision to enter into an agreement to purchase the Tabor Facility and before the acquisition was finalized, Pennexx released preliminary estimates that sufficiently conveyed to the market that purchasing, renovating, and equipping the new facility would require the company to expend substantial capital resources. Under these circumstances, the Court cannot conclude that Queen's knowledge of the January 29, 2002 report prepared by McClain "compels or forcefully suggests" that he acted with scienter in making the challenged statements from the February 20, 2002 press release. At best, Queen's premature optimism amounts to inactionable negligence. See, e.g., *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994)* (noting that "misguided optimism is not a cause of action, and does not support an inference of fraud"). The Court concludes, therefore, that the collective allegations of the SAC are insufficient to give rise to a strong inference that Queen acted with scienter in making the challenged [*28] statements from the February 20, 2002 press release. As granting Lead Plaintiff leave to amend with respect to this claim would be futile, the instant Motion is denied in this respect.

The SAC also alleges that Pennexx materially understated the cost of the Tabor Facility project in its March 29, 2002 and April 17, 2002 SEC filings. Pennexx's Form 10-KSB for the 2001 fiscal year, which was filed on March 29, 2002, contained the following "preliminary estimate" of the cost of purchasing, renovating, and equipping the Tabor Facility:

| | |
|---|---|
| Purchase Price | $ 2.0 million |
| Renovation Cost | $ 2.0 million to $ 3.0 million |
| Equipment Costs | 6.5 million to $ 10.0 million |
| | |
| Total | $ 10.5 million to $ 15.0 million |

(Pennexx Form 10-KSB at 17, filed Mar. 29, 2002.) The Form 10-KSB was signed by Queen, McGreal, Luter, Cole, and C. Brent Moran, who also served as a director of Pennexx. (Id. at 21.) On April 17, 2002, Pennexx filed a Form 8-K in which the company reiterated its previous estimate that the Tabor Facility's renovations would cost $2.0 million to $3.0 million. (Pennnexx Form 8-K at 1, filed Apr. 17, 2002.) Lead

Plaintiff asserts [*29] that Defendants knew that the cost estimates contained in the March 29, 2002 and April 17, 2002 SEC filings were false and misleading based on McClain's determination, in his January 29, 2002 budget estimate, that renovations to the Tabor Facility would cost $4.2 million and that the entire project would cost $18.6 million to $23.8 million.

Even assuming that Pennexx adopted the cost esti-

  

Case 1:04-cv-00831-SLR     Document 54-7     Filed 07/20/2005     Page 20 of 26

Page 9

2005 U.S. Dist. LEXIS 652, *29; Fed. Sec. L. Rep. (CCH) P93,074

mates contained in McClain's report, the Court notes that McClain's report was "based on the information currently in hand" as of March 1, 2002, only nine days after Pennexx had entered into a preliminary agreement to purchase the Tabor Facility and over one month before the acquisition of the Tabor Facility was finalized. The most plausible inference from the allegations of the SAC is that Pennexx revised its cost estimates in response to ongoing financial negotiations during the intervening time period. Indeed, Pennexx advised the market in the March 29, 2002 Form 10-KSB that "Smithfield has agreed to allow the Company to purchase, renovate, and equip the [Tabor] Facility with borrowings under its existing $30 million credit line of up to $2 million, $2 million, and $6.5 million, respectively. [*30] If the actual costs exceed these amounts, Pennexx will have to fund the difference from cash flow or will need to obtain additional financing." (Pennexx Form 10-KSB at 17, filed Mar. 29, 2002.) n9 The low-end cost estimates contained in the challenged SEC filings correspond to the limited principal advances permitted by Smithfield under the parties' credit agreement. Mr. McClain's higher cost estimates, by contrast, do not appear to consider the significant constraints on Pennexx's ability to finance the Tabor Facility project. The Court concludes, therefore, that the collective allegations of the SAC fail to give rise to a strong inference that any of the Defendants acted with scienter in issuing the challenged cost estimates in the March 29, 2002 and April 17, 2002 SEC filings. As granting Lead Plaintiff leave to amend with respect to these claims would be futile, the instant Motion is denied in this respect.

> n9 The April 17, 2002 Form 8-K contains a materially identical statement. (See Pennexx Form 8-K at 1, filed Apr. 17, 2002.)

[*31]

2. Pennexx's reporting of financial information n10

> n10 Defendants note that Lead Plaintiff has not previously asserted any Rule 10b-5 claims based on Pennexx's reporting of its financial information. At the October 6, 2004 status conference, the Court advised Lead Plaintiff's counsel that "if you're going to expand [the proposed SAC] beyond what was initially in the case I'm telling you I'm going to deny it." (10/6/04 Tr. at 49-50.) However, Lead Plaintiff's new Rule 10b-5 claims based on Pennexx's reporting of its financial condition are sufficiently related to the existing allegations of the FAC. The Court concludes, therefore, that Lead Plaintiff did not act in contra-

vention of the Court's directive in including these claims in the SAC.

Lead Plaintiff asserts that Defendants recklessly reported Pennexx's financial information in several SEC filings during the class period. Lead Plaintiff specifically challenges the following statement, which appeared in all of the Form 10-QSBs filed by Pennexx during [*32] the class period: n11

> In the opinion of the Company, all adjustments, including normal recurring adjustments, necessary to present fairly the financial position of the Company as of [the specified period] and the results of its operations and cash flows for [the specified period] have been included. The results of operations for the interim period are not necessarily indicative of the results for the year.

(2d Am. Compl. P 66) (emphasis added). Lead Plaintiff also challenges the following statement, which appeared in Pennexx's April 1, 2003 Form 10-KSB for the 2002 fiscal year:

> The Company carried out an evaluation of the effectiveness of its disclosure controls and procedures within 90 days prior to the filing of this report. This evaluation was carried out under the supervision and with the participation of the Company's management, including the Company's President and Chief Executive Officer and the Chief Financial Officer. Based on that evaluation, the Company's President and Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective. There have not been any significant changes [*33] in the Company's internal controls, or in other factors which would significantly affect internal controls subsequent to the date the Company carried out its evaluation, or any corrective actions taken with regard to significant deficiencies or material weaknesses.

(Id. P 68.) The April 1, 2003 Form 10-KSB was signed by Queen, McGreal, Beltrami, and Moran. (Id.) Appended to the April 1, 2003 Form 10-KSB were certifications signed by Queen and Beltrami which stated that they had disclosed to Pennexx's "auditors and the audit committee of [Pennexx's] board of directors . . . all sig-

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 21 of 26

Page 10

2005 U.S. Dist. LEXIS 652, *33; Fed. Sec. L. Rep. (CCH) P93,074

nificant deficiencies in the design or operation of internal controls which could adversely affect [Pennexx's] ability to record, process, summarize and report financial data and have identified for [Pennexx's] auditors any material weaknesses in internal controls." (Id. P 69.) Lead Plaintiff contends that the challenged statements were false and misleading because Pennexx lacked the internal controls necessary to ever accurately report the company's financial information to the SEC.

> n11 Pennexx filed the challenged Form 10-QSBs on April 9, 2002, May 15, 2002, August 19, 2002, and November 14, 2002. The April 9, 2002 Form 10-QSB was signed by Queen and McGreal. The May 15, 2002 Form 10-QSB was signed by Queen and Pearcy. The August 19, 2002 Form 10-QSB was signed by Queen. The November 14, 2002 Form 10-QSB was signed by Queen and Joseph Beltrami, Pennexx's Chief Financial Officer.

[*34]

Defendants maintain that Lead Plaintiff's failure to contest a single number contained in the challenged SEC filings is fatal, as claims grounded on corporate mismanagement are not actionable under the federal securities laws. As a general matter, "allegations of failure to disclose mismanagement alone do not state a claim under federal securities law." *In re Craftmatic Sec. Litig.*, *890 F.2d 628, 639 (3d Cir. 1989)*. Thus, "it is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls." *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992)*. However, "a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." *Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992)*. Accordingly, the securities laws are implicated where a company publicly comments on the nature or quality of its management practices. See *Shapiro, 964 F.2d at 282* (noting that "where a defendant affirmatively characterizes [*35] management practices as 'adequate' . . . and the like, the subject is 'in play' . . . and [the defendant] is bound to speak truthfully").

The securities laws are, therefore, implicated in this case because Pennexx made affirmative representations throughout the class period regarding the effectiveness of the company's financial disclosure controls and the company's concomitant ability to fairly present its financial position. The SAC asserts that the challenged statements were false and misleading and that Defendants acted with scienter in making the challenged statements based on:

(1) a memo prepared by Jeffrey Deel, a Smithfield employee, concerning Pennexx's food control weaknesses; (2) a report prepared by Bart Ellis, Smithfield's Vice President of Operations, concerning Pennexx's financial losses and business culture; and (3) admissions made by Queen during the July 23, 2004 walking tour concerning flaws in Pennexx's yield monitoring system.

In an August 2, 2002 memorandum entitled, "Pennexx Report – Financial Losses and Business Culture" (hereinafter, "the Ellis Report"), Ellis summarized the results of an audit and inspection of Pennexx that had been performed by Smithfield. [*36] (Ellis Report at 1.) The Ellis Report was sent to Queen, Luter, and other Smithfield and Pennexx executives. (Id.) The Ellis Report noted that Smithfield's audit and inspection of Pennexx was prompted by "inordinate losses" generated by Pennexx in both "the fall of 2001" and the period from "April 2002 to current" without any "advance notification provided by Pennexx management of these developing poor financial losses." (Id.) The Ellis Report commented that "Pennexx executives accept that no timely reporting exists, to the point where an outside observer would reasonably believe that management is indifferent. Many support functions (HR, I/S, accounting, credit/receivables, payables, maintenance) appear to be of secondary importance to management." (Id.) The Ellis Report found that the following "deficiencies result from this culture":

> A. Financial reporting is lacking as to internal controls (see Deel memo of July 24, 2002) and report production is not performed on schedule. Income statements and balance sheets are only published on a quarterly basis on the schedule demanded by SEC 10Q requirements.
>
> B. The weekly stock ledger report which quantifies product [*37] yield, meat cost, and a weekly P/L estimate on a billable basis has not been generated on time back to at least April. The report has been reviewed and it does track with the income statement. Of course, neither the stock ledger or the income statement are produced so that management can schedule formal reviews.

(Id.) The Ellis Report proposed the following as "immediate priorities" for Pennexx:

> A. Monthly financial reports are issued by the 2nd Friday following the month [sic] end, and the actual earnings num-

  

2005 U.S. Dist. LEXIS 652, *37; Fed. Sec. L. Rep. (CCH) P93,074

ber is known by mid–afternoon on the 2nd
Wednesday.

B. The weekly Stock Ledger report is issued
by the end of business each Monday for the
prior week.

C. Establish and define and [sic] or-
ganization structure which defines duties
and responsibilities. Accounting should
have two groups – Financial (general)
and Cost Human Resources responsibilities
should not fall to accounting staff. Quality
Assurance should answer directly to the
president, not operations.

(Id. at 1–2.) The Ellis Report concluded by expressing
the following concerns:

Current Pennexx management lacks the
fundamental business and operating skills
which are required [*38] to generate consis-
tent positive results on a go forward basis.
The start up challenges alone for this expan-
sion will prove formidable for any strong
organization. These challenges will prove
devastating for the current organization.

(Id. at 2.)

The "Deel memo" referenced in the Ellis Report was
prepared for the Pennexx "file" by Smithfield's Jeffrey
Deel on July 24, 2002. (Deel Memo at 1.) In the memo,
which is entitled "Pennexx Food Control Weaknesses"
(hereinafter, "the Deel Memo"), Deel noted several fac-
tors that "could generate yield losses" for Pennexx.
(Deel Memo at 1.) The Deel Memo noted that Pennexx's
"accounting staff is not generating needed production
analysis" and recommended that Pennexx "consult with
other Smithfield Foods subs or other outside experts
in cost accounting to develop accounting and report-
ing systems to identify and segment responsibility ar-
eas of production." (Id.) The Deel Memo also noted
that "inventory reconciliations are not performed" by
Pennexx and recommended "development of a perpetual
inventory system to track SKU's on a daily basis." (Id.)
The Deel Memo further noted that Pennexx employees
"sometimes" complete purchase orders [*39] for raw
materials and supplies "after the fact," but fail "to docu-
ment the intended agreement." (Id.) Deel recommended
that Pennexx employees complete "all [purchase order]
info at commitment and set[] volume maximums on sup-
ply quantities." n12 (Id.)

n12 The SAC attempts to impute knowledge of
the Deel Memo and Ellis Report to McGreal and
Cole based on the following allegations:

(i) The [Ellis] Report indicates that it
was

circulated to Defendants Queen
and Luter IV.

(ii) That Defendant Luter shared the
sentiments expressed in the [Deel]
Memo and [Ellis] Report of July and
August 2002 is evident from his com-
ments at a September 24, 2002 meet-
ing of the Pennexx board of directors
(as memorialized in the minutes of
the meeting) that "he remained con-
cerned that the 'true financial situa-
tion' of the Company might not be
known in light of [former Pennexx
CFO] George Pearcy's allegations"
[that Pennexx executives pressured
him to underreport the company's net
losses for the second quarter of 2002].

(iii) Mr. Luter IV repeated these con-
cerns at a meeting of the Pennexx
board of directors held on September
26, 2004 (as noted in the minutes
thereto) when he noted that a let-
ter from Smithfield which stated that
Pennexx "may have" breached its loan
covenants with Smithfield "reflected
a lack of confidence in the true finan-
cial picture of the Company after the
George Pearcy incident.

(2d Am. Compl. P 79.) These allegations merely
establish that Luter discussed Pearcy's allegations
at the Pennexx board meetings of September 24,
2002 and September 26, 2002. In the absence of
specific allegations that Luter discussed the Deel
Memo and the Ellis Report at Pennexx board meet-
ings, Lead Plaintiff cannot impute knowledge of
the Deel Memo and the Ellis Report to McGreal
and Cole. Furthermore, to the extent that Lead
Plaintiff also relies on these allegations in plead-
ing material misstatements and scienter, the Court
finds that Luter's "concerns" about the Pearcy al-
legations fail to establish that any of the chal-
lenged statements alleged in the SAC, including
Pennexx's statement of its net losses for the second
quarter of 2002, were false or misleading when

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 23 of 26

Page 12

2005 U.S. Dist. LEXIS 652, *39; Fed. Sec. L. Rep. (CCH) P93,074

made or that Defendants acted scienter in making the challenged statements.

**[*40]**

The SAC further alleges that, during the July 23, 2004 walking tour of the Tabor Facility, Queen admitted that the production analysis necessary to timely monitor Pennexx's results was non-existent:

> There's no way in this system [i.e., the Tabor Facility's yield monitoring system] to tell you what's in your finished goods inventory, which also gives you a weight. That weight is your final yield. Because that information was so flawed and not having that to know what our weight was, we had to wait until our monthly P&Ls were completed before we knew what our yield loss was because the system was never up and running in getting us timely yields as we needed them and as it was designed. So we were basically relying on an accounting system which was a Quick Books accounting system, so a monthly inventory at the end of the month to find out where you were and it was usually takes us ninety days to complete to know where we were the previous month. So as we started doing more business and we did a lot of business in the month of February [2003], when we got our inventory back, we had lost $400,000 in yield loss and had absolutely no idea where or why we had lost that money. And **[*41]** the system was all designed to tell us specifically where it went but it didn't because it didn't function properly . . . .
>
> . . . You cannot run a plant that does not give you on-line yielding.

(2d Am. Compl. P 80.)

Lead Plaintiff asserts that the allegations in the SAC collectively demonstrate that Defendants, while conscious of Pennexx's deficient internal controls, recklessly made false statements concerning the effectiveness of the company's financial disclosure controls and the company's concomitant ability to accurately disclose its financial information. As an initial matter, the Court notes that Queen's comments during the July 23, 2004 walking tour fail to establish the falsity of Defendants' statements concerning Pennexx's ability to generate accurate financial information. Queen's comments merely reveal that Pennexx's yield monitoring system failed to provide accurate, realtime inventory data, and that, as a result, the company was not aware of the magnitude of its yield losses until the monthly accounting results were subsequently released. Queen does not suggest that the flaws in Pennexx's yield monitoring system prevented the company from accurately disclosing **[*42]** its financial condition to the SEC.

The Court further concludes that neither the Ellis Report nor the Deel Memo demonstrate that the challenged statements concerning Pennexx's ability to generate accurate financial information were false or misleading. The Ellis Report only criticizes the timeliness of Pennexx's financial reporting, not the accuracy of Pennexx's financial reporting. Cf. *In re IKON Office Solutions, Inc. Sec. Litig., 66 F. Supp. 2d 622, 631 (E.D. Pa. 1999)* (holding that plaintiff sufficiently alleged misstatement where plaintiffs identified internal memoranda and an audit that raised "numerous red flags evidencing that the Company's internal controls were gross deficient and that the financial data being generated by its financial reporting mechanism was so pervasively inaccurate and unreliable that reliance on that information for financial statement purposes was precluded by GAAP and GAAS") (emphasis added). Moreover, it appears that the Ellis Report refers only to Pennexx's failure to provide Smithfield, and not the SEC, with timely financial information, as the report indicates that Pennexx's "income statements and balance sheets are only published **[*43]** on a quarterly basis on the schedule demanded by SEC 10Q requirements." (Ellis Report at 1.) Although the Ellis Report cites the Deel Memo for the proposition that Pennexx's "financial reporting is lacking as to internal controls," the Deel Memo neither states nor implies that Pennexx lacked the internal controls necessary to accurately disclose the company's financial condition to the SEC. The Deel memo instead focuses on ways in which Pennexx could improve its production efficiencies to minimize yield losses. In the absence of any specific allegations that Pennexx's internal controls and procedures for disclosing financial information to the SEC were ineffective, the court cannot infer that Defendants acted negligently, much less with scienter, in making the challenged statements.

Even if the deficiencies in Pennexx's internal controls identified in the Deel Memo and the Ellis Report did implicate the company's ability to accurately disclose its financial information, Lead Plaintiff has still failed to sufficiently allege facts that give rise to a strong inference that Defendants acted with scienter in making the challenged statements. The April 9, 2002 and May 15, 2002 Form 10-QSBs **[*44]** were issued prior to the dissemination of the Deel Memo and the Ellis Report. There are no other allegations in the SAC from which the Court could infer that Defendants acted with scienter

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 24 of 26

Page 13

2005 U.S. Dist. LEXIS 652, *44; Fed. Sec. L. Rep. (CCH) P93,074

in making the challenged statements in the April 9, 2002 and May 15, 2002 SEC filings. See *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("The fact that [defendant] was overhauling its accounting system . . . does not command an inference that company officials should have anticipated finding a problem or that financial data reported under the old system was inaccurate."); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) (concluding that allegations regarding "the breakdown in the internal controls and the review thereof" only established negligence of defendants); *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 639–40 (D.N.J. 2002) (dismissing securities claim where plaintiffs failed to allege contemporaneous facts that defendants knew trade management computer system was unable to properly capture and analyze trade marketing information, even though "Defendants conceded that, in retrospect, the defects [*45] in the [computer system] were material insofar as correction of these problems eventually revealed a much larger outstanding consumer deduction balance than the company had estimated in its financial reports"); *In re Westinghouse Sec. Litig.*, 832 F. Supp. 948, 979 (W.D. Pa. 1993) ("Plaintiffs may not cite confidential communications, policy recommendations and internal memoranda identifying measures by which Westinghouse could improve some areas of operations and allege that the corporation had previously committed fraud."), aff'd in part, rev'd in part, *90 F.3d 696 (3d Cir. 1996)*. n13

n13 In *In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996), the Third Circuit affirmed the district court's dismissal of the plaintiffs' Rule 10b-5 claim alleging that the defendant–company misrepresented the adequacy of its internal controls. *Id.* at 711–12.

Furthermore, the SAC is devoid of allegations that Defendants consciously or recklessly opted [*46] not to improve the company's financial disclosure controls and procedures in response to the observations and recommendations made in the Ellis Report and Deel Memo. See *Svezzese v. Duratek, Inc.*, 2002 U.S. Dist. LEXIS 20967, Civ. A. No. 01–1830, 2002 WL 1012967, at *5 (D. Md. Apr. 30, 2002) (distinguishing cases that "contain allegations of pervasive, ongoing deficiencies in the internal controls that were known to the defendant companies") (emphasis added), aff'd, *67 Fed. Appx. 169 (4th Cir. 2003)* (unpublished decision); cf. *In re IKON, 66 F. Supp. 2d at 631* (holding that plaintiffs adequately alleged scienter by describing "a variety of internal memoranda expressing concern that the problems had not been corrected"); *In re Westinghouse, 832 F. Supp. at 979*

(noting the *Section 10(b) of the Exchange Act* "may not be used to punish [companies] for identifying and implementing improvements to corporate policies"). n14

n14 In support of the scienter element, the SAC also alleges that Pennexx's reported financial information violated generally accepted accounting principles ("GAAP"). The GAAP violations alleged in the SAC are, however, based entirely on the Ellis Report, the Deel Memo, and Queen's admissions during the July 23, 2004 walking tour concerning flaws in Pennexx's yield monitoring system. See *Holmes v. Baker, 166 F. Supp. 2d 1362, 1379 (S.D. Fla. 2001)* (noting that while GAAP violations, combined with other "red flags," may establish scienter, the purported "red flags cannot consist primarily of rehashes of the GAAP violations"). Moreover, the SAC does not allege that Defendants knew that Pennexx's reported financial information violated GAAP. See *In re AFC Enters. Sec. Litig., 348 F. Supp. 2d 1363, 2004 U.S. Dist. LEXIS 26088, Civ. A. No. 03–817, 2004 WL 2988212, at *8 (N.D. Ga. Dec. 28, 2004)* ("It is . . . tenuous to impute knowledge of cumulative accounting errors generally to operational officers and directors of a corporation.").

[*47]

The Court concludes, therefore, that the collective allegations of the SAC fail to sufficiently allege that the challenged statements were false or misleading when made, or that Defendants acted with scienter in making the challenged statements. As granting Lead Plaintiff leave to amend with respect to these claims would be futile, the instant Motion is denied in this respect.

### 3. Underreporting of Losses

The SAC alleges that Pennexx underreported the company's losses for the second quarter of 2002. On August 19, 2002, Pennexx disclosed in its Form 10-QSB that the company had suffered a net loss of approximately $2.2 million for the second quarter of 2002. (Pennexx Form 10-QSB at 3, filed Aug. 19, 2002) The Form 10-Q was signed by Queen. (Id. at 14.) Pennexx reiterated the $2.2 million figure in a press release issued on August 20, 2002. (2d Am. Compl. P 96.) In the FAC, Lead Plaintiff asserted that Pennexx fraudulently underreported its losses for the second quarter of 2002 based on Pearcy's preliminary determination that the company suffered net losses of $2.5 million. n15 *Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, 2004 WL 2203709, at *19.* The Court dismissed this claim because, [*48] even assuming that the alleged

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 25 of 26

Page 14

2005 U.S. Dist. LEXIS 652, *48; Fed. Sec. L. Rep. (CCH) P93,074

misstatement of losses was material, Lead Plaintiff had failed to sufficiently allege facts giving rise to a strong inference that Defendants acted with scienter in reporting Pennexx's losses for the second quarter of 2002. Id. The Court noted that Lead Plaintiff did not allege that any of the Defendants ever adopted Pearcy's loss determination. Id. The Court further found that "the more compelling inference from the facts alleged in the Amended Complaint is that the $2.2 million loss reported in the SEC filings was based on the outside auditors' review of Pennexx's financials." Id. The SAC seeks to cure the deficiencies identified by the Court by alleging new facts based on the Deel Memo, the Ellis Report, and Queen's admissions during the July 23, 2004 walking tour.

> n15 The SAC reiterates the following allegations from the FAC in support of the instant claim. On numerous occasions, Pearcy was informed by Queen and other Pennexx officers, including Dennis Bland, Pennexx's Chief Operating Officer, and McGreal, that he was permitted to report losses in the range of $800,000 to $1.2 million for the second quarter of 2002, but in no event was he to report losses in excess of $1.2 million. (2d Am. Compl. P 87(a).) In anticipation of filing Pennexx's Form 10-QSB on August 14, 2002, Pennexx held a meeting during which Pearcy advised other Pennexx officers that he intended to disclose that Pennexx had suffered losses of $2.5 million for the second quarter of 2002. (Id. P 87(b).) Queen refused to accept the loss and left the meeting. (Id. P 87(c).) On August 12, 2002, Queen, McGreal, and Bland handed Pearcy a two-page letter which purported to terminate him for incompetence. (Id. P 87(e).) On August 13, 2002, Pearcy met with an ad hoc audit committee of Pennexx and told them that the preliminary financial results showed a quarterly loss of approximately $2.5 million and that he had been directed by management to report a loss of no greater than $800,000 to $1.2 million. (Id. P 87(f).) Pearcy's allegations were subsequently reviewed by both Pennexx's outside auditor and Smithfield's outside auditor. (Id. P 88.)

[*49]

The internal controls allegations based on the Deel Memo, the Ellis Report, and Queen's admissions during the July 23, 2004 walking tour fail give rise a strong inference that Queen and Pennexx acted with scienter in making the challenged statements. As discussed above, the internal controls allegations in the SAC do not implicate the accuracy of Pennexx's financial disclosures. Even if the internal controls allegations in the SAC did implicate the accuracy of Pennexx's financial disclosures, the Court notes that "internal controls allegations are frequently dismissed, even when a corporation's executives knew that the internal controls were inadequate." Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 19-20 & n.12 (D. Mass. 2004) (citing cases); see also Svezzese, 2002 U.S. Dist. LEXIS 20967, 2002 WL 1012967, at *6 (noting that most colorable securities claims involving the misstatement of specific financial data based on deficient internal controls "include other allegations which strongly give rise to an inference of scienter on their own, such as insider trading").

In Crowell, the securities plaintiff argued, inter alia, that the defendant corporation knowingly overstated [*50] its revenues by tens of millions of dollars. 343 F. Supp. 2d at 9. In support of his claim, plaintiff alleged that defendant's system of internal controls was materially deficient. Id. at 19. The court observed that the "facts alleged in [plaintiff's] complaint suggest that [defendant's] failure to develop internal controls was egregious" and that "a better formula for systematic revenue misstatement would be difficult to imagine." Id. at 20. Notwithstanding the egregious deficiencies in the defendant's internal financial controls, the Court noted that "if the allegations regarding [defendant's] failure to maintain adequate internal controls were the only ones in the Complaint, the Court would almost certainly have to dismiss the case," as "standing alone, even this level of mismanagement does not constitute scienter." Id. at 19-20. However, as the plaintiff had also "adequately alleged that [defendant] engaged in multiple courses of conduct to inflate revenues artificially," the Court concluded that "the desire to hide such fraudulent conduct would provide an obvious motive to maintain minimal internal controls. [*51] " Id. Thus, "when considered in context with the other, stronger allegations, [plaintiff's internal controls allegations] at least strengthen[] [plaintiff's] case." Id.

In this case, by contrast, the facts alleged in the SAC do not support any inference that Pennexx consciously maintained minimal internal controls in order to conceal a fraudulent course of conduct. Pearcy's $2.5 million calculation was allegedly based on "preliminary" financial results, which were subsequently reviewed by an ad hoc audit committee appointed by Pennexx, as well as the outside auditors for both Pennexx and Smithfield. Although Pennexx executives allegedly pressured Pearcy not to report losses in excess of $1.2 million, the company ultimately reported significantly greater losses of $2.2 million, which was only $300,000 less than Pearcy's "preliminary" determination. Accordingly, the Court concludes that the collec-

  

Case 1:04-cv-00831-SLR    Document 54-7    Filed 07/20/2005    Page 26 of 26

Page 15

2005 U.S. Dist. LEXIS 652, *51; Fed. Sec. L. Rep. (CCH) P93,074

tive allegations of the SAC fail to give to rise to a strong inference that Queen and Pennexx acted with scienter in reporting the company's financial losses for the second quarter of 2002. As granting Lead Plaintiff leave to amend with respect to this claim would be futile, **[*52]** the instant Motion is denied in this respect. n16

> n16 Lead Plaintiff concedes the remaining press releases cited in the SAC do not allege false or misleading misstatements under *Rule 10b–5*. (Pl.'s Reply at 13–14.)

### C. Sanctions

The Smithfield Defendants request that the Court require Lead Plaintiff to reimburse them for the costs of responding to the instant Motion. The Smithfield Defendants maintain that sanctions are warranted in this case based on Lead Plaintiff's "deliberate disregard of this Court's instruction not to add new allegations to the Proposed Complaint" and Lead Plaintiff's "blatant mischaracterization of the relevant documents." (Smithfield Defs.' Mem. at 24.)

*Section 78u–4(c)(1) of the PSLRA* provides that: "In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing each party with the requirements of *Rule 11(b) of the Federal Rules of Civil Procedure* **[*53]** as to any complaint, respon-

sive pleading, or dispositive motion." *15 U.S.C. § 78u–4(c)(1)*. As this action has not yet been finally adjudicated, it would be premature for the Court to perform the inquiry mandated by *§ 78u–4(c)(1)* at this juncture. Moreover, the Smithfield Defendants have not independently moved for sanctions pursuant to *Federal Rule of Civil Procedure 11*. Accordingly, the Court declines to entertain the Smithfield Defendants' request for sanctions.

### IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff's Motion for Leave to Amend and File a Second Amended Complaint is denied in its entirety.

An appropriate Order follows.

### ORDER

**AND NOW,** this 13th day of January, 2005, upon consideration of Lead Plaintiff's Motion for Leave to Amend and File a Second Amended Complaint (Doc. No. 87), the Smithfield Defendants' Response thereto (Doc. No. 90), the Pennexx Defendants' Response thereto (Doc. No. 91), and all attendant and responsive briefing, **IT IS HEREBY ORDERED** that said Motion is **DENIED** in its entirety.

BY THE COURT:

s/ John R. Padova

John **[*54]** R. Padova, J.

