# EXHIBIT H

LEXSEE 2003 U.S. DIST. LEXIS 20964

## IN RE KEYSPAN CORPORATION SECURITIES LITIGATION

01 CV 5852 (ARR)

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 20964

November 21, 2003, Decided

**PRIOR HISTORY:** *In re KeySpan Corp. Sec. Litig., 2003 U.S. Dist. LEXIS 26173 (E.D.N.Y., July 30, 2003)*

**DISPOSITION:** [*1] Defendants' motion for reconsideration was granted, alleged false statements from the year 2000 were stricken from the amended complaint.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: Marc Smilow, Weiss & Yourman, New York, NY.

For Plaintiffs: S. Gene Cauley, Cauley Geller Bowman & Rudman, LLP, Little Rock, AR.

For KeySpan Corporation, Defendant: Michael Chepiga, Simpson Thacher & Bartlett LLP, New York, NY.

For Individual Defendants: Robert Higgins, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C.

**JUDGES:** Allyne R. Ross, United States District Judge.

**OPINIONBY:** Allyne R. Ross

**OPINION:**

OPINION AND ORDER

ROSS, United States District Judge:

By opinion and order dated July 30, 2003, the court denied defendants' motion to dismiss the amended complaint. See *In re KeySpan Corp. Sec. Litig., 2003 U.S. Dist. LEXIS 26173, 01 Civ. 5852 (ARR), 2003 WL 21981806,* at *18 (E.D.N.Y. July 30, 2003) ("KeySpan II"). By motion filed September 10, 2003, defendants have moved for reconsideration of this opinion pursuant to Local Civil *Rule 6.3*. For the reasons set forth below, the motion is granted.

BACKGROUND

For purposes of the instant opinion, the court assumes familiarity with its July 30 opinion and with the allegations of plaintiffs' [*2] amended class action complaint ("amended complaint," or "AC"). The court herein summarizes only those portions of the opinion and the amended complaint that are necessary to resolve defendants' motion.

The amended complaint alleges a class period dating from March 24, 2000, to July 17, 2001. Plaintiffs allege that throughout this period the individual defendants, four officers and directors of defendant KeySpan Corporation ("KeySpan," or "the Company"), made a series of false statements about KeySpan's performance and prospects. Specifically, the amended complaint alleges that the individual defendants knew of throughout the class period, yet deliberately concealed from the public, severe financial and operational problems at Roy Kay, Inc., a recently acquired subsidiary. The problems at Roy Kay allegedly belied defendants' positive reports and earnings forecasts, which misleadingly omitted the material threat Roy Kay posed to KeySpan's much-touted "growth strategy" in particular and to its financial health and reputation more generally.

In sustaining the complaint, the court rejected defendants' assertion that plaintiffs had merely pleaded "fraud by hindsight," that is, that plaintiffs [*3] had simply taken facts disclosed by defendants at the end of the class period and alleged, without sufficient factual particularity, that defendants had known these facts all along. See *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806,* at *12. The court concluded, "Plaintiffs have pleaded specific facts demonstrating that as of January 2001, defendants possessed information about major problems at one its subsidiaries; that the existence of these problems contradicted the Company's rosy public representations; and that defendants waited six months before revealing these problems to the public." *2003 U.S. Dist. LEXIS 26173,* at [WL] *15. Based on this

  

conclusion, the court held that plaintiffs not only had overcome defendants' charge of fraud by hindsight but also had established defendants' scienter. Defendants' failure to disclose information contrary to their alleged false statements, the court held, constituted "strong circumstantial evidence of conscious misbehavior or recklessness." Id. (quoting *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001)*).

Although the court denied defendants' motion to dismiss the entire complaint, the court granted defendants' motion, made in the alternative, [*4] to strike particular alleged false statements from the complaint. See *2003 U.S. Dist. LEXIS 26173*, at [WL] *17. The court struck two statements made in 2000 as inactionable general expressions of optimism, or "puffery." See id. (striking March 24, 2000 statement that defendants were "confident of increasing long-term value for our shareholders," and August 8, 2000 statement by defendant Catell that "I think we have a greater growth potential in our territory than any company in the industry"). The court rejected plaintiffs' assertion that these statements were premised on misrepresentations of existing facts, stating, "Although the amended complaint might permit an inference that defendants knew of the situation at Roy Kay at the very end of 2000, nothing in the complaint permits an inference of earlier knowledge." Id. For substantially the same reason, the court struck statements made in March 2000 as inactionable forward-looking statements within the statutory safe harbor of the *Private Securities Litigation Reform Act* ("PSLRA"). See *2003 U.S. Dist. LEXIS 26173*, at [WL] *18 ("The court agrees with defendants that ... plaintiffs have not alleged facts demonstrating [the statements'] falsity when made.").

In the instant motion, [*5] defendants argue that the foregoing findings – which limit the start date of defendants' alleged knowledge of the Roy Kay situation to January 2001 or, at the earliest, "the very end of 2000" – compel the conclusion that plaintiffs have failed to plead scienter for any statements made prior to this date. Defendants assert that the court "implicitly" found that plaintiffs had failed to plead facts demonstrating that prior to January 2001 defendants knew of or recklessly disregarded the problems at Roy Kay. Def. Mem. at 2. Accordingly, defendants ask that the court make explicit this finding and strike from the amended complaint all alleged false statements made in the year 2000. n1

n1 The statements at issue were made from March 24, 2000, to October 31, 2000.

Plaintiffs oppose the motion on three grounds. First, plaintiffs argue that it fails to satisfy the requirements of Local Civil *Rule 6.3* insofar as it allegedly does not point out any factual matter or controlling decision that the court overlooked. Second, [*6] plaintiffs argue that the motion, which effectively seeks to shorten the class period, is premature, because "questions regarding the duration of a class period are to be resolved at the class certification stage of the proceedings and not before." Pl. Mem. at 3. Finally, plaintiffs argue that the court has already rejected defendants' arguments on the merits, inasmuch as the court's opinion allegedly supports the conclusion that defendants were aware of the problems at Roy Kay "many months" before January 2001. *2003 U.S. Dist. LEXIS 26173*, at [WL] 4. Plaintiffs also point out, correctly, that the court, having found conscious misbehavior, expressly declined to rule on the adequacy of plaintiffs' motive and opportunity allegations. See *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806*, at *15 n.6. Defendants acknowledge as much, albeit in a footnote, but assert that the motive and opportunity allegations are deficient as well. Def. Mem. at 2 n.2.

DISCUSSION

I. Defendants' Motion Complies with Local Civil *Rule 6.3*

Local Civil *Rule 6.3* requires a party moving for reconsideration to "set[] forth concisely the matters or controlling decisions which counsel believes the court has overlooked." *Local Civ. R. 6.3*; [*7] see also *EEOC v. Fed. Express Corp., 268 F. Supp. 2d 192, 195 (E.D.N.Y. 2003)* (to succeed, "the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion") (citations omitted). "The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Boggs v. Die Fliedermaus, LLP, 286 F. Supp. 2d 291, 2003 U.S. Dist. LEXIS 17774, No. 99 Civ. 2451(RWS), 2003 WL 22299315*, at *3 (S.D.N.Y. Oct. 7, 2003) (citing *Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)*). The movant may not use a motion for reconsideration to rehash "arguments on issues that have been considered fully by the Court," *Boggs, 2003 U.S. Dist. LEXIS 17774, 2003 WL 22299315*, at *3 (citations and internal quotation marks omitted), nor may the movant "advance new facts, issues or arguments not previously presented to the Court." *Dietrich v. Bauer, 198 F.R.D. 397, 399 (S.D.N.Y. 2001).* [*8] In essence, "motions for reconsideration allow the district court to correct its own mistake." *Byrne v. Liquid Asphalt Sys., 250 F. Supp.*

  

2d 84, 88 (E.D.N.Y. 2003); see also *Boggs, 2003 U.S. Dist. LEXIS 17774, 2003 WL 22299315*, at *3 ("[A] motion for reconsideration may be granted to correct a clear error or prevent manifest injustice.") (citations and internal quotation marks omitted). The decision to grant or deny a motion for reconsideration lies within the sound discretion of the district court. See, e.g., *Byrne, 250 F. Supp. 2d at 88; Dietrich, 198 F.R.D. at 399*.

Plaintiffs' objections notwithstanding, defendants' motion fully complies with these requirements. Defendants neither raise new arguments nor fail to cite to matters previously raised that the court overlooked. On the contrary, defendants' motion points to issues that were clearly put before the court on the underlying motion but that the court erroneously failed to consider.

In their underlying motion, defendants argued that plaintiffs had not adequately pleaded scienter for any of the alleged misstatements in the amended complaint. Although defendants contended that scienter [*9] was lacking throughout the class period, defendants separately analyzed plaintiffs' scienter allegations in connection with the 2000 statements and the 2001 statements. Indeed, in the sections of their briefs concerning both "motive and opportunity" and "conscious misbehavior," defendants made separate pointheadings for each period. Def. Mem., 5/27/03, at 21 ("Plaintiffs Have Not Alleged ... Facts That Demonstrate Defendants Knew Or Recklessly Disregarded That KeySpan's 2000 Financial Statements Were False When Made"); id. at 23 ("Plaintiffs Do Not Allege With Particularity That Defendants Were Aware Of Or Recklessly Disregarded Facts Contradicting Their Public Statements in 2001"); id. at 16 ("The December 2000 Sales Were Not Suspicious Or Unusual"); ("The May 2001 Sales Were Not Suspicious Or Unusual"); see also Def. Reply, 6/17/03, at 7, 10, 18, 19 (similarly dividing discussion of scienter into respective 2000 and 2001 periods).

In their original motion, defendants thus squarely placed before the court the adequacy of plaintiffs' scienter allegations for each of two periods: 2000 and 2001. As mentioned, the court held that plaintiffs had adequately pleaded conscious [*10] misbehavior and therefore declined to reach the question of motive and opportunity. In reaching its conclusion, however, the court relied exclusively on facts indicating defendants' concealed knowledge "as of January 2001," *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806*, at *15, or, by inference, "at the very end of 2000." Id. at *17. The court expressly found that the amended complaint did not plead any facts suggesting that defendants knew of the problems at Roy Kay any earlier. See id. Obviously, this finding is of critical importance to the issue of whether plaintiffs have adequately alleged conscious misbehavior for the year 2000. Nevertheless, as defendants point out, the court did not address the implications of this finding. Coupled with the court's failure to address whether plaintiffs had adequately pleaded motive and opportunity for the year 2000, the court's silence on defendants' year 2000 knowledge left the opinion devoid of any holding on the question of defendants' scienter during the year 2000. Because scienter must be pleaded with respect to each false statement alleged to be actionable, this silence was error. See *Kalnit, 264 F.3d at 138* (quoting [*11] *15 U.S.C. § 78u–4(b)(2)*) ("The complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.") (emphasis added). Although tactfully framed as a request for "clarification," Def. Mem. at 1, defendants' motion, in keeping with the purpose of a motion to reconsider, calls the court's attention to this error and provides the opportunity for the court to fix it. Plaintiffs' procedural objections under Local *Rule 6.3* are therefore not well taken.

## II. Defendants' Motion Is Not Premature

Plaintiffs argue that defendants' motion, insofar as it raises "questions regarding the duration of the class period," is premature. Pl. Mem. at 3. This argument lacks merit.

While one effect of the court's granting defendants' motion would be to shorten the class period, defendants' arguments do not directly concern "the scope and duration of the class period." Id. at 3. Rather, defendants' arguments address the legal sufficiency of the complaint; as mentioned, defendants merely ask this court to decide, as indeed [*12] it must, whether each of the alleged false statements in the amended complaint is accompanied by adequate corresponding allegations of scienter. Such arguments are clearly the province of a motion to dismiss (or to reconsider an opinion on a motion to dismiss), and in fact cannot even be addressed at the class certification stage. See *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974)* ("In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of *Rule 23* are met.") (citation and internal quotation marks omitted); see also *Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982)* ("Class certification motions are not subject to the same standards as motions for dismissal for failure to state a claim or for summary judgment."); *In re Health Mgmt., Inc., Sec. Litig., 184 F.R.D. 40, 44 (E.D.N.Y. 1999)* ("This court

  

will not inquire into the merits of this case [at the class certification stage] by determining which statements ... actually opened the door to litigation [*13] and which slammed the door shut.") (citation and internal quotation marks omitted).

Defendants' motion has nothing to do with whether plaintiffs have satisfied the requirements of *Rule 23*. Instead, defendants' arguments are limited to the question of whether the amended complaint satisfies the pleading requirements of the PSLRA and *Rule 9(b)*. These arguments are properly before the court at this time, and the court rejects plaintiffs' unsupported assertion to the contrary.

## III. Plaintiffs Have Failed to Plead Defendants' Scienter during the Year 2000

Plaintiffs also oppose defendants' motion on the merits, contending that the court "has already rejected defendants' arguments." Pl. Mem. at 4. Plaintiffs construe certain passages from the court's opinion as representing an affirmative finding of scienter with respect to all of the pre-2001 statements at issue, or at least as providing support for such a finding. As explained above, however, the court did not make any explicit ruling on defendants' scienter before January 2001 (or rather, before "the very end of 2000"). Moreover, as defendants recognize, the court's finding that nothing in the amended complaint supports an [*14] inference of knowledge before the end of 2000 weighs strongly against a finding of scienter, at least under the conscious misbehavior or recklessness prong. In any event, the relevant question is not whether the court's opinion supports a finding of scienter, but whether the amended complaint does. n2 As explained below, the court finds that it does not.

> n2 Plaintiffs also assert that this court sustained the violations of ARB No. 45, which plaintiffs claim occurred "in significant part in fiscal year 2000." Pl. Mem. at 5. Although the court did sustain all of the alleged GAAP violations, see *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806*, at *15 n.5, it did not explicitly address whether any of the alleged violations in the year 2000 were committed with scienter. Because GAAP violations, without corresponding intent to defraud, are inactionable under the securities laws, see *Chill v. GE, 101 F.3d 263, 270 (2d Cir. 1996)*, the court's analysis and holding with respect to the pre-2001 false statements apply equally to the pre-2001 violations of GAAP.

[*15]

### A. Conscious Misbehavior or Recklessness

As the Second Circuit has stated, "securities fraud claims have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statement. Under the circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)*; see also *Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)* (conduct satisfies conscious misbehavior or recklessness prong where it "represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (citation and internal quotation marks omitted).

In this case, the amended complaint is devoid of allegations demonstrating, or even suggesting, that the problems at Roy Kay were either "known to the defendant[s] or so obvious that the defendant[s] must have been aware" of them throughout the year 2000. The earliest indication of any [*16] defendant's knowledge of the situation at Roy Kay is the January 25, 2001 meeting between defendant Feraudo and the principals of Roy Kay. As this court held in its July 30 opinion, Feraudo's comments at that meeting demonstrate an awareness not only of the gravity of Roy Kay's difficulties but of the threat these problems posed to KeySpan itself. See *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806*, at **12-16. Although plaintiffs are correct that some of the problems Feraudo referred to had been ongoing for many months prior to the meeting, nothing Feraudo said at that meeting suggests that he, Catell, or any of the other defendants had contemporaneous knowledge of these problems. n3 As this court explained in its opinion dismissing the first consolidated class action complaint, plaintiffs cannot demonstrate scienter merely by cataloguing the mounting problems at Roy Kay and asserting, without particularized factual support, that defendants knew or were reckless in not knowing about these problems. See *In re KeySpan Corp. Sec. Litig., 2003 U.S. Dist. LEXIS 20746, No. 01 Civ. 5852 (ARR), 2003 WL 1702279, at *24 (E.D.N.Y. Mar. 21, 2003)* ("KeySpan I") ("Although the complaint is long on details of [*17] the mounting difficulties at Roy Kay, it is short on facts suggesting that any of defendants had contemporaneous knowledge of these difficulties.").

> n3 Moreover, pleading defendants' mere knowledge of isolated problems would not be enough. That is, even assuming arguendo that the facts alleged permitted an inference that defen-





dants knew of one or more of the particular difficulties Roy Kay was having, the amended complaint would still have to show that defendants were aware that these problems presented a material threat to KeySpan. However, nothing in the amended complaint remotely suggests that during the year 2000 defendants knew enough about the situation at Roy Kay to make them aware that their publicly optimistic statements were misleading.

It is reasonable to infer that there might have been some lag time between defendants' full awareness of the problems at Roy Kay and the January 25, 2001 meeting with the Kays. The court therefore was and is willing to assume, on a motion to dismiss, that defendants [*18] might have perceived the seriousness of the Roy Kay situation "at the very end of 2000," *KeySpan II, 2003 U.S. Dist. LEXIS 26173, 2003 WL 21981806*, at *17, that is, approximately a month before the January 25 meeting. Unfortunately for plaintiffs, the statements at issue occurred well before late December 2000; as mentioned, the alleged false statements were made between March 24, 2000, and October 31, 2000. It is not a reasonable inference from the facts alleged that defendants, when issuing the October earnings reports — much less when making public statements earlier in the year — knew that their accuracy was undermined by the situation at Roy Kay. Accordingly, the court finds that plaintiffs have failed to plead "strong circumstantial evidence of consciousness misbehavior or recklessness," *Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir.2000)*(citation omitted), and therefore have failed to plead scienter on this basis.

### B. Motive and Opportunity

Even in the absence of consciousness misbehavior or recklessness, plaintiffs may establish scienter based on allegations that defendants had a motive and opportunity to commit fraud. n4 The parties do not dispute [*19] that defendants, by virtue of their positions in the Company, had such an opportunity. The question is whether plaintiffs have adequately pleaded motive.

> n4 In their submissions in connection with the instant motion, both sides merely acknowledge the possibility of pleading scienter via motive without addressing the substance of plaintiffs' pleadings in this regard. Accordingly, the court's discussion of the parties' contentions about motive is based on their briefs submitted in connection with the underlying motion.

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak, 216 F.3d at 307* (quoting *Shields v. Citytrust Bancorp., 25 F.3d 1124, 1130 (2d Cir. 1994))*. On the other hand, a plaintiff cannot base allegations of motive on generic incentives possessed by almost all corporate executives, such as "the desire to maintain a high corporate credit rating ... or otherwise to sustain [*20] the appearance of corporate profitability or of the success of an investment ..., and ... the desire to maintain a high stock price in order to increase executive compensation ... or prolong the benefits of holding corporate office." (citations and internal quotation marks omitted).

Here, plaintiffs assert that defendants had two motives to commit fraud: the desire to profit from insider stock sales and the need to maintain a high credit rating in order to facilitate the acquisition of Eastern Enterprises. Considered alone or together, these alleged motives fail to create a strong inference of defendants' intent to deceive the public in making the statements at issue.

### 1. Insider Stock Sales

The amended complaint alleges that the "magnitude and timing" of defendants' class period stock sales demonstrate defendants' fraudulent intent. AC P 152. Specifically, the amended complaint alleges that defendants sold their shares in two "tranches," in December 2000 and May 2001, AC P 148-49; that the large volume of sales was unusual, inasmuch as none of the defendants, with one minor exception, had sold any shares or exercised any options in the year prior to December 2000; and that [*21] both sets of sales took place after the individual defendants became aware of the severity of problems at Roy Kay, and after the artificial inflation of KeySpan's stock price caused by defendants' concealment of these problems.

In the context of insider trading allegations, a plaintiff sufficiently pleads motive by alleging that defendants "misrepresented corporate performance to inflate stock prices while they sold their own shares." *Kalnit, 264 F.3d at 138*. However, "'the mere fact that insider stock sales occurred does not suffice to establish scienter.'" *Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 58 (E.D.N.Y.1999)* (quoting *Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir.1996))*. For insider sales to raise an inference of improper motive, they must be "suspicious" or "unusual." See id. (collecting cases).

Much of the parties' briefing on the issue of motive focuses on the stock sales of Catell and, in particular, on the percentage of his total holdings that he sold during the class period. Plaintiffs allege that Catell sold 195,000 shares in December 2000, for proceeds

  

approaching $7 million; unlike the [*22] other defendants, he did not sell any shares in May 2001. AC PP 57, 151. Although the amended complaint alleges that Catell's sales represent "almost 90% of the shares acquired from the exercise of options and almost 75% of all of the shares he owned, including the exercised options," AC P 22, plaintiffs concede in their memorandum of law that Catell in fact sold only "25% of all combined shares (over which he had direct control) and options then exercisable." Pl. Mem., 6/10/03, at 45. Defendants demonstrate that the actual percentage is even lower, given that public records filed with the SEC reveal that Catell sold fewer shares than plaintiffs claim he did. Def. Reply, 6/26/03, at 8 (first bullet point).

Defendants, for their part, sidestep plaintiffs' allegations, which appear to be supported by the public record, that the other three individual defendants sold much larger percentages of their available holdings in December 2000. For instance, defendants apparently do not dispute that Feraudo exercised 100% of his available options in December 2000 and immediately sold all of the shares so acquired, n5 or that, given his relatively small amount of shares not held as options, this [*23] sale represented almost a complete divestment of his total holdings. AC P 27; Pl. Mem., 6/10/03, at 42; Def. Ex. 11, 13. Defendant Matthews appears to have sold close to 50% of his total shares plus exercisable options in December 2000, Def. Ex. 9, 13, and defendant Luterman's December sales appear to represent an even greater percentage of his holdings. Def. Ex. 10, 13.

> n5 In addition, plaintiffs appear to be correct in their allegation that Feraudo exercised certain options prematurely. AC P 27 n.1; Def. Ex. 11 (December 2000 Form 4).

On the other hand, as defendants point out and as this court recognized in its first opinion, defendants' collective total holdings increased during the class period, a fact that undercuts the contention that defendants were motivated to unload their shares based on negative insider information. See KeySpan I, 2003 U.S. Dist. LEXIS 20746, 2003 WL 1702279, at *21 (collecting cases). Nevertheless, the court accepts, for the purpose of analyzing defendants' motive, that the magnitude of defendants' [*24] December 2000 stock sales raises some suspicion. n6 That said, the lack of suspiciousness of the timing of the sales, and the absence of any logical connection between the sales, defendants' insider knowledge, and the alleged misstatements -- deficiencies identified by the court in the March 21 opinion, see id. 2003 U.S. Dist. LEXIS 20746, at *23 -- undermine any inference of scienter from these sales.

> n6 The May 2001 sales represented much smaller dollar amounts and percentages of defendants' total holdings at the time. In any event, given their temporal distance from the year 2000 statements at issue, these sales say nothing about defendants' state of mind in making those statements.

The last public statement at issue was the Company's third-quarter Form 10-Q, issued October 31, 2000. Defendants' December sales took place on December 12 and December 20, some six to seven weeks after this alleged false statement. As the court stated in its March 21 opinion, this lapse of time "tends to negate any inference that defendants 'sought to reap [*25] the immediate benefit a falsely positive statement had on the market.'" Id. (quoting Ressler, 75 F. Supp. 2d at 60.) n7 As the court also recognized, the December sales post-dated the earlier alleged misstatements by an even greater amount of time. Id. Moreover, the December sales pre-date the July 17, 2001 disclosure of losses from Roy Kay by seven months.

> n7 In fact, the lapse of time discussed in the March 21 opinion was even shorter, because the complaint at issue there had alleged a fraudulent statement occurring on November 9, 2000. Id.

Where the alleged insider trading occurs either well after any of the alleged false statements, or well before the public revelation of bad news -- both of which are the case here -- courts have consistently found the inference of scienter to be attenuated. See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093 (9th Cir. 2002) (finding officers' sales of, inter alia, 49%, 55%, and 74% of their respective holdings not [*26] suspicious where timing of sales did not "appear to have been calculated to maximize the personal benefit from undisclosed inside information") (citation omitted); Ressler, 75 F. Supp. 2d at 60 (no inference of fraud where sales took place "well over two weeks after [the alleged fraudulent] comments were made," and over six months prior to the negative disclosure); In re Party City Secs. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Lauber's sales took place ... twelve, four, and three months, respectively, before Party City announced its inability to complete the year-end audit ... A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."); Head v. NetManage, Inc., 1998 U.S. Dist. LEXIS 20433, No. C 97-4385 (CRB), 1998 WL 917794, at **4-5 (N. D. Cal. Dec. 30, 1998) (sales by multiple insiders, including certain defendants' sales of 76%, 94%, and 100% of their holdings, did not

  

Case 1:04-cv-00831-SLR   Document 54-8   Filed 07/20/2005   Page 8 of 18

Page 7
2003 U.S. Dist. LEXIS 20964, *26

support scienter where no sales were made in two months before negative disclosure); see also *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2002) (no inference of scienter despite seven defendants' sales of over [*27] 69% of their holdings, and an eighth defendant's sale of 98% of her holdings, where, inter alia, sales were "suspicious in amount, but not in timing").

The court's finding that the December 2000 sales do not give rise to a strong inference of scienter is reinforced by the absence of allegations supporting defendants' knowledge of the problems at Roy Kay at the time of the false statements earlier in the year. Although plaintiffs may, of course, plead motive and opportunity without a showing of conscious misbehavior, the court cannot but be influenced by the lack of any allegations supporting defendants' contemporaneous knowledge of facts contradicting the accuracy of their year 2000 statements. As the Ninth Circuit has explained,

> stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements. In this case, the class period alleged is so long, and the virtually identical allegations recycled throughout the complaint so many times, that it becomes difficult to see how particular stock sales would strengthen allegations that particular [*28] statements were uttered with deliberate recklessness at the times they were made. This fact operates to the detriment of the plaintiffs, because it is their burden under the PSLRA to provide a clear context from which we can find a strong inference of fraud.

*Vantive*, 283 F.3d at 1093.

With respect to the defendants' statements during the year 2000, all of which are alleged to be false for failing to disclose the "crisis at Roy Kay" and most of which precede the December stock sales by many months, the court finds the reasoning of this passage persuasive. In the absence of any allegations supporting an inference that defendants knew of or recklessly disregarded the severity of the situation at Roy Kay throughout the year, it is difficult to see how defendants' December sales operate retroactively to create a motive to fraudulently conceal that situation. This logic finds support in opinions from within this Circuit. See *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (finding sales that occurred before the company insider himself became aware of negative information "fail to provide any inference of an intent to deceive the public"); [*29] *Leventhal v. Tow*, 48 F. Supp. 2d 104, 114-15 (D. Conn. 1999) (finding stock sales not suspicious where, inter alia, "over 65% of the alleged irregular sales occurred prior to the first allegedly negative report presented to [defendants]"); see also *In re Health Mgmt. Sys. Sec. Litig.*, 1998 U.S. Dist. LEXIS 8061, No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) (timing not suspicious where there "was no one particular event or events that triggered the substantial sales by the defendants"). n8 In any event, even without considering defendants' lack of knowledge during the relevant period, the court concludes that the timing of the December 2000 sales is simply too arbitrary in relation to the false statements at issue and to the ultimate negative disclosure to support a strong inference of scienter.

> n8 Here, the sales occurred just before defendants' likely knowledge of the situation at Roy Kay, that is, just before "the very end of 2000." However, even if the court were to assume arguendo that the sales were made after defendants became aware of the problems at Roy Kay, this assumption would not alter the fundamental point – namely, that in the absence of any particularized allegations of earlier knowledge, the December sales say nothing about defendants' state of mind from March to October.

[*30]

### 2. Debt Issuance

Plaintiffs' allegations concerning the Fitch rating are also insufficient. The amended complaint alleges that on November 8, 2000, Fitch assigned an "A-" rating to KeySpan's $1.65 billion senior unsecured debt shelf registration. AC P 101. Plaintiffs allege that the high Fitch rating depended on Fitch's ignorance of the problems at Roy Kay, as evidenced by Fitch's express reliance on the "reported plans of the Company to continue to expand its unregulated retail energy operations through acquisitions and internal growth." AC P 102. The amended complaint alleges that this positive debt rating was "critical to KeySpan's financing of the Eastern acquisition and an additional motivating factor to conceal the operational and financial crises at the Roy Kay subsidiary that would have jeopardized the Fitch rating." AC P 103.

Defendants argue that KeySpan's alleged motive to maintain a high credit rating constitutes the sort of generic motive that courts have rejected as a matter of law. In *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d

  

Cir. 1996) the Second Circuit rejected an attempt to plead scienter [*31] based on defendants' alleged desire to "maintain[] the company's bond or credit ratings at the highest possible level, so as to maximize the marketability of the $700 million of debt securities issued in January and minimize the interest rate on those securities." *Id. at 813*. The Court held that mere allegations of "a company's desire to maintain a high bond or credit rating" did not constitute a sufficient motive because "if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Id. (quoting *Acito, 47 F.3d at 54*). n9

> n9 Defendants also assert that the probative value of the high Fitch rating is eliminated by the fact that even after the Company announced that it would take losses due to Roy Kay, the Fitch rating remained the same. Plaintiffs take issue with the introduction of the post-class period Fitch rating, as it was neither filed with the SEC nor purportedly relied on by plaintiffs in bringing their complaint. The court agrees with plaintiffs that the propriety of considering the post-class period Fitch rating is dubious. See *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (on motion to dismiss, court may consider "public disclosure documents required by law to be, and that have been, filed with the SEC ..., and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit."). More importantly, however, the court finds its probative value to be minimal. That the rating did not in fact drop upon KeySpan's disclosure of the losses from Roy Kay says nothing about defendants' state of mind before the disclosure. Theoretically, defendants could well have feared that the negative announcement would damage KeySpan's credit rating. Of course, whether the amended complaint pleads with sufficient particularity that defendants did in fact harbor such a fear, and were thereby motivated to commit fraud, is a separate matter, and one that is addressed below.

[*32]

Plaintiffs contend that "it is well-established that the flotation of company debt can support an inference of scienter." Pl. Mem., 6/10/03, at 48 n.27. n10 Plaintiffs also argue that the court should disregard *In re Emex Corp. Sec. Litig., 2002 U.S. Dist. LEXIS 17528, No. 01 Civ. 4886 (SWK), 2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002)*, which defendants cite and which purportedly established a bright-line rule that the desire to raise capital, by whatever means, can never support a finding of scienter. Though this court disagrees that Emex created such a rule, n11 the court agrees that no bright-line rule exists. As the Second Circuit recently clarified, the sufficiency of an alleged motive to raise capital depends on the circumstances of the particular case. See *Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000)* ("This Court has ruled that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter.") (citing, inter alia, *In re Time Warner. Inc. Sec. Litig., 9 F.3d 259, 271 (2d Cir. 1993)*).

> n10 As support for this proposition, plaintiffs cite solely to Ganino, in which the Second Circuit merely issued a remand to the district court to determine in the first instance whether facilitating a debt offering, among other asserted motives, amounted to a cognizable motive. *Ganino, 228 F.3d at 170*. It is thus an overstatement to say that the flotation of company debt is "well established" as a motive. In any event, as discussed below, this court agrees that, under certain circumstances, the flotation of company debt could constitute a motive to commit fraud.

[*33]

> n11 In Emex, the court held that allegations that defendants desired to increase the share price of Emex prior to two public offerings were insufficiently particularized to establish motive. *Id. 2002 U.S. Dist. LEXIS 17528 [WL]at *6*. This court reads the holding in Emex as a mere application of the general principle that "a desire to raise much needed capital," without more, will not support an inference of scienter. See id. (quoting *Glickman v. Alexander & Alexander Servs., Inc., 1996 U.S. Dist. LEXIS 2325, No. 93 Civ. 7594(LAP), 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996)*).

In Rothman, plaintiffs alleged that the defendants "would concretely benefit from an artificially inflated [company] stock price, caused by their alleged material omissions, by using less [company] stock as consideration to acquire four companies." *Id.* The Court rejected defendants' assertion that San Leandro stood for the proposition that the desire to consummate a transaction could never constitute an adequate motive, stating, "Although virtually every company may have the desire to maintain a high bond or credit rating, as [*34] *San*

  

Case 1:04-cv-00831-SLR   Document 54-8   Filed 07/20/2005   Page 10 of 18

2003 U.S. Dist. LEXIS 20964, *34   Page 9

*Leandro* reasoned, not every company has the desire to use its stock to acquire another company." *Id.* After ruling that only one of the four acquisitions constituted a viable motive for fraud, the court nevertheless upheld a finding of scienter in light of the particular facts alleged about the remaining transaction. See *id. at 93-94*. The court found that defendants' alleged manipulation of the company's expenses to inflate its stock price in order to consummate the acquisition, more than half of which was paid for with stock, "in combination with the other allegations of the Complaint, reenforce[d] the adequacy of the complaint's allegation of scienter." *Id. at 94* (emphasis added). Notably, the court had earlier held that plaintiffs had adequately pleaded recklessness. *Id. at 92*. The court reaffirmed that its holding regarding motive was highly dependent on context, stating, "Whether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context of one impending acquisition might well depend on the particular circumstances of the case, and, in any event, is not the issue before us." *Id.*; see also [*35] *In re Interpublic Sec. Litig.*, 2003 U.S. Dist. LEXIS 8844, No. 02 Civ. 6527(DLC), 2003 WL 21250682, at *11 (S.D.N.Y. May 29, 2003) ("While the simple purchase of one company by another may not ordinarily provide a sufficient allegation of a motive to commit fraud, a sustained and extensive plan to grow by acquisition, particularly through scores of acquisitions paid for with a company's stock, as alleged here, may."); *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001) (inflation of stock price in acquisitions context "may at times be sufficiently specific support for an allegation of scienter"; noting that analysis is "highly fact-intensive" and "extremely contextual").

Accordingly, the question before the court is whether defendants' asserted desire to maintain a high Fitch rating in order to finance the Eastern acquisition, in light of the particular circumstances alleged in the complaint, constitutes a sufficiently concrete motive to commit fraud. Upon careful review of plaintiffs' allegations, the court concludes that it does not.

As an initial matter, the court finds significant that the amended complaint is almost devoid of allegations about [*36] the Eastern acquisition itself. The amended complaint, unlike the previous complaint, provides no factual context for the Eastern acquisition or its importance to the Company. Even assuming such importance, however, plaintiffs have failed to provide sufficient details of the financing of the acquisition for the court to conclude that a high Fitch rating was as "critical" as plaintiffs conclusorily assert it was. AC P 103. Although the amended complaint asserts that the money raised by the long-term debt issuance would replace the short-term debt and commercial paper used to make the Eastern purchase, AC P 101, it does not plead facts to show that the high Fitch rating was crucial to the acquisition itself or even to the Company's financial health more generally. See *In re Baker Hughes Secs. Litig.*, 136 F. Supp. 2d 630, 643 (S. D. Tex. 2001) (in the absence of particularized facts, "plaintiff's simple reference to 'badly needed' or otherwise 'critical financing'" does not raise strong inference of scienter); *Glickman*, 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *12 (motive to increase capital to consummate acquisitions insufficient where plaintiff pleaded no facts "to show that [*37] the underlying fraud was in any way necessary to [the] transaction[s]"); *Portannese v. Donna Karan Int'l, Inc.*, 1998 U.S. Dist. LEXIS 22435, No. 97 Civ. 2011(CBA), 1998 WL 637547, at *21 (E.D.N.Y. Aug. 14, 1998) (alleged motive to manipulate balance sheet to maintain credit facility was insufficiently concrete because "plaintiffs stop short of asserting that [the company] would have been in peril of losing this credit facility" absent the asserted manipulation). Indeed, the allegations of the amended complaint indicate that the Eastern acquisition was a fait accompli at the time of the Fitch rating and debt issuance, and that the money thus raised would simply "replace" money already otherwise raised. AC PP 101, 155. Other than the conclusory assertion that the financing was "desperately needed," AC P 155, there is no suggestion that a lower Fitch rating would actually have threatened the deal, the Company, or the fortunes of any of the individual defendants. Without allegations detailing circumstances that made the need for the high rating a particularly keen one, no "strong" inference of fraud arises from the desire to obtain this rating.

Moreover, nothing in the amended complaint [*38] alleges that defendants even considered the Eastern acquisition or the Fitch rating when making the false statements at issue. Although plaintiffs allege that Fitch relied on the alleged misrepresentations when issuing its rating, they do not allege, and nothing in the complaint permits the inference, that defendants believed this rating to be critical to the acquisition of Eastern and were therefore motivated to make the misrepresentations. See *Glickman*, 1996 U.S. Dist. LEXIS 2335, 1996 WL 88570, at *11 ("After all, the complaint never alleges that these transactions actually motivated defendants to engage in fraudulent conduct."); *Emex*, 2002 U.S. Dist. LEXIS 17528, 2002 WL 31093612, at *6 ("Moreover, the Complaint is devoid of any allegations that defendants considered either stock offering [the benefits of which allegedly provided a motive] when issuing the April 9, press release [which was alleged to contain false statements]."). Indeed, to accept the Eastern transaction as an adequate basis for scienter, the court would

  

have to conclude that beginning in March 2000, defendants embarked on a coordinated seven-month campaign of public disinformation, culminating with the falsified third-quarter [*39] earnings reports in October 2000, in order to secure a high credit rating that would "clinch" the financing for this transaction - which, in turn, would "support[] the rise of Key Span's stock prices to levels of historic all-time highs, at which time defendants [would sell] their stock." Pl. Mem., 6/10/03, at 48. This speculative theory not only is unsupported by any specific factual allegations, but also leaves unexplained the fact that defendants allegedly continued to make false statements for a full seven months after the supposed scheme was consummated in December. Although the amended complaint alleges another debt issuance and high Fitch rating in May 2001, it is vague as to the purpose of this issuance and lacks any details to suggest that it was necessary for the realization of a particular concrete benefit. See AC P 121.

In the absence of more specific allegations connecting, logically and temporally, the alleged false statements to defendants' alleged motive, plaintiffs' scienter allegations are simply too vague and speculative to pass muster. See *Glickman, 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *11* (motive insufficient where plaintiffs failed to "point to a discrete [*40] and specific series of events flowing directly from a particular motive"); *Fant v. Perelman, 1999 U.S. Dist. LEXIS 5694, No. 97 Civ. 8435 (LAP), 1999 WL 199078, at *12 (S.D.N.Y. Apr. 9, 1999)* (no motive where "there is a factual vacuum in the complaint" between the alleged motive and the alleged fraudulent scheme) (citation omitted). As the Glickman court recognized, cases in which courts have sustained allegations of motive founded on a desire to raise capital "show a much closer relationship between the allegation of fraud and the transactions said to be the goal or purpose of the fraud." *Glickman, 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *10*; see, e.g., *Time Warner, 9 F.3d at 267-68* (finding sufficient motive both to fraudulently conceal company's active consideration of rights offering needed to pay down debt from merger, and to "hype" alternative, more attractive means of raising capital, where announcement of rights offering would lower stock price and thereby decrease its efficacy); *Interpublic, 2003 U.S. Dist. LEXIS 8844, 2003 WL.21250682*, at ** 11-12 (finding sufficient motive in "sustained multi-year program of acquisition and misstatements of financial results," where "many of these acquisitions [*41] relied on [the company's] issuing its own shares and stock-for-stock transactions"); *Complete Mgmt., 153 F. Supp. 2d at 320, 327-28* (finding sufficient motive in detailed allegations that defendants sought to record "phony" receivables to inflate stock price in order to use stock to make acquisitions that, in turn, would reduce company's dependence on the phony receivables).

In sum, the court concludes that the desire to maintain a high credit rating to finance debt incurred by the Eastern acquisition, while not wholly generic, is not alleged with sufficient particularity to raise a strong inference of scienter. Even when defendants' stock sales a month after the first Fitch rating are also considered, the facts as alleged in the complaint fail to present a clear context from which it can be inferred that defendants were motivated to make false statements from March to October of 2000. For these reasons, plaintiffs have failed to satisfy the scienter requirement with respect to any of the alleged false statements made during this period. n12

> n12 As indicated above, this holding also applies to the alleged violations of GAAP during the year 2000.

[*42]

## CONCLUSION

For the foregoing reasons, defendants' motion is granted, and the alleged false statements from the year 2000 are hereby stricken from the amended complaint.

SO ORDERED.

Allyne R. Ross

United States District Judge

Dated: November 21, 2003

  

# EXHIBIT I

Westlaw.

Slip Copy
2005 WL 1386448 (6th Cir.(Mich.))
(Cite as: 2005 WL 1386448 (6th Cir.(Mich.)))

Page 1

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)

United States Court of Appeals,
Sixth Circuit.
D.E. & J. LIMITED PARTNERSHIP, Individually, and on behalf of All Others
Similarly Situated, Plaintiffs-Appellants,
v.
Charles CONAWAY, Jeffrey Boyer, Mark S. Schwartz, Matthew F. Hilzinger, Martin E. Welch and PricewaterhouseCoopers LLP, Defendants-Appellees.
Nos. 03-2334, 03-2417.

June 10, 2005.

**Background:** Investors brought putative securities fraud class actions against bankrupt company's senior executive officers and its outside auditor. Actions were consolidated. The United States District Court for the Eastern District of Michigan, 284 F.Supp.2d 719, Rosen, J., granted defendants' motions to dismiss, and investors appealed.

**Holdings:** The Court of Appeals, Sutton, Circuit Judge, held that:
(1) investors failed to state loss causation element of fraud claim, and
(2) District Court did not abuse its discretion by denying request to amend complaint that was made informally in brief.

Affirmed.

[1] Securities Regulation 60.47

349Bk60.47 Most Cited Cases
Investors failed to state loss causation element of their securities fraud claim against corporation's officers and auditor by alleging only that they had paid artificially inflated prices for corporation's publicly traded securities; complaint did not plead that alleged fraud became known on any particular day, did not estimate damages alleged fraud had caused, and did not connect alleged fraud with ultimate disclosure and loss, other than in boilerplate language. Securities Exchange Act of 1934, as amended, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(4); 17 C.F.R. § 240.10b-5.

[2] Federal Civil Procedure 851
170Ak851 Most Cited Cases
District court hearing securities fraud action did not abuse its discretion by denying request to amend complaint that was made informally in brief in opposition to motion to dismiss, especially since plaintiff previously had been given two opportunities to amend complaint. U.S.Dist.Ct.Rules E.D.Mich., Local Rule 15.1.
On Appeal from the United States District Court for the Eastern District of Michigan.

Sanford P. Dumain, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Plaintiff-Appelee.

Marc L. Newman, Miller Shea, Rochester, MI, Scott R. Lassar, Hille R. Sheppard, Erin E. Kelly, Walter C. Carlson, Sidley, Austin, Brown & Wood, David H. Kistenbroker, Pamela G. Smith, Carl E. Volz, Katten, Muchin & Zavis, Emily Nicklin, John F. Hartmann, James J. Boland, Paul J. Ferak, Kirkland & Ellis, Chicago, IL, Martin L. Perschetz, Matthew L. Craner, Schulte Roth & Zabel, Brian Rosner, Tiffany E. Cale, Natalie A. Napierala, Heather J. Haase, Rosner Moscow & Napierala, New York, NY, Jonathan T. Walton, Jr., Walton & Donnelly, Dennis J. Levasseur, Bodman, Longley & Dahling, Detroit, MI, Thomas J. Tallerico, Bodman, Longley & Dahling, Troy, MI, for Defendants-Appellees.

Before KENNEDY, DAUGHTREY, and SUTTON, Circuit Judges.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SUTTON, Circuit Judge.

*1 On January 22, 2002, Kmart Corporation, one of the most familiar brands in discount retailing and one of the largest--operating through approximately 1,900 stores with approximately 234,000 employees--filed for bankruptcy. Kmart's bankruptcy announcement was followed by a predictable drop in its stock price, by the restatement of some of its interim financial reports and by this securities fraud lawsuit.

On February 21, 2002, D.E. & J. Limited Partnership filed this lawsuit on behalf of a class of Kmart stockholders who purchased their stock from March 13, 2001, to May 15, 2002, against several of Kmart's senior executives and its auditor, PricewaterhouseCoopers (PwC). The district court dismissed D.E. & J.'s complaint with prejudice for failing to meet the pleading standards of the Private Securities Litigation Reform Act (PSLRA). As the plaintiffs have failed adequately to plead "loss causation" under 15 U.S.C. § 78u-4(b)(4) and *Dura Pharmaceuticals, Inc. v. Broudo*, --- U.S. ----, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), we affirm.

I.

Kmart is a Delaware Corporation. Its principal place of business is Troy, Michigan, where it was first incorporated as the successor to the business developed by its founder, S.S. Kresge.

In May of 2000, Kmart hired Charles Conaway and gave him a mandate to revitalize the discount-retail chain. During his tenure as Kmart's Chairman and Chief Executive Officer from May 2000 until his resignation in March of 2002, Conaway replaced much of Kmart's existing management. Two of the individual defendants in this case were among the officers that Conaway hired or promoted during this period: Mark Schwartz, who was Kmart's President and Chief Operating Officer from March 14, 2001, until November 9, 2001; and Jeffrey Boyer, who was Kmart's Chief Financial Officer from May 4, 2001, until November 9, 2001. The other two named individual defendants were among those officers whom Conaway replaced at the very beginning of the class period: Matthew Hilzinger, who was Kmart's Vice President and Controller until July 2001; and Martin Welch, who was Kmart's Executive Vice President and Chief Financial Officer until May of 2001.

In order to compete more effectively with Kmart's two principal rivals, Wal-Mart Stores and Target Corporation, Conaway implemented several projects intended to strengthen Kmart's inventory controls, customer service and price competitiveness. These initiatives achieved initial success, with Kmart reporting improved sales and gross margins and an improving inventory situation. The price of Kmart stock, as a result, rose from $9.19 per share on March 13, 2001, to $13.16 per share on August 7, 2001, an increase of 43% at a time when the stock market was generally stagnant or declining.

Kmart's brief financial success during this period, D.E. & J. alleges, was the result of accounting fraud. According to D.E. & J., senior executives at Kmart represented that Kmart was experiencing a financial turnaround while concealing the extent of Kmart's financial difficulties in several ways. First, Kmart allegedly tried to mask losses by using interim financial statements that reported rebates that it hoped to earn from its vendors at the end of the year. By reporting vendor rebates as a reduction of expenses in interim statements and by basing its interim statements on aggressive forecasts, Kmart ran the risk that it would not ultimately obtain all of the rebates and that its interim statements would reflect unrealistically high projections of future sales. Second, Kmart's outdated internal control system failed to track and monitor inventory effectively, (1) reporting an item as "in-stock" even if the company had only one piece of inventory, (2) causing stores to accumulate obsolete merchandise and (3) ultimately misstating inventory ledgers. Third, Kmart's aggressive efforts to obtain discounts and other benefits from its vendors damaged the company's long-term relationships with its vendors. Fourth, Kmart's expansion of its "Bluelight Special" discount program to a "Bluelight Always" program failed, because the company's competitors responded by cutting their prices as well. JA 0140.

*2 By late 2001, whether as a result of fraud or not, it was clear that Conaway's initiatives were not succeeding. In October of 2001, the company disclosed that its sales had been flat during September, and in November and December the company disclosed a decline in sales.

On January 22, 2002, Kmart filed for bankruptcy. In a press release, the company attributed its bankruptcy filing to a "combination of factors, including a rapid decline in its liquidity resulting from Kmart's below-plan sales and earnings performance in the fourth quarter." JA 0155. The price of Kmart's stock subsequently dropped from $1.74 to $0.70 per share.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On January 25, 2002, Kmart disclosed that it had received an anonymous "whistleblower" letter expressing serious concerns about the Company's accounting methods and financial results. The anonymous author of the letter stated that he or she had "kept copies of transactions [he or she] consider[ed] to be inaccurate" and "recorded conversations during which distortions and misstatement[s] of records were discussed." JA 0128. The letter directly implicated Schwartz and PwC. See JA 0128 (reporting that Schwartz told a "superior to not be surprised if Kmart shares were trading at four or five dollars per share by the end of the year"); id. ("Resident auditors from PricewaterhouseCoopers are hesitant to pursue these issues or even question obvious changes in revenue and expense patterns."). Kmart announced that it would conduct an internal investigation to look into the allegations. Three similar letters followed.

On February 21, 2002, D.E. & J. brought this securities fraud lawsuit on behalf of purchasers of Kmart securities between May 17, 2001, and January 22, 2002. The lawsuit initially named only Conaway as a defendant.

On May 15, 2002, Kmart, in its Form 10-K disclosure for fiscal year 2001, reported a loss of $2.42 billion for the year. In addition to adjusting for a single vendor transaction in 2001 and moving a $167 million loss contingency from the fourth quarter to the third quarter (matters not at issue here), Kmart announced that, due to the bankruptcy and resulting inability to estimate vendor purchases and associated allowances, it had changed its policy of estimating and recording vendor allowances on an interim basis. It then restated its financial statements to lower its vendor rebates for the first three quarters of fiscal year 2001 (which until then had not been audited) by $311, $211 and $32 million respectively. In the disclosure, Kmart attributed its bankruptcy filing to a "rapid decline in our liquidity resulting from our below-plan sales and earnings performance in the fourth quarter, the evaporation of the surety bond market and erosion of supplier confidence," and stated that "[o]ther factors includ[ing] intense competition in the discount retailing industry, unsuccessful sales and marketing initiatives, the continuing recession, and recent capital market volatility" played a role as well. JA 0205. Following this announcement, Kmart's common stock dropped five cents, from $1.22 to $1.17 per share.

*3 On June 14, 2002, Kmart announced a $1.45 billion loss during the first fiscal quarter of 2002. The company recorded a charge of $758 million to "write-down inventory in 283 stores that were closed in May and June, and inventory transferred from the remaining stores to the closing stores." JA 0158.

On August 15, 2002, D.E. & J. filed an amended complaint naming Boyer, Schwartz, Hilzinger, Welch and PwC as defendants; attaching the whistleblower letters; and expanding the class period to March 13, 2001, through May 15, 2002, five months longer than the period in the original complaint. On November 1, 2002, D.E. & J. filed its "corrected consolidated amended complaint," declaring that its counsel had conducted interviews with "[f]ormer employees of Kmart, who worked at the Company during the relevant time" and "[f]ormer employees of certain vendors of Kmart," both of whom, the complaint claimed, were "knowledgeable with respect to the matters referred to herein." JA 0125-- 26. Any remaining information, the complaint continued, was "within the possession and control of defendants and other Kmart insiders, thus preventing plaintiffs from further detailing defendants' misconduct at this time." JA 0126. The complaint reiterated the expanded class period of March 13, 2001, to May 15, 2002.

On September 19, 2003, the district court dismissed all of the claims with prejudice. In doing so, it determined that D.E. & J. had failed to meet the PSLRA's pleading requirements for scienter and misrepresentation for all defendants except Conaway and Schwartz. The court dismissed the complaint in its entirety, however, because D.E. & J. had failed to plead the necessary element of "loss causation" for any of its allegations. Because D.E. & J. had failed to plead primary violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), by any of the defendants, the district court also found that it had failed to plead that they were "controlling persons" liable under § 20(a) of the Act, 15 U.S.C. § 78t(a). And the district court denied D.E. & J. leave to amend its complaint, first and foremost because, instead of filing a motion for leave to amend, it had merely requested in its brief that "if the Court concludes that any aspect of plaintiffs' claims are inadequately pled ... [the plaintiffs] be granted leave to replead and cure any deficiencies." D. Ct. Op. at 58.

II.

D.E. & J. appeals the dismissal of its § 10(b) claims against all parties save for Boyer, Hilzinger and Welch and appeals the dismissal of its § 20(a) claims against all parties. We review the district court's dismissal of the complaint de novo. Helwig v.

*Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir.2001).

A.

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment]" of any "deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Promulgated under this statute by the Securities and Exchange Commission, Rule 10b-5 forbids the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5(b).

*4 On the basis of this statute and this rule, individuals may bring a private damages action resembling the common-law tort actions for deceit and misrepresentation. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). With the passage of the PSLRA, however, Congress has imposed additional statutory requirements on this private action, including the heightened pleading requirements that a plaintiff (1) specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).

Under § 78u-4(b)(4) of the PSLRA, private plaintiffs also must prove that a defendant's securities fraud caused their economic loss. In relevant part, the statute says the following:

> Loss causation. In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.
> 15 U.S.C. § 78u-4(b)(4).

Construing this causation provision, *Dura Pharmaceuticals v. Broudo* recently held that a plaintiff could not satisfy it merely by alleging (and later establishing) that the price of the security on the date of the purchase was inflated because of the misrepresentation. 125 S.Ct. at 1631. In *Dura*, the plaintiff represented a class of individuals who bought stock in Dura Pharmaceuticals on the public market between April 15, 1997, and February 24, 1998. *See id.* at 1629. During that period, the plaintiffs alleged, Dura (or its officials) made false statements concerning its profits and the prospects for future approval by the Food and Drug Administration (FDA) of its products. Upon disclosure of the news on February 24, 1998, that its earnings would be lower than previously expected (principally due to slow drug sales), Dura's shares lost almost half of their value, falling from $39 per share to about $21 per share. *See id.* at 1630. In November of 1998, Dura announced that the FDA would not approve its new product, prompting a further drop in its share price. *See id.* The plaintiffs argued that, "[i]n reliance on the integrity of the market, [they] ... paid artificially inflated prices for Dura securities and ... suffered damage[s] thereby." *Id.* (quotations and emphasis omitted).

This type of allegation, the Supreme Court concluded, did not adequately plead loss causation under the PSLRA. Because a purchaser may sell the "shares quickly before the relevant truth begins to leak out," *id.* at 1631, a seller's misrepresentation (and its associated inflated price) does not inevitably lead to a loss, but rather *"might* mean a later loss," *id.* at 1632. Even if the purchaser later resells those shares at a lower price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* "[A]t the moment the transaction takes place," therefore, "the plaintiff has suffered no loss," *id.* at 1631, and the most that can be said "is that the higher purchase price will *sometimes* play a role in bringing about a future loss," *id.* at 1632.

*5 Drawing on this insight and on the observation that securities-fraud actions resemble common-law fraud actions that have long required a showing that an individual suffered actual economic loss, the Court held that private securities-fraud plaintiffs may recover damages only when they "adequately allege and prove the traditional elements of causation and loss." *Id.* at 1633. And although the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed.R.Civ.P. 8(a)(2), the mere allegation that the plaintiff class purchased their shares at an artificially inflated price did not serve to place the defendants on "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 1634 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The *Dura* complaint (1) failed "to claim that Dura's share

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1386448 (6th Cir.(Mich.))
(Cite as: 2005 WL 1386448 (6th Cir.(Mich.)))

Page 5

price fell significantly after the truth became known," (2) failed to specify "the relevant economic loss," and (3) failed to describe "the causal connection ... between [the] loss and the misrepresentation." *Id.* Without the requirement that a plaintiff "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," the Court concluded, the securities laws would become nothing more than "a partial downside insurance policy." *Id.*

[1] D.E. & J.'s complaint here does not differ in any material respect from Broudo's. Like Broudo, D.E. & J. did not plead that the alleged fraud became known to the market on any particular day, did not estimate the damages that the alleged fraud caused, and did not connect the alleged fraud with the ultimate disclosure and loss. Rather, the heart of D.E. & J.'s causation theory looks remarkably like Broudo's allegations in his complaint:

> Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they *paid artificially inflated prices* for Kmart publicly traded securities. Plaintiffs and the Class would not have purchased Kmart publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.
> As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Kmart publicly traded securities during the class period.

JA 0189--90 (emphasis added). The recitation of D.E. & J.'s belief that the "defendants' wrongful conduct" "direct[ly] and proximate[ly]" caused the plaintiffs' losses does not change matters. For if these allegations would suffice here, the mere inclusion of boilerplate language would suffice everywhere and would defeat the requirement that a plaintiff explain how the loss occurred.

In D.E. & J.'s view, two other facets of this case distinguish it from the pleading failings that doomed the complaint in *Dura.* First, D.E. & J. claims that the complaint's observation that the price of Kmart stock dropped from $1.74 per share to $0.70 per share on January 22, 2002, following the company's disclosure that it had filed for reorganization under Chapter 11, suffices to plead that Kmart caused the investors' losses. *See* JA 0155. And second, D.E. & J. asserts that its observation on appeal that "Kmart's stock did drop more than 4%" on the day that Kmart announced its restatements (May 15, 2002) suffices to meet the statutory requirement. *See* D.E. & J. Br. at 36--37; *id.* at 28 ("[T]he price of Kmart's stock *did decline* after the Company announced its massive restatement.").

*6 Neither of these observations (one in the complaint, the other on appeal) "provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between the loss and the misrepresentation." *Dura,* 125 S.Ct. at 1634. As to the bankruptcy filing, D.E. & J. never alleged that Kmart's bankruptcy announcement disclosed any prior misrepresentations to the market. *See* JA 0155 (observing only that "[a]ccording to [Kmart's] press release, the Company's decision to seek 'judicial reorganization' was based on a 'combination of factors, including a rapid decline in its liquidity resulting from Kmart's below-plan sales and earnings performance in the fourth quarter" ' and that "[f]ollowing this announcement, the price of Kmart common stock dropped"). And, of course, the filing of a bankruptcy petition by itself does not a security fraud allegation make. *Cf. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n. 4 (2d Cir.2005)* (explaining that defendant Merrill Lynch's downgrades in its stock recommendations--from "accumulate" to "neutral" and from "buy" to "accumulate"--did "not amount to a corrective disclosure ... because they do not reveal to the market the falsity of the prior recommendations"). Here, D.E. & J. has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop. But the observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.

As to the stock price drop following Kmart's restatements, D.E. & J. never mentioned in its complaint the five cent drop in Kmart's stock prices on May 15, 2002, the day Kmart announced its restatements. By failing even to note that Kmart's stock dropped in price after the company restated its financial records and by failing to present this argument to the district court, D.E. & J. simply never pleaded that the defendants' alleged misrepresentations caused economic losses on May 15, 2002. Ultimately, as in *Dura,* D.E. & J. has said "the following (and nothing significantly more than the following) about economic losses attributable to the ... misstatement," 125 S.Ct. at 1630: "Plaintiffs and the Class have suffered damages in that, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1386448 (6th Cir.(Mich.))
(Cite as: 2005 WL 1386448 (6th Cir.(Mich.)))

Page 6

reliance on the integrity of the market, they paid artificially inflated prices for Kmart publicly traded securities." JA 0189. And ultimately, as in *Dura,* that pleading does not satisfy the PSLRA's loss causation requirement.

B.

D.E. & J. also seeks to hold each of the individual defendants liable as "controlling persons" of Kmart under § 20(a) of the Exchange Act. That provision extends liability to

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

*7 15 U.S.C. § 78t(a); *see also* 17 C.F.R. § 240.12b-2 (defining "control" as "the power to direct or cause the direction of the management and policies of a [company], whether through the ownership of voting securities, by contract, or otherwise").

Because "controlling person" liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act. D.E. & J. has not charged Kmart with a violation of the Securities Act, and accordingly it may not bring a claim for recovery under this theory. *See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 696--98 (6th Cir.2004); In re Comshare Inc. Sec. Litig., 183 F.3d 542, 554 n. 11 (6th Cir.1999); Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983).* The district court properly rejected this claim on the pleadings.

III.

[2] Lastly, we do not believe that the district court abused its discretion in denying D.E. & J. an opportunity to file what would have amounted to a fourth complaint. *See Miller v. Champion Enters., Inc., 346 F.3d 660, 671 (6th Cir.2003); Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 306 (6th Cir.2000).* D.E. & J. did not file a formal motion for leave to amend in this case and did not submit a proposed amended complaint to the district court, in contravention of local rules. *See* E.D. Mich. Local R. 15.1 ("A party who moves to amend a pleading shall attach the proposed amended pleading to the motion."). The sole way in which D.E. & J. indicated that it wished to amend its complaint was by "request[ing], almost as an aside in their brief opposing Defendants' motions to dismiss, that 'if the Court concludes that any aspect of the plaintiffs' claims are inadequately pled ... that they be granted leave to replead and cure any deficiencies identified by the Court.' " D. Ct. Op. at 58. *See* JA 0847 (requesting "an opportunity to amend" the complaint "if the Court deems the claims [ ] insufficiently pleaded"). The district court did not abuse its discretion in choosing not to credit this statement in a brief as a motion to amend where D.E. & J. previously had been given two opportunities to amend its complaint. *See PR Diamonds, 364 F.3d at 698--700* (upholding the district court's denial of leave to amend where the plaintiffs made the following request in a brief opposing the defendants' motions to dismiss: "Alternatively, in the event the Court grants any part of the Defendants' motions to dismiss, plaintiffs respectfully request leave to amend their Complaint"); *Begala v. PNC Bank, Ohio, Nat'l Ass'n, 214 F.3d 776, 784 (6th Cir.2000)* (affirming denial of leave to amend because "[w]hat plaintiffs may have stated, almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is [ ] not a motion to amend"); *see also id.* (plaintiffs cannot expect "an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies") (emphasis omitted); *Parry, 236 F.3d at 306* ("[A] party requesting leave to amend must 'act with due diligence if it wants to take advantage of the Rule's liberality.' ") (quotations and citation omitted).

IV.
*8 For these reasons, we affirm.

2005 WL 1386448 (6th Cir.(Mich.))

**Briefs and Other Related Documents** (Back to top)

• _____03-2417_____ (Docket) (Nov. 05, 2003)

• _____03-2334_____ (Docket) (Oct. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.