# EXHIBIT K

Westlaw.

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: INITIAL PUBLIC OFFERING SECURITIES
LITIGATION
Amy LIU, Robert Tenney, Robert Tate, Mary
Gorton, Carla Kelly, Henry
Ciesielski, Ed Grier, Frank Turk, Jennie Papuzza,
Stanley Warren, Ellen
Dulberger, Craig Mason, and Sharon Brewer,
Plaintiffs,
v.
CREDIT SUISSE FIRST BOSTON CORP., Credit
Suisse First Boston (USA), Inc.,
Credit Suisse First Boston, Credit Suisse Group,
Efficient Networks, Inc.,
eMachines, Inc., Lightspan Partnership, Inc., Tanning
Technology Corp., and
Tumbleweed Communications Corp., Defendants.
No. MDL 1554(SAS), 21 MC 92(SAS).

June 28, 2005.

John G. Watts, Yearout & Traylor, P.C.,
Birmingham, AL, for Plaintiffs.

Kristin Linsey Myles, Robert L. Dell Angelo,
Munger, Tolles & Olson LLP, San Francisco, CA,
Michael L. Hirschfeld, John A. Boyle, Milbank,
Tweed, Hadley & McCloy LLP, New York, NY,
Randall J. Clement, Sheppard, Mullin, Richter &
Hampton LLP, Costa Mesa, CA, Mitchell E. Herr,
Holland & Knight LLP, Miami, FL, for Issuer
Defendants.

Peter K. Vigeland, Robert W. Trenchard, Wilmer,
Cutler & Pickering, New York, NY, for CSFB
Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 This document relates to:

I. INTRODUCTION

In an Opinion and Order dated April 1, 2005, this Court dismissed plaintiffs' claims in this action, No. 04 Civ. 3757, in their entirety. [FN1] Plaintiffs moved for reconsideration. On May 13, 2005, I granted plaintiffs' motion in part, but reaffirmed the dismissal of plaintiffs' claims because plaintiffs had failed to plead loss causation. [FN2] Plaintiffs now move for reconsideration of the May 13 Opinion. [FN3]

> FN1. See *In re Initial Public Offering Sec. Litig.* ("In re IPO"), No. 21 MC 92, 2005 WL 743550 (S.D.N.Y. Apr. 1, 2005) ("*Liu II*").

> FN2. See *In re IPO*, No. 21 MC 92, 2005 WL 1162445 (S.D.N.Y. May 13, 2005) ("*Liu Reconsideration*").

> FN3. See Plaintiffs' Memorandum in Support of the Rule 59(e) Motion to Alter, Amend, or Vacate the Order of May 13, 2005, Dismissing the Plaintiffs' Complaint ("2d Reconsideration Mem."). As they did in their first motion for reconsideration, plaintiffs have styled their motion under 59(e) rather than Local Rule 6.3. As I noted in my May 13 Opinion, there is no difference between the two. See *Liu Reconsideration*, 2005 WL 1162445, at *1.

II. LEGAL STANDARD

A motion for reconsideration is governed by Local Rule 6.3 and is appropriate where a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court." [FN4] Alternatively, a motion for reconsideration may be granted to "correct a clear error or prevent manifest injustice." [FN5] Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." [FN6]

> FN4. *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390, 392 (S.D.N.Y.2000) (quotation marks and citation omitted). See also *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

Page 2

Cir.1995) ("The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.").

FN5. *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.1983).

FN6. *In re Health Mgmt. Sys., Inc. Sec. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000).

Local Rule 6.3 should be "narrowly construed and strictly applied" to avoid repetitive arguments on issues that have been considered fully by the Court. [FN7] A motion for reconsideration "is not a substitute for appeal;" [FN8] nor is it "a 'second bite at the apple' for a party dissatisfied with a court's ruling." [FN9] Courts have repeatedly been forced to warn counsel that such motions should not be made reflexively, "to reargue those issues already considered when a party does not like the way the original motion was resolved." [FN10] A motion under Local Rule 6.3 "shall be served within ten (10) days after the entry of the court's order determining the original motion." [FN11]

FN7. *Greenes v. Vijax Fuel Corp.,* No. 02 Civ. 450, 2004 WL 1516804, at *1 (S.D.N.Y. July 7, 2004).

FN8. *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 207 F.Supp.2d 292, 296 (S.D.N.Y.2002) (quotation omitted).

FN9. *Pannonia Farms, Inc. v. USA Cable,* No. 03 Civ. 7841, 2004 WL 1794504, at *2 (S.D.N.Y. Aug. 10, 2004).

FN10. *Houbigant, Inc. v. ACB Mercantile,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

FN11. S.D.N.Y. Local Rule 6.3. *See also* Fed.R.Civ.P. 59(e) (same).

On April 19, 2005, in *Dura Pharmaceuticals, Inc. v. Broudo,* [FN12] the Supreme Court rejected the Ninth Circuit's permissive pleading standard for loss causation, which required only that a plaintiff allege that she had bought a security at an artificially inflated price. [FN13] The Court noted that "it should

not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid." [FN14] *Dura* did not establish what *would* be a sufficient loss causation pleading standard; it merely established what was *not.* However, *Dura* cited the stricter standards of the Second, Third, Seventh and Eleventh Circuits' standards as those with whom "the Ninth Circuit's views about loss causation differ." [FN15] The Court did not explicitly modify the stricter standards of those Circuits when it rejected the Ninth Circuit's lenient standard; accordingly, *Dura* did not disturb Second Circuit precedent regarding loss causation.

FN12. 125 S.Ct. 1627, 1630 (2005).

FN13. *See Broudo v. Dura Pharms., Inc.,* 339 F.3d 933, 938 (9th Cir.2003).

FN14. *Dura,* 125 S.Ct. at 1634.

FN15. *Id.* at 1630 (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 198 (2d Cir.2003)).

### III. PLAINTIFFS' ARGUMENT

*2 Plaintiffs' second motion for reconsideration focuses on the Court's May 13 decision that plaintiffs had not adequately pled loss causation. [FN16] Essentially, plaintiffs contend that the Court misconstrued the relevant legal standard for loss causation, as articulated in the Second Circuit's decision in *Lentell v. Merrill Lynch & Co., Inc.* [FN17] In the May 13 Order, I noted that:

FN16. Plaintiffs also quibble with the Court's description of the alleged scheme, devoting four pages to the proposition that "the artificial inflation occurred *before* the actual results were announced to have beaten the preexisting estimates." 2d Reconsideration Mem. at 8. Because plaintiffs have not sufficiently alleged that the alleged scheme caused their losses, the exact timing of the alleged artificial inflation is irrelevant. Moreover, to the extent that plaintiffs now raise questions of transaction causation that were addressed in my April 1,

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

2005 Order, the ten-day deadline for reconsideration motions has expired. *See* S.D.N.Y. Local Rule 6.3; Fed.R.Civ.P. 59(e).

FN17. 396 F.3d 161 (2d Cir.2005).

in material misstatement and omission cases, a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event. Moreover, to establish loss causation, a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. [FN18]

FN18. *Liu Reconsideration,* 2005 WL 1162445, at *3 (footnotes and quotation marks omitted).

Plaintiffs contend that *Lentell* simply requires "that the Plaintiffs' Complaint alleges facts to support that the misstatements or omissions were the 'proximate cause' ... of the investment loss." [FN19] Plaintiffs contend that, under *Lentell,* " 'proximate cause' is construed broadly, except that it logically requires that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." [FN20] Plaintiffs argue that the corrective disclosure requirement of *Lentell* was in fact just one of several possible ways for plaintiffs to allege loss causation, and that plaintiffs' failure to allege any corrective disclosures has no effect on any of the other methods by which plaintiffs may adequately plead loss causation. [FN21]

FN19. 2d Reconsideration Mem. at 5.

FN20. *Id.*

FN21. *See id.* at 5-6 (summarizing plaintiffs' apprehension of the *Lentell* test as follows: "[1] was the subject of those 'misstatements and omissions' the cause of the decline in stock values that Plaintiffs claim as their loss? or [2] was there any corrective disclosure regarding the falsity of those 'misstatements and omissions' so as to cause [ ] the decline in stock values that Plaintiffs claim as their loss?[ ] or [3] have Plaintiffs alleged that the Defendants concealed or misstated any risks associated with an

investment in those securities, some of which presumably caused Plaintiffs' losses?") (bracketed numbers in original).

Plaintiffs' confusion is understandable. As the Second Circuit noted in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* the Circuit has produced "somewhat inconsistent precedents on loss causation." [FN22] Indeed, although the Circuit has issued several opinions dealing with loss causation in the last few years, the standard remains ambiguous. [FN23]

FN22. 250 F.3d 87, 98 n. 1 (2d Cir.2001).

FN23. *See Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 187 ("While loss causation is easily defined, its application to particular facts has often been challenging."); *Emergent Capital,* 343 F.3d at 198 (including a section entitled *"Suez Equity* Clarified"); *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) ("acknowledg [ing] that [the] opinion in *Suez Equity* can be (mis-)read").

## IV. DISCUSSION

A. Reconciling the Second Circuit's Loss Causation Standard

The Circuit's most recent decision on loss causation, *Lentell v.. Merrill Lynch,* notes that "we follow the holdings of [three earlier Second Circuit cases,] *Emergent Capital, Castellano* and *Suez Equity." [FN24] Lentell'* s loss causation standard, though, is difficult to parse. To begin, *Lentell* holds that:

FN24. *Lentell,* 396 F.3d at 174.

Thus to establish loss causation, "a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable. [FN25]

FN25. *Id.* at 173 (quoting *Suez Equity,* 250 F.3d at 95) (emphasis in *Lentell* ).

But *Lentell'* s full discussion of loss causation spans several pages, at times asserting different formulations of the loss causation standard. For

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

example, the *Lentell* decision later posits that "[t]his Court's cases--post-*Suez* and pre-*Suez*--require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." [FN26] On the next page of the decision, the court continues to reformulate its standard, noting that "our precedents make clear that loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant. If that relationship is sufficiently direct, loss causation is established...." [FN27] Finally, *Lentell* also states the loss causation standard in the negative: "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality." [FN28]

> FN26. *Lentell,* 396 F.3d at 173.

> FN27. *Id.* at 174 (citations omitted).

> FN28. *Id.* (quotation marks and citations omitted).

*3 Thus, over time, the Second Circuit has advanced several different standards for pleading loss causation, including "direct causation," [FN29] "materialization of risk," [FN30] and "corrective disclosure," [FN31] all of which are referenced in *Lentell.* However, a close look at the recent discussion of loss causation by the Second Circuit reveals that the loss causation pleading standard, although murky, is not internally inconsistent.

> FN29. *See id.* at 174 ("If that relationship [between 'the plaintiff's investment loss and the information misstated'] is sufficiently direct, loss causation is established...."). *See also Suez Equity,* 250 F.3d at 98 n. 1 (construing *First Nationwide Bank v. Gelt Funding Co.,* 27 F.3d 763, 769-70 (2d Cir.1994) as "relying on 'direct causation' analysis for loss causation"). In *First Nationwide,* a RICO case involving allegations that lenders were fraudulently induced to make nonrecourse loans for the purchase of real estate, the Circuit dismissed a complaint for a number of reasons, including: (1) plaintiff had not adequately pled materiality; (2) intervening factors (including a market-wide downturn in real estate prices) likely caused plaintiff's losses; and (3) five years had elapsed between the alleged misrepresentations and the losses

suffered. *See First Nationwide,* 27 F.3d at 772 (noting that "[h]ere, no social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through loan applications with a fine-tooth comb in the hope of uncovering a misrepresentation.") (quotation marks, citation and alteration omitted).

> FN30. *See Lentell,* 396 F.3d at 173 (requiring "that the loss be caused by the materialization of the concealed risk"). *See also Suez Equity,* 250 F.3d at 98 n. 1 (calling the Seventh Circuit's "materialization of risk" standard--which involves "inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud"-- "both principled and predictable," but noting that the Second Circuit is "not writing on a blank slate, and believe[s] that the approach here articulated best reconciles our precedents to date.").

> FN31. *See Lentell,* 396 F.3d at 175 n. 4 (finding that, because plaintiffs alleged no corrective disclosures, they could not establish loss causation).

Part of the problem lies in the continued expansion of the definition of "securities fraud." Some unlawful activities, such as "jaywalking," have clearly defined limits and comprise a limited range of human behavior. Securities fraud, by contrast, encompasses many distinct types of fraudulent activities, each of which causes harm in different ways. For example, a broker may "churn" a client's investments--*i.e.,* make excessive trades to generate broker commissions--and harm the client by generating large commissions. [FN32] A broker may assure a client that the broker will only make "safe" investments, and then spend the client's money on extremely risky securities, which lose value; in such cases, the client is harmed when the concealed risk-- the volatility of the actual investments--lowers the value of her portfolio. [FN33] A manipulative potential partner may fraudulently persuade a sole proprietor to issue shares in a closely held company, and then dismantle the company or force out the original owner, causing the owner to lose money as the company's profits diminish. [FN34] A corporation with a right of first refusal on its preferred stock might assure a shareholder seeking to cash in his preferred shares that "nothing [seriously affecting share value] is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

going to change in the near future" when in fact the corporation knows that a recapitalization likely to enhance share prices is imminent; in such a case, the loss is caused when the employee misses out on a surge in stock prices after the recapitalization occurs. [FN35]

FN32. *See, e.g.,* *Caiola v. Citibank, N.A.,* 295 F.3d 312 (2d Cir.2002).

FN33. *See, e.g.,* *Louros v. Kreicas,* 367 F.Supp.2d 572, 592-93 (S.D.N.Y.2005).

FN34. *See, e.g., Weiss v. Witcoff,* 966 F.2d 109 (2d Cir.1992).

FN35. *Castellano,* 257 F.3d at 175.

All of these examples of securities fraud cause a loss to the injured party. The mechanisms for such losses vary widely. However, the common thread is that, in each situation, "the loss be foreseeable and [ ] the loss be caused by the materialization of the concealed risk." [FN36] This is true even of the "somewhat inconsistent" precedents the Circuit attempted to reconcile in *Suez Equity,* which resulted in a legal standard that itself has required numerous clarifications. [FN37]

FN36. *Lentell,* 396 F.3d at 173 (emphasis omitted).

FN37. *Suez Equity,* 250 F.3d at 98 n. 1.

In *Suez Equity,* the Second Circuit offered the following as an explanation of its holding:
The standard that we have employed in this opinion attempts to reconcile what we view as our somewhat inconsistent precedents on loss causation. *See, e.g., First Nationwide Bank v. Gelt Funding Co.,* 27 F.3d 763, 769-70 (2d Cir.1994) (recognizing "foreseeability" approach, but relying on "direct causation" analysis for loss causation); *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992) (per curiam) (following "foreseeability" approach); *Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.,* 801 F.2d 13, 22 (2d Cir.1986) (finding loss causation where "investment quality" of securities was misrepresented). Were we unconstrained by our own precedents, we might propose a different standard. We note that the approach of the Seventh Circuit-- inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud--appears to be both principled and predictable. *See Bastian*

*v. Petren Res. Corp.,* 892 F.2d 680, 685-86 (7th Cir.1990); *see also Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997) ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused his injuries."). But, we are not writing on a blank slate, and believe that the approach here articulated best reconciles our precedents to date. [FN38]

FN38. *Id.* (quoting the entirety of footnote one of the *Suez Equity* opinion).

*4 Upon closer examination, however, the purportedly "inconsistent precedents" are more consistent than they might initially appear to be. That closer examination is warranted in light of the apparent confusion that reigns with respect to the element of loss causation. A chronological review may be the best approach to the required close examination.

In 1986, the Circuit decided *Manufacturers Hanover Trust,* in which the court established the "investment quality" standard for material misrepresentation cases. [FN39] In that case, the court held that the defendant had misrepresented the risks associated with an investment in a company whose assets were extremely unstable. Eventually, the very instability that defendant had concealed caused the collapse of the company, resulting in the loss of the investment. Thus the misrepresentation went to the investment quality of plaintiff's investment, because plaintiff "would not have contracted with [defendant] ... [to invest] had [plaintiff] known of the misrepresentation ... particularly given that the [ ] statements were in part a response to the financial community's concern regarding [defendant's] stability." [FN40]

FN39. *Manufacturers Hanover Trust,* 801 F.2d at 22. *Manufacturers Hanover Trust* addressed the question of whether the district judge had properly instructed a jury, which ultimately returned an award of $17 million, as to the legal standard for *proving*-- not *pleading*-- loss causation. The Circuit found that the district court, in its charge on "proximate cause," had satisfactorily instructed the jury on loss causation. Despite the different procedural posture, *Suez Equity* relied on *Manufacturers Hanover Trust,* as well as *Weiss* and *First Nationwide Bank* (both pleading cases), in formulating its pleading standard for loss causation.

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

FN40. *Id.*

In 1992, the Circuit decided the *Weiss* case, in which defendants persuaded plaintiff to sell them half his company in return for defendants' promise to provide necessary supplies. [FN41] But defendants did not disclose that they had no intention of keeping their promise but rather intended to take over plaintiff's business and force the plaintiff out. The court held that "it was quite foreseeable that the consummation of defendants' secret intention not to perform their promises would cause Weiss to suffer a loss." [FN42]

FN41. *See Weiss,* 966 F.2d at 110-11.

FN42. *Id.* at 112.

In both *Manufacturers Hanover Trust* and *Weiss,* the court held that loss causation could be pled by alleging that (1) defendants concealed a foreseeable risk associated with a securities transaction between plaintiffs and defendants; and (2) the foreseeable risk occurred causing plaintiffs' loss. The difference between the two cases is that one involved an *investor* (hence the phrase "investment quality"), and the other involved an *issuer of securities* (hence the term "foreseeability"). But both cases involved a concealment of negative information which caused the plaintiff's loss when the concealed information eventually caused the transaction to fail.

In 1994, the Circuit decided the third loss causation case cited in *Suez Equity,* which allegedly established a "direct causation" requirement. [FN43] But *First Nationwide Bank* did no such thing, for the following reasons. *First,* it was not a securities case at all, but a RICO case, involving allegations that a lender was fraudulently induced to make nonrecourse loans for purchases of real estate whose value was materially misstated. The case addressed "proximate cause" rather than "loss causation," which the *Lentell* court later described as an "imperfect" analogy. [FN44] *Second,* the court found that several factors prevented plaintiffs from pleading proximate cause: (1) plaintiff offered no valid methodology for calculating the magnitude of the misrepresentation regarding the value of the real estate; (2) five years had elapsed between the time of the misrepresentation and the time of the loss; and (3) a massive market-wide downturn in real estate prices had occurred during the interim. [FN45] Nonetheless, in articulating its standard, *First Nationwide Bank* offered the following summary of the law of proximate cause: "in addition to showing that but for the defendant's

misrepresentations the transaction would not have come about, the [plaintiff] must show that *the misstatements were the reason the transaction turned out to be a losing one.*" [FN46] Although *First Nationwide Bank* is a RICO case, addressing "but-for" causation and "proximate cause," rather than the securities law concepts of transaction causation and loss causation, it articulates requirements similar to those of *Weiss* and *Manufacturers Hanover Trust.* A plaintiff must allege a material misstatement (*i.e.,* concealment of a risk), and that misstatement must be the cause of the plaintiff's loss (*i.e.,* the risk must materialize).

FN43. *See First Nationwide Bank,* 27 F.3d at 755-56. Indeed, it is unclear from the text of *First Nationwide Bank* and *Suez Equity* what a "direct causation" requirement might mean in the context of securities fraud, where statements made to no investor in particular, but disseminated to the public, have consistently been found to have caused investor losses when the statements concealed a risk and the risk materialized.

FN44. *Lentell,* 396 F.3d at 173.

FN45. *See First Nationwide Bank,* 27 F.3d at 770-72. Indeed, the Second Circuit decision on which *First Nationwide Bank* relies for support of its "direct causation" requirement--*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104 (2d Cir.1993)--refers to the requirement that plaintiff's injuries be "directly *related*" to the alleged wrongdoing, not "directly *caused*" by it. *See Standardbred,* 985 F.2d at 104 ("These opinions emphasize the necessity of proof in a RICO case that the defendant's violations were a proximate cause of the plaintiff's injury, *i.e.,* that there was a *direct relationship* between the plaintiff's injury and the defendant's injurious conduct.") (emphasis added). The Supreme Court case on which both *Standardbred* and *First Nationwide Bank* further relied, *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992), is a case about indirect injury in the context of the securities laws. *Holmes* involved a multi-tiered chain of injury in a securities fraud case, in which plaintiffs alleged that an individual's manipulation of securities caused securities prices to crash, thereby causing injury to two

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

broker-dealers. Those broker-dealers, in turn, were subsequently unable to fulfill their own obligations to plaintiffs. *Holmes* is a classic proximate cause decision in which the chain of causation is too diffuse to fairly hold a defendant liable for a twice-removed plaintiff's injuries. It does not articulate a standard of loss causation stricter than the Second Circuit's traditional standard.

> FN46. *First Nationwide Bank,* 27 F.3d at 769 (emphasis added).

**\*5** Thus, on closer examination, all three cases involve the concealment of a risk and the materialization of that risk. Unfortunately, however, the court in *Suez Equity* resolved the conflict in terminology by sticking with the term "investment quality." "[P]laintiffs may allege ... loss causation by averring [ ] that ... the defendants' misrepresentations induced a disparity between the transaction price and the true *investment quality* of the securities at the time of the transaction." [FN47]

> FN47. *Suez Equity,* 250 F.3d at 97-98 (quotation marks omitted).

In *Emergent Capital,* decided only two years later, the court essentially conceded that the legal standard stated in *Suez Equity* was incomplete. "Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement." [FN48] Rather, the *Emergent Capital* court noted that the *Suez Equity* plaintiffs "specifically asserted a causal connection between the concealed information-- *i.e.,* the executive's [bad financial] history [and incompetence]--and the ultimate failure of the venture." [FN49] Thus, the *Emergent Capital* court applied the earlier standard of concealment of a risk and materialization of that risk without an explicit acknowledgment. [FN50]

> FN48. *Emergent Capital,* 343 F.3d at 198.

> FN49. *Id.*

> FN50. Indeed, even if *Emergent Capital* had explicitly reaffirmed the standard of *Suez Equity,* which calls only for a disparity between price and investment quality at the time of purchase--*i.e.,* artificial inflation--the standard would no longer be valid. In *Dura,* 125 S.Ct. at 1630, the Supreme Court overturned the Ninth Circuit's permissive standard for pleading loss causation, which

required only that a plaintiff allege that a security's value was artificially inflated at the time of purchase.

Finally, in *Lentell,* the court paid lip service to *Suez Equity* [FN51] but held that the Second Circuit "require[s] both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." [FN52] It is thus beyond cavil that *Lentell* requires more than the bare "proximate cause" standard asserted by plaintiffs here. [FN53]

> FN51. See *Lentell,* 396 F.3d at 174 ("We follow the holding [ ] of ... *Suez Equity.*"); *but see id.* at 173 ("We acknowledge that the pleading principles set out in the foregoing passage require both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk; and we further acknowledge that our opinion in *Suez Equity* can be (mis-)read to say that this Circuit has rejected the 'materialization of risk' approach. *Suez Equity* does not purport to express this Circuit's authoritative position, because that wording: (i) is dicta consigned to a footnote; (ii) is framed in terms that are tentative and speculative, *see* [*Suez Equity,* 250 F.3d] at 98 n. 1 ('The standard that we have employed in this opinion *attempts* to reconcile *what we view* as our *somewhat* inconsistent precedents on loss causation.') (emphasis added); and (iii) is expressly limited to what was (in 2001) 'our precedents *to date,*' *id.* (emphasis added).") (emphasis and parentheticals in original).

> FN52. *Id.* (beginning of second full paragraph; beginning of third full paragraph) (emphasis in original). Curiously, the exact same language, including the emphasis, appears twice on the same page of the *Lentell* decision.

> FN53. 2d Reconsideration Mem. at 3.

**B. Application to** *Liu v. CSFB*

It is vital to understand the nature of the risks that plaintiffs in the instant action allege were concealed. There are two kinds of risks. One risk is that the market could simply discover that the earnings estimates had been tainted by fraud, and that confidence in the securities would diminish, causing their prices to fall. The other risk is more central to

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

plaintiffs' alleged scheme. Plaintiffs have alleged that defendants' scheme lowballed earnings estimates, warned the public that those estimates might be too low, and then reported earnings that exceeded those estimates. As a result, defendants induced the public to overvalue the securities. But when the investors eventually learned that the earnings did not always exceed expectations, their confidence collapsed, as did the price of the stock, causing their loss.

1. Disclosure of Falsity

The first type of "concealed risk" at issue here--*i.e.,* that the public might learn that the earnings estimates were fraudulent when made--*could* support a claim for securities fraud if plaintiffs had pled a disclosing event. *Lentell* teaches, however, that such a concealment can only cause losses after it is disclosed:

> plaintiffs have argued (affirmatively) on this appeal that the falsity of Merrill's recommendations was made public no earlier than April 2002, when the NYAG's affidavit "described the inner workings of Merrill's Internet Group," and that until then plaintiffs (and presumably the market at large) therefore lacked knowledge of the fraud. The complaints withstand the statute of limitations on the strength of that argument. By the same token, however, Merrill's concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public. [FN54]

FN54. *Lentell,* 396 F.3d at 175 n. 4.

*6 The reasoning is simple. Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. [FN55] By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed--*i.e.* a corrective disclosure. [FN56]

> FN55. *See, e.g., Suez Equity* (concealed incompetence led to company's collapse); *Castellano,* 257 F.3d at 187 (concealed intent to recapitalize led plaintiff to sell stock in ignorance of the fact that company would recapitalize thereby vastly increasing stock value).

> FN56. *See Lentell,* 396 F.3d at 173 ("the misstatement or omission [involving

favorable analyst recommendations] concealed something from the market that, when disclosed, negatively affected the value of the security.); *In re Worldcom, Inc. Sec. Litig.,* 2005 WL 375314, at *6 ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.").

Plaintiffs have not alleged that defendants' fraudulent concealment of their true opinions was ever disclosed, and plaintiffs have made no attempt to tie such a disclosure to their alleged losses. Under *Lentell,* plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses. [FN57]

> FN57. *See id.* at 175 n. 4.

The circumstances of *Lentell* are strikingly similar to those alleged in the instant case. In both cases, plaintiffs argued that the fraud was not disclosed, if ever, until years *after* their losses were realized, in successful efforts to withstand dismissal based on the statute of limitations. [FN58] Both cases allege that plaintiffs' losses were caused when negative market events (*i.e.,* a downgrading of "buy" recommendations or a failure to meet earnings forecasts) were followed by a decline in securities prices. In *Lentell,* though, the court held that the fraudulent nature of the analysts' conduct was not revealed until "the inner workings of the [analyst] Group" were disclosed; the downgrading of "buy" recommendations did not disclose that the analysts' reports had been tainted. [FN59] In this case, the gulf between what was alleged to have been the concealed risk and the events that materialized is even more apparent: what was concealed was the analysts' belief that revenue *would* exceed forecasts, and what materialized was exactly the opposite. Accordingly, plaintiffs have *never* alleged any disclosure of the falsity of defendants' opinions.

> FN58. Specifically, the concealment in *Lentell* was alleged to have been disclosed when the New York Attorney General's office issued an affidavit describing the analysts' behavior. *See id.* In the instant case, no such disclosure has been alleged.

> FN59. *Id.* In *Lentell,* the "inner workings" of the analysts' group showed that the analysts ignored warnings that certain companies might fail. However, the analysts never lied

Slip Copy                                                                      Page 9
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

about those specific defects; rather, their alleged fraud was to be unfailingly upbeat and to inflate share prices through repetitive positive reviews of the securities at issue. *See id.* at 165-66 (summarizing the alleged fraud, which involved "bullish research reports," publication of "BUY or ACCUMULATE" recommendations, and "profoundly unrealistic price targets," issued pursuant to agreements to pump up share prices and share in the investment banking proceeds). Thus, what the analysts concealed was that they did not believe in their own statements, and the effect of their false praise dissipated only when their alleged fraud came to light. *Compare id. with Fogarazzo v. Lehman Bros et al.,* No. 03 Civ. 5194 (Order of 2/10/05), in which I noted that plaintiffs had made the following allegations regarding concealment of specific investment risks:

On September 7, 1999 ... Lehman analysts resumed [Lehman's] 1-Buy rating and evaluated RSL's break-up value as exceeding $40 per share. Additionally, [an] analyst cited RSL's Delta 3 IPO as "pure upside to our valuation" of RSL. Documents reveal that RSL ... in fact, thought little about Delta 3's long-term prospects.

...

Morgan Stanley ... reiterated its Strong Buy rating and a $38.00 per share price target for RSL, even though ... RSL announced [three days later] that it had taken a massive $32 million restructuring charge. Incredibly, in the same [ ] report, Morgan Stanley characterized the $32 million charge to earnings as "a positive for RSL." 2/10/05 Order in *Fogarazzo,* No. 03 Civ. 5194, at 3-4.

### 2. The Market Conditioning Theory

With respect to the other allegedly concealed risk--that a complicated scheme misled the public as to the true value of the stock--the loss can only be caused when the true value of the securities is revealed to the public. This theory depends on the supposition that the investing public would disregard the available objective evidence of a company's performance (*e.g.,* its past verified earnings statements, its stature in the marketplace, and its posture in mergers and acquisitions) and instead overvalue the company by relying on the fraudulently nurtured belief that the company would continue to exceed earnings estimates indefinitely.

*Lentell* acknowledges that "systematically overly optimistic" analysts' reports (and, by analogy, the systematically pessimistic earnings forecasts alleged here), might sometimes support a claim of securities fraud. [FN60] However, "where [ ] substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk," *Lentell* imposes a heavy burden on plaintiffs to plead their losses specifically. [FN61] As in *Lentell,* the hundreds of statements that accompanied defendants' earnings forecasts warned that defendants' estimates were unreliable and could be beaten. [FN62] In such cases, "a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud--rather than other salient factors--that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and undisclosed portions of the risk that ultimately destroyed an investment." [FN63]

FN60. *Lentell,* 396 F.3d at 177.

FN61. *Id. Lentell* refers to the fact that the allegedly fraudulent analysts' recommendations in that case (*i.e.,* "buy" or "accumulate") were invariably accompanied by cautionary language that the stock prices were volatile. In fact, the securities at issue in *Lentell* were rated in the "most risky" possible category on a four-point scale. Plaintiffs in *Lentell* alleged that defendants' analyst reports concealed the risk of volatility in share prices--*i.e.,* the chance that the prices could plummet despite earlier "buy" recommendations. Thus, the "substantial indicia of the risk" were the warnings that the stock price was volatile, and they appeared "on the face" of the analyst reports. Put another way, *Lentell* establishes a standard for those situations in which allegedly misleading statements include cautionary language that the statements might be wrong or misleading. In such cases, plaintiffs must meet a heavy burden of alleging specific losses that are connected to the risks that were actually *concealed,* rather than those risks that were *disclosed* by defendants in their cautionary statements. *See id.*

FN62. *See* Exs. D, E to Third Amended Complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1529659 (S.D.N.Y.)
(Cite as: 2005 WL 1529659 (S.D.N.Y.))

FN63. *Lentell,* 396 F.3d at 177.

*7 Plaintiffs have failed to allege facts sufficient to do either. Rather, they have alleged that the concealed risks materialized when one of three "Disclosing Events" occurred: (1) reported revenue failed to meet or exceed earnings forecasts; (2) a company announced such a shortfall before reporting revenues; or (3) analysts revised their estimates downward. [FN64] As I noted in my June 8, 2004 Opinion granting plaintiffs' motion for leave to amend their complaint, "each Disclosing Event was the unfortunate but commonplace event of a publicly traded company failing to meet its revenue forecast, coupled with a concomitant and predictable immediate drop in share prices." [FN65] Plaintiffs have made no effort to allege that it was the defendants' fraud that caused their losses. Nor have plaintiffs alleged "facts sufficient to apportion the losses" between that predictable immediate drop in share prices and any loss that might be attributable to investors abandoning their belief that earnings would exceed estimates forever. [FN66]

> FN64. Third Amended Complaint ¶ 225.

> FN65. *In re IPO ("Liu I"),* 341 F.Supp.2d 328, 350 (S.D.N.Y.2004).

> FN66. *Lentell,* 396 F.3d at 177.

Accordingly, plaintiffs have failed to allege loss causation.

V. CONCLUSION

For the foregoing reasons, plaintiffs' second motion for reconsideration is denied in its entirety. The Clerk is directed to close this motion and this case.
  SO ORDERED:

2005 WL 1529659 (S.D.N.Y.)

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 2245646 (Trial Motion, Memorandum and Affidavit) Issuer Defendants' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Preliminary Approval of the Partial Settlement with Issuer Defendants (Aug. 04, 2004)

• 2004 WL 2245647 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Preliminary Approval of Proposed Settlement with Issuer Defendants (Aug. 04, 2004)

• 2004 WL 2270817 (Trial Motion, Memorandum and Affidavit) Underwriter Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Approval of Settlement with Defendant Issuers and Individuals (Aug. 04, 2004)

• 2002 WL 32495945 (Trial Motion, Memorandum and Affidavit) Plaintiff Mdcm Holdings, Inc.'s Memorandum of Law in Opposition to Defendant Credit Suisse First Boston Corporation's Motion for an Order Limiting the Scope of Discovery (Feb. 06, 2002)

• 2002 WL 32595836 (Trial Motion, Memorandum and Affidavit) Plaintiff Mdcm Holdings, Inc.'s Memorandum of Law in Opposition to Defendant Credit Suisse First Boston Corporation's Motion for an Order Limiting the Scope of Discovery (Feb. 06, 2002)

• 2002 WL 32495877 (Trial Pleading) Amended Class Action Complaint (Feb. 04, 2002)

• 2002 WL 32595835 (Trial Pleading) Amended Class Action Complaint (Feb. 04, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Not Reported in F.Supp.2d

2003 WL 22436233 (E.D.Pa.)

(Cite as: 2003 WL 22436233 (E.D.Pa.))

Page 1

**ℍ**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re THE LOEWEN GROUP INC. Securities
Litigation
No. Civ.A. 98-6740.

July 16, 2003.

Chet B. Waldman, Wolf Popper, LLP, Lester Levy, Wolf, Popper, Ross, Wolf & Jones, Mark C. Gardy, Abbey Gardy, LLP, Stephen J. Fearon, Jr., Squitieri & Fearon, LLP, New York, NY, Daniel E. Bacine, Jeffrey W. Golan, Barrack, Rodos & Bacine, Deborah R. Gross, Robert P. Frutkin, Law Offices Bernard M. Gross, PC, Jacob A. Goldberg, Sherrie R. Savett, Berger & Montague, PC, Philadelphia, PA, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Seattle, WA, for Plaintiffs.

Brian Troyer, Jones, Day, Reavis & Pogue, Jason N. Mather, Jones Day, John W. Edwards, II, Cleveland, OH, Craig E. Ziegler, David H. Marion, Michael K. Twersky, Richard G. Placey, Montgomery, Mccracken, Walker & Rhoads, LLP, Steven E. Bizar, Buchanan Ingersoll, P.C., Philadelphia, PA, for Defendants.

*MEMORANDUM*

ONEILL, J.

BACKGROUND

**\*1** This is a class action in which plaintiffs allege that defendants committed securities fraud in violation of § § 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § § 78(b) and 78(t), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

I have before me motions to dismiss the consolidated class action complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1) and (2) (2002). The individual

defendants, Raymond Loewen and Paul Wagler, filed a joint motion to dismiss, the corporate defendant filed its own motion to dismiss and plaintiffs filed a memorandum in opposition to the motions. [FN1]

> FN1. I have heard oral argument on the pending motions and have been supplied with supplemental memoranda of law from each party.

I. Procedural History

This class action began in 1998 as a series of securities fraud claims brought by Loewen Group shareholders against officers and directors of the corporation as well as the corporation itself. In 1999 the cases were consolidated under Federal Rule of Civil Procedure 42(a) into the current class action. Loewen Group filed for bankruptcy protection in June 1999, and consequently this action was put into the civil suspense file. Late in 2001, with the consent of the parties, I removed the action from the civil suspense file.

Plaintiffs filed the consolidated class action complaint on February 1, 2002. Subsequently, all defendants filed motions to dismiss. Plaintiffs' claims against four of the original defendants have been dismissed. I dismissed plaintiffs' claims against Robert Lundgren because plaintiffs did not name him as a defendant in their amended complaint. I dismissed plaintiffs' claims against Lawrence Miller, William R. Shane and William Grant Ballantyne because they were barred by the statute of limitations.

II. Parties

A. Defendants

Raymond Loewen founded Loewen Group. When the class period began he was Chairman of the Board and CEO of Loewen Group. He resigned from these positions on October 9, 1998, after which he remained with the company as non-executive co-chairman of the board until January 1999, when he was replaced.

Paul Wagler was the Chief Financial Officer, a member of the company's executive committee and a director of the company when the class period began and held those positions until December 17, 1998.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

Twice during 1998 he assumed new positions, first as Executive Vice President, Finance and then as Executive Vice President, Operations and Chief Operating Officer. Although Wagler retired from the board in December 1998, he now serves as Chief Operating Officer of Alderwoods Group, Inc., the successor to Loewen Group.

Loewen Group, Inc. was a publicly held company specializing in the operation of funeral homes and cemeteries in Canada and in the United States. Loewen Group had four insurance subsidiaries. The company's principal executive office was in Canada, but Loewen Group also maintained corporate offices in Covington, Kentucky and Trevose, Pennsylvania. At all times during the class period Loewen Group stock was traded on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange. The company filed periodic reports with the NYSE and the Securities and Exchange Commission and was followed by analysts from a number of major brokerage firms.

B. Plaintiffs

*2 Lead plaintiffs are the City of Philadelphia, through its Board of Pensions and Retirement, Phil Schwartz, James McGlathery, Terry Roberts, Kurt Mueller, Jr., Harley Puff and Morton Silas. Lead plaintiffs bring this action on behalf of themselves and all other persons who purchased or otherwise acquired Loewen Group common stock, preferred stock or call options during the period March 5, 1997 through January 14, 1999 (the class period).

III. Background [FN2]

> FN2. Because this is a motion to dismiss, I take all facts from the consolidated class action complaint and consider them in the light most favorable to plaintiffs.

In the two years leading up to the class period Loewen Group expanded its focus from funeral homes to include cemetery businesses as well. It acquired a large number of cemetery-related businesses. In September 1996, six months before the beginning of the class period, Service Corporation International, the world's largest chain of funeral homes, made an unsolicited bid to buy all of Loewen Group's common stock for a higher price than the stock was currently trading for on the NYSE. Loewen Group's Board of Directors unanimously rejected the bid.

After rejecting Service Corporation International's bid, Loewen Group continued its well-publicized acquisition program. By the end of 1998, Loewen Group owned 1,072 funeral homes and 488 cemeteries. It also carried a debt load of $2.3 billion.

In late 1998 the company announced third quarter results that were significantly below forecast. In January, 1999, the Florida Department of Banking and Finance issued an order suspending Loewen Group's ability to engage in "new pre-need funeral business" in Florida as a result of failure to comply with state accounting laws.

Loewen Group's stock traded at a high of $35.50 per share on July 18, 1997. On January 14, 1999, the last day of the class period, the stock closed at $5.12 per share. At the end of the trading day following the suspension of Loewen Group's operations in Florida, January 15, 1999, the shares closed at $4.81 per share. By the end of May, 1999, the price was down to $0.56 per share. On June 1, 1999 the company filed to reorganize under Chapter 11 of the Bankruptcy Code.

IV. Factual Allegations

A. Alleged materially false and misleading statements and omissions made by defendants during the class period

1. Statements that overstated Loewen Group's revenue and income

There were numerous publications during the class period that reported or reflected Loewen Group's revenue and income. It is not disputed that defendants disclosed the company's financial figures to the Securities and Exchange Commission, to various securities analysts and to the public directly. The disclosures include the following filings with the Securities and Exchange Commission: Forms 10-K and 10-Q and the company's Registration Statements and Prospectus. Compl. ¶ ¶ 81, 93-95, 97, 101, 104-05, 107, 109, 125, 138, 144-46, 151. The complaint also relies on press releases and interviews in which defendants reported the revenue, income and assets of Loewen Group. Compl. ¶ ¶ 84-85, 99, 110-11, 118, 124, 127, 142, 149. Additionally, plaintiffs seek to connect statements made by defendants with positive reports by industry analysts. Compl. ¶ ¶ 113-14, 120, 122-23, 141, 154. Finally, the complaint cites the Annual Reports issued by Loewen Group as a source of financial figures. Compl. ¶ ¶ 88, 90

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

**\*3** Plaintiffs claim that defendants' representations of Loewen Group's financial status were "materially false and misleading." Compl. ¶ 81. The alleged falsity is claimed to be a result of the following failures by defendants: (1) failure to write off or write down accounts receivable resulting from the sale of pre-need cemetery sales contracts as soon as it was known that those accounts receivable were not fully collectible and (2) failure to establish a sufficient allowance for doubtful accounts. These actions allegedly violated Canadian Generally Accepted Accounting Practices, which are set forth in the *Canadian Institute of Chartered Accountants Handbook ("CICA Handbook" )*. Plaintiffs assert that the complained-of accounting practices resulted in artificially high valuation of Loewen Group's revenue, income and assets, which in turn resulted in artificially inflated stock prices.

In addition to the claim of artificially inflated revenue and income figures plaintiffs allege that defendants encouraged or at least knew of and ignored fraudulent practices by Loewen Group's sales departments. The first fraudulent practice pleaded is the writing of phony contracts by sales associates. Compl. ¶ 55. Plaintiffs claim that the generous commissions that Loewen Group paid its employees on pre-need cemetery contracts that required only small down-payments "left the door open for some salespersons to commit fraud by writing phony contracts and fronting the down-payments themselves." *Id.*

Additionally, plaintiffs allege that Loewen Group regional managers directed salespersons to back-date cemetery contracts so that the company would meet estimated quarterly sales numbers. Compl. ¶ 58. To conceal the back-dating Loewen Group's administrative department in Kentucky allegedly "swept" the regional offices to ensure that the dates on all documents matched. *Id.* Plaintiffs attempt to connect defendants to these alleged fraudulent acts through Ron Robertson, a regional manager who reported to defendant Loewen. *Id.*

2. Statements that overstated the value of Loewen Group's assets

Loewen Group's valuations of its assets were made public in the same manner as its revenue and income. Plaintiffs allege that defendants overpaid for the properties it acquired during the class period and failed to follow Canadian GAAP principles regarding valuation and adjustments in valuation of assets. Compl. ¶¶ 75-77, 89. According to the complaint former Loewen Group employees have estimated that the corporation "overpaid for about 70% of the acquisitions it made." Compl. ¶ 89. Plaintiffs name three reasons for the overpayment: (1) Loewen Group paid finders fees to employees for each acquisition they facilitated; (2) the company did not obtain independent third party appraisals of the businesses it bought; and (3) Loewen Group was "a volitile and irrational bidder for death care properties" during a bidding war with its competitors. *Id.*

3. Failing to disclose state investigations of Loewen Group's operations

**\*4** In 1996 and 1997, Florida authorities found "serious deficiencies in the overall state of [Loewen Group's Florida subsidiaries'] book and records." Compl. ¶ 64, 130-32. As a consequence, in 1997 Florida Department of Banking and Finance ("FBF") put two of Loewen Group's subsidiaries on probation with the requirement that they bring their books and records into compliance with Florida law. Compl. ¶ 65. The Florida subsidiaries entered into a settlement agreement with the FBF (the "Stipulation"), which agreement was later incorporated into FBF's February 20, 1997 Final Order. Compl. ¶ 65. If the subsidiaries failed to comply with the requirements of the Order the FBF would suspend Loewen Group's license to operate in Florida. Compl. ¶¶ 66-67.

On January 14, 1999, the FBF suspended the licenses of two of Loewen Group's Florida subsidiaries. Compl. ¶¶ 180-83. The suspension was imposed because the subsidiaries were "operated incompetently, negligently and in violation of" Florida law. Compl. ¶ 180. Plaintiffs claim that it was a violation of federal securities law that defendants "did not disclose the material fact that [two of its Florida subsidiaries] were engaging in numerous violations of the Stipulation, the Order and Florida law." Compl. ¶ 133. Florida authorities announced the suspension on January 14, 1999, which was also the last day of the class period. Compl. ¶ 180.

4. Statements about the success and profitability of Loewen Group's expansion-through-acquisition strategy

In their supplemental brief plaintiffs list the following statements as examples of defendants' false and misleading statements regarding the acquisition strategy undertaken by Loewen Group:
  . "As a result of the successful implementation of this [acquisition of funeral homes and cemeteries]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

strategy, the Company has grown significantly." Compl. ¶ ¶ 97, 104, 107, 111 (various documents published May-June 1997).

. "This strong performance across the Company ... reflects ... the ongoing momentum of our acquisition program." Compl. ¶ 124 (August 1997 press release).

. "Mr. Loewen noted that the company continues to be the consolidator of choice in the industry and is sharpening the focus of its acquisition program, pursuing transactions on a selective and disciplined basis." Compl. ¶ 135 (November 1997 press release).

. "During 1997 the Company continues its acquisition program on a focused and disciplined basis." Compl. ¶ 142 (March 1998 press release).

. "As a result of the successful implementation of this [acquisition] strategy, the Company has grown significantly.... Due to the successful implementation of its business strategies, the Company has grown from 489 locations at December 31, 1992 to 1,611 at March 6, 1998." Compl. ¶ 146 (1997 Form 10-K).

B. Scienter Allegations

1. Motive and Opportunity

Plaintiffs point out several facts that set the background for the alleged motive to inflate artificially the price of Loewen Group common stock. Com pl. ¶ ¶ 232-33. First, in September 1996 Loewen Group's board rejected a bid by Service Corporation International to buy all Loewen Group common stock at a price significantly over market value. Compl. ¶ ¶ 61-63. Second, during the class period Loewen Group made acquisitions of other companies using Loewen Group common stock. Compl. ¶ ¶ 261-62. Third, certain debt covenants that bound Loewen Group during the class period required that the company maintain specific financial ratios. Compl. ¶ ¶ 264-66. Fourth, the individual defendants owned significant amounts of Loewen Group common stock as well as stock options. Compl. ¶ ¶ 249-251. Finally, the individual defendants were well compensated by the company with salary, stock, stock options and other perquisites. Compl. ¶ ¶ 234-43, 258.

*5 Plaintiffs argue that the individual defendants had the opportunity to commit the alleged fraudulent acts because they were part of the senior management of Loewen Group. For most of the class period, defendant Loewen was Chief Executive Officer for Loewen Group and Chairman of its Board. Compl. ¶

278. During the same period, defendant Wagler was Chief Financial Officer, a member of the company's executive committee and a director of the company. Id.

2. Circumstances Indicting Recklessness or Conscious Misbehavior

Plaintiffs plead facts that they argue support their claim that defendants acted with recklessness or conscious misbehavior. The individual defendants were top executive officers with Loewen Group during the class period. Compl. ¶ 219. Additionally, defendant Wagler was a certified public accountant. Com pl. ¶ ¶ 229-30. Plaintiffs also point out that the Loewen Group board recommended that defendants Loewen and Wagler be asked to retire. Compl. ¶ 260.

The complaint quotes statements made by Loewen Group officers after the class period. For instance, defendant Wagler said on January 18, 1999 that Loewen Group's accounting was "not up to speed." Compl. ¶ 190. Robert Lundgren, who was a director of the company during the class period, said in March 1999 that Loewen Group "we basically ended up paying too much for assets and then got into significant balance-sheet problems." Compl. ¶ 208.

Plaintiffs also rely on operating changes made within the company after the close of the class period. In late 1998 Loewen Group increased the allowance it made for uncollectible accounts receivable. ¶ 78. In 1999 the company changed the operating procedures of its preneed cemetery sales program. Compl. ¶ ¶ 199, 204.

During the class period several states conducted investigations of Loewen Group's practices. Compl. ¶ ¶ 220-22. Florida placed Loewen Group subsidiaries on probation and thereafter suspended their ability to conduct business in Florida. Compl. ¶ 222. Documents issued by the Florida authorities between 1997 and 1999 list numerous violations of state law. Compl. ¶ ¶ 65- 67, 130-32.

Finally, plaintiffs point to the fall in value of Loewen Group common stock that occurred during the class period. Compl. ¶ 226. In July 1997 the stock was trading at $35.50 per share, its highest value. Compl. ¶ 17. By the end of the class period the stock was trading at $5.12 per share. Id.; Comp. ¶ 185.

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiffs' complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citations omitted). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendant on notice of the essential elements of the plaintiff's cause of action." *Id.* Claims should be dismissed under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

*6 Nevertheless, in evaluating plaintiffs' pleadings I will not credit any "bald assertions." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997). Nor will I accept as true legal conclusions or unwarranted factual inferences. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Because plaintiffs make claims of securities fraud, Federal Rule of Civil Procedure 9(b) and the Reform Act impose a higher level of scrutiny than that used for most Rule 12(b)(6) motions. The Court of Appeals has said that "Rule 9(b) and the Reform Act impose independent, threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6)." *In re Rockefeller Center Properties, Inc. Sec. Litig.,* 311 F.3d 198, 224 (3d Cir.2002). A securities fraud complaint may be dismissed under Rule 9(b) and the Reform Act even if it would survive traditional Rule 12(b)(6) scrutiny. *Id.* The requirements of Rule 9(b) and the Reform Act will be discussed in detail hereafter.

On a motion to dismiss filed pursuant to Rule 12(b)(6) the materials at which I may look are limited. *Burlington Coat Factory .,* 114 F.3d at 1424-25. To determine whether plaintiffs have met their burdens I may consider only the facts alleged in the complaint and the documents upon which the complaint relies. *Id.* I may consider a document not cited in or attached to the complaint only if it is "integral to or explicitly relied upon in the complaint." *Id.* at 1426, quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996).

DISCUSSION

I. Applicable Law

Plaintiffs bring their claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78j(b) [FN3] and 78t(a); [FN4] 17 C.F.R. § 240.10b-5. [FN5]

FN3. 15 U.S.C. § 78(j), entitled "Manipulative and deceptive devices" declares:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
(a) [omitted]
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

FN4. 15 U.S.C. § 78t(a) provides for joint and several liability for a supervisor who controls a subordinate who violates the Exchange Act.

FN5. 17 C.F.R. § 240.10b-5, entitled "Employment of manipulative and deceptive devices" reads as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

A. Sections 10(b) and 20(a)

To state a valid securities fraud claim under Section

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

Page 6

10(b), a plaintiff must first establish that defendant, in connection with the purchase or sale of a security, "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *Burlington Coat Factory,* 114 F.3d at 1417. The plaintiff must additionally establish that the defendant acted with scienter, as defined in the Reform Act, and that plaintiff's reasonable reliance on defendant's misstatement proximately caused him injury. *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989). Finally, the plaintiff must ensure that the complaint complies with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the Exchange Act. 15 U.S.C. § 78t (2002). Claims under Section 20(a) are derivative, therefore, and must be dismissed if the underlying Section 10(b) claim is dismissed. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999); *In re Cybership Sec. Litig.,* 189 F.Supp.2d 214, 233 (D.N.J.2002).

*7 Plaintiffs concede that they may not obtain a judgment against the corporate defendant because it is protected by its bankruptcy Order and Section 524(a)(1) of the Bankruptcy Code. Plaintiffs wish to retain Loewen Group as a defendant, however, in an attempt to collect any judgment entered against Loewen Group from the individual defendants under the Reform Act's uncollectible share provision, 15 U.S.C. § 78u-4(f)(4). Loewen Group bases its motion to dismiss in part on the Bankruptcy Code. I do not reach this issue because I will grant the motions to dismiss the claims against the individual defendants; therefore, the claim against Loewen Group will be dismissed as well.

B. Federal Rule of Civil Procedure 9(b)

Section 10(b) claims and their derivative Section 20(a) claims sound in fraud and therefore must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." The Court of Appeals has made clear that Rule 9(b) is to be "vigorously applied in securities fraud cases." *Burlington Coat Factory,* 114 F.3d at 1417.

The purpose behind Rule 9(b) is threefold. First, the

detailed pleading gives defendants notice of the claims that are being asserted against them. *Id.* at 1418. Second, the required detail serves to protect the reputation of defendants. *Id.* Finally, the more stringent requirements are meant to reduce the number of frivolous suits that can be filed with the purpose of exacting settlements. *Id.*

Rule 9(b) does not require that the plaintiffs "plead the 'date, place or time' of the fraud, but they must use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *In re Nice Systems, Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 577 (D.N.J.2001) (citations omitted). For a claim made under Section 10(b), the specificity requirement of Rule 9(b) can be satisfied by pleading the following:

(1) the defendant made a misrepresentation or omission;
(2) the misrepresentation or omission was material;
(3) the misrepresentation or omission was of a fact;
(4) the defendant acted with knowledge or recklessness (scienter);
(5) the plaintiff reasonably relied on the misrepresentation or omission; and
(6) the plaintiff consequently suffered damage.
*In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996). Questions of materiality are generally left to the jury; however, complaints may contain "claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Burlington Coat Factory,* 114 F.3d at 1426.

C. The Requirements of the Private Securities Litigation Reform Act of 1995

There is yet another source of pleading requirements for federal securities fraud claims--the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1) and (2) (2002). The Reform Act heightens the pleading standards regarding misrepresentations or omissions themselves and the state of mind of the defendants.

*8 Congress passed the Reform Act in an effort to curb abuses of securities fraud class actions. It was intended to protect corporations and corporate directors and officers from unfounded lawsuits and to protect clients from manipulation by class action attorneys. *Advanta Corp.,* 180 F.3d at 531, citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1005 U.S.C.A.A.N. 679, 748.

With respect to pleading a statement or omission, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

Reform Act requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In other words, a plaintiff must plead "the who, what, when, where and how: the first paragraph of any newspaper story." *Advanta Corp.*, 180 F.3d at 534, quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

With respect to pleading state of mind or scienter of the defendant, the Reform Act requires that "with respect to each act or omission ... [plaintiffs] state with particularity facts giving rise to a strong inference that the defendant acted" with knowledge or recklessness. 15 U.S.C. § 78u-4(b)(2). Plaintiffs must plead facts supporting a "strong inference" of scienter by alleging either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior." *Advanta Corp.*, 180 F.3d at 530, 534.

II. Law Applied to Allegations Pleaded

A. Allegations of Inflated Revenue and Income Figures

Plaintiffs assert two reasons for the alleged artificial inflation of Loewen Group's reported revenue and income figures. Plaintiffs contend that Loewen Group's reported revenue and income were inflated during the class period by the corporation's failure to account properly for its pre-need cemetery accounts receivable. Additionally, plaintiffs claim that defendants encouraged or at least failed to stop fraudulent practices by the corporation's sales department. Loewen Group published its revenue and income figures through Securities and Exchange Commission filings, press releases and interviews of corporate officers and directors by analysts.

1. Allegations of fraudulent accounting practices

As stated above, to survive the motion to dismiss plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4 (2002). As I will explain, plaintiffs' claim of fraudulent accounting practices has not met this

threshhold.

Plaintiffs cite management practices of Loewen Group's sales departments as the source of the false revenue and income reports. Plaintiffs allege that Loewen Group awarded sales commissions that were too high and required customer deposits that were too low. They argue that the high up-front sales commissions encouraged employees to make contracts with unqualified purchasers and to commit fraud by drafting phony contracts or selling the same plot of cemetery land twice. Plaintiffs also contend that the small down payment due upon reservation of a cemetery plot failed to provide customers with a disincentive to walk away, especially in light of the high prices Loewen Group charged compared to the prices of independent cemeteries.

*9 Plaintiffs argue that defendants knew or were reckless in not knowing that the manner in which pre-need cemetery sales were made would lead to a high level of customer defaults. A company that expects high customer default should, under Canadian GAAP rules, make allowances high enough to cover the expected defaults and write down or write off accounts receivables that it knows are not collectible in full. FN6 Plaintiffs argue that defendants took neither of these steps.

> FN6. The applicable provisions of the *CICA Handbook* are: "An account or note receivable should be written off as soon as it is known to be uncollectible or should be written down to its estimated realizable value as soon as it is known that it is not collectible in full." ¶ 3020.10.
> "If, after writing off all known uncollectible accounts, it is expected that some further losses will be incurred in collecting the accounts and notes receivable outstanding, ..., an allowance for doubtful accounts should be provided." ¶ 3020.12.
> "[T]he amount of the allowance for doubtful accounts at the end of a financial period should b e calculated by reference to the accounts outstanding at the end of the financial period after taking into consideration all circumstances known at the date of review." ¶ 3020.13.

Defendants claim that plaintiffs have not met the pleading standard for this claim because plaintiffs have not pleaded specific facts regarding:
. when and to what level the accounts receivable should have been written down;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

. when and to what level the allowance should have been changed;

. why the allowance made by the corporation was unreasonable in light of the cancellations experienced; and

. how many accounts ultimately were uncollectible.

Case law in this Circuit provides guidance for dealing with Section 10(b) claims. For instance, the plaintiffs in _Burlington Coat Factory,_ 114 F.3d 1410, also based their Section 10(b) claim in part on violations of GAAP. They alleged that GAAP violations led to an overstatement of earnings and consequently, artificially inflated stock prices. _Burlington Coat Factory,_ 114 F.3d at 1419-20. The district court dismissed the plaintiffs' Section 10(b) claim because it did not meet the pleading specificity requirements of Rule 9(b). _Id._ at 1414. The Court of Appeals stated that the plaintiffs had made "an adequate allegation of 'how' [the defendant] overstated its earnings" because plaintiffs had plead the amount of the alleged overstatement in earnings (2-3 cents), the specific earnings statements in error (the first three quarters of 1994), and the reason for the falsity of the earnings statements (defendants "failed to account properly for expenses associated with purchases of inventory and thereby violated a specific accounting concept: SFAC No.6"). _Id._ at 1422.

In this case, plaintiffs do not provide any dollar amounts or percentages by which Loewen Group's revenue and figures were inflated. Nor do they plead when adjustments to accounts receivable or increases in allowance should have been made or why the adjustments and increases made by Loewen Group were unreasonable. Plaintiffs do specify which financial statements were false: all declarations of financial figures during the class period are alleged to be false.

Another instructive case regarding allegations of GAAP violations and otherwise improper accounting practices is _Westinghouse,_ 90 F.3d 696. The _Westinghouse_ plaintiffs claimed that the defendants improperly moved loans from nonearning to earning status even though nothing had changed the likelihood that the company would collect on the loans. _Id._ at 711. Such action would be a violation of GAAP. The Court of Appeals reversed the district court's dismissal of this claim because it decided plaintiffs had met the applicable pleading requirements. _Id._ The allegations were specific enough because (1) they alleged "that defendants changed the classification of the loans when nothing

regarding collectibility had occurred" and (2) they alleged "that specific loans had at least three of the eight [factors indicating that appropriateness of] nonearning status both before and after they were removed from nonearning status." _Id._

*10 In contrast to the allegations in _Westinghouse,_ the allegations made by plaintiffs in this case do not reach the level of specificity required by Rule 9(b) and the Reform Act. Plaintiffs do not plead facts that would demonstrate which accounts were unlikely to be collectible, when and by what level the accounts receivable figure on Loewen Group's books should have been decreased, why the allowances Loewen Group set aside for uncollected accounts receivable were unreasonable or how many accounts were in fact uncollectible. Neither the increase in allowance toward the end of the class period nor the eventual financial ruin of Loewen Group are proof that defendants committed any acts worse than mismanagement. _See In re Milestone Scientific Sec. Litig.,_ 103 F.Supp.2d 425, 465-66 (D.N.J.2000) (later occurrences do not support claim of securities fraud).

That plaintiffs have not made a claim of fraud is supported by the Court of Appeals' decision in _Shapiro v. UJB Financial Corp.,_ 964 F.2d 272 (3d Cir.1992). The _Shapiro_ plaintiffs claimed that the defendants did not maintain a sufficient loan loss reserve, which is similar to Loewen Group's allowance for uncollectible accounts receivables. _Id._ at 280-81. The Court of Appeals affirmed the district court's dismissal of the _Shapiro_ plaintiffs' claim regarding loan loss reserves because although they had made a claim that the loans carried a "high risk of noncollectibility" plaintiffs did not allege that defendants "possessed or made affirmative forecasts regarding" the possibility of needing to increase its loan loss reserves in the future. _Id._ at 283. Likewise, plaintiffs in this case have not plead facts tending to show that defendants had any specific knowledge that Loewen Group's allowance for uncollectible accounts receivable was insufficient.

2. Allegations of fraudulent sales practices

Additionally, defendants challenge the sufficiency of plaintiffs' pleaded facts supporting the allegation that defendants knew of or encouraged fraudulent practices by employees. Plaintiffs' supplemental brief names a former salesperson who has testified that he committed fraudulent acts and that "Loewen Group winked" at fraudulent practices. Pls.' Supp. Br., pp. 4-5. The complaint states that "[d]efendants had actual knowledge of these practices [salespersons writing

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

phony contracts] since certain salespersons were caught, and subsequently fired, for these practices." Compl. ¶ 55.

Plaintiffs also claim that the corporation conducted "weekend blitzes" or "warrior weekends" during which sales forces were directed by managers to back-date cemetery contracts so that quarterly sales numbers could be met. Compl. ¶ 58. They connect this practice to defendant Loewen by claiming that one of the regional managers who ordered the back-dating reported directly to and took orders from defendant Loewen. *Id.*

This claim does meet the fact pleading requirement of Rule 9(b) and the Reform Act. Plaintiffs plead who took these steps, when they did and how the alleged acts would have affected investors' opinion of the company.

B. Plaintiffs' claim that defendants failed to write down assets on a timely basis

*11 During the class period Loewen Group acquired many cemetery and funeral home businesses. The parties dispute whether Loewen Group carried the acquired businesses on its books at the proper values. Plaintiffs claim that Loewen Group overvalued the acquired properties and consequently undervalued the goodwill included in its purchase of businesses. Compl. ¶ 74, 76. The published asset valuations, plaintiffs argue, were consequently materially false and misleading.

Canadian GAAP requires that tangible assets acquired and liabilities assumed to be carried on the corporation's books at "fair value at the date of acquisition" and that the excess of purchase price over that fair value be carried as "goodwill." Compl. ¶ 75. [FN7] Additionally, Canadian GAAP prescribes the straight-line amortization of goodwill and requires that the value of a business' goodwill be written down and charged to income if the goodwill becomes impaired. Compl. ¶ 77. [FN8]

FN7. "[T]he cost of the purchase should be allocated as follows:
(a) the acquiring company's interest in identifiable assets acquired and liabilities assumed should be based on their fair values at the date of acquisition;
(b) the excess of the cost of the purchase over the acquiring company's interest in identifiable assets acquired and liabilities assumed should be reflected as goodwill; ..."

CICA Handbook ¶ 1580.44.

FN8. "[T]he amount reflected as goodwill at the date of acquisition should be amortized to income by the straight-line method over the estimated life of such goodwill...." *CICA Handbook* ¶ 1580.48.
"[W]hen there is a permanent impairment in value of the unamortized portion of goodwill, it should be written down. The write-down should be treated as a charge against income." *CICA Handbook* ¶ 1580.62.

The parties agree that Loewen Group and the other two large death-care consolidators were involved in a bidding war during the class period. Compl. ¶ 89, Response of Defs. Loewen and Wagler to Pl.'s Supp. Br., pp. 6-7; Def. Loewen Group Inc.'s Supp. Memo., pp. 13-14. Each of the consolidators sought to hold the largest share of the United States market and the companies bid up the prices of individual cemetery and funeral home businesses in the process.

Plaintiffs have not pleaded this claim with sufficient specificity to satisfy Rule 9(b) and the Reform Act. Like their allegations of inflated revenues and income, plaintiffs' pleading of inflated valuation of assets lack any specific factual basis. Plaintiffs have not pleaded the amount by which any acquisition was overvalued, the time and amount by which any asset should have been written down, who knew the assets were overvalued or what information was available to defendants that should have alerted them to the need for a write-down. Without these specific facts, a claim fails to meet the requirements of Rule 9(b) and the Reform Act. *Advanta Corp.,* 180 F.3d at 534; *see also Burlington Coat Factory,* 114 F.3d at 1420-22; *Westinghouse,* 90 F.3d at 711; *Shapiro,* 964 F.2d at 280-83.

C. Plaintiffs' claim that defendants failed to disclose that Loewen Group's Florida operations were on probation and under threat of license suspension and that other states were investigating Loewen Group's operations

An omission does not violate Section 10(b) unless there is an affirmative duty to disclose. *Oran,* 226 F.3d at 285. "Such a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Id.* at 285-86. There also can be a duty to correct or update information. The duty to correct applies "when a company makes a historical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information was not." *Burlington Coat Factory,* 114 F.3d at 1431. A duty to update arises when a statement that was reasonable at the time made becomes misleading as a result of later events. Even in that situation, there is no duty to update unless the statement contained an "implicit factual representation that remained 'alive' in the mind of investors as a continuing representation." *Id.* at 1432.

*12 Plaintiffs do not plead one of these specific duties to disclose the investigations. The complaint states only that the Florida "probation was a serious issue for the Company since the Florida Department of Banking and Finance had the ability to suspend the licenses of these subsidiaries which would severely restrict the Company's ability to take on new pre-need funeral business in Florida...." Compl. ¶ 68. The complaint also details the numerous violations of Florida law and the orders issued by the Florida authorities with respect to the violations. Compl. ¶ ¶ 130-32.

Because Loewen Group stock was traded on the NYSE a special rule regarding materiality applies. The rule is based on the proposition that on an open and active securities market like the NYSE the price of a company's stock takes into account all available material information regarding the company and its business. In such an efficient market, "information important to reasonable investors ... is immediately incorporated into the stock price." *Burlington Coat Factory,* 114 F.3d at 1425. Consequently, when a stock is traded on an efficient market the materiality of disclosed information may be measured by looking at movement in the price of the corporation's stock in the days following the announcement. *Id.* Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," if a company's disclosure of information has a negligible effect on stock prices, "it follows that the information disclosed ... was immaterial as a matter of law." *Id.*

On January 14, 1999, the last day of the class period, Florida suspended Loewen Group's licence to operate in Florida and announced the suspension. Compl. ¶ 180. On January 15 Loewen Group stock fell 6% and ended the day at $4.81 per share. Compl. ¶ 185. Before these developments, however, Loewen Group stock had already lost 85.2% of its value from its high of $34.50 share in June 1997. Compl. ¶ 17 (noting high and low value of Loewen Group stock); Compl. ¶ 185 (noting stock lost 6% of value to close

at $4.81 on January 15, 1999, meaning that the stock price fell from $5.12 to $4 .81). In fact, the drop in value of the stock that occurred after Florida suspended Loewen Group's license was only $0.31, or 0.91% of the $33.94 total drop in value of the stock from its high in June 1997 to its low in May 1999. Compl. ¶ 19 (noting low stock price of $0.56 per share in May 1999).

Numerous problems at Loewen Group contributed to its stock's steep drop in value between 1997 and 1999. Defendants' decision not to publicize state investigations into its businesses was not a material factor in the lost value of Loewen Group stock. Before January 14, 1999 there were ongoing state investigations and the probation of the two Florida subsidiaries that could have been disclosed to the public. State investigations, as plaintiffs admit in their complaint, are routine in a regulated industry like the cemetery business. Compl. ¶ 64, n. 5. While probation cannot be called routine, it is not as serious as suspension. The fact that such a small part of the total drop in value of the stock (0.91%) occurred after the more serious suspension of the Florida subsidiaries was announced, however, clearly indicates that the state investigations and Florida probation were not material.

*13 That the omissions were not material is supported by *Oran v. Stafford,* 226 F.3d 275 (3d Cir.2000). The *Oran* defendants did not disclose two reports concerning heart abnormalities observed in patients using one of defendants' prescription drugs. *Id.* at 281. The Court of Appeals affirmed the district court's dismissal of the claim, which was based on the market's lack of reaction to later disclosure of the reports. *Id.* at 283-84. Like the Florida probation of and threat to suspend the Florida subsidiaries, the reports in *Oran* revealed potential serious problems that would, if realized, negatively affect the corporation and its stock value. The Court's holding that the *Oran* defendants' omission was not material supports my conclusion that the alleged omissions in this case are not material.

D. Plaintiffs' claim that defendants made false and misleading statements about the success and profitability of Loewen Group's expansion-through-acquisition strategy

The statements highlighted by plaintiffs in their supplemental brief [FN9] include declarations of the "successful implementation" and "ongoing momentum" of the acquisition program, which was described as being undertaken on a "focused and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

disciplined basis." Plaintiffs allege that these statements were misrepresentations of material fact. They claim that "defendants misrepresented that the acquisitions were propelling the Company's growth and profitability" when in reality the acquisition program was contributing to Loewen Group's financial downfall. Pls.' Supp. Br., p. 11. Defendants maintain that all of the statements were either true or immaterial puffery.

FN9. I focus on the statements listed in plaintiffs' supplemental brief in opposition to defendants' motion to dismiss because there are far too many statements in the 292 paragraph complaint to address. I think it reasonable to assume that plaintiffs included their strongest examples in their supplemental brief.

Obviously, there can be no securities fraud liability for a true statement. Furthermore, not every misrepresentation of fact will lead to securities fraud liability. The misrepresentation must be material. Material information is "information that would be important to a reasonable investor in making his or her investment decision." _Burlington Coat Factory,_ 114 F.3d at 1425. Information that is not disclosed is material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information' available to that investor." _Oran,_ 226 F.3d at 282.

The Court of Appeals explained the difference between misstatements of material fact and immaterial puffery in _Advanta Corporation,_ 180 F.3d 525. It stated that Section 10(b) "liability does not attach merely because 'at one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less rosy.' ' _Id._ at 538, quoting _DiLeo,_ 901 F.2d at 627. Statements are puffery, and therefore not actionable, if they are "vague and general statements of optimism." _Advanta Corp.,_ 180 F.3d at 538. The theory behind not holding defendants liable for puffery is that reasonable investors would consider the source of such optimism and consequently not allow it to affect unduly their opinion of the stock.

*14 The line between material misrepresentations and immaterial positive statements was further delineated in _In re Aetna Inc. Securities Litigation,_ 34 F.Supp.2d 935, 947 (E.D.Pa.1999). Although in dicta, Judge Padova distinguished two descriptions of a merger as "highly successful." One was actionable

fraud--"Joe has done a great job leading the rapid and successful integration of the health business...." _Id._ at 944-45. One was immaterial puffery--the corporation stated that its new president had been an integral force in "the merger and the highly successful integration at" the corporation _Id._ at 947-48. The critical difference between the two statements was in the context. The first statement, taken in context, was linked to goals set forth by the company in a prior proxy statement. _Id._ at 948 ("[T]he statements ... are not mere puffing statements but constitute concrete representations about the success of the merger, as gauged by the objectives in the proxy materials."). In contrast, the second statement was not linked to specific corporate goals, but rather was clearly intended as part of a brief positive biography of a new officer. _Id._ ("[T]he description of the integration as 'highly successful,' without more, is a generalized statement that is inactionable as a matter of law because it constitutes mere 'puffery' and would be understood by reasonable investors as such.").

The materiality question asks of each statement: is the allegedly false statement, in the context in which it was publicized, "information that would be important to a reasonable investor in making his or her investment decision." _Burlington Coat Factory,_ 114 F.3d at 1425. Applying that standard, I now will examine each alleged fraudulent misrepresentation.

The statements boil down to assertions that Loewen Group grew and exhibited a "strong performance" due to "successful implementation" of its acquisition strategy. It is a fact that Loewen Group grew during the class period because it acquired many funeral homes and cemeteries during that time. Compl. ¶ 5. Therefore, the statements about the company's "growth" are true and not actionable. The remainder of the alleged fraudulent statements declared that the acquisition strategy was being undertaken on a "focused and disciplined basis" and was being successfully integrated.

The first statement cited in plaintiffs' supplemental brief is "[a]s a result of the successful implementation of this [acquisition of funeral homes and cemeteries] strategy, the Company has grown significantly." Compl. ¶ 97, 104, 107, 111. The statement appeared in Loewen Group's 1996 Form 10-K, which was incorporated into both a Registration Statement and Prospectus filed in conjunction with a May 1997 secondary offering of shares and a May 1997 press release. In three of its four publications, the statement is directly followed by the declaration that "[m]anaging the Company's growth is critical to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

Page 12

profitability, and will continue to be one of the most important responsibilities and challenges facing the company." Compl. ¶ 97, 104, 107. In the fourth publication, a press release, the statement is followed by a claim about the compound annual growth rates of Loewen Group's revenues and earnings. Compl. ¶ 111.

*15 The 1996 Form 10-K also included a statement that "[a]ggressive pricing by the Company's competitors, particularly for strategic operations, may result in increased acquisition costs." Def. Loewen Group's Memo. in Support of Mot. to Dismiss, p. 20. [FN10] The Registration Statement and Prospectus plaintiffs quote also said "[t]here can be no assurance that the Company will be able to identify, negotiate and consummate acquisitions or that acquired businesses can be operated profitably or integrated successfully into the Company's operations without substantial costs, delays or other operational or financial problems." Def. Loewen Group's Memo. in Support of Mot. to Dismiss, p. 20.

> FN10. Although I am ruling on a motion to dismiss I may cite to portions of documents on which plaintiffs base their claims even though plaintiffs did not include those particular portions in their complaint. *Burlington Coat Factory,* 114 F.3d at 1424-25. Plaintiffs have not challenged the accuracy of defendants' quotations.

The fourth publication of the statement appeared in a press release that was published three days after Loewen Group filed the Registration Statement and Prospectus for its secondary offering. Compl. ¶ 111. I do not have a copy of the full press release and the portion given to me by plaintiffs does not contain any statements that clarify the claim of "successful implementation." Nevertheless I find the statement to be immaterial. Loewen Group had a strategy of acquiring independent funeral homes and cemeteries. The strategy was implemented by the corporation's purchase of those businesses. Only six months had passed from when the acquisition program started with Service Corporation International's hostile takeover bid until the time of the press release. A reasonable investor would not think that "successful implementation" of a six month old strategy implied that there were no more risks involved in the strategy.

To summarize, a reasonable investor would not be influenced unduly by the statement "[a]s a result of the successful implementation of this [acquisition of funeral homes and cemeteries] strategy, the Company

has grown significantly." Rather the claim of "successful implementation" is immaterial puffery that is not actionable. In all publications it is clear that the statement is coming from the corporation or its officers and directors. Furthermore, in three of the publications the statement is made in the context of a larger declaration by the corporation that included a warning about the challenge of managing the company's growth. A reasonable investor would take those positive statements in their context to mean that Loewen Group was successfully buying businesses, but that managing that growth continued to be a challenge to the corporation.

The second statement quoted by plaintiffs is "[t]his strong performance across the Company ... reflects ... the ongoing momentum of our acquisition program." Compl. ¶ 124. This statement was made by Ray Loewen and published in a press release in August 1997. The press release cited increases in earnings and revenue from the second quarter of 1996 to the second quarter or 1997. In fact, the complaint does not allege that this statement is materially false and misleading, but rather quotes it in the course of making a claim of material omission regarding the operation of the pre-need sales department. Compl. ¶ 124. Accordingly, I will not address the merit of this statement as a fraudulent statement.

*16 The third statement about the acquisition program that plaintiffs cite comes from a November 1997 press release: "Mr. Loewen noted that the company continues to be the consolidator of choice in the industry and is sharpening the focus of its acquisition program, pursuing transactions on a selective and disciplined basis." Compl. ¶ 135. The press release reported a loss for the third quarter of 1997, which was attributed to "restructuring, strategic initiative and other charges." It quoted Paul Wagler as saying "[t]he majority of the anticipated future savings from the restructuring and strategic initiatives are associated with our efforts to more effectively integrate our filed and administrative operations." *Id.* In context Mr. Loewen's statements that his company is "the consolidator of choice," "sharpening the focus" and "pursuing transactions on a selective and disciplined basis" are nothing more that corporate puffery. These are the kinds of positive statements that corporate officers make all of the time and that reasonable investors know to take with a grain of salt. *See Advanta Corp.,* 180 F.3d at 538.

The fourth statement quoted by plaintiffs is almost identical to the third-- "During 1997 the Company continues its acquisition program on a focused and

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

disciplined basis." Compl. ¶ 142 (March 1998 press release). Loewen Group used the press release to report improved earnings for the fourth quarter of 1997. It was in this context that the company claimed to be running its acquisition program on a focused and disciplined basis. Again, this statement is immaterial puffery. *See Advanta Corp., 180 F.3d at 538.*

The fifth statement cited by plaintiffs is: "As a result of the successful implementation of this [acquisition] strategy, the Company has grown significantly.... Due to the successful implementation of its business strategies, the Company has grown from 489 locations at December 31, 1992 to 1,611 at March 6, 1998." Pls.' Supp. Br., p. 12. This statement was made by the company in its 1996 Form 10-K. In their supplemental brief plaintiffs inserted an ellipsis where the document itself read: "Managing the Company's growth by successfully integrating newly acquired operations with existing facilities and optimizing economies of scale is critical to profitability, and will continue to be one of the most important responsibilities and challenges facing the Company." Compl. ¶ 146. The omitted statement adequately renders the statement of "successful implementation" immaterial because it alerted the readers to the fact that the company was continuing to face challenges connected with the acquisition program. Plaintiffs do not challenge the factual claims about numbers of locations.

None of the statements cited by plaintiff are material misrepresentations under Section 10(b). Plaintiffs' claim of false and misleading statements about the success and profitability of Loewen Group's acquisition strategy therefore will be dismissed under Rule 12(b)(6).

E. Pleading Scienter

*17 Not only must plaintiffs making Section 10(b) claims meet factual pleading requirements as to the details of the alleged fraudulent acts, they also must plead facts that support that each defendant acted with the required state of mind. Only one of plaintiffs' claims has met the pleading requirements as to the alleged fraudulent acts--the allegation of fraudulent practices by Loewen Group's sales departments. I will examine this claim to determine if it will be dismissed under the scienter pleading requirements.

The Reform Act requires that a securities fraud complaint "state with particularity facts giving rise to

a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2). In this Circuit a plaintiff may establish this strong inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat Factory, 114 F.3d at 1418.*

1. Plaintiffs' pleading of motive and opportunity

The complaint paints a picture of defendant Loewen as a power-hungry dictator desperate for control. Loewen was the founder of the corporation and its president and CEO when one of Loewen Group's main competitors, Service Corporation International, made the hostile bid to takeover the corporation. Service Corporation International offered Loewen Group shareholders $45 for each of their shares, which were at the time trading at $28 per share on the NYSE. After Loewen Group's board of directors rejected the bid, plaintiffs argue, defendants needed to increase the price of Loewen Group stock to keep shareholders content and to ward off other hostile takeover bids.

The District Court for the Southern District of New York has succinctly described the scienter analysis I must make: "The question turns, then, on the concreteness of the allegations; a generalized desire to maintain a higher stock price will not rise to the level of motive for [Section 10(b) ] purposes. However, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." *In re Complete Mgmt., Inc. Sec. Litig., 153 F.Supp.2d 314, 328 (S.D.N.Y.2001).*

A pleading of motive that was similar to the one made by plaintiffs in this case was rejected by the Court of Appeals in *Burlington Coat Factory, 114 F.3d at 1423, n. 12.* The *Burlington Coat Factory* plaintiffs alleged that the individual defendants intended to inflate the company's stock price in an effort to "protect, perpetuate and enhance their executive positions and the substantial compensation, prestige and other perquisites of executive employment obtained thereby." *Id.* (quoting complaint). The Court rejected this pleading of motive because in general "causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

**\*18** The *Burlington Coat Factory* Court did state that a specific takeover bid could motivate corporate officers to create fraudulently a temporary raise in stock price. *Id.* In this case, however, Service Corporation International's hostile takeover bid was defeated on January 7, 1997, nearly two months before the class period started. Compl. ¶ 63. Defendants were not facing a hostile takeover bid during the class period.

Accordingly, plaintiffs' allegation that defendants were motivated to commit fraud because of their compensation in salary, stock, stock options and other perquisites is too general to satisfy the scienter pleading requirements. These are general motivations for all corporate officers and do not satisfy the Reform Act's requirements for pleading scienter. *Burlington Coat Factory,* 114 F.3d at 1423, n. 12.

Plaintiffs' allegation that defendants wanted to inflate the value of Loewen Group stock to use it to acquire other businesses, directly and through compliance with existing debt covenants, is also too general. *See In re Health Mgmt, Inc. Sec. Litig.,* 970 F.Supp.2d 192, 204 (E.D.N.Y.1997) (finding allegation of motive insufficient where plaintiffs do not explain how the corporation's acquisitions of other businesses with inflated stock would be "in the informed economic self-interest of the Individual Defendants beyond" the general motivations of every corporate officer and director). Plaintiffs do not allege how defendants Loewen and Wagler would benefit personally from the acquisitions. Loewen and Wagler's desires to retain control of the corporation as officers and directors do not create a "strong inference" of fraudulent intent. *See id.*

None of plaintiffs' allegations of motive by the individual defendants meets the Reform Act's requirements for pleading of scienter. Without sufficient pleading of motive the existence of an opportunity to defraud is insufficient to meet the Act's requirement for pleading of scienter. *See Advanta Corp.,* 180 F.3d at 530, 534.

2. Plaintiffs' pleading of circumstantial evidence of conscious misbehavior or recklessness by defendants

Another way to satisfy the Reform Act's pleading requirement regarding scienter is to plead strong circumstantial evidence of conscious misbehavior or recklessness by defendants. *Advanta Corp.,* 180 F.3d at 530, 534. Plaintiffs attempt to satisfy this requirement by pleading that (1) one former

employee would testify that Loewen Group "winked" at fraudulent practices; (2) that several salespersons were caught and fired for fraudulent practices; (3) that one fired salesperson was hired back; and (4) that a regional manager who allegedly committed and encouraged his inferiors to commit fraud reported to and took orders from defendant Loewen.

None of these alleged connections meets the requirement of the Act. The testimony of the former employee does not connect the individual defendants remaining in this case to the fraud. Defendants Loewen and Wagler were based in Canada and oversaw the entire corporation. The employee quoted does not identity either of them as endorsing fraud. Nor does it follow from the fact that several salespersons were caught for fraud and fired that defendants knew of and encouraged ongoing fraud in Loewen Group's sales departments. Even the rehiring of one fired employee does not show defendants' knowledge or encouragement of fraud. The regional manager who reported to and took order from defendant Loewen has not made a claim that Loewen knew of or ordered the commission of fraud in the sales department.

**\*19** Plaintiffs plead in the alternative that defendants Loewen and Wagler were engaged in reckless misbehavior. They do not plead, however, facts indicating that the alleged fraud should have been discovered by defendants. Rather, plaintiffs point to changes made at Loewen Group after the end of the class period and statements made after the end of the class period as evidence of recklessness. Compl. ¶ ¶ 78, 190, 199, 204, 208. Plaintiffs may not base their pleading of scienter on "a bare inference that a defendant 'must have had' knowledge of the facts." *In re Advanta,* 180 F.3d at 539 (citations omitted). The facts pleaded simply do not add up to the "strong circumstantial evidence" required. *See Advanta Corp.,* 180 F.3d at 530, 534.

F. Section 20(a) Claims

A plaintiff cannot maintain a claim under Section 20(a) of the Exchange Act without meeting the pleading requirements for a primary violation of the Act. *Cybership,* 189 F.Supp.2d at 233; *see also Advanta Corp.,* 180 F.3d at 541. Plaintiffs' Section 20(a) claims therefore will be dismissed.

G. Dismissal of claims against Loewen Group

As I explained earlier, plaintiffs may not obtain a judgment against Loewen Group because the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22436233 (E.D.Pa.)
(Cite as: 2003 WL 22436233 (E.D.Pa.))

Page 15

corporation is protected by its bankruptcy Order and Section 524(a)(1) of the Bankruptcy Code. The only reason allow suit to proceed against Loewen Group was the possibility of plaintiffs' use of the uncollectible share provision of the Reform Act, 15 U.S.C. § 78u-4(f)(4). Use of the provision requires a judgment against at least one of the individual defendants. *Id.* Because I will dismiss all claims against the individual defendants I will also dismiss all claims brought against Loewen Group. I do not reach, therefore, the issue of whether the claims against Loewen Group should be dismissed under the Bankruptcy Code.

An appropriate Order follows.

## ORDER

AND NOW, this day of July, 2003, in consideration of defendants' motions to dismiss, plaintiffs' opposition thereto, oral argument by the parties and the various supplemental memoranda and briefs that have been filed, and for the reasons set forth in the accompanying memorandum, defendants' motions to dismiss are GRANTED and the complaint is DISMISSED. Plaintiffs' claim of failure to disclose state investigations and the Florida probation of Loewen Group businesses and their claim of false and misleading statements about the success and profitability of Loewen Group's acquisition strategy are dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b). The other claims are dismissed with leave to amend pursuant to Rule 9(b) of the Federal Rules of Civil Procedure and the Reform Act. Any amended complaint must be filed within twenty (20) days from the date of this Order.

2003 WL 22436233 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

•                    2:98cv06740                    (Docket)
(Dec. 29, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.