EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
2004 WL 609374 (D.Del.)
(Cite as: 2004 WL 609374 (D.Del.))

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Stephen J. DILORENZO, derivatively on behalf of
dELiA\*S Corp. and Alloy, Inc.,
Plaintiff,
v.
Christopher EDGAR, Geraldine Karestky, Stephen I.
Kahn, Evan Guillemin, dELiA\*S
Corp., and Alloy, Inc., Defendants.
**No. Civ. 03-841-SLR.**

March 24, 2004.

Theodore J. Tacconelli, Ferry, Joseph & Pearce,
P.A., Wilmington, DE, for Plaintiff.

Allen M. Terrell, Jr., Richards, Layton & Finger, Jon
E. Abramczyk, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.

\*1 At Wilmington, this 24th day of March, 2004,
having reviewed the motions of defendants to dismiss
(D.I.10, 13), and the memoranda submitted
therewith;

IT IS ORDERED that defendants' motions (D.I.10,
13) to dismiss are denied for the reasons that follow:

1. Plaintiff filed this derivative action on August 27,
2003 alleging violations of § 16(b) of the Securities
Exchange Act of 1934, codified at 15 U.S.C. §
78p(b). (D.I.1) The suit is brought on behalf of
dELiA\*s Corporation ("dELiA\*s") and Alloy, Inc.
("Alloy"), and seeks to recover short-swing profits
obtained by defendants Christopher Edgar, Geraldine
Karetsky, Stephen Kahn and Evan Guillemin
("Former Director defendants"). On October 16,
2003, the defendants filed motions to dismiss
pursuant to Fed.R.Civ.P. 12(b) 1 and 12(b)(6).
(D.I.10, 13)

2. During the relevant time period, the Former
Director defendants were directors of dELiA\*s. Kahn
was the Chief Executive Officer and Chairman of the
Board. Edgar was the Executive Vice President and
Vice Chairman. Guillemin was the Chief Financial
Officer and Treasurer. On or about May 12, 2003, the
Former Director defendants purchased in aggregate
7,297,298 shares of dELiA\*s common stock at a
price of $0.37 per share for a total of $2.7 million.
(D.I.1, ¶ 12) Of this amount Kahn purchased
4,054,054 shares; Karetsky purchased 2,702,703
shares; Edgar purchased 337,838 shares; and
Guillemin purchased 202,703 shares. Further,
dELiA\*s issued to the Former Director defendants a
total of 600,000 warrants to purchase shares at $0.37
a share.

3. On July 30, 2003, dELiA\*s entered into an
agreement with Alloy to conduct a tender offer for all
of the publicly held shares of dELiA\*s. At that time,
Karetsky and Kahn entered into an agreement to
support the merger and tender their shares. Kahn,
Edgar and Guillemin each received employment
agreements with Alloy upon the effective date of the
merger. (Id., ¶ 10, 15)

4. On August 6, 2003, Dodger Acquisition Corp., a
direct wholly owned subsidiary of Canal Park Trust
and an indirect wholly owned subsidiary of Alloy,
commenced a tender offer for 100% of dELiA\*s
shares at a price of $.0928 per share. (Id., ¶ 25; D.I.
12, at ex. 1) Plaintiff contends that the Former
Director defendants obtained short-swing profits in
violation of § 16(b) as a result of an August 6, 2003
tender-offer by Alloy to dELiA\*s shareholders for a
cash-out merger between the corporations.

5. During the offer period, plaintiff commenced the
present action but did not tender his shares. On
September 7, 2003, the merger closed and plaintiff,
along with other nontendering shareholders, was
cashed-out and his shares canceled. Canal Park Trust
is now the sole shareholder of dELiA\*s stock.
(D.I.12)

6. Plaintiff was a dELiA\*s shareholder at the time of
the filing of the complaint. Plaintiff also contends
that at the time of the transaction he was an Alloy
shareholder and has maintained that interest. Plaintiff
seeks a disgorgement of $4,071,892 in profits
received by the Former Director defendants as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 609374 (D.Del.)
(Cite as: 2004 WL 609374 (D.Del.))

result of the transaction. Plaintiff also seeks $334,800 related to the acquisition of the 600,000 warrants.

*2 7. Defendants' motions to dismiss contend that plaintiff's complaint fails for a lack of standing because he is no longer a shareholder of dELiA*s and because he failed to make demand upon the corporation's board of directors.

8. Standard of Review. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

9. In considering a motion to dismiss, a court may consider Securities Exchange Commission documents that are expressly relied upon in the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997); Indeck Maine Energy, L.L.C. v. ISO New England Inc., 167 F.Supp.2d 675 (D.Del.2001). Further, on a motion to dismiss the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials. See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir.2000); Ieradi v. Myland Lab, Inc., 230 F.3d 594, 600 n. 3 (3d Cir.2000) (citing Fed.R.Evid. 201).

10. Standing under Section 16(b). Section 16(b) establishes strict liability for covered individuals who engage in the sale or purchase of a covered security. 15 U.S.C. § 78p(b). The right of recovery under § 16(b) is held, however, solely by the issuer of the security. Id. A shareholder may bring a derivative action "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." Id.

11. There are three requirements for shareholder standing to bring suit under § 16(b). See Gollust v.

Mendell, 501 U.S. 116 (1991). First, the plaintiff must own a security within the meaning of the section. Second, the security held by the plaintiff must be a security of the issuer of the security traded by the covered individual. Third, the plaintiff must own a security of the issuer at the time the § 16(b) action is instituted. Id. at 123-24. Unlike a typical shareholder derivative action, there is not a requirement that the plaintiff maintain continual ownership, only that he has "some continuing financial stake in the litigation" so as to satisfy minimum standing requirements imposed by the jurisdictional limitations of Article III. See id. at 125.

*3 12. In the present case, plaintiff's complaint alleges that he owned shares of stock issued by dELiA*s at the time he filed the present action. Consequently, plaintiff satisfied the statutory requirements for standing at the time the suit was instituted. Defendants contend, however, that plaintiff is no longer a shareholder and lacks the requisite standing to maintain the suit. Plaintiff argues that his ownership of shares in Alloy provide a basis for his continuing financial interest in the outcome of the litigation.

13. In Gollust, the Supreme Court considered the effect of a stock-exchange merger upon the plaintiff's previously filed § 16(b) action. The unanimous Court concluded that although plaintiff was no longer a shareholder of the issuer, as his stock was exchanged for stock in the new corporation, he nonetheless had the minimal financial interest in the outcome of the litigation to satisfy constitutional concerns. Id. at 126-28. Consequently, under Gollust, where a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest in the outcome of the litigation.

14. In the present case, the major distinguishing factor is the form of restructuring. Instead of a stock-exchange merger, dELiA*s effectuated a cash-out merger. The court concludes that § 16(b)'s remedial purpose should not be truncated by the legal nuances of the corporate restructuring. A shareholder of a parent corporation has a financial interest, albeit tenuous, in the disgorgement of profits obtained by insiders of a corporate subsidiary. Although Congress did not provide statutory standing for such a party to institute a § 16(b) suit, [FN1] a shareholder of a parent corporation has a cognizable interest for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 609374 (D.Del.)
(Cite as: 2004 WL 609374 (D.Del.))

purposes of satisfying constitutional requirements. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Consequently, the court concludes that plaintiff satisfies the constitutional requirements to maintain the suit.

> FN1. Where a shareholder of a parent corporation brings a suit against a subsidiary of the parent under a derivative theory, the suit is referred to as double derivative in nature. Section 16(b) suits premised upon double derivative standing have been rejected by a majority of courts. *See Lewis v. McAdam,* 762 F.2d 800, 804 (9th Cir.1985) (concluding that standing does not exist in a cash-stock merger); *Untermeyer v. Valhil. Inc.,* 665 F.Supp. 297, 300-01 (S.D.N.Y.1987) (concluding that standing does not exist in a cash-out merger). These cases are distinguished, however, because the Supreme Court in *Gollust* differentiated between standing to institute suit and a sufficient interest to maintain suit. *See Gollust,* 501 U.S. at 123-24.

15. Demand. Defendants also contend that plaintiff does not have standing for failure to satisfy Fed.R.Civ.P. 23.1's requirements for demand. It is clear, however, that Rule 23.1 does not apply to actions brought pursuant to § 16(b). For example, unlike typical derivative actions, the decision to bring a § 16(b) enforcement action does not enjoy protection of the business judgment rule. *See Cramer v. General Telephone & Elec. Corp.,* 582 F.2d 259, 276 (3d Cir.1978). Similarly, as discussed above, there are no requirements of continuous ownership. *See Gollust,* 501 U.S. at 124-25.

16. Where demand would have been futile, courts have excused the requirement under § 16(b). *See Berkwich v. Mencher,* 239 F.Supp. 792, 793-94 (S.D.N.Y.1965); *Grossman v. Young,* 72 F.Supp. 375 (S.D.N.Y.1947). On a motion to dismiss for failure to state a claim, the court must accept as true plaintiff's allegations of demand futility. *Id.* at 380.

*4 17. In the present case, plaintiff pleads demand futility stating that he "has not made demand on dELiA*s Board of Directors because such demand would be futile in view of Alloy's acquisition of the company and defendants' control of dELiA*s Board." (D.I.1, ¶ 28) Plaintiff's allegations of control are supported by those documents submitted by defendants in support of their motion to dismiss. [FN2] (D.I.12) Further, had plaintiff made a demand, § 16(b) would preclude him from filing suit until either sixty days had passed or the board had rejected his demand. Due to the short timing of the merger, plaintiff's shares would be canceled before he would have been permitted to bring suit. The failure of the dELiA*s board to bring suit on its own behalf after becoming aware of plaintiff's suit also supports plaintiff's futility allegations. *See Berkwich,* 239 F.Supp. at 794. Consequently, for purposes of resolving the pending motion to dismiss the court finds that plaintiff has sufficiently alleged the existence of demand futility.

> FN2. For example, the Former Director defendants represent four of the eleven members of the former dELiA*s and include three of the four former officers. (D.I. 12, ex. 2 at B-3) Collectively, the Former Director defendants owned 37.8% of the dELiA*s stock.

2004 WL 609374 (D.Del.)

### Motions, Pleadings and Filings (Back to top)

• 2003 WL 23472178 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Motion of Nominal Defendants dELiA*s Corp. and Alloy, Inc. to Dismiss the Complaint (Nov. 25, 2003)

• 2003 WL 23472179 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motions to Dismiss (Nov. 10, 2003)

• 2003 WL 23472177 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Nominal Defendants dELiA*s Corp. and Alloy, Inc. to Dismiss the Complaint (Oct. 16, 2003)

• _____1:03CV00841_____(Docket) (Aug. 27, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

LEXSEE 2005 U.S. DIST. LEXIS 6427

In re: Best Buy Company, Inc. Securities Litigation

Civil No. 03-6193 ADM/AJB

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

*2005 U.S. Dist. LEXIS 6427; Fed. Sec. L. Rep. (CCH) P93,224*

April 12, 2005, Decided

**PRIOR HISTORY:** *Meeuwenberg v. Best Buy Co., 2004 U.S. Dist. LEXIS 7686 (D. Minn., Apr. 29, 2004)*

LexisNexis(R) Headnotes

**COUNSEL:** [*1] Kimberly C. Epstein, Esq., Sylvia Wahba Keller, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA; Thomas V. Seifert, Esq., Head, Seifert & Vander Weide, Minneapolis, MN, for Plaintiffs.

Thomas B. Hatch, Esq., Elliot S. Kaplan, Esq., John P. Morgan, Esq., Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, for Defendants.

**JUDGES:** ANN D. MONTGOMERY, U.S. DISTRICT JUDGE.

**OPINIONBY:** ANN D. MONTGOMERY

**OPINION:**

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

On January 12, 2005, oral argument before the undersigned United States District Judge was heard on Defendants Best Buy Company, Inc., Richard M. Schulze, Bradbury H. Anderson, Allen U. Lenzmeier, and Darren R. Jackson's (collectively, "Best Buy" or "Defendants") Motion to Dismiss [Docket No. 52]. In their Consolidated Class Action Complaint ("Complaint") [Docket No. 47], Plaintiffs Louis Meeuwenberg, David Tkach, Stephen Anish, and Christopher Hinton ("Plaintiffs") allege a securities fraud class action. Because Plaintiffs fail to meet the particularity requirements required for pleading a *10(b)* or *10b-5* claim under the Securities Exchange Act, Defendants' Motion is granted.

### II. BACKGROUND [*2] n1

n1 For purposes of the instant Motion, the facts are viewed in the light most favorable to the nonmoving party. See *Digi-Tel Holdings, Inc. v. Proteq Telecommunications, 89 F.3d 519, 522 (8th Cir. 1996); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).*

In January 2001, Best Buy acquired Musicland Stores Corporation, including 1,309 Musicland stores, n2 for approximately $700 million. Lewis Decl. [Docket No. 55] Ex. 13. n3 The Musicland stores were acquired for the purpose of attracting new customers to Best Buy, as well as the ability to cross merchandise product. Compl. P 31. At the time of acquisition, Musicland's sales were primarily based on pre-recorded music. Lewis Decl. Ex. 13. Although sales of pre-recorded music were flat or in decline at the time of the purchase, Best Buy intended to return the stores to profitability with a different mix of products, including DVD movies, video games, and expanded hardware offerings. Id. at Exs. 2, 13.

n2 Musicland includes the Sam Goody, On Cue, and Suncoast chains. The stores will collectively be referred to as the "Musicland stores."

[*3]

n3 Because the exhibits attached to the Lewis Declaration are documents either relied upon by the Complaint or are filed with the Securities and Exchange Commission, the Court will consider these documents, and deny Plaintiffs' Motion to Strike [Docket No. 62]. *In re: K-Tel Int'l, Inc. Securities Litigation, 107 F. Supp. 2d 994, 998-99 (D. Minn. 2000),* aff'd, *300 F.3d 881 (8th Cir. 2002).* The majority of the documents cited by Plaintiffs in their Motion to Strike are not relied upon in the determination of the Motion to Dismiss. Only those cited herein were considered for background factual purposes only.

  

Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 7 of 23

Page 2

2005 U.S. Dist. LEXIS 6427, *3; Fed. Sec. L. Rep. (CCH) P93,224

The market, however, did not share Best Buy's optimism regarding the Musicland purchase. In response to reports of the acquisition, Best Buy's stock price dropped over 20%, from $28.81 to $22.94, apparently over fears that the Musicland store purchase would dilute Best Buy's earnings. Id. at Ex. 27. Over the following year, however, the Musicland stores contributed one cent per share to Best Buy's overall earnings. Id. at Exs. 2, 10. This result [*4] was consistent with Best Buy's predictions. Id. Best Buy credited Musicland's contributions to strong sales of DVD movies and video games in the last quarter of the year. Id. at Ex. 10. In fact, for the entire duration that Best Buy owned the Musicland stores, including the class period, Best Buy's earnings met or exceeded forecast expectations. Id. at Exs. 3–7, 9–10, 16, 18, 20–21, 23, 25.

In December 2002, Best Buy revised its earnings outlook downward for the fourth quarter, "due to an expected operating loss of $80–85 million from our Musicland stores." Id. at Ex. 21. Best Buy's outlook also included consideration of a sale of the Musicland stores: "A more comprehensive review of the business alternatives is underway to determine the overall profit potential of the business as a whole." Id.

## III. DISCUSSION

### A. Standard of Review

A misrepresentation claim brought under § *10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5* must plead the following elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often [*5] analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re: K–Tel Int'l, Inc Securities Litigation, 300 F.3d 881, 888 (8th Cir. 2002).* The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *15 U.S.C. § 78u–4(b)(1).* In short, the PSLRA "embodies the pleading requirement of *Fed. R. Civ. P. 9(b)." K–Tel, 300 F.3d at 889.* Particularity requires an identification of the "who, what, when, where, and how." *Id. at 890* (citation omitted).

Although "scienter is not explicitly required by the

statutory text of the Exchange Act. . . it is an acknowledged essential element of a *section 10(b)* and *Rule 10b–5* claim." *Id. at 893.* [*6] The PSLRA, therefore, requires that a pleading must "state with particularity facts which give rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u–4(b)(2).* This includes "such matters as the time, place and contents of false representations, as well as, the identity of the person . . . ." *K–Tel, 300 F.3d at 890* (citation omitted). Recklessness, as well as intentional conduct, satisfies the scienter requirement. *Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1534 (8th Cir. 1996)* (citation omitted). Recklessness is defined as "an extreme departure from the standards of ordinary care, and . . . presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *K–Tel, 300 F.3d at 893* (citations omitted). Motive and opportunity are both relevant to the scienter inquiry, "but particularly important to establishing scienter is a showing of unusual or heightened motive to meet the Reform Act standard." *Id. at 894* (citation omitted). Without a showing of motive [*7] and opportunity, the remaining allegations against the defendants must be particularly strong to constitute an inference of recklessness. Id. Specifically, unsupported allegations that defendants had motives common to all officers and directors — such as keeping the stock price high for the general purpose of increasing compensation or the desire to make the corporation appear profitable – are insufficient to establish scienter. Id. However, if the stock price was artificially inflated for the purpose of selling stock, scienter may be established. Id.

In the instant action, Plaintiffs' allegations fail to meet the heightened pleading requirements of the PSLRA and *Rule 9(b)*. Either the allegations made by Plaintiffs fail to state with particularity why a specific statement is misleading, or Plaintiffs fail to adequately state with particularity facts which give rise to a strong inference of scienter. Moreover, Plaintiffs' allegations do not meet the materiality requirements of a *10(b)* or *10b–5* claim.

### B. 10(b) and 10b–5 Misrepresentations and Omissions

Plaintiffs allege a number of false and misleading misstatements were made by Best Buy between January 9, 2002, and [*8] August 7, 2002 (the "Class Period"). Plaintiffs' Complaint also alleges that Best Buy failed to disclose the truth regarding the status of the Musicland remerchandising efforts. According to Plaintiffs, these omissions made Best Buy's positive statements false and misleading, resulting in the instant lawsuit. For

  

Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 8 of 23

Page 3

2005 U.S. Dist. LEXIS 6427, *8; Fed. Sec. L. Rep. (CCH) P93,224

purposes of analysis, Plaintiffs' allegations are divided into four categories — general allegations against Defendants, specific allegations against Defendants, the allegations of the Confidential Informants, and the individual Defendants' stock sales.

### 1. General Allegations

In its overarching allegations, Plaintiffs claim Best Buy failed to disclose material information pertaining to the failure of the Musicland acquisition, particularly Best Buy's failure to disclose that it was cutting prices on products to overcome the "negative price halo." Compl. PP 5, 55. Furthermore, Plaintiffs allege Best Buy failed to disclose to the public severe problems with the efforts to remerchandise and remodel the Musicland stores. Id. Plaintiffs contend that as a result of these omissions, Best Buy's positive statements were false and misleading.

In support of dismissal of [*9] the action, Best Buy argues that Plaintiffs' claims are conclusory allegations not grounded in specific facts. First, Best Buy argues the allegation that it was experiencing "severe and persistent operational and financial difficulties with Musicland" is not reflected in the financial results of the Musicland stores. Even the Confidential Informants relied upon by Plaintiffs are unable to state that the actual financial performance of Musicland differed from what Best Buy reported to the public. Second, Best Buy cites to Plaintiffs' failure to identify facts to support the claim that the Musicland stores were not performing to "internal expectations." Finally, Best Buy argues that Plaintiffs fail to provide any factual support for the contention that by January 9, 2002, Best Buy was aware the Musicland acquisition was a failure and that Best Buy would have to sell Musicland to avoid ongoing losses. Contrary to this allegation, Best Buy argues it actually increased its earnings forecast for the fourth quarter, and then proceeded to improve upon that forecast by a substantial margin. n4 Again, on April 2, 2002, Best Buy provided earnings guidance for the first quarter, and exceeded those [*10] results as well. It was not until August 8, 2002, that Best Buy reported that softening sales across most product categories could affect earnings. Compl. P 78. Plaintiffs do not challenge the reasoning behind the August 8, 2002 announcement, nor do they allege that the reasons given by Best Buy for the tempered forecast were false or misleading.

n4 In fact, before, during, and after the Class Period, Best Buy met or exceeded its most recent predicted earnings. Only once did Best Buy downgrade its earnings forecast, shortly before the end of the second quarter of fiscal year 2003. Defs' Mem. of Law in Support of Motion to Dismiss at

5 [Docket No. 54].

Plaintiffs' general allegations rely on the more specific allegations of false and misleading statements. Therefore, an analysis of the specific allegations must be undertaken to determine whether the general allegations are pled with sufficient particularity.

### 2. Specific Allegations

In the section "Materially False and Misleading Statements Issued During [*11] the Class Period," comprising paragraphs 51-77 of the Complaint, Plaintiffs reference a number of statements it believes to be false and misleading. Many of the paragraphs, however, do not contain allegations of materially false and misleading statements. Only the paragraphs actually containing allegations are analyzed.

P 51

In Paragraph 51 of the Complaint, Plaintiffs allege a Best Buy press release containing a statement relating to "the benefits of remerchandising many of the Company's Sam Goody stores . . ." is materially false and misleading. Best Buy correctly contends this statement is a forward-looking statement under *Section 10(b)* and *Rule 10b-5. 15 U.S.C. § 78u-5(c)*. Forward-looking statements apply to projections regarding revenue, income, earnings, statements about management's plans or objectives, and statements involving future economic performance. *15 U.S.C. § 78u-5(i)(1)(A-C)*. Consequently, a challenged forward-looking statement must be accompanied by an allegation that the statement was made with actual knowledge that it was false and misleading to survive a motion to dismiss. *In re Navarre Corp. Securities Litigation, 295 F.3d 791, 799 (8th Cir. 2002)*. [*12] Plaintiffs make a general allegation that the "safe harbor" for forward-looking statements does not apply because Best Buy either failed to accompany its forward-looking statements with appropriate cautionary language or made the statements at issue with actual knowledge of their falsity. Compl. P 93. However, Plaintiffs' general allegation, which does not specifically reference any single statement by Best Buy, is insufficient to meet the particularity requirements of the PSLRA.

Here, the statements in the press release are clearly forward-looking. The language itself references future performance, and is accompanied by cautionary language. Specifically, the press release states:

Statements made in this news release . . . should be considered forward-looking and subject to various risks and uncertainties.

  

Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 9 of 23

Page 4

2005 U.S. Dist. LEXIS 6427, *12; Fed. Sec. L. Rep. (CCH) P93,224

Such forward–looking statements are based on management's beliefs and assumptions regarding information currently available, and are made pursuant to the "safe harbor" provisions . . . . The Company's actual results could differ materially from those expressed in the forward-looking statements. Factors that could cause results to vary include, among others, those expressed [*13] in the Company's filings with the Securities and Exchange Commission. The Company has no obligation to publically update or revise any of the forward-looking statements that may be in this news release.

Lewis Decl. Ex. 8. Here, the cautionary language relates to the future performance of Best Buy; as a result, it addresses the allegedly misleading statement cited by the Plaintiffs. This language is sufficient to render the alleged misrepresentations forward–looking. *Parnes v. Gateway 2000, Inc., 122 F.3d 539, 548 (8th Cir. 1997)*. To survive the Motion to Dismiss, Plaintiffs must allege the statement was made with actual knowledge of its falsity. No such allegation is asserted.

P 52

In Paragraph 52, Plaintiffs reference another January 9, 2002 press release in which Best Buy reported sales increases at the Musicland stores, stating: "The increase reflected market share growth and the remerchandising of most Sam Goody stores to include more DVD movies, video gaming hardware and software, and consumer electronics." Lewis Decl. Ex. 7. Nowhere, however, do Plaintiffs allege the statement or earnings summaries are false or misleading, nor do they argue the [*14] reasons given by Best Buy for the earnings increase are inaccurate. Therefore, this allegation fails to meet the particularity requirements required by the PSLRA.

P 53

In Paragraph 53, Plaintiffs quote a portion of a transcript of the January 9, 2002 analyst conference hosted by Best Buy. Plaintiffs highlight two sentences from that conference. The first sentence reads: "Sam Goody Stores opened are doing substantially better than the On Cue stores, thus enabling the building of a larger brand identity for Sam Goody and expanding the chain at a more rapid rate." The second sentence states: "All the efforts have been successful and have achieved all of the synergies that were expected in the first year which is a big achievement." With the exception of the second half of the first sentence, these contentions are historical statements which Plaintiffs do not allege to be false. In

regard to the claim that Sam Goody could be expanded at a more rapid rate, the statement is forward-looking. Again, Plaintiffs fail to allege with particularity facts which give rise to a strong inference of scienter.

P 55

In Paragraph 55, Plaintiffs list a number of "adverse facts" or reasons upon [*15] which it concludes that Best Buy "lacked a reasonable basis for their positive statements about the Company and their earnings projections, which were materially false and misleading at all times," as alleged in Paragraphs 51–53. Plaintiffs later apply the reasons contained within Paragraph 55 to all the allegations contained within Paragraphs 51–77. However, the averments proffered in Paragraph 55 either do not demonstrate how the referenced allegations are false or fail to demonstrate a strong inference of scienter. Rather, the averments in Paragraph 55 are of a general nature. For example, Plaintiffs allege Best Buy failed to adequately train Musicland personnel in the sale of consumer electronics, the Musicland stores were inadequate in both size and location, and the company was incurring additional costs to rotate inventory. However, the allegations do not reference specific facts sufficient to meet the particularity requirements of the PSLRA or *Rule 9(b)*. Nor do any of the allegations in Paragraph 55 give rise to a strong inference that the Defendants acted with scienter. Plaintiffs' allegations are too vague and general to meet the particularity requirements of the PSLRA.

P [*16] 59

In Paragraph 59, Plaintiffs allege Best Buy's press release of February 29, 2002, in which Best Buy increased its earnings expectations for the fourth quarter to $1.38 per share, was materially false and misleading. Plaintiffs do not demonstrate that this assertion is material, however, as Best Buy's ultimate earnings for the fourth quarter were a reported $1.62 per share, a figure Plaintiffs do not allege to be inaccurate. As a result, it is unclear how this assertion is material, much less false or misleading, and therefore, the averment fails to meet the particularity requirements.

P 61

In Paragraph 61, Plaintiffs cite a March 7, 2002 press release which states in part: "The change in product mix — including more video gaming hardware and software, and devices that play movies and music — drove an increase in the average purchase per customer." Again, Plaintiffs fail to allege with particularity why this statement is inaccurate.

  

Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 10 of 23

Page 5
2005 U.S. Dist. LEXIS 6427, *16; Fed. Sec. L. Rep. (CCH) P93,224

P 64

In Paragraph 64, Plaintiffs quote an April 2, 2002 press release in which Best Buy announced its financial results for the fourth quarter of fiscal year 2002. The press release states that the Musicland stores met profitability [*17] targets, and that the strong finish to the quarter built Best Buy's optimism for the year ahead, with expectations of growth in revenues. The press release contains historical statements, which Plaintiffs do not allege were inaccurate, as well as forward-looking statements, which are not alleged with facts sufficient to give rise to a strong inference of scienter.

P 65

In Paragraph 65, Plaintiffs extensively quote various individual Defendants from an investment analyst conference call. The call had been prefaced by cautionary language regarding forward-looking statements. Lewis Decl. Ex. 11. In the transcript of the conference call, the Defendants discuss the past performance results of the Musicland stores, whose earnings exceeded management expectations in the first year. Defendants also noted that sales at Musicland stores outpaced mall traffic figures. Additionally, the Defendants made statements indicating Best Buy expected modest sales growth over the coming year, and intended on continuing to invest and reposition the Musicland stores. As with the other alleged misrepresentations, Plaintiffs fail to allege the historical figures cited by Best Buy were inaccurate, or that [*18] Best Buy's forward-looking statements were made with recklessness, much less the actual knowledge of their falsity required for forward-looking statements. Furthermore, in other portions of the same conference call, Defendants state that due to a reduction in the number of Musicland stores, it expected Musicland's operating results to drop by $40 million in fiscal year 2003. Lewis Decl. Ex. 11. As a result, Plaintiffs fail to adequately allege with particularity that the conference call statements were false or misleading.

P 66

In Paragraph 66, Plaintiffs cite an April 2, 2002 press release in which Best Buy discusses a marketing test in which the Sam Goody name outperformed the On Cue name in rural areas, and, as a result, On Cue stores would be renamed Sam Goody. Plaintiffs fail to allege the marketing test was false or misleading. The press release also states the name change would allow Best Buy to capitalize on the name change. Moreover, this is a forward-looking statement, accompanied by cautionary language, wherein scienter is not alleged with particu-

larity. Lewis Decl. Ex. 10.

P 67

Paragraph 67 of the Complaint references an analyst conference call later in the [*19] day on April 2, 2002, in which Defendants stated they did not believe transforming the On Cue stores to Sam Goody stores would cause "a lot of disruption." Again, the conference call was prefaced by cautionary language. Lewis Decl. Ex. 11. Plaintiffs fail to allege this statement was made with actual knowledge of its falsity. Additionally, the vague nature of the statement at issue makes it difficult to identify facts sufficient to establish a strong inference of recklessness in the actions of Defendants, much less actual knowledge of its falsity.

P 70

In Paragraph 70 of the Complaint, Plaintiffs quote a number of forward-looking statements from Best Buy's annual 10-K form filed on May 30, 2002. The paragraphs quoted include a number of statements regarding the prospects, intentions, and business strategies for Best Buy and the Musicland stores. However, the 10-K is accompanied by cautionary language stating that the information contained therein was forward-looking, and subject to numerous factors. As a result, Plaintiffs' failure to allege the 10-K statements were made with actual knowledge of their falsity is fatal to these allegations.

P 72

In Paragraph 72, Plaintiffs [*20] cite to a June 6, 2002 press release in which Best Buy reported on the latest Musicland results, which included a slight drop in sales. The press release also contains Best Buy's earnings growth expectations for fiscal year 2003. Plaintiffs do not allege the Musicland loss was inaccurate, nor do they state with particularity how the earnings estimates report is false or misleading.

P 73

Paragraph 73 of the Complaint details Best Buy's press release of the first quarter results for the fiscal year 2003, which contained Best Buy's usual cautionary language regarding forward-looking statements. Plaintiffs highlight a statement which reads:

> "Our strong beginning for the year builds our confidence that we can continue to achieve top-quartile growth rates in sales and earnings," Schulze added. "We expect contributions from new store openings, comparable stores sales gains and improved





Case 1:04-cv-00831-SLR     Document 57-2     Filed 07/20/2005     Page 11 of 23

Page 6

2005 U.S. Dist. LEXIS 6427, *20; Fed. Sec. L. Rep. (CCH) P93,224

operating efficiency to drive our growth."

Lewis Decl. Ex. 16. The statement is not material to Plaintiffs' claims. The statement appears in a press release about Best Buy as a whole, and is not directed to Musicland stores. Id. The results also stated Best Buy's expectations for growth [*21] in the second quarter, which included remerchandising efforts at Sam Goody stores. However, Plaintiff's do not allege with particularity how this statement was false or misleading, and fail to allege Defendants had actual knowledge of its falsity.

**P 74**

Paragraph 74 of the Complaint details an investment analyst conference call in which Defendant Schulze explains that Best Buy recently switched to a new management system, and had increased inventory to address anticipated problems with the transition. Once again, Plaintiffs fail to allege how this statement is false or misleading; moreover, it is unclear how this general statement about Best Buy inventory is material to the Musicland stores.

**P 75**

In Paragraph 75 of the Complaint, Plaintiffs cite a July 12, 2002, Amendment No. 3 to SEC Form S-3 filed by Best Buy. In the Amendment, Best Buy stated the Musicland acquisition provided Best Buy access to new distribution channels, customers, and the ability to leverage Best Buy's core competencies to the new operations. Plaintiffs fail to particularly allege what is false and misleading about these statements. Additionally, the statement is so general as to render it immaterial. [*22] *Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996).*

**P 76**

Finally, in Paragraph 76 of the Complaint, Plaintiffs extensively quote from Best Buy's 10-Q filed for the first quarter of fiscal year 2003. The 10-Q contains a number of forward-looking statements, none of which are alleged with facts sufficient to satisfy scienter requirements.

### 3. Confidential Informant Allegations

The Plaintiffs reference a number of allegations made by Confidential Informants ("CIs"). The cumulative effect of these allegations with the above-cited alleged misrepresentations still falls short of the particularity requirements of the PSLRA.

The allegations attributed to the CIs, far from

meeting the PSLR requirements of particularity, are rather vague claims made by the CIs. For example, in Paragraphs 39 and 40 of the Complaint, CI 1 states that it was "well-known" throughout the company that the majority of Musicland stores were in "level C or D" locations, and the Musicland real estate was "really bad." Assuming this statement to be true, it does not adequately demonstrate that Best Buy's statements regarding the prospects were false or misleading, much [*23] less that Best Buy acted with scienter. The who, what, when, where and how are missing from these statements which would allow a strong inference to be made that the Defendants acted recklessly, or with actual knowledge that their statements were misleading. *K-Tel, 300 F.3d at 891.*

Plaintiffs also allege, in Paragraph 41, that Best Buy's practice of discounting products in the Musicland stores was misleading since the Defendants knew the practice could not be sustained, and was merely a charade to give the Musicland stores a short-term boost. Again, the specifics of these allegations are missing – in fact, Paragraph 41 merely makes bare assertions, with no apparent facts, much less specifics, to support the allegations. As a result, these allegations also fail to meet the particularity requirements.

Paragraph 43 of the Complaint is slightly more specific in that it names Defendants Schulze and Anderson, and alleges they participated in conference calls updating them on the remerchandising of the Musicland stores. However, CI 2 merely reports that problems occurred during the remerchandising effort requiring substantial modifications. Updates and changes to the remerchandising [*24] plan are not sufficient to make Best Buy's general statements regarding the plan false, or demonstrate a strong inference of recklessness on behalf of the Defendants. CI 2 also alleges, in Paragraph 4, that Defendants Schulze and Anderson were aware of the problems regarding the "negative price halo," or the perception that Musicland products were overpriced, as well as the failure of various strategies to correct the problem. Again, however, the existence of the "negative price halo," coupled with the Defendants' awareness of it and attempts to alleviate the problem, do not meet the particularity requirements to raise a strong inference that the general statements regarding Musicland were false. Best Buy was not required to report every nuance of the remerchandising strategy, and the vague allegations reported by CI 2 are not sufficiently particular to raise a strong inference of recklessness on behalf of Best Buy.

CI 3 alleges that during a meeting in September or October, 2001, Defendant Schulze became upset when told of remodeling issues. He is alleged to have thrown





Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 12 of 23

Page 7

2005 U.S. Dist. LEXIS 6427, *24; Fed. Sec. L. Rep. (CCH) P93,224

papers at another employee, and stated he was "sick and tired" of "reading reports every day about what is going [*25] wrong." While inflammatory, these statements are too vague to be considered evidence of a strong inference of recklessness. Acknowledging one's frustration with business issues is not the same as making misrepresentations. The statements do not give rise to the requisite strong inference of recklessness. Moreover, business problems alone are not sufficient to establish scienter. See *Ronconi v. Larkin, 253 F.3d 423, 430 (9th Cir. 2001).*

The remaining CIs also make allegations about the remodeling and remerchandising efforts. Many of these allegations relate to movement of inventory between Musicland and Best Buy, while others relate to alleged disruptions in individual stores during the remerchandising efforts. Other CIs allege other miscellaneous claims, including problems with "inventory shrinkage" due to shoplifting, and problems at individual stores. Even assuming these allegations are true, they identify isolated issues that can not support a strong inference of scienter in regard to the much broader allegations of fraud alleged by the Plaintiff's.

Because Plaintiff's fail to allege their general, specific, and Confidential Informant claims with the particularity [*26] required of the PSLRA, the Complaint fails.

**4. Stock Sales and Convertible Debentures**

As evidence of motive, Plaintiffs rely on the stock sales of various Best Buy directors and officers during the Class Period. It is undisputed, however, that Defendant Anderson was the only individual Defendant to sell stock during the Class Period. It is highly disputed whether Defendant Anderson's sales were sufficiently unusual to raise an inference of wrongdoing. The Eighth Circuit has held that while "alleging the defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock is sufficient" to demonstrate scienter, the benefit must be more than of a generalized nature to the defendants. *K-Tel, 300 F.3d at 894–95.*

Here, although Defendants allege a number of officers and directors sold shares of stock during the Class Period, they do not allege that Defendants Schulze, Lenzmeier, or Jackson sold any stock or exercised any options during the Class Period. As a result, no inference of scienter can be found against these Defendants in relation to their stock sales. Although Defendant Anderson did sell stock during the Class Period, [*27] the vast majority of his sales are part of his apparent pattern of selling stock on a weekly basis. Such regularity in the sale of stock over a long period of time – both before, during, and after the Class Period – does not raise an inference of scienter. Although Defendant Anderson did make one additional sale of stock in April 2002, comprising 20,000 shares of stock, it is not of a sufficient amount to constitute a strong inference of scienter, as that amount represented less than 2% of Defendant Anderson's holdings at the end of the year. Lewis Decl. Ex. 15.

As the Eighth Circuit has held, "general allegations of a desire to increase stock prices . . . are too generalized and are insufficient" to satisfy the PSLRA particularity requirement. *Id. at 895.* As a result, Plaintiffs' allegations that Defendants acted with the intent to raise stock prices are insufficient to satisfy the scienter requirements. Similarly, Plaintiffs' allegations regarding Best Buy's offering of convertible debentures announced in January 2002 also fail. Although Plaintiffs discuss the offering, they do not allege how it benefitted the individual Defendants, nor do they state with particularity [*28] how any statements made in connection with the offering were false or misleading.

**C. Alleged Exchange Act Section 20(a) Violations**

In addition to the *10(b)* and *10b-5* claims, Plaintiffs allege violation of *Section 20(a) of the Exchange Act* against the individual Defendants. "*Section 20 of the Exchange Act* extends liability for fraudulent conduct under *Section 10(b)* to individuals controlling persons found to have committed securities fraud." *In re: Xcel Energy, Inc., 286 F. Supp. 2d 1047, 1059 (D. Minn. 2003)* (citing *15 U.S.C. § 78t(a)*). Like a *10(b)* or *10b-5* claim, the primary violation under *Section 20* must be plead with particularity as required by the PSLRA. *Vohs v. Miller, 323 F. Supp. 2d 965, 973 (D. Minn. 2004).* Because Plaintiffs based their *Section 20(a)* claims on the same allegations as the *10(b)* and *10b-5* claims, the *Section 20(a)* claims fail for the same reasons as previously discussed.

**D. Plaintiffs' Request to Amend and Materiality**

Anticipating that Defendants' Motion to Dismiss might be granted, Plaintiffs request leave to amend their Complaint. n5 Although leave is generally granted [*29] when justice requires, in the instant case, it is not apparent that amendment will cure the Complaint's defects. *Frey v. City of Herculaneum, 44 F.3d 667, 672 (8th Cir. 1995).* Plaintiffs argue that, if allowed to amend, they would add: (1) additional details establishing Defendants' knowledge of the remerchandising issues; (2) more details regarding the remerchandising problems; (3) additional details establishing the credibil-

  

Case 1:04-cv-00831-SLR    Document 57-2    Filed 07/20/2005    Page 13 of 23

Page 8

2005 U.S. Dist. LEXIS 6427, *29; Fed. Sec. L. Rep. (CCH) P93,224

ity of the CIs; and (4) additional details concerning the Musicland stores inventory buildup. Additional details in these areas, however, will not remedy the key issues of lack of particularity in the present allegations. The Complaint does not fail for lack of details regarding the alleged remerchandising problems so much as it fails for a lack of particularity of falsity or scienter.

n5 The Plaintiffs have, in fact, already had an opportunity to recast and recharacterize their Complaint. The initial Complaint was filed on November 20, 2003 [Docket No. 1]. Following the consolidation of a number of individual cases, the Consolidated Class Action Complaint was filed on August 19, 2004. Although both pleadings allege securities fraud, the Consolidated Complaint for the first time raises allegations by the CIs.

[*30]

Plaintiffs' allegations do not meet *10(b)* and *10b-5* materiality requirements. As Defendants noted in their brief and at oral argument, the Plaintiffs have not alleged that any specific financial disclosure or statement from Best Buy was false or misleading, including the August 8, 2002 press release in which Best Buy downgraded its earnings forecast. Although securities lawsuits are not confined to misrepresentations and omissions regarding financial information, Plaintiffs have been unable to provide any Eighth Circuit law as authority for the proposition that misrepresentations of the type alleged by Plaintiffs are material to a *10(b)* or *10b-5* claim. The single case Plaintiffs produced where omissions were found to be the basis of a *10(b)* or *10(b)-5* claim, Rodney v. KPMG Peat Marwick, is not analogous to the instant litigation. *143 F.3d 1140 (8th Cir. 1998)*. In Rodney, Plaintiffs alleged that KPMG, in discussions related to fund investments and risks contained within prospectuses, violated three of its internal investment restrictions. *Id. at 1141*. Here, it is not alleged Best Buy violated any internal rules. Moreover, the omissions in Rodney [*31] related directly to assumptions regarding investments. Here, the alleged omissions regarding the remerchandising program do not directly relate to investments.

A fact is deemed material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1998)* (citation omitted). Even if Best Buy were to have specifically stated there were difficulties with the integration of the Musicland stores, it is not clear that this would alter the mix of information available and important to investors. Musicland's performance and earnings were reflected within Best Buy's overall earnings. Plaintiffs do not allege that these figures were false or that the true figures were omitted. Therefore, the mix of information available to investors would not have significantly changed; and as a result, Best Buy's alleged omissions were not material. Thus, Defendants' Motion to Dismiss must be granted, and Plaintiffs' request for leave to amend the Complaint will be denied.

## IV. CONCLUSION

Based [*32] upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss [Docket No. 52] is **GRANTED;** and

2. Plaintiffs' Motion to Strike [Docket No. 62] is **DENIED;** and

3. Plaintiffs' Complaint [Docket No. 47] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/ Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated: April 12, 2005.

  

# EXHIBIT C

Westlaw.

Slip Copy
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
**(Cite as: 2005 WL 181885 (N.D.Cal.))**

Page 1

**C**

**Motions, Pleadings and Filings**

United States District Court,
N.D. California.
In re GILEAD SCIENCES SECURITIES
LITIGATION,
**No. C03-4999 MJJ.**

Jan. 26, 2005.

AMENDED ORDER *GRANTING* DEFENDANTS'
12(b)(6) MOTION TO DISMISS

JENKINS, J.

**\*1** This Document Relates To: ALL ACTIONS

INTRODUCTION

Before the Court is Gilead Sciences, Inc. ("Gilead"), John C. Martin, John F. Milligan, Mark L. Perry, Norbert W. Bischofberger, Anthony Carrociolo and William A. Lee's ("Defendants") Motion to Dismiss a federal securities fraud action brought against them by a class consisting of all purchasers of Gilead stock between July 14, 2003 and October 28, 2003. Defendants seek an Order dismissing the Consolidated Amended Class Action Complaint ("Amended Complaint") with prejudice under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, Defendants' motion is GRANTED with leave to amend.

FACTUAL ALLEGATIONS

This motion arises from an Amended Complaint ("Comp.") alleging securities fraud in violation of section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants, and violation of section 20(a) of the Securities Exchange Act. The Amended Complaint is brought on behalf of a class consisting of all persons who purchased or otherwise acquired Gilead stock between July 14, 2003 and October 28, 2003.

The allegations of Plaintiffs' complaint relate to Gilead's announcement in July 2003 of its financial results for the second quarter of 2003, and the impact its premier product, Viread, had on those results. Viread is a groundbreaking antiretroviral drug used to treat HIV/AIDS that was introduced in 2001. On July 14, 2003, the first day of the class period, Gilead issued a press release entitled "Gilead Sciences Expects Second Quarter 2003 Financial Results Will Exceed Expectations," and stating, "[t]he increase in revenue was driven primarily by strong sales growth of Viread." The press release went on to say that Viread sales increased due to "broader prescribing patterns ... as well as increases in U.S. wholesaler inventory levels in the second quarter." On the same day, *Bloomberg News* identified Gilead spokeswoman Amy Flood as stating that "[t]he main reason for the jump in Viread sales is an increase in prescriptions, not inventory stocking."

Two weeks later, on July 31, 2003, Gilead issued a press release containing its final results for the second quarter. Gilead announced that it had net revenues of $230.7 million for the quarter, of which $167 million related to Viread. Gilead went on:

Viread sales growth was primarily driven by higher prescription volume, a significant increase in U.S. wholesaler inventories and a favorable European currency environment compared to the same quarter last year. Gilead estimates that increased stocking by U.S. wholesalers accounted for $25-30 million in Viread sales in the second quarter.

The press release contained warnings regarding the forward-looking statements and stated that the statements were "subject to certain risks and uncertainties, which could cause actual results to differ materially." Statements made during Gilead's earnings call of that same date, as well as on its Form 10-Q filed August 14, 2003, contained similar warnings.

**\*2** Also on July 31, 2003, Gilead held a conference call with analysts and other investors regarding its financial results. During the call, an officer of Gilead stated:

Of significant note, we believe that a substantial inventory build occurred in U.S. distributor channel during the second quarter as wholesalers anticipated the Viread price increase announced on June 27th. Though difficult to determine the exact figure for this inventory build, we estimate that wholesaler inventories increased by $25 to $30 million during the quarter.... Based on the U.S.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
(Cite as: 2005 WL 181885 (N.D.Cal.))

inventory build up seen in the second quarter, we anticipate Viread sales for the third quarter will be at or below the sales level recognized this second quarter. We expect these inventories to be drawn down to more normal levels during this quarter."

On August 14, 2003, Gilead filed its Form 10-Q for the second quarter of 2003. This form confirmed the previously announced financial results. The Form 10-Q also discussed the inventory buildup: "We estimate that this higher stocking resulted in $25.0 to $30.0 million of additional sales during the second quarter, which may adversely impact sales in the third quarter as wholesalers return to more normal inventory levels and buying patterns." The form 10-Q also disclosed the existence of a July 19, 2003 letter issued by the FDA warning Gilead about certain aspects of its promotional practices of Viread.

On October 28, 2003, Gilead announced its financial results for the third quarter of 2003. Gilead announced net revenues of $194.1 million, and sales of Viread of $115.4 million. At that time, Gilead stated: "After reviewing NDC prescription trends, IMS inventory data and actual Viread sales, Gilead estimates there was approximately $33 to $37 million of inventory reduction by U.S. pharmaceutical wholesalers during the third quarter of 2003 following an equivalent inventory build during the second quarter of 2003." The next day, Gilead's stock dropped $7.46 per share from $59.46 per share to close at $52 per share. Approximately one month later, on December 2, 2003, Gilead's stock price had recovered the entire drop experienced on October 29 and closed at $59.83 per share.

Plaintiffs allege that for the period of at least September 2001 through, and subsequent to, the class period, Gilead engaged in the off-label marketing of Viread. Off-label marketing refers to the use for marketing purposes of information such as the result of clinical studies and other materials on the uses of and the efficacy of an FDA-approved product that has not been approved by the FDA for inclusion in the product's package labeling. Pursuant to FDA guidelines, pharmaceutical manufacturers such as Gilead may only promote an FDA-approved drug consistent with the contents of its FDA-approved package labeling.

Plaintiffs allege that Gilead's off-label marketing activities began as early as September 2001 at Gilead's national sales meeting in Miami. There, sales and marketing employees allegedly were given information regarding Gilead's submission of Viread

clinical data and information to the FDA and, with a "wink and a nod," were instructed to use this information to sell Viread even though Viread had yet to be approved by the FDA. The FDA approved Viread in October, 2001. Later, employees allegedly were instructed at numerous regional and national sales meetings by Gilead executives "overtly and covertly," to use off-label information to aggressively promote and sell Viread. At these meetings, employees allegedly would be provided off-label information such as updates on clinical trials of Viread in large group meetings and then told in subsequent smaller meetings to use this information to sell Viread. Defendants Martin, Perry, Lee, Milligan, and Bischofberger allegedly attended one or more of these regional and national sales meetings.

*3 According to the Amended Complaint, Gilead received an Untitled FDA Letter on March 14, 2002, advising the company that its representatives had made false and misleading oral promotional statements at the December 2001 Interscience Conference on Antimicrobial Agents and Chemotherapy conference. According to the Untitled FDA Letter, Gilead falsely and misleadingly promoted Viread by stating that it contained "no toxicities," was "extremely safe," and was "extremely well-tolerated," despite the fact that its boxed warning and Package Labeling advised to the contrary. The Untitled FDA Letter further ordered Gilead to "immediately cease making such violative statements," and required Gilead to submit a written response describing its intent and plans to comply with the FDA's directives. Plaintiff alleges that the false statements were made by Defendant Martin and it was company-wide knowledge that Martin was the cause of the Untitled FDA Letter. On March 21, 2002, Gilead responded stating that it was "commit[ted] to ensure that future violative statements are not made in the promotion of Viread." However, sixteen months later, on July 29, 2003, the FDA issued a second letter, notifying Gilead that it considered certain oral representations made by a Gilead representative at a promotional booth during a conference in April 2003 to be improper. This conference took place during Gilead's second fiscal quarter of 2003, just prior to Defendants' first class period announcement of outstanding Viread sales and financial results which exceeded market expectations. In response to and in compliance with this letter, on November 7, 2003, defendant Martin wrote a correction letter to the conference's attendees.

JUDICIAL NOTICE
In addition to the Motion to Dismiss the Amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
(Cite as: 2005 WL 181885 (N.D.Cal.))

Page 3

Complaint, Defendants have filed a Request for Judicial Notice, and ask the Court to notice a number of documents. Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy can not reasonably be questioned." Plaintiffs do not object to the Court's taking judicial notice of the requested documents. [FN1]

> FN1. However, Plaintiffs object to Defendants' Motion for Judicial Notice only if Defendants seek to have the Court take judicial notice of the truth of the requested documents. The Court does not restrict its taking of judicial notice in this way.

A. Documents Explicitly Referenced in the Amended Complaint

Initially, Defendants ask the Court to take judicial notice of specified press releases, one news article, and SEC filings explicitly referenced in the Amended Complaint under the "incorporation by reference" doctrine. This doctrine permits the Court to consider documents alleged in a complaint and whose authenticity no party questions, but which are not physically attached to [plaintiffs'] pleading." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). Here, this includes press releases dated July 14 and July 31, 2003, a news article dated July 14, 2003, and Gilead's Form 10-Q filed with the SEC, all of which are attached to the Declaration of Grant Fondo and explicitly referenced in the Amended Complaint. Plaintiffs do not dispute the authenticity of any of these documents, or claim that Defendants documents contain errors. Absent such an argument, incorporation under *Branch* is warranted.

B. Allegations on Which the Complaint Implicitly Rely

*4 The Court can take judicial notice of Exhibit D because "the Court may take judicial notice of documents on which allegations in the [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided the authenticity of those documents is not in dispute." *In re Calpine Corp. Sec. Litig.,* 288 F.Supp.2d 1054, 1076 (N.D.Cal.2003). Plaintiffs necessarily rely upon this conference call because they claim that Defendants perpetuated a fraud on the market with the July 31, 2003 financial announcement and estimated inventory build-up. Therefore, the statements made in the conference call directly relate to the claim of

fraud on the market and the transcript reflects information available to the market at the time.

C. Public Filings With the SEC

Defendants ask the Court to take judicial notice of publically available documents that Defendants filed with the SEC. "In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss...." *Calpine,* 288 F.Supp.2d at 1076. Accordingly, the Court takes judicial notice of these documents. [FN2]

> FN2. The Court refuses to take judicial notice of Ex. O (April 2003 press release), as it does not fit into any of the recognized categories allowing for judicial notice.

LEGAL STANDARDS

A. Rule 12(b)(6)

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir.1984). When deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6), a court must take all of the material allegations in plaintiff's complaint as true, and construe them in the light most favorable to plaintiff. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Moreover, a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Id.*

In the context of a motion to dismiss, review is limited to the contents in the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. Where such a conversion takes place, all parties must be given an opportunity to present all material made pertinent to such a motion by Rule 56. *In re Pacific Gateway Exchange, Inc. Sec. Lit. .,* 169 F.Supp.2d 1160, 1164 (N.D.Cal.2001); *see also* Fed.R.Civ.P. 12(b). However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896

Slip Copy
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
(Cite as: 2005 WL 181885 (N.D.Cal.))

F.2d 1542, 1555 n. 19 (9th Cir.1989).

Where a plaintiff fails to attach to the complaint documents referred to in it, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support plaintiff's claim. *See Pacific Gateway Exchange,* 169 F.Supp.2d at 1164; *Branch v. Tunnell,* 14 F.3d 449, 44 (9th Cir.1994), *cert denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1997). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stay Electronics Sec. Lit.,* 89 F.3d 1399, 1405 n. 4 (1996), *cert denied,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.,* 146 F.3d 699, 705 (9th Cir.1998).

B. Section 10(b) and Rule 10b-5

*5 Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce
  (a) To employ any device, scheme, or artifice to defraud,
  (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
  17 C.F.R. § 240.10b-5

To be actionable under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. *See Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999). Additionally, as in all actions alleging fraud, plaintiffs must state with particularity the

circumstances constituting fraud. Fed.R.Civ.P. 9(b).

C. Section 20(a)

Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Sec. Lit.,* 201 F.Supp.2d 1051, 1063 (N.D.Cal.2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

D. Private Securities Litigation Reform Act

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (1995)) (Nov. 28, 1995). The PSLRA strengthened the pleading requirements of Rules 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. A complaint under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc.,* 183 F.3d 970, 974 (9th Cir.1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(1).

ANALYSIS
*6 In order to support its claims under the PLSRA, Plaintiffs must first specify a "statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs argue that statements from four separate incidents attributed to Defendants were false and misleading. [FN3]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. Before engaging in the pertinent legal analysis, the Court deems it necessary to highlight the theory of Plaintiffs' action. In their original complaint, Plaintiffs alleged that Defendants gave a false impression of the true demand for Viread by understating the degree to which drug wholesalers had increased their inventory levels. To that end, Plaintiffs' complaint focused primarily upon Defendants' July 31, 2003, estimate of inventory stocking numbers ($25 to $30 million) and Defendants' revision of those numbers on October 28, 2003 ($30 to $37 million). In fact, nearly all of the statements that Defendants allege were false involve Gilead's public statements regarding its estimate of the impact inventory stocking had on the company's second quarter financial results. This is evidenced by the fact that Plaintiffs' class period began on July 14, 2003 and ended on October 28, 2003.

However, Plaintiffs' Amended Complaint alleged new facts, upon which Plaintiffs now primarily rely. Plaintiffs contend that Defendants engaged in improper off-label marketing of Viread that lead to increased Viread prescriptions. Consequently, Plaintiffs allege that Viread's 2003 second quarter sales report overstated the true demand for the drug. Plaintiff assert that Defendants violated the PSLRA by not disclosing the off-label marketing profits, as these profits were material adverse facts necessary to make the company's second quarter statement not misleading. In their Opposition to Defendants' Motion to Dismiss, Plaintiffs allege that Gilead's misrepresentations regarding overstocking, in combination with the company's off-label marketing scheme, "support an inference that Defendants knew, or were deliberately reckless in ignoring, that the Company materially understated its reports of sales to wholesalers in Second Quarter 2003."

Initially, Plaintiffs contend that statements from Gilead's press release on July 14, 2003 were false. Specifically, the press release stated that "[t]he increase in revenue was driven primarily by strong sales growth of Viread." The press release went on to state that Viread sales increased due to "broader prescribing patterns ... as well as increases in U.S. wholesaler inventory level in the second quarter in anticipation of a Viread price increase." On the same day, the *Bloomberg News* identified Gilead spokeswoman Amy Flood as stating that "[t]he main reason for the jump in Viread sales is an increase in prescriptions, not inventory stocking." Plaintiffs also assert that this statement was false and misleading.

Next, Plaintiffs allege that Gilead's July 31, 2003 press release contained false statements. In the press release, the company stated that "Viread sales growth was primarily driven by higher prescription volume, a significant increase in U.S. wholesaler inventories and a favorable European currency environment.... Gilead estimates that increased stocking by U.S. wholesalers accounted for $25-30 million of Viread sales in the second quarter." The press release also stated that the company was "focused on continuing this sales momentum and increasing our market share through robust clinical data and label expansions...." Plaintiffs assert that these statements were false.

Finally, Plaintiffs assert that Gilead's Second Quarter 2003 10-Q contained false statements. Specifically, the company stated that "[t]he increase in product sales is due to the significant increase in the volume of sales of Viread." The Second Quarter 2003 10-Q also stated that "[t]he significant increase in Viread sales is due to increased prescription volume."

Defendants move the Court to dismiss the Amended Complaint with prejudice pursuant to the PSLRA and Federal Rules of Civil Procedure 8(a), 8(e), 9(b), and 12(b)(6) on several grounds. Defendants argue that: 1) Plaintiffs fail to plead facts with the required particularity that Defendants' public statements were false and misleading at the time they were made; 2) the Amended Complaint fails to plead scienter; 3) the Safe Harbor provisions of the Reform Act bars claims based on Defendants' forward looking statements; 4) Plaintiffs fail to plead that defendants Martin, Milligan, Perry, Bischofberger, Carraciolo, and Lee are liable as control persons under section 20(a) of the Exchange Act.

A. Falsity and Scienter

In order to avoid having their action dismissed, Plaintiffs must "plead with particularity either the alleged misleading statements or scienter[.]" *In re Fritz Cos. Sec. Litig.*, 282 F.Supp.2d 1105, 1112 (N.D.Cal.2003). The Ninth Circuit has articulated the rule as follows:

*7 Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
(Cite as: 2005 WL 181885 (N.D.Cal.))

pleading requirements of 15 U.S.C. § § 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or deliberate recklessness made false or misleading statements to investors. Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a "strong inference" that misleading statements were knowingly or deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).
Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir.2001) (citations and internal quotation marks omitted).

*1. Defendants' Misrepresentations Regarding Wholesaler Overstocking*

Defendants argue that Plaintiffs have not pointed to any evidence to indicate that any of Defendants' statements regarding wholesaler overstocking were false or misleading. Defendants assert that Gilead's increase in revenues in the second quarter of 2003, was in fact, driven by strong sales of Viread. Defendants also assert that the growth in Viread sales was driven by higher prescription volumes and an increase in wholesaler inventories. Defendant also contend that their estimate of the inventory stocking numbers in July of 2003 ($25 to $30 million) was based on the best available data at the time. In essence, Defendants assert that the statements challenged by Plaintiffs were not false, misleading, or even equivocal, but were in fact entirely true.

Plaintiffs contend that the Amended Complaint adequately details the manner in which Defendants materially understated Viread sales to wholesalers in the July 31 press release. Plaintiffs argue that the "significant shift in wholesaler sales from $25 to $30 million to $33 to $37 million" is strong evidence that Defendants' estimates were misleading. Plaintiffs also argue that the difference between the estimates is "material" and must be considered by the Court. Regarding Defendants' other challenged statements, Plaintiffs assert that given the announced price increase of Viread, Defendants must have known that Gilead's higher second quarter sales figures were related to increased inventory stocking of Viread, and not increased prescription sales.

The Court finds that Plaintiffs have failed to allege any facts inconsistent with the conclusion that

Gilead's 2003 second quarter financial reports were made in good faith and based on the best information available at the time. Most importantly, Plaintiffs have not referenced a single document or conversation suggesting Defendants knew that the July 31 estimate of the second quarter inventory stocking numbers was too low at the time the estimate was made public. It is noteworthy that the press release contained only an "estimate" of the increased stocking numbers, and the press release specifically warned investors of Gilead's limited ability to accurately estimate inventory levels. In fact, the press release stated that Gilead was making a "great deal of assumptions" and "rely[ing] on incomplete data" in making the estimate. Moreover, as noted by Defendants, Gilead's revised October estimates regarding increased stocking numbers were not significantly different than the original July estimate. Additionally, Plaintiffs have not alleged facts that would tend to show that the growth in Viread sales was not driven, at least in part, by higher prescription sales. [FN4] Given these considerations, the Court finds that Plaintiffs have not alleged sufficient facts to demonstrate that any of Defendants' statements regarding wholesaler overstocking were false or misleading at the time the statements were made.

> FN4. In a similar case to this one, the plaintiffs had alleged that the Company's executives knew that wholesaler purchases of a pharmaceutical company's product in one quarter would lead to overstocking and, therefore, would result in fewer sales in the next quarter, while at the same time defendants were publically projecting strong future sales. Lipton v. Pathogenesis Corp., 284 F.3d 1027 (9th Cir.2002). The court found that the complaint's reference to internal reports on sales data and patient demand data was insufficient to support a PSLRA claim. Id. at 1036. "Plaintiffs do not mention a specific [ ] document relied on by defendants such as a particular [ ] report, graph or chart. Nor do they detail with particularity the content of such data." Id. Here, Plaintiffs have not referenced a single internal report on Gilead's sales data that could have provided information (scienter) to Defendants.

*2. Off-Label Marketing Scheme*

*8 While not conceding the issue of wholesaler stocking, Plaintiffs spend the majority of their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Opposition to Defendants' Motion to Dismiss focusing on Gilead's alleged off-label marketing scheme. Plaintiffs allege that the off-label marketing scheme was "the cornerstone of [Gilead's] business." Plaintiffs conclude that Defendants had a duty to disclose the details of the off-label marketing scheme, and the subsequent FDA warning letters, to its investors. [FN5] According to Plaintiffs, Defendants' off-label marketing enabled the company to create the appearance of increased prescriptions and demand for Viread. As a result, wholesalers were encouraged to stock up on Viread ahead of Gilead's announced price increase. Plaintiffs further allege that Gilead's second quarter sales estimates, including wholesaler stocking, were tainted by the off-label marketing scheme because the marketing "created an artificial and illusory demand for Viread."

> FN5. Thus, it appears that Plaintiffs are bringing their action pursuant to 15 U.S.C. § 78u-4(b)(1)(B), which instructs Plaintiffs to allege that Defendants "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading."

Defendants argue that Plaintiffs never allege that anyone at Gilead (including Defendants) actually participated in improper off-label marketing activities. Defendants also contend that Plaintiffs have not shown a connection between Gilead's alleged off-label marketing activities and actual sales of Viread.

The Court initially considers whether Plaintiffs have adequately alleged that Defendants engaged in an illegal off-label marketing scheme. The Amended Complaint states that Plaintiffs' confidential witnesses (CW1 and CW2) attended various meetings at which Gilead's sales and marketing team received specific instructions to market Viread off-label. Specifically, according to the Amended Complaint, CW1 and CW2 attended the 2002 Los Angeles Regional Meeting at which Defendants Meyers, Perry, and Martin were in attendance. A similar meeting took place in Las Vegas during 2003 and Defendants Milligan, Perry, Bischofberger, and Martin were allegedly present. Additionally, a company meeting took place in Orlando during 2003, and CW 1 and CW 2 recall that Defendants Martin, Milligan, Bischofberger, Lee, and Perry were in the room when specific instructions were given to sales and marketing personnel to utilize off-label information to push sales of Viread. Moreover, both

CW1 and CW2 attended various other meetings, not attended by Defendants, in which Gilead presenters provided off-label information and encouraged them to use the information to sell Viread.

In addition to the allegations of CW1 and CW2, the Court must consider the FDA letters that were sent to Gilead. The March 14, 2002 letter advised Gilead that its promotional activities were violating the Federal Food, Drug, and Cosmetic Act. These violations arose from "false and misleading oral statements about Viread" made by Viread representatives in Chicago during 2001. The letter advised Gilead to "immediately cease making such violative statements and ... cease ... distribution or use of any promotional materials for Viread that contain ... violative statements." The FDA sent another letter to Gilead on July 29, 2003, and stated that Gilead representatives had "minimized important risk information and broadened the indication for Viread." As a result of these violations, the FDA instructed Gilead to provide the agency with a detailed response regarding its promotional activities of Viread.

*9 Defendants contend that CW 1 and CW 2 never allege that Defendants actually participated in improper off-label marketing activities. Defendants are correct. Indeed, CW1 and CW 2 only allege that Gilead representatives were instructed to engage in such activity, not that such activity actually took place. However, the Court must also consider the FDA letters sent to Gilead. In those letters, the FDA clearly confirms that Gilead representatives were actively engaging in the off-label marketing of Viread with the intent to increase Viread sales. Therefore, when the allegations of CW1 and CW2 are considered in light of the FDA's letters to Gilead, it becomes apparent that Plaintiffs have alleged sufficient facts to raise a strong inference that Defendants' had knowledge of the company's off-label marketing scheme.

Yet, this conclusion does not end the Court's inquiry. Plaintiffs must also establish a connection between the company's off-label marketing activities and the 2003 second quarter reports that Plaintiffs allege were false and misleading. In other words, Plaintiffs must allege that Gilead's off-label marketing scheme was a "material fact" that needed to be disclosed to investors along with the 2003 second quarter sales reports. [FN6] See 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs have not carried this burden. Specifically, Plaintiffs have not alleged that any sales of Viread during the second quarter of 2003 were the result of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131
(Cite as: 2005 WL 181885 (N.D.Cal.))

improper off-label marketing activities. In fact, Plaintiffs do not identify a single prescription written for Viread that was allegedly generated by off-label marketing activity. Under the heightened pleading standard required in PSLRA cases, the Court cannot simply assume that Gilead's off-label marketing of Viread necessarily resulted in increased sales of that drug. Instead, Plaintiffs must allege facts to bridge this logical gap. Plaintiffs have failed to do so.

> FN6. It is noteworthy that the July 29, 2003 warning letter from the FDA was disclosed to the public on August 7, 2003, and referenced in Gilead's second quarter Form 10-Q filed with the SEC on August 14, 2003. Interestingly, the record reveals that the public announcement of the FDA letter did not have an adverse affect on Gilead's stock price. This fact weighs against a finding that Defendants' off-label marketing scheme was a "material fact" requiring disclosure to investors.

Furthermore, even assuming Plaintiffs had alleged that such sales took place, Plaintiffs would also have to allege that those sales were "material" to the 2003 second quarter reports. While Plaintiffs may not be required to detail the impact of Viread's off-label marketing on a sale-by-sale basis, Plaintiffs must allege facts that show a relationship between the off-label marketing of Viread, related sales of Viread, and the manner in which those sales affected Gilead's 2003 second quarter financial reports. Plaintiffs have alleged no such facts.

*3. Stock Sales*

Plaintiffs also rely on stock sales by the individual Defendants as an indication of their scienter. Generally, stock sale allegations can not raise an inference of scienter unless Plaintiffs allege specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics,* 183 F.3d at 986. Among the relevant factors for a court to consider are: 1) the amount and percentage of shares sold by insiders; 2) timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

*10 Defendant Martin sold 50,000 shares of Gilead stock, 2.62% of his total shares, during the class period. Defendant Bischofberger sold 90,020 shares, 9.47% of his total shares, during the class period.

Defendant Perry sold 52,344 shares, 10.95% of his total shares, during the class period. Defendant Lee sold 15,000 shares, 4.03% of his total shares, during the class period. Defendant Milligan sold 11,000 shares, 5.45% of his total shares, during the class period. Defendant Carraciolo sold 324,601 shares, 100% of his total shares, during the class period.

In light of the three factors above, these sales are not sufficiently suspicious to raise an inference of scienter. Other than Mr. Carraciolo, none of the individual defendants sold more than eleven percent of their holdings in Gilead during the class period. [FN7] *See Ronconi,* 253 F.3d at 435 (suggesting that sales of 10-17% of holdings was not suspicious). Collectively, the individual defendants sold just over eight percent of their share. Moreover, with the exception of Mr. Carraciolo, the individual defendants sold a roughly proportional number of shares in the third quarter of 2003 (the class period) as in the second quarter of 2003. Such sales are not sufficiently suspicious.

> FN7. Even though Mr. Carraciolo sold 100% of his shares in Gilead, his sales represent a relatively insignificant portion of the allegedly suspicious sales. It is also relevant that Mr. Carraciolo had become a company officer on July 30, 2003, and thus the Court has no context in which to infer that Mr. Carraciolo's sales were suspicious. *See Silicon Graphics,* 183 F.3d at 987 ("And although [defendant] had never sold such a large quantity of stock, he had only been with [the company] for a year and had no significant trading history for purposes of comparison.").

Plaintiffs allege that the timing of the stock sales are suspicious because Defendants Perry and Bischofberger sold their stock during the first week of August 2003, before the company disclosed that it had received a warning letter from the FDA. The Court disagrees. These sales represent only a small percentage of the total sales the Plaintiffs allege are suspicious. *See Ronconi,* 253 F.3d at 435 (stating that when corporate insiders collectively fail to seize a prime opportunity to "gain[ ] market advantage from as yet undisclosed bad news," an inference of scienter is negated). Therefore, the Court also does not find the timing of the stock sales suspicious.

*4. Allegations as a Whole*

In sum, the Amended Complaint "lacks sufficient

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA." _Silicon Graphics, 183 F.3d at 984_. In _No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920 (9th Cir.2003)_, the plaintiffs alleged that officers of America West Airlines had artificially inflated the company's stock prices. In support of their case, the plaintiffs alleged specific omissions and misrepresentations by the company's officers regarding deferred maintenance costs, unsafe maintenance practices, an ongoing investigation by the Federal Aviation Administration, and highly suspicious stock sales, in which most of the individual defendants sold 100% of their shares. _Id._ at 938-42. Viewing the totality of the allegations, the court held that the plaintiffs "raise[d] a strong inference that Defendants knew that the maintenance problems were ongoing and, thus, that the statements made by America West were false." _Id._ at 942.

*11 Unlike the situation in _America West,_ Plaintiffs have failed to allege particularized facts that could lead the Court to infer that Defendants knowingly misrepresented the details of Gilead's 2003 second quarter sales numbers. Even when the alleged misrepresentations regarding wholesaler stocking are considered together with the off-label marketing scheme and the challenged stock sales, Plaintiffs have failed to set forth adequate corroborating details and facts to support their allegations under the PSLRA pleading standard. [FN8] _See America West, 320 F.3d at 945_ (holding that the allegations must be considered in their totality in determining whether plaintiffs have met the PSLRA standard).

> FN8. Since Plaintiffs have not met the PSLRA pleading standard, the Court does not need to decide whether Defendants' statements fall within the safe harbor provision under 15 U.S.C. § 78u-5(c)(1)(A) or (B).

## RULE 20(a) LIABILITY

Section 20(a) of the Securities Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act. _In re Ramp Networks, Inc. Sec. Lit., 201 F.Supp.2d 1051, 1063 (N.D.Cal.2002)_. Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. _Id._

Here, Plaintiffs assert that the individual Defendants are liable under this section because of an underlying

violation of section 10(b). However, because Plaintiffs have failed to adequately plead the underlying 10b-5 violation, the section 20(a) claims must be dismissed as well.

## DISMISSAL WITHOUT PREJUDICE

Leave to amend under Federal Rule of Civil Procedure 15 should be liberally granted. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment." _Eminence Capital v. Aspeon Inc., 316 F.3d 1048, 1053 (9th Cir.2003)_ (error to refuse leave to amend in a securities fraud case to allow plaintiff to plead scienter). Here, it is possible that Plaintiffs could remedy their significant pleading defects in an amended complaint by adding detailed factual support for their allegations of false or misleading statements, and demonstrating that Defendants had the requisite scienter at the time the statements were made. Accordingly, the Court dismisses the Amended Complaint without prejudice. The Plaintiffs should file an amended complaint within thirty (30) days from the date of this Order.

## CONCLUSION

After consideration of the Amended Complaint in light of the heightened pleading standards of the PSLRA and the requirements of Federal Rule of Civil Procedure 12(b)(6), the Court GRANTS Defendants' 12(b)(6) motion to dismiss without prejudice.

IT IS SO ORDERED.

2005 WL 181885 (N.D.Cal.), Fed. Sec. L. Rep. P 93,131

**Motions, Pleadings and Filings** (Back to top)

• _3:03cv04999_ (Docket) (Nov. 10, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.