# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

————————————————————————x
               :

IN RE VERITAS SOFTWARE CORPORATION  :  Case No. 04-CV-831 (SLR)
SECURITIES LITIGATION             :  Consolidated Action

               :

————————————————————————x

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

ROSENTHAL, MONHAIT, GROSS
  & GODDESS, P.A.
Norman M. Monhait (DSBA No. 1040)
Citizens Bank Center, Suite 1401
919 Market Street
P.O. Box 1070
Wilmington, Delaware  19899-1070
(302) 656-4433
(302) 658-7567 (fax)
E-mail: nmonhait@rmgglaw.com

*Liaison Counsel for Lead Plaintiffs*
*Tay Siew Choon and Mark Leonov*

[Additional counsel listed below]

Dated:  September 7, 2005

## TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................. iii

Nature and Stage of the Proceedings ...................................................................... 1

    Nature of the Action ......................................................................................... 1

    Procedural History ........................................................................................... 1

Summary of Argument ............................................................................................ 2

Counter-Statement of Pertinent Facts ..................................................................... 5

    Declining Sales and Demand During the Class Period .................................... 5

    Improper Recognition of Revenue and False Financial Results ...................... 5

    False Earnings Guidance for the Second Quarter of 2004 .............................. 7

    Insider Selling and Golden Parachutes ........................................................... 9

ARGUMENT ......................................................................................................... 10

I.     STANDARD OF REVIEW .......................................................................... 10

II.    PLAINTIFFS HAVE ALLEGED DEFENDANTS' IMPROPER
       RECOGNITION OF REVENUE WITH SUFFICIENT
       PARTICULARITY ...................................................................................... 11

III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT
       DEFENDANTS' STATEMENTS OF EARNINGS GUIDANCE
       FOR THE SECOND QUARTER OF 2004 WERE KNOWINGLY
       FALSE AND MISLEADING ...................................................................... 16

    A.    Plaintiffs Adequately Allege That the Earnings Guidance
        Lacked a Reasonable Basis and Therefore Was False When
        Made ....................................................................................................... 16

    B.    Plaintiffs Adequately Allege That Defendants Knew the
        Earnings Guidance Was False and Misleading When Made ..................... 22

IV.   DEFENDANTS' FALSE EARNINGS GUIDANCE FOR THE
       SECOND QUARTER OF 2004 IS NOT PROTECTED BY THE
       STATUTORY "SAFE HARBOR" OR THE "BESPEAKS
       CAUTION" DOCTRINE ............................................................................ 23

    A.    April 21, 2004 Press Release .................................................................. 25

    B.    May 5, 2004 Analyst Day Conference .................................................... 28

    C.    June 14, 2004 Press Release .................................................................... 29

V.    PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS
      CAUSATION WITH RESPECT TO THE CLAIMS OF
      IMPROPER RECOGNITION OF REVENUE .....................................................31

VI.   PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER
      WITH RESPECT TO ALL DEFENDANTS.......................................................34

Conclusion ...........................................................................................................39

## TABLE OF AUTHORITIES

**Page**

### CASES

In re Advanta Corp. Securities Litigation,
No. 97-4343, 1998 WL 387595
(E.D. Pa. July 9, 1998), aff'd, 180 F.3d 525 (3d Cir. 1999) ........................................22

In re Aetna, Inc. Securities Litigation,
34 F. Supp. 2d 935 (E.D. Pa. 1999) ......................................................................22, 23

In re Alpharma Inc. Securities Litigation,
372 F.3d 137 (3d Cir. 2004)........................................................................................36

Asher v. Baxter International Inc.,
377 F.3d 727 (7th Cir. 2004),
cert. denied, 125 S. Ct. 1639 (2005) ......................................................................26, 28

Bell v. Fore Systems, Inc.,
17 F. Supp. 2d 433 (W.D. Pa. 1998)............................................................................36

In re Best Buy Co. Securities Litigation,
No. Civ. 03-6193, 2005 WL 839099
(D. Minn. Apr. 12, 2005) ............................................................................................29

In re Burlington Coat Factory Securities Litigation,
114 F.3d 1410 (3d Cir. 1997)...........................................................................9, 11, 24

California Public Employees'
Retirement System v. Chubb Corp.,
394 F.3d 126 (3d Cir. 2004)....................................................................................15, 19

In re Campbell Soup Co. Securities Litigation,
145 F. Supp. 2d 574 (D.N.J. 2001) .............................................................. 13-14, 15, 24

In re Cendant Corporation Litigation,
60 F. Supp. 2d 354 (D.N.J. 1999) ..................................................................... 12, 35-36

Chalverus v. Pegasystems, Inc.,
59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................................15

In re Compaq Securities Litigation,
848 F. Supp. 1307 (S.D. Tex. 1993) ...................................................................... 27-28

In re Donald J. Trump Casino Securities
   Litigation-Taj Mahal Litigation,
      7 F.3d 357 (3d Cir. 1993)..............................................................................24-25, 28

Dura Pharmaceuticals, Inc. v. Broudo,
      125 S. Ct. 1627 (2005) ...............................................................................................33

Freed v. Universal Health Services, Inc.,
   No. 04-1233, 2005 WL 1030195
      (E.D. Pa. May 3, 2005) .......................................................................................15, 19

Gavish v. Revlon, Inc.,
   No. 00 Civ. 7291 (SHS), 2004 WL 2210269
      (S.D.N.Y. Sept. 30, 2004) .........................................................................................15

Grossman v. Novell, Inc.,
      120 F.3d 1112 (10th Cir. 1997)............................................................................27, 29

Gruntal & Co. v. San Diego Bancorp,
      901 F. Supp. 607 (S.D.N.Y. 1995).............................................................................17

GSC Partners CDO Fund v. Washington,
      368 F.3d 228 (3d Cir. 2004)..................................................................................10, 11

Hishon v. King & Spalding,
      467 U.S. 69 (1984) .....................................................................................................11

In re Honeywell International Inc. Securities Litigation,
      182 F. Supp. 2d 414 (D.N.J. 2002) .............................................................19-20, 28-29

Kalnit v. Eichler,
      264 F.3d 131 (2d Cir. 2001).......................................................................................38

In re Lucent Technologies, Inc. Securities Litigation,
      217 F. Supp. 2d 529 (D.N.J. 2002) ............................................................................25

Medtronic Ave, Inc. v. Boston Scientific Corp.,
   No. 98-478-SLR, 2001 WL 652016
      (D. Del. Mar. 30, 2001)........................................................................................ 11-12

In re MicroStrategy, Inc. Securities Litigation,
      115 F. Supp. 2d 620 (E.D. Va. 2000)........................................................................36

In re Midway Games, Inc. Securities Litigation,
      332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................................15-16, 29

Montoya v. Mamma.com Inc.,
  No. 05 Civ. 2313 (HB), 2005 WL 1278097
  (S.D.N.Y. May 31, 2005) ............................................................................34

In re NUI Securities Litigation,
  314 F. Supp. 2d 388 (D.N.J. 2004) ........................................................12, 31

Ottmann v. Hanger Orthopedic Group, Inc.,
  353 F.3d 338 (4th Cir. 2003)................................................................. 12-13

In re Ravisent Technologies, Inc. Securities Litigation,
  No. 00-1014, 2004 WL 1563024
  (E.D. Pa. July 13, 2004) .......................................................................22, 37, 38

SEC v. Lipson,
  No. 97 C 2661, 1997 WL 452701
  (N.D. Ill. Aug. 6, 1997)...............................................................................37

SEC v. Lucent Technologies, Inc.,
  363 F. Supp. 2d 708 (D.N.J. 2005) ...............................................................13

Semerenko v. Cendant Corp.,
  223 F.3d 165 (3d Cir. 2000)..............................................................31, 32, 33

Sheehan v. Little Switzerland, Inc.,
  136 F. Supp. 2d 301 (D. Del. 2001) ........................................... 25, 26, 34-35

In re StaffMark, Inc. Securities Litigation,
  123 F. Supp. 2d 1160 (E.D. Ark. 2000) ...................................................27, 29

Tse v. Ventana Medical Systems, Inc.,
  No. 97-37-SLR, 1998 WL 743668
  (D. Del. Sept. 23, 1998) ................................................................. 10-11, 14

In re Tyson Foods, Inc. Securities Litigation,
  No. 01-425-SLR, 2004 WL 1396269
  (D. Del. June 17, 2004) ..............................................................................31

In re Viropharma, Inc. Securities Litigation,
  No. 02-1627, 2003 WL 1824914
  (E.D. Pa. Apr. 7, 2003)......................................................................22, 24, 26

In re World Access, Inc. Securities Litigation,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000) .........................................................13

## STATUTES & RULES

Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b) .............................................................2

Securities Exchange Act § 20(a), 15 U.S.C. § 78t(a) ...........................................................2

15 U.S.C. § 78u-5(c)(1)(A)(i) ........................................................................................24, 26

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................................ 23-24

15 U.S.C. § 78u-5(c)(2) ........................................................................................................28

28 U.S.C. § 1404(a) ................................................................................................................1

D. Del. Local Civ. R. 7.1.3(c)(1)(E) .....................................................................................5

Fed. R. Civ. P. 9(b) .................................................................................................2, 11, 13

Fed. R. Civ. P. 12(b)(6) ...............................................................................................2, 10

Fed. R. Civ. P. 15(a) ...........................................................................................................39

SEC Rule 10b-5 .......................................................................................................................2

## Nature and Stage of the Proceedings

**Nature of the Action**

The essence of this securities class action is that Veritas Software Corporation ("Veritas" or the "Company") and its top officers fraudulently recognized revenue on large sales contracts that were not completed for the year 2003 and the first quarter of 2004. From March through June 2004, Defendants only gradually and deceptively released information about why Veritas's revenues were being restated for those periods. To blunt the disastrous effect that the restatement would have on the share price, Defendants issued fraudulent "guidance" of expected revenues for the second quarter of 2004. Defendants also knew that when the truth was finally revealed and the share price dropped, Veritas would be a prime takeover candidate. Accordingly, certain Individual Defendants awarded themselves golden parachute agreements that would provide lucrative benefits in the event of a takeover, and sold substantial portions of their Veritas shares at artificially inflated prices.

**Procedural History**

This action was commenced on July 7, 2004 against Veritas, Gary L. Bloom, the Company's CEO, and Edwin J. Gillis, the Company's CFO, alleging that Veritas issued a materially misleading press release regarding expectations on revenue and earnings for the second quarter of 2004, in violation of the Securities Exchange Act of 1934 (the "Exchange Act"). (D.I. 1)  On July 19, 2004, defendants moved pursuant to 28 U.S.C. § 1404(a) to transfer this action to the Northern District of California, where Veritas is headquartered. (D.I. 4-7) The Court denied the motion as well as a subsequent motion for reconsideration. (D.I. 31, 45) On March 3, 2005, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), this Court consolidated the original and related complaints, appointed

Tay Siew Choon and Mark Leonov as Co-Lead Plaintiffs, and approved their selection of Co-Lead and Liaison Counsel. (D.I. 44)

On May 27, 2005, following a lengthy investigation which included interviews of numerous former Veritas employees, Lead Plaintiffs, on behalf of a proposed class of purchasers of Veritas common stock during the Class Period of April 23, 2003 through July 6, 2004 (collectively, "Plaintiffs"), filed a Consolidated Amended Class Action Complaint (the "Complaint") asserting claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants Veritas, Bloom, Gillis and an additional defendant, John Brigden, the Company's senior vice president and general counsel. (D.I. 52) In addition to the claims asserted in the initial complaint, the Complaint alleges that the Company's financial statements during the Class Period were materially false and misleading due to Veritas's improper recognition of revenue on sales transactions that had not been completed, in violation of generally accepted accounting principles ("GAAP") and the Company's own revenue recognition policies.

On July 20, 2005, Defendants moved to dismiss the Complaint pursuant to various provisions of the PSLRA and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (D.I. 53-57)

As demonstrated below, the motion to dismiss should be denied.

## Summary of Argument

1.     Plaintiffs' allegations of fraudulent revenue recognition are amply particularized under Rule 9(b) and the standards this Court and other courts in this Circuit have articulated. Defendants' attacks on the *bona fides* of the Confidential Witnesses who contributed to the Complaint are groundless.

2.    The Complaint adequately alleges that the second quarter 2004 earnings guidance of $490-$505 million was false when made. Defendants had to complete all of the major sales contracts for which revenue was improperly recognized in earlier periods. Additionally, Veritas had to complete more deals than ever before, in the face of sharply declining demand. Because Defendants were now under increased scrutiny as a result of announcing the restatement, during the second quarter of 2004 Defendants could not continue their practice of fraudulently inflating revenues. Defendants' challenges to the allegations supplied by former Veritas employees who have come forward on a confidential basis are unavailing. Each Confidential Witness was in a position to observe the alleged wrongdoing and provided firsthand, contemporaneous and reliable information concerning Defendants' alleged wrongdoing.

3.    The Complaint also adequately alleges that Defendants knew that the earnings guidance was false. Courts in this Circuit have held that scienter may be inferred from the Individual Defendants' management positions where, as here, the alleged fraud concerns the Company's core business while the Individual Defendants were at the helm. The timing of Bloom's and Gillis's stock sales before the April 21, 2004 issuance of the earnings guidance cannot negate an inference of scienter. This is especially so because by April 21, these Defendants had already dumped their shares upon the realization that the share price would plummet when the fraudulent revenue recognition came to light. Moreover, the reissuance of the earnings guidance only a few weeks before Veritas was forced to repudiate that guidance strongly supports an inference of scienter.

4.    Veritas's earnings guidance is not protected by the statutory "safe harbor" for forward-looking statements or the judicially created "bespeaks caution" doctrine. None of

the statements of earnings guidance was accompanied by meaningful cautionary language sufficient to enable this Court to find as a matter of law that the guidance was immaterial. Indeed, the cautionary language Defendants quote is drawn from annual or quarterly reports that Veritas issued after the earnings guidance was released, or reports issued so long before the earnings guidance that they can hardly be viewed as "accompanying" the guidance as required by the PSLRA.

     5.     The Complaint sufficiently pleads loss causation. Contrary to Defendants' arguments, which ignore the relevant allegations, loss causation is pleaded by allegations that Plaintiffs and Class members: (a) purchased Veritas shares at artificially inflated prices because of Defendants' material misrepresentations concerning, among other things, improper revenue recognition, and (b) suffered damages when the stock price plummeted upon the partial revelation of the truth *(i.e.,* woefully off-the-mark revenue estimates based, in part, on the improper revenue recognition).

     6.     Finally, the Complaint sufficiently pleads Defendants' scienter with respect to the revenue recognition claims. The allegations of the Individual Defendants' participation in the alleged fraud, buttressed by the contemporaneous accounts of the Confidential Witnesses, strongly support an inference that Defendants acted with the requisite state of mind. Even assuming *arguendo* that Bloom and Gillis sold all of their Veritas stock during the Class Period pursuant to a preexisting Rule 10b5-1 trading plan, that fact cannot negate an inference of scienter where neither of them sold stock before the Class Period. And Defendants' contention that they sold stock after the July 6, 2004 press release finds no support in the record.

## Counter-Statement of Pertinent Facts

### Declining Sales and Demand During the Class Period

Veritas was a leading provider of various kinds of storage management software.
¶ 7.[1]  Software upgrades were the largest source of revenue from existing clients, and most of Veritas's revenue from existing customers was derived from such upgrades. ¶ 45(a).  During 2003 and 2004, Veritas developed seven major upgrades of application product management (APM) software, but they sold poorly, resulting in sales that were only a small fraction of what Veritas had internally projected.  ¶ 45(b).

During 2003 and 2004, Veritas failed in many of its attempts to renew existing business.  Indeed, the Company's efforts to renew contracts with major corporate customers were stymied because of poor customer service, a lack of integration of customer service into the sales effort, and many of the customers' own financial woes.  ¶ 45(d).  At the end of the first quarter of 2004, virtually none of the sales force had met their sales quotas, and despite the fact that the Company was already understaffed, none of the sales personnel who left during that quarter were replaced.  ¶ 45(e)-(f).

### Improper Recognition of Revenue and False Financial Results

According to former employees of Veritas, the Company's legal department was responsible for determining revenue recognition. ¶ 41(a).  Brigden, the Company's general counsel since November 2001 (¶ 10(a)), approved contracts (knowing that the income therefrom would be included in revenue recognition) despite the fact that they lacked essential terms like the price and in some cases were unsigned by the customers. Management fabricated the revenue results for a given quarter before the quarter ended, and

---

[1]  Citations to "¶ ___" herein refer to paragraphs of the Complaint.  Consistent with this Court's Local Civil Rule 7.1.3(c)(1)(E), Plaintiffs where possible have avoided repeating facts recited in Defendants' opening memorandum.

to meet their numbers, approved and recognized the income from the "fake" contracts as revenue. When an employee in Brigden's department responsible for reviewing contracts protested to Brigden that certain approved contracts were incomplete, he said:

> What's the difference? We already know what the numbers for the quarter are.

¶ 41(b).

Brigden also fired highly regarded and honest employees and replaced them with new people loyal only to him, and insisted on reviewing the biggest contracts, such as those with IBM, himself. Contracts with major customers often lacked critical terms and, according to the same former employee, booking revenues from unsigned or incomplete contracts was standard practice at least through 2003. ¶ 41(b).

Indeed, during the Class Period at least through 2003, Veritas's management put great pressure on the sales force to report revenue sufficient to meet earnings estimates. As a result, sales personnel would write up and process contracts without essential terms and customer signatures "all the time," in order to meet revenue targets and "bolster the numbers." ¶ 41(c).

Veritas's quarterly and year-end financial results for 2003 and the first quarter of 2004, reported between April 23, 2003 and April 21, 2004 in press releases, Form 10-Q quarterly reports and its Form 10-K Annual Report for 2003, were materially false and misleading because during these periods the Company improperly recognized revenue on sales transactions that in fact were not completed, and on "contracts" that were not signed by Veritas customers or lacked essential terms like the price and total amount to be paid, all in violation of GAAP and the Company's own revenue recognition policies. ¶¶ 1, 24, 34.

On March 15, 2004, as a result of an internal investigation, Veritas announced a restatement of its previously reported financial results for 2003. ¶ 32. However, the extent of the restatement and the improper revenue recognition in 2003 and the first quarter of 2004 were not initially disclosed. The truth emerged only gradually while, throughout the second quarter of 2004, Veritas continued to issue false earnings guidance to prevent a sell-off of Veritas shares. ¶¶ 32, 34, 36, 37-39, 42.

In the March 15, 2004 press release, Veritas announced only that it would restate its previously reported financial results for 2001 and 2002 and "revise" its 2003 results "to reflect corrections" of these prior periods, and that the filing of the Company's Form 10-K for 2003 and Form 10-Q for the first quarter of 2004 would be delayed. The press release stated falsely that the restatement concerned GAAP violations that occurred in 2001 and 2002 only. The Company's internal investigation "identified certain accounting practices not in compliance with generally accepted accounting principles during 2002, 2001 and prior periods under the direction of former financial management. These practices included the incorrect deferral of professional services revenue . . . . The expected adjustments for 2003 are primarily a consequence of correcting errors from the prior periods." On this news, Veritas stock slipped over the next two trading days from $31.01 to $27.29, on substantially higher than usual volume. ¶ 32.

**False Earnings Guidance for the Second Quarter of 2004**

On April 21, 2004, Veritas announced that it expected to earn between $490 million and $505 million, or between $0.22 and $0.24 per share on a GAAP basis, for the second quarter of 2004. ¶ 34. The Company publicly "confirmed" this earnings guidance two separate times, on May 5, 2004 in a presentation to securities analysts in Las Vegas, and in a press release on June 14, 2004, about two weeks before the end of the quarter. ¶¶ 36-37.

The June 14, 2004 press release also finally announced the filing of Veritas's 2003 Form 10-K and first quarter 2004 Form 10-Q. Veritas announced that its 2003 financial statements would also be restated, finally admitting (in contrast to the March 15 disclosure) that the Company recognized revenue improperly during 2003. Veritas also announced that the downward "adjustments" for 2003 would be greater than had been announced on March 15 and that the first quarter 2004 results had also been "adjusted" downward. ¶ 37. The 2003 Form 10-K stated in particular: "We also made adjustments to 2003 that are unrelated to errors in prior periods. . . . The adjustments unrelated to errors in prior periods are expected to be recognized as revenue in 2004." ¶ 38.

Veritas's earnings guidance was utterly off the mark. On July 6, 2004, just *three weeks* after the Company's latest confirmation of its anticipated results for the quarter, Veritas suddenly announced that revenues for the second quarter actually would be "in the range of $475 million to $485 million" and its earnings per share actually would be "in the range of $0.17 to $0.19." On this news, Veritas stock plunged *36%*, from $26.55 to $17.00, on heavy trading. ¶ 44.

During a July 27, 2004 conference call with securities analysts to discuss Veritas's weak second quarter results, and in a follow-up presentation to analysts and investors on August 11, 2004, Bloom (the Chairman and CEO) attributed the earnings shortfall to a $30 million drop in the Company's U.S. direct enterprise business, resulting from completing only 201 sales contracts worth more than $100,000 during the quarter, compared to 246 such contacts during the first quarter of 2004 and 286 during the fourth quarter of 2003.[2] ¶¶

---

[2]    Attempting to downplay these facts, Defendants state unremarkably that Veritas publicly disclosed the number of major deals the Company entered into during these two quarters. See Defs. Mem. at 8 n.5. This fails to address the critical allegation that

43(b), 44. Bloom's statements during the conference call confirm that Defendants knew during the second quarter, and prior to issuing the guidance, that U.S. direct enterprise transactions worth more than $100,000 were a critical component of Veritas's business, and that the guidance for the second quarter was dependent on completing substantially *more* such transactions than the 246 that had been closed during the first quarter. ¶ 43(b).[3]

**Insider Selling and Golden Parachutes**

During the Class Period, Bloom exercised options to sell 65,500 shares of Company stock for proceeds exceeding $2.4 million, and Gillis exercised options to sell 90,000 Veritas shares for proceeds of more than $5.6 million. ¶ 46. Bloom and Gillis had not sold *any* Veritas shares before the Class Period despite the fact that Bloom, at least, had been an officer of Veritas since 2000. Many of their sales occurred during late December 2003 and January 2004, after the results for 2003 were known but before they were publicly announced. These Defendants also sold stock between January 28 and March 12, 2004, when the Company's internal investigation of accounting irregularities was in progress but before it was publicly disclosed. ¶ 47. After selling their shares, Bloom and Gillis were left owning minimal amounts of Veritas stock: 3,392 and 994 shares, respectively. ¶ 48.

---

Defendants *knew during* the second quarter that they would need to close many *more* deals than they had closed during the first quarter in order to achieve the second quarter estimates. ¶ 43(b).

[3] Defendants note Bloom's comment during the conference call that other large software companies attributed their own missed expectations to similar "delays in purchasing decisions." Defs. Mem. at 8 n.3. The causes of earnings shortfalls at unrelated companies are irrelevant. The relevant allegation is that Defendants were aware of but failed to meaningfully disclose such problems at Veritas. Indeed, Defendants' submission of press releases issued by unrelated companies (Walsh (Defs.) Decl. Exs. N & O) is improper on this motion. The Complaint does not rely upon or reference these press releases, and they have nothing to do with Plaintiffs' claims. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (court may consider documents "integral to" or "explicitly relied on" in complaint on motion to dismiss).

In March 2004, in the midst of the Company's investigation into its accounting violations and restatement announcement, the Individual Defendants entered into lucrative change of control agreements *(i.e.,* golden parachutes) with the Company. This was despite the fact that the Individual Defendants had been managing Veritas for years and in late 2003 Veritas had indicated an interest in *acquiring other* companies rather than being taken over. The Individual Defendants knew that the price of Veritas stock would likely fall when the accounting and other problems were made public, making the Company a potential takeover target. Indeed, in a research note dated July 6, 2004, the last day of the Class Period, Piper Jaffray stated: "[W]e believe there could be some potential for takeout of VERITAS at this historically low valuation. With the top executives signing a change of control agreement in March of 2004 (same date as the restatement announcement) we feel *they see potential for a take out and wanted to protect themselves* in case a change of control occurs." ¶ 50 (emphasis added).

As the Court is aware from Defendants' motion to transfer (D.I. 4), Veritas and Symantec Corporation announced a few months later, on December 18, 2004, that they would "merge"—with Symantec as the surviving company—in an all-stock transaction worth $13.5 billion.

## ARGUMENT

### I.    STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), this Court must accept all of Plaintiffs' well-pleaded factual allegations as true and construe the Complaint in the light most favorable to Plaintiffs. See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004). "Accordingly, the court must resolve any ambiguities concerning the

- 10 -

sufficiency of the claims in favor of the plaintiff." Tse v. Ventana Med. Sys., Inc., No. 97-37-SLR, 1998 WL 743668, at *4 (D. Del. Sept. 23, 1998) (Robinson, J.) (citing Hughes v. Rowe, 449 U.S. 5, 10 (1980) (per curiam)). This Court may look beyond the complaint to extrinsic documents when Plaintiffs' claims are based on those documents. GSC Partners, 368 F.3d at 236. However, as noted above, those documents must be "integral to" the claims or "explicitly relied upon in the complaint" for the Court to consider them at this stage. Burlington Coat Factory, 114 F.3d at 1426.

Thus, the Court "may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (emphases added). The issue for this Court is not "whether a plaintiff will ultimately prevail" at trial, but "whether the claimant is entitled to offer evidence to support the claims." Burlington Coat Factory, 114 F.3d at 1420 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Under these standards, and the standards applicable to pleading claims of securities fraud under the PSLRA and Rule 9(b), it is clear that the Complaint states claims under the Exchange Act. Defendants' motion to dismiss should be denied.

## II.   PLAINTIFFS HAVE ALLEGED DEFENDANTS' IMPROPER RECOGNITION OF REVENUE WITH SUFFICIENT PARTICULARITY

The Complaint alleges that Defendants fraudulently recognized revenue by approving contracts that were incomplete, lacked essential terms and were unsigned by Veritas customers. E.g., ¶ 41(b)-(c). There is no merit to Defendants' assertion that Rule 9(b) requires Plaintiffs to "allege specifics such as the dates, transactions, customer names and amounts by which revenue was allegedly misstated." Defs. Mem. at 27. This Court recognized in Medtronic Ave, Inc. v. Boston Scientific Corp., No. 98-478-SLR, 2001 WL

652016 (D. Del. Mar. 30, 2001) (Robinson, J.), that Rule 9(b) does not require nearly the

level of exhaustive detail that Defendants demand:

> The requirement for particularity in pleading fraud does not
> demand an exhaustive cataloging of facts, but only specificity
> sufficient to provide assurance that plaintiff has investigated
> the alleged fraud and reasonably believes that a wrong has
> occurred. . . . Moreover, a claimant is free to use alternative
> means of injecting precision and some measure of
> substantiation into its allegations of fraud.

Id. at *2 (citing Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc., 42 F. Supp. 2d 423,

441 (D. Del. 1999)) (antitrust case). Further, "[t]he Third Circuit has cautioned that courts

should 'apply the rule with some flexibility and should not require plaintiffs to plead issues

that may have been concealed by the defendants.'" In re Cendant Corp. Litig., 60 F. Supp.

2d 354, 368-69 (D.N.J. 1999) (quoting Rolo v. City Inv. Co. Liquidating Trust, 155 F.3d

644, 658 (3d Cir. 1998)).

Notably, the court in In re NUI Securities Litigation, 314 F. Supp. 2d 388 (D.N.J.

2004), rejected an argument similar to that Defendants make here because it would impose

too stringent a burden upon plaintiffs:

> Defendants contend that plaintiffs have not pled the alleged
> bad debt practice with sufficient particularity because, *inter*
> *alia,* they do not "allege any facts concerning (i) the level of
> NUI's bad debt stated in its financials, (ii) what the allegedly
> 'true' level of bad debt should have been, (iii) specific
> transactions and amounts of allegedly undisclosed bad debt,
> [and] (iv) facts providing a basis for requiring an accounting
> write-off." We disagree. The burden on plaintiffs, while
> heavy, is not as overwhelming as defendants suggest, and is
> satisfied by the allegations in the Second Amended
> Complaint.

Id. at 403 n.8 (brackets in original) (citation omitted); see Ottmann v. Hanger Orthopedic

Group, Inc., 353 F.3d 338, 350 n.8 (4th Cir. 2003) (rejecting argument that plaintiffs were

required to "allege particular transactions where revenues were improperly recorded,

including the names of customers, the terms of specific transactions, and the approximate amount of the fraudulent transactions"); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 593 (D.N.J. 2001) (accepting plaintiff's argument that they "need not allege with numerical specificity the extent or impact of Defendant's allegedly improper accounting practices"); In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) ("It is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendant transgressed, by customer, amount, and precise method.").

The Complaint, based in part on information provided by multiple former Veritas employees with personal knowledge of the wrongdoing, alleges a pervasive scheme by Defendants to inflate the Company's revenue numbers by including "sales" from contracts that had not been signed by the customer or that were missing essential terms such as price (the very term that would determine the revenue to be generated by the contract). The Complaint alleges that these fraudulent activities were "standard practice" at the Company, that they happened "all the time," and that incomplete or unsigned contracts were personally approved by Brigden who, when confronted about this practice, stated *"What's the difference? We already know what the numbers for the quarter are."* ¶ 41(b)-(c) (emphasis added).

These allegations are more than sufficient to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior," which is what Rule 9(b) requires. SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 715 (D.N.J. 2005). As was the circumstance in Campbell Soup, 145 F. Supp. 2d at 593, "[w]hile Plaintiffs will need to 'fill in the details' to prove their claims, Plaintiffs have sufficiently plead the who, what, where,

- 13 -

when, and how of the allegedly fraudulent practices and have sufficiently demonstrated that, if true, the practices would have had a material impact on Defendants' financial statements." Accordingly, Defendants' attack on Confidential Witness ("CW") No. 3, who provides details about the approval of unsigned or incomplete contracts, for "fail[ure] to allege any particulars" is wholly without merit. Defs. Mem. at 29.

Defendants also take issue with CW No. 4's statement that the Company's "legal department was responsible for deciding when revenue could be recognized and reported," ¶ 41(a), because it is purportedly "not remotely plausible since revenue recognition is an accounting function, not a legal function—as reflected in VERITAS' public filings identifying revenue recognition as one of VERITAS' critical *accounting* policies." Defs. Mem. at 30 (emphasis in original). Defendants essentially deny the truth of the allegation, which is improper on this motion. See Tsc, 1998 WL 743668, at *4 (court bound to give plaintiff benefit of all reasonable inferences to be drawn from complaint). Moreover, the veracity of the Company's public filings is itself at issue in this case. The facts reported by CW No. 4—who worked in the Company's legal department—substantiate the allegations of fraud: revenue recognition *should* be an accounting function, but according to CW No. 4, and for reasons known only to Defendants, it apparently was a legal function at Veritas.

Defendants' challenge to CW No. 5's reliability is equally groundless. Plaintiffs allege that CW No. 5 "was a sales staff administrator at Veritas . . . and was involved with new contracts." ¶ 23(e). CW No. 5 stated that "sales personnel would 'all the time' write up and process contracts without essential terms and customer signatures." ¶ 41(c). Defendants argue that the Complaint does not set forth enough details about "where" the witness worked or what it means to be "involved" with new contacts, Defs. Mem. at 31, but Defendants cite

no authority holding that such information is required at the pleading stage. In reality, Plaintiffs need only describe confidential witnesses "in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Campbell Soup, 145 F. Supp. 2d at 595 (citing Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.), cert. denied, 531 U.S. 1012 (2000)). Here, the allegation that CW No. 5 was a sales staff administrator amply supports the inference that this witness was aware that the sales department was preparing and processing contracts that lacked signatures or essential terms.[4]

Finally, Defendants' assertion that the complaint does not allege that a sales staff administrator would "have any involvement with the finance department or the revenue recognition process," Defs. Mem. at 31, misses the point entirely. This witness provides information about the creation of the contracts Defendants used to recognize revenue improperly. ¶ 41(c). He or she did not have to be involved in the revenue recognition process to provide information about treating the unsigned or incomplete contracts as revenue.[5] It is common sense that the only reason the sales staff would have engaged in a

---

[4]   Defendants' half-hearted contention that the Complaint does not allege what it means to "process" contracts does not remotely support dismissal and merits little response. See Defs. Mem. at 31.

[5]   Other cases cited by Defendants are readily distinguishable. In Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226 (D. Mass. 1999), the court held that a plaintiff *could* adequately plead improper revenue recognition by describing the specific names and amounts involved in one fraudulent transaction, not that it *must* do so to satisfy Rule 9(b). The courts in both California Public Employees' Retirement System v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004), and Freed v. Universal Health Services, Inc., No. 04-1233, 2005 WL 1030195 (E.D. Pa. May 3, 2005), found that the plaintiffs had alleged insufficient facts to show that their confidential sources would possess the information they claimed to possess. Here, Plaintiffs have done so, as set forth above. Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004), concerned the materiality of the financial misstatements at issue, which Defendants do not challenge here. Finally, in In re Midway Games, Inc. Securities Litigation, 332 F. Supp. 2d 1152, 1169 (N.D. Ill. 2004),

continuing practice of submitting incomplete contracts for approval is that the contracts were being approved and not sent back to them.

## III. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS' STATEMENTS OF EARNINGS GUIDANCE FOR THE SECOND QUARTER OF 2004 WERE KNOWINGLY FALSE AND MISLEADING

### A. Plaintiffs Adequately Allege That the Earnings Guidance Lacked a Reasonable Basis and Therefore Was False When Made

Although the earnings guidance for the second quarter of 2004 accomplished nicely the goal of buffering the emerging information about the earlier improper revenue recognition and delaying the drop in the share price, Defendants knew at the time that the range of $490-$505 million was not achievable.  At the time the guidance was issued Defendants knew, among other things, that: demand was diminishing, Veritas had the additional burden of completing sales that had already been improperly booked as revenue, and the guidance required Veritas to exceed, in the second quarter, the fictitious revenues reported for the first quarter of 2004.  ¶¶ 43-45.  Moreover, given that the restatement announcements created much greater scrutiny of Veritas, it was no longer possible for Veritas to fraudulently inflate revenues, and there was no way that the revenues ultimately reported would meet expectations.

Defendants mischaracterize Plaintiffs' allegations as being confined to management's hindsight review on July 27, 2004 of what went wrong.  See Defs. Mem. at 16.  The factors Bloom listed in that review were, for the most part, known to Defendants when Veritas announced the anticipated earnings.  This knowledge is corroborated by the accounts of the

---

the court held that a witness referenced in the complaint "simply reiterate[s] plaintiffs' general allegation that defendants manipulated Midway's reserves, without providing any specific information."  Here, in contrast, CW Nos. 3, 4, and 5 provide firsthand accounts of the conduct of Brigden and Company employees who carried out Defendants' fraudulent scheme to recognize revenue from unsigned or incomplete contracts.

Confidential Witnesses referenced in the Complaint. Bloom admitted as much by acknowledging during the second quarter of 2004 that demand had dropped between the fourth quarter of 2003 and first quarter of 2004. Bloom admitted further that demand continued to drop during the second quarter, which led to fewer, slower and smaller sales. Thus, the only way to meet Veritas's anticipated earnings was to make more sales than had been made during the first quarter (due, in part, to the revenue previously recognized on incomplete contracts).

Defendants fail to address Plaintiffs' allegation as to the incomplete sales contracts for which revenue had already been recognized, as a reason why the guidance could not be achieved.[6] Because Defendants do not address this allegation (a factor not mentioned during the July 27 conference call) the Court should find that the Complaint adequately alleges that the earnings guidance was false. See Gruntal & Co. v. San Diego Bancorp, 901 F. Supp. 607, 615 (S.D.N.Y. 1995) (court need not address sufficiency of complaint as to elements of Rule 10b-5 violation not challenged in motion to dismiss).

That Defendants knew prior to the issuance of the earnings guidance that demand and sales were diminishing is corroborated by reliable information supplied by former Veritas employees who came forward on a confidential basis. ¶ 45. CW No. 2, who worked in sales management at Veritas during most of the second quarter of 2004, reports that software upgrades were the largest source of new revenue from existing clients and required the Company continually to have new products and ideas in the pipeline. ¶¶ 23(b), 45(a). CW

---

[6]  ¶ 43(a); see also ¶ 35 (financial results for first quarter 2004 false and misleading because earnings included revenue recognized improperly from unsigned contracts), ¶ 37 (June 14 press release "adjusting" first quarter results downward and also confirming second quarter guidance) and ¶ 51 (improper recognition of revenue done for purpose of enabling Company to meet revenue expectations); cf. Defs. Mem. at 16.

No. 1 reported that the upgrades did not sell well at all. ¶ 45(b). Additionally, according to CW No. 2, Veritas failed during 2003 and 2004 in its attempts to renew existing business—including its botched efforts to renew contracts with major corporate customers due to poor customer service, lack of integration of customer service into the sales effort, and many of the customers' own financial difficulties. ¶ 45(d).

Acknowledging that CW No. 2 worked for Veritas during the second quarter, and tacitly conceding that he or she was in a position to know the material facts alleged, Defendants contend nonetheless that the Court should not credit CW No. 2's account because it lacks "the *names* of dissatisfied customers who did not renew their business." Defs. Mem. at 21 (emphasis added). However, Defendants do not explain why such information is necessary to establish that the second quarter 2004 estimates were false. Moreover, Defendants argue that CW No. 2 does not explain precisely how the problems he or she recounts, standing alone, contributed to the second quarter shortfall despite the fact that a reasonable inference may be drawn that the failure to renew existing business with major customers—an essential part of Veritas's business plan—would contribute to lower than expected earnings.

Defendants argue that CW No. 1's account should be disregarded because he or she worked in a regional office and left Veritas before the second quarter. However, the facts that CW No. 1 related concerning Veritas's business plan and strategy (¶ 45(a)-(b)) were in force during the second quarter as well. Defendants do not suggest any major shift in strategy between the first and second quarters of 2004 to refute this. Defendants' further charge that CW No. 1's knowledge about projected revenues is merely speculative (Defs. Mem. at 20) is errantly based on a selective quotation from the Complaint. CW No. 1, a

- 18 -

sales manager, stated that consulting services "must have been" part of the revenue estimates *"based on what the Veritas executives were telling the salespeople."* ¶ 45(d) (emphasis added). This firsthand knowledge of what Veritas *executives* were telling the sales force satisfies Defendants' purported requirement (if there is one) that a witness must work in Company headquarters to have reliable knowledge pertinent to alleged wrongdoing.[7] Finally, Defendants' comment that it is uncontested that Veritas "achieved its first quarter projections" (Defs. Mem. at 20) is of little moment, and not entirely accurate, given Plaintiffs' allegation that the first quarter results were premised on prematurely or improperly recognized revenue. ¶ 35.

Similarly, the fact that CW Nos. 3 and 4 left Veritas before the second quarter does not undermine the relevance of their knowledge concerning second quarter earnings. CW No. 3 stated that demand for new software licenses dropped in 2003 and did not recover, and CW No. 4 stated this downturn in demand led Veritas, despite the fact that it was already understaffed, not to replace employees who left during the first quarter. ¶ 45(e)-(f). These facts directly corroborate Plaintiffs' allegation that management knew during the second quarter that in order to achieve the second quarter guidance, the Company would have to close substantially more than 246 major U.S. direct enterprise transactions. ¶ 43(b); see In re Honeywell Int'l Inc. Sec. Litig., 182 F. Supp. 2d 414, 427 (D.N.J. 2002) ("There are ample

---

[7]    In contrast, in Chubb, 394 F.3d at 154-55, cited by Defendants, the complaint attributed allegations about one of Chubb's businesses to former employees who worked in other, separate businesses or who did not work for Chubb at all, and attributed nationwide information to employees in local branch offices without suggesting how those employees had access to such information. In Freed, 2005 WL 1030195, all of the confidential sources worked in local offices and there was no suggestion that any of them received company-wide information. The court also stressed that the complaint, unlike the Complaint here, did not allege when the confidential sources were employed and identified them simply as "former UHS employees," with no titles or job descriptions given. Id. at *7, *9.

facts pled to support an inference that material facts known to at least some of the defendants were withheld in order to maintain the price of Honeywell's stock.").

June 14, 2004 found Defendants only sixteen days (and a mere thirteen business days) away from the end of the quarter, facing diminishing demand and sales, and knowing that they would finally have to admit that there had been premature and improper revenue recognition during 2003, that the restatement was not based solely on errors in prior years, that the downward adjustments for 2003 would be greater than previously announced, and that the first quarter 2004 results would have to be adjusted downward. Consequently, Defendants had a tremendous incentive to keep earnings expectations high in order to keep the share price from falling. So, despite there being no reasonable basis to do so, Veritas issued a press release on June 14, 2004 in which it once again "confirmed" its earnings guidance for the quarter. ¶ 37. In reality, Bloom knew during the second quarter that the accuracy of the guidance was dependent upon closing *more* large U.S. direct enterprise transactions than the 246 that had been closed during the first quarter, deals that were defined by Gillis as being worth more than $100,000 and averaging about $190,000. ¶¶ 34, 43(b). This meant that Veritas had to complete, at an absolute minimum, *247* major transactions in order to meet expectations of $490-$505 million for the second quarter of 2004. At most, by June 14, 2004, Veritas had completed 201 major transactions, the number reported at the end of the quarter.[8] By the end of the quarter, Veritas had missed even the lowest point of the

---

[8]   Indeed, Veritas had probably competed fewer than 201 transactions at that point, given that the quarter had not quite ended and the sales force likely pushed to complete pending deals in the waning days of the quarter. See ¶ 41(c) ("great pressure" from management to report revenue sufficient to meet earnings estimates).

range by $5 million, reporting revenues of only $485 million.[9]  Thus, it strains credulity to

think that Defendants believed on June 14 that the earnings guidance was achievable.  But

instead of lowering the guidance, or even acknowledging that most of the range was not just

unlikely but impossible, Defendants reaffirmed the range so as to blunt the market's reaction

to the improper revenue recognition in 2003.[10]

It is clear that the second quarter earnings guidance lacked any reasonable basis in

fact.  Knowing the low level of large sales transactions that had been completed as of June

14, 2004 (and April 21 and May 5), and facing slowing demand and sales, Defendants had

no reasonable basis to reaffirm the entire target range.

---

[9]  Defendants' claim that the earnings shortfall was only $5 million (see Defs. Mem. at 7, 22) is illogical given management's explanation that the Company needed to complete at least 247 deals, and probably more, rather than the actually completed 201 deals in order to make its numbers for the second quarter.  At an average of $190,000 per contract, a $5 million shortfall would account for only 26 additional transactions rather than the minimum of 46 needed according to management.  And Defendants' spin on the shortfall as insignificant (though not immaterial) in light of the various ranges of guidance issued is belied by the sharp, *one-third* drop in the stock price when the lowered guidance was announced.

[10]  It should also be noted that there was no possibility that Veritas would achieve revenues at the top of the range.  Veritas's actual reported revenue for the second quarter was $485 million, the high-end of the reduced $475-$485 million earnings projection issued on July 6.  See Defs. Mem. at 12 n.8.  This was $20 million less than the $505 million high-end of the Company's earnings guidance.  Assuming that, consistent with Gillis's statement regarding the results for the immediately preceding quarter, the average large U.S. direct enterprise transaction was worth $190,000 (¶ 34), Veritas would have had to complete 105 of these major transactions ($20 million-worth of transactions at $190,000 each) *more* than it actually completed in order to meet the high end of the expectations.  Veritas admitted that it closed only 201 transactions during the second quarter, resulting in the earnings shortfall. ¶ 44.  Therefore, Veritas would have had to complete a whopping *306* major sales transactions during the second quarter to meet the high end of the expectations.  To make its numbers for the quarter, then, Veritas would have had to complete, at an absolute minimum, *105* sales contracts worth $100,000 or more in just 13 business days, where the Company had closed (at most) only 201 such deals during the 51 business days that had elapsed since the beginning of the quarter.  This would have required Veritas to close deals at an enormously accelerated rate of *8.07* per business day between June 14 and 30, 2004, where the Company had in fact completed just 3.94 deals per business day between April 1 and June 13, 2004.

**B.    Plaintiffs Adequately Allege That Defendants Knew the Earnings Guidance Was False and Misleading When Made**

Arguing that an inference of knowledge cannot be drawn from an officer's position at the company, Defendants contend that the Complaint does not allege that the Individual Defendants actually knew the earnings guidance was false. To the contrary, where, as here, the alleged fraud relates to the core business of the Company while the Individual Defendants are at the helm, an inference that top management had knowledge of the undisclosed facts is appropriate. See In re Viropharma, Inc. Sec. Litig., No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) ("[B]ecause Pleconaril was Viropharma's leading product and Defendants were the highest ranking members of the company, it can be *assumed* that the Defendants were aware of these facts.") (emphasis added); In re Aetna, Inc. Sec. Litig., 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (allegations of fraud and widespread problems relating to Aetna's "core business" when individual defendants were top executives "provide strong circumstantial evidence that Defendants . . . had knowledge of undisclosed facts[.]");[11] In re Ravisent Techs., Inc. Sec. Litig., No. 00-1014, 2004 WL 1563024, at *12 (E.D. Pa. July 13, 2004) (knowledge sufficiently pleaded by allegations showing "how Liu's position as CFO would have provided him with the knowledge that the [forward-looking] statements were misleading").

---

[11]    The court in Aetna carefully distinguished In re Advanta Corp. Securities Litigation, No. 97-4343, 1998 WL 387595 (E.D. Pa. July 9, 1998), aff'd, 180 F.3d 525 (3d Cir. 1999), cited by Defendants: "In Advanta, the alleged fraud did not relate to the corporation's core business but rather concerned a change in the period for investigations of credit card holders who filed for bankruptcy. The court in Advanta refused to impute knowledge of this *operational detail* to the individual defendants in the absence of other allegations to support an inference of knowledge." Aetna, 34 F. Supp. 2d at 953 (emphasis added).

Defendants note that Bloom and Gillis ceased their insider stock sales before Veritas's April 21, 2004 announcement of the second quarter guidance.[12] This hardly demonstrates a lack of knowledge that the guidance was false. First, it is clear that by April 21, Defendants had already dumped their shares when they realized that the share price would plummet when the fraudulent revenue recognition was disclosed. Second, and far more compelling than Defendants' observation, is the timing between the issuance (and reissuance) of the guidance and Veritas's repudiation of it on July 6, 2004. Here, the passage of a mere three weeks between the last "confirmation" of the guidance (only *two* weeks before the end of the second quarter) and the July 6 disclosure, supports an inference of knowledge that the guidance was false. See Aetna, 34 F. Supp. 2d at 953 n.10 ("The timing between the alleged false statements [last repeated on August 5] and the September 29 revelation that earnings were going to be significantly lower than expected may also support a finding of Defendants' knowledge of the falsity of the statements issued in the press releases.") (citing cases). In sum, Plaintiffs have adequately alleged Defendants' knowledge of the falsity of the second quarter 2004 earnings guidance.

## IV.   DEFENDANTS' FALSE EARNINGS GUIDANCE FOR THE SECOND QUARTER OF 2004 IS NOT PROTECTED BY THE STATUTORY "SAFE HARBOR" OR THE "BESPEAKS CAUTION" DOCTRINE

Veritas's anticipated earnings for the second quarter of 2004, issued on April 21 and publicly "confirmed" on May 5 and June 14, 2004, are not protected by the PSLRA's "safe harbor" for forward-looking statements because Plaintiffs have adequately alleged that the earnings projections lacked a reasonable basis and were knowingly false when made. See 15

---

[12] Defendants argue that they could not conceivably have known that the earnings guidance was false because Veritas's actual second quarter revenue "fell only $5 million short," or 1%, of the low end of the earnings range given. Defs. Mem. at 22. As discussed in footnote 9 above, this "1%" claim is illogical and irrelevant in context.

U.S.C. § 78u-5(c)(1)(B); Campbell Soup, 145 F. Supp. 2d at 589 (plaintiff can defeat safe harbor by demonstrating statement was knowingly false); see also Burlington Coat Factory, 114 F.3d at 1428 (opinion about future events actionable if lacked a reasonable basis when made).

Even assuming *arguendo* that the statements were not false when made, the issuance and reconfirmations of guidance were not *accompanied* by *meaningful* cautionary language. See 15 U.S.C. § 78u-5(c)(1)(A)(i) (forward-looking statement shielded from liability if "identified" as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"). There was no language conveying that it would be necessary to complete an unprecedented number of sales contracts in a declining market or that Defendants would have to spend much of their time completing contracts on which revenue had already (and improperly) been recognized.

The term "meaningful" is of critical importance. The cautionary language must describe specific, then-existing factors that could undermine the predictive statement. Vague, overbroad, or boilerplate disclaimers will not suffice to bring a forward-looking statement within the safe harbor: "Meaningful cautionary language must be *substantive* and *tailored to the specific predictions* made in the allegedly misleading statement." Viropharma, 2003 WL 1824914, at *8 (emphases added). Indeed, to conclude that cautionary statements render the misrepresentations and omissions immaterial, a defendant must prove that the cautionary statements "discredit the other one so obviously that the risk of real deception drops to *nil.* " In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7

F.3d 357, 372 (3d Cir. 1993) (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991)) (emphasis added).

Moreover, questions of materiality involve delicate assessments of fact and accordingly are ill-suited to resolution at the pleading stage. See In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529, 557 (D.N.J. 2002) ("The question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on a motion to dismiss.") (citing Fecht v. Price Co., 70 F.3d 1078, 1080 (9th Cir. 1995)); Sheehan v. Little Switzerland, Inc., 136 F. Supp. 2d 301, 312 (D. Del. 2001) (Robinson, J.) (rejecting argument that cautionary language rendered omission immaterial: "Materiality is a highly fact-intensive issue which makes it difficult to resolve at the pleading stage.") (citing Basic Inc. v. Levinson, 485 U.S. 224, 236 (1988)).

### A.    April 21, 2004 Press Release

Veritas's April 21, 2004 press release reported financial results for the first quarter of 2004 and the Company's expected revenue and earnings per share for the second quarter. ¶ 34. Although there is a "safe harbor statement" at the end of the press release, Defendants do not even mention it in their brief, presumably because it is so vague and unrelated to the risks that should have been disclosed.[13]   Rather, Defendants cite—with respect to all three

---

[13]   At the end of the body of the press release was the following "cautionary" statement:

SAFE HARBOR STATEMENT

This press release *may* include estimates and forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, including statements relating to projections of future revenues and earnings and statements relating to anticipated effects of our pending restatement on *[sic]* our financial results. These forward-looking statements involve *a number of risks and uncertainties, including* the risk that we will not be able to maintain the quality of our end-user customer and partnering

issuances of earnings guidance—language from the Company's Form 10-Q for the third

quarter of 2003 and Form 10-K for 2003.  See Defs. Mem. at 15.

"Cautionary" language that may be found in the 2003 Form 10-K, which was filed

with the SEC on June 14, 2004 (¶ 38), cannot conceivably dispel the materiality of the

earnings guidance in the April 21 press release because the Form 10-K was issued two

months *after* the press release.  See Sheehan, 136 F. Supp. 2d at 311 (materiality of

statements or omissions may be affected by *"contemporaneous* disclaimers and cautionary

language") (citing Trump, 7 F.3d at 371) (emphasis added).

Conversely, cautionary statements in the Form 10-Q for the third quarter of 2003,

filed with the SEC on November 14, 2003 (¶ 29), cannot soften the materiality of earnings

---

> relationships, the risk that we will need to make other unanticipated
> adjustments to our financial results and *the risk that we will not
> manage our business effectively,* that could cause the actual results we
> achieve to differ materially from such forward-looking statements. For
> more information regarding potential risks, see the "Factors That May
> Affect Future Results" section of our most recent report on Form 10-Q
> for the quarter ended September 30, 2003 on file with the SEC.  We
> undertake no obligation to update any forward-looking statement to
> reflect events or circumstances after the date hereof.

Walsh (Defs.) Decl. Ex. G (emphases added).

Nothing in this verbose, broad statement warned a reasonable investor that Veritas's
actual second quarter results could be materially lower than the guidance because, among
other things, Veritas would have to close substantially more major U.S. direct enterprise
sales transactions that had been closed during the prior quarter and it was premised on a base
of revenue that included revenue recognized improperly from unsigned or incomplete
contracts.  See ¶ 43.  No specific "important factors" are given, see 15 U.S.C. § 78u-
5(c)(1)(A)(i), nor does the statement identify any of the problems relating to unsigned
contracts and the necessary quantum of sales transactions of which Defendants were well
aware. See Asher v. Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004) ("There is no reason
to think—at least, no reason that a court can accept at the pleading stage, before plaintiffs
have access to discovery—that the items mentioned in Baxter's cautionary language were
those that at the time were the (or any of the) 'important' sources of variance."), cert. denied,
125 S. Ct. 1639 (2005); Viropharma, 2003 WL 1824914, at *8 ("The language Defendants
cite as cautionary is verbose, and more importantly it falls far short of advising investors
about any specific risks.  This language would not discourage reliance on the statements of
fact in the . . . press release and the Form 8-k.").

guidance that the Company first issued *five months* later for a future quarter. See Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997) (discussing cautionary statements issued one month prior to allegedly false predictions: "Remote cautions are less likely effectively to qualify predictions contained in separate statements."). Indeed, given this lapse in time, there is considerable doubt whether the risk factors in the Form 10-Q can be said to "accompany" the earnings guidance in the April 21 press release. See In re StaffMark, Inc. Sec. Litig., 123 F. Supp. 2d 1160, 1172 (E.D. Ark. 2000) ("[T]he fact that Defendants included risk factors in its 1997 Prospectus would not qualify as language accompanying earnings predictions made in late 1998 and 1999.").

Even if the risk factors set forth in the Form 10-Q are properly considered alongside the earnings guidance in the April 21 press release, Defendants are misguided in their contention that these factors meaningfully apprised investors of the "precise risk" that materialized with respect to Veritas's second quarter results. Defs. Mem. at 15. The three risk factors Defendants emphasize—"revenue is difficult to forecast and is likely to fluctuate from quarter to quarter due to *many factors,*" "the *possibility* that our customers may cancel, defer or limit purchases as a result of reduced IT budgets or *weak and uncertain economic and industry conditions,*" and "[i]f we experience lower-than-anticipated revenue . . . or if we announce that we expect lower revenue or earnings than previously forecasted, *the market price of our securities could decline*" (Defs. Mem. at 15) (emphases added)—are little more than boilerplate and do not specifically warn investors of the problems with unsigned contracts and the Company's failure to close a sufficient number of sales transactions. See In re Compaq Sec. Litig., 848 F. Supp. 1307, 1318 (S.D. Tex. 1993) (no protection accorded to forward-looking statements coupled only with "vague cautionary

- 27 -

language concerning such broad factors as competition, economic conditions and foreign exchange rates"). None of these risk factors can reasonably be read to disclose the "specific risks envisioned by management" that could undermine the Company's future prediction of $490 to $505 million in revenue.  Id.

### B.    May 5, 2004 Analyst Day Conference

On May 5, 2004, a representative of Veritas orally reiterated the earnings guidance during the Company's Analyst Day Conference in Las Vegas. ¶ 36. At the beginning of the Company's presentation, Veritas's director of investor relations, Renee Budig, stated the following with respect to forward-looking statements:

> [B]efore I get started, I'm going to talk a little bit about the Safe Harbor, as you know, we're going to be making some forward-looking statement *[sic]* today.  Those forward-looking statements do involve some risks and uncertainties, and those are fully documented in our Forms 10K and 10Q.

Walsh (Defs.) Decl. Ex. J, at 2.

Ms. Budig's casual and oblique reference to "risks and uncertainties" is plainly insufficient to meaningfully apprise investors of the specific risks underlying the earnings guidance. See Asher, 377 F.3d at 732 ("'boilerplate' warnings won't do"); Trump, 7 F.3d at 371 ("vague or blanket disclaimer" inadequate to prevent misinformation).  Her equally overbroad reference to unspecified Form 10-Ks and 10-Qs (indeed, *all* of Veritas's 10-Ks and 10-Qs) cannot remotely be construed as making a "cautionary statement" that satisfies the requirements of the PSLRA.  See 15 U.S.C. § 78u-5(c)(2) (oral forward-looking statement must be accompanied by a cautionary statement "that the *particular* oral statement is a forward-looking statement; *and* . . . that the actual results might differ materially from those projected in the forward-looking statement" and must identify documents containing additional information about risk factors) (emphases added); see Honeywell, 182 F. Supp. 2d

at 427 ("Under the Reform Act's safe harbor each *particular* oral statement must be identified as forward looking. 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). None were so identified here.") (emphasis in original).

To the extent that Ms. Budig's prefatory statement reasonably can be construed as a reference to the Company's third quarter 2003 Form 10-Q and 2003 Form 10-K, such documents fail to bring the earnings guidance within the safe harbor or the bespeaks caution doctrine for the same reasons given above with respect to the April 21, 2004 press release. The 2003 Form 10-K, in particular, was filed a month *after* the analyst conference. And to the extent that Ms. Budig was referring to Veritas's 2002 or even 2001 Form 10-K, whatever cautionary statements or risk factors were stated in those annual reports are far too removed from the Company's second quarter 2004 earnings guidance to be "accompanying" the guidance, let alone "meaningful" cautionary language under the PSLRA.[14] See Grossman, 120 F.3d at 1123; StaffMark, 123 F. Supp. 2d at 1172.

### C.   June 14, 2004 Press Release

Veritas's June 14, 2004 press release announced the (late) filing of the Company's Form 10-K for 2003, including restated results for 2002 and 2001, and Form 10-Q for the first quarter of 2004, and confirmed the Company's expected revenue and earnings per share

---

[14] Defendants' citation to Midway Games, 332 F. Supp. 2d at 1170, Defs. Mem. at 14 n.10, is unhelpful to them because the cautionary statement Defendants emphasize, namely that "actual results could differ from those anticipated in the forward-looking statements," was left unsaid by Ms. Budig, and the Form 10-Ks to which Ms. Budig arguably referred were not sufficiently contemporaneous to the earnings guidance. In re Best Buy Co. Securities Litigation, No. Civ. 03-6193, 2005 WL 839099 (D. Minn. Apr. 12, 2005), also cited by Defendants, sheds no light on these issues because the opinion does not specify what "cautionary language regarding forward-looking statements" was provided during the conference call.

for the second quarter just 16 days before the end of that quarter. ¶ 37. The press release

ended with the following "cautionary" statement:

> This press release *may* include estimates and forward-looking
> statements within the meaning of the Securities Act of 1933
> and the Securities Exchange Act of 1934, including
> statements relating to projections of future revenues and
> earnings.    These forward-looking statements involve *a*
> *number of risks and uncertainties, including* the risk that we
> will not gain market acceptance of our products and services,
> the risk that we will not be able to maintain the quality of our
> end-user customer and partnering relationships and *the risk*
> *that we will not manage our business effectively,* that could
> cause the actual results we achieve to differ materially from
> such forward-looking statements. . . .

Exhibit A to the accompanying supporting Declaration of Norman M. Monhait (emphases

added).[15]

This cautionary statement is substantively similar to the "safe harbor statement" in

the April 21 press release and, for the same reasons discussed in part IV.A above, is

insufficiently "meaningful" to render the earnings guidance immaterial as a matter of law.

The pertinent risk factors in Veritas's contemporaneously filed Form 10-K for 2003

(and third quarter 2003 Form 10-Q), quoted on page 15 of Defendants' brief and discussed in

part IV.A above, similarly fail to render the guidance given in the June 14 press release

immaterial. Finally, the press release references the contemporaneously filed Form 10-Q for

the first quarter of 2004, but the excerpt submitted by Defendants, Walsh (Defs.) Decl. Ex.

C, excludes the statement of risk factors (which, in any event, are substantively the same as

---

[15]  Defendants did not include the June 14, 2004 press release with their submissions to
the Court.  Although it is Defendants' burden, in moving to dismiss, to submit documents
that they believe support their position and of which the Court may take judicial notice,
Plaintiffs have submitted the June 14 press release herewith for the Court's convenience.

those found in the 2003 Form 10-K, and thus equally insufficient). See NUI, 388 F. Supp. 2d at 416.

## V.    PLAINTIFFS HAVE ADEQUATELY PLEADED LOSS CAUSATION WITH RESPECT TO THE CLAIMS OF IMPROPER RECOGNITION OF REVENUE

Following Third Circuit precedent, this Court held in In re Tyson Foods, Inc. Securities Litigation, No 01-425-SLR, 2004 WL 1396269 (D. Del. June 17, 2004) (Robinson, C.J.), that in order to establish (or allege) loss causation, "the law requires only that a plaintiff [allege] that defendant's wrongful conduct was a substantial factor in the market change . . . [and] 'a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value.'" Id. at *12-13 (citing Semerenko v. Cendant Corp., 223 F.3d 165, 187 (3d Cir. 2000), and quoting Robbins v. Kroger Properties, Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)). Contrary to Defendants' argument, Plaintiffs are under no burden at this stage of the proceedings to specifically tie the revelation of each alleged misrepresentation to the particular stock correction. In fact, as this Court noted in Tyson Foods, "Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact." Id. at *13 (citing EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000)). Moreover, where, as here, plaintiffs premise their allegations on a fraud-on-the-market theory, "the causal nexus between the misleading statement and a plaintiff purchasing or selling that security may be presumed." Id. (citing Basic Inc., 485 U.S. at 242-43).

Defendants correctly cite Semerenko as controlling authority in the Third Circuit (Defs. Mem. at 24), yet do not demonstrate how plaintiffs fail to meet the standards articulated therein. Semerenko involved a class action against Cendant Corporation, its former officers and directors, and others, on behalf of the shareholders of American Bankers

Insurance Group ("ABI"), alleging violations of the Exchange Act for certain misrepresentations regarding Cendant's tender offer for shares of ABI common stock. Semerenko, 223 F.3d at 169. Defendants moved to dismiss, arguing among other things that plaintiffs failed to establish proximate causation between the misrepresentations and the subsequent termination of the merger. Id. at 174. Defendants similarly argued there that certain public disclosures during the class period broke the causal nexus between the fraudulent statements and the ultimate stock drop due to the failed merger. Id. at 183-84. In reversing the district court's dismissal of the action, the Third Circuit held that where a complaint sufficiently alleges that plaintiffs "purchased shares of [the] stock at a price that was inflated due to the alleged misrepresentations, and that [they] suffered a loss when the truth was made known and the price of [the] stock returned to its true value," loss causation is adequately pleaded. Id. at 185.

Plaintiffs easily meet this standard here. First, Plaintiffs allege that they purchased Veritas shares at artificially inflated prices:

> As a result of defendants' materially false and misleading statements during the Class Period, plaintiffs and other Class members suffered damages because the price of the Company's securities was artificially inflated when Plaintiffs and other Class members purchased them as a result of Defendants' material misrepresentations, and the inflation in the price of Veritas' stock was removed at or before the end of the Class Period, including as Defendants' misrepresentations or their effects became known.

¶ 52. Second, Plaintiffs allege that when the truth became known, Veritas stock plunged to its true value:

> On July 6, 2004, only three weeks after the Company confirmed its second quarter 2004 expectations of revenue in the range of $490 million to $505 million and GAAP earnings per share in the range of $0.21 to $0.23, Veritas shocked the market by announcing that the Company's second-quarter

> 2004 revenues would actually be "in the range of $475 million to $485 million" and that its GAAP earnings per share would "be in the range of $0.17 to $0.19." As a result of this news, on July 7, 2004, the Company's share price plunged 36% from $26.55 to $17.00 on heavy trading volume.

¶ 44. Accordingly, Plaintiffs have adequately pleaded loss causation under Semerenko.[16]

Although Defendants concede the reason for the dramatic price drop on July 7, 2004 was the news of the earnings shortfall, they argue investors could not have reasonably linked this news to improper revenue recognition because the Company did not admit that information until later. This argument, however, ignores the fact that merely two weeks before the end of the quarter, Defendants reaffirmed previous guidance based in significant part on revenue and expected revenue (including contracts that had not been signed but had already been booked as revenue and earnings in prior quarters). ¶¶ 34-37, 42-44. The thrust of Defendants' argument, therefore, is that because the July 6, 2004 announcement did not state explicitly that improper revenue recognition played a role in the earnings shortfall, Plaintiffs' loss could not have been proximately caused by something not fully revealed until July 27, 2004. This is an illogical and unsustainable argument.

First, Defendants' position ignores what the market clearly understood on July 6, 2004 to be a shocking about-face for the Company—as evidenced by the tremendous volume of trading activity the following day. Second, it appears to justify the notion that a Company can avoid liability simply by providing a partial disclosure and withholding the full truth

---

[16] Defendants also rely on Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627 (2005), for the proposition that where plaintiffs merely allege that their damages were caused by purchasing shares at artificially inflated prices and were damaged thereby, loss causation is not adequately pleaded. Defs. Mem. at 25. Dura, however, does not add anything to the analysis because the Third Circuit already follows such reasoning. See Semerenko, 223 F.3d at 185. Moreover, as illustrated herein and in the Complaint, Plaintiffs' damages are not alleged merely on the basis of purchasing artificially inflated shares, but also by showing how the stock price corrected as a result of the truth being revealed. ¶¶ 44, 52.

until the share price bottoms out. There is simply no authority for this position. To the contrary:

> Plaintiffs need only allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," and loss causation does not require *full* disclosure and can be established by *partial* disclosure during the class period which causes the price of shares to decline.

Montoya v. Mamma.com Inc., No. 05 Civ. 2313 (HB), 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005) (citing Dura, 125 S. Ct. at 1631, and Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005)) (emphases in original). Here, Plaintiffs relate the July 6, 2005 disclosures to both the broader allegations in the Complaint and the substantial stock drop on July 7, 2005. Consequently, the Complaint adequately pleads loss causation.

## VI.    PLAINTIFFS HAVE ADEQUATELY PLEADED SCIENTER WITH RESPECT TO ALL DEFENDANTS

Defendants either gloss over the Complaint's key scienter allegations or attempt to morph the Complaint's particularized allegations into the "rote" or "conclusory" allegations that courts have found insufficient. Nonetheless, even a cursory review of the Complaint reveals a pattern of knowing, conscious participation in the fraud by all three Individual Defendants.

This Court has recognized that allegations that a defendant "participated in the drafting, preparation, and/or approval of the public representations complained of" adequately allege scienter. Sheehan, 136 F. Supp. 2d at 313. As this Court explained,

> The complaint generally alleges that Toler, Liston, and Carey, as former LSI directors, participated in the drafting, preparation, and/or approval of the public representations complained of in this complaint. Specifically, Toler, LSI's former CEO and director, (1) filed and signed LSI's Form 8-K which incorporated the merger agreement, and (2) co-signed and sent a letter to LSI shareholders advising them of

> the merger agreement. Liston, LSI's former CFO and director, signed and filed LSI's Form 10-Q. The Form 10-Q incorporated the merger agreement. Carey, LSI's former Chairman of the Board and former director, co-signed and sent a letter to the LSI shareholders advising them of the merger agreement. These specific allegations of conduct give sufficient rise to a strong inference that each of these defendants acted with the required state of mind.

Id. at 313-14.

The Complaint here gives rise to a similar inference that the Defendants acted with the requisite state of mind. It alleges that Bloom and Gillis signed materially false statements filed with the SEC, reviewed and approved materially false and misleading Veritas press releases, and made numerous materially false and misleading statements about Veritas that were incorporated into analyst reports and news articles. ¶¶ 8, 9. Brigden, in particular, "had specific responsibility for ... determining whether, and how much, revenue could be properly recognized and included in the financial results issued during the Class Period and described [in the Complaint]." ¶ 10(b).[17] These allegations, standing alone, are sufficient under this Court's ruling in Sheehan.

Plaintiffs go further, however, and allege that Brigden actively participated in the fraudulent scheme by approving incomplete or unsigned contracts that he knew would be used to improperly recognize revenue. ¶ 41(b). When CW No. 3 questioned Brigden about these contracts, Brigden said—directly to the witness—"What's the difference? We already know what the numbers for the quarter are." ¶ 41(b). This allegation, standing alone, sufficiently alleges Brigden's scienter. In Cendant, 60 F. Supp. 2d at 370, the court found that allegations that a defendant knew of but failed to correct improperly recognized revenue

---

[17] Defendants' contention that "plaintiffs fail to explain how CW No. 3 allegedly knew that Mr. Brigden knew revenue would be recognized from these contracts he approved," Defs. Mem. at 32, is therefore incorrect.

sufficiently pleaded scienter. Here, the Complaint goes a step further and alleges that Brigden himself caused the revenue to be improperly recognized. See also In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 637 (E.D. Va. 2000) (scienter pleaded where alleged that defendants recognized revenue from unexecuted contracts); Bell v. Fore Sys., Inc., 17 F. Supp. 2d 433, 440 (W.D. Pa. 1998) (allegation that defendants, among other things, knowingly "engaged in improper accounting practices in violation of GAAP for purposes of revenue recognition," gave rise to a strong inference of knowing or conscious misbehavior.").[18]

While Defendants' knowing participation in the fraud is sufficient to allege scienter, see Cendant, 60 F. Supp. 2d at 370 ("When a defendant acts with scienter, 'his personal motivation for manipulating the market is irrelevant in determining whether he violated § 10(b).'") (quoting SEC v. U.S. Envt'l, Inc., 155 F.3d 107, 112 (2d Cir. 1998)), the Complaint also alleges other facts from which scienter may be inferred.

First, Bloom's and Gillis's stock sales provide even more reason to infer the requisite state of mind. As noted above, many of their sales occurred after the results for 2003 were

---

[18] Defendants go too far by citing In re Alpharma Inc. Securities Litigation, 372 F.3d 137, 150 (3d Cir. 2004), for the proposition that "[i]t is not sufficient to allege that defendants knowingly made false statements." Defs. Mem. at 32. The Alpharma court actually held that rote allegations that the Defendants knowingly made false statements are insufficient. Alpharma, 373 F.3d at 150. Defendants' citation to Alpharma for the proposition that plaintiffs must allege *particular transactions* in which revenue was recognized improperly by or at the instruction of each defendant," Defs. Mem. at 32 (emphasis in original), is also inapposite because the allegations in Alpharma did not rise to the level of detail alleged here. The court in Alpharma rejected purely "conclusory" allegations that the defendants had set "lofty" sales goals. Alpharma, 373 F.3d at 150. Here, in contrast, the Complaint alleges details of Defendants' scheme to improperly recognize revenue from unsigned and incomplete contracts. Similarly, Defendants' assertion that it is not sufficient "to impute the knowledge of a subordinate to a defendant," Defs. Mem. at 32, is irrelevant because the Complaint alleges that Defendants themselves had personal knowledge of the fraudulent scheme.

known but before they were announced to the market, and during the time when the Company's internal investigation of accounting irregularities was in progress but before it was publicly disclosed.

Defendants contend that the insider sales cannot support an inference of scienter because they were made pursuant to a Rule 10b5-1 trading plan. While sales pursuant to a preexisting plan may, in some instances, negate an inference of scienter, that is not the case here. This is because neither Bloom nor Gillis sold stock *before* the Class Period. ¶ 47. In SEC v. Lipson, No. 97 C 2661, 1997 WL 452701 (N.D. Ill. Aug. 6, 1997), Lipson argued that he did not act with scienter because he sold stock pursuant to a preexisting plan for estate planning purposes to benefit his son. The court rejected this argument and denied the motion to dismiss, explaining that "defendant has not shown that he sold any shares for himself or his son before learning the disappointing *nonpublic* news, and thus the court may properly infer scienter from the particular timing of the sales in this case." Id. at *3 (emphasis added). Although Defendants state that "it is clear from Messrs. Bloom's and Gillis's trading records that they sold stock after VERITAS publicly issued an earnings release," Defs. Mem. at 34, there is no allegation or evidence of any such sales in the record. Defendants' Exhibit H is simply the July 6, 2004 press release, and Exhibits L and M only reflect stock sales during the Class Period and before the July 6 press release.[19]

---

[19] Defendants also claim that Bloom and Gillis could not have acted with scienter because they sold small percentages of their Veritas stock during the Class Period. Defs. Mem. at 33. Gillis sold 34% of his holdings; that is hardly a minor percentage. To the extent that Bloom's sale of 1.71% of his holdings does not, by itself, raise an inference of scienter, the Complaint adequately alleges Bloom's scienter for the other reasons discussed herein. The fact that Brigden did not sell any stock does not prove an absence of scienter. See Ravisent, 2004 WL 1563024, at *10 (rejecting argument that dismissal was warranted by defendants' having not "cashed in" on fraudulently high stock price).

Second, the circumstances surrounding the change of control agreements are highly suspicious and go far beyond Defendants' general desire to increase their pay, which is Defendants' self-serving portrayal. Defs. Mem. at 35.[20] For example, the Complaint alleges that Defendants signed the change of control agreements in March 2004, "in the midst of accounting investigations" and that they entered into these agreements (which would protect them in the event the Company was acquired) even though Bloom had announced in late 2003 that the Veritas was seeking to *acquire other* companies. ¶ 50. Indeed, the Complaint quotes a July 6, 2004 research note in which an analyst actually draws the same conclusion: "With the top executive signing a change of control agreement in March of 2004 (same date as the restatement announcement) we feel they see potential for a take out and wanted to protect themselves in case a change of control occurs." ¶ 50.

Finally, the Complaint alleges that Defendants perpetrated their fraudulent scheme so the Company could use its stock to acquire Precise Software Solutions, Inc. Contrary to Defendants' assertions, the fact that the acquisition was not 100% financed with Veritas stock does not preclude an inference of scienter. See Ravisent, 2004 WL 1563024, at *10 (scienter pleaded by motivation to keep stock price high for acquisition partially paid for by stock). In sum, the Complaint adequately alleges scienter with respect to all Defendants.

---

[20]  Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001), cited by Defendants, does not concern a change of control agreement, but only the general desire to increase or maintain compensation.

- 38 -

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss the Consolidated Amended Class Action Complaint in its entirety.

In the event this Court grants the motion in whole or in part, Plaintiffs respectfully request leave to amend pursuant to Federal Rule of Civil Procedure 15(a).

Dated:  September 7, 2005                    Respectfully submitted,

                                             ROSENTHAL, MONHAIT, GROSS
                                               & GODDESS, P.A.

                                        By: _____
                                             Norman M. Monhait (DSBA No. 1040)
                                             Citizens Bank Center, Suite 1401
                                             919 Market Street
                                             P.O. Box 1070
                                             Wilmington, Delaware  19899-1070
                                             (302) 656-4433
                                             (302) 658-7567 (fax)
                                             E-mail: nmonhait@rmgglaw.com

                                             *Liaison Counsel for Lead Plaintiffs*
                                             *Tay Siew Choon and Mark Leonov*

                                             David J. Goldsmith *(pro hac vice)*
                                             GOODKIND LABATON RUDOFF
                                               & SUCHAROW LLP
                                             100 Park Avenue
                                             New York, New York  10017-5563
                                             (212) 907-0700
                                             (212) 818-0477 (fax)

Andrew M. Schatz *(pro hac vice)*
Barbara F. Wolf *(pro hac vice)*
SCHATZ & NOBEL, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, Connecticut 06103
(860) 493-6292
(860) 493-6290 (fax)

Robert I. Harwood
Jeffrey M. Norton *(pro hac vice)*
WECHSLER HARWOOD LLP
488 Madison Avenue
New York, New York 10022
(212) 935-7400
(212) 753-3630 (fax)

*Co-Lead Counsel for Lead Plaintiffs*
*Tay Siew Choon and Mark Leonov*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of September, 2005, a copy of **Plaintiffs'**

**Answering Brief In Opposition To Defendants' Motion To Dismiss The Consolidated Amended**

**Class Action Complaint** was served, by electronic filing, upon:

> Peter J. Walsh, Jr., Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6[th] Floor
> 1313 N. Market Street
> Wilmington, Delaware 19899

and a copy by United States mail, first class postage prepaid, upon:

Andrew M. Schatz, Esquire
Barbara F. Wolf, Esquire
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103

David J. Goldsmith, Esquire
Shelley Thompson, Esquire
Goodkind Labaton Rudoff
  & Sucharow LLP
100 Park Avenue
New York, NY 10017

Jeffrey M. Norton, Esquire
Wechsler Harwood LLP
488 Madison Avenue
New York, New York 10022

Richard A. Maniskas, Esquire
Schiffrin & Barroway LLP
280 King Of Prussia Road
Radnor, PA 19087

Eric J. Belfi, Esquire
Murray Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016

Norman M. Monhait (# 1040)
ROSENTHAL MONHAIT GROSS
  & GODDESS, P.A.
919 Market Street, Suite 1401
Citizens Bank center
P.O. Box 1070
Wilmington, Delaware 19899
(302) 656-4433
Email: nmonhait@rmgglaw.com

Attorneys for Plaintiffs