## TABLE OF CONTENTS / EXHIBITS

**Case**                                                                                    **Exhibit**

In re Advanta Corp. Securities Litigation,
    No. 97-4343, 1998 WL 387595
    (E.D. Pa. July 9, 1998), aff'd, 180 F.3d 525 (3d Cir. 1999)                    A

In re Best Buy Co. Securities Litigation,
    No. Civ. 03-6193, 2005 WL 839099
    (D. Minn. Apr. 12, 2005)                                                      B

Freed v. Universal Health Services, Inc.,
    No. 04-1233, 2005 WL 1030195
    (E.D. Pa. May 3, 2005)                                                        C

Gavish v. Revlon, Inc.,
    No. 00 Civ. 7291 (SHS), 2004 WL 2210269
    (S.D.N.Y. Sept. 30, 2004)                                                     D

Medtronic Ave, Inc. v. Boston Scientific Corp.,
    No. 98-478-SLR, 2001 WL 652016
    (D. Del. Mar. 30, 2001)                                                       E

Montoya v. Mamma.com Inc.,
    No. 05 Civ. 2313 (HB), 2005 WL 1278097
    (S.D.N.Y. May 31, 2005)                                                       F

In re Ravisent Technologies, Inc. Securities Litigation,
    No. 00-1014, 2004 WL 1563024
    (E.D. Pa. July 13, 2004)                                                      G

SEC v. Lipson,
    No. 97 C 2661, 1997 WL 452701
    (N.D. Ill. Aug. 6, 1997)                                                      H

Tse v. Ventana Medical Systems, Inc.,
    No. 97-37-SLR, 1998 WL 743668
    (D. Del. Sept. 23, 1998)                                                      I

In re Tyson Foods, Inc. Securities Litigation,
    No. 01-425-SLR, 2004 WL 1396269
    (D. Del. June 17, 2004)                                                       J

## TABLE OF CONTENTS (Cont'd)

**Case**                                                                    **Exhibit**

In re Viropharma, Inc. Securities Litigation,
      No. 02-1627, 2003 WL 1824914
      (E.D. Pa. Apr. 7, 2003)                                                              K

# EXHIBIT A

## Westlaw.

Not Reported in F.Supp.                                                                                   Page 1
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

☞
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L.
Rep. P 90,243
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
In re ADVANTA, CORP., Securities Litigation.
**No. 97-CV-4343.**

July 9, 1998.

*MEMORANDUM*

BUCKWALTER, J.

### I. INTRODUCTION

*1 After their stock lost approximately 20% of its value
when Advanta Corporation ("Advanta") announced it
expected to report a $20 million loss for the first quarter of
1997, plaintiffs, Advanta shareholders, filed this proposed
securities class action suit against Advanta and seven of its
present and former officers and directors. FN1 Their three
count amended complaint (the "Complaint") alleges
violations of Section 10(b) (Count I); Section 20(a) (Count
II) and Section 20(A) (Count III, against defendants
Greenawalt and Marshall only) of the Securities and
Exchange Act of 1934 (the "Exchange Act"). Presently, all
defendants move to dismiss Counts I and II and defendants
Greenawalt and Marshall seek dismissal of Count III. FN2
For the reasons that follow, Advanta's Motion is granted and
Greenawalt's Motion is granted.

FN1. Individual defendants are as follows: Richard
A. Greenawalt ("Greenawalt"), former President
and Chief Operating Officer; Dennis T. Alter
("Alter"), Chairman of the Board; Robert A.
Marshall ("Marshall"), former Executive Vice
President and Group Executive, Advanta Personal
Payment Services; William A. Rosoff ("Rosoff"),
Director and Vice Chairman of the Board of
Directors; Alex Hart ("Hart"), Chief Executive
Officer and Director; Gene S. Schneyer
("Schneyer"), Vice President, Secretary and
General Counsel; and John J. Calamari
("Calamari"), Vice President, Finance and

Principal Accounting Officer.

FN2. Defendants, Advanta, Atler, Rosoff, Hart,
Schneyer and Calamari, filed a motion to dismiss
Counts I and II ("Advanta's Motion"). Defendants,
Greenawalt and Marshall, filed a motion to dismiss
the entire Complaint ("Greenawalt's Motion") and
joined Advanta's motion.

### II. BACKGROUND FN3

FN3. The facts are as alleged in the Complaint or
taken from documents cited in Complaint, the full
text of which are attached to either Advanta's or
Greenawalt's motion to dismiss. *See In re
Burlington Coat Factory Securities Litigation,* 114
F.3d 1410, 1426 (3d Cir.1997); *see also, San
Leandro Emer. Med. Group Profit Sharing Plan v.
Phillip Morris Co.,* 75 F.3d 801, 809 (2d Cir.1996)
(district court properly considered full text of
documents partially quoted in complaint in
granting motion to dismiss). Furthermore, plaintiffs
have not objected to this Court's consideration of
such documents.

Advanta is a leading issuer of standard and gold MasterCard
and VISA credit cards. Advanta cards typically carry no
annual fee and a credit limit of approximately $6,000.
Advanta is popularly known for its ability to attract
customers by offering low "teaser" interest rates, about 7%,
for a limited period. After the teaser period expires, Advanta
raises the interest rate to a higher more competitive amount.

Historically, Advanta enjoyed strong credit quality and low
charge-off rates. FN4 Advanta's 1995 annual report
informed shareholders that the company's total number of
customer accounts increased by 27%, in 1995, to more than
5 million by the end of the year. The company boasted that
its emphasis on acquiring gold card customers, generally
better credit risks, helped maintain its "enviable credit
quality profile."

FN4. A "charge-off" occurs when a credit card
holder's unpaid balance becomes uncollectible,
generally because a borrower is excessively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

delinquent, defaults, files for bankruptcy or an account is fraudulent. The unpaid balance is then "charged-off" against an established reserve.

In a press release issued on July 18, 1996, Advanta announced that earnings for the three and six months ending June 30, 1996, represented an increase of 35% and 25%, respectively, compared to the same periods in 1995. Advanta also reported that "return on equity surpassed the 25% goal for the twenty-second consecutive quarter, attaining 27.7%." This was an increase over both the previous quarters' results and the results for the same quarter in 1995.

Plaintiffs maintain that in an effort to continue its previous growth, Advanta engaged in several practices that severely undermined the company's future viability. Advanta began issuing credit cards with teaser rates and periods significantly lower and longer than industry standard. Advanta increased the number of high risk customers it extended credit to, contrary to representations made in its July 18, 1996 press release, and failed to increase personnel to monitor and enforce collection of such high risk accounts. Thus, by mid-1996 Advanta's credit card charge-off rate had significantly increased.

Additionally, in the third quarter of 1996, Advanta changed its charge-off methodology for consumer credit card bankruptcies to provide the company additional time (from 30 to 90 days) to investigate a bankruptcy before charging-off an account. Plaintiffs allege that the change was simply a way for Advanta to delay reporting the earnings impact of rising charge-off rates from the third and fourth quarters of 1996 to the first quarter of 1997 and to allow individual defendants in the interim to unload shares of Advanta stock at artificially inflated prices. FN5

> FN5. According to plaintiffs, during the months of November and December (in which the full negative impact of Advanta's weakened credit quality was masked) defendants Greenawalt, Alter, Marshall and Schneyer "dumped" more than one million shares of Advanta common stock for proceeds in excess of $44 million.

*2 Plaintiffs also note that the change in the charge-off methodology was likely to have little effect in decreasing overall charge-offs. Advanta lacked adequate personnel to conduct additional investigation the extended charge-off period provided for. Moreover, more than three quarters of personal bankruptcies are filed under Chapter 7, freeing the borrower from all debt and rendering additional investigation by the creditor meaningless.

In a news release issued on March 17, 1997, Advanta announced that "[f]or the first quarter, the Company currently expects to report a loss in the area of $20 million, or approximately $0.44 cents per share, compared with earnings of $41 million for the first quarter of 1996." Advanta attributed the loss to "continuing increases in consumer bankruptcies and charge-offs and lower receivable balances than originally anticipated in the credit card business." FN6 Advanta simultaneously announced that its Board of Directors and senior management "have commenced a thorough and systematic review of its business strategy, growth prospects and operating environment aimed at maximizing the Company's value." In this regard, Advanta listed a number of steps it would take towards increasing revenue and stemming rising credit card losses. Advanta proposed to reprice credit card interest rates, improve collection procedures, shorten its teaser period, tighten underwriting and attract more high-quality credit card holders.

> FN6. Advanta's predictions came true. The company reported a first-quarter net loss of $19.8 million, or 43 cents a share, compared with net income of $41 million, or 91 cents a share in the year-earlier quarter. Additionally, credit card charge-offs were 6.6%, up from 3.2% in the first quarter of 1996.

Immediately, the value of both classes of Advanta stock dropped. Advanta Class A stock dropped from $40.375 per share to $31.875 per share and Advanta Class B stock dropped from $39.6875 per share to $30.375 per share.

Against this background, plaintiffs allege that from August 13, 1996 until March 17, 1997 (the "Class Period"), defendants disseminated a series of materially false and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
(Cite as: Not Reported in F.Supp.)

misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) and are liable as "control persons" under Section 20(a) of the Exchange Act (Count II). Additionally, Subclass plaintiff, Jerry Weinberg, seeks to hold defendants, Greenawalt and Marshall, liable as contemporaneous traders under Section 20(A) of the Exchange Act (Count III). Presently, defendants seek dismissal pursuant to Rule 12(b)6, for failure to state a claim, and Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), for insufficient pleading.

### III. LEGAL STANDARDS

#### A. Rule 12(b)(6)

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court must primarily consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). The court must accept as true all allegations contained in the complaint and must give the plaintiff the benefit of every favorable inference that can be drawn from those allegations. *See J/H Real Estate Inc. v. Abramson*, 901 F.Supp. 952, 955 (E.D.Pa.1995) ; *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). A complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. *See Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988). Although the fact specific inquiries common to securities cases generally preclude dismissal, courts will nonetheless grant a defendant's 12(b)(6) motion if the alleged misrepresentations or omissions are immaterial or not pled in accordance with Rule 9(b) or the PSLRA. Dismissal is not appropriate, however, merely because a court disbelieves a complaint's factual allegations. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

#### B. Rule 9(b) and the PSLRA

*3 Because 10b-5 claims by necessity involve allegations of

fraudulent conduct, courts have long required that they be pled in accordance with Rule 9(b), which provides in pertinent part that in "all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs, through their pleadings, must inject precision and some measure of substantiation into their allegations of fraud. By way of example, allegations of who, what, when, where and how: the first paragraph of any newspaper story, would satisfy the particularity requirement of Rule 9(b). *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In 1995, in response to debate over the impact of securities fraud litigation, Congress enacted the PSLRA, which substantially modified, among other things the standard for pleading securities fraud claims. The PSLRA places additional burdens on plaintiffs attempting to plead fraud in securities cases. Under 15 U.S.C. § 78u-4(b), a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Failure to meet these pleading requirements results in dismissal. 15 U.S.C. § 78u-4(b)(3).

### IV. DISCUSSION

#### A. Count I

Plaintiffs assert claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs must therefore meet the three step test for Rule 10b-5 violations outlined by the Third Circuit Court of Appeals in *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1417 (3d Cir.1997). First, the plaintiff must establish that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Second, the plaintiff must establish that the defendant acted with scienter and that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
(Cite as: Not Reported in F.Supp.)

plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must meet the heightened pleading requirements of <u>Federal Rule of Civil Procedure 9(b)</u> and the PSLRA. FN7

> FN7. For facts or information to be material for purposes of securities fraud litigation they must be of a type that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Additionally, materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiar for the trier of fact. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.1992). Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law. *Id.*

The private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of fact that effect trading on the secondary market. *See In Re Burlington Coat Factory,* 114 F.3d at 1417 (citations omitted).

*4 First, plaintiffs allege that numerous statements from forms filed with the SEC, press releases and annual and quarterly reports were misleading when issued because they failed to reveal adverse business practices adopted by Advanta and negative facts and trends relating to the company's credit card business. Additionally, plaintiffs single out one statement made by Janet Point ("Point"), Vice President of Investor Relations, claiming Point knew her statement was false when issued.

Presently, defendants argue that all statements contained in the Complaint evidence full disclosure and are not misleading and that plaintiffs' allegations concerning such statements fail to meet the heightened pleading standards of <u>Rule 9(b)</u> and the PSLRA. First, I discuss the sufficiency of plaintiffs' general allegations of non-disclosure and then turn to their specific allegations regarding Point's statement.

### i. Disclosure of Negative Facts and Trends

Plaintiffs contend that certain statements made during the Class Period are actionable because they fail to disclose negative facts and trends Advanta's officers and directors were aware of and thus left investors with false impressions as to the quality of Advanta's credit card portfolio. Specifically, plaintiffs claim Advanta failed to reveal that: 1) to perpetuate customer growth, the company had relaxed its underwriting standards; 2) in an attempt to retain customers, after the initial teaser period expired, Advanta was not repricing accounts to normal industry standard interest rates; 3) it lacked adequate credit collection capabilities and personnel to follow through on delinquent accounts; and 4) that the extended investigative period provided in the new charge-off methodology was irrelevant as most customers filed Chapter 7 bankruptcy, releasing them from all credit card debt.

Two general categories of statements are attributed with these deficiencies: 1) statements issued by Advanta regarding the 30 to 90 day charge-off change FN8 and 2) what plaintiffs characterize as overly optimistic reports regarding the quality and future profitability of Advanta's credit card division. I review these groups individually in light of plaintiffs' allegations.

> FN8. Initially, plaintiffs argued that statements regarding the charge-off change were misleading because they did not explain the full negative impact of the change (that charge-off loss reports would be delayed). They abandoned this argument when faced with defendants' motion to dismiss highlighting the fact that, as plaintiffs admit in the Complaint, on at least four occasions Advanta not only disclosed the new method but provided detail as to the exact effect the change would have on reported earnings and losses.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 5
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

a. Charge-off Statements

Plaintiffs claim the following statements regarding the charge-off change were misleading because they failed to disclose the four adverse conditions listed above.

On September 18, 1996, Advanta Credit Card Master Trust (the securitization vehicle for Advanta) in a Form 8K disclosed the change in the charge-off methodology along with the following explanatory language:

As a result of this new methodology, charge-offs of receivables held by the Trust were lower in August 1996 than they would have been under the previous methodology and, conversely, delinquent Receivables were higher by a like amount.

On October 17, 1996, Advanta filed a Form 8K stating the following:

In the third quarter, the Company adopted a new charge-off methodology relating to credit card bankruptcies which provides for an investigative period following notification of the bankruptcy petition of up to 90 days (rather than up to 30-days) prior to charge-off. The longer investigative period, which is consistent with others in the industry, had an approximate $24 million net positive impact for the quarter.

*5 The change is next mentioned in Advanta's third quarter report filed on November 12, 1996:

In the third quarter of 1996, the Company adopted a new charge-off methodology related to bankrupt credit card accounts, providing for a period of up to a 90-day (rather than a 30-day) investigative period following notification of the bankruptcy petition, prior to charge-off.

Credit statistics following the paragraph reflected this change in methodology.

Finally, on January 21, 1997 Advanta issued the following:

As previously disclosed, the Company adopted a new charge-off methodology relating to credit card bankruptcies in the third quarter of 1996. As anticipated that change had an impact in the fourth quarter 1996 similar to the amount in the third quarter. FN9

FN9. Plaintiffs also cite to Advanta's second

quarter Form 10-Q filed on August 13, 1996, which they note makes no mention of the charge-off change implemented in the beginning of the third quarter. They claim disclosure in the second quarter report was necessary as, at the time it was filed, the third quarter, along with the new policy were "well underway." Corporations, however, are not required to disclose events from the quarter in progress in reports regarding the previous quarter. *Zucker v. Quasha,* 891 F.Supp. 1010, 1019 (D.N.J.1995); *see also, In re Burlington Coat Factory,* 114 F.3d at 1432 (company not obligated to update public as to state of quarter in progress). Consequently, consideration of alleged omissions regarding charge-offs in Advanta's second quarter 1996 report is unnecessary.

Defendants correctly note that each statement contains full and accurate disclosure as to the discrete topic of charge-offs and inclusion of such unrelated topics as underwriting, teaser rates, general trends in bankruptcy and collection practices was not necessary to clarify the accounting change. I agree.

When a corporation makes a disclosure, such as Advanta's report of the charge-off change, there is duty to make it complete and accurate. *See U.S. v. Yeaman,* 987 F.Supp. 373, 378 (E.D.Pa.1997) (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir.1968)). This, however, does not mean that by revealing one fact one must reveal all others that would be interesting or market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead. *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (interpreting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d. at 860).

Advanta's coverage of the charge-off change, as cited by plaintiffs, was both complete and accurate. It describes the impact the change will have on both receivables and losses, the company's justifications for the change, and the assurance that the switch conforms with industry standards. There was no need for Advanta to interject into these comprehensive statements the extraneous information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                        Page 6
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

plaintiffs assert was lacking. Furthermore, additional explanation of the change is contained in the full text of documents cited in the Complaint. For example, a footnote to the financial highlights section of Advanta's October 17, 1996 Form 8K explains "[t]hird quarter 1996 figures reflect the adoption of a new charge-off methodology. Without this change, managed credit card charge-off and delinquency rates for the third quarter 1996 would have been 4.6% and 3.7% respectively." FN10

> FN10. In analyzing securities fraud claims, review of the full text of documents cited in plaintiffs' complaint is appropriate. It prevents plaintiffs from maintaining a claim of fraud by extracting an isolated statement from a document and placing it in a complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. *In re Burlington Coat Factory Securities Litigation,* 114 F.3d at 1426 (citations omitted).

Therefore, I find Advanta's statements regarding implementation of the company's new charge-off policy neither materially false nor misleading and therefore not violative of Rule 10b-5. Accordingly, plaintiffs' 10b-5 claims based on such statements are dismissed pursuant to Rule 12(b)(6). FN11

> FN11. Additionally, plaintiffs' argue that the September 18, 1996 statement is misleading because it was issued by Advanta Credit Card Master Trust, rather than Advanta. Although they fail to allege as much, presumably the inference to be drawn is that the report was never made available to Advanta shareholders. Neither party has commented on this subject, yet, for purposes of Rule 12(b)(6), I will assume the report was unavailable. This consideration, however, does not alter my ultimate conclusion. It is evident from the remaining statements that Advanta's disclosure was sufficient.

b. Positive Portrayals

*6 Next plaintiffs cite to four sources which they assert contain overly optimistic portrayals of the company and fail to disclose negative business practices and information.

First, in its 1996 third quarter report Advanta emphasized "our track record underscores our commitment to excel;" described itself as "a rapidly growing consumer financial services enterprise;" reassured shareholders that "despite a challenging industry environment, we are pleased to report that Advanta produced continued, consistent earnings growth in the third quarter" and noted that "for the fifth consecutive year, return on equity has met or exceeded the 25% level achieved this quarter."

Second, in its Form 10-Q filed on November 12, 1996, Advanta stated "The changes in the delinquency and charge-off rates from year-to year ... reflect the trend in unsecured consumer credit quality which is being experienced throughout the credit industry."

Third, on November 13, 1996 Advanta increased Class A and Class B dividends and commented "this dividend increase reflects management's confidence in the company's earnings momentum and Advanta's continuing commitment to enhancing shareholder value."

Finally, commenting on Advanta's fourth quarter results, announced on January 21, 1997, Alter stated "I am pleased to report that in 1996, Advanta maintained the growth of its current businesses and accelerated its expansion into new ventures."

Defendants maintain that plaintiffs allegations lack specificity regarding disclosure-"the Complaint is silent as to the source, date, recipients, author or any other details about the undisclosed negative information."

Under the PSLRA, a plaintiff alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

On the first page of the Complaint, plaintiffs state that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                         Page 7
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

allegations contained within are based on information and belief, thus they must explain in some detail the basis for such belief. Towards this end plaintiffs claim that by virtue of their positions as officers/directors of Advanta, individual defendants were well aware of negative facts and trends within the company. "Because of Board membership and/or executive positions with Advanta, each of the Individual Defendants had access to the adverse undisclosed information about Advanta's business prospects and financial condition and performance ... and knew that these adverse facts rendered the positive representations made by and about Advanta and its business materially false and misleading."

Additionally, plaintiffs' characterize suggestions for future improvement made in Advanta's March 17, 1997 press release and made by Advanta's founder and Chairman of the Board, Dennis Alter in an article entitled "House of Cards" appearing in the June 1997 issue of Philadelphia Magazine as "admissions" that during the Class Period defendants were aware of Advanta's potential downfalls. In reaction to first quarter losses, both identify a number of potential problem areas for the company and list corrective measures the company may take. The March 17, 1997 press release included the following suggestions: (1) aggressively repricing interests rates for high risk customers; (2) bringing Advanta's credit card fees "more in line with current industry norms;" (3) reducing the teaser period; (4) tightening underwriting; (5) "[m]ore quickly identifying and intervening on potentially troubled accounts;" (6) increasing the number of high quality cardholders; and (7) "[c]ontinuing to develop additional products that offer customers added value, rather than relying solely on low price." Additionally, Alter explained to Philadelphia Magazine "[w]hat happened is when the introductory period ended, we were probably not as aggressive as we could have been [repricing our rates]...."

*7 Taken together, and assuming for present purposes only that defendants had a duty to disclose, plaintiffs support for their belief that defendants were of aware of negative facts during the class period is insufficient. Plaintiffs first "fact", that their positions within the company rendered defendants knowledgeable, is merely an unsupported conclusion. A

director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions. *Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1338-39 (9th Cir.1977) (citations omitted), and plaintiffs have not pointed to specific reports, circulated among defendants, which contained the adverse information defendants are charged with knowing. *See San Leandro Emer. Med. Group Profit Sharing Plan v. Phillip Morris Co.*, 75 F.3d 801, 812-13 (2d Cir.1996).

Additionally, Advanta's after the fact statements recognizing the causes of its first quarter losses do not constitute a basis for charging defendants with prior knowledge. Courts have uniformly rejected such attempts to plead fraud by hindsight, acknowledging that a plaintiff does not state a claim for securities fraud merely because a company discloses, after the fact, that its performance failed to meet expectations. *See Wallace v. Systems and Computer Technology Corporation*, 1997 WL 602808 * 5 (E.D.Pa. Sept.23, 1997) ; *In re Goodyear Tire & Rubber Co. Sec. Lit.*, 1993 WL 130381 at *2 (E.D.Pa. Apr.22, 1993) ; *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir.1991) ; *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990). During 1995 and 1996 Advanta reassured investors that it was capable of maintaining its earnings momentum. During the Class Period, Advanta continued issuing encouraging messages. Later the company had to report significant losses in its credit card division. Yet, simple comparison of these descriptions does not create underlying factual support for plaintiffs' claims. Plaintiffs' must point to specific facts suggesting that the difference is attributable to fraud. *See In re Donald J. Trump Casino Securities Litigation*, 793 F.Supp. 543, 556-57 (D.N.J.1992) ; *DiLeo v. Ernst & Young*, 901 F.2d at 627. In the instant case plaintiffs have not brought such facts to the Court's attention. FN12 Therefore, because they have not alleged circumstances indicating that any of the "positive portrayals" identified in the Complaint were false or misleading, plaintiffs have failed to adequately plead fraud. FN13 Accordingly, plaintiffs' claims based on these statements are dismissed pursuant to Rule 9(b) and the PSLRA.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
(Cite as: Not Reported in F.Supp.)

FN12. Furthermore, I note that the uncanny resemblance between plaintiffs' list of undisclosed adverse business conditions and the list of proposed corrective measures contained in Advanta's March 17, 1997 press release only bolsters my conclusion.

FN13. Because I dismiss plaintiffs claim under 15 U.S.C. § 78u-4(b) for failure to adequately plead facts underlying their fraud claim, I do not address the issue of whether or not plaintiffs have adequately plead scienter as required by 15 U.S.C. § 78u-4(b)(2).

Additionally, I note that review of the full text of documents cited in plaintiffs' complaint demonstrates an effort by Advanta to address plaintiffs' concerns. FN14 In its third quarter report Advanta notes "[t]he provision for credit card losses for the third quarter of 1996 was $24.2 million compared to $10.6 million for the comparable period of 1995. This increase was primarily ... In response to higher charge-off, impaired asset and delinquency levels." Also, in their 1995 annual report Advanta stated:

FN14. In re Burlington Coat Factory, supra note 10.

*8 Throughout the industry, credit card issuers and other lending institutions experienced deteriorations in credit quality as delinquencies and charge-offs rose. Advanta has enjoyed historically low delinquency and charge-off rates over the past few years. Given the changes in the recent credit cycle, coupled with the sheer size and seasoning of our portfolio, we expect to see delinquencies and charge-offs move upward to more normalized levels.

ii. Janet Point's Statement

Plaintiffs claim that a statement issued by on September 12, 1996 by Janet Point, Vice President for Investor Relations was false and misleading. Point informed the Dow Jones New Service that Advanta expected large revenue increases from repricing more than $5 billion of credit card receivables with current teaser rates of about 7% to what she described as Advanta's normal interest rate of 17%. Yet, in the June 1997 Philadelphia Magazine article, Alter is quoted as saying, "[w]hat happened is when the introductory period ended, we were probably not as aggressive as could have been [repricing our rates] ... Instead of repricing to 18 percent-we repriced closer to 13 or 14 percent in order to retain our image and the luster of being a low-cost provider." Comparison of these two statements, plaintiffs' allege, leads to the inference that Point's statement was false and misleading.

Defendants contend that Point's statement is not actionable because it falls within a statutory safe harbor that protects forward-looking statements when the plaintiff fails to prove defendant made them with actual knowledge that they were false. Under the safe harbor that defendants refer to, 15 U.S.C. § 78u-5(c), "a person shall not be liable with respect to any forward-looking statement ... to the extent that ... the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that person that the statement was false or misleading...."

It is apparent that Point's statement meets the definition of a forward-looking statement-"a statement of plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," so I must determine whether it is worthy of statutory protection. In paragraph 33 of their complaint, plaintiffs allege generally that all statements by Advanta, or its representatives referred to in the complaint do not qualify for safe harbor protection because "at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of Advanta who knew that those statements were false when made." Presumably, additional support for plaintiffs' allegations comes from Alter's later "inconsistent" comments to Philadelphia Magazine.

Defendants characterize these allegations as conclusory and assert that they fail to allege the required state of mind, that the speaker had actual knowledge that the statement was false or misleading when made. I agree. Plaintiffs' catch-all allegation that all speakers knew that their statements were false when made is too broad and Alter's comments indicate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 9
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243
**(Cite as: Not Reported in F.Supp.)**

nothing more than Advanta's failure to follow through exactly as planned on its proposed interest increase, rather than purposeful intent to fool the investing public. Therefore, mindful of the pleading requirements of Rule 9(b) and the PSLRA, I find plaintiffs' allegations as to Point's state of mind insufficient. Accordingly, Plaintiffs' claims of fraud based on such statement are dismissed pursuant to Rule 9(b) and the PSLRA.

### B. Counts II and III

*9 Counts II and III are derivative of Count I and therefore are also dismissed. In Count II, the Complaint alleges that individual defendants are liable as "control persons" under Section 20(a) of the Exchange Act. Because, plaintiffs have failed to state and/or to adequately plead a primary violation of the Exchange Act, their "control persons" claims must also be dismissed. See *Shapiro v. UJB Fin. Corp.*, 964 F.2d at 279. Likewise, under Section 20A, an insider who trades shares of stock while in possession of material, nonpublic information is liable to any person who traded contemporaneously with the insider. Generally, to state a claim under Section 20A a plaintiff must establish: (1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act. See e.g., *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703-04 (2d Cir.1994) ; *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871-72 (9th Cir.1993). Accordingly, because plaintiffs have failed to state and/or plead a claim under the Exchange Act their Section 20A claim is also dismissed.

An appropriate Order follows.

#### ORDER

AND NOW, this 9th day of July 1998, upon consideration of a motion to dismiss Counts I and II of the complaint submitted by defendants, Advanta Corp., Dennis Alter, William A. Rossoff, Alex W. Hart, Gene S. Schneyer, and John J. Calamari (collectively "Advanta" and "Advanta's Motion") and joined by defendants, Richard A. Greenawalt ("Greenawalt") and Robert A. Marshall ("Marshall")

(Docket No. 16); a motion to dismiss the entire complaint submitted by Greenawalt and Marshall ("Greenawalt's Motion") (Docket No. 15); Plaintiffs' combined response (Docket No. 20); a reply submitted by Greenawalt and Marshall (Docket No. 26) and a reply submitted by Advanta (Docket No. 27), it is hereby ORDERED that Advanta's Motion is GRANTED and Greenawalt's Motion is GRANTED.

As to Count I, claims based on statements regarding change in Advanta's charge-off policy are DISMISSED, with prejudice, pursuant to Rule 12(b)(6); claims based on Janet Point's statement regarding changes in interest rates are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA; and claims based on remaining general statements regarding Advanta's credit card division are DISMISSED, without prejudice, pursuant to Rule 9(b) and the PSLRA. As they derive from Count I, Counts II and III are also DISMISSED, without prejudice. Any amended complaint plaintiffs seek to file pursuant to this Memorandum and Order must be filed within thirty (30) days of this order, unless that time limitation is specifically extended by order of this court.

E.D.Pa.,1998.
In re Advanta, Corp.
Not Reported in F.Supp., 1998 WL 387595, Fed. Sec. L. Rep. P 90,243

Briefs and Other Related Documents (Back to top)

• 2:97cv04343 (Docket) (Jun. 30, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**Westlaw.**

Slip Copy
Slip Copy, 2005 WL 839099
**(Cite as: Slip Copy)**

Page 1

**H**
Slip Copy, 2005 WL 839099
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
In re: BEST BUY COMPANY, INC. SECURITIES
LITIGATION
**No. Civ. 03-6193ADMAJB.**

April 12, 2005.

Kimberly C. Epstein , and Sylvia Wahba Keller , Lerach
Coughlin Stoia Geller Rudman & Robbins LLP , San
Francisco, CA, and Thomas V. Seifert , Head, Seifert &
Vander Weide, Minneapolis, MN, for and on behalf of
Plaintiffs.
Thomas B. Hatch , Elliot S. Kaplan , and John P. Morgan ,
Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN,
for and on behalf of Defendants.

MEMORANDUM OPINION AND ORDER

MONTGOMERY, J.

### I. INTRODUCTION

\*1 On January 12, 2005, oral argument before the
undersigned United States District Judge was heard on
Defendants Best Buy Company, Inc., Richard M. Schulze,
Bradbury H. Anderson, Allen U. Lenzmeier, and Darren R.
Jackson's (collectively, "Best Buy" or "Defendants")
Motion to Dismiss [Docket No. 52 ]. In their Consolidated
Class Action Complaint ("Complaint") [Docket No. 47],
Plaintiffs Louis Meeuwenberg, David Tkach, Stephen
Anish, and Christopher Hinton ("Plaintiffs") allege a
securities fraud class action. Because Plaintiffs fail to meet
the particularity requirements required for pleading a 10(b)
or 10b-5 claim under the Securities Exchange Act,
Defendants' Motion is granted.

### II. BACKGROUND FN1

FN1. For purposes of the instant Motion, the facts
are viewed in the light most favorable to the
nonmoving party. See Digi-Tel Holdings, Inc. v.
Proteq Telecommunications, 89 F.3d 519, 522 (8th

Cir.1996) ; Hamm v. Groose, 15 F.3d 110, 112 (8th
Cir.1994).

In January 2001, Best Buy acquired Musicland Stores
Corporation, including 1,309 Musicland stores, FN2 for
approximately $700 million. Lewis Decl. [Docket No. 55]
Ex. 13. FN3 The Musicland stores were acquired for the
purpose of attracting new customers to Best Buy, as well as
the ability to cross merchandise product. Compl. ¶ 31. At
the time of acquisition, Musicland's sales were primarily
based on pre-recorded music. Lewis Decl. Ex. 13. Although
sales of pre-recorded music were flat or in decline at the
time of the purchase, Best Buy intended to return the stores
to profitability with a different mix of products, including
DVD movies, video games, and expanded hardware
offerings. Id. at Exs. 2, 13.

> FN2. Musicland includes the Sam Goody, On Cue,
> and Suncoast chains. The stores will collectively be
> referred to as the "Musicland stores."

> FN3. Because the exhibits attached to the Lewis
> Declaration are documents either relied upon by
> the Complaint or are filed with the Securities and
> Exchange Commission, the Court will consider
> these documents, and deny Plaintiffs' Motion to
> Strike [Docket No. 62]. In re: K-Tel Int'l, Inc.
> Securities Litigation, 107 F.Supp.2d 994, 998-99
> (D.Minn.2000), aff'd, 300 F.3d 881 (8th Cir.2002).
> The majority of the documents cited by Plaintiffs
> in their Motion to Strike are not relied upon in the
> determination of the Motion to Dismiss. Only those
> cited herein were considered for background
> factual purposes only.

The market, however, did not share Best Buy's optimism
regarding the Musicland purchase. In response to reports of
the acquisition, Best Buy's stock price dropped over 20%,
from $28.81 to $22.94, apparently over fears that the
Musicland store purchase would dilute Best Buy's earnings.
Id. at Ex. 27. Over the following year, however, the
Musicland stores contributed one cent per share to Best
Buy's overall earnings. Id. at Exs. 2, 10. This result was
consistent with Best Buy's predictions. Id. Best Buy credited
Musicland's contributions to strong sales of DVD movies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 839099
**(Cite as: Slip Copy)**

and video games in the last quarter of the year. *Id.* at Ex. 10. In fact, for the entire duration that Best Buy owned the Musicland stores, including the class period, Best Buy's earnings met or exceeded forecast expectations. *Id.* at Exs. 3-7, 9-10, 16, 18, 20-21, 23, 25.

In December 2002, Best Buy revised its earnings outlook downward for the fourth quarter, "due to an expected operating loss of $80-85 million from our Musicland stores." *Id.* at Ex. 21. Best Buy's outlook also included consideration of a sale of the Musicland stores: "A more comprehensive review of the business alternatives is underway to determine the overall profit potential of the business as a whole." *Id.*

### III. DISCUSSION

#### A. Standard of Review

A misrepresentation claim brought under § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 must plead the following elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. *In re: K-Tel Int'l. Inc Securities Litigation.* 300 F.3d 881, 888 (8th Cir.2002). The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In short, the PSLRA "embodies the pleading requirement of Fed.R.Civ.P. 9(b)." *K-Tel.* 300 F.3d at 889. Particularity requires an identification of the "who, what, when, where, and how." *Id. at 890* (citation omitted).

**\*2** Although "scienter is not explicitly required by the statutory text of the Exchange Act ... it is an acknowledged essential element of a section 10(b) and Rule 10b-5 claim." *Id. at 893.* The PSLRA, therefore, requires that a pleading

must "state with particularity facts which give rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This includes "such matters as the time, place and contents of false representations, as well as, the identity of the person...." *K-Tel.* 300 F.3d at 890 (citation omitted). Recklessness, as well as intentional conduct, satisfies the scienter requirement. *Alpern v. UtiliCorp United, Inc.* 84 F.3d 1525, 1534 (8th Cir.1996) (citation omitted). Recklessness is defined as "an extreme departure from the standards of ordinary care, and ... present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *K-Tel.* 300 F.3d at 893 (citations omitted). Motive and opportunity are both relevant to the scienter inquiry, "but particularly important to establishing scienter is a showing of unusual or heightened motive to meet the Reform Act standard." *Id. at 894* (citation omitted). Without a showing of motive and opportunity, the remaining allegations against the defendants must be particularly strong to constitute an inference of recklessness. *Id.* Specifically, unsupported allegations that defendants had motives common to all officers and directors-such as keeping the stock price high for the general purpose of increasing compensation or the desire to make the corporation appear profitable-are insufficient to establish scienter. *Id.* However, if the stock price was artificially inflated for the purpose of selling stock, scienter may be established. *Id.*

In the instant action, Plaintiffs' allegations fail to meet the heightened pleading requirements of the PSLRA and Rule 9(b). Either the allegations made by Plaintiffs fail to state with particularity why a specific statement is misleading, or Plaintiffs fail to adequately state with particularity facts which give rise to a strong inference of scienter. Moreover, Plaintiffs' allegations do not meet the materiality requirements of a 10(b) or 10b-5 claim.

#### B. 10(b) and 10b-5 Misrepresentations and Omissions

Plaintiffs allege a number of false and misleading misstatements were made by Best Buy between January 9, 2002, and August 7, 2002 (the "Class Period"). Plaintiffs' Complaint also alleges that Best Buy failed to disclose the truth regarding the status of the Musicland remerchandising

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 839099
(Cite as: Slip Copy)

Page 3

efforts. According to Plaintiffs, these omissions made Best Buy's positive statements false and misleading, resulting in the instant lawsuit. For purposes of analysis, Plaintiffs' allegations are divided into four categories-general allegations against Defendants, specific allegations against Defendants, the allegations of the Confidential Informants, and the individual Defendants' stock sales.

### 1. General Allegations

*3 In its overarching allegations, Plaintiffs claim Best Buy failed to disclose material information pertaining to the failure of the Musicland acquisition, particularly Best Buy's failure to disclose that it was cutting prices on products to overcome the "negative price halo." Compl. ¶¶ 5, 55. Furthermore, Plaintiffs allege Best Buy failed to disclose to the public severe problems with the efforts to remerchandise and remodel the Musicland stores. Id. Plaintiffs contend that as a result of these omissions, Best Buy's positive statements were false and misleading.

In support of dismissal of the action, Best Buy argues that Plaintiffs' claims are conclusory allegations not grounded in specific facts. First, Best Buy argues the allegation that it was experiencing "severe and persistent operational and financial difficulties with Musicland" is not reflected in the financial results of the Musicland stores. Even the Confidential Informants relied upon by Plaintiffs are unable to state that the actual financial performance of Musicland differed from what Best Buy reported to the public. Second, Best Buy cites to Plaintiffs' failure to identify facts to support the claim that the Musicland stores were not performing to "internal expectations." Finally, Best Buy argues that Plaintiffs fail to provide any factual support for the contention that by January 9, 2002, Best Buy was aware the Musicland acquisition was a failure and that Best Buy would have to sell Musicland to avoid ongoing losses. Contrary to this allegation, Best Buy argues it actually increased its earnings forecast for the fourth quarter, and then proceeded to improve upon that forecast by a substantial margin. FN4 Again, on April 2, 2002, Best Buy provided earnings guidance for the first quarter, and exceeded those results as well. It was not until August 8, 2002, that Best Buy reported that softening sales across most product categories could affect earnings. Compl. ¶ 78.

Plaintiffs do not challenge the reasoning behind the August 8, 2002 announcement, nor do they allege that the reasons given by Best Buy for the tempered forecast were false or misleading.

> FN4. In fact, before, during, and after the Class Period, Best Buy met or exceeded its most recent predicted earnings. Only once did Best Buy downgrade its earnings forecast, shortly before the end of the second quarter of fiscal year 2003. Defs' Mem. of Law in Support of Motion to Dismiss at 5 [Docket No. 54].

Plaintiffs' general allegations rely on the more specific allegations of false and misleading statements. Therefore, an analysis of the specific allegations must be undertaken to determine whether the general allegations are pled with sufficient particularity.

### 2. Specific Allegations

In the section "Materially False and Misleading Statements Issued During the Class Period," comprising paragraphs 51-77 of the Complaint, Plaintiffs reference a number of statements it believes to be false and misleading. Many of the paragraphs, however, do not contain allegations of materially false and misleading statements. Only the paragraphs actually containing allegations are analyzed.

### ¶ 51

In Paragraph 51 of the Complaint, Plaintiffs allege a Best Buy press release containing a statement relating to "the benefits of remerchandising many of the Company's Sam Goody stores ..." is materially false and misleading. Best Buy correctly contends this statement is a forward-looking statement under Section 10(b) and Rule 10b-5. 15 U.S.C. § 78u-5(c). Forward-looking statements apply to projections regarding revenue, income, earnings, statements about management's plans or objectives, and statements involving future economic performance. 15 U.S.C. § 78u-5(i)(1)(A-C). Consequently, a challenged forward-looking statement must be accompanied by an allegation that the statement was made with actual knowledge that it was false and misleading to survive a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 4
Slip Copy, 2005 WL 839099
(Cite as: Slip Copy)

motion to dismiss. *In re Navarre Corp. Securities Litigation,* 295 F.3d 791, 799 (8th Cir.2002). Plaintiffs make a general allegation that the "safe harbor" for forward-looking statements does not apply because Best Buy either failed to accompany its forward-looking statements with appropriate cautionary language or made the statements at issue with actual knowledge of their falsity. Compl. ¶ 93. However, Plaintiffs' general allegation, which does not specifically reference any single statement by Best Buy, is insufficient to meet the particularity requirements of the PSLRA.

**\*4** Here, the statements in the press release are clearly forward-looking. The language itself references future performance, and is accompanied by cautionary language. Specifically, the press release states:

Statements made in this news release ... should be considered forward-looking and subject to various risks and uncertainties. Such forward-looking statements are based on management's beliefs and assumptions regarding information currently available, and are made pursuant to the "safe harbor" provisions.... The Company's actual results could differ materially from those expressed in the forward-looking statements. Factors that could cause results to vary include, among others, those expressed in the Company's filings with the Securities and Exchange Commission. The Company has no obligation to publically update or revise any of the forward-looking statements that may be in this news release.

Lewis Decl. Ex. 8. Here, the cautionary language relates to the future performance of Best Buy; as a result, it addresses the allegedly misleading statement cited by the Plaintiffs. This language is sufficient to render the alleged misrepresentations forward-looking. *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 548 (8th Cir.1997). To survive the Motion to Dismiss, Plaintiffs must allege the statement was made with actual knowledge of its falsity. No such allegation is asserted.

¶ 52

In Paragraph 52, Plaintiffs reference another January 9, 2002 press release in which Best Buy reported sales increases at the Musicland stores, stating: "The increase reflected market share growth and the remerchandising of

most Sam Goody stores to include more DVD movies, video gaming hardware and software, and consumer electronics." Lewis Decl. Ex. 7. Nowhere, however, do Plaintiffs allege the statement or earnings summaries are false or misleading, nor do they argue the reasons given by Best Buy for the earnings increase are inaccurate. Therefore, this allegation fails to meet the particularity requirements required by the PSLRA.

¶ 53

In Paragraph 53, Plaintiffs quote a portion of a transcript of the January 9, 2002 analyst conference hosted by Best Buy. Plaintiffs highlight two sentences from that conference. The first sentence reads: "Sam Goody Stores opened are doing substantially better than the On Cue stores, thus enabling the building of a larger brand identity for Sam Goody and expanding the chain at a more rapid rate." The second sentence states: "All the efforts have been successful and have achieved all of the synergies that were expected in the first year which is a big achievement." With the exception of the second half of the first sentence, these contentions are historical statements which Plaintiffs do not allege to be false. In regard to the claim that Sam Goody could be expanded at a more rapid rate, the statement is forward-looking. Again, Plaintiffs fail to allege with particularity facts which give rise to a strong inference of scienter.

¶ 55

**\*5** In Paragraph 55, Plaintiffs list a number of "adverse facts" or reasons upon which it concludes that Best Buy "lacked a reasonable basis for their positive statements about the Company and their earnings projections, which were materially false and misleading at all times," as alleged in Paragraphs 51-53. Plaintiffs later apply the reasons contained within Paragraph 55 to all the allegations contained in Paragraphs 51-77. However, the averments proffered in Paragraph 55 either do not demonstrate how the referenced allegations are false or fail to demonstrate a strong inference of scienter. Rather, the averments in Paragraph 55 are of a general nature. For example, Plaintiffs allege Best Buy failed to adequately train Musicland personnel in the sale of consumer electronics, the Musicland

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 5
Slip Copy, 2005 WL 839099
**(Cite as: Slip Copy)**

stores were inadequate in both size and location, and the company was incurring additional costs to rotate inventory. However, the allegations do not reference specific facts sufficient to meet the particularity requirements of the PSLRA or Rule 9(b). Nor do any of the allegations in Paragraph 55 give rise to a strong inference that the Defendants acted with scienter. Plaintiffs' allegations are too vague and general to meet the particularity requirements of the PSLRA.

¶ 59

In Paragraph 59, Plaintiffs allege Best Buy's press release of February 29, 2002, in which Best Buy increased its earnings expectations for the fourth quarter to $1.38 per share, was materially false and misleading. Plaintiffs can not demonstrate that this assertion is material, however, as Best Buy's ultimate earnings for the fourth quarter were a reported $1.62 per share, a figure Plaintiffs do not allege to be inaccurate. As a result, it is unclear how this assertion is material, much less false or misleading, and therefore, the averment fails to meet the particularity requirements.

¶ 61

In Paragraph 61, Plaintiffs cite a March 7, 2002 press release which states in part: "The change in product mix-including more video gaming hardware and software, and devices that play movies and music-drove an increase in the average purchase per customer." Again, Plaintiffs fail to allege with particularity why this statement is inaccurate.

¶ 64

In Paragraph 64, Plaintiffs quote an April 2, 2002 press release in which Best Buy announced its financial results for the fourth quarter of fiscal year 2002. The press release states that the Musicland stores met profitability targets, and that the strong finish to the quarter built Best Buy's optimism for the year ahead, with expectations of growth in revenues. The press release contains historical statements, which Plaintiffs do not allege were inaccurate, as well as forward-looking statements, which are not alleged with facts sufficient to give rise to a strong inference of scienter.

¶ 65

In Paragraph 65, Plaintiffs extensively quote various individual Defendants from an investment analyst conference call. The call had been prefaced by cautionary language regarding forward-looking statements. Lewis Decl. Ex. 11. In the transcript of the conference call, the Defendants discuss the past performance results of the Musicland stores, whose earnings exceeded management expectations in the first year. Defendants also noted that sales at Musicland stores outpaced mall traffic figures. Additionally, the Defendants made statements indicating Best Buy expected modest sales growth over the coming year, and intended on continuing to invest and reposition the Musicland stores. As with the other alleged misrepresentations, Plaintiffs fail to allege the historical figures cited by Best Buy were inaccurate, or that Best Buy's forward-looking statements were made with recklessness, much less the actual knowledge of their falsity required for forward-looking statements. Furthermore, in other portions of the same conference call, Defendants state that due to a reduction in the number of Musicland stores, it expected Musicland's operating results to drop by $40 million in fiscal year 2003. Lewis Decl. Ex. 11. As a result, Plaintiffs fail to adequately allege with particularity that the conference call statements were false or misleading.

¶ 66

*6 In Paragraph 66, Plaintiffs cite an April 2, 2002 press release in which Best Buy discusses a marketing test in which the Sam Goody name outperformed the On Cue name in rural areas, and, as a result, On Cue stores would be renamed Sam Goody. Plaintiffs fail to allege the marketing test was false or misleading. The press release also states the name change would allow Best Buy to capitalize on the name change. Moreover, this is a forward-looking statement, accompanied by cautionary language, wherein scienter is not alleged with particularity. Lewis Decl. Ex. 10.

¶ 67

Paragraph 67 of the Complaint references an analyst conference call later in the day on April 2, 2002, in which Defendants stated they did not believe transforming the On Cue stores to Sam Goody stores would cause "a lot of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                     Page 6
Slip Copy, 2005 WL 839099
**(Cite as: Slip Copy)**

disruption." Again, the conference call was prefaced by cautionary language. Lewis Decl. Ex. 11. Plaintiffs fail to allege this statement was made with actual knowledge of its falsity. Additionally, the vague nature of the statement at issue makes it difficult to identify facts sufficient to establish a strong inference of recklessness in the actions of Defendants, much less actual knowledge of its falsity.

¶ 70

In Paragraph 70 of the Complaint, Plaintiffs quote a number of forward-looking statements from Best Buy's annual 10-K form filed on May 30, 2002. The paragraphs quoted include a number of statements regarding the prospects, intentions, and business strategies for Best Buy and the Musicland stores. However, the 10-K is accompanied by cautionary language stating that the information contained therein was forward-looking, and subject to numerous factors. As a result, Plaintiffs' failure to allege the 10-K statements were made with actual knowledge of their falsity is fatal to these allegations.

¶ 72

In Paragraph 72, Plaintiffs cite to a June 6, 2002 press release in which Best Buy reported on the latest Musicland results, which included a slight drop in sales. The press release also contains Best Buy's earnings growth expectations for fiscal year 2003. Plaintiffs do not allege the Musicland loss was inaccurate, nor do they state with particularity how the earnings estimates report is false or misleading.

¶ 73

Paragraph 73 of the Complaint details Best Buy's press release of the first quarter results for the fiscal year 2003, which contained Best Buy's usual cautionary language regarding forward-looking statements. Plaintiffs highlight a statement which reads:

"Our strong beginning for the year builds our confidence that we can continue to achieve top-quartile growth rates in sales and earnings," Schulze added. "We expect contributions from new store openings, comparable stores sales gains and improved operating efficiency to drive our

growth."
Lewis Decl. Ex. 16. The statement is not material to Plaintiffs' claims. The statement appears in a press release about Best Buy as a whole, and is not directed to Musicland stores. *Id.* The results also stated Best Buy's expectations for growth in the second quarter, which included remerchandising efforts at Sam Goody stores. However, Plaintiffs do not allege with particularity how this statement was false or misleading, and fail to allege Defendants had actual knowledge of its falsity.

¶ 74

*7 Paragraph 74 of the Complaint details an investment analyst conference call in which Defendant Schulze explains that Best Buy recently switched to a new management system, and had increased inventory to address anticipated problems with the transition. Once again, Plaintiffs fail to allege how this statement is false or misleading; moreover, it is unclear how this general statement about Best Buy inventory is material to the Musicland stores.

¶ 75

In Paragraph 75 of the Complaint, Plaintiffs cite a July 12, 2002, Amendment No. 3 to SEC Form S-3 filed by Best Buy. In the Amendment, Best Buy stated the Musicland acquisition provided Best Buy access to new distribution channels, customers, and the ability to leverage Best Buy's core competencies to the new operations. Plaintiffs fail to particularly allege what is false and misleading about these statements. Additionally, the statement is so general as to render it immaterial. *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996).

¶ 76

Finally, in Paragraph 76 of the Complaint, Plaintiffs extensively quote from Best Buy's 10-Q filed for the first quarter of fiscal year 2003. The 10-Q contains a number of forward-looking statements, none of which are alleged with facts sufficient to satisfy scienter requirements.

3. Confidential Informant Allegations

The Plaintiffs reference a number of allegations made by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 7
Slip Copy, 2005 WL 839099
**(Cite as: Slip Copy)**

Confidential Informants ("CIs"). The cumulative effect of these allegations with the above-cited alleged misrepresentations still falls short of the particularity requirements of the PSLRA.

The allegations attributed to the CIs, far from meeting the PSLR requirements of particularity, are rather vague claims made by the CIs. For example, in Paragraphs 39 and 40 of the Complaint, CI 1 states that it was "well-known" throughout the company that the majority of Musicland stores were in "level C or D" locations, and the Musicland real estate was "really bad." Assuming this statement to be true, it does not adequately demonstrate that Best Buy's statements regarding the prospects were false or misleading, much less that Best Buy acted with scienter. The who, what, when, where and how are missing from these statements which would allow a strong inference to be made that the Defendants acted recklessly, or with actual knowledge that their statements were misleading. _K-Tel,_ 300 F.3d at 891.

Plaintiffs also allege, in Paragraph 41, that Best Buy's practice of discounting products in the Musicland stores was misleading since the Defendants knew the practice could not be sustained, and was merely a charade to give the Musicland stores a short-term boost. Again, the specifics of these allegations are missing-in fact, Paragraph 41 merely makes bare assertions, with no apparent facts, much less specifics, to support the allegations. As a result, these allegations also fail to meet the particularity requirements.

Paragraph 43 of the Complaint is slightly more specific in that it names Defendants Schulze and Anderson, and alleges they participated in conference calls updating them on the remerchandising of the Musicland stores. However, CI 2 merely reports that problems occurred during the remerchandising effort requiring substantial modifications. Updates and changes to the remerchandising plan are not sufficient to make Best Buy's general statements regarding the plan false, or demonstrate a strong inference of recklessness on behalf of the Defendants. CI 2 also alleges, in Paragraph 4, that Defendants Schulze and Anderson were aware of the problems regarding the "negative price halo," or the perception that Musicland products were overpriced, as well as the failure of various strategies to correct the problem. Again, however, the existence of the "negative

price halo," coupled with the Defendants' awareness of it and attempts to alleviate the problem, do not meet the particularity requirements to raise a strong inference that the general statements regarding Musicland were false. Best Buy was not required to report every nuance of the remerchandising strategy, and the vague allegations reported by CI 2 are not sufficiently particular to raise a strong inference of recklessness on behalf of Best Buy.

**\*8** CI 3 alleges that during a meeting in September or October, 2001, Defendant Schulze became upset when told of remodeling issues. He is alleged to have thrown papers at another employee, and stated he was "sick and tired" of "reading reports every day about what is going wrong." While inflammatory, these statements are too vague to be considered evidence of a strong inference of recklessness. Acknowledging one's frustration with business issues is not the same as making misrepresentations. The statements do not give rise to the requisite strong inference of recklessness. Moreover, business problems alone are not sufficient to establish scienter. See _Ronconi v. Larkin,_ 253 F.3d 423, 430 (9th Cir.2001).

The remaining CIs also make allegations about the remodeling and remerchandising efforts. Many of these allegations relate to movement of inventory between Musicland and Best Buy, while others relate to alleged disruptions in individual stores during the remerchandising efforts. Other CIs allege other miscellaneous claims, including problems with "inventory shrinkage" due to shoplifting, and problems at individual stores. Even assuming these allegations are true, they identify isolated issues that can not support a strong inference of scienter in regard to the much broader allegations of fraud alleged by the Plaintiffs.

Because Plaintiffs fail to allege their general, specific, and Confidential Informant claims with the particularity required of the PSLRA, the Complaint fails.

### 4. Stock Sales and Convertible Debentures

As evidence of motive, Plaintiffs rely on the stock sales of various Best Buy directors and officers during the Class Period. It is undisputed, however, that Defendant Anderson

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 839099
(Cite as: Slip Copy)

Page 8

was the only individual Defendant to sell stock during the Class Period. It is highly disputed whether Defendant Anderson's sales were sufficiently unusual to raise an inference of wrongdoing. The Eighth Circuit has held that while "alleging the defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock is sufficient" to demonstrate scienter, the benefit must be more than of a generalized nature to the defendants. *K-Tel,* 300 F.3d at 894-95.

Here, although Defendants allege a number of officers and directors sold shares of stock during the Class Period, they do not allege that Defendants Schulze, Lenzmeier, or Jackson sold any stock or exercised any options during the Class Period. As a result, no inference of scienter can be found against these Defendants in relation to their stock sales. Although Defendant Anderson did sell stock during the Class Period, the vast majority of his sales are part of his apparent pattern of selling stock on a weekly basis. Such regularity in the sale of stock over a long period of time-both before, during, and after the Class Period-does not raise an inference of scienter. Although Defendant Anderson did make one additional sale of stock in April 2002, comprising 20,000 shares of stock, it is not of a sufficient amount to constitute a strong inference of scienter, as that amount represented less than 2% of Defendant Anderson's holdings at the end of the year. Lewis Decl. Ex. 15.

*9 As the Eighth Circuit has held, "general allegations of a desire to increase stock prices ... are too generalized and are insufficient" to satisfy the PSLRA particularity requirement. *Id.* at 895. As a result, Plaintiffs' allegations that Defendants acted with the intent to raise stock prices are insufficient to satisfy the scienter requirements. Similarly, Plaintiffs' allegations regarding Best Buy's offering of convertible debentures announced in January 2002 also fail. Although Plaintiffs discuss the offering, they do not allege how it benefitted the individual Defendants, nor do they state with particularity how any statements made in connection with the offering were false or misleading.

C. Alleged Exchange Act Section 20(a) Violations

In addition to the 10(b) and 10b-5 claims, Plaintiffs allege

violation of Section 20(a) of the Exchange Act against the individual Defendants. "Section 20 of the Exchange Act extends liability for fraudulent conduct under Section 10(b) to individuals controlling persons found to have committed securities fraud." *In re: Xcel Energy, Inc.,* 286 F.Supp.2d 1047, 1059 (D.Minn.2003) (*citing* 15 U.S.C. § 78t(a)). Like a 10(b) or 10b-5 claim, the primary violation under Section 20 must be plead with particularity as required by the PSLRA. *Vohs v. Miller,* 323 F.Supp.2d 965, 973 (D.Minn.2004). Because Plaintiffs based their Section 20(a) claims on the same allegations as the 10(b) and 10b-5 claims, the Section 20(a) claims fail for the same reasons as previously discussed.

D. Plaintiffs' Request to Amend and Materiality

Anticipating that Defendants' Motion to Dismiss might be granted, Plaintiffs request leave to amend their Complaint. FN5 Although leave is generally granted when justice requires, in the instant case, it is not apparent that amendment will cure the Complaint's defects. *Frey v. City of Herculaneum,* 44 F.3d 667, 672 (8th Cir.1995). Plaintiffs argue that, if allowed to amend, they would add: (1) additional details establishing Defendants' knowledge of the remerchandising issues; (2) more details regarding the remerchandising problems; (3) additional details establishing the credibility of the CIs; and (4) additional details concerning the Musicland stores inventory buildup. Additional details in these areas, however, will not remedy the key issues of lack of particularity in the present allegations. The Complaint does not fail for lack of details regarding the alleged remerchandising problems so much as it fails for a lack of particularity of falsity or scienter.

> FN5. The Plaintiffs have, in fact, already had an opportunity to recast and recharacterize their Complaint. The initial Complaint was filed on November 20, 2003 [Docket No. 1]. Following the consolidation of a number of individual cases, the Consolidated Class Action Complaint was filed on August 19, 2004. Although both pleadings allege securities fraud, the Consolidated Complaint for the first time raises allegations by the CIs.

Plaintiffs' allegations do not meet 10(b) and 10b-5

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 9
Slip Copy, 2005 WL 839099
(Cite as: Slip Copy)

materiality requirements. As Defendants noted in their brief and at oral argument, the Plaintiffs have not alleged that any specific financial disclosure or statement from Best Buy was false or misleading, including the August 8, 2002 press release in which Best Buy downgraded its earnings forecast. Although securities lawsuits are not confined to misrepresentations and omissions regarding financial information, Plaintiffs have been unable to provide any Eighth Circuit law as authority for the proposition that misrepresentations of the type alleged by Plaintiffs are material to a 10(b) or 10b-5 claim. The single case Plaintiffs produced where omissions were found to be the basis of a 10b or 10(b)-5 claim, *Rodney v. KPMG Peat Marwick,* is not analogous to the instant litigation. 143 F.3d 1140 (8th Cir.1998). In *Rodney,* Plaintiffs alleged that KPMG, in discussions related to fund investments and risks contained within prospectuses, violated three of its internal investment restrictions. *Id. at 1141.* Here, it is not alleged Best Buy violated any internal rules. Moreover, the omissions in *Rodney* related directly to assumptions regarding investments. Here, the alleged omissions regarding the remerchandising program do not directly relate to investments.

*10 A fact is deemed material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citation omitted). Even if Best Buy were to have specifically stated there were difficulties with the integration of the Musicland stores, it is not clear that this would alter the mix of information available and important to investors. Musicland's performance and earnings were reflected within Best Buy's overall earnings. Plaintiffs do not allege that these figures were false or that the true figures were omitted. Therefore, the mix of information available to investors would not have significantly changed; and as a result, Best Buy's alleged omissions were not material. Thus, Defendants' Motion to Dismiss must be granted, and Plaintiffs' request for leave to amend the Complaint will be denied.

IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendants' Motion to Dismiss [Docket No. 52] is GRANTED; and

2. Plaintiffs' Motion to Strike [Docket No. 62] is DENIED; and

3. Plaintiffs' Complaint [Docket No. 47] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2005.
In re Best Buy Co., Inc. Securities Litigation
Slip Copy, 2005 WL 839099

Briefs and Other Related Documents (Back to top)

• 0:03CV06193 (Docket) (Nov. 20, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
(Cite as: Slip Copy)

C

Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Lloyd FREED, Individually and On Behalf of All Others
Similarly Situated
v.
UNIVERSAL HEALTH SERVICES, INC., et al.
No. Civ.A.04-1233.

May 3, 2005.

Michael T. Fantini , Sherrie R. Savett, Philadelphia, PA, for
Lloyd Freed, Individually and On Behalf of All Others
Similarly Situated.
Neil G. Epstein, Philadelphia, PA, for Universal Health
Services, Inc., Alan B. Miller and Steve G. Filton.

*MEMORANDUM*

PADOVA, J.
*1 Presently before the Court in this putative class action is
Defendants' Motion to Dismiss the Amended Consolidated
Class Action Complaint. For the reasons that follow, said
Motion is granted.

I. BACKGROUND

This action is brought on behalf of a class of public
investors who purchased the securities of Universal Health
Services, Inc. ("UHS") during the period from July 21, 2003
through February 27, 2004 (the "relevant period"). In Count
One of the Amended Consolidated Class Action Complaint
(the "Amended Complaint"), Lloyd Freed (hereafter "Lead
Plaintiff") alleges violations of Section 10(b) of the
Securities Exchange Act of 1934 ("Exchange Act"), as
amended by the Private Securities Litigation Reform Act of
1995 ("PSLRA"), 15 U.S.C. §§ 78j(b) , 78t(a) , and Rule
10b-5 promulgated thereunder, see 17 C.F.R. § 240.10b-5,
against UHS; Alan B. Miller, Chief Executive Officer of
UHS and Chairman of UHS's Board of Directors; and Steve
G. Filton, Chief Financial Officer of UHS. In Count Two of
the Amended Complaint, Lead Plaintiff alleges violations of
Section 20(a) of the Exchange Act against Defendants
Miller and Filton (the "individual Defendants"). The

essence of Lead Plaintiff's federal securities claims is that
Defendants artificially inflated the price of UHS stock by
issuing public statements and filing earnings reports that
omitted or misstated material facts concerning UHS's rising
level of bad debts, and by using accounting manipulations to
materially overstate UHS's financial results.
(Am.Cons.Comp.¶¶ 3, 5, 7.)

UHS is a Delaware corporation which owns and operates
acute care hospitals, behavioral health centers, ambulatory
surgery centers and radiation oncology centers throughout
North America and France, and maintains its principal
corporate offices in Pennsylvania. (Id. ¶¶ 13, 31, 37.) UHS
hospitals and staff provide services which include general
surgery, internal medicine, obstetrics, emergency room care,
operating room care, radiology, oncology, diagnostic care,
coronary care, pediatric services, pharmacy services, and
physiotherapy and laboratory procedures. (Id. ¶ 23.) UHS
receives payments for the services it renders from
private-sector insurers, the federal government under the
Medicare program, state governments under their Medicaid
programs, and directly from uninsured patients. (Id.)

In 2001 and 2002, the overall hospital market sector began
to experience a change in the mix of patients, which led to
an increasing level of uninsured patients. (Id. ¶ 24.) At the
same time, insured individuals became responsible for an
increasing percentage of healthcare expenditures because
the burden of health care expenses was shifting from
employers, private-sector insurers, and state and federal
governments to individuals, while health insurance
premiums, co-pay charges and deductibles were steadily
rising. (Id.) Many hospitals responded to these
industry-wide trends by increasing their levels of bad debt
reserves in 2003. (Id. ¶ 26.) UHS, however, reported that it
was not affected by the changes other hospitals were
experiencing, and decreased its level of bad debt reserves
from 11.9% of revenue to 8.5% of revenue. (Id.) The
Amended Complaint alleges that Defendants acted
recklessly in reducing UHS's levels of bad debt reserves,
and that Defendants kept UHS's bad debt reserves
artificially low by materially understating the amount of bad
debt UHS was experiencing, thereby overstating UHS's
financial results. (Id. ¶¶ 27, 30.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
**(Cite as: Slip Copy)**

A. *False and Misleading Statements During the Class Period*

**\*2** According to the Amended Complaint, Defendants' fraudulent scheme began with a July 21, 2003 press release over the PR Newswire, in which UHS announced that its net earnings per share increased by 19% for the three-month and six-month periods ended June 30, 2003, over the comparable periods in 2002. (*Id.* ¶ 31.) The press release further stated that UHS's operating margin "increased to 16.7% in the three-month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year." (*Id.*) The next day, in response to a question regarding UHS's bad debt expenses during a conference call with investors, Defendant Filton stated that "[w]e actually think that our self-pay utilization as a percentage of overall utilization is pretty much pancake flat between 2003 and 2002 and have not seen significant changes." (*Id.* ¶ 32.) One month later, on August 13, 2003, UHS filed its quarterly Form 10-Q report for the three month period ended June 30, 2003. (*Id.* ¶ 33.) In this report, UHS represented that operating income and operating margins were important measures of UHS's performance. (*Id.*) The report further stated that "[o]verall operating margins ... were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period." (*Id.*)

On October 20, 2003, UHS issued another press release over the PR Newswire, which stated that "earnings per share ... for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002." (*Id.* ¶ 37.) The next day, during a conference call with investors, Defendant Filton represented that "[w]e're not seeing as some of the other companies have mentioned, a real increase in uninsured or at least uninsured after insurance patients or a difficulty in collecting from those patients." (*Id.* ¶ 38.) On November 10, 2003, UHS filed its quarterly Form 10-Q report, which stated that

> Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall

operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expenses.

**\*3** (*Id.* ¶ 40.) Thereafter, during the 22nd Annual J.P. Morgan Healthcare Conference held in mid-January 2004, Defendant Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its peers because UHS had not experienced a material adverse change in self-pay revenues in its markets or in the collection rates. (*Id.* ¶ 45.) Defendant Miller further stated that he expected UHS's bad debt ratios to remain stable in the near term. (*Id.*)

The Amended Complaint alleges that these statements proved to have been false because, on February 18, 2004, UHS issued a press release over the PR Newswire which stated that

> [t]he Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts. We expect this trend to continue until there is a notable strengthening of the labor market.

(*Id.* ¶ 47.) On March 1, 2004, UHS issued another press release over the PR Newswire in which it announced that

> earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year. On a same facility basis, the Company's acute care hospitals have continued, in the

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
(Cite as: Slip Copy)

first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continue to unfavorably impact our bad debt expense. The Company is vigorously addressing each of these areas.

(*Id.* ¶ 49.) In response to this announcement, UHS's stock dropped 21% to $44.88 per share on volume of 6.7 million shares. (*Id.* ¶ 54).

### B. *"True Facts" and Fraudulent Accounting Practices*

The Amended Complaint alleges that, as early as July 23, 2003, Defendants were aware that UHS's bad debt exposure was increasing due to higher levels of uninsured patients and Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare. (*Id.* ¶ 42(e)-(f).) In addition, the Amended Complaint avers that UHS's operating income was inflated as a result of Defendants failure to (1) make sufficient allowance for the bad debt it was incurring; (2) properly write off uncollectible receivables; (3) properly deduct the appropriate allowance for doubtful accounts from operating income; and (4) comply with generally accepted accounting principles ("GAAP"). (*Id.* ¶ 42(a)-(d).)

In support of these allegations, the Amended Complaint pleads the following "true facts." First, Defendants were aware that UHS's levels of bad debt were steadily increasing from July 21, 2003 through February 27, 2004. (*Id.* ¶¶ 18, 60.) Second, Defendants admitted that the increase in UHS's bad debt reserves for the fourth quarter of 2003 was a "catch up" or "true-up" for insufficient bad debt reserves during the fiscal year 2003. (*Id.* ¶¶ 47-56.) Third, the low levels of bad debt UHS had reported were attributable to fraudulent accounting practices, which concealed the true amounts of bad debt UHS was encountering. (*Id.* ¶¶ 5, 34, 42, 51, 61, 66.)

**\*4** The Amended Complaint further charges Defendants with deliberately falsifying UHS's true levels of bad debt and income by violating GAAP and Security and Exchange Commission ("SEC") rules governing the calculation of

uncollectible receivables in its financial statements for purposes of inflating UHS's earnings and boosting UHS's stock. (*Id.* ¶ 66.) Specifically, the Amended Complaint avers that Defendants improperly delayed the write-off of uncollectible accounts, intentionally understated UHS's provision for doubtful accounts, decreased UHS's level of bad debt reserves, and failed to disclose UHS's policy of accounting for doubtful accounts. (*Id.* ¶¶ 63, 73, 76.) These practices allegedly allowed UHS to materially inflate reported earnings and mislead investors during the relevant period. (*Id.* ¶ 73, 80.)

Defendants have moved to dismiss both counts of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b), as well as under § 78u-4(b) of the PSLRA.

### II. LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988). Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

### III. DISCUSSION

#### A. *Count One: Rule 10b-5*

Defendants seek the dismissal of Count One of the Amended Complaint, which asserts a securities fraud claim against UHS and the individual Defendants pursuant to Section 10(b) and Rule 10b-5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... of any manipulative or deceptive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                                                Page 4
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
(Cite as: Slip Copy)

device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir.2002).

### 1. Pleading fraud with particularity

**\*5** Because a claim under Section 10(b) and Rule 10b-5 is a claim for fraud, a plaintiff must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the PSLRA. Cal. Pub. Employees' Retirement Sys. v. CHUBB Corp., 394 F.3d 126, 143 (3d Cir.2004). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'-that is, the 'who, what, when, where and how' of the events at issue." In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir.2002) (quoting In re Burlington Coat Factory, 114 F.3d at 1422)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " CHUBB, 394 F.3d at 144 (quoting In re Rockefeller, 311 F.3d at 216)). The court must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity. In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir.1996).

In addition, under the PSLRA, a Rule 10b-5 complaint must "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, FN1 the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." In re Rockefeller, 311 F.3d at 224. "In other words, pursuant to this 'modified' Rule 12(b)(6) analysis, 'catch-all' or 'blanket' assertions that do not comply with the particularity requirements are disregarded." CHUBB, 394 F.3d at 145.

> FN1. Lead Plaintiff agrees that the Amended Complaint's "true facts," which are based on the investigation of counsel, are pled on information and belief. (03/09/2004 Tr. at 30.)

As mentioned above, Plaintiffs' 10b-5 claims are based on allegedly false or misleading statements contained in press releases issued by UHS, conference calls between financial analysts and the individual Defendants, and UHS's quarterly and annual earnings reports that were filed with the SEC. The subject matter of the alleged misstatements and misleading information falls into two general categories: (1) statements that UHS was not experiencing an increase in the levels of bad debt during the relevant period; and (2) Defendants' use of improper accounting methods to conceal the rising levels of bad debt and artificially inflate UHS's earnings.

**\*6** Defendants do not dispute that Lead Plaintiff has identified Defendants' allegedly false and misleading statements with particularity. Defendants instead maintain that Lead Plaintiff has failed to plead sufficient "true facts" specifying why those statements were false. Under the heightened pleading standard imposed by Rule 9(b) and the PSLRA, "it is the 'true facts' recited in the [Amended Complaint] that are of paramount importance ... because they provide the exclusive basis for [Lead Plaintiff's] claims that the various statements made throughout the [relevant period] were materially false and misleading ... and that



Defendants knew of the falsity of the statements and financial results." *CHUBB*, 394 F.3d at 145.

A complaint can meet these heightened pleading requirements by providing sufficient documentary evidence and/or a sufficient description of the personal sources which lead the plaintiff to believe that certain statements were false or misleading. *Id. at 147.* Here, Lead Plaintiff has not provided any documentary evidence to support the Amended Complaint's allegations of securities fraud, and instead is proceeding solely on the basis of information received from confidential sources. (*See* 03/09/2005 Tr. at 35.) Lead Plaintiff's reliance on confidential sources to supply the requisite particularity for their fraud claims, therefore, "assumes a heightened importance." *CHUBB*, 394 F.3d at 149.

In assessing the particularity of allegations made on information and belief which are based on statements by confidential sources, courts examine "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id. at 147.* Under this standard, "so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources." *Id.* However, a complaint must contain sufficient information about each source "to support the probability that the source possesses the information alleged." *Id.* at 155. Accordingly, complaints that rely heavily on confidential sources to establish the "true facts" must contain information describing the time period during which the confidential sources were employed by the defendant corporation, the dates on which they acquired the information they purportedly possess, and the manner in which they had access to such information. *Id.* at 148.

Lead Plaintiff contends that Defendants were reckless in reducing UHS's bad debt reserves during the relevant period, and that Defendants' statements regarding UHS's consistently low levels of bad debt were false and misleading, because Defendants at the time were aware that UHS's was in fact experiencing an increase in its levels of bad debt. In support of this contention, the Amended

Complaint cites to "a former UHS employee from the business office of LCH [Lancaster County Hospital]" who stated that when the area's county hospital closed in the fall of 2002, LCH "immediately began experiencing an influx of indigent patients seeking treatment through the emergency room." (Am.Cons.Compl.¶ 30.) The Amended Consolidate Complaint further alleges that the Edinburg Regional Medical Center ("ERMC") served as the county hospital before being purchased by UHS, and that "[a] former ERMC director explained that ERMC inherited the large indigent patient population from the date of purchase." (*Id.*)

*7 In addition, the Amended Complaint avers that UHS hospitals had begun to experience increased numbers of self-pay patients as early as April 2003, because ERMC at that time "internally recorded that bad debt was a concern." (*Id.* at 39.) The Amended Complaint does not mention the source from which Lead Plaintiff's counsel received this information. The Amended Complaint does allege, however, that "a former ERMC director confirmed that UHS management had been focusing on the length of stay issued [sic] at the ERMC facility from the beginning of 2003, if not earlier." (*Id.* ¶ 52.) That former director further explained that "the length of stay issue ... was related to the indigent patient population who had no coverage, and likely no ability to pay, from the point of initial service." (*Id.*)

Both the EMRC and LCH sources were employed in two local UHS hospitals, and none of them claim to have information regarding a nationwide increase in the treatment of indigent patients or rising levels of bad debt at UHS facilities in general. Moreover, the Amended Complaint does not allege when the confidential sources were employed by UHS, the dates on which they acquired the information they purportedly possess, or how these former employees had access to such information. *See CHUBB,* 394 F.3d 148. The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess the information that UHS was experiencing an increase in levels of bad debt during the relevant period.

Lead Plaintiff also contends that Defendants acted recklessly when, in face of UHS's alleged rising exposure to bad debt, Defendants failed to increase UHS's bad debt

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                              Page 6
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
**(Cite as: Slip Copy)**

reserves. In support of the contention that Defendants were aware of UHS's rising exposure to bad debt, the Amended Complaint cites to "former UHS personnel employed in the business office of [LCH]," who state that UHS "corporate procedure, unbeknownst to investors, dictated that no accounts less than 180 days old were to be considered bad debt even if an account was known or anticipated to be uncollectible from the date service was provided." (Am.Cons.Compl.¶ 28.) Similarly, a "former business office employee at LCH" stated that "UHS's practice was to bill Medicare and Medicaid for all services rendered and recognize all revenue at the time of service even if it was known or anticipated that a large portion of those claims would be denied." (Id. ¶ 29) (emphasis deleted).

The Amended Complaint further cites "[f]ormer employees from numerous hospitals" for the proposition that all LCH revenue "was sent to UHS's corporate office in electronic format approximately three to four times per day" and that "bi-weekly and monthly reports tracking accounts receivable and bad debt were provided to the appropriate executives at UHS's corporate headquarters." (Am.Cons.Compl.¶ 50.) The Amended Complaint goes on to state that

> *8 former UHS personnel from the office of the controller at Summerlin Hospital Medical Center [ ] confirmed that each UHS Las Vegas area hospital submitted its financial information, including uncollectible receivable account amounts, to Valley Health Systems, a centralized business office responsible for billing patients, collecting receivables and writing off receivables that were not collected. Valley Health Systems consolidated the financial information from the hospitals and forwarded it to UHS's corporate accounting department at least on a monthly basis.

(Id.) In addition, the Amended Complaint avers that

> [a] former director of the Midwest Center for Youths and Family Services ("SMCH") stated there are 'no surprises or sudden changes' when it comes to bad debt levels as it is known at the point of service whether a patient is uninsured, and because any indicators for potential bad debt problems would appear in reports submitted to UHS corporate offices for monthly management meetings.

(Id.)

Notably, though all of these sources were employed in local UHS hospitals, the Amended Complaint fails to allege how they would have had access to information regarding UHS's operations nationwide. Where a complaint relies heavily on former employees who worked in the defendant corporation's local branches for information concerning the defendant corporation's business on a national scale, a "lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic." *CHUBB, 394 F.3d at 148.* The Amended Complaint also fails to allege at what time the confidential sources were employed by UHS, or the dates on which they acquired the information they purportedly possess. *See id.* The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess information regarding UHS's nationwide operating procedures. Accordingly, the Court finds that the Amended Complaint fails to plead the falsity of Defendants' statements during the relevant period with the particularity demanded by the PSLRA.

Lead Plaintiff further contends that Defendants committed accounting fraud when, in violation of the GAAP and SEC reporting requirements, Defendants falsely inflated UHS's earnings and assets as well as stockholders' equity earnings by failing to establish and maintain adequate bad debt reserves during the relevant period. FN2 The Amended Complaint alleges that Defendants, in violation of the GAAP, delayed the recognition and write-off of uncollectible accounts, understated its provision for bad debt, and failed to restate UHS's previously misstated financial statements. FN3 In support of these contentions, the only "true fact" the Amended Complaint alleges is that "former UHS employees stated that during the [relevant period], the Company mandated that no accounts less than 180 day [sic] delinquent be written off." (Am.Cons.Compl.¶ 70.)

> FN2. Financial results reported in violation of GAAP are presumptively misleading. *See* 17 C.F.R. § 210.4-01(a)(1) ; *CHUBB, 394 F.3d at 152 n. 16.*

> FN3. Specifically, the Amended Complaint alleges

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
(Cite as: Slip Copy)

that Defendants violated the following GAAP principles: (1) financial reporting should provide information that is useful to present and potential investors in making rational investment decisions; (2) omissions or misstatements are material if the judgment of a reasonable person relying on it would have been changed or influenced by the inclusion or correction of the item; (3) financial reporting should provide information about management's discharge of its stewardship responsibility to stockholders; (4) financial reporting should provide information about an enterprise's financial performance during a period; (5) financial reporting should be reliable in that it represents what it purports to represent; (6) no information that may be necessary to ensure that the report validly represents underlying events and conditions be omitted; (7) conservatism should be used as a prudent reaction to uncertainty; and (8) contingencies that might result in gains should not be reflected in accounts.

*9 As above, the Amended Complaint does not allege sufficient facts to support the probability that the confidential sources would possess the information they purport to possess. Indeed, the relevant confidential sources are identified only as "former UHS employees." In addition, the Amended Complaint does not rely on any sources, confidential or otherwise, to substantiate its allegations that UHS understated its provision for bad debt and would have been required to restate its earlier financial statements. The Court further notes that, where a complaint alleges that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, the complaint must state what the unreasonable accounting practices were and how those practices distorted the disclosed data. *In re Burlington*, 114 F.3d at 1417-18. Statements of reserve amounts are "fraudulent only if ... the responsible parties knew or should have known that [the amounts of reserve] were derived in a manner inconsistent with reasonable accounting practices." *Christidis v. Pa. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983). Accordingly, a complaint must plead with particularity "the manner in which, in establishing reserves for bad debts in the financial

statements relied upon, the defendants knowingly departed from reasonable accounting practices." *Id.* To do so, the complaint must "include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." *In re Loewen Group, Inc. Sec. Litig.*, Civ. A. No. 98-6640, 2004 WL 1853137, at *11 (E.D.Pa. Aug. 18, 2004). In the absence of such allegations, "neither the increase of allowance toward the end of the class period nor the eventual financial ruin of [the defendant corporation] are proof that defendants committed any acts worse than mismanagement." *Id.* at *12.

Here, the Amended Complaint does identify with sufficient particularity which GAAP procedures were allegedly violated. However, the Amended Complaint does not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible. *See id.* Similarly, the Amended Complaint does not identify the data, or source of data, that was used to arrive at its conclusions, the amount by which reserves were distorted, or how much revenue was improperly recognized. *See CHUBB*, 394 F.3d at 153. Accordingly, the Court finds that the Amended Complaint fails to plead facts which would support the inference that Defendants were engaging in accounting fraud with the particularity demanded by the PSLRA.

2. *Failure to State a Claim: Falsity of Statements*

*10 The Amended Complaint's failure to plead the "true facts" with the particularity required by Rule 9(b) and the PSLRA supports dismissal apart from Rule 12(b)(6). *CHUBB*, 394 F.3d at 156. Dismissal, however is also warranted pursuant to Rule 12(b)(6) for failure to adequately plead the falsity of Defendants statements. As the Amended Complaint does not comply with the PSLRA's threshold pleading requirements, Lead Plaintiff may not benefit from inferences stemming from the unparticularized allegations mentioned above to establish the falsity of Defendants' statements during the Class Period. However,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                              Page 8
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
**(Cite as: Slip Copy)**

even if those allegations were accepted, they would not give rise to an inference that UHS was experiencing an increase in bad debt during the relevant period. Thus, the information provided by the LCH source does not establish that LCH was experiencing a rising exposure to bad debt beginning in July 2003, but merely that the closing of the county hospital one year earlier, in the fall of 2002, "immediately" caused LCH to see an influx of indigent patients. Similarly, the information provided by the EMRC source does not establish that EMRC experienced an increase in levels of indigent patients during the relevant period, or that UHS acquired EMRC, and therefore inherited its unusually high existing levels of bad debt, during that time. Moreover, the mere fact that EMRC "internally" recorded that bad debt was "a concern" at its facility, and that UHS "focused" on the length of patient stays at EMRC in early 2003, does not establish that either EMRC, or UHS as a whole, were in fact experiencing an increase in exposure to bad debt during the relevant period. Indeed, the Amended Complaint itself broadly asserts that "former employees of various UHS hospitals .... report that issues such as length of stay and increase in the numbers of self-pay patients were either non-existent, or had been recognized and discussed well before the [relevant period]." (Am.Cons.Compl.¶ 52.) The confidential sources, therefore, fail to establish that UHS was in fact experiencing an increase in levels of bad debt during the relevant period, much less that Defendants were aware of any such increase.

The only other source the Amended Complaint relies on for the falsity of Defendant's representations are statements made by Defendants' themselves and which, according to Lead Plaintiff, amount to admissions that Defendant's earlier statements were false. FN4 In support of this argument, the Amended Complaint points to the following statements. First, in a press release issued by UHS over the PR Newswire on February 18, 2004, UHS reported that its provision for doubtful accounts for the fourth quarter of 2003 was 7.8% of net revenues, as compared to 6.9% during the prior year's fourth quarter. (Am.Cons.Compl.¶ 47.) The press release went on to state that UHS "expect[s] this trend to continue until there is a notable strengthening of the labor market." (*Id.*) Second, in a press release issued by UHS over the PR Newswire on March 1, 2004, UHS reported that its

earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the earnings per diluted share recorded in the same period in the prior year. (*Id.* ¶ 49.) UHS explained this development as follows:

> FN4. The Court notes that the Amended Complaint also alleges that general industry trends showed an increase in levels of bad debt throughout the hospital sector during the relevant period. However, Lead Plaintiff has stated that those industry trends are not relied on to establish the falsity of Defendants' statements, but rather were included merely as "a background for ... the entire situation." (03/09/05 Tr. at 29.) The Court agrees that the fact that UHS's competitors were experiencing an increase in bad debt is not relevant to a determination whether Defendants' statements that UHS's levels of bad debt during the relevant period remained comparatively stable were false.

*11 On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continues to unfavorably impact our bad debt expense.(*Id.*)

Third, the Amended Complaint cites to the transcript of a conference call between the individual Defendants and analysts held on March 1, 2004. During that conference call, Filton stated that "[b]ad debt expense remains a pressure point in our hospital!" and that "for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several quarters and for the most part, again, we see across all of our facilities." (*Id.* ¶ 51.) In response to one analyst's question concerning whether there was any catch-up charge in UHS's bad debt numbers, Filton further stated that "the fourth quarter probably contained some intra or catch-up in 2004.... Look, I am sure if we went through the detail we would find some element of catch-up in the first quarter of '04. I do not think

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



it is material." (*Id.* ¶ 53; 03/01/04 Conf. Tr., Defs.' Ex. 20.)

While Lead Plaintiff contends that these statements are admissions which demonstrate the falsity of Defendants' earlier representations, the statements in fact are entirely consistent with Defendants' prior disclosures. Indeed, the fact that pressure on bad debt had been present for several quarters in March 2004 is mirrored by UHS's steady increase in bad debt reserves during the relevant period from 6.83% of net revenues on June 30, 2003, to 8.42% of net revenues on March 31, 2004. (*See* Am. Cons.Compl. ¶ 66.) Moreover, Filton's statements that the level of bad debt reserves in the fourth quarter of 2004 probably contained an immaterial element of catch-up does not amount to an admission that the statements made by Defendants during the relevant period were false. Courts have long recognized that "fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy." *CHUBB*, 394 F.3d at 158 (internal quotations omitted). The Court, therefore, concludes that even if the information provided by the confidential sources is taken into account, the Amended Complaint fails to establish the falsity of Defendants' statements during the relevant period. Accordingly, Defendants' Motion to Dismiss Count One of the Amended Complaint is granted. FN5

> FN5. Because the Court concludes that the Amended Complaint does not plead the "true facts" with sufficient particularity under the PSLRA and does not establish that Defendants' representations during the relevant period were false, the Court does not reach the question whether the Amended Complaint properly attributes the allegedly misleading statements to the Defendants, or adequately pleads the elements of scienter, materiality, and loss causation.

### C. *Section 20(a) of the Exchange Act*

Defendants also move to dismiss Count Two of the Amended Complaint, which alleges that the individual Defendants violated Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person

liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Plaintiffs alleging a Section 20(a) violation must plead facts showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions. FN6 *La Fata v. Raytheon Co.*, 207 F.R.D. 35, 45 n. 5 (E.D.Pa.2002). The heightened pleading requirements of Rule 9(b) do not apply to Section 20(a) claims. *In re U.S. Interactive, Inc. Sec. Litig.*, Civ. A. No. 01-522, 2002 WL 1971252 , at *20 (E.D.Pa. Aug. 23, 2002) (citing *In re Tel-Save Sec. Litig.*, Civ. A. No. 98-3145, 1999 WL 999427, at *6 (E.D.Pa. Oct.19, 1999)); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, Nos. MDL-1446, Civ. A. No. H-01-3624, 2003 WL 230688, at *11 (S.D.Tex. Jan.28, 2003) (concluding that Rule 8 notice pleading standard applies to Section 20(a) claims because "the legislative history behind the controlling person provision of both the 1933 and 1934 Acts indicates that Congress sought to reach persons who tried to evade responsibility under the common law of agency by standing behind the scenes and having 'dummies' under their control commit the primary violations" and "without discovery, it would be extremely difficult to know facts where the controlling person was hiding behind the controlled person"). Here, the Amended Complaint fails to establish an underlying violation by UHS. *La Fata*, 207 F.R.D. at 45 n. 5. Accordingly, Defendants' Motion to Dismiss Count Two of the Amended Complaint is granted.

> FN6. While Lead Plaintiff will also have to prove at trial that the individual Defendants were each "culpable participants" in the underlying fraud, *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 889-90 (3d Cir.1975), "the 'overwhelming trend in this circuit' is that culpable participation does not have to be plead to survive a motion to dismiss." *Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615, 645 (D.N.J.2003) (quoting *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F.Supp. 1003, 1013 (D.N.J.1996)).

> ### D. *Leave to Amend*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248
(Cite as: Slip Copy)

Page 10

*12 Lead Plaintiff has requested that, should the Court grant any part of Defendants' Motion, the Court also grant Lead Plaintiff leave to amend the Amended Complaint. By adopting the PSLRA, Congress has evinced its intent to "provid[e] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 246 (3d Cir.2004) (quotations omitted). However, "ordinarily, leave to amend is granted when a complaint is dismissed on Rule 9(b) particularity grounds alone." *CHUBB,* 394 F.3d at 165. Here, the Amended Complaint is dismissed not only for failure to comply with the particularity requirements imposed by Rule 9(b) and the PSLRA, but also for failure to state a claim pursuant to Rule 12(b)(6). Nonetheless, the Court notes that the Amended Complaint could have been dismissed on particularity grounds alone, the Court was not previously called upon to rule on a motion to dismiss in this action, and Lead Plaintiff's investigation is ongoing. Accordingly, the Court will permit Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint which, in compliance with Rule 11(b), FN7 corrects the Amended Complaint's Rule 9(b) , PSLRA and Rule 12(b)(6) pleading deficiencies.

> FN7. Pursuant to Rule 11(b) an attorney who presents a pleading to the court certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3).

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss the Amended Complaint and permits Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint.

An appropriate Order follows.

*ORDER*

AND NOW, this 3rd day of May, 2005, upon consideration of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 29), all submissions received in response thereto, and the argument held on March 9, 2005, IT IS HEREBY ORDERED that said Motion is GRANTED and the Amended Consolidated Complaint is DISMISSED in its entirety. IT IS FURTHER ORDERED that Lead Plaintiff may move for leave to file a Second Amended Consolidated Complaint within thirty (30) days of the date of this Order.

E.D.Pa.,2005.
Freed v. Universal Health Services, Inc.
Slip Copy, 2005 WL 1030195, Fed. Sec. L. Rep. P 93,248

Briefs and Other Related Documents (Back to top)

• 2:04cv01233 (Docket) (Mar. 22, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                                        Page 1
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

C

Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L.
Rep. P 93,007
Briefs and Other Related Documents

United States District Court,S.D. New York.
Dan GAVISH, Tricia Fontan, Walter Fontan, individually
and on behalf of all others similarly situated, Plaintiffs,
v.
REVLON, INC., Rev Holdings Inc., Ronald O. Perelman,
George Fellows, and Frank J. Gehrmann, Defendants.
No. 00 Civ. 7291(SHS).

Sept. 30, 2004.

*OPINION & ORDER*

STEIN, J.

Table of Contents
I.BACKGROUND.
    A. The Parties.
    B. The Scheme to Artificially Inflate
    Revlon's Stock Price.
    C. The Fraud Allegations.
    1. Aggressively Selling Products.
    2. Offering Promotions, Discounts,
    Rebates.
    3. Shipping Products Early.
    4. Granting Rights of Return.
    5. Delaying Issuing Credits to
    Customers.
    6. Bill and Hold: Shipping Products
    After Billing.
    7. Booking Non-Existent Sales.
    D. Misleading Statements.
    1. October 2, 1998 Press Release:
    Statements 1-5.
    2. October 28, 1998 Press Release:
    Statements 6 and 7.
    3. Third-Quarter 1998 10-Q.
    4. January 11, 1999 Press Release:
    Statements 8 and 9.
    5. January 12, 1999 Statement:
    Statement 10.

    6. January 28, 1999 Press Release:
    Statements 11-13.
    7. January 1999 to March 1999:
    Statements 14 and 15.
    8. 1998 Form 10-K.
    9. April 7, 1999 Announcement.
    10. April 26, 1999 Interview with
    Fellows: Statements 16-18.
    11. April 29, 1999 Press Release:
    Statement 19.
    12. First Quarter 1999 10-Q.
    13. July 27, 1999 Press Release.
    14. Second Quarter 1999 10-Q.
    15. The October 1, 1999 Disclosu
II.DISCUSSION.
    A. Standard of Review.
    B. Section 10(b) Claims.
    1. Improper Revenue Recognition
    a. Misrepresentation and Scienter.
    b. Materiality of Alleged
    Overstatements. 3
    2. Exacerbation of the Inventory
    Problem-Channel Stuffing.
    a. Falsity. 5
    b. Scienter. 5
    3. Misrepresentations as to the
    Remaining Size of the Inventory
    Problem. 6
    C. Section 20(a) Claims.
III.CONCLUSION.

Plaintiffs have brought this class action alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the 1934") and Rule 10b-5 promulgated thereunder. Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint for failure to plead fraud with sufficient particularity as required by Fed.R.Civ.P. 9(b), for failure to comply with the pleading requirements set forth in the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (codified in various sections of 15 U.S.C.) ("PSLRA"), and for failure to state a claim upon which relief can be granted. For the reasons set forth below, defendants' motion to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

dismiss the amended complaint is granted.

## I. BACKGROUND

Plaintiffs' Amended Class Action Complaint alleges the following relevant facts, which the Court presumes to be true for the purposes of this motion.

### A. The Parties

The plaintiffs are individual investors who bring this action on their own behalf and as a class action on behalf of all persons who purchased Revlon, Inc. securities from October 2, 1998 through September 30, 1999 (the "Class Period"). FN1 In an amended complaint, they allege that they purchased Revlon stock at an artificially high price created by material misstatements and omissions in defendants' representations to the market.

> FN1. An earlier litigation asserted similar claims on behalf of a class of investors who purchased Revlon securities between October 29, 1997 and October 1, 1998. *See In re Revlon, Inc. Sec. Litig.,* No. 99 Civ. 10192, 2001 WL 293820 (S.D.N.Y. Mar. 27, 2001).

Revlon is a Delaware corporation and a leading manufacturer of cosmetic, skin care, fragrance, and personal, hair and nail care products. (Compl.¶ 15). Defendant REV Holdings, Inc., as of the date of the complaint, owned approximately 83.0% of the outstanding shares of capital stock of Revlon, representing approximately 97.4% of the voting power of those outstanding shares. (Compl.¶ 16). Plaintiffs name a variety of individual defendants who were involved with Revlon in various capacities as follows: Ronald O. Perelman indirectly owns and controls REV Holdings, Inc. and was Chairman of Revlon's Board of Directors during the Class Period (Compl.¶¶ 16-18); George Fellows was Revlon's President, Chief Executive Officer, and Director (Compl.¶ 17); and Frank J. Gehrmann was Revlon's Executive Vice President and Chief Financial Officer. (Compl.¶ 17).

### B. The Scheme to Artificially Inflate Revlon's Stock Price

Perelman acquired Revlon in 1986 through a leveraged

buy-out. (Compl.¶ 2). The buy-out saddled Revlon with substantial debt, a large portion of which was secured by twenty million Revlon shares pledged by Perelman. (Compl.¶ 2).

During the Class Period, defendants believed that Revlon's debt would have to be alleviated either through refinancing or the sale of the company. (Compl.¶¶ 2, 104). In order to refinance or sell the company on favorable terms, defendants needed to maintain for Revlon the "appearance of a healthy company." (Compl.¶ 104). According to the complaint, defendants could not honestly maintain such an appearance, however, given their knowledge and exacerbation of the "bloated retail inventory imbalances which, throughout the Class Period, kept Revlon from realizing the full amount of customer acceptance of Revlon products." (Compl.¶¶ 2, 8).

*2 In order to maintain Revlon's ability to refinance its debt, defendants allegedly tried to make Revlon appear to be in better financial health than it actually was. Specifically, plaintiffs allege that defendants fraudulently: (1) overstated Revlon's sales through accounting practices that violated generally accepted accounting principles or Revlon's own revenue recognition policy; (2) failed to disclose and falsely denied the "trend" that Revlon, in order to prop up short-term sales, was selling more merchandise to retailers than retailers were selling to consumers; and (3) hid or downplayed the extent to which Revlon's retail channels remained bloated with merchandise. Potential buyers, refinanciers, and the stock market were thereby misled by material misstatements and omissions into believing the company was much healthier than it was until Revlon revealed the true state of its finances.

The complaint alleges that on October 1, 1999 Revlon revealed the true state of its finances when it "shocked the market" by "admitt[ing]" that "it had not previously reduced the amount of its inventory of Revlon product in the channel as it had represented and had 'decided to accelerate the reduction of U.S. retailers' warehouse inventory levels." ' (Compl.¶¶ 79-80). Plaintiffs further quote Revlon's October 1 press release as "admitt[ing]" that " 'instead of the originally planned gradual reduction, the Company plans to achieve the accounts' new, lower inventory targets by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

reducing the level of shipments through year end.[']" (Compl.¶ 80). Revlon also announced an "operating loss before restructuring charges of between $70 million and $80 million for 1999 and a third quarter net loss before restructuring charges of approximately $3.10 to $3.20." (Compl.¶ 80). The complaint alleges that, as a result of this press release, Revlon stock declined "even further" to "below $12 per share." (Compl.¶ 80).

### C. The Fraud Allegations

Plaintiffs allege a series of actions taken by defendants to show that they were intentionally inflating Revlon's revenue and manipulating its accounting.

The complaint lists these specific allegations regarding Revlon's sales and accounting practices during the Class Period (Compl.¶¶ 20-32):

### 1. Aggressively Selling Products

According to the complaint, "[a] former Special Projects Manager at Revlon" reports that "during 1998 and 1999" Revlon was "forcing an excessive amount of products" on its retailers. (Compl.¶ 21(d)). Revlon maintained difficult-to-meet quarterly sales quotas that frustrated its huge sales force and upset its overstocked retail clients. (Compl.¶ 21(d), (o), (r)). In particular, "[a]t one point," a customer named Sally Beauty Supply ordered Revlon to cease product shipments because it did not have any room to store excess Revlon products. (Compl.¶ 21(c)). A former Revlon Territory Sales Manager-who believed that Revlon's quotas were "excessive and unrealistic"-reported that managers in Miami were told in 1998 and 1999 to "load" their retail customers with inventory at the end of each quarter and at year's end. (Compl.¶ 21(g)). Those customers in turn would use Revlon's desire to sell great quantities at quarter's end to negotiate better deals. (Compl.¶ 21(g), (p), (q), (r)). Plaintiffs allege that, as a result of this practice, quarters during the Class Period became "more and more back-end loaded." (Compl.¶ 21(f)).

### 2. Offering Promotions, Discounts, Rebates

*3 The complaint alleges that Revlon oversupplied its retailers by "offering promotions, special deals, rebates and marketing incentives." (Compl. ¶¶ 5, 21(o)-(r), 29, 91). In particular, plaintiffs allege that during relevant time periods, one Territorial Sales Manager stated that she "was advised to offer retail customers discounts ... to encourage large orders," something "she did not think ... was standard practice within the industry." (Compl.¶ 21(g)). Indeed, "[i]t was widely known in the industry that large retail chains, such as Rite-Aid and CVS, would receive a cash discount for agreeing to purchase large amounts of product before the end of the quarter." (Compl.¶ 21(o)). "[L]ater in 1998," the complaint alleges, retail customers "could buy one Revlon item and receive a second Revlon item free." (Compl.¶ 29).

### 3. Shipping Products Early

Revlon allegedly disregarded shipment dates requested by customers and shipped products earlier. (Compl.¶ 21(b), 22(a)). In particular, plaintiffs allege that, at some unspecified time, Safeway received "many shipments" that Safeway had either not even ordered or "requested to be shipped at a later date." (Compl.¶ 22(a)). As a result, "at a later date," Safeway posted signs at its stores stating, " 'Do not accept shipments from Revlon.' " (Compl.¶ 22(a)). Still "[l]ater in 1998," Safeway's southern California stores stopped purchasing from Revlon altogether. (Compl.¶ 22(a)). Moreover, "[i]n December 1998, Revlon shipped to the Fred Meyer Co .... orders which Fred Meyer Co. had asked to be shipped in January and February 1999." (Compl.¶ 21(b)).

### 4. Granting Rights of Return

Revlon is further said to have provided "unlimited rights of return" that would allow retail customers to keep excess product that they received at the end of quarters and return it at a later date. (Compl.¶¶ 21(h), 22(c), 89). Specifically, "[d]uring the Class Period," FN2 Revlon allegedly "rolled out [its new Ultima II line] to Longs Drugstores" with "a right to return the merchandise after one year." (Compl.¶ 21(h)). In 1999, Longs Drugstores returned "much of the Ultima II merchandise" it had purchased. (Compl.¶ 21(h)).

> FN2. Although accepted as true, this allegation, like many others in this complaint, appears to be copied directly from the complaint in the action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

brought by investors who purchased Revlon securities in the year preceding this Class Period. *See In re Revlon,* 2001 WL 293820. According to paragraph 4(d) of the complaint in that action, however, the Ultima II line was rolled out to Longs Drugstore during the first quarter of 1998, not, as the complaint in this action would have it, "[d]uring the Class Period" which begins on October 2, 1998. Other apparently copied allegations do not even bother to adjust dates to match this Class Period. (Compl.¶ 23).

### 5. Delaying Issuing Credits to Customers

Plaintiffs charge Revlon with delaying issuance of credit to customers who returned products. (Compl.¶¶ 21(i), 22(a), 24-26). In particular, "a former employee stated that credits to customers were often delayed, particularly if a merchandise return was made in October or November." (Compl.¶ 21(i)). Moreover, Revlon allegedly contracted with Genco Distribution System ("Genco"), a third-party return center located in Maryland, to process and hold returned product. (Compl.¶ 24). A Revlon employee named Stan Hirsh, who spent several days per week on site at Genco, directed Genco to hold pristine product returns for long periods of time before shipping them back to Revlon manufacturing centers for redistribution, thus delaying the issuance of credits by Revlon. (Compl.¶ 25). In October 1998, Genco received thirty pallets of Revlon merchandise from Marc Glassman, Inc., a return allegedly containing enough product to supply the needs of more stores than were in the Glassman chain. This return was held at Genco for months before it was shipped to a Revlon manufacturing center, as was a trailer load of lipstick returned from Israel in "early 1999." (Compl.¶ 26).

### 6. Bill and Hold: Shipping Products After Billing

**\*4** According to the complaint, not only did Revlon ship products early, it shipped them late, after the end of the quarter in which the sales were booked. (Compl.¶ 21(a)). This allegation is based on statements of former Revlon employees that Revlon "rented storage facilities and loaded its semi trailers with merchandise which had not been ordered by its customers" and then engaged in " 'bill and hold' practices pursuant to which customers were billed for product which had not been shipped and which remained in Revlon's control." (Compl.¶¶ 21(a), (c)).

### 7. Booking Non-Existent Sales

The complaint also claims that Revlon booked as sales shipments that no one had ordered. (Compl.¶¶ 22(a), 89). This allegedly may have occurred in recordings of sales to Safeway at some unidentified time in 1998. (Compl.¶ 22(a)).

Plaintiffs turn all of the alleged conduct, set forth above, into a mantra of fraud repeated at the end of each paragraph of the complaint which arguably contains a "statement" in an attempt to meet the PSLRA requirement that the complaint "specify ... the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The paragraph that repeats those allegations, based on the allegedly fraudulent conduct, is as follows:

> These statements were materially false and misleading, and were known by the Defendants to be materially false and misleading at the time of their publication, or were recklessly disregarded as such, because the Defendants were manipulating the Company's reported revenue, operating income, net income, and EBIDTA [earnings before interest, taxes, depreciation, and amortization], by actively stuffing the channel with inventory that customers had not ordered, recording as sales shipments to Revlon's own warehouses, delaying recording credits being issued to the customers, realizing "sales" that did not qualify as recognizable revenue, and engaging in improper bill and hold transactions.

(Compl.¶¶ 36, 39, 45, 50, 52, 54, 56, 58, 60, 65, 68, 72, 74, 77).

### D. Misleading Statements

As set forth above, in order to state a claim for violation of the securities laws based on fraudulent misstatements or omissions, plaintiffs are required to "specify each statement alleged to have been misleading." PSLRA, 15 U.S.C. § 78u-4(b)(1). Plaintiffs have provided a farrago of statements, allegedly rendered misleading in light of the defendants various fraudulent practices with respect to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

Page 5

manipulating revenue, by quoting at length from the "reported revenue, operating income, net income, and EBITDA" contained in Revlon's SEC filings during the Class Period and the commentary in those filings, company press releases, and articles from the business and popular press, occasionally using boldfaced type to emphasize those allegations. Below, the Court has summarized the statements that plaintiffs have attributed to defendants in chronological order. Where appropriate, the Court has placed the statements in their original context. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir.1996)* ; *Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir.1991).*

*5 In addition to these alleged misstatements, plaintiffs have identified one specific omission which they believe Revlon had a duty to disclose to the market: the Class Period "trend" that "sales by Revlon to its customers (into the channel) greatly exceeded sell-through (sales by its customers out of the channel)." (Compl.¶ 98(d)).

1. October 2, 1998 Press Release: Statements 1-5

The consensus analyst estimate for the third quarter of 1998 was that Revlon would have $635 million in net sales and $0.73 in earnings per diluted share. (Compl.¶ 33). On the first day of the Class Period, October 2, 1998, Revlon announced that third quarter results would fall materially short of those expectations. (Compl.¶ 3). Revlon would have only $540 million in net sales and only $0 .07 in earnings per diluted share. (Compl.¶ 3).

Fellows explained in Revlon's press release that a "number of factors" had adversely affected Revlon's domestic business:

Among them are a slowdown in the rate of growth in the mass market color cosmetics category as well as a greater than expected seasonal flattening of share caused by a shift in advertising and promotional activity and delays in some product introductions. At the same time, retailers, particularly chain drugstores, driven by recent consolidation, are pursuing efficiencies by reducing inventory levels.

The other factors mentioned by Fellows were "the aggregate

effect of the weak international economic environment" and "weakness in foreign currencies." (Glekel Decl. Ex. A).

The company announced a $50 million restructuring to include "the closing of three international plants, a reorganization of the Company's workforce principally outside of the U.S., and other actions designed to reduce costs." Fellows estimated that the restructuring would "result in annual benefits in the range of $25 to $30 million." (Glekel Decl. Ex. A).

Fellows, while acknowledging that "the anticipated results for the second half of the year are very disappointing," nevertheless maintained that "the longer-term outlook for our Company continues to be extremely positive, despite significant challenges in the marketplace" ("Statement 1"). He asserted that "[t]he business fundamentals of our Company are strong" ("Statement 2") and noted, in that respect, the strength of the company's Revlon and Almay brands, that the company's "program to broaden distribution of our Ultima II line is showing significant strength" ("Statement 3"), and that Revlon "expect[s] that as retail inventories are stabilized, our growth will again outpace category growth" ("Statement 4"). Fellows concluded by reaffirming Revlon's business strategy: "[d]espite the challenges we now face," he was quoted, "we are confident that our long-term outlook remains positive and we intend to pursue the fundamental business strategy that fueled our success to date" ("Statement 5"). (Compl. ¶ 3; Glekel Decl. Ex. A).

*6 The October 2 press release labeled some statements therein as "forward-looking statements" made pursuant to the safe harbor provisions of the PSLRA, including "the Company's expectation that once retailer efficiencies have been achieved, growth will outpace category growth." Revlon also noted several factors that "could cause actual results to differ materially from those expressed in the forward-looking statements," including "less than expected growth after retailer efficiencies have been realized." (Glekel Decl. Ex. A).

2. October 28, 1998 Press Release: Statements 6 and 7

On October 28, 1998, another Revlon press release

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

confirmed third quarter results in line with the October 2 estimates. (Compl.¶ 38). "Net sales," Revlon reported, "were $548.6 million for the third quarter of 1998, compared to $581.0 million for the third quarter of 1997," a decline of 3.5% on a constant U.S. dollar basis. (Glekel Decl. Ex. B).

Fellows reiterated that Revlon's "business fundamentals are strong and our outlook for the future continues to be positive" ("Statement 6"). He said, again, that Revlon would address the challenges it faced-including the "slowdown," the "seasonal flattening," "delays in some product introductions," and retailers' reductions of inventory levels-"by pursuing the same business strategy that fueled our success for the prior 19 quarters and through restructuring efforts we have already announced ..." ("Statement 7"). The release also warned that Revlon "expects retail inventory balancing and reductions to affect sales in the fourth quarter and in 1999." (Compl. ¶ 38; Glekel Decl. Ex. B).

The October 28 release identified "the effect on sales of retail inventory balancing and reductions" as a "forward-looking statement" made pursuant to the safe harbor provisions of the PSLRA. Revlon warned that "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions" might "cause actual results to differ materially from those expressed" in the statement. (Glekel Decl. Ex. B).

### 3. Third-Quarter 1998 10-Q

Revlon filed its third quarter Form 10-Q on November 17, 1998. The filing repeated the figures for net sales, EBIDTA, operating income, and net income quoted in Revlon's October 28 press release. It identified "the affect on sales of retail inventory balancing and reductions" as a forward-looking statement whose predictive value could be undermined by, among other things, "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. C at 18).

4. January 11, 1999 Press Release: Statements 8 and 9

On January 11, 1999, Revlon announced that it was "expanding its restructuring program, originally announced in October, to further increase efficiencies and enhance the Company's competitive positioning." (Glekel Decl. Ex. D). The "[a]dditional restructuring" announced that day "include[d] manufacturing reconfigurations, personnel realignments and reductions, the disposition of resultant excess real estate, realignment and consolidation of regional activities and other cost saving measures." (Compl.¶ 48).

*7 Fellows commented that Revlon was taking "major steps to re-engineer" Revlon: "By realigning our resources to more closely match the changing needs of our customers, we are building our business for the future" ("Statement 8"). (Compl.¶ 48). Fellows blamed "a number of factors" for 1998 results, "including weaknesses in the international economic environment and continued domestic inventory consolidations." (Compl.¶ 48). Noting that "[w]e expect results in the first half of 1999 to continue to be affected by inventory reductions and uncertainty in the international economic environment," he also expressed confidence "that 1999 will show improved growth after customer inventories are reduced to targeted levels during the first half" ("Statement 9"). (Compl.¶ 48). The January 11 release tagged the statement about expected 1999 results as forward-looking and cautioned that "delays in achieving or lower than expected growth after customer inventories are reduced to target levels" could upset that expectation. (Glekel Decl. Ex. D).

### 5. January 12, 1999 Statement: Statement 10

On January 12, 1999, an article in *Capital Cities Media, Inc.* quoted Fellows. (Compl.¶ 51). According to the article, Fellows "said that during the course of mapping out last fall's retrenchment [of Revlon], 'opportunities presented themselves to make some additional savings and allow us to realign our supply chain to more closely relate to our customers. Not only can we save money but service our customers better' " ("Statement 10"). (Compl.¶ 51).

### 6. January 28, 1999 Press Release: Statements 11-13

On January 28, 1999, Revlon announced full-year and fourth quarter results for 1998. (Compl.¶ 53). The company

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                           Page 7
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

reported net sales in the fourth quarter of $630.5 million, "a decrease of 1.5% compared with the fourth quarter of 1997 on a reported basis or a decrease of 0.4% on a constant U.S. dollar basis." (Compl.¶ 53). Full-year 1998 sales were reported to have "increased 0.6% to $2.25 billion on a reported basis, or 2.7% on a constant U.S. dollar basis ." (Glekel Decl. Ex. E at 5).

The January 28 announcement also confirmed that "Revlon continues to implement its previously announced restructuring program" which, it said, "is expected to provide estimated annualized savings in the range of $30 million to $40 million." It stated that Revlon "is realigning the ways it does business to better serve its customers" ("Statement 11") by, "among other items," developing a "new strategic plan to maximize the potential of the Revlon brand equity, build the Company's portfolio of brands, and expand its relationships with key retailers." Fellows, citing increased market share and the success of the Revlon, Almay, and Ultima II brands, was quoted as assuring the market that "Revlon's fundamentals remain strong" ("Statement 12"). Finally, Fellows expressed "confiden[ce] that our recently announced restructuring program will better align our business processes with a dynamic market" ("Statement 13"). (Compl.¶ 53).

### 7. January 1999 to March 1999: Statements 14 and 15

**\*8** On January 29, 1999, *Capital Cities Media, Inc.* reported that Revlon's fourth quarter 1998 earnings per share were ahead of Wall Street's average estimate. (Compl.¶ 55). The complaint alleges that Fellows was quoted in the article as follows: " ' The second half of 1998 was an aberration .... with [sic] this restructuring, we've been bettering the processes of the company. If you plan it properly, it tends to fall into place, [sic] At the end of the day, you end up with a better operation....' " ("Statement 14"). (Compl.¶ 55). In addition, the March edition of *Soap, Perfumery & Cosmetics* reported that Fellows had "attributed some of Revlon's problems to a slowing of sales, citing numbers from October that revealed industry growth had slowed from double digits to 8%" ("Statement 15"). (Compl.¶ 57).

### 8. 1998 Form 10-K

On March 3, 1999, Revlon filed its 1998 Form 10-K, in which it repeated the figures for net sales, EBITDA, operating income, and net income that it had set forth in its January 28, 1999 press release. (Compl.¶ 59). Under the heading "Net Sales," Revlon warned that it "expects retail inventory balancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. F. at 16). Revlon identified any statement as to the "effect on sales of retail inventory balancing and reductions" as a forward-looking statement whose accuracy could be undercut by "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. F. at 25-26).

### 9. April 7, 1999 Announcement

On April 7, 1999, Revlon announced that it would undertake "a review of strategic alternatives available to it to maximize shareholder value." One alternative it said it would look into was the sale of one or more businesses of the company. Revlon anticipated using the proceeds of such a sale to pay down indebtedness. (Compl.¶ 61).

### 10. April 26, 1999 Interview with Fellows: Statements 16-18

*Chain Drug Review* interviewed Fellows on April 26, 1999. Fellows reportedly said that "Revlon is going to continue to drive category growth, and we believe it's going to continue to gain share as it has for so long" ("Statement 16"). He also allegedly maintained that "[t]he Company is well on the way to overcoming the inventory problems-many of which were beyond our control-that set us back last year, leaving us to pursue chain drug, discount and supermarket sales with our proven formula for success" ("Statement 17"). Fellows did not think that the sale of one or more parts of Revlon's business was "imperative" for Revlon to "convince Wall Street to get the valuation of the company back where it belongs" ("Statement 18"). (Compl.¶ 64).

### 11. April 29, 1999 Press Release: Statement 19

On April 29, 1999, Revlon released its financial results for the first quarter of 1999. (Compl.¶ 66). "In the first quarter," the company reported, "net sales were $441.1 million, a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 8
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

decrease of 11.4% compared with the first quarter of 1998 on a reported basis or a decrease of 8.8% on a constant U.S. dollar basis." (Compl.¶ 66). Fellows explained that, "[a]s expected, our sales were adversely impacted by continuing reductions of retailer inventories, as well as slower than anticipated category growth through most of the quarter." (Glekel Decl. Ex. G). The press release also contained the following paragraph ("Statement 19"):

> *9 "Our fundamentals are strong: Revlon is one of the world's best known brand names in cosmetics. It stands for high-quality, innovative products and marketing expertise that has helped to create one of the strongest cosmetics franchises in the world," said Fellows. "These fundamental strengths will continue to fuel growth for Revlon."

(Compl.¶ 66). The release identified "the Company's expectations that its fundamental strength will continue to fuel growth" as a forward-looking statement subject to "difficulties or delays in realizing future growth from the Company's fundamental strengths." (Glekel Decl. Ex. G).

### 12. First Quarter 1999 10-Q

On May 17, 1999, Revlon filed its Form 10-Q for the first quarter of 1999, which repeated the figures for net sales, EBIDTA, operating income, and net income announced in its April 29 press release. (Compl.¶ 67). Revlon warned that it "expect[ed] retail inventory rebalancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. H at 9). It also identified "the effect on sales of retail inventory balancing and reductions" as a forward-looking statement subject to "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions." (Glekel Decl. Ex. H. at 14-15).

### 13. July 27, 1999 Press Release

Revlon announced its results for the second quarter of 1999 on July 27, 1999. (Compl.¶ 71). "Net sales in the second quarter," according to the company, "were $553.4 million, a decrease of 3.8% compared with the second quarter of 1998 on a reported basis or a decrease of 1.2% on a constant U.S. dollar basis." (Compl.¶ 71). Revlon warned that slow category growth and lowered inventory targets established by the trade in the United States "will extend the time

needed to absorb the effects of inventory rebalancing." (Glekel Decl. Ex. I). The company also identified its "assessment of retailers' inventory targets and the time needed to reverse the effects of inventory rebalancing and the Company's anticipation of a stronger second half of 1999" as forward-looking statements subject to several contingencies. (Glekel Decl. Ex. I).

In the same press release, Revlon stated that it was "actively engaged in ongoing discussions with potential purchasers of all or part of the Revlon business." (Compl.¶ 71).

### 14. Second Quarter 1999 10-Q

Revlon recapitulated its second quarter results on August 16, 1999, when it filed its second quarter Form 10-Q:

> Net sales [in millions] were $553.4 and $575.3 for the second quarters of 1999 and 1998, respectively, a decrease of $21.9, or 3.8% on a reported basis (a decrease of 1.2% on a constant U.S. dollar basis), and were $994.5 and $1,073.1 for the first half of 1999 and 1998, respectively, a decrease of $78.6, or 7.3% on a reported basis (a decrease of 4.7% on a constant U.S. dollar basis).

(Compl.¶ 76). Revlon explained that, in the United States, "[n]et sales for the second quarter and first half of 1999 were adversely affected by continuing adjustments in inventory levels by retailers, slower than anticipated category growth and competitive activities." (Glekel Decl. Ex. J at 9). The company warned that it "expects retail inventory balancing and reductions to continue to affect sales in 1999." (Glekel Decl. Ex. J at 9).

### 15. The October 1, 1999 Disclosure

*10 On October 1, 1999, Revlon allegedly "shocked the market" by issuing a press release which announced (1) that Revlon had "determined not to sell its remaining cosmetics, personal care, fragrances and skin treatment businesses," (2) that Revlon did intend to pursue the sale of its worldwide Professional Products business and its non-core Latin American brands, and (3) the following, which concerns retailer inventory imbalances:

> [W]orking with its customers, the Company has decided to accelerate the reduction of U.S. retailers' warehouse inventory levels. Instead of the originally planned gradual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

reduction, the Company plans to achieve the accounts' new, lower, inventory targets by reducing the level of shipments through year end. During this process, the Company intends to maintain its previously announced step up in second half spending, designed to drive consumer purchasing and facilitate the inventory reduction process.

George Fellows, President and CEO, said, "For the past year, the issue of retail inventory imbalances has kept the Company from realizing the full benefit of the continuing consumer acceptance of Revlon products. In order to allow the efficient introduction of new products into the marketplace, we decided to work with our retail partners to put this issue behind us now by foregoing planned sales of both new and established products amounting to approximately $280 million for the third and fourth quarters of 1999 to reduce inventories in accordance with our accounts' months' supply target levels."

These actions adversely affected third quarter results and will also adversely impact the fourth quarter. Because of this, combined with lower than expected volume and worsening economic conditions in key international markets, the Company said it now expects a 1999 full year operating loss before restructuring charges of between $70 million and $80 million versus earlier forecasts. The Company now expects a third quarter 1999 net loss before restructuring charges of approximately $3.10 to $3.20 per diluted share, net sales of approximately $435 to $450 million, and operating loss before restructuring charges of approximately $120 to $125 million. As a result, the Company will not be in compliance with certain of the financial covenants under its existing Credit Agreement. The Company has begun discussions with its bank lenders and is confident of amending the Agreement on satisfactory terms....
(Compl.¶ 79).

## II. DISCUSSION

### A. Standard of Review

In most civil cases, a complaint will survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted unless, after accepting all of the well-pleaded facts as true and drawing all reasonable

inferences in favor of the plaintiffs, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). "However, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss." *Citibank, N.A. v. Itochu Intern, Inc,* 2003 WL 1797847, *1 (S.D.N.Y.,2003) (citing *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996)).

*11 In deciding a motion to dismiss, the Court may deem a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (internal citations omitted).

### B. Section 10(b) Claims

To state a claim for relief pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000) ; accord *Suez Equity Investors, L.P. v. Toronto Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001). Moreover, a plaintiff alleging securities fraud in violation of those provisions must satisfy the heightened pleading requirements of the PSLRA and Fed.R.Civ.P. 9(b). *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.2001). Rule 9(b) provides that in all averments of fraud "the circumstances constituting fraud ... shall be stated with particularity." This means that a securities fraud complaint "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (internal citations omitted). Moreover, read together, Rule 9(b) and the PSLRA mandate that "plaintiffs must allege ... fraudulent acts and scienter ...

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

with particularity." *Elliott Assocs. L.P. v. Hayes*, 141 F.Supp.2d 344, 353 (S.D.N.Y.2000); *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir.2004) ; *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 556-557 (S.D.N.Y.2004).

The PSLRA "does not require that plaintiffs plead every single fact upon which their beliefs concerning false or misleading statements are based." *Novak*, 216 F.3d at 313. However, it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n.1; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir.2001) (plaintiffs must "plead with particularity sufficient facts to justify [their] beliefs"); *see also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354-59 (5th Cir.2002) ; *Rothman v. Gregor*, 220 F.3d 81, 89-92 (2d Cir.2000).

Plaintiffs must also comply with the pleading requirements of Rule 9(b) and the PSLRA when alleging that defendants acted with scienter, or fraudulent intent, in order to show "why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d at 306. Plaintiffs can establish the requisite "strong inference of fraudulent intent" either (a) by demonstrating "that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir.2001) (quoting *Novak*, 216 F.3d at 307, and *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995), respectively) (quotation marks omitted).

*12 In this case, the Court construes the complaint to allege that Revlon misled the market in three ways: (1) by inflating Revlon's reported sales and revenue through various improper accounting techniques; (2) by failing to disclose that Revlon's improper short-term revenue inflation practices and channel stuffing were causing retailers' inventory imbalances to grow and would, in the longer run, force the company to forego significant sales; and (3) by using optimistic public statements to mask the retailer inventory problem.

Defendants agree with plaintiffs that there was an inventory problem during the Class Period; indeed, defendants are

eager to point out that they repeatedly warned the market that the inventory problem might continue to affect sales. Therefore, defendants deny that they made material false statements. Specifically, defendants argue that the complaint fails to state with sufficient particularity facts that support a reasonable belief that Revlon (1) overstated sales by engaging in improper accounting and (2) exacerbated the inventory problem through its short-term revenue inflation practices. With respect to the inventory problem itself, the defendants contend (3) that, as a matter of law, their public statements were simply too immaterial to have misled the market.

### 1. Improper Revenue Recognition

The improper accounting allegations relate to the sales figures (and reported revenue, operating income, net income, and EBITDA) that Revlon reported in its press releases and SEC filings. The complaint claims that Revlon overstated its sales during the Class Period by engaging in practices that breached Generally Accepted Accounting Principles ("GAAP") or its own stated revenue recognition policy. Because plaintiffs make this allegation on information and belief, the PSLRA requires them to state facts with a degree of particularity sufficient to support a reasonable belief that Revlon was in fact overstating sales through improper accounting. *Rombach v. Chang* 355 F.3d 164, 170 (2d Cir.2004) (Thus, plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.") (quoting 15 U.S.C. § 78u-4(b)(1)) (quotation marks omitted). In addition, they must state with sufficient particularity facts constituting strong circumstantial evidence that defendants were overstating sales with scienter. *See Rothman*, 220 F.3d at 90-91 (citing 15 U.S.C. § 78u-4(b)(2)). Because defendants are unlikely to have overstated sales in the manner alleged without being aware of it, the misrepresentation and scienter inquiries are essentially combined. *See id.* at 90.

The *Rothman* case provides some guidance as to the degree of particularity required to support a reasonable belief that a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

defendant has engaged in misleading accounting. In *Rothman,* the defendant corporation, GT Interactive Software Corp. ("GT"), underwrote the software development costs of small independent software developers by advancing them the royalty payments they expected to earn on future sales of software. *See id.* at 84-85. The plaintiffs alleged that GT misleadingly inflated its earnings by not expensing advances for particular software titles even after concluding that royalty advances for those titles were unlikely to be recouped by future sales. *See id.* at 89. With respect to the PSLRA's particularity requirements, the court held that GT's public financial statements-which themselves indicated that GT's total capitalized royalty advances increased by the same amount as its new royalty advances-sufficiently supported the inference that GT was not expensing *any* royalty advances at all. *See id.* Moreover, the court held that three other allegations were sufficiently particularized to support the inference that GT was at least reckless to the fact that royalty advances were not likely to be recouped through sales: (1) poor sales of most of GT's software, in comparison with the amount of royalties advanced (as demonstrated by domestic sales figures from a market research firm and the names and sales figures for several front-line software titles); (2) GT's efforts to collect royalty advances from the software developers (as demonstrated by four lawsuits in which GT sought to recover almost forty-four percent of the royalty advances it had capitalized); and (3) GT's sudden decision at the end of the class period to expense over eighty-four percent of the royalty advances it had previously capitalized. *See id.* at 90-92.

*13 In other words, plaintiffs must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase. *See e.g. In re AOL Time Warner, Inc. Sec. and "Erisa" Litig.,* 2004 WL 992991, *12 (S.D.N.Y. May 5, 2004)* (Allegations sufficiently particular to survive a motion to dismiss where "the Amended Complaint contains the date of the transaction at issue, the amount of the allegedly overstated revenue, preliminary details of the accounting for the transaction, and a basis for believing the accounting may

have been fraudulent.").

a. Misrepresentation and Scienter

Here, plaintiffs ground their allegations that defendants made material misrepresentations on claims that defendants took certain actions to inflate sales and reported revenue. Thus, plaintiffs conclude that because Revlon intentionally inflated sales figures, defendants knew that their statements about sales, based on the inflated figures, were false.

Plaintiffs are attempting to meet the scienter requirement by pleading circumstantial evidence of defendants' knowledge that the information in its misstatements was false. "To meet this strong circumstantial evidence standard, plaintiffs must 'specifically alleg[e] defendants' knowledge of the facts or access to information contradicting their public statements." *In re Bristol-Myers Squibb Securities Litigation,* 312 F.Supp.2d 549, 562 (S.D.N.Y.2004) (quoting *Faulkner v. Verizon Communications, Inc.,* 189 F.Supp.2d 161, 172 (S.D.N.Y.2002)) (alteration in original).

The allegation that Revlon overstated sales through improper accounting is supported through the juxtaposition of two "facts" which they allege on information and belief: first, as demonstrated by certain transactions identified in the complaint, the fact that Revlon engaged in a series of sales practices that are susceptible to misleading accounting, and, second, as demonstrated by Revlon's October 1, 1999 announcement, the fact that Revlon was forced to forego $280 million in sales at the end of the Class Period. Plaintiffs vaguely suggest that the ultimate sales shortfall, when considered in light of the sort of sales transactions in which Revlon was engaging, indicates that Revlon must have been engaging in the improper accounting. There is no question that the existence of the sales drop-off can reasonably be inferred from the October 1, 1999 announcement. Even so, the accounting abuses, and the manner in which they contributed to the sales drop-off, are not alleged with a degree of detail sufficient to support a reasonable belief that Revlon actually engaged in them during the Class Period. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 203 (1st Cir.1999); *cf. Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 80-81 (1st Cir.2002).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

The first allegedly fraudulent practice mentioned in the complaint is the shipping and booking of unordered sales. Plaintiffs support the allegation that Revlon engaged in this practice only with the statement that Revlon's customer Safeway, at some unspecified time in 1998 (but apparently prior to "later in 1998"), "received many shipments which had not been ordered or which had been requested to be shipped at a later date." (Compl.¶¶ 21(a), 22(a), 89). This allegation is deficient for at least two reasons. First, the complaint's use of the disjunctive "or" greatly diminishes its probative value, as shipping a shipment early is entirely different than shipping an unordered shipment. Second, although plaintiffs are not necessarily required to reveal the identity of the personal sources of their factual allegations, *see Novak, 216 F.3d at 312-13; In re Philip Services Corp. Securities Litigation,* No. 98 CIV. 0835, 2004 WL 1152501, at *12-13 (S.D.N.Y. May 24, 2004), the factual allegations must themselves, in their particularity, "provide an adequate basis for believing that the defendants' statements were false," *Novak, 216 F.3d at 314.* This allegation, supported only by the one detail as to the identity of the customer, also fails to provide an adequate basis for believing that Revlon acted knowingly in such a way as to enable it to materially overstate its sales by recognizing sales that had never even occurred.

*14 A second practice that plaintiffs believe circumvented GAAP or Revlon's stated revenue recognition policy is the practice of billing customers for product and then holding the product in Revlon warehouses for a period of time before shipping it (the "bill and hold" allegation). Plaintiffs suspect that this occurred based on the following information: "[f]ormer Revlon employees have stated that," at some unspecified date, "Revlon engaged in 'bill and hold' practices pursuant to which customers were billed for product which had not been shipped and which remained in Revlon's control." (Compl.¶¶ 21(c), 21(a)). However, affixing the phrase "former employees have stated" to this otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA. In order for plaintiffs to rely upon confidential sources to meet the pleading requirements of the PSLRA, those sources must be "described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information alleged." *Novak, 216 F.3d at 314; In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 493 (S.D.N.Y. July 7, 2004). This case is unlike *In re Initial Public Offering Sec. Litig.,* 220 F.R.D. 30, 32 n.4 (S.D.N.Y. Oct. 30, 2003) where plaintiffs were permitted to rely on confidential sources, but the allegations were also supported by overwhelming corroboration in statements alleged by plaintiffs. Here, the absence of any particulars "is indicative of ... excessive generality." *Greebel,* 194 F.3d at 204.

A third practice alleged in the complaint that gave Revlon the ability to engage in accounting abuse is that Revlon allowed customers the right to return excess product. For example, Revlon allegedly "rolled out [its new Ultima II line] to Longs Drugstores" with "a right to return the merchandise after one year," a right which Longs exercised in 1999 for "much" of the Ultima II merchandise it had purchased. (Compl.¶ 21(h), 22(c)). Granting a right of return, however, is not fraudulent unless the seller fails to disclose the practice or, if it is disclosed, fails to maintain adequate reserves for expected returns in accordance with GAAP or the company's stated revenue recognition policy. *See Greebel,* 194 F.3d at 205. Plaintiffs' allegations that Revlon's returns contractor, Genco, received "extremely high levels of returns" in "late 1998 and 1999," including a large return from Marc Glassman, Inc. in October 1998, (Compl.¶¶ 24-26), do not raise a sufficient inference that Revlon's overall reserves for returns were recklessly inadequate. Nor does the complaint contain an allegation that Revlon acted to inflate its revenues knowingly or intentionally when establishing the return policy.

Finally, plaintiffs allege that, after receiving returns, Revlon would delay issuing credits to the retailers. A source states that an identified Revlon employee instructed Genco to hold large shipments of returned products (specifically, returns from Marc Glassman, Inc. in October 1998 and from Israel in "early 1999") for long periods of time before shipping them back to Revlon manufacturing centers for redistribution. (Compl.¶¶ 24-26). Plaintiffs suspect that this delay in issuing credits-which in and of itself would not constitute a fraud on the market-was accompanied by a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

corresponding delay in recognizing the accrual of returns because "[a] former employee" stated that "her supervisor specifically advised the sales employees to stop writing credits [for returns] between October and December" of an unidentified year. (Compl.¶ 21(i)). Plaintiffs also fail to meet the pleading requirements of the PSLRA because this source is not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak, 216 F.3d at 314.*

**\*15** If the foregoing series of improper accounting allegations were accompanied by other, more particularized and less inferentially attenuated allegations of material fraudulent conduct, they would perhaps suffice to raise a sufficient inference of wrongdoing. *See, e.g., In re Revlon, No. 99 Civ. 10192, 2001 WL 293820, at \*8 (S.D.N.Y. Mar. 27, 2001).* However, "offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness." *In re Bristol-Myers Squibb Sec. Litig., 312 F.Supp.2d 549, 566 (S.D.N.Y.2004).*

Absent more particularized allegations of knowingly fraudulent conduct, however, the particularized aspects of the complaint in this action plead little more than neutral facts which happen to be consistent with plaintiffs' theory of how Revlon fraudulently overstated its sales, and "a general allegation that the practices at issue resulted in a false report of company [sales] is not a sufficiently particular claim of misrepresentation." *Greebel, 194 F.3d at 203* (quoting *Gross v. Summa Four, Inc., 93 F.3d 987, 996 (1st Cir.1996)* (quoting *Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 n.5 (1st Cir.1994))* (internal quotation marks omitted). The plaintiffs fail to make sufficient allegations that at the time of the sales at issue the defendants knew or should have known that the revenue from those sales should have been treated differently and, thus, that the contemporaneous financials were incorrect. *See Faulkner, 189 F.Supp.2d at 172.*

b. Materiality of Alleged Overstatements

Even if the complaint's allegations did establish a sufficient inference of improper accounting, the Court agrees with defendants that plaintiffs have failed to adequately allege that the financial results reported in Revlon's public statements and SEC filings were misleading to a material degree. The test of whether a statement is materially misleading is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir.2004)* (internal citations omitted). At the pleading stage of litigation, "a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino, 228 F.3d at 161-62* (citing *Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)).* " '[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' " *Id.* at 162 (quoting *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985)); see also In re Revlon, 2001 WL 293820, at \*9.*

**\*16** Nevertheless, given the particularity requirements of securities fraud pleading, the materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture. *See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 116 (2d Cir.1982)* (citing *Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518, 522 (S.D.N.Y.1977)); see also Gross, 93 F.3d at 996; Shushany v. Allwaste, Inc., 992 F.2d 517, 522 (5th Cir.1993) ; Coates v. Heartland Wireless Communications, Inc., 55 F.Supp.2d 628, 639 (N.D.Tex.1999) ; Schick v. Ernst & Young, 141 F.R.D. 23, 27 (S.D.N.Y.1992).* In other words, although there is no "numerical benchmark" for assessing the materiality of misstatements in financial reports, *Ganino, 228 F.3d at 162-65,* defendants (and the court) are still "entitled to be appraised of the approximate amount of overstatement involved." *Jacobson, 445 F.Supp, at 522.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

The complaint here describes the financial misstatements it alleges as "material." It fails, however, to even attempt to approximate the magnitude or degree of those misstatements in relation to Revlon's total financial picture. Cf. *In re Revlon, 2001 WL 293820, at \*10*. None of the complaint's allegations of improper sales practices contain a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements. In these circumstances, plaintiffs' conclusory allegations of materiality cannot withstand a motion to dismiss. Cf. *Ganino, 228 F.3d at 166; Novak, 216 F.3d at 303-04; Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir.1994); In re Revlon, 2001 WL 293820, at \*10*.

Plaintiffs point to the section of the complaint which generally pleads GAAP violations, (Compl.¶¶ 85-96), and argue that it entitles them to a presumption that the alleged overstatements of sales were material "even in the absence of any quantification." (Pls.' Opp. at 7 (citing 17 C.F.R. § 210.4-01(a)(1))). The complaint's general GAAP allegations, however, are no more particular with respect to the materiality of Revlon's alleged accounting shenanigans than the rest of the complaint, and plaintiffs therefore still face a materiality problem. See SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150, 45151 (1999) (citing FASB Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, 132 (1980)). Indeed, "[m]inor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law." *In re Segue Software, Inc. Sec. Litig., 106 F.Supp.2d 161, 170 (D.Mass.2000)* (citing *Greebel, 194 F.3d at 206); see also Recupito v. Prudential Sec., Inc., 112 F.Supp.2d 449, 459 (D.Md.2000)* ("[T]here is a distinction between misleading financial statements ... and ones that are materially so").

2. Exacerbation of the Inventory Problem-Channel Stuffing

\*17 Plaintiffs allege that, in addition to dishonest revenue recognition, Revlon engaged in aggressive sales campaigns, especially at the end of quarters. That practice is said to have created a house of cards comprised of overstocked retailers and increasingly back-ended quarters. According to the amended complaint, the house of cards collapsed in the third quarter of 1999 when retailers returned merchandise

and refused to make new orders, thereby forcing Revlon to forego material amounts of sales. Plaintiffs allege that Revlon misled the stock market with respect to this situation by breaching its regulatory duty to disclose a "known trend" that was reasonably expected to have a material unfavorable impact on net sales-specifically, that, during the Class Period, "sales by Revlon to its customers (into the channel) greatly exceeded sell-through (sales by its customers out of the channel)." (Compl.¶ 98(d)). See 17 C.F.R. § 229.30; *Scholastic, 252 F.3d at 70; In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 590-91 (D.N.J.2001)*. In addition, plaintiffs allege that Revlon falsely assured the market through its public statements that it was working down the inventory problem when in fact it was exacerbating it through its continued efforts to stuff inventory into the channel. (Compl.¶¶ 49, 59). For instance, when Fellows expressed confidence on January 11, 1999, that "1999 will show improved growth after customer inventories are reduced to targeted levels during the first half," (Compl.¶ 48), he implied that Revlon was in the process of decreasing the excess inventory in the channel. However, plaintiffs have not set forth with particularity sufficient facts to support this allegation.

a. Falsity

Plaintiffs make their allegation of an undisclosed channel stuffing trend on information and belief. They must therefore state with particularity facts sufficient to support a reasonable belief that the trend existed. See *Novak, 216 F.3d at 314 n.1; see also Scholastic, 252 F.3d at 70-74*. To be clear, the ultimate "falsity" question here is not whether plaintiffs have raised a sufficient inference that Revlon aggressively pursued end-of-quarter sales during the Class Period. As the U.S. Court of Appeals for the First Circuit has noted, "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course...." *Greebel, 194 F.3d at 202*. Nor is the question whether "more inventory was in the hands of retailers than commercially warranted." *Aldridge, 284 F.3d at 81*. Revlon repeatedly warned the market that there was. Cf. *Scholastic, 252 F.3d at 76-77*. Rather, the question is whether the information stated in the complaint is sufficiently particularized to support a reasonable belief that, during the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                     Page 15
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

Class Period, Revlon was exacerbating this inventory imbalance by selling more inventory to retailers than retailers were selling to consumers and then making misstatements or failing to disclose information about that practice.

**\*18** The decision of the U.S. Court of Appeals for the Second Circuit in *Scholastic* provides some guidance as to the sort of information that can reasonably support a belief in the existence of a particular sales trend. *See* 252 F.3d at 70-74. In that case, the plaintiffs alleged that the defendant, Scholastic, recklessly failed to disclose that sales of its "Goosebumps" books to distributors and consumers were declining and that, as a result, returns were increasing. *See id.* The court held that the trend was adequately alleged because information in the complaint-which "cover[ed] over two-thirds of Scholastic's trade business in Goosebumps"-"specifically set[ ] out the distributors through which Goosebumps books were sold, and allege[d] declines in sales as of specific dates, some in terms of percentage and others in terms of quantity." *Id.* at 70-71.

In evaluating whether the complaint adequately alleges that total sales into Revlon's channel exceeded total sell-through from October 1998, the fact that retailers found themselves carrying substantially more inventory than was commercially necessary has some probative value. *See Novak*, 216 F.3d at 312-13. The complaint, however, fails to grapple with Revlon's aggregate reported quarterly sales or any measure of sell-through. *See In re Trex Co. Sec. Litig.*, 212 F.Supp.2d 596, 610 & n.12 (W.D.Va.2002). Moreover, the following allegations, on their own, tend to be either unspecific, innocuous, or both: that (1) some Revlon sales managers faced great pressure to make sales (Compl.¶ 21); (2) some Revlon sales managers were told to offer promotions, special deals, rebates, return rights and large discounts to retailers to induce large orders (Compl.¶¶ 5, 21(o)-(r), 29, 91); (3) at some unspecified time (but prior to "later in 1998") Revlon shipped "many shipments" to Safeway that Safeway had not ordered "or" had "requested to be shipped at a later date" (Compl.¶ 22(a)); (4) in December 1998 Revlon shipped to Fred Meyer Co. "orders" which Fred Meyer had requested be shipped in early 1999 (Compl.¶ 21(b)); (5) Genco received "extremely high levels

of returns" in "late 1998 and 1999," specifically 30 pallets from Marc Glassman in October 1998 and a trailer load of lipstick from Israel in "early 1999" (Compl.¶ 26); and (6) "in 1999" Longs Drugstores returned "much of the Ultima II merchandise" it had purchased earlier "[d]uring the Class Period" (Compl.¶ 21(h)).

### b. Scienter

Assuming without deciding that the facts stated in the complaint provide a sufficient basis to suspect the existence of the trend of growing inventories, the complaint would still have to state with particularity facts giving rise to a strong inference of defendants' scienter, i.e., that defendants were at least reckless to the fact that Revlon's future sales were being sacrificed for short-term sales.

"Strong inference that the defendant acted with the required state of mind," required by the PSLRA to state a securities fraud claim, may arise when the complaint sufficiently alleges that the defendants: "(1) benefited in concrete and personal way from purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2000) (internal citations omitted).

**\*19** In *Scholastic*, for example, the court concluded that a publisher's scienter as to sell-through to consumers was adequately alleged where there were "detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade," including the defendants' electronic access to retailers' point-of-sale data. *Scholastic*, 252 F.3d at 76; *see also In re Trex Co.*, 212 F.Supp.2d at 60.

Here, the aggressive sales practices attributed to Revlon do not by themselves raise a strong inference of scienter as to the existence of the alleged channel stuffing trend. Simply put, "there may [have been] any number of legitimate reasons for attempting to achieve sales earlier," none of which would have necessarily entailed knowledge of the trend. *Greebel*, 194 F.3d at 203. Moreover, the complaint's allegations provide no reason to believe that the aggressive sales campaigns-as opposed to some other factor out of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

defendants' control which they were less likely to have been aware of, such as retailer consolidation or elimination of already-existing overstock, demand, or competition-constituted the factor that rendered channel inflow greater than channel outflow during the Class Period. These allegations are very similar to the claims in *In re Bristol-Myers Squibb Securities Litigation,* 312 F.Supp.2d 549, 568 (S.D.N.Y.2004), in which the court held, on the basis of similar facts that: "where it is alleged that (i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real customers who paid real money, there is no strong inference that Defendants knew or should have known that the sales should have been accounted for in some way other than the Company's historical revenue recognition upon shipment model, and, therefore, conscious misbehavior or recklessness cannot be inferred." *See Kalnit,* 264 F.3d at 142-43 (discussing *Novak,* 216 F.3d at 304, and *Rothman v. Gregor,* 220 F.3d 81, 90-91 (2d Cir.2000)). Finally, the complaint's totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the channel, (Compl.¶ 7), are insufficiently particularized to support a strong inference of defendants' scienter. *See e.g., Johnson v. Tellabs, Inc.,* 303 F.Supp.2d 941, 966 (N.D.Ill.2004) (collecting cases where allegations of channel stuffing alone were held insufficient to show scienter); *In re Trex,* 212 F.Supp.2d at 608; *cf. Scholastic,* 252 F.3d at 76; *Rombach v. Chang,* 355 F.3d at 176 ("[A] 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.' " (internal citations omitted)).

### 3. Misrepresentations as to the Remaining Size of the Inventory Problem

**\*20** Plaintiffs allege that the optimistic statements they have culled from defendants' commentary on Revlon's condition masked (1) improper accounting, (2) the channel stuffing trend, and (3) the impact that the inventory problem would have on future sales. As established above, however, the improper accounting and channel stuffing trend have not been adequately alleged; therefore, the Court will now address only whether the statements were misleading with respect to the inventory problem. Moreover, as the existence of that problem was revealed to the market from the beginning of this Class Period, the only viable contention that plaintiffs can make is that defendants' statements lulled the market into believing that the problem was smaller than it in fact was.

As a preliminary matter, some of the more specific statements identified in the complaint are simply not actionable as currently pled. The specific facts the statements proclaim to be true are not alleged to have been false and are not inconsistent with what is alleged to have been true. *See In re Nokia Corp. Sec. Litig.,* No. 96 Civ. 3752, 1998 WL 150963, at \*9 (S.D.N.Y. April 1, 1998) ("Plaintiffs simply fail to allege how these statements are false."). In this regard, the complaint does not state a claim with respect to Statement 3 because it fails to allege the falsity of the fact asserted in that statement B that the Ultima II line was "showing significant strength." Similarly, the complaint does not allege the falsity of the fact asserted in Statement 16-that slowing industry sales growth was responsible for "some" of Revlon's inventory problems. These relatively specific statements are simply "outside the [broad] sphere of the plaintiffs' allegations of falsehood." *Harris v. Ivax Corp.,* 182 F.3d 799, 804 (11th Cir.1999).

With respect to the remaining statements, defendants argue that they are so vague or unspecific or bespoke such caution that they did not alter the "total mix" of information made available to the market, *Ganino,* 228 F.3d at 162, and therefore did not give rise to any duty to disclose the precise severity of the downturn in sales that defendants allegedly foresaw with certainty. In other words, defendants argue that the statements were immaterial as a matter of law. Similarly, defendants contend that the statements cannot serve as the basis of a Rule 10b-5 fraud claim because they are moored within the safe harbor for forward-looking statements created by the statutory breakwater of the PSLRA.

"Materiality is a mixed question of law and fact." *Ganino,* 228 F.3d at 162. "In most circumstances," therefore,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 17
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

"disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996) (citing *Basic*, 485 U.S. at 236). In fraud-on-the-market cases, however, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace-loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.; see also Novak*, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *San Leandro*, 75 F.3d at 811; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 n.3 (2d Cir.1993) ; *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir.1993) ; *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-01 (3d Cir.1990) ; *Zerman v. Ball*, 735 F.2d 15, 20-21 (2d Cir.1984) ; *In re Nokia Corp. Sec. Litig.*, 1998 WL 150963, at *6. This is because "[a]nalysts and arbitrageurs rely on facts in determining the value of a security," *Raab*, 4 F.3d at 290, and are not duped by "easily recogniz[able] ... self-directed corporate puffery," *Shaw*, 82 F.3d at 1218.

*21 "Expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d at 174. Immaterial optimistic statements are protected by the "bespeaks caution" doctrine and the PSLRA's safe harbor provision. Under the bespeaks caution doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002). The Second Circuit clarified the scope of the bespeaks caution doctrine as follows: "[w]hen cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in

context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.*

The PSLRA's "safe harbor was modeled in part after, but not meant to displace, the judicial bespeaks caution doctrine." *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *5 (S.D.N.Y. Mar. 28, 2001). As in the bespeaks caution doctrine, it may provide protection from liability based on a "forward-looking statement," 15 U.S.C. § 78u-5(c)(1) , a term defined at 15 U.S.C. § 78u-5(i)(1). Pursuant to the safe harbor, liability may not be imposed with respect to a forward-looking statement if either (1) the statement was "immaterial," 15 U.S.C. § 78u-5(c)(1)(A)(ii); (2) the statement was "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i) ; or (3) the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading, 15 U.S.C. § 78u-5(c)(1)(B). See *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 755 (S.D.N.Y.2001), *abrogated on other grounds by In re IPO*, 241 F.Supp.2d 281 (2003). The first two inlets of the safe harbor "look[ ] to the statement itself," while the third "looks to the state of mind of the person making the disclosure...." *Credit Suisse First Boston Corp.*, 2001 WL 300733, at *4; see also *Harris*, 182 F.3d at 803, 807 n.10.

The statements from the October 2, 1998 press release (Statements 1 through 5) ought to be considered together, in context. (Compl.¶ 35). Statement 3 FN3-touting the strength of the program to broaden distribution of the Ultima II line-is, as noted above, not alleged to be false at all. Statements 1, FN4 4, FN5 and 5 FN6 are forward-looking statements accompanied by language warning that Revlon's "growth will outpace category growth" only "as" or "once" "retail inventories are stabilized." As such, they bespeak caution as to the negative eventuality that allegedly came to pass and are immaterial. Statement 4, additionally, is specifically identified as a forward-looking statement and therefore certainly within the safe harbor of 15 U.S.C. §

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

78u-5(c)(1)(A)(i). Although Statements 1 and 5 are not precisely labeled as forward-looking statements, they *are* forward-looking statements, and are so vague, general, and hedged that they qualify for the PSLRA's safe harbor for "immaterial" forward-looking statements codified at 15 U.S.C. § 78u-5(c)(1)(A)(ii), *see also Colby v. Hologic, Inc.,* 817 F.Supp. 204, 211 (D.Mass.1993) , if not that codified at 15 U.S.C. § 78u-5(c)(1)(A)(i).

> FN3. Statement 3 is as follows: "Our program to broaden distribution of our Ultima II line is showing significant strength." (Compl.¶ 35).

> FN4. Statement 1 is as follows: "While the anticipated results for the second half of the year are very disappointing, the longer term outlook for our Company continues to be extremely positive, despite significant changes in the marketplace." (Compl. ¶ 35; Glekel Decl. Ex. A).

> FN5. Statement 4 is as follows: "we expect that as retail inventories are stabilized, our growth will again outpace category growth." (Compl.¶ 35).

> FN6. Statement 5 is as follows: "Despite the challenges we now face, we are confident that our long-term outlook remains positive and we intend to pursue the fundamental business strategy that fueled our success to date." (Compl. ¶ 35; Glekel Decl. Ex. A).

*22 Statement 2-"[t]he business fundamentals of our Company are strong"-is more problematic, but nevertheless immaterial. The statement contains a present tense verb, and could be read literally to state a "current fact," however vaguely and loosely. In context, however, the word "fundamentals" clearly refers to specific statements of fact that are not alleged to be false-the touting of the strength of the Revlon and Almay brands and the program to broaden distribution of the Ultima II line. Moreover, the last sentence of the paragraph in which Statement 2 appeared cautioned that Revlon's growth would exceed category growth only "as retail inventories are stabilized," and that is the very problem that plaintiffs allege Statement 2 fraudulently downplays. In these circumstances, Statement 2

is "too patently immaterial" to support these plaintiffs' particular fraud-on-the-market claim. *Shaw,* 82 F.3d at 1219.

Statements 6 FN7 and 7 FN8 from the October 28, 1998 press release fare no better. Both are forward-looking statements accompanied by language that bespeaks caution with respect to the continuing "challenge" presented by the inventory problem, to wit: "the Company expects retail inventory balancing and reductions to affect sales in the fourth quarter and in 1999" and "lower than expected sales as a result of a longer than expected duration of retail inventory balancing and reductions" is a factor "that could cause actual results to differ materially." Statement 7 is specifically identified as a forward-looking statement, and is thus protected by the PSLRA safe harbor as well. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). The forward-looking aspect of Statement 6 is so vague, general, and hedged that it too is within the safe harbor because it is immaterial. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii). To the extent that Statement 6's "business fundamentals" comment asserts a current fact, it is patently immaterial on these facts for the same reasons that Statement 2 is immaterial.

> FN7. Statement 6 is as follows: "our business fundamentals are strong and our outlook for the future continues to be positive." (Compl.¶ 38).

> FN8. Statement 7 is as follows:
> We will address the challenges we face by pursuing the same business strategy that fueled our success for the prior 19 quarters and through restructuring efforts we have already announced, including the closing of international plants, a reorganization of the Company's workforce principally outside the U.S., and other actions designed to reduce costs. The resulting efficiencies are intended to enhance the Company's competitive position and provide estimated annualized benefits in the range of $25 million to $30 million. (Compl.¶ 38).

The January 11, 1999 press release contained Statements 8 FN9 and 9. FN10 Both statements are forward-looking. Taken in context, Statement 8 is a vague prediction about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 19
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

the impact of Revlon's specific plans for restructuring, and says nothing remotely specific about the present or future of inventory imbalances. Moreover, Statement 9 itself bespeaks exactly the problem that plaintiffs allege to have been minimized-"[w]e expect results in the first half of 1999 to continue to be affected by inventory reductions." There is, in addition, language warning about "delays in achieving or lower than expected growth after customer inventories are reduced to target levels." Thus, Statements 8 and 9 are immaterial as a matter of law. In addition, they qualify for the PSLRA safe harbor. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).

> FN9. Statement 8 is as follows: "By realigning our resources to more closely match the changing needs of our customers, we are building our business for the future." (Compl.¶ 48).

> FN10. Statement 9 is as follows: "We expect results in the first half of 1999 to continue to be affected by inventory reductions and uncertainty in the international economic environment, but we are confident that 1999 will show improved growth after customer inventories are reduced to targeted levels during the first half." (Compl.¶ 48).

Statement 10-the January 12, 1999 statement by Fellows reported in *Capital Cities Media, Inc.*-is oddly phrased. Fellows reportedly stated that during the course of mapping out the previous full's retrenchment, " 'opportunities presented themselves to make some additional savings and allow us to realign our supply chain to more closely relate to our customers. Not only can we save money but service our customers better.' " (Compl.¶ 51). The complaint may simply fail to state a claim with respect to this statement, as it does not allege that opportunities did not present themselves to Revlon or that Revlon could not have realigned its supply chain, saved money, or better served its customers. Yet, even assuming that Statement 10's general optimism misleads vis-à-vis the inventory problem, it only predicts the improved health of Revlon looking forward. Given that there is no allegation that Fellows controlled the full text of this statement and that Revlon had warned investors the day before that "[w]e expect results in the first half of 1999 to continue to be affected by inventory

reductions," the Court deems Statement 10 to have bespoken caution with respect to persisting inventory imbalances. Thus, it is immaterial under the bespeaks caution doctrine and is protected by the safe harbor of the PSLRA.

*23 Revlon announced its full-year and fourth quarter results and put forth Statements 11, 12, and 13 on January 28, 1999. Statement 12 is another bromide about how "Revlon's fundamentals remain strong." As with Statements 2 and 6, the word "fundamentals" clearly refers to specific statements of fact that are not alleged to be false-an increase in market share in the U.S. mass market and the success of the Revlon, Almay and Ultima II brands. Moreover, just two weeks before, in its January 11, 1999 press release, Revlon had made clear that it expected "results in the first half of 1999 to continue to be affected by inventory reductions." In these circumstances, Statement 12 is too immaterial to support plaintiffs' claim that Revlon fooled the market with respect to the size of its inventory problem.

Statements 11 FN11 and 13 FN12 are more specific, positive comments about Revlon's "realign[ment]" and "restructuring" efforts. Assuming that the generality of these comments could somehow mislead with respect to the persistence and magnitude of the inventory problem alleged in the complaint, they are nevertheless forward looking comments. Moreover, when read in context, they quite clearly refer to specific efforts that are not alleged to have fallen short of expectations: with respect to Statement 11's "realign[ment]," the "new strategic plan to maximize the potential of the Revlon brand equity, build the Company's portfolio of brands, and expand its relationships with key retailers;" and, with respect to Statement 13's "restructuring," the aspects of the restructuring program outlined in Revlon's previous announcements. Given these references and Revlon's previous warnings about the continued impact of the inventory problem, Revlon's utterance of these forward-looking statements did not alter the total mix of information in the market so as to oblige Revlon to disclose what it allegedly knew about the continuing magnitude of that problem. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii).

> FN11. Statement 11 is as follows: "The Company

Westlaw.

Not Reported in F.Supp.2d                                                    Page 20
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
(Cite as: Not Reported in F.Supp.2d)

is realigning the way it does business to better service its customers." (Compl. ¶ 53; Glekel Decl. Ex. E).

FN12. Statement 13 is as follows: " 'We are also confident that our recently announced restructuring program will better align our business processes with a dynamic market." ' (Compl. ¶ 53; Glekel Decl. Ex. E).

Statement 14 consists, in relevant part, of Fellows's January 29, 1999 comment in *Capital Cities Media, Inc.* that "[t]he second half of 1998 was an aberration .... with [sic] this restructuring, we've been bettering the processes of the company." Fellows' belief that the second half of 1998 "was" an aberration was rendered immaterial for purposes of this complaint by Revlon's repeated warnings in its own official statements about the possible persistence of the inventory problem. Still, the second portion of Statement 14 refers to an already-accomplished "bettering [of] the processes" achieved through "this restructuring." The word "restructuring," however, logically refers to the "restructuring" that Revlon had trumpeted in its prior statements to the market, not the disappearance of the inventory problem. In these circumstances, the vague and loose assertion that "processes" had been "bettered" is "too patently immaterial" to support a claim that defendants misled the market about the extent of their inventory problem. *Shaw,* 82 F.3d at 1219.

**\*24** Statements 16 through 19 are from Fellows's April 26, 1999 interview with *Chain Drug Review* and Revlon's April 29, 1999 press release. Statements 16 FN13 and 18 FN14 are, at best, vaguely optimistic forward-looking statements. They are immaterial in light of Revlon's repeated warnings in its own official statements about the possible persistence of the inventory problem; specific warnings from Revlon at the beginning of March and the middle of May sandwiched the April 26 *Chain Drug Review* article. Statement 19-yet another "our fundamentals are strong" comment-is immaterial for the same reasons as Statements 2, 6, and 12.

FN13. Statement 16 is as follows: "Revlon is going to continue to drive category growth, and we believe it's going to continue to gain share as it has

for so long." (Compl.¶ 64).

FN14. Statement 18 concerns the report that Fellows did not think that the sale of one or more parts of Revlon's business was "imperative" for Revlon to "convince Wall Street to get the valuation of the company back where it belongs." (Compl.¶ 64).

Statement 17-Fellows's comment in *Chain Drug Review* that " '[t]he Company is well on the way to overcoming the inventory problems ... that set us back last year, leaving us to pursue chain drug, discount, and supermarket sales with our proven formula for success' '-is the most problematic statement in the complaint, as it seems to evaluate the current status of the inventory problem. *See Novak,* 216 F.3d at 315. Assuming it is the sort of statement which could be found too puffy, plaintiffs have nevertheless failed to allege with sufficient particularity either that it was false when made or that Fellows was reckless to its falsity when he made it. Indeed, "as long as [their] public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak,* 216 F.3d at 309. And if "plaintiffs contend defendants had access to contrary facts"-as plaintiffs do here-"they must specifically identify the reports or statements containing this information." *Id.* (citing *San Leandro,* 75 F.3d at 812).

## C. Section 20(a) Claims

Plaintiffs allege that defendants Perelman, Fellows, and Gehrmann are liable as "control persons" within the meaning section 20(a) of the Securities Exchange Act of 1934. These claims are dismissed because plaintiffs have failed to plead a primary violation of section 10(b). *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994).

## III. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the amended complaint is granted without prejudice.

S.D.N.Y.,2004.
Gavish v. Revlon, Inc.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 21
Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L. Rep. P 93,007
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2004 WL 2210269, Fed. Sec. L.
Rep. P 93,007

Briefs and Other Related Documents (Back to top)

• 1:00cv07291 (Docket) (Sep. 27, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.