# EXHIBIT E

**H**

Not Reported in F.Supp.2d, 2001 WL 652016, 2001-2 Trade Cases P 73,388

Briefs and Other Related Documents

United States District Court, D. Delaware.

MEDTRONIC AVE, INC., Plaintiff,

v.

BOSTON SCIENTIFIC CORPORATION; Scimed Life Systems, Inc.; Boston Scientific Scimed, Inc.; and Medinol, Ltd., Defendants.

**No. CIV.A. 98-478-SLR.**

March 30, 2001.

MEMORANDUM ORDER

ROBINSON, District J.

*1 At Wilmington this 30th day of March, 2001, having reviewed plaintiff's motion to strike defendants' counterclaims and sixth and seventh affirmative defenses (D.I.55) and to dismiss defendants' counterclaim and to strike defendants' seventh affirmative defense (D.I.56);

IT IS ORDERED that:

1. Plaintiff's motion to strike (D.I.55) is denied, as it is not supported by relevant case law.

2. Plaintiff's motion to dismiss (D.I.56) likewise is denied, for the reasons that follow:

a. The Federal Rules of Civil Procedure permit a party to move for dismissal of a claim or counterclaim for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To prevail on such a motion, however, the movant must show beyond a doubt that the claimant cannot prove any set of facts in support of the claim that would entitle it to relief. *Conley v. Gibson,* 335 U.S. 41, 45-46 (1957). Moreover, all of the claimant's well-pled allegations must be taken as true, and all reasonable inferences from those allegations must be drawn in the claimant's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421-22 (1969) ; *Advanced Cardiovascular Sys. v. Scimed Life Sys.,* 988 F.2d 1157, 1161 (Fed.Cir.1993) ; *Dow Chemical Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 694 (D.Del.1998).

b. Count II of defendants' counterclaims is an action for violation of Section 2 of the Sherman Act, codified at Title 15, Section 2 of the United States Code. (D.I. 50 at 8-10). In essence, defendants allege that AVE is attempting to monopolize the market for coronary stents in the United States by enforcing the patents-in-suit against defendants and others, with full knowledge that those patents were fraudulently procured. Two separate acts of fraud are alleged: (1) fraud on the Patent Office during prosecution of the patents by virtue of intentionally and fraudulently failing to identify one or more inventors of the subject matter claimed in the patents, and (2) fraud perpetrated on the prior owner of the claimed subject matter to induce a transfer of ownership.

c. Plaintiff argues for dismissal of the antitrust counterclaim on three grounds. First, plaintiff argues that the counterclaim fails as a matter of law because defendants have not alleged that plaintiff possesses a sufficiently high market share. Plaintiff is incorrect in its assertion that there is a minimum market share requirement for an attempted monopolization claim. The case law is clear that market share is just one factor a court considers in evaluating the existence of monopoly power. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 201 (3d Cir.1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power.") (emphasis added).

d. Second, plaintiff argues that the nature of the alleged fraud on the Patent Office is not sufficiently "material" to support an antitrust claim. Under *Walker Process Equip., Inc. v. Food Machinery and Chemical Corp.,* 382 U.S. 172 (1965), a patentee who brings an infringement suit can be subject to antitrust liability if the asserted patent was obtained through intentional fraud on the Patent Office and the patent would not have issued but for that act or omission. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1071 (Fed.Cir.1998). Defendants assert that, during the prosecution of the patents-in-suit, the applicant "intentionally and fraudulently fail[ed] to identify one or more joint inventors of the subject matter claimed in the patents." (D.I.50, ¶ 15) The factual basis for this allegation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arises from two pending state court actions where the question of inventorship is at issue. The Federal Circuit has declared that, "[a]s a critical requirement for obtaining a patent, inventorship is material.... Examiners are required to reject applications under 35 U.S.C. § 102(f) on the basis of improper inventorship." *Perspective Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1321 (Fed.Cir.2000). Under controlling Federal Circuit precedent, then, the alleged fraudulent conduct is sufficient to withstand plaintiff's motion to dismiss.

*2 e. Plaintiff's final argument is that defendants have failed to provide plaintiff with adequate notice of the basis for the antitrust claim. In accordance with the "notice pleading" approach embodied in the Federal Rules of Civil Procedure, a claimant is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Additionally, where a claim involves an averment of fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b).

f. The requirement for particularity in pleading fraud does not demand an exhaustive cataloging of facts, but only specificity sufficient to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred. *Resource Ventures, Inc. v. Resources Management Int'l, Inc.,* 42 F.Supp.2d 423, 441 (D. Del 1999) (denying motion to dismiss where pleading described the act of fraud, but not specifics such as the date, place or time). Moreover, a claimant is free to use alternative means of injecting precision and some measure of substantiation into its allegations of fraud. The court finds that defendants' pleadings pass muster under Fed.R.Civ.P. 9(b).

D.Del.,2001.

Medtronic Ave, Inc. v. Boston Scientific Corp.

Not Reported in F.Supp.2d, 2001 WL 652016, 2001-2 Trade Cases P 73,388

Briefs and Other Related Documents (Back to top)

• 2000 WL 34417250 (Trial Pleading) Answer to Second Amended Complaint, Affirmative Defenses and Counterclaims (Jul. 13, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Slip Copy, 2005 WL 1278097
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Kevin MONTOYA, Individually, and on behalf of All Others Similarly Situated and Sonia Epstein Mauthner Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.
AVIVA PARTNERS, L.L.C., Individually, and on behalf of All Others Similarly Situated and Sonia Epstein Mauthner Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.
Sonia Epstein MAUTHNER, Individually, and on behalf of All Others Similarly Situated, Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.
Allan J. PORRECA, Individually, and on behalf of All Others Similarly Situated, Charles Contes, Individually, and on behalf of All Others Similarly Situated, and Sonia Epstein Mauthner, Individually, and on behalf of All Others Similarly Situated, Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.
Gary SCANGA, Individually, and on behalf of All Others Similarly Situated, and Sonia Epstein Mauthner, Individually, and on behalf of All Others Similarly Situated, Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.
Daniel MCDOUGAL, Individually, and on behalf of All Others Similarly Situated and Sonia Epstein Mauthner, Individually, and on behalf of All Others Similarly Situated, Plaintiff,
v.
MAMMA.COM INC., Guy Faure, David Goldman and Daniel Bertrand, Defendant.

**No. 05 Civ. 2313(HB), 05 Civ. 2483(HB), 05 Civ. 2534(HB), 05 Civ. 2625(HB), 05 Civ. 2719(HB), 05 Civ. 3444(HB).**

May 31, 2005.

*CONSOLIDATION ORDER*

BAER, J.

*1 WHEREAS, following briefing and oral argument in Chambers on May 19, 2005; and

WHEREAS, Rule 42(a) of the Federal Rules of Civil Procedure permits a court to order all actions consolidated if they involve "common issues of law or fact," Fed.R.Civ.P. 42(a); and,

WHEREAS, consolidation is especially appropriate in securities class actions where the complaints are "based on the same public statements and reports and defendants will not be prejudiced," *Ferrari v. Impath, Inc.*, No. 03 Civ. 5667, 2004 WL 1637053, at *2 (S.D.N.Y. Jul. 20, 2004) (citations and quotations omitted); and,

WHEREAS, all the parties to this securities class action consented to its consolidation; and,

WHEREAS, Section 21D of the Private Securities Litigation Reform Act of 1995 ("PSLRA") provides that in securities class actions, courts "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members," 15 U.S.C. § 78u-4(a)(3)(B)(i); and,

WHEREAS, in accordance with the PSLRA, the "most adequate plaintiff" is the movant who "filed the complaint or made a motion in response," "has the largest financial interest in the relief sought by the class," and "satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); and,

WHEREAS, courts in this district have assessed a movant's "financial interest" through an examination of several factors including but not limited to: "(1) the number of shares purchased during the class period; (2) the number of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*, No. 03 Civ. 8264, 2004 WL 1179311, at *7 (S.D.N.Y. May 27, 2004) (*quoting Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D.Ill. Aug. 11, 1997) ); *Ferrari*, 2004 WL 1637053, at *4; and,

WHEREAS, the Do Group, the Lin Group, the Mamma.com-Lead-Plaintiff-Group, the Wearn Group, and the Witkowski Group each moved for appointment as lead plaintiff; and

WHEREAS, the Do Group estimated their total loss at $186,102.90; and,

WHEREAS, the Lin Group estimated their total loss at $153,219.98; and,

WHEREAS, the Mamma.com-Lead-Plaintiff-Group estimated their total loss at $221,846.00; and,

WHEREAS, the Wearn Group estimated their total loss at $54,987; and,

WHEREAS, the Witkowski Group estimated their total loss at $310,219.87; and,

WHEREAS, after the filing of the initial motions, the members of the Witkowski Group and the Mamma.com-Lead-Plaintiff-Group agreed, given their respective large financial stake in the litigation, to join and create the "Witkowski-Mamma.com Group" and estimated their total loss at $339,622.95; and,

WHEREAS, despite arguments to the contrary, two independent lead plaintiff movants may join together to help ensure that "adequate resources and experience are available to the prospective class in the prosecution of this action" and because "[e]mploying a co-lead plaintiff structure here will also provide the proposed class with the substantial benefits of joint decision-making," *Pirelli*, 2004 WL 1179311, at *22 (*citing to In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 45 (S.D.N.Y.1998); and,

*2 WHEREAS, the Witkowski-Mamma.com Group has the largest financial interest in the litigation; and,

WHEREAS, certain lead plaintiff groups opposed the Witkowski-Mamma.com Group motion to be appointed lead plaintiff because the group included "in and out purchasers" whom, according to these opposition groups, defendants could potentially argue that some of whom sold their shares before the class period ended and, therefore, must fail in any effort to establish loss causation (*see* Mem. Supp. of Lin at 3); and,

WHEREAS, "in and out purchasers" are those individuals or entities that purchase and sell shares within the class period and, thus, obfuscate loss calculations, *see In re Star Gas Sec. Litig.*, No. 04 Civ. 1766, 2005 WL 818617, at *5 (D.Conn. Apr. 8, 2005);

WHEREAS, in accordance with the PSLRA, 15 U.S.C. § 78u-4 *et. seq.*, and *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 1631 (2005) , and *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir.2005), plaintiffs need only allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," and loss causation does not require *full* disclosure and can be established by *partial* disclosure during the class period which causes the price of shares to decline; and,

WHEREAS, the Witkowski-Mamma.com Group demonstrated that the lead plaintiff, and other class members, purchased a substantial portion of their securities before the April 6, 2004 disclosure of the alleged fraud, sold a substantial portion of their shares after the April 6, 2004 disclosure of the alleged fraud and, therefore, can allege that "the subject of the fraudulent statement or omissions was the cause of the actual loss suffered" and, therefore, satisfy the tests articulated by the Supreme Court in *Dura* and the Second Circuit in *Lentell;* and,

WHEREAS, six of the nineteen Movants currently before this Court were "in-and-out purchasers," and, at least at this stage, "in and out purchasers" do not appear to be "unique" and, thus, "render such plaintiff incapable of adequately representing the class," 15 U.S.C. §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78u-4(a)(3)(B)(iii)(II)(bb); and,

WHEREAS, the Witkowski-Mamma.com Group present a diverse yet cohesive group of individual investors who reported the largest financial interest and has demonstrated that it is typical and representative of the class; and,

WHEREAS, Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach"), Milberg Weiss Bershad & Schulman LLP ("Milberg"), Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen"), Stull, Stull & Brody ("Stull"), and Zwerling, Schachter & Zwerling, LLP ("Zwerling") each moved for appointment as lead counsel; and,

WHEREAS, pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), the lead plaintiff shall, subject to Court approval, select and retain counsel to represent the class and, lead plaintiff, Witkowski-Mamma.com Group, selected the law firms of Milberg and Cohen, firms which have substantial experience in the prosecution of shareholder and securities class actions; and,

*3 ORDERED that the above-captioned cases are hereby CONSOLIDATED for all purposes pursuant to Fed.R.Civ.P. Rule 42(a) and *Montoya, et. al., v. Mamma.com, et. al.*, 05 Civ. 2313, is DESIGNATED the lead case; and it is further

ORDERED, the Witkowski-Mamma.com Group is hereby DESIGNATED as Lead Plaintiffs in the consolidated action, pursuant to Section 21(D)(a)(3) (B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the PSLRA; and it is further

ORDERED that the law firms of Milberg and Cohen are hereby DESIGNATED as Lead Counsel for the Class, pursuant to Section 21(D)(a)(3) (B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the PSLRA; and it is further

ORDERED that pursuant to Fed.R.Civ.P. 42(a), the Clerk of the Court is to REMOVE *Avira, et. al. v. Mamma.com, et. al.* 05 Civ. 2483, *Epstein, et. al. v. Mamma.com, et. al.* 05 Civ. 2534, *Porreca, et. al. v. Mamma.com, et. al.* 05 Civ. 2625, *Scanga, et. al. v. Mamma.com, et. al.*, 05 Civ. 2719, *McDougal, et. al. v,. Mamma.com, et. al.* 05 Civ. 3444, from my docket as separate cases; and it is further

ORDERED that the parties APPEAR, in Chambers, for a pretrial scheduling conference on July 7, 2005 at 1.40 p.m.

SO ORDERED.

S.D.N.Y.,2005.
Montoya v. Mamma.com Inc.
Slip Copy, 2005 WL 1278097

Briefs and Other Related Documents (Back to top)

- 1:05cv03444 (Docket) (Apr. 01, 2005)
- 1:05cv02719 (Docket) (Mar. 08, 2005)
- 1:05cv02625 (Docket) (Mar. 07, 2005)
- 1:05cv02534 (Docket) (Mar. 03, 2005)
- 1:05cv02483 (Docket) (Mar. 01, 2005)
- 1:05cv02313 (Docket) (Feb. 22, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

**H**

Not Reported in F.Supp.2d, 2004 WL 1563024, Fed. Sec. L. Rep. P 92,871

United States District Court,E.D. Pennsylvania.
In re: RAVISENT TECHNOLOGIES, INC. SECURITIES LITIGATION
**No. Civ.A. 00-CV-1014.**

July 13, 2004.

Bruce G. Murphy , Vero Beach, FL, Robert P. Frutkina , Law Offices Bernard M. Gross PC , Robert M. Roseman , Spector Roseman & Kodroff , Stuart H. Savett, Philadelphia, PA, for Plaintiff.
Alexander D. Bono , Blank Rome Comisky & McCauley, LLP , Philadelphia, PA, Meredith N. Landy , O'Melveny & Myers LLP, Menlo Park, CA, for Defendants.

*MEMORANDUM & ORDER*

SURRICK, J.
*1 THIS DOCUMENT RELATES TO ALL ACTIONS

Presently before us is the Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint pursuant to Fed.R.Civ.P. 12(b)(6), (Doc. No. 13). FN1 For the following reasons, the Defendants' Motion to Dismiss will be denied.

> FN1. Accompanying Defendants' Motion is Defendants' Request for Judicial Notice in Support of Motion to Dismiss on July 5, 2000, (Doc. No. 14). Plaintiffs object to three of those documents which are attached as Exhibits G, J & K to Defendants' Request for Judicial Notice in Support of Motion to Dismiss, (Doc. No. 14). (Pls.' Mem. of Law in Opp'n to Defts' Mot. to Dismiss ("Pl. Opp'n Mem.") at 9-10.) Fed.R.Evid. 201(b) permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir.2002). Furthermore, Fed.R.Evid. 201(d) states that a district court must take judicial notice "if requested by a party and supplied with the necessary information." Each of the exhibits that Plaintiffs contest is of the type that has previously been admitted by judicial notice in the Third Circuit. This includes documents integral to or explicitly relied upon in the Complaint; properly-authenticated public disclosure documents filed with SEC; and stock prices and analyses reported by reputable financial service firms. We will take judicial notice of all exhibits submitted by Defendants in support of their Motion to Dismiss.

I. Background Facts

The action presently before the Court is a class action alleging violations of the federal securities laws. Plaintiffs allege that Defendants violated Section 11 of the Securities Act of 1933 (" '33 Act"), 15 U.S.C. §§ 77k , 77o ; Section 15 of the '33 Act, 15 U.S.C. §§ 77k , 77o ; Sections 10(b) of the Securities Exchange Act of 1934 (" '34 Act"), 15 U.S.C. § 78j(b) , and the rules and regulations promulgated under the '34 Act by the Securities and Exchange Commission ("SEC") including Rule 10b-5, 17 C.F.R. § 240.10b-5 ; and Section 20(a) of the '34 Act, 15 U.S.C. § 78t(a). (Compl.¶¶ 2, 3.)

This action arises out of stock purchases made during and after an initial public offering ("IPO") of Ravisent Technologies, Inc., between July 15, 1999, and April 27, 2000. Ravisent was founded in 1994. In 1999 Ravisent began the transition from a privately-owned to a publicly-traded company with the filing of a Registration Statement with the SEC on July 13, 1999. The Registration Statement and accompanying Prospectus stated that the IPO would be effective between July 15, 1999 and July, 22, 1999, and consist of the sale of 5,000,000 shares of stock at $12 each. FN2 (Compl.¶¶ 15-16.) The Registration Statement included audited financial statements from 1996 through 1998, as well as an unaudited financial statement for the first quarter of 1999. In addition, the Registration Statement included an assessment of Ravisent's financial condition; business strategy and future plans; customer names; a brief description of pending litigation filed against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it by the Zoran Corporation; Ravisent's revenue recognition policies; and a description of risks associated with buying Ravisent stock. The Registration Statement specifically included a discussion of how Ravisent had changed its "strategic focus from selling hardware-based digital solutions to licensing software-based digital solutions." (Doc. No. 14 Ex. A "Reg. Stmt.") In addition, the Registration Statement included lengthy warnings concerning how this change in strategic focus could affect revenues. At the conclusion of the IPO, Ravisent's stock price had increased from $12 to $17.63 per share. (Defs.' Mem. of Law in Support of Mot. to Dismiss Consolidated and Am. Class Action Compl. ("Mot. to Dismiss") at 3.)

FN2. In addition, 750,000 "over-allotment" shares were available for purchase by Ravisent's underwriters in the event it became necessary to cover a short position in the underwriter's account due to selling more shares of stock than had been sold to the underwriters by Ravisent. (Reg. Stmt. at 83.)

Pursuant to SEC regulations, Ravisent filed timely financial statements for the second and third quarters of 1999. However, before releasing its audited fourth-quarter and year-end financial statements for 1999, Ravisent announced on February 18, 2000, that these financial statements for 1999 would be delayed "due to discussions with its auditors about revenue recognition on some of its contracts." (Compl.¶ 49.) As a result of this announcement, Ravisent's stock price decreased from $29.63 a share to $18.56. (*Id.*) One month later, on March 14, 2000, Ravisent announced that it would be restating its financial statements for the second and third quarters of 1999. (*Id.*) These restatements were necessary for several reasons. First, Ravisent advised that a new interpretation of Statement of Position ("SOP") 97-2 required deferring revenue recognition derived from the future delivery of software technology, even though the revenue had already physically been received. FN3 (*Id.*) Second, two transactions that were previously recorded as revenue were amended, and recorded instead as a return of inventory and an inventory consignment. (Mot. to Dismiss at 5-6.) The interpretation of SOP 97-2 resulted in the deferral of licensing revenue of $1.4 million that had previously been recognized in the second and third quarters of 1999. (*Id.* Ex. F.) The restatement of the second and third-quarter financials for fiscal year 1999 associated with the two transaction adjustments resulted in an operating margin reduction of $200,000 for 1999. (*Id.*) On March 30, 2000, Ravisent filed its Form 10-K for fiscal year 1999. That report set forth the original financial statements for the year along with the restated financial statements.

FN3. SOP 97-2 deals with software revenue recognition. The Accounting Standards Executive Committee (AcSEC) of the American Institute of Certified Public Accountants (AICPA) issues SOPs that govern accounting methods for various types of businesses and financial concerns. The relevant part of SOP 97-2 states, "[i]f an arrangement to deliver software or a software system does not require significant production, modification or customization of software, revenue should be recognized when all the following criteria are met: persuasive evidence of an agreement exists; delivery has occurred; the vendor's fee is fixed or determinable; collectibility is probability." SOP 97-2, AICPA, http:// www.aicpa.org/members/div/practmon/recover/appenda.htm (last visited 9/9/03).

*2 As a result of these restatements, numerous lawsuits were filed and eventually consolidated into the class action now before us. (Doc. No. 10.) The Class is made up of individuals who claim to have relied to their detriment on allegedly false and misleading affirmative statements and/or omissions made by the Defendants in the Registration Statement filed in connection with the IPO, the required financial disclosures made in the following year, and the statements made in conjunction with these financial statements. FN4 Defendants are Ravisent; Francis E.J. Wilde, III; James C. Liu; Frederick J. Beste, III; Peter X. Blumenwitz; Walter L. Threadgill; and Paul A. Vais, collectively "Ravisent". FN5 (Compl.¶¶ 9-14.)

FN4. Specifically, the Section 11 and 15 claims under the '33 Act address only the contents of the Registration Statement filed in connection with the IPO. The Section 10(b) and 20(a) claims pertain to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

all of Ravisent's financial statements for the second and third quarters of 1999 as well as statements made in connection with the performance of the company.

FN5. Each of the individual Defendants owned stock in Ravisent in amounts ranging from 1.6% to 28.3%. Wilde and Liu signed the Registration Statement for the IPO. Beste, Blumenwitz, Threadgill, and Vais each signed the Registration Statement through Liu as their attorney-in-fact. Liu also signed the financial statements filed with the SEC for the second and third quarters of 1999. Liu was replaced as CFO by Thomas J. Fogarty as of May 11, 2000. (*Id.* ¶¶ 9-14.)

Defendants contend that Plaintiffs have failed to state a claim upon which relief can be granted. In support of their motion to dismiss, Defendants argue that: (i) Plaintiffs' allegations associated with violations of Section 10(b) and Rule 10b-5 fail to meet the pleading requirements of the Federal Rules of Civil Procedure as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (ii) Plaintiffs have failed to allege any actionable misstatement or omission in connection with Section 10(b) and Rule 10b-5; (iii) Plaintiffs have failed to sufficiently allege a Section 11 claim; and (iv) Plaintiffs cannot state a cause of action for control person liability under Section 15 or 20(a) because there are no primary violations of the Securities laws, nor do the allegations satisfy the pleading requirements under the PSLRA. (Mot. to Dismiss at 8.)

## II. Standard of Review for Motion to Dismiss

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Tracinda Corp. v. Daimlerchrysler AG,* 197 F.Supp.2d 42, 53 (D.Del.2002). A court should not dismiss a case for failure to state a claim unless the plaintiff can prove no set of facts in support of the claim that would entitle it to relief. *See United States v. Marisol, Inc.,* 725 F.Supp. 833, 836 (M.D.Pa.1989); *see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998) ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations."). The court's inquiry is directed towards whether the plaintiff's allegations constitute a claim under Rule 8(a). Though the "plain statement" requirements of Rule 8(a) is construed quite liberally, the court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). Finally, the court should not look to whether plaintiffs will "ultimately prevail," it should only consider whether they should be allowed to offer evidence in support of their claims. *In re Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997).

## III. Discussion

*3 Plaintiffs' claims can be separated into three groups. First, Plaintiffs' Section 10(b) claims allege that Defendants made fraudulent statements during the entire class period. Thus, the basis of Plaintiffs' Section 10(b) claims are statements/omissions made in the Registration Statement as well as statements made during the rest of the class period. Second, Plaintiffs' Section 11 claims allege that Defendants made material statements and/or omissions in the Registration Statement. This claim focuses only on the Registration Statement and other documents issued in connection with the IPO. Third, Plaintiffs assert control-person liability claims against Defendants Wilde and Liu under Sections 15 and 20 in connection with the underlying violations of Sections 11 and 10(b).

### a. Section 10(b) and Rule 10b-5 Claims

Plaintiffs allege violations of Section 10(b) and Rule 10(b)(5) (collectively "Section 10(b)") based on oral and written statements made by Defendants Ravisent, Wilde and Liu. Specifically, Plaintiffs allege that these Defendants are liable under Section 10(b) for alleged misstatements and omissions made in connection with the Registration Statement; FN6 as well as the financial results released by Ravisent for the second and third quarters of 1999, that were ultimately restated. (Compl.¶¶ 37, 42-47.) In addition, Plaintiffs claim that statements made by Wilde and Liu regarding Ravisent's finances also violated Section 10(b).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





To state a valid claim under Section 10(b) FN7 and Rule 10b-5, FN8 a plaintiff must show that defendants: (1) made a misrepresentation or omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that the Plaintiffs' reliance was the proximate cause of his or her injury. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir.2000). Defendants contend that this cause of action should be dismissed because Plaintiffs' pleadings do not adequately plead scienter; and the statements made by Wilde and Lui are protected by the "safe harbor" of the PSLRA.

FN6. These same statements/omissions are also the basis of Plaintiffs' Section 11 claim.

FN7. Section 10(b) makes it "unlawful for any person, directly or indirectly ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78j(b).

FN8. Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

Where pleadings allege fraud, they fall under the heightened requirements of Rule 9(b). In a complaint averring fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." FN9 Fed. R. Civ. P. 9(b). The PSLRA also imposes a heightened pleading standard for securities fraud actions. Pursuant to the PSLRA, for each alleged misleading statement, the plaintiff must show the reasons why the statement is misleading, and the facts on which the belief is formed that the statement is misleading if the allegation is made on information or belief. FN10 *NAHC*, 306 F.3d at 1328 (citing 15 U.S.C.A. § 78u-4(b)(1)). It also requires the plaintiff, to allege "with particularity" facts that give rise to a strong inference that the defendant acted with the required state of mind in connection with the alleged act or omission. 15 U.S.C.A. § 78u-4(b)(2). Whereas Rule 9(b) allows state of mind to be averred generally, the PSLRA requires the plaintiff to "state with particularity" facts relating to state of mind. *NAHC*, 306 F.3d at 1328 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n. 5 (3d Cir.1999)). To the extent that Rule 9(b) and the PSLRA conflict, the Third Circuit has held that PSLRA "supersedes" Rule 9(b). *Id.* Securities actions like a Section 10(b) claim alleging fraud must satisfy the heightened requirements of the PSLRA. For various reasons, Defendants contend that Plaintiffs' allegations regarding these claims fail.

FN9. A wide variety of reasons have been advanced for requiring particularity in the pleading of fraud, but the most compelling purpose in this instance is to deter "strike suits". *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir.2003). Strike suits have been described as largely groundless claims where plaintiff is allowed to conduct costly and extensive discovery for the primary purpose of inducing settlement, rather than revealing relevant evidence. *Zuckerman v. Harnishfeger Corp.*, 591 F.Supp. 112, 117 (S.D.N.Y.1984).

FN10. Defendants argue in a conclusory fashion that Plaintiffs' allegations are insufficient to satisfy the PSLRA because they are based on their "attorneys' review of 'the public announcements made by defendants, Securities and Exchange Commission ("SEC") filings, press releases and media reports and discussions with consultants, regarding Ravisent Technologies, Inc.," ' rather than on specific sources of their beliefs. (Mot. to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Dismiss at 30.) However, this is only the first paragraph of the Complaint. The rest of the Complaint is replete with citations to specific documents and statements upon which Plaintiffs' pleadings rely.

1. Misleading Statements/Omissions of Material Fact

***4** To fulfill the materiality requirement, the misstatement or omission must be such that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). We will examine both the materiality of the statements made in connection with the Registration Statement, FN11 and the materiality of alleged misstatements made after the IPO.

FN11. Whereas Section 11 claims only pertain to statements made in materials connected to the initial sale of a security, Section 10(b) claims pertain to any statement made in connection with the sale of a security. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("The resolution of this issue turns on the fact that the two provisions [Sections 11 and 10(b) ] involve distinct causes of action and were intended to address different types of wrongdoing.... Section 10(b) is a 'catchall' antifraud provision ... [w]hile a Section 11 must be based on misstatements or omissions in a registration statement."). Thus, Plaintiffs allege the misstatements/omissions made in the Registration Statement violate both Section 11 and Section 10(b).

Plaintiffs allege four misstatements/omissions made in connection with the Registration Statement: (1) the misstatement of Ravisent's policy for recognizing revenue from licensing contracts; (2) the omission of the second quarter (1999) financial information in the Registration Statement that contained revenue that was ultimately restated; (3) the statements suggesting that Ravisent's historical losses were a thing of the past; and (4) the omission and/or misstatement of the possible consequences Ravisent might suffer as a result of the Zoran litigation. (Compl.¶¶ 16-27.) Of all of the alleged misstatements and/or omissions in the Registration Statement which Plaintiff proffers, only Ravisent's position regarding Revenue Recognition in the Prospectus represents a misrepresentation sufficient to support the Section 10(b) claim.

As was stated previously, prior to the IPO in 1997, Ravisent changed its strategic focus from selling hardware-based digital solutions to licensing software-based digital solutions, and by 1999 Ravisent began to focus exclusively on licensing. (Reg. Stmt. at 9.) Under this licensing business model, Ravisent "receive[s] a license royalty for each personal computer system, peripheral or consumer electronics product sold that contains ... [the] CineMaster product and a royalty for each silicon device sold by a semiconductor manufacturer that incorporates [the] technology." (*Id.* at 18.) Ravisent is dependent upon its customers accurately reporting the number of products that have been sold that have incorporated this software. (*Id.*)

In the Registration Statement, Ravisent adopts the requirements for recognizing revenue from the sale of software in SOP 97-2, FN12 stating that:

FN12. SOP 97-2 provides as follows: "If the arrangement does not require significant production, modification, or customization of software, revenue should be recognized when *all* of the following criteria are met: (1) Persuasive evidence of an arrangement exists; (2) Delivery has occurred; (3) The vendor's fee is fixed or determinable; and (4) Collectibility is probable." *S.E.C. v. Intelliquis Intern., Inc.,* No. 2:02-CV-674, 2003 WL 23356426, at *4 (D.Utah Dec.11, 2003). In the Registration Statement, Ravisent acknowledges the importance of SOP 97-2, and SOP 98-9. (Reg. Stmt. at 44.) Ravisent's policy for recognizing revenue seems to be written with a clear understanding of these financial accounting rules. Moreover, Ravisent's management included

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> individuals with a strong background in accounting. Among the members of the audit committee were the CEO, Wilde, and the CFO, Liu. Previously, Wilde was an executive at other software companies. Liu was a management consultant with Deloitte & Touche Management Consulting, and holds a B.A. in Finance and Accounting from Washington University and an M.B.A. from the Wharton School at the University of Pennsylvania.

Licensing revenues are recognized *when earned, which is generally based on receiving notification from a licensee detailing the shipments of products incorporating RAVISENT technology.* In a number of cases, this occurs in the quarter following the sale of the licensee's product to its customers. RAVISENT's license agreements generally have a term of one year or less, and typically require payment with 45 or 60 days after the end of the calendar quarter in which the product is shipped. Some of RAVISENT's contracts may also require payments of an up-front license fee. License fees paid in advance, with no further commitment, *are recognized in the period that the license agreement is signed, the technology is delivered, and collectibility is probable.**5 (Reg. Stmt. at 18 (emphasis added).) It seems clear that a reasonable investor would understand this policy to mean that Ravisent would not recognize revenue that it had received from its licensees, until its licensees had *actually* shipped the products containing Ravisent software to the licensees' customers. Such a policy would comport with the strictures of SOP 97-2 and its conservative approach toward the recognition of revenue from licensing of software.

On March 14, 2000, Ravisent announced the restatement of its financial disclosures from the second and third quarters of 1999. Ravisent believed that a restatement was necessary because of a "changed" interpretation of SOP 97-2. (Doc. No. 14 Ex. F.) The press release announcing the restatement stated:

> The primary cause for the restatement of previously reported financial results stems from an interpretation of a part of Statement of Position 97-2 issued by the American Institute of Certified Public Accountants (SOP 97-2) relating to revenue recognition for contracts providing for future delivery of technology. Based on this change, all revenue from customer arrangements that provide for future delivery of specific technology are to be treated as deferred revenue until the future technology is delivered. This means that under such contracts revenue cannot be recognized from customers who have received, accepted and paid for RAVISENT's current products, even if those payments are non-cancelable and non-refundable.

(*Id.*) In essence, the "new interpretation" simply required Ravisent to comply with the requirements of SOP 97-2 and not recognize revenue from the sale of software until that software had been delivered. Defendants have provided the Court with no specific information regarding the subject transactions. However, from the press release it seems clear that in the second and third quarters of 1999, Ravisent received royalties for some number of products, from licensees who intended to ship products containing Ravisent software in the future. Rather than wait to recognize these royalties until the products had been shipped, as would have been appropriate under the stated policy and SOP 97-2, Ravisent "booked" the revenue in the quarters in which it was received. After acknowledging that this recognition was improper, Ravisent deferred "booking" the revenue associated with these products until it was informed by the licensees that the products had actually shipped. As a result, Ravisent restated $1.4 million in licensing revenue that it had previously recognized in the second and third quarters of 1999. (*Id.*)

Plaintiffs allege that restating this income to comply with SOP 97-2 is evidence that the revenue recognition policy in the Registration Statement was a material misstatement. (Pl. Opp'n Mem. at 14.) We agree. Pursuant to the policy stated in the Registration Statement, Ravisent should have deferred licensing revenue until the technology was shipped by its licensees. It did not. Logic dictates that if Ravisent "changed" its policy for revenue recognition to comply with this "new interpretation" of the SOP 97-2, requiring it to recognize revenue only upon delivery of products containing Ravisent software, Ravisent *could not have* been following the proclaimed policy for revenue recognition until the restatement in 2000. If Ravisent had been following the policy stated in the Registration Statement at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the time of the IPO there would have been no misstatement. Since Ravisent was clearly not following the revenue recognition policy stated in the Registration Statement the policy stated in the Registration Statement was a misstatement of the policy actually being followed at the time of the IPO. Ravisent was simply not doing what the Registration Statement told potential investors that it was doing. This constitutes a material misstatement sufficient to support Section 10(b) liability.

*6 Defendants do not dispute that at the time it recognized revenue improperly in the second and third quarters of 1999, Ravisent was not following the stated revenue recognition policy in the Registration Statement. Instead Defendants submit that this statement was not misleading when it was made in the Registration Statement. It only became misleading when revenue was recognized in violation of this policy in the second and third quarters of 1999, and is only material in hindsight. (Mot. to Dismiss at 29.) We disagree. The statement regarding revenue recognition was a statement to investors that Ravisent would recognize revenue in compliance with GAAP and AICPA standards. FN13 After Ravisent announced that it was restating revenue because of a "revised interpretation of SOP 97-2," it became patently clear that the policy Ravisent had been following in the second and third quarters of 1999 did not comply with GAAP and AICPA standards. FN14 Liability may exist where a company subsequently releases financial information in violation of the policies stated in its registration materials. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 709-10 (3d Cir.1996) (holding that Section 11 and Section 10(b) claims could proceed where company allegedly misstated intention to follow GAAP in establishing loan loss reserves); *White v. Heartland High-Yield Mun. Bond Fund,* 237 F.Supp.2d 982, 985 (E.D.Wis.2002) (finding Section 11 liability could exist against mutual fund company for not following "fair value" pricing procedure). FN15

FN13. Affirmative statements regarding the use of GAAP and AICPA accounting methods would promote investor confidence that the company was taking a conservative approach towards revenue recognition and that the company's financial statements were an accurate picture of its financial health.

FN14. Even if we were to assume that the revenue recognition policy became misleading when revenue was recognized in violation of this policy in the second and third quarters of 1999, we are satisfied that the allegations are sufficient to state a claim under Section 10. The Registration Statement (including Prospectus) was made public on July 15, 1999. The second quarter of 1999 closed on June 30, 1999. The audited financial statements for that quarter were released on August 10, 1999. Certainly the process of auditing these results was taking place at the time the IPO was ongoing.

FN15. In *Heartland,* investors in a mutual fund brought suit after a dramatic "one-day decline" in the fund's net asset value, alleging that in the funds' registration materials defendants fraudulently represented their intention to follow certain policies in investing fund assets. 237 F.Supp.2d 982, 983-84. The district court concluded that the plaintiff's Section 11 claim survived a motion to dismiss where it could be inferred that the defendant had not been following the stated policies in the registration statement. *Id.* at 985. As Section 10(b) applies to a greater scope of misstatements than does Section 11, we believe that the misstatements in that case could also have been the basis of Section 10(b) liability. In the instant case, the misstatement regarding Ravisent's revenue recognition policy is sufficient to establish both Section 10(b) and Section 11 liability.

Related to the statement regarding revenue recognition is Plaintiffs' contention that Ravisent's failure to disclose the second quarter financial reports in the Registration Statement was a false and misleading omission. (Com pl.¶¶ 20-21.) The simple answer to this is that at the time of the Registration Statement, Ravisent had no duty to disclose the second quarter financial information under the SEC rules regarding disclosure. FN16 Moreover, the inclusion of the second quarter financial statements in the Registration Statement would have been of little assistance to an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





investor. It was not apparent that Ravisent was not following its stated policy regarding revenue recognition until it restated the second and third-quarter financial statements the following year.

> FN16. SEC Rule 3-12(a) of Regulation S-X. *See also* 17 C.F.R. § 210.3-12(a) (stating that financial statements included in the registration statement must be no more than 135 days old at effective date of registration, or they have to be updated). As of July 15, 1999, the effective date of the Registration Statement, the first-quarter financial statements for 1999 were only 106 days old. Therefore, the financial information provided by Ravisent was up to date for purposes of 17 C.F.R. § 210.3-12(a) and was not required to be updated for another twenty-nine days.

The other alleged misrepresentations and/or omissions in the Complaint fail to satisfy even the liberal pleading standard of Rule 8(a). Plaintiffs argue that omissions made by Ravisent with respect to the pending litigation filed by Zoran (a customer and competitor of Ravisent) presented a false and misleading picture of the consequences of the litigation. (*Id.* ¶ 22.) Plaintiffs allege Ravisent failed to state the full ramifications of the Zoran litigation. Plaintiffs believe that Ravisent should have also stated that as a result of the litigation Ravisent could not meet its supply obligations to Dell Computer, Ravisent's credibility had been seriously damaged with both Dell Computer and other customers, Ravisent had been forced to switch products sooner than expected, and Ravisent had incurred assorted intangible costs as a result of testing done in conjunction with the parts supplied by Zoran. (*Id.*) Despite these contentions, the Registration Statement does include a litany of risk factors which comprehensively address the alleged omissions regarding the Zoran litigation. With respect to litigation, Ravisent generally warns that:

> *7 [a]ny litigation brought by us or others, could result in the expenditure of significant financial resources and the diversion of management's time and efforts. In addition, litigation in which we are accused of infringement may cause product shipment delays, require us to develop non-infringing technology or require us to enter in to royalty or license agreements even before the issue of infringement has been decided on the merits.

(Reg. Stmt. at 14-15.) Ravisent also warns of the risks involved due to Ravisent's change in business model (licensing rather than selling its products), its anticipated decline in revenue, its inability to obtain a new contract with its largest customer (Dell), and its history of losses. FN17 (Reg. Stmt. at 9-11.) On page fifty-seven of the Registration Statement, Ravisent specifically addresses the litigation with Zoran, and provides the warning that, "the resolution of this litigation could harm Ravisent's financial condition." This statement along with the general risk statements gave investors a clear picture of the possible effects of the Zoran litigation, as well as other effects future litigation could have on the company and its investors. Defendants' disclosure concerning the risks of the Zoran litigation are sufficient.

> FN17. "The Third Circuit has held that in determining whether statements contained in a prospectus are materially misleading, the prospectus must be read as a whole. Courts must avoid examining the alleged misstatements in isolation 'because accompanying statements may render them immaterial as a matter of law." ' *In Re U.S. Interactive Class Action Sec. Litig.*, No. Civ. A. 01-522, 2002 WL 1971252, at *7 (E.D.Pa. Aug.23, 2002) (citing *EP Medsystems Inc. v. EchoCath*, 235 F.3d 865 (3d Cir.2000)).

Plaintiffs assert that the Registration Statement was false and misleading because it failed to acknowledge that Ravisent had suffered a "huge loss" in the second quarter of 1999, and that it "touted the fact that Ravisent had virtually eliminated its previous losses." (Compl.¶¶ 20-21.) Defendants are correct in their assertion that these affirmative "statements *cannot be found anywhere* in the Registration Statement." (Mot. to Dismiss at 20.) Moreover, even an inference of this cannot be found in the Registration Statement. Not only does Ravisent not suggest that losses will be eliminated, it provides plain language cautioning investors about the limitations in using past financial figures to forecast future performance. FN18 In the Registration Statement Ravisent specifically warned investors that "we

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





have a history of losses and we may not be able to achieve profitability in the future." (Reg. Stmt. at 11.) For these reasons there is no basis for Plaintiffs' suggestion that Ravisent's statements and/or omissions with respect to losses, or the future elimination thereof, was misleading.

> FN18. Among the warnings, Ravisent states, "historical financial information is of limited value in projecting future operation results," "comparing different periods of [the Company's] operating results is not meaningful and you should not rely on these results for any period as an indication of our future performance." (Doc. No. 14 Ex. A at 10, Ex. B at 9-10, 29.)

The second category of alleged misstatements were those made after the IPO was completed. For the reasons already noted in connection with the statement regarding revenue recognition in the Registration Statement, we believe the statements in the financial releases for the second and third quarters of 1999, are also misleading as these statements recognize revenue that should not have been "booked" under Ravisent's revenue recognition policy. Plaintiffs claim that statements made by Defendants Wilde and Liu in connection with Ravisent's performance were also false, misleading, and material. (Compl.¶¶ 37, 42.) On August 10, 1999, two weeks after the IPO had closed, a Ravisent press release quoted Wilde as saying that "the year-over-year improvement in gross margins illustrates the growing momentum in our software and technology license business." Then in October, 1999, Defendant Wilde told the Dow Jones News Service that Ravisent will record a profit of $1.1 million in the quarter, compared with a loss of $500,000 a year ago. (*Id.* ¶ 42.) The same article quoted Liu as stating that the Company expected revenue to increase " 'north of 60% this year and into (the) next' and then rise 40% in subsequent years." (*Id.*) It was only six months later that Ravisent restated revenue for the second and third quarters of 1999.

*8 Defendants contend that these statements are of the sort that are so "vague and general" that the law considers them "immaterial puffery." *Advanta,* 180 F.3d at 538. We disagree. Examples of statements which could be called puffery include a broker calling a bond "marvelous," or saying a stock is so "red hot" that the investor "could not lose." *In re Viropharma, Inc. Sec. Litig.,* No. Civ. A. 02-1627, 2003 WL 1824914, at *6 (E.D.Pa. Apr.7, 2003) (quoting *Newman v. L.F. Rothchild,* 651 F.Supp. 160, 163 (S.D.N.Y.1986)). In this case, the statements were made by the CEO and the CFO to the general public. Moreover, these statements were statements about the financial condition of the company. These representations were material. *See Basic,* 485 U.S. at 232.

2. Scienter

As an element of a Section 10(b) claim, the plaintiff must allege and prove that the defendant(s) acted with scienter. To satisfy this scienter requirement, a plaintiff must either: (1) allege "facts establishing a motive and an opportunity to commit fraud;" (2) or set forth "facts that constitute circumstantial evidence of either reckless or conscious behavior." *Advanta,* 180 F.3d at 534. Under the PSLRA, allegations of scienter, whether of circumstantial evidence of consciousness or recklessness or motive and opportunity to commit fraud, must be pled "with particularity" and give rise to "a strong inference" of scienter. *In re ATI Techs., Inc. Sec. Litig.,* 216 F.Supp.2d 418, 438 (E.D.Pa.2002). "Catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme" are not sufficient. *Id.* (quoting *Advanta,* 180 F.3d at 535). *See also In re Digital Islands Sec. Litig.,* 357 F.3d 322, 328 (3d Cir.2004) ( " '[U]nless plaintiffs in securities fraud actions allege facts ... with the requisite particularity ... they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) anlaysis." ') (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 224 (3d Cir.2002)).

Plaintiffs allege that Defendants' failure to comply with the stated revenue policy, and statements by Wilde and Liu with respect to the company's performance, satisfy the scienter requirements because they either establish a motive and an opportunity to commit fraud, or constitute circumstantial evidence of either reckless or conscious behavior. (Compl.¶¶ 63-68.)

Plaintiffs' allegations of reckless or conscious behavior on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the part of Defendants rest on the failure to comply with SOP 97-2. The Third Circuit has defined a reckless act as one "involving not merely simple, inexcusable negligence, but an extreme departure from the standards of ordinary care, and which present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535 (citing *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)). Plaintiffs aver that Defendants' departure from its own policies was a violation of GAAP and FASB, (Compl.¶¶ 59-62), that is sufficient to plead recklessness or conscious behavior. *See In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 724 (D.Del.2000) (finding that "[w]hen combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of recklessness"); *In re Ikon Sec. Litig.*, 66 F.Supp.2d. 622, 631 (E.D.Pa.1999) (finding that "there can be no claim of fraud based merely on a company's deviation from its own undisclosed internal accounting policies, where, however, a company deviates from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter") (citing *In re Cirrus Logic Sec. Litig.*, 946 F.Supp. 1446, 1458 (N.D.Cal.1996)). Defendants contend that violations of GAAP, do not constitute circumstantial evidence of recklessness, *ATI Techs.*, 216 F.Supp.2d at 438 (citing *Burlington Coat Factory*, 114 F.3d at 1421-22), such that Ravisent's failure to comply with SOP 97-2 is in itself sufficient to prove scienter. *See also Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 80 (2d Cir.1999) ; *Vosgerichian v. Commodore Int'l*, 832 F.Supp. 909, 915 n. 8 (E.D.Pa.1993), *vacated on other grounds*, 862 F.Supp. 1371 (E.D.Pa.1994) ; *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992). Plaintiffs respond that the instant case is distinguishable from those cases cited by Defendants because here Wilde and Liu as CEO and CFO helped write the Registration Materials, had authority over the second and third quarter financial statements, and had such important roles in the company that they would necessarily have knowledge of Ravisent's software contracts and whether Ravisent had the right to recognize income from those contracts in 1999. Defendants contend that the pleadings are lacking because "[g]eneralized imputations of knowledge do not suffice [to establish scienter], regardless of the Defendants' position within the company." *In re AT & T Corp. Sec. Litig.*, No. Civ. A. 00-5364, 2002 WL 31190863, at * 28 (D.N.J. Jan.30, 2002) (quoting *Advanta*, 180 F.3d at 539). Defendants argue that mere allegations by Plaintiffs that Wilde and Liu were aware of the improper recognition of revenue due to their positions in the company is not specific enough to carry the Rule 9(b) burden of pleading recklessness or conscious behavior. (Mot. to Dismiss at 14.) However, the Complaint here went beyond mere generalized allegations. Plaintiffs specifically pled how the individual Defendants would have knowledge and access to the misstatements. FN19

> FN19. The Complaint alleged in relevant part:
>
> 66. Defendants Wilde and Liu participated in the drafting of the Prospectus, and the financial statements alleged herein to be misleading [.] They knew that the Prospectus specifically cited SOP 97-2 and knew what it provided. Defendant Liu was Chief Financial Officer and Vice President of Ravisent.... Mr. Wilde during all relevant times was Chief Executive Officer of Ravisent. The Individual Defendants both knew the terms of and approved and/or signed the software contracts, software revenue could not be recognized under SOP 97-2 and GAAP because the contracts provided for deliverables of future technology.... Both of them knew that Ravisent was recognizing revenue which did not conform to Ravisent's stated revenue recognition policy.
>
> (Compl.¶ 66.)

*9 In reaching the conclusion that Defendants' violation of its stated revenue policy is a significant factor in pleading scienter, the case of *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 625 (E.D.Va.2000) was instructive. In *MicroStrategy* the plaintiff class brought suit after it came to light that the defendant had been recognizing revenue from contracts that at not yet been completed. Like Plaintiff, MicroStrategy was a software company that received revenue from "product license fees, product support fees, and royalties from various sources." *Id.* at 624. Also like Plaintiff, MicroStrategy stated that it would recognize revenue in "conformance with the strictures of GAAP and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the Company's declared ... policies which stated ... that 'product license revenues are generally recognized upon the execution of a contract and shipment of a related software product, provided that no significant vendor obligations remain outstanding and the resulting receivable is deemed collectible by management." ' *Id.* The plaintiff class in *MicroStrategy* alleged that, "by acknowledging the need to restate the prior financials, defendants have effectively admitted that the Company's improper recognition of revenue was therefor known or recklessly disregarded at the time all of the foregoing fraudulent financial statements were originally released, and that the originally issued financial statements were materially misleading." *Id.* at 634. Thus, the plaintiff class argued that the company's severe violations of simple revenue recognition policies was sufficient to show recklessness, i.e. scienter. The court agreed, finding that "MicroStrategy's GAAP violations and restatement of financials, when viewed in light of the magnitude of the overstatements, the nature of the accounting principles violated, and the importance of the contracts to which these principles were applied compels" an inference of scienter on the part of defendants. FN20 *Id.* at 639-40.

FN20. The court in *MicroStrategy* analyzed the GAAP rules that the company violated, stating that "if the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard." 115 F.Supp.2d at 638. The court concluded "that the alleged simplicity of the GAAP rules violated here are relevant and contribute probative weight to an inference of scienter." *Id.*

The instant case is similar to *MicroStrategy*. With respect to license revenue, Ravisent's crystalline policy was that: "Licensing revenues are recognized when earned, which is generally based on receiving notification from a licensee detailing the shipments of products incorporating Ravisent technology." (Reg. Stmt. at 33.) This policy could not have been any more simple. Licensing revenue was to be recognized when Ravisent was notified it was delivered. Yet despite this, in the second and third quarters of 1999, Ravisent recognized revenue from licensing agreements for products that had not yet been shipped. Defendants had sufficient skill to understand the simple accounting principles at issue. Moreover, Defendants knew that the premature recognition of even one contract would grossly overstate Ravisent's financial statement due to its limited number of customers. Under the circumstances we are compelled to conclude that these allegations of recklessness or conscious behavior are sufficient to plead scienter. FN21

FN21. Defendants believe that KPMG's role as an outside auditor illustrates that Wilde and Liu did not have the requisite intent necessary to establish a 10(b) claim. We disagree. In the case of *In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935 (E.D.Pa.1999) the court concluded that scienter was adequately pled against high-ranking corporate officials when the alleged misstatement concerned a "key aspect" of the corporation's business. *Id.* at 953. This is equally true here. Ravisent was focused on changing its business strategy from sales to the licensing of its software. The CEO and CFO must have been apprised of the issues the company would face in terms of revenue recognition.

***10** The requirements for pleading scienter may also be satisfied where Plaintiffs sufficiently show that the Defendants had motive and opportunity to commit fraud. FN22 Plaintiffs contend that Defendants stood to benefit from an artificially inflated stock price. Defendants correctly assert that neither of the individual Defendants "cashed in" on this fraudulently high price by selling stock. (Mot. to Dismiss at 12.) Defendants argue that in the absence of insider sales, fraud allegations make no economic sense, and this fact alone warrants dismissal. FN23

FN22. By alleging that Wilde and Liu were respectively, CEO and CFO of Ravisent, Plaintiffs satisfy their burden of alleging opportunity to commit fraud.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





FN23. Defendants cite the cases of *Burlington*, 114 F.3d at 1413; *San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris*, 75 F.3d 801, 814 (2d Cir.1996) ; *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1254 (N.D.Ill.1997), to support their argument that in the absence of insider stock sales, allegations of fraud are weak. Each of these cases is either inapplicable to the current situation or can be easily distinguished. However, Defendants are correct that fraudulent motive cannot be inferred from the single fact that some officers sold stock. *Burlington Coat Factory*, 114 F.3d at 1424. For this reason, little legal significance is given to Plaintiffs' assertions that defendant would have profited by insider sales but for the discovery of their alleged fraud. (Compl.¶ 65.) As our analysis shows, motive in this case does not rest on allegations of insider trading.

Despite the fact that neither Wilde nor Liu personally sold Ravisent stock, Plaintiffs allege that Defendants's motive to fraudulently elevate the price of Ravisent stock was based on their interest in inflating the Company's offering price in the IPO, and keeping the price of Ravisent stock artificially elevated for use in the acquisition of Tekenema. (*Compl.* ¶¶ 65, 67-68.) Defendants argue that "[g]eneral claims that officials sought to inflate the price of common stock to 'protect, perpetuate and enhance their executive positions' alleges a motive generic to all corporate officials," and fails to satisfy the pleading requirements of the PSLRA. *ATI Techs.*, 216 F.Supp.2d at 440 (quoting *Burlington Coat Factory*, 114 F.3d at 1423 n. 12). We agree that Plaintiffs' general claims are insufficient.

As to the allegation that stock price was artificially inflated to aid in the acquisition of Tekenema, courts have found that a "stock-based acquisitions at the time of the alleged misrepresentations support a strong inference of scienter." *ATI Techs.*, 216 F.Supp.2d at 440. Specifically, Plaintiffs urge the Court to consider the instant case in light of the Second Circuit decision in *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir.2000), where the court inferred scienter, at least in part from the plaintiffs' allegations that defendants had artificially inflated the stock price to finance an acquisition. Some courts have only inferred scienter where the stock price was artificially inflated to aid in the acquisition of another company, and other factors such as insider trading contributed to the strong inference of motive. *See Rothman*, 220 F.3d at 93-94 ("Whether sufficient motive could be shown *solely* by an allegation of a high stock price artificially maintained ... is not the issue before us.") (emphasis added); *In re Unisys Corp. Sec. Litig.*, No. CIV. A. 00-1849, 2000 WL 1367951 , at *5-7 (E.D.Pa. Sept.21, 2000) (holding stock-for-stock merger, avoidance of cash dividend, and insider trades, satisfy scienter); *Voit v. Wonderware*, 977 F.Supp. 363, 374-75 (E.D.Pa.1997) (finding scienter from stock-based acquisition and insider trades). Other courts have found that artificially increasing share price of stock to be used in stock-for-stock merger and acquisition was solely sufficient to satisfy element of scienter. *Marra v. Tel-Save Holdings, Inc.*, No. 98-3145, 1999 WL 317103, at *7-9 (E.D.Pa. May 18, 1999) *See also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269-71 (2d Cir.1993) (finding scienter from material omission designed to artificially inflate stock price to dilute the effects of upcoming "rights offering"); *but see In re CDNOW, Inc. Sec. Litig.*, 138 F.Supp.2d 624, 642 n. 22 (E.D.Pa.2001) (holding that allegations of scienter failed where the allegations of using stock for mergers were vague and general). As the court in *Time Warner* suggested, "the close question is whether the defendants are adequately alleged to have a motive to benefit from the non-disclosure." FN24 *Id.* at 269-70. In this case, Plaintiffs' argument is compelling. On November 18, 1999, almost four months after the IPO and the second quarter of 1999 had closed, Ravisent acquired Teknema for a total value of $17 million, $13.2 million of which was comprised of Ravisent common stock. (Compl.¶¶ 41, 65, 67-68.) Under Plaintiffs' theory, the artificially inflated stock price (and the underlying financial analysis) benefitted Ravisent in two ways. First, it made Ravisent stock a much more attractive asset in the bargaining phase. Second, the greater the value of Ravisent stock, the fewer shares would be needed for the Teknema acquisition and the greater resources Ravisent would retain for further acquisitions using its own currency. FN25 With all inferences drawn in favor of Plaintiffs, the allegations related to "motive and opportunity" are sufficient to plead scienter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN24. In *Time Warner*, the Second Circuit upheld plaintiff's pleading of scienter that alleged the defendants artificially inflated the stock price through misrepresentations in order to attract strategic alliances and possibly dilute the effect of the announcement of a rights offering on the stock price. *Id.* at 269-71. Though that court conceded that the plaintiffs had failed to "articulat[e] with either clarity or consistency their motive theory," and noted that the motive is economically in doubt, the court stated "[w]ith all inferences drawn in favor of the plaintiffs, it is arguable that the defendants acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock." *Id.*

FN25. Ravisent completed the Teknema acquisition for 804,000 shares. If the deal had been completed after April 27, 2000, $13.2 million worth of stock would require the transfer of more than 1.9 million shares at an approximate value of $6.86/share. (Compl.¶ 56.) Issuing more shares would dilute the value of the already issued shares.

3. Reliance and Proximate Cause

*11 The final two elements of the 10b-5 claim in this case are not challenged by Defendants. The Plaintiffs advance a fraud-on-the-market theory. The fraud-on-the-market theory is a theory of indirect actual reliance under which a plaintiff is entitled to three separate presumptions in attempting to establish the element of direct reliance. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir.2000). Under this theory, the court presumes that: the market price of the security actually incorporated the alleged misrepresentations; the plaintiff actually relied on the market price of the security as an indicator of its value; and the plaintiff acted reasonably in relying on the market price of the security. *Id.* In this case the Complaint pleads the necessary facts: Ravisent stock was listed on the NASDAQ exchange; the Company filed periodic public reports with the SEC; and the Class members purchased stock during the Class period. (Compl.¶ 70.) These allegations are sufficient to establish direct reliance. FN26

FN26. The fraud-on-the-market theory creates only a presumption of reliance which may be rebutted by raising any defense to reliance. *See Basic*, 485 U.S. at 248-49 (1988). However, in reviewing a Rule 12(b)(6) motion to dismiss the court must accept the allegations of the complaint as true. Defenses to reliance raised by defendants are not considered in a 12(b)(6) analysis. *Id.* at 180-81.

The Third Circuit has held that a plaintiff may establish the element of loss causation simply by showing that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation. *Scattergood v. Perelman*, 945 F.2d 618, 624 (3d Cir.1991) (holding that it was a "fair inference from the complaint ... that the market price paid by the plaintiffs exceeded the value of the stock at the time of purchase based on the true facts."). In the instant case, the Complaint alleges that the Class consists of persons who purchased Ravisent stock pursuant to the IPO and during the period between July 15, 1999, and April 27, 2000. (Compl.¶ 82.) After Ravisent announced the restatement of income on February 18, 2000, and April 27, 2000, Ravisent stock fell to less than $7 a share. (*Id.* ¶¶ 49, 56.) Because these precipitous declines in the price of Ravisent stock can be presumed to reflect the true value of the stock in light of the restatements of income (i.e. the value of the stock if revenue had been "correctly" stated), we conclude that the Plaintiffs have adequately pled this element.

4. Safe Harbor of the PSLRA

As a separate attack on the sufficiency of Plaintiffs' pleadings, Defendants argue that even if the statements made by Wilde and Liu are considered to be material, they are immune from Section 10(b) liability because they are "forward-looking" and are thus protected by the "safe harbor" created by the PSLRA. FN27 (Mot. to Dismiss at 10, 17.) Under the PSLRA, "a statement is forward-looking if, it is a 'statement containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structures, or other financial items." ' *Advanta*, 180 F.3d at 536 (quoting 15 U.S.C. § 78u-5(i)(1)(A)); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999) (holding that a forward looking statement is one whose truth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or falsity cannot be determined until after the statement has been made). However, it is not enough that the statements be forward-looking to be immune from liability. A forward-looking statement only qualifies for the safe harbor to the extent that it is: (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i) ; or (2) the plaintiff fails to prove the forward-looking statement was made, or approved by an executive officer of the company, with actual knowledge that the statement was false or misleading, 15 U.S.C. § 78u-5(c)(1)(B). *Viropharma,* 2003 WL 1824914, at *7.

> FN27. The "safe harbor" of the PSLRA specifically does not apply to statements made in connection with an IPO. 15 U.S.C. § 78u-5(b)(2)(B). As such, the statements made in the Registration Statement cannot be saved by the safe harbor.

***12** Wilde's two statements made subsequent to the close of the second and third quarters of 1999. Plaintiffs argues that all of the statements made by Wilde were not "forward-looking" but *opinions* that the second quarter numbers demonstrated Ravisent's business momentum and that this momentum continued to improve in the third quarter due to Ravisent's increased market position. (Mot. to Dismiss Ex. G.) We agree. Though Wilde's comments contained financial analysis, the statements did not pertain to future projections about financial performance. Thus, Wilde's statements were not forward-looking and we need not inquire as to whether the accompanying cautionary statement was sufficient to provide these statements with immunity.

Liu's statements, by comparison, stated that Ravisent *expected* revenue to increase one year "and then rise again" in subsequent years. As these statements were projections about future performance, they were undoubtedly forward-looking. However, the statement contained in a *Dow Jones News Service* article was not accompanied by an adequate cautionary statement. Defendants contend that the safe harbor of the PSLRA still applies because Plaintiffs have not adequately pled that these statements were made with actual knowledge of their falsity. (Mot. to Dismiss at 18.) To this end Plaintiffs alleged in the Complaint that:

> defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ravisent who knew that those statements were false when made.

(Compl.¶ 69.) In addition, Plaintiffs scienter pleadings also specifically address how Liu's position as CFO would have provided him with the knowledge that the statements were misleading. Neither Wilde or Liu's statements are protected by the safe harbor of the PSLRA.

b. Section 11 Analysis

To plead a prima facie case under Section 11, the plaintiff must allege that the registration statement contained a misstatement or omission when it became effective; that the misstatement or omission was material; and that the plaintiff purchased the security pursuant to such statement. *Herman & MacLean,* 459 U.S. at 382 (citing 15 U.S.C. § 77k(b)). Unlike Section 10 cases, pleading an action under Section 11 does not require proof of scienter, or a general motive or intent to manipulate. *Id.* at 382 (holding that the differences between the two claims allow them to be pled in the same complaint). Liability for false or misleading statements under Section 11 approximates the tort standard of strict liability. *See In re Adams Golf, Inc. Sec. Litig.,* 176 F.Supp.2d 216, 237 (D.Del.2001) (finding Section 11 provides *"strict liability* against the issuer of stock for misstatements in the prospectus.") (emphasis added).

***13** Defendants argue that since Plaintiffs' Section 11 claim alleges fraud, rather than negligence, it must comply with the particularity requirements of Federal Rule of Civil Procedure 9(b). Although scienter is not an element of a Section 11 claim, *Herman & MacLean,* 459 U.S. at 382, this does not mean that all Section 11 claims are immune from the heightened pleading requirements of Rule 9(b). *See Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 287-88 (3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1992) (holding that where a Section 11 claim alleges fraud, it must satisfy the pleading requirements of Rule 9(b)). While Section 11 claims asserting negligence must only satisfy the pleading requirement of Rule 8(a), claims asserting fraud in the Section 11 context must satisfy the heightened pleading requirement of Rule 9(b). *See Shapiro,* 964 F.2d at 288 ("The plain language of the rule [Rule 9(b) ] clearly encompasses § 11 and § 12(2) encompasses claims based on fraud like those before us."); *Adams Golf,* 176 F.Supp.2d at 229 ("When a plaintiff's § 11 and 12(a)(2) claims are grounded in fraud, the pleading requirements of Rule 9(b) apply."); *contra Bernstein v. Crazy Eddie, Inc.,* F.Supp. 962, 973 (E.D.N.Y.1988). FN28

FN28. There appears to be a conflict in the circuits over whether the heightened pleading standard of Rule 9(b) applies to Section 11 claims averring fraud. In the Third Circuit when Section 11 claims are grounded in fraud rather than innocent or negligent misstatement, Rule 9(b) applies. *Compare Shapiro,* 964 F.2d at 288, *and In re NationsMart Sec. Litig.,* 130 F.3d 309, 314 (8th Cir.1997).

The threshold issue for this Court is whether Plaintiffs' Section 11 claim sounds in fraud or negligence. In *Shapiro,* the court suggested that where plaintiffs' claims make no allegation of negligence, and the complaint "brims" with references to "intentional" and "reckless" conduct, the Section 11 claim is based on fraud. *Id.* at 287-88. *See also Adams Golf,* 176 F.Supp.2d at 229 (finding that Section 11 claim sounded in negligence where there were no claims of fraud and the complaint was not "artfully pleaded" to avoid heightened pleading requirements); *In re Cendant Corp. Litig.,* 60 F.Supp.2d 354, 364 (D.N.J.1999) (finding that the complaint does not sound in fraud where plaintiff's theory of liability is that "defendants had not made a reasonable investigation or possessed reasonable grounds for the belief that the statements ... which were contained in the Registration Statement were true, were without omissions of any material facts, and were not misleading").

Defendants contend that the Section 11 claim must sound in fraud because paragraph 36 of the Complaint incorporates the pleadings for the Section 11 claim into the Section 10(b) claim. Defendants argue that because Plaintiffs' Section 10(b) claim incorporates the pleadings from the Section 11 claim, and in the Section 10(b) claim Plaintiffs plead scienter, Plaintiffs' Section 11 claim must be premised on fraud as well. (Mot. to Dismiss at 26.) Defendants also contend that the Section 11 claim is premised on fraud because Plaintiffs do not use terms like "negligent" or "reasonable care".

It appears that Plaintiffs' counsel were aware of *Shapiro* when drafting the complaint, and were careful to plead negligence sufficiently to avoid the heightened pleading requirements. The Complaint does not use language like "intentional" or "reckless" in connection with the Section 11 claim. (Compl. ¶¶ 16-24.) Rather in alleging that the Registration Statement was false and misleading, the Complaint specifically states with respect to the Section 11 claim that:

> *14 19. The Prospectus was *false and misleading* in failing to disclose that the Company had entered into software licensing agreements with customers which provided for the furnishing of future technology by Ravisent, and that under SOP 97-2 revenue could not be recognized under these agreements before the future deliveries were provided. Ravisent's statements in the Prospectus about revenue recognition were materially false and misleading....
>
> 20. The Prospectus further *failed* to disclose that Ravisent was not following this disclosed revenue recognition policy in the second quarter of 1999.... Defendants['] *failure* to disclose this practice was materially misleading....
>
> 21. The Prospectus was also false and misleading in that it failed ... to disclose that the Company had entered into additional software licensing agreements during the June 30, 2000 quarter.... The misleading nature of this omission....

(Compl.¶¶ 19-21.) These phrases are at the very least ambiguous as to whether Plaintiffs' claim is based on fraud or negligence. Moreover, we note that in introducing the Section 11 claim, the Complaint specifically states:

> "Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above, as if fully set forth herein. In these prior paragraphs there is no allegation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

knowledge or scienter. With respect to this Count and Count II [ (Control Person Liability under Section 15) ], plaintiffs specifically exclude any allegation of knowledge or scienter on the part of the Defendants."

(Compl.¶ 25.) This case is similar to *In re Cendant,* where the court determined that despite the fact that plaintiff claimed violations of Section 11 and 10(b), the allegations were separate such that the " § 11 is limited to negligence." 60 F.Supp.2d at 364. Viewing the pleadings in a light most favorable to Plaintiffs we are satisfied that the allegations related to Section 11 need only meet the requirement of Rule 8(a).

Since Plaintiffs' Section 11 claims do not sound in fraud, to survive the 12(b)(6) motion the Complaint must plead only misrepresentations and/or omissions that satisfy the liberal pleading standard of Rule 8(a). Plaintiffs offer several different bases for Section 11 liability. We have determined that Plaintiffs' allegations regarding Ravisent's stated policy of revenue recognition is the only misstatement in the Registration Statement sufficient to satisfy the pleading requirements of Section 11 liability. (Compl.¶¶ 16-27.)

Section 11 requires that an undisclosed fact must be material at the time of the offering in order for liability to attach. *Klein v. General Nutrition Cos., Inc.,* 186 F.3d 338, 342 (3d Cir.1999). "Material is defined as matters as to which an average prudent investor ought reasonably be informed before purchasing that security registered." *Kusner v. First Pennsylvania Corp.,* 531 F.2d 1234, 1240 n. 1 (3d Cir.1976) , (quoting 17 C.F.R. § 230.405 (1975)); *see also Basic,* 485 U.S. at 231 ("[a misrepresentation or omission is material] if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]"). There is no reason to doubt that Ravisent's deviation from their stated position on revenue recognition is a fact that a prudent investor should be informed of. *See Tracinda Corp.,* 197 F.Supp.2d at 58 ("to prevail on a motion to dismiss the defendant must show that under no set of facts will the plaintiff be able to establish that the alleged misrepresentations and omissions were material"). Therefore, we conclude that the Plaintiff has pled material misstatements/omissions regarding revenue recognition, sufficient to survive a motion to dismiss.

c. Control Person Liability: Section 15 Claim and Section 20 Claim

*15 Plaintiffs have also alleged that Wilde and Liu are liable as control persons under Section 15 and 20(a). Section 15 of the '33 Act, 15 U.S.C. § 77o, establishes joint and several liability for "controlling persons" based upon violations of Sections 11 and 12. *Zucker v. Quasha,* 891 F.Supp. 1010, 1014 (D.N.J.1995). Section 20 of the '34 Act establishes liability for "controlling persons" based upon violations of Section 10(b). *Copland v. Grument,* No. Civ. A. 96-3351, 1998 WL 256654, at *7 (D.N.J. Jan.9, 1998). The elements of a controlling person liability claim under Section 20 of the '34 Act and Section 15 of the '33 Act are identical. *Tracinda Corp.,* 197 F.Supp.2d at 55. To state a claim, the plaintiff must allege: a primary violation of the federal securities laws by a controlled person; control of the primary violator by the defendant; and that the controlling person was in some meaningful way a culpable participant in the primary violation. *Tracinda Corp.,* 197 F.Supp.2d at 55. We have already determined that Plaintiffs have adequately alleged violations of Section 10(b) and Section 11. Therefore, the analysis turns on the two remaining elements. *See id.* (citing *In re Cephalon Sec. Litig.,* No. Civ. A. 96-0633, 1997 WL 570918, at *2 (E.D.Pa. Aug.29, 1997)).

"To establish a defendant is a control person, a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person.' " *In re Mobile Media Sec. Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998) (quoting *Kersh v. Gen'l Council of Assemblies of God,* 804 F.2d 546, 548 (9th Cir.1986)). "In addition to control, culpable participation must be proved before control person liability for misrepresentation attaches." *Mobile Media,* 28 F.Supp.2d at 940 (citing *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975)). To satisfy these additional elements, Plaintiffs in the present case allege that Defendants Wilde and Liu were controlling persons of Ravisent within the meaning of Section 15 and Section 20. (Compl.¶ 34.) The basis for these allegations are the facts that Wilde and Liu are respectively CEO and CFO of Ravisent, they are both Ravisent Directors, and significant shareholders.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants provide authority for the notion that mere allegations of status and stock ownership are insufficient to establish control person liability. (Mot. to Dismiss at 30 n. 12.) However, the instant case can be distinguished from those that Defendants cite. Status or stock ownership is not necessarily sufficient by itself to establish control person liability. *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1243 (N.D.Cal.1991). (Plaintiff must demonstrate "actual power or influence over the company.") The fact that Wilde and Liu are alleged to be the CEO and CFO is sufficient to demonstrate "actual power" or "influence" over the company. *Id.* The issue before us is whether Plaintiffs have satisfied their burden in light of the 12(b)(6) motion, not whether Wilde and Liu were actually liable under this doctrine. Plaintiffs have satisfied the requirements for pleading Section 15 and Section 20 liability.

V. Conclusion

***16** Plaintiffs have pled sufficient facts as to each count to warrant further proceedings in this action. Accordingly, Defendants' Motion to Dismiss will be denied.

And appropriate Order follows.

*ORDER*

AND NOW, this ______ day of July, 2004, upon consideration of Defendants Ravisent Technologies, Inc.'s Motion to Dismiss Consolidated and Amended Class Action Complaint (Doc. No. 13), and all documents in support thereof, and opposition thereto, it is hereby ORDERED that Defendants' Motion is DENIED.

IT IS SO ORDERED.

E.D.Pa.,2004.
In re Ravisent Technologies, Inc.
Not Reported in F.Supp.2d, 2004 WL 1563024, Fed. Sec. L. Rep. P 92,871

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

**H**

Not Reported in F.Supp., 1997 WL 452701
Briefs and Other Related Documents
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
David E. LIPSON, Defendant.
**No. 97 C 2661.**

Aug. 6, 1997.

**MEMORANDUM OPINION AND ORDER**

HOLDERMAN, District Judge.

*1 Defendant has moved for summary judgment against plaintiff's complaint for insider trading fraud and failure to disclose stock trades. Defendant has also moved to dismiss plaintiff's fraud claim for its lack of particularity and to strike plaintiff's request for injunctive relief. Upon evaluation of the appropriate materials and for the reasons stated herein, defendant's motions are all denied.

**BACKGROUND**

In 1995, defendant served as chief executive officer of Supercuts, Inc. The complaint alleges that defendant took advantage of internal company reports of poor sales by selling 365,000 shares of Supercuts in March and April of 1995 before the bad news became public and lowered the stock's price in May 1995. Count I of the complaint seeks damages for fraudulent trading pursuant to section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) and section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder. Count II alleges that defendant violated section 16(a) of the Exchange Act (15 U.S.C. § 78p(a)) and Rules 16a-2 and 16a-3 thereunder by failing to report his stock sales as required for a company officer. Plaintiff seeks to have defendant disgorge the losses he avoided, pay civil penalties, and enjoined from committing further violations of the Securities Act and the Exchange Act.

Defendant has presented three motions for the court to consider. Defendant seeks to dismiss count I under Rule 9(b) of the Federal Rules of Civil Procedure for failure to plead the trading fraud claim with particularity. In his motion for summary judgment, defendant has two arguments to dismiss count I:(1) the internal sales reports were so inaccurate that they were not material nonpublic information, and (2) defendant lacked scienter because the stock was sold under his son's name as part of an attorney-approved estate plan. The latter reason is also an argument for summary judgment for count II, as defendant clams he had no duty to report stock sales which were not his own. Defendant also claims that count II is barred because Rule 16a requires disclosure only for profitable stock sales and plaintiff has not established that defendant did more than avoid losses. Lastly, defendant seeks to strike plaintiff's request for injunctive relief against future violations because the complaint has not pled allegations showing a sufficient likelihood of future violations by defendant.

**ANALYSIS**

I. *Plaintiff has Pled Fraud with Sufficient Particularity*

Defendant contends that plaintiff has not pleaded its fraud claim with the particularity required under Rule 9(b). The complaint alleges that on specified days in early 1995, defendant received Supercuts' internal sales report for the previous month. After defendant discovered that these internal sales reports indicated sales had been between 11 and 16 percent below budget estimates, defendant sold Supercuts shares through a brokerage account. These allegations are sufficient to allege particular facts in violation of Rule 10(b)-5, which states:

> *2 It shall be unlawful ... (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The complaint alleges with particularity how defendant sold Supercuts stock with knowledge of material nonpublic information and thus defrauded the unfortunate stock buyers. Likewise, the allegations are sufficient to state a particular claim under section 17(a) of the Securities Act, which states: "It shall be unlawful ... (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud upon the purchaser."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant relies on Arazie v. Mullane, 2 F.3d 1456 (7th Cir.1993), in which the allegations relied on an undated, unaddressed, and authorless internal memo stating a competitor "had taken some of the patron base away." While *Arazie* held that this was a "scanty description" which could not satisfy Rule 9 (b) (*id.* at 1467), the *Arazie* memo has little similarity in structure or importance to Supercuts' monthly sales reports and the official and lengthy preparation involved in those reports. Moreover, the sales reports are vastly different in content, as the Arazie memo had no specific numbers or overall revenue analysis but only a comment that one factor could have a negative effect. Because plaintiff has stated with particularity the facts giving rise to defendant's fraudulent trading, the motion to dismiss under Rule 9(b) is denied.

II. *Plaintiff has Presented Facts Sufficient to Establish a Claim of Trading with Material Nonpublic Information*

Summary judgment is appropriate only if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir.1997). The non-moving party is entitled to the benefit of all reasonable inferences. *Id.*

In regards to count I, defendant first claims that he did not violate the insider trading statute because Supercuts' internal sales reports were historically unreliable and thus were not material information. To have his summary judgment motion granted, defendant must show that the sales reports were so obviously unimportant to an investor that reasonable minds could not differ on the issue of materiality. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). As an example of the inaccuracy of the internal reports, defendant notes that a report defendant allegedly saw on March 8, 1995 temporarily understated the discrepancy between actual revenue for February 1995 and budgeted revenue for the month. Unfortunately for defendant, this negative inaccuracy gave defendant even greater reason to believe that Supercuts' stock would fall on publication of the news in May 1995, and thus the information was material in favor of selling stock even if wildly inaccurate. In order to believe defendant that the devastating internal sales reports had no correlation with reality whatsoever, this court would have to take a leap of faith in favor of defendant, the moving party. As plaintiff is entitled to all reasonable inferences for this motion, the court finds that the internal sales reports were not obviously unimportant and denies summary judgment on this ground.

*3 Defendant next argues that he lacked scienter because the stock sales were part of the estate plan for his son, a wholly innocent explanation for the sales in both motive and timing. As to motive, defendant has cited no authority that generous conduct would excuse his insider trading. In addition, plaintiffs have presented evidence that defendant directly controlled the sales proceeds for his own personal benefit. As to innocent timing, defendant relies on *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990), which held that insider sales did not show scienter when the insiders had longstanding programs of periodic disinvestment and had sold an even greater number of shares directly before the time-period at issue. Unlike *Apple,* defendant has not shown that he sold any shares for himself or his son before learning the disappointing nonpublic news, and thus the court may properly infer scienter from the particular timing of the sales in this case.

Lastly, defendant claims he lacked scienter because his attorneys approved all sales. Defendant, though, has not shown that he told his attorneys that he was privilege to material nonpublic information. Only one attorney developed any knowledge that defendant might have traded on adverse news, and this attorney confronted defendant after the trade and told him it was "foolish." ¶ 35 Pl. R. 12(N) Stat. This attorney then went to Supercuts' outside counsel and an outside Member of the Board of Directors to say that defendant's transaction really troubled him in the wake of the adverse news. Although defendant attempts to attack the attorney's credibility, such character questions are appropriately resolved by the trier of fact. Because defendant withheld pertinent facts from his other attorneys before receiving their consent, he cannot portray himself as an innocent soul misguided by his attorneys. Since there remain genuine issues of fact regarding count I against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant, the motion for summary judgment on count I is denied.

### III. *Plaintiff has Shown Material Issues of Fact Regarding Defendant's Compliance with Statutory Disclosure Requirements*

Defendant also claims that he did not have to report the stock sales as alleged in count II because either (1) he did not have a pecuniary interest in the sales, (2) he did not receive a profit from the sales but only avoided additional losses, or (3) his son did not live with him. In response to the first contention, plaintiff has evidence of pecuniary interest showing that defendant directly controlled the proceeds from the stock sales and distributed those proceeds to entities entirely controlled by defendant for his own personal benefit.

As to defendant's second claim that profits from a stock sale are a prerequisite to the disclosure requirement, Rule 16a-1(a)(2) defines who is subject to the reporting requirements:

> any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities, subject to the following:
>
> ***4** (i) The term pecuniary interest in any class of equity securities shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities. 17 C.F.R. § 240.16a-1(a)(2)

While defendant cites cases limiting the definition of "profit" to a positive net gain, the Rule 16a-1(a)(2) phrase "opportunity ... to profit" focuses on a person's potential to gain from their stock. The American Heritage Dictionary defines "opportunity" as "a chance for progress or advancement." 2nd Ed. at 872. Because ownership of any stock represents an opportunity and chance to profit should the stock go higher, the statutory language mandates that the actual profit or loss of a sale is irrelevant to the disclosure requirement. Since plaintiff has shown evidence that defendant controlled all proceeds from a sale, defendant had the opportunity to profit from his Supercuts' stock. Taking all inferences in plaintiff's favor, the requirements of Rule 16a-1(a)(2) were met and defendant was required to report his sale of stock.

Defendant's final claim is the statute mandates that he was not required to report his son's sales because his son did not live with him, citing Rule 16a-1(a)(2)(ii)(A). This provision directs a rebuttable presumption that an officer is the beneficial owner of securities held by an immediate family member in the same household. Because the provision serves only to expand the scope of beneficial ownership as defined in Rule 16a-1(a)(2)(i), it cannot aid defendant in this matter when he comes directly within the Rule 16a-1(a)(2)(i) definition. Accordingly, summary judgment is denied on count II.

### IV. *Defendant has not Demonstrated that Plaintiff's Request for Injunctive Relief is Immaterial*

Lastly, defendant contends that plaintiff's request for injunctive relief should be stricken because the complaint has not pleaded facts which would warrant an injunction. A Rule 12(f) motion allows the striking of "redundant, immaterial, impertinent, or scandalous matter." F.R.Civ.P. Rule 12(f). Motions to strike are not favored, and the court will not grant the motion unless it is clear that the matter at issue can have no bearing on the litigation. *Kruse v. Aamed, Inc.*, 1997 WL 102528 (N.D.Ill.).

In a case involving violations of securities laws, an injunction requires a substantial likelihood of future violations. *Securities and Exchange Commission v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). Defendant claims that plaintiff's allegations of isolated illegal conduct fail to show a substantial likelihood of future violations, citing *Youmans*. In *Youmans*, though, the court listed seven factors to determine the likelihood of future violations, of which isolated violations were only one factor. Because defendant has not addressed the other six factors regarding injunctive relief, he has not demonstrated that the claim for injunctive relief is immaterial. Accordingly, the motion to strike the claim for injunctive relief is denied.

### CONCLUSION

***5** For the reasons stated above, the motions for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment, to dismiss pursuant to Rule 9(b), and to strike are all DENIED. The parties are urged to discuss the settlement of this case.

N.D.Ill.,1997.
S.E.C. v. Lipson
Not Reported in F.Supp., 1997 WL 452701

Briefs and Other Related Documents (Back to top)

• 1:97cv02661 (Docket) (Apr. 17, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.