# EXHIBIT I

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

**H**

Not Reported in F.Supp., 1998 WL 743668
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Alex TSE, et al., Plaintiffs,
v.
VENTANA MEDICAL SYSTEMS, INC.; Jack W. Schuler;
John Patience; and Marquette Venture Partners, Defendants.
**No. C.A. 97-37-SLR.**

Sept. 23, 1998.

Stephen P. Lamb , and Joel E. Friedlander , of Lamb &
Bouchard , Wilmington, Delaware, Emil Hirsch , of
Freedman, Levy, Kroll & Simonds, Washington, D.C., for
plaintiffs, of counsel.
Jesse A. Finkelstein , and Raymond J. DiCamillo , of
Richards, Layton & Finger , Wilmington, Delaware, Steven
M. Katz , Elizabeth M. Saunders , and Michele E. Rose , of
Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California,
for defendants, of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Plaintiffs Alex Tse, Margaret Wai Lam Leung, Michelle
Leung, and Ching-Shuang Shih filed this action against
defendants Ventana Medical Systems, Inc. ("Ventana"),
Jack W. Schuler, John Patience, and Marquette Venture
Partners ("Marquette"), alleging violations of § 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq.
("the 1934 Act") and Rule 10b-5 promulgated by the
Securities and Exchange Commission, in connection with a
merger between Biotek Solutions, Inc. FN1 ("Biotek") and
Ventana. (D.I.27, ¶¶ 53-77) Plaintiffs allege numerous
related state and common law violations. (D.I.27, ¶¶
78-100) Specifically, it is alleged that an insider transaction
of Ventana stock between defendants was not disclosed
when plaintiffs were asked to approve the merger. (D.I.27)
Plaintiffs also allege that the terms of the insider transaction
were far more favorable than the terms offered to the
shareholders of Biotek for Ventana stock. (D.I.27)

> FN1. Biotek is "in the business of developing,
> manufacturing, and marketing instruments/reagent
> systems that automate immunohistochemistry and
> [in situ ] hybridization tests for the analysis of cells
> and tissues on microscope slides." (D.I.27, ¶ 13)

Jurisdiction over the federal securities law claim is
authorized under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.
The court has supplemental jurisdiction over the state and
common law claims since they are related to plaintiffs'
federal claim. 28 U.S.C. § 1367(a).

Presently before the court is defendants' motion to dismiss
the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure
to state a cognizable claim. (D.I.48)

II. BACKGROUND

Defendant Ventana is a Delaware corporation with its
principal offices in Tucson, Arizona. (D.I.27, ¶ 4) Ventana
is in the business of developing, manufacturing, and
marketing medical instruments that are used in the analysis
of cells and tissues in connection with the diagnosis and
treatment of cancer. Until February 1996, Ventana was
Biotek's principal competitor. (D.I.27, ¶ 23) Defendants
Schuler and Patient reside in Illinois and are directors of
Ventana. (D.I.27, ¶¶ 5-6) Defendant Marquette is a venture
capital investment firm. FN2 (D.I.27, ¶ 7) Marquette is an
Illinois partnership in which defendant Patience was a
general partner until March 1995. (D.I.27, ¶ 7)

> FN2. Marquette, through an initial capital
> investment, began its financial relationship with
> Ventana in 1989. (D.I. 41, Ex. A at 28-31) Since
> Marquette's investment in Ventana was substantial,
> a Marquette representative (Patience) was elected
> to sit on Ventana's board of directors in a
> non-voting capacity beginning in July 1989. (D.I.
> 41, Ex. A at 7-8, 34-35; D.I. 43, Ex. 7 at V000051)
> Marquette was also given visitation rights to attend
> Ventana's board meetings and examine board
> meeting minutes, financial materials, and other
> information provided to Ventana's board. (D.I. 43,
> Ex. 7 at V000051)
> In addition to serving as a director of Ventana in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

Page 2

his own right, Patience continued to serve as Marquette's representative even after his separation from Marquette in March 1995. (D.I. 41, Ex. A at 34, 44-45) After March 1995, Marquette also designated Keith Kerman as its representative on Ventana's board of directors. (D.I. 41, Ex. A at 44) Accordingly, Kerman, on behalf of Marquette, also attended Ventana's board meetings. (D.I. 41, Ex. A at 44-45; D.I. 43, Ex. 41, 44, 48-49, 51, 55-56) At some time after 1992, Ventana, at the request of Marquette, changed its state of incorporation from California to Delaware. (D.I. 41, Ex. A at 35-36)

Between 1992 and 1995, plaintiffs made several cash investments in Biotek. (D.I.27, ¶ 12) In return for these investments, plaintiffs received Biotek common stock ("Biotek Stock") and Biotek promissory notes ("Biotek Notes"). (D.I.27, ¶¶ 12-15) The following are the total shares of Biotek Stock and dollar amounts of Biotek Notes that each plaintiff received:

| Plaintiff | Shares of Biotek Stock |
|---|---|
| Tse | 18,904 |
| Margaret Leung | 547,835 |
| Michelle Leung | 35,252 |
| Shih | 19,935 |

(D.I. 27, ¶¶ 16-22

On December 12, 1995, Biotek and Ventana entered into a letter of intent setting forth the proposed terms of a merger plan. (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Under the terms of the merger plan, Ventana Acquisition Corporation, a wholly-owned subsidiary of Ventana, was to "merge[ ] with and into Biotek, leaving Biotek as the successor corporation and a wholly-owned subsidiary of Ventana." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) The plan also provided that after Biotek satisfied certain liabilities, Biotek Stock would be converted into the right to receive cash and promissory notes of Ventana, called "Ventana Payment Notes." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Biotek Notes would be converted into subordinated convertible promissory notes of Ventana, called "Ventana Exchange Notes." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Under the terms of the merger, Ventana Exchange Notes were convertible into Ventana common stock at a rate

of $5.00 per share. (D.I. 27, ¶ 42; D.I. 49, Ex. 1) The letter of intent concluded by stating that "[t]he parties shall diligently and in good faith use their best efforts to negotiate and execute a definitive acquisition agreement and attendant documents and to consummate the Acquisition." (D.I. 49, Ex. 1 at A5)

**\*2** Plaintiffs allege that on or about January 10, 1996, the board of directors for Biotek approved a proposed merger with Ventana. (D.I.27, ¶ 25)

Plaintiffs allege that on January 16, 1996, Ventana's board of directors approved in principle the sale of 646,664 shares of Ventana common stock to defendants Schuler, Patience, and Marquette. (D.I.27, ¶ 48(a)) Ostensibly, the sale was compensation for Schuler's and Patience's time spent working on Ventana's business. FN3 (D.I. 29 at 2) Plaintiffs allege that the adjusted (post Reverse-Split) purchase price of $1.62 per share was determined by Ventana's board of directors "to equal the fair market value of Ventana's Common Stock as of January 1996." (D.I.27, ¶ 48(b)) Final approval of the compensation package occurred at Ventana's February 23, 1996 board meeting.

$1,060,054.64

FN3. According to Patience, his resignation from Marquette involved a "Separation Agreement [ ] which, *inter alia*, outlined the disposition of compensation [he] received from certain Marquette portfolio companies during a defined period of time." (D.I. 29 at 1) Patience claims that when Ventana's board of directors authorized his right to purchase Ventana stock at a specified price, a "question arose between [him] and Marquette as to whether" this right was subject to the Separation Agreement. According to Patience, this question was resolved by assigning to Marquette Patience's right to purchase a certain portion of Ventana stock at the designated price. (D.I. 29 at 2)

On January 19, 1996, a definitive letter of intent to merge, which incorporated the terms set forth in the letter of intent, was executed. (D.I. 27, ¶ 27; D.I. 49, Ex. 2) On or about February 8, 1996, Biotek's board of directors sent a letter to all holders of Biotek securities, soliciting their approval of the planned merger. (D.I.27, ¶ 28) The letter explained the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

Page 3

terms of the merger and the proposed conversion of Biotek Stock and Notes into Ventana Payment Notes and Exchange Notes. (D.I.27, ¶¶ 28-29) Enclosed with the letter was an Information Sheet (D.I.49, Ex. 3), jointly issued by Biotek and Ventana, which disclosed that "due to the size of Biotek's outstanding liabilities, there would be no cash proceeds or Ventana Payment Notes available for disbursement to the holders of Biotek Stock." (D.I.27, ¶ 31)

Included as an exhibit to the Information Sheet was the Agreement and Plan of Reorganization ("the Agreement"). (D.I. 27, ¶ 32; D.I. 49, Ex. 2) Section 4.5 of the Agreement set forth the "authorized capital stock of Ventana as of the date hereof" and identified that Ventana had 2, 110, 789 shares of common stock and 70, 089 shares of preferred stock "reserved for issuance ... under its stock option and stock purchase plans." (D.I. 49, Ex. 2 at A30-31) Section 4.7 of the Agreement provided:

No representation or warranty made by Ventana in this Article IV or in any other Article or Section of this Agreement, or in any certificate, schedule or other document furnished or required to be furnished by Ventana pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they are made.

(D.I. 49, Ex. 2 at A31) Similarly, § 6.3(a) provided that

[t]he representations and warranties of Ventana and Sub set forth in Article IV of this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and as of the Effective Time as though made on and as of the Effective Time (except to the extent such representations and warranties speak only as of an earlier date, including, without limitation, Ventana's representations as to outstanding capitalization), and the covenants and agreements of Ventana and Sub set forth herein shall have been complied with in all material respects and Bio[t]ek shall have received a certificate signed by an authorized officer of Ventana and Sub dated the Effective Time to such effect.

*3 (D.I. 49, Ex. 2 at A39)

Based on the terms of the merger agreement, 90% of the

outstanding Biotek Stock had to vote in favor of the planned merger. (D.I.27, ¶ 35) Plaintiffs Tse and Margaret Leung, who owned 9.12% of the outstanding merger, were dissatisfied with the planned merger because they would receive no payment for their Biotek Stock. (D.I.27, ¶¶ 33, 35) After expressing their dissatisfaction to Biotek director Johnson Lee ("Lee"), plaintiffs allege that Lee and Michael R. Danzi ("Danzi"), Biotek's president, sought to persuade them to change their position. (D.I.27, ¶ 36) According to plaintiffs, Danzi represented that Biotek was experiencing a serious shortage of capital and had to accept the planned merger or file for bankruptcy. (D.I.27, ¶ 37(a)) Danzi also allegedly stated that Ventana was planning to make an initial public offering soon after the proposed merger and that the expected initial public offering price was estimated to be between $4.00 and $5.00 per share without the Biotek merger, and $8.00 per share after the merger. (D.I.27, ¶ 37(b)) Plaintiffs also aver that they were informed by Danzi that he "and all Ventana insiders did not receive and were not about to receive any commission or other compensation in connection with their efforts in facilitating" the planned merger. (D.I.27, ¶ 37(d))

On February 19, 1996, plaintiffs Tse and Margaret Leung sent Biotek a letter, indicating that they would vote to approve the merger plan. (D.I.27, ¶ 39) Plaintiffs Shih and Michelle Leung also approved the merger plan and agreed to the conversion of their Biotek Stock and Notes. (D.I.27, ¶ 40)

On February 23, 1996, the merger plan was formerly approved and became effective on February 26, 1996. (D.I.27, ¶ 41) Under the terms of the merger agreement, the Ventana Exchange Notes that were to be issued to holders of Biotek securities were convertible into Ventana common stock at a conversion price of $13.53 per share. FN4 (D.I.27, ¶ 42) Biotek Noteholders had 30 days beginning on February 26, 1996, to convert all or part of their holdings into Ventana common stock. (D.I.27, ¶ 42)

> FN4. The conversion price of $13.53 per share is based on an adjustment from the original conversion price of $5.00 per share because of a 2.7 to 1 reverse stock split of Ventana Common Stock. (D.I. 27, ¶ 42 n. 1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

Page 4

On March 20, 1996, a public meeting was held in Newport Beach, California by Ventana to, *inter alia,* inform and educate holders of Biotek securities about the advantages and disadvantages of exercising the right to convert the Ventana Exchange Notes. (D.I.27, ¶ 50) A private meeting was held immediately preceding the public meeting in which Schuler, Patience, Danzi, Lee, and Michelle Leung were present. (D.I.27, ¶ 50) Ventana's president and chief executive officer, R. James Danehy, was also present at the private meeting. (D.I.27, ¶ 50) According to plaintiffs, the defendants made no mention of any compensation plan for Ventana insiders in either the private or the public meeting.

On March 24, 1996, Tse, Margaret Leung, and Michelle Leung elected not to convert any of their Ventana Exchange Notes into Ventana common stock. (D.I.27, ¶ 43) Plaintiff Shih converted half of her Ventana Exchange Notes and received 1,434 FN5 shares of Ventana Common Stock and an unsecured promissory note in the amount of $19,389.77. (D.I.27, ¶ 44)

> FN5. Prior to the Reverse-Split, Shih had received 3,879 shares of Ventana common stock. (D.I.27, ¶ 44)

*4 In April and May 1996, Patience, Schuler, and Marquette completed the purchase of the stocks they were offered as part of a purported compensation package. Patience and Schuler purchased a total of 616,481 shares, while Marquette purchased 30,183 shares. (D.I.27, ¶ 48) According to plaintiffs, this "insider transaction" was not disclosed to the plaintiffs or the public until it was made public in a July 3, 1996 preliminary prospectus issued in connection with Ventana's initial public offering. (D.I.27, ¶ 51)

On or about March 1, 1997, the Ventana Exchange Notes were paid in full. (D.I.27, ¶ 33)

Plaintiffs allege that the approval of the merger was tainted by the following representations and omissions:
a. As early as January 16, 1996, Ventana's [b]oard of [d]irectors approved in principle the sale of a total of 646,664 shares of Ventana [c]ommon [s]tock to insiders[ ] Jack W. Schuler and John Patience[ ] and Defendant[ ]

Marquette Venture Partners[ ], a venture capital fund, with whom Patience had an affiliation [ ].
b. The purchase price under the [i]nsider [t]ransaction was fixed by the [b]oard of [d]irectors at $1.62 per share ( [p]ost Reverse [-] Split) which was determined by the [b]oard to equal the fair market value of the Ventana [c]ommon [s]tock as of January 1996. This determination of value at $1.62 was contemporaneous with Ventana's offer to convert the Ventana Exchange Notes into Ventana [c]ommon [s]tock at a price of $13.53 ( [p]ost Reverse[-]Split) within thirty days after February 26, 1996.
c. The specific terms of the [i]nsider [t]ransaction and its final approval were given by the [b]oard of [d]irectors of Ventana on February 23, 1996, which had also been set to be the date on which the [s]pecial [m]eeting of [s]hareholders of Biotek was held in order to approve the [m]erger.
d. The proxy materials and, specifically, the Information Statement, disclosed all common stock equivalents as of December 31, 1995. Similarly, ¶ 4.5 of the [ ] Agreement discussed Ventana's outstanding options, warrants and other common stock equivalents as of January 19, 1996 but did not disclose the [i]nsider [t]ransaction under which a significant block of dilutive Ventana [c]ommon [s]tock was to be issued, thus rendering the discussion of options, warrants and other stock equivalents misleading. In addition, by holding the $13.53 per share price ( [p]ost Reverse[-]Split) out to Plaintiffs as a conversion price, Ventana impliedly represented that such a number bore a reasonable realitionship to the per share fair market value of that stock.
(D.I. 51 at 7) (citations omitted).

### III. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court primarily must consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case as well as exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The court also may "consider a concededly authentic document upon which the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

Page 5

complaint is based when the defendant attaches such a document to its motion to dismiss." *Id.* at 1196. In ruling on a 12(b)(6) motion, the factual allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam* ). Moreover, the court must accept as true all allegations contained in the complaint and is bound to give the plaintiff the benefit of every reasonable inference to be drawn from those allegations. *See Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963) ; *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). Accordingly, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *See Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (*per curiam* ). Thus, the "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ; *Ransom v. Mazzaro,* 848 F.2d 398, 401 (3d Cir.1988).

## IV. DISCUSSION

### A. Plaintiffs' Section 10(b) and Rule 10b-5 Claim

**\*5** The relevant statutes for purposes of evaluating defendants' motion are § 10(b) of the 1934 Act and Rule 10b-5. Section 10(b) prohibits any person

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1997). Rule 10b-5, enacted pursuant to § 10, makes it unlawful in connection with the purchase or sale of any security

[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b-5(b) (1998). FN6

**FN6.** The Supreme Court, in *SEC v. Nat'l Sec., Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) , held that a merger constitutes a "sale" under Rule 10b-5 because securities of the acquired corporation are "purchased" in exchange for an acquiring corporation's securities. *See id.* at 468. Therefore, defendants' exchange of Ventana securities for Biotek securities is a "sale" within the meaning of Section 10(b).

In addition, compliance with § 14 of the Securities Exchange Act is required whenever a corporation solicits a proxy. Rule 14a-9, promulgated under § 14 of the 1934 Act, provides that

[n]o solicitation subject to this regulation shall be made by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a); *see also* 15 U.S.C. § 78n(a) (1996). The Third Circuit recognizes that Rule 14a-9 and Rule 10b-5, both of the 1934 Act, apply equally to false or misleading statements used to solicit a proxy. *See Scattergood v. Perelman,* 945 F.2d 618, 622 (3d Cir.1991).

To establish a claim for securities fraud under Rule 10b-5 or Rule 14a-9, plaintiffs must prove that (1) a recognized duty existed with the defendants; (2) the defendants made misstatements or omissions of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which plaintiffs relied; and (6) that plaintiffs' reliance was the proximate cause of their injury. *See id.; In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989) ; *D & N Financial Corp. v. RCM Partners Ltd. Partnership,* 735 F.Supp. 1242, 1247 (D.Del.1990). Furthermore, since the claim being asserted is a fraud claim, plaintiffs must satisfy the heightened pleading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

requirements of Federal Rule of Civil Procedure 9(b). *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A fraud complaint must state "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Rule 9(b)'s heightened pleading standard provides defendants with notice of the claims against them while reducing the number of frivolous suits brought solely to extract settlements. *See In re Burlington*, 114 F.3d at 1418 (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994)). However, when the factual information is within defendants' control, as it is here, the standard is "relaxed". *See id.* To meet this "relaxed" standard, plaintiffs must accompany their legal theory with factual allegations that make their theory seem plausible. *See id.; Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.1992).

### 1. Loss Causation

*6 Initially, defendants argue that plaintiffs have failed to state a § 10(b) claim because they have not adequately pled loss causation. Under Rule 10b-5, plaintiffs have "the burden of proving that the act or omission of the defendant caused the losses for which [they] seek[ ] to recover damages". 15 U.S.C. § 78u-4(b)(4). To prove the causation element, plaintiffs must establish both transaction and loss causation. FN7 *See Scattergood*, 945 F.2d at 622; *see also Litton Indus., Inc., v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir.1992). Transaction causation focuses on whether the misrepresentation induced the plaintiff to enter the transaction. *See Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 562 (W.D.Pa.1996). Loss causation, on the other hand, relates to whether the misrepresentation caused plaintiff's pecuniary loss. *See id.* Thus, transaction causation is akin to but-for causation while loss causation corresponds to proximate causation. *See id.* Transaction causation is presumed in securities cases when the claim is based on a failure to disclose and the information withheld is material. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456,

31 L.Ed.2d 741 (1972) ; *Litton*, 967 F.2d at 748. In contrast, to establish loss causation, plaintiffs must allege that the misrepresentation was the direct or proximate cause of the economic loss. *See Edward J. DeBartolo Corp.*, 928 F.Supp. at 562; *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 209 (S.D.N.Y.1997). Only loss causation is at issue on this motion.

> FN7. Although the Third Circuit has not directly addressed the issue of loss causation, it has noted that proximate cause is an element of a Rule 10b-5 claim and that a plaintiff must show that the misrepresentations "touch upon the reasons for the investment's decline in value." *In re Phillips Petroleum*, 881 F.2d at 1244 (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981), *aff'd in part reversed in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

Plaintiffs claim that they have suffered damages as a result of defendants' omission and misrepresentation of material facts, averring that they would have held out for more favorable conversion terms. (D.I.27, ¶¶ 72, 77). Specifically, plaintiffs allege

> that the nondisclosure and concealment of Ventana's true fair market value of $1.62[ ] per share, as determined by its [b]oard of [d]irectors[,] allowed Ventana's pre-merger shareholders to retain approximately eighty-three percent (83%) of the combined equity after the [m]erger, whereas a full disclosure of the true fair market value of Ventana would have necessitated a material decrease in the Five Dollar ($5.00) conversion price which would have allowed the holders of Biotek [s]ecurities to receive upon conversion forty percent (40%) of the combined equity after the [m]erger.

(D.I. 27, ¶ 72; *see also* D.I. 27, ¶ 77) The primary loss alleged by plaintiffs is the opportunity to convert their Ventana Exchange Notes into Ventana common stock at the lower rate offered to the directors ($1.62), not the $5.00 rate which the Agreement allegedly implied was the fair market value, and thereby realize " 'a greater piece of the Ventana Pie.' " FN8 (D.I. 51 at 12)

> FN8. As noted above, plaintiff Shih did elect to convert one-half of her notes into 3,879 shares of

Westlaw.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

Ventana stock.

The Third Circuit recognizes standing to bring suit based upon claims of lost opportunity. *See Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir.1976). In *Gould*, plaintiffs filed suit claiming inadequate disclosure in a proxy statement. Plaintiffs claimed that selected shareholders were offered more favorable conversion terms for their holdings under the terms in a merger than were other shareholders and that this arrangement was not disclosed in the proxy statement. *See Gould*, 535 F.2d at 765-69. In finding for the plaintiffs, the Third Circuit, agreeing with the reasoning of the trial court, found that by the circulation of defective proxy materials "plaintiffs were lulled to inaction and thereby suffered the loss of an opportunity to secure a merger agreement which would be more favorable to them." *Id.* at 782 ("[W]hile it was possible that full disclosure and correction of the defective proxy materials would not have affected the terms of the merger it was equally possible that such disclosure might have resulted in the favored defendants sharing with plaintiffs the premium of $8.25 per share which the former received.").

*7 Defendants rely on the holding in *Norwood*, 959 F.Supp. at 209-10, in which the court dismissed plaintiff's § 10b claim for failure to adequately plead loss causation. In *Norwood*, plaintiff, a non-convertible note holder, sued the acquiring company for, *inter alia*, violations of Rule 10b-5 arising out of alleged misrepresentations made during the course of merger negotiations. *See id.* at 207. Plaintiff alleged that "it was damaged because, had it known about defendants' fraud, it would have pursued other options, such as selling [the target company] to another interested company or putting [the target] into bankruptcy sooner." *Id.* at 209. The *Norwood* court found that plaintiff, as a debt holder, had failed to allege actual loss due to a decline in the acquiring corporation's stock price. *See id.* at 209-10. Although sufficient allegations of misrepresentation were found, the court found no causal link between the drop in stock price following the merger and plaintiff's notes. *See id.* at 209-10. The court reasoned that "absent a threat to [the acquiring corporation's] solvency (which was not alleged), a decrease in [the acquirer's] stock price cannot render

[plaintiff's] debt less likely to be paid." *Id.* at 209-10.

In the instant case, however, plaintiffs' complaint alleges that their loss resulted from the opportunity to convert at a better rate, not merely from their status as Ventana security holders. In *Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234 (3d Cir.1976), the Third Circuit held that a convertible bond purchaser who alleged purchase of securities in reliance on misleading statements and omissions in a prospectus had standing to bring a suit for damages under Rule 10b-5. *See id.* at 1238-39. The Third Circuit reasoned that because of the convertible feature of a bond, which is directly related to stock price, "a misrepresentation in the prospectus that would be material to a stock purchaser would be material to a convertible bond purchaser. The convertible bond purchaser may well have been defrauded of the interest differential." *Id.* at 1238. Even absent actual conversion or default of the debentures, the court concluded that a convertible bondholder may have experienced the same fraud as a stock purchaser because of misrepresentation in a prospectus. *See id.* at 1238-39. This convertible feature, which the plaintiffs in the instant action possessed, differentiates the instant case from the holding in *Norwood*.

In the case at bar, the Agreement required a 90% affirmative vote of the outstanding Biotek Notes in order to consummate the merger. (D.I.27, ¶ 35) Plaintiffs owned approximately 9.12% of all the outstanding Biotek Notes. (D.I.27, ¶ 35) Consequently, although their consent was not necessarily required to effectuate the merger, plaintiffs were in a relatively strong bargaining position. Thus, the court cannot conclude, based upon the pleadings, that had plaintiffs not been "lulled to inaction" by defendants' alleged omissions/misrepresentations, they would not have successfully prevailed upon Ventana to pay a higher price for Biotek. FN9 *Cf. Fought v. Hayes Wheels Int'l, Inc.*, 101 F.3d 1275, 1277 (8th Cir.1996) (stating that a court cannot afford a non-moving party " 'the benefit of unreasonable inferences' " (citation omitted)); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir.1990) (same). Therefore, accepting plaintiffs' allegations as true, the court finds that plaintiffs have adequately pled facts establishing loss causation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 8
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

FN9. The court notes defendants' argument that "by the spring of 1995, Biotek was experiencing considerable financial difficulties and by that fall it was on the verge of bankruptcy." (D.I. 48 at 5) However, support for this statement is drawn from Ventana's Initial Public Offering Prospectus, dated July 26, 1996, a document that was neither attached to nor the basis of plaintiffs' complaint; thus, the court cannot consider this document in considering defendants' motion to dismiss.

2. Duty to Disclose Omitted Facts

*8 Plaintiff makes four arguments in support of defendants' duty to disclose: (1) defendants' duty to prospective purchasers; (2) defendants' duty to correct and update prior statements; (3) defendants' duty arising from the good faith obligation expressed in the letter of intent; and (4) defendants' duty to disclose as a function of California law.

Duty to prospective purchasers. Absent a specific statutory or regulatory duty, insider trading, or a fiduciary duty, a corporation and its officers have no affirmative duty of disclosure. See _In re General Motors Class E Stock Buyout Sec. Litig., 694 F.Supp. 1119, 1129 (D.Del.1988)_. Thus, a duty to disclose under § 10(b) does not arise merely from the possession of non-market information. See _Chiarella v. United States, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)_. Rather, liability for securities nondisclosure "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." _Id._ at 230; accord _Dirks v. SEC, 463 U.S. 646, 657-658, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)_; see also _Berkowitz v. Conrail_, No. Civ. A. 97-1214, 1997 WL 611606, at *7 (E.D.Pa. Sept. 25, 1997) (stating that when a fraud claim is based on nondisclosure of information, "there can be no finding of fraud if the corporation was under no duty to disclose the information"). As the Supreme Court acknowledged in _Chiarella_, corporate insiders, particularly officers, directors, or controlling stockholders, assume an affirmative duty of disclosure when trading in shares of their own corporation. See _Chiarella 445 U.S. at 226-27_ (citing _In re Cady, Roberts & Co._, 40 S.E.C. 907, 1961 WL 3743 (1961)). "[I]nsiders must disclose material facts which are known to them by virtue of their position but which are

not known to persons with whom they deal and which, if known, would affect their investment judgment." _Cady, Roberts_, 1961 WL at *3. This duty extends not only to existing shareholders but also to nonshareholders when sales of securities are made to them. See _id._ at *5; see also _Gratz v. Claughton, 187 F.2d 46, 49 (2d Cir.1951)_. Such a duty ensures that corporate insiders "will not benefit personally through fraudulent use of material, nonpublic information." _Chiarella, 445 U.S. at 230_.

Defendants argue that where the acquirer was neither an insider nor a fiduciary of the target, the acquirer owes no duty to disclose to the shareholders of the target. Although such a assertion may be true, it is not relevant under the circumstances of the case at bar. FN10 In the instant action, the acquiring corporation traded in its own securities. By the terms of the Agreement, defendants were asking plaintiffs to become equity shareholders in the acquiring corporation, Ventana. Accordingly, as "insiders," defendants assumed an affirmative duty to disclose material information. FN11 Given the fact that plaintiffs allege that approval in principle of the Schuler/Patience, compensation package (i.e., the "insider transaction") occurred virtually simultaneously with the issuance of the proxy materials, plaintiffs' complaint adequately states a claim based on defendants' duty to disclose material information. FN12 See _Voit v. Wonderware Corp., 977 F.Supp. 363, 369 (E.D.Pa.1997)_ (finding that plaintiffs established a duty to disclose where they alleged that the acquiring corporation traded on its overvalued shares by using to them to purchase the target). FN13

FN10. Defendants rely on two cases in support of their position, neither of which is applicable to the case at bar. In _Staffin v. Greenberg, 672 F.2d 1196 (3d Cir.1982)_, rev'd on other grounds, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Third Circuit held that an acquiring corporation which was neither an insider nor a fiduciary was not under a duty to disclose its plans to acquire the target company even if the purchase was based on knowledge of nonpublic material facts. See _id. at 1202_. In _Gordon v. Diagnostek, 812 F.Supp. 57 (E.D.Pa.1993)_, plaintiffs filed suit against both

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

companies involved in a merger negotiation, alleging a failure to disclose financial data. *See id. at 59.* Citing to the Third Circuit's decision in *Staffin,* the district court held that an acquiring corporation in a failed arms-length acquisition owed no duty to disclose to the shareholders of the target corporation. *See id. at 60.* There was no duty, the court reasoned, because the acquiring corporation had no relationship with the target: absent "a fiduciary or other relationship of trust stemming from prior dealings between the parties" no duty to disclose nonpublic market information arises. *Id.* Neither of these cases involved an acquiring corporation trading in its own securities; thus, they are inapplicable to the case at bar.

FN11. Defendants argue that the complaint fails to allege that (1) Marquette made any material misstatement or omission or (2) any facts which would give rise to any duty between Marquette and plaintiffs. (D.I. 48 at 32) Plaintiffs do not contest defendants' assertions. However, after review of the complaint and items appearing in the record of the case, the court finds that Marquette is an "insider" within the meaning of Rule 10b-5.
Although "insiders" are traditionally defined as directors, officers, and controlling shareholders of the corporation, these three groups do not define the classes of persons who have an obligation to refrain from trading on nonpublic information. Rather, the prohibition extends to those individuals who are in a special relationship with the corporation and are thereby privy to confidential information. *See Cady, Roberts,* 1961 WL 3743. Thus, under certain circumstances, even outsiders can be subject to the same restraints as are insiders. *See Dirks,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911. Moreover, where an individual is "deputized" to serve as a director of another company, for the benefit of that third party, then the third party also incurs liability. *See Blau v. Lehman,* 368 U.S. 403, 409, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).
In the case at bar, in 1989, Marquette acquired a

substantial interest in Ventana. (D.I. 41, Ex. A at 28) Since that time, a representative from Marquette has served on Ventana's board of directors, albeit in a non-voting capacity. (D.I. 41, Ex. A at 34-35) As a capital investment firm, Marquette has a substantial interest in monitoring Ventana's financial welfare. With a member on the board of directors, even though non-voting, Marquette could influence and direct certain financial decisions. (D.I. 41 at 58) In fact, Marquette insisted that Ventana change its state of incorporation to Delaware. (D.I. 41 at 36) Thus, given Marquette's close relationship with Ventana, the court finds that Marquette is also an "insider" within the meaning of Rule 10b-5.

FN12. For purposes of securities fraud litigation, for a fact to be material " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ' *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Materiality is a mixed question of law and fact, and the assessment of the inferences a reasonable shareholder would draw from a particular set of facts is "peculiarly for the trier of fact." *Shapiro,* 964 F.2d at 281 n .11. Only if the alleged omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to resolve the issue as a matter of law through dismissal. *See id.; TSC Indus.,* 426 U.S. at 449. Applying this standard to the case at bar, the court finds defendants' alleged omission of the Schuler/Patience compensation package to be material.

FN13. The court declines to address plaintiffs' alternative theories as to defendants' duty to disclose.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00831-SLR    Document 58-4    Filed 09/07/2005    Page 11 of 38



Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

### 3. Scienter

*9 Defendants argue that plaintiffs have failed to plead scienter with the required particularity. In response to the debate over frivolous litigation, Congress enacted the Private Securities Reform Litigation Act ("PSRLA"), Pub.L. No. 104-67, 109 Stat. 737, 15 U.S.C. § 78u-4 (1995). Applicable to actions filed after December 22, 1995, the PSRLA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint which fails to meet this standard must be dismissed upon motion by the defendant(s). See id. § 78u-4(b)(3)(A). However, in drafting the PSRLA, Congress failed to include what allegation of facts are sufficient to establish a "strong inference that the defendant acted with the required state of mind." As a result, courts are split as to the pleading burden the PSRLA places on plaintiffs.

Prior to enactment of the PSRLA, a majority of circuit courts, including the Third Circuit, uniformly held that recklessness constituted scienter under Rule 10b-5. See *In re Phillips Petroleum, 881 F.2d at 1244; McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir.1989) ; Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir.1982) ; Broad v. Rockwell Int'l. Corp., 642 F.2d 929, 961-62 (5th Cir.1981) ; Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044 (7th Cir.1977).* However, the courts were split as to what facts alleging scienter a plaintiff was required to plead. The Second Circuit, among others, required that plaintiffs plead a "strong inference of scienter" by alleging facts that (1) established a motive and opportunity to commit fraud on the part of defendants; or (2) facts constituting circumstantial evidence of reckless or conscious behavior. See *Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995) ; In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir.1993).* In contrast, the Ninth Circuit rejected a requirement that plaintiff allege facts from which intent to commit fraud could be inferred, finding that scienter could be averred generally without requiring plaintiffs to satisfy the "strong inference" test of the Second Circuit. See *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1546-47 (9th Cir.1994).* The Third Circuit adopted the approach taken by the Second Circuit, recognizing that

"[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " *In Re Burlington Coat, 114 F.3d at 1418.*

While the language of the PSRLA suggests that Congress codified the Second Circuit's scienter requirement, district courts are split as to whether or not this is the case. Several courts have adopted the Second Circuit's more rigid "conscious behavior" standard, requiring plaintiffs to allege specific facts that constitute circumstantial evidence of conscious behavior by the defendants. See *Voit, 977 F.Supp. at 373* (rejecting "motive and opportunity" test and recklessness liability); *Norwood, 959 F.Supp. at 208-09* ("A plaintiff cannot simply couple a factual statment with a conclusory allegation of fraudulent intent to adequately plead scienter. Nor is it sufficient to simply allege statments of a prosperous future compared to a bleaker reality" (citation omitted)); *Friedberg v. Discreet Logic, Inc., 959 F.Supp. 42, 47-50 (D.Mass.1997)* (holding that a plaintiff "must set forth specific facts that constitute strong circumstantial evidence of conscious behavior by defendants"); *In re Silicon Graphics, Inc. Sec. Litig.,* No. C 96-0393, 1996 WL 664639, *5-6 (N.D.Cal. September 25, 1996), aff'd on rehearing, 970 F.Supp. 746 (N.D.Cal.)* (same). Other courts, while interpreting the PSLRA as codifying the Second Circuit case law, have retained both recklessness liability and the "motive and opportunity" test. See *Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F.Supp. 1297, 1308-11 (C.D.Cal.1996)* (holding that "Second Circuit jurisprudence in the area of securities fraud claims is wholly consistent with both the language and purpose of the PSRLA"); *Rehm v. Eagle Fin., Corp., 954 F.Supp. 1246, 1250-53 (N.D.Ill.1997)* (same); *In re Health Management, Inc. Sec. Litig., 970 F.Supp. 192, 199-202 (E.D.N.Y.1997)* (finding that "pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the court a novel legal theory" fulfills the "strong inference" requirement). Consistent with this approach, a plaintiff may plead either circumstantial evidence of recklessness or, in the alternative, motive and opportunity. Finally, other courts have adopted an approach that incorporates features of both of the other approaches. These courts have rejected the "motive and opportunity" test

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

while retaining the "conscious recklessness test" as well as liability for recklessness. *See In re Baesa Sec. Litig., 969 F.Supp. 238, 240-42 (S.D.N.Y.1997)* (reasoning that § 21D(b)(2) addresses only pleadings, codifying the "strong inference" standard while failing to mention any specific test); *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp., 2 F.Supp.2d 1345, 1355-59 (D.Colo.1998)* (agreeing that recklessness still suffices as scienter under the PSRLA); *In re Stratosphere Corp. Sec. Litig., 1 F.Supp.2d 1096, 1106-07 (D.Nev.1998)* (same).

*10 Regardless of which approach the Third Circuit may choose to employ, the court finds that plaintiffs' allegations are sufficient, even under the strictest "conscious behavior" standard, to withstand a motion to dismiss. Plaintiffs do not rely strictly on the assertion of insider trading to fulfill the PSRLA's strong inference requirement for scienter. FN14 Instead, plaintiffs' complaint alleges strong circumstantial evidence indicating that defendants knowingly attempted to conceal material facts surrounding the merger. FN15 Thus, the court finds that plaintiffs' complaint sufficiently alleges "conscious behavior," meeting the standard for pleading scienter under the PSRLA. *See Voit, 977 F.Supp. at 374.*

> FN14. Specifically, plaintiffs allege that Patience and Schuler knowingly availed themselves of an opportunity unavailable to other Ventana security holders by purchasing a substantial block of Ventana common stock at a preferential price ($1.62), thereby realizing an aggregate windfall profit. (D.I.27, ¶¶ 67, 69-70)

> FN15. Besides alleging generally that the nondisclosure of the "insider transaction" was done with the intent to deceive them, plaintiffs allege that the following circumstances are indicative of "conscious behavior" of an intent to deceive:
> i) Schuler and Patience ... controlled and were in a position to approve the issuance of disclosures to be made to the Biotek Shareholders and Noteholders and the public and were the direct and immediate beneficiaries of the highly profitable Insider Transaction;
> ii) As of the July 1996 IPO, Defendants Schuler and Patience owned a total of 1,258,752 shares of Ventana Common Stock, of which 616,481 shares, or 49% thereof, were acquired as a result of the undisclosed Insider Transaction;
> iii) The number of shares issued was unusually high and not made as part of a larger offering;
> iv) The non-disclosure of the Insider Transaction enabled the Ventana Insiders to retain numerical voting control over Ventana both before and after the IPO;
> v) Two insiders, Schuler and Patience, have reaped windfall profits of at least $5,166,111.78 to date as a result of the Insider Transaction;
> vi) Schuler and Patience actually reaped the windfall profits derived from the Insider Transaction;
> vii) The Defendants seek to justify their fraudulent conduct on the basis that the shares issued under the Insider Transaction were part of a compensation package. This assertion is pretextual and deceptive ...;
> viii) The February 23, 1996 final approval of the Insider Transaction was timed so as to avoid disclosure of the Insider Transaction in the proxy solicitation for the Merger notwithstanding the fact that the approval thereof in principle was fixed as of late January 1996 and the date of the operative fair market value determination made by the Ventana Board of Directors was January 1996;
> ix) The price at which Ventana acquired Biotek was at least 70.16% less than Biotek's true market value. But for the nondisclosure of the Insider Transaction, Ventana would not have been able to obtain such windfall to the detriment of the holders of Biotek Securities who received no cash whatsoever on account of their Biotek shares; and
> x) Schuler and Patience concealed the existence of the Insider Transaction and its pricing component at the Private Meeting. During the Private Meeting Johnson Lee specifically asked Patience and Schuler whether Ventana could set a floor of Five Dollars ($5.00) on any future issuance of Ventana Common Stock. Patience and Schuler provided such assurance by representing to the participants at the Private Meeting that no stock would be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                         Page 12
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

issued at less than Five Dollars ($5.00) per share because their 'incentive' in any effort to raise capital began at Four Dollars ($4.00) per share.... (D.I.27, ¶ 77(i)-(x))

### 4. Circumstances of Fraud

Under the PSRLA, plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If the plaintiffs' complaint fails to meet this requirement, it must be dismissed upon motion of the defendant(s). *See id.* § 78u-4(b)(3)(A).

In the case at bar, plaintiffs allege two false or misleading statements on the part of defendants. First, that the affirmative representation made in § 4.7 of the Information Statement was false. (D.I.27, ¶ 58(a)) Second, that the Information Statement's representations regarding Ventana's capitalization were misleading. (D.I.27, ¶ 58(b)) With respect to the first statement, plaintiffs contend that it was false because (1) the Agreement and Information Statement failed to disclose the existence, terms, and conditions of the alleged "insider transaction" which were known to defendants and (2) the capitalization of Ventana as set forth in § 4.5 of the Agreement failed to disclose that as of January 16, 1996 Ventana had granted Schuler and Patience the right to purchase a dilutive block of Ventana Common Stock at $1.62 per share. (D.I.27, ¶ 58(a)) Plaintiffs aver that the second statement was misleading because Ventana knew at the time it sent the Information Statement to Biotek security holders that a dilutive block of 646,664 shares of Ventana common stock had been approved for issuance and future grant to Schuler and Patience at a price per share significantly lower than the warrant exercise price. (D.I.27, ¶ 58(b)) As a result of the false and misleading statements, plaintiffs argue they were left with the "mistaken and indeed false impression" that the $5.00 per share conversion price constituted an implied representation that $5 .00 per share was a reasonable determination of the fair market value (pre Reverse-Split) of Ventana's common stock. (D.I.27, ¶ 60)

The court finds that plaintiffs' complaint meets the requirements of Rule 9(b) and the PSRLA. Plaintiffs have identified those statements which they allege to have been false or misleading and have sufficiently identified contemporaneous facts indicating that the statements were false or misleading when made by defendants. Even assuming arguendo that these facts were not literally false as of February 8, 1996, the court has already determined that defendants as "insiders" assumed an affirmative duty to disclose material facts. Plaintiffs' complaint sufficiently alleges what facts defendants were required to disclose and why such disclosure was mandated. (D.I.27, ¶¶ 56, 58) Accordingly, the court finds that plaintiffs have stated a cause of action for securities fraud under § 10(b) and Rule 10b-5.

### B. Plaintiffs' State Law Claims

**\*11** Besides their federal claims, plaintiffs allege numerous state law claims. First, plaintiff Michelle Leung alleges violations of § 25401 of California's Blue Sky Law, Cal. Corp.Code § 25401 (count II). (D.I.27, ¶¶ 78-83) Second, plaintiffs collectively allege violations of § 25402 of California's Blue Sky Law, Cal. Corp.Code § 25402 (count III). (D.I.27, ¶¶ 84-86) Third, plaintiffs allege that defendants committed fraud under the common law of California (count IV). (D.I.27, ¶¶ 87-92) Fourth, plaintiff Shih alleges that defendants Schuler and Patience, as directors of Ventana, breached their fiduciary duty and committed constructive fraud (count V). (D.I.27, ¶¶ 93-96) Finally, plaintiffs Tse and Margaret Leung allege that defendant Ventana violated § 78A-56 of North Carolina's Blue Sky Law, N.C. Gen.Stat. § 78A-56 (count VI). (D.I.27, ¶¶ 97-100)

### 1. Plaintiffs' California State Law Claims

Plaintiff Leung, as a resident of California, filed a state law claim under § 25401 of California's Corporate Code. (D.I.27, ¶¶ 78-86). Section 25401 , modeled after clause (b) of Rule 10b-5, provides that

[i]t is unlawful for any person to offer or to sell or to buy or offer to buy a security in this state by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 13
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

fact necessary to make the statement not misleading. Cal. Corp.Code § 25401 (1997). Unlike Rule 10b-5 , however, reliance on any alleged misrepresentation or omission is not required under § 25402. See *Lynch v. Cook*, 148 Cal.App.3d 1072, 196 Cal.Rptr. 544, 553-54 (Cal.Ct.App.1983). Since California's statute is virtually identical to the federal securities statute, the court finds, given earlier discussion of the federal claims, that plaintiff Leung has alleged sufficient facts with respect to count II to withstand a motion to dismiss.

Collectively, plaintiffs filed an additional claim under § 25402 of the California Corporate Code, alleging insider trading against defendants Patience, Schuler, and Ventana. Section 25402 provides in relevant part that it is unlawful for an insider

to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of that information.

Cal. Corp.Code § 25402 (emphasis added). Defendants contend that plaintiffs have failed to allege, *inter alia,* how the alleged omission could have "significantly affect[ed] the market price" of Ventana common stock since Ventana was a private company and the offer to plaintiffs to convert their Biotek Notes was at a negotiated price. (D.I. 48 at 31 n. 19) Plaintiffs do not address defendants' assertion.

*12 According to the treatise cited by defendants, Harold Marsh, Jr. & Robert H. Volk, 1 *Practice Under California Securities Laws* (4th ed.1996), FN16 the statutory requirement that the material information "significantly affect the market price" in order for the insider to incur liability was, *inter alia,* "to indicate that these sections were intended to be applicable only to situations where purchases or sales were made in the market." (D.I. 48, Ex. 11 at 14-31)

FN16. Marsh and Volk were the principal drafters of the California Corporate Securities Law of 1968. See *Mirkin v. Wasserman*, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, 580 (Cal.1993).

Marsh was the reporter for the drafting committee and Volk was Commissioner of Corporations at that time. See *id.* at 580 n. 10.

The court is unaware of, and the parties have not provided, any California case law interpreting this requirement generally, much less in a context similar to that at bar. In the absence of any guidance from the California courts, the court interprets the plain language of the statute to preclude defendants' liability under the circumstances. The instant action involves a negotiated sale of stock, not a market transaction. Moreover, prior to the merger, Ventana was a private company. Thus, there is no indication, nor have plaintiffs alleged, that the material information at issue would have "significantly affect[ed] the market price" of the stock as required by the statute. Accordingly, plaintiffs' complaint is insufficient to withstand defendants' motion to dismiss with respect to count III.

2. Plaintiffs' Common Law Fraud Claim

Plaintiffs allege that "[t]he omissions to disclose material facts and misrepresentations contained in the Agreement constitute fraud under the common law of California." (D.I.27, ¶ 90) Under California law, a claim for common law fraud requires the plaintiff to demonstrate that defendants (1) made a false representation; (2) with knowledge of the statement's falsity; (3) intending to induce reliance thereon; and (4) that plaintiffs actually and reasonably relied on the representation, thereby suffering injury. See *Gray v. First Winthrop Corp.*, 776 F.Supp. 504, 512 (N.D.Cal.1991).

Based on its previous discussions regarding the federal claims, the court finds that plaintiffs have sufficiently alleged a claim for fraud under California common law. Despite defendants' arguments to the contrary, plaintiffs have pled fraud with the particularity mandated by Fed.R.Civ.P. 9(b); defendants had a duty to disclose the allegedly omitted information; and plaintiffs have adequately pled a causal nexus between the alleged omission and the claimed damages. Consequently, the court finds that plaintiffs' claim for fraud is sufficient to withstand defendants' motion to dismiss.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 14
Not Reported in F.Supp., 1998 WL 743668
(Cite as: Not Reported in F.Supp.)

3. Plaintiffs' Claim for Breach of Fiduciary Duty FN17

> FN17. In their complaint, plaintiffs did not specify the state law under which they were bringing their breach of fiduciary duty/dilution claim. However, since in their answering brief opposing defendants' motion to dismiss, plaintiffs solely cited to Delaware case law, the court will look to Delaware law in evaluating plaintiffs' claim.

In their complaint, plaintiffs allege that upon conversion of plaintiff Shih's Ventana Exchange into Ventana common stock, Schuler and Patience, as directors of Ventana, owed a fiduciary duty of loyalty to plaintiff Shih as well as other holders of Ventana Exchange Notes who had elected to convert all or a portion of their notes into Ventana common stock ("the Converting Shareholders"). (D.I.27, ¶ 94) Under Delaware law, directors of corporations owe a fiduciary duty to the corporations upon whose board they serve as well as to the shareholders of those corporations. See *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989). This duty does not extend, however, to holders of a corporation's convertible debentures (until conversion occurs), see *Simons v. Cogan*, 549 A.2d 300, 303-04 (Del.1988), or to prospective stockholders, see *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del.1988). Hence defendants are correct in their assertion that they did not owe a fiduciary obligation to the Converting Shareholders with respect to preconversion disclosure of the compensation package. However, the question posed by plaintiffs' complaint is whether after conversion, consummation of the compensation package violated defendants' duty of loyalty to the Converting Shareholders.

*13 The duty of loyalty mandates against self-dealing resulting in the personal financial gain of one or more directors who participate in the board approval. Plaintiffs contend that, pursuant to their fiduciary obligation, Schuler and Patience were required after the conversion not only to disclose to the Converting Shareholders the existence and terms of the compensation package but to not continue the effectuation of the compensation package, which was still executory at the time of plaintiff Shih's conversion. (D.I.27, ¶¶ 95-96) Plaintiffs contend that defendants' breach of their

duty of loyalty resulted in stock dilution and a corresponding decrease in stockholder voting power. (D.I.27, ¶ 96(b)-(c)) Such allegations, if true, constitute an actionable individual claim under Delaware corporate law. See *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 330 (Del.1993) ("It is well settled that the test used to distinguish between derivative and individual harm is whether the plaintiff suffered 'special injury.' A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." (citations omitted)).

4. Plaintiffs' North Carolina State Law Claim

With respect to count VI, plaintiffs Tse and Margaret Leung ("the Tse plaintiffs") allege the following:

> 98. The Tse Plaintiffs are residents of the State of North Carolina and are entitled to the protection of the North Carolina securities laws. Danzi and/or Lee telephoned the Plaintiff Alex Tse in North Carolina in order to solicit the Tse Plaintiffs' approval of the Merger.
> 99. Therefore, Ventana's offer to sell Ventana Exchange Notes or, alternatively, its offer to buy the Biotek Notes and the Biotek Shares was made in the State of North Carolina within the meaning of N.C. Gen.Stat. § 78A-63.
> 100. Ventana's omissions to disclose material facts and the misrepresentation of material facts ... constitute a violation of § 78A-56 of North Carolina's Blue Sky Law, N.C. Gen.Stat. § 78A-56.

(D.I.27, ¶¶ 98-100) Defendants contend that plaintiffs' claim fails to state a cause of action because (1) it is pleaded inadequately; (2) the North Carolina law cited by plaintiffs does not apply to merger transactions; and (3) plaintiffs fail to allege that any defendant directed conduct towards the Tse plaintiffs in North Carolina. Plaintiffs do not contest defendants' assertions regarding the insufficiency of count VI.

Section 78A-56 provides in pertinent part that:

> (a) Any person who: ...
> (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 743668
**(Cite as: Not Reported in F.Supp.)**

Page 15

were made, not misleading (the purchaser not knowing of the untruth or omission) ... is liable to the person purchasing the security from him....

**\*14** N.C. Gen.Stat. § 78A-56(a)(2). However, expressly excluded from the term "purchase" within the purview of this statute is

[a]ny transaction incident to a class vote by security holders, pursuant to the certificate of incorporation or the applicable corporation statute, on a merger, consolidation, reclassification of securities, or sale of corporate assets in consideration of the issuance of securities of another corporation.

*Id.* § 78A-2(8)(f)(3) (emphasis added). The court interprets the plain language of this statute to preclude defendants' liability under the circumstances at bar. FN18 Further, plaintiffs have not alleged that any defendant directed conduct regarding the merger at issue towards the Tse plaintiffs in North Carolina; rather plaintiffs allege only that individuals associated with Biotek, not Ventana, contacted them in North Carolina. Thus, the court concludes that plaintiffs Tse and Margaret Leung have failed to state a claim for violation of the North Carolina General Statute § 78A-56. Accordingly, count VI shall be dismissed.

> FN18. The court is unaware of and the parties have not provided any North Carolina case law directly on point.

### V. CONCLUSION

For the reasons stated above, the court finds that plaintiffs have adequately pled facts sufficient to withstand defendants' motion to dismiss with respect to counts I, II, IV, and V of plaintiffs' amended complaint (D.I.27). The court further finds that plaintiffs have failed to state a claim with respect to count III of the complaint. Similarly, the court finds that plaintiffs Tse and Margaret Leung have failed to state a claim with respect to count VI of the complaint. Accordingly, counts III and VI are dismissed without prejudice. An appropriate order shall issue.

D.Del.,1998.
Tse v. Ventana Medical Systems, Inc.
Not Reported in F.Supp., 1998 WL 743668

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

**H**
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L.
Rep. P 92,847
Briefs and Other Related Documents
Related Andrews Newsletter Articles
United States District Court,D. Delaware.
In re: TYSON FOODS, INC. Securities Litigation
**No. Civ.A. 01-425-SLR.**

June 17, 2004.

John L. Reed , and Matt Neiderman , of Duane Morris LLP,
Wilmington, Delaware, for Lead Plaintiffs.
Mark C. Gardy , and Karin E. Fisch , of Abbey Gardy LLP ,
New York, New York and Michael H. Schaalman , Cristina
D. Hernandez-Malaby , and Steven J. Berryman , of Quarles
& Brady LLP, Milwaukee, Wisconsin, of counsel.
Anthony W. Clark , and Robert S. Saunders , of Skadden,
Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware,
for Defendants.
David F. Graham , Anne E. Rea , James W. Ducayet , and
Melanie E. Walker , of Sidley Austin Brown & Wood LLP,
Chicago, Illinois, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 22, 2001, the first of several class actions were
filed against Tyson Foods, Inc. ("Tyson Foods"), Don
Tyson, John Tyson and Les Baledge alleging violations of
Section 10(b) and 20(a) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j and 78t and Rule 10b-5. (D.I.1) On
September 21, 2001 this court consolidated these cases
pursuant to the Private Securities Litigation Reform Act,
Pub.L. 104-67, 109 Stat. 737 (1995) (codified at various
sections of 15 U.S.C.), and named, as lead plaintiffs, Aetos
Corporation, Pelican Limited Partnership, Stark
Investments, L.P., and Shepherd Investments International,
Ltd. (collectively the "Lead Plaintiffs").

On January 22, 2002, defendants moved for dismissal of the
complaint. On October 23, 2002, following briefing and oral
argument, the court granted in part and denied in part

defendants' motion to dismiss, finding that two of the
statements by Tyson were potentially actionable under
federal securities law. (D.I. 25 at ¶ 14)

On October 6, 2003, the court certified this action as a class
action on behalf of all persons and entities similarly situated
who purchased securities in IBP, Inc. ("IBP") on or before
March 29, 2001, and subsequently sold those securities
during the period from March 30, 2001 through June 15,
2001, inclusive, and who sustained damages as a result of
such transactions. (D.I.139, 140) The court also appointed
Lead Plaintiffs as class representatives.

Presently before the court are the parties' cross motions for
summary judgment. (D.I.157, 161, 163) Having reviewed
the parties' briefs and heard oral argument, the court
concludes that defendants are entitled to summary judgment
for the reasons that follow.

II. BACKGROUND

This case arises from events surrounding a merger between
two of the nation's largest protein distributors. Tyson Foods
is the nation's largest poultry distributor and IBP is the
nation's largest beef and second largest pork distributor. The
details of that transaction are described in great detail in a
Chancery Court opinion in which the Chancery Court found
that IBP had not breached the parties' agreements and that
IBP was entitled to specific performance. In re IBP
Shareholders Litigation, 789 A.2d 14 (Del. Ch.2001).

A. IBP Auction

In July 2000, IBP management informed its board that it
was interested in pursuing a leveraged buyout of IBP with
the assistance of the investment bank Donaldson, Lufkin &
Jenrette. Following negotiations, management and other
investors (the "Buyout Group") agreed that the Buyout
Group would purchase all of IBP's shares at $22.55 per
share. In re IBP Shareholders Litigation, 789 A.2d at 25-27.

On November 12, 2000, Smithfield Foods, the nation's
largest pork producer, made an unsolicited bid for IBP
offering a stock exchange offer worth $25 per share to IBP
shareholders. On November 24, 2000, defendants Don and
John Tyson met with Bob Peterson and Richard Bond, IBP's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

Chief Executive Officer and President/Chief Operating Officer, to discuss the potential combination of Tyson Foods and IBP. *Id. at 28-30.* At that meeting, the representatives discussed the possibility that certain projections prepared in relation to the earlier management LBO (the "Rawhide Projections") may not be met.

**\*2** On December 4, 2000, Tyson Foods, contingent upon a quickly timed due diligence review, proposed to acquire IBP in a two-step cash and stock exchange valued at $26 per share. Tyson Foods and IBP executed a confidentiality agreement which stated that Tyson Foods could not rely on oral assurances that were not converted to written representations and warranties and expressly provided that IBP and its representative would have no liability from the use or accuracy of any non-public information provided to Tyson Foods through the course of due diligence (the "Confidentiality Agreement"). *Id. at 31-32.*

Tyson Foods began its due diligence process with IBP. During that review, Tyson Foods was informed that there had been fraud uncovered at DFG, an IBP subsidiary, and that there were serious business problems with that operating unit. Tyson Foods also learned that certain weather conditions were likely to have an adverse effect on IBP's abilities to meet its forecasts in the Rawhide Projections. *Id. at 33-35.*

In mid and late December 2000, IBP prepared and conducted an auction between Tyson Foods and Smithfield. The Rawhide Projections were updated for use in the final bidding. On December 28, 2000, Tyson Foods received IBP's updated projections which revised downward IBP's projected FY 2000 earnings by $70 million. Following receipt of these new projections, Tyson Foods raised its bid to $27 per share in cash. Following its $27 per share offer, Tyson Foods had two additional due diligence calls with IBP in which DFG's problems were discussed and Tyson Foods was informed that a restatement of financials may be required and that IBP may take an impairment charge. *Id. at 37-39.* Tyson Foods subsequently raised its bids to $28.50 and later to $30 per share in cash and stock. *Id. at 22, 38-39.* IBP accepted the latter offer.

On December 29, 2000, the Securities and Exchange Commission ("SEC") sent an email to IBP's special committee's outside counsel. That email contained a letter from the SEC to Bob Peterson commenting on the preliminary Rawhide Proxy as well as on IBP's financials. Inexplicably, the SEC letter was not forwarded to Tyson Foods until January 10, 2001. The SEC letter addressed a number of issues, including some already identified by Tyson Foods during the course of its due diligence review.

### B. Merger Agreement

On January 1, 2001, the parties entered into a merger agreement for the sale of IBP to Tyson Foods (the "Merger Agreement"). The Merger Agreement provided for an initial cash tender offer of $30 per share to be followed by an exchange offer of $30 in Tyson Foods stock for each IBP share. The cash offer period was scheduled to close no later than February 28, 2001. In the event the conditions to the cash offer were not met by that date, Tyson Foods would commence a cash election merger in which IBP shareholders could receive either cash, stock or a combination thereof in the amount of $30 per share.

**\*3** On January 12, 2001, the Tyson Foods board met and ratified management's decision to enter into the Merger Agreement. The SEC letter was not disclosed to the board nor was a copy of the letter shown to any board member. That same day, a shareholder meeting was held and the Merger Agreement was ratified by the shareholders. The SEC letter was not disclosed to the shareholders. *Id.* at 43-45.

### C. Delays in Cash Offer

On January 16, 2001, Larry Shipley, IBP's Chief Executive Officer, informed Steve Hankins, Tyson Foods' Chief Financial Officer, that the earnings charge arising out of the issues at DFG might reach $50 million, that a restatement of 1999 earnings might be necessary, and than an impairment study had been commenced but not yet completed. *Id* at 45. Hankins has testified that he concluded that IBP would have to restate the financials that had been warranted in the Merger Agreement. On January 17, Tyson Foods announced it was extending the cash offer period because the anti-trust waiting period had not expired. *Id.* The announcement did

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

not mention the SEC letter, DFG or any potential violation of the Merger Agreement.

Later in January, Tyson Foods again extended the cash offer period on the basis that the offering documents incorporated the IBP's warranted financials which were potentially inaccurate. *Id.* at 45-46. Tyson Foods indicated it would delay closing the cash offer and commencing the exchange offer until after IBP had settled all outstanding issues with the SEC. *Id.* On January 25, 2001, IBP sent a letter to Tyson Foods disclosing that IBP earnings would be lowered to $47 million and that IBP was still considering whether a restatement of earnings would be necessary. *Id.* at 46.

During February, Tyson Foods became increasingly reticent about the IBP deal and began considering a way to negotiate a lower price. Tyson Foods' concern with the IBP deal was augmented by its own poor financial performance. *Id.* at 47-48. On February 22, 2001, IBP publicly reported that it would restate its financials in order to take an additional charge at DFG of $32.9 million and an impairment charge at DFG of up to $108 million. On February 28, Tyson Foods terminated the cash tender. John Tyson publicly commented that Tyson Foods would "determine what effect these matters will have on our deal" once IBP had finished its work on its issues with the SEC. *Id.* at 46. By that time, Tyson Foods had also learned that IBP's earnings were far below the Rawhide Projections. *Id.* at 48.

In February, Tyson Foods had sought advice from two firms serving as outside counsel, Milbank, Tweed, Hadley & McCloy, LLP and Skadden, Arps, Slate, Meagher & From, LLP. (D.I.159, exs.25, 26) Millbank Tweed's qualified opinion letter indicated that Tyson Foods had the right to terminate based on IBP's allegedly inaccurate financial statements which breached IBP's representations and warranties. (D.I.159, ex. 27) Skadden Arps' opinion focused on renegotiation strategies and did not take a position on whether Tyson Foods may terminate. (D.I.159, ex. 28) The Skadden Arps opinion discussed possible causes of action that Tyson Foods might have, including fraud in the inducement and breach of warranty.

**\*4** Defendant Les Baledge, Executive Vice President and General Counsel for Tyson Foods, received the two opinion letters and advised Don and John Tyson, as well as other senior managers, that outside counsel had advised that Tyson Foods had grounds to terminate the transaction. Baledge did not indicate outside counsel's rationale nor did he provide the memoranda directly to Don Tyson or John Tyson. (D.I. 160, ex. B at 36, 79; ex. D at 89-93; ex. E at 121-23)

IBP began to sense that Tyson Foods wanted to renegotiate and realized that the deal may fall through altogether. *Id.* Tyson Foods' key management began slowing down the merger implementation process in an effort to provide Don Tyson and John Tyson some time to reconsider their position. On March 5, 2001, Dick Bond met with Don Tyson in an effort to alleviate Don Tyson's concerns. Bond and Don Tyson also subsequently spoke by phone. In these conversations the two discussed DFG, IBP's overall performance and a concern about mad cow disease and hoof-and-mouth disease. Don Tyson did not raise concerns about the SEC letter. *Id.* at 48-49.

On March 7, 2001, John Tyson sent a memorandum to all Tyson Foods employees stating that the company was still committed to the merger transaction. On March 13, however, John Tyson expressed concern to Bond regarding IBP's first quarter performance and that he wanted Bond's best estimates for IBP's performance for the remainder of the year. Bond sent estimates indicating a range between $1.80 and $2.47 a share, with a best estimate of $2.12. *Id.* at 49.

On March 13, 2001, IBP filed its restated warranted financials, which were consistent with its previous release regarding DFG. *Id.* On March 14, Tyson Foods issued a press release indicating that it was pleased that IBP had resolved most of its SEC issues. The press release also stated that Tyson Foods was continuing to look at IBP's business and its weak first quarter results. *Id.* On March 15, 2001, in-house counsel for Tyson Foods sent a letter to IBP which indicated Tyson Foods' sentiment that the merger transaction could proceed now that the SEC issues were resolved. *Id.* at 49-50.

On March 26, 2001, Tyson Foods and IBP representatives met to discuss the transaction. At that meeting, John Tyson

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

by him. (D.I. 169, ex. D at 47-49) Following issuance of the press release and attached termination letter, there was a swift decline in IBP shares. IBP closed on March 29, 2001, at $22.79 and reached a low of $15 per share on March 30. (D.I.160, ex. 34)

### D. Litigation

As indicated in the above press release, Tyson Foods filed suit on March 29, 2001, seeking rescission or termination of the Merger Agreement. IBP filed suit seeking specific performance. On June 18, 2001, after extensive fact finding, the Chancery Court of the State of Delaware issued its opinion finding against Tyson Foods and in favor of IBP. *In re IBP Shareholders Litig.,* 789 A.2d at 14. The Chancery Court ultimately reached five conclusions: (1) the Merger Agreement and related contracts were valid and enforceable; (2) Tyson Foods was contractually allocated certain financial risks under those agreements, including accounting issues at DFG, which could not serve as a basis for termination; (3) DFG-related issues before the SEC were not a permissible basis for termination; (4) IBP had not suffered a material adverse effect within the meaning of the agreement; and (5) IBP was entitled to specific performance. *Id. at 23.*

Following issuance of that opinion, Tyson Foods and IBP reached a settlement whereby the merger would be consummated and all claims against Tyson Foods, including shareholder claims, would be released. *In re IBP Shareholders Litig.,* 793 A.2d 396 (Del. Ch.2002) (denying vacatur), *aff'd,* 818 A.2d 145 (Del.2003). The Chancery Court approved the settlement on the condition that the federal securities claims, which were already being filed in this court, were excluded from the scope of the settlement.

Tyson Foods' shareholders also brought suit in derivative against the Tyson Foods directors for breach of fiduciary duty with respect to the events surrounding the merger. *Shapiro v. Allen,* Civ. No. 18967 (Del. Ch. Mar. 19, 2003). The Chancery Court, ruling from the bench following oral argument, dismissed the case in its entirety for failure to state a claim. *Id.*

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)).

*7 The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. DISCUSSION

Lead Plaintiffs assert that the March 29, 2001 press release and termination letter contained material misleading statements regarding IBP and Tyson Foods' decision to terminate the merger, and which had an adverse effect on the IBP stock price. Lead Plaintiffs allege scienter and primary liability on the part of each of the defendants, as well as controlling person liability on the part of defendants Don and John Tyson.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Lead Plaintiffs seek summary judgment on liability, arguing that the Chancery Court's opinion establishes each element of their § 10(b) and § 20(a) claims. (D.I.167) In Lead Plaintiffs' view, the sole remaining issue of fact to be resolved is damages. Don Tyson and John Tyson, in their motion for summary judgment, assert that Lead Plaintiffs' claims of both primary and secondary liability fail for lack of the requisite scienter and participation in conduct which is actionable under federal securities law. (D.I.164) Baledge and Tyson Foods, in their motion for summary judgment, assert that Lead Plaintiffs' claims fail due to both scienter and loss causation. (D.I.162)

### A. Section 10(b)

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (2004). Rule 10b-5, promulgated under § 10(b), makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b) (2004).

Therefore, a claim for securities fraud under § 10(b) and Rule 10b-5, require proof of the following: "(1) that the defendant[s] made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant[s] acted with knowledge or recklessness and (5) that the plaintiff[s] reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996).

### 1. Made a Misrepresentation or Omission

*8 Don Tyson and John Tyson move for summary judgment on the issue of primary liability on the basis that Lead Plaintiffs have offered no evidence to support a finding of actionable conduct within the scope of primary liability under § 10(b) and Rule 10b-5. The court agrees.

Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994). In *Central Bank,* the Supreme Court ruled that conduct outside the clear scope of § 10(b) is not actionable under implied remedies of secondary liability, such as aiding and abetting a primary violation. *Id.* at 191.

In determining whether a person has primary liability within the scope of this section, courts apply either the "bright line" test, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998) , or the "substantial participation" test, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir.2000). The Third Circuit has not yet determined which test should be applied. *See In re IKON Office Solutions, Inc.*, 277 F.3d 658, 667 n. 8 (3d Cir.2002). Nevertheless, under either test defendants John Tyson and Don Tyson can not be held liable.

In the case at bar, the undisputed facts are that neither Don Tyson nor John Tyson made the statements for which liability is alleged. Under the bright line test, a defendant must actually make the false or misleading statement. *See Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997). Under the substantial participation test, there must be "substantial participation or intricate involvement" by the defendant in the drafting and preparation of the fraudulent statements "even though that participation might not lead to the actor's actual making of the statements." *Howard*, 228 F.3d at 1061. For example, where a statement is not directly made by the defendant but the defendant was substantially involved in the drafting and editing thereof, substantial participation has been found. *See, e.g., In re Software Toolworks Inc.*, 50 F.3d 615, 628 (9th Cir.1994).

The undisputed evidence in this regard is that Don Tyson and John Tyson had no involvement in the actual crafting of the language of the termination letter and press release. The termination letter, which contained the alleged actionable statements at issue, was signed solely by Baledge and crafted by him with the help of outside counsel. Consequently, Lead Plaintiffs' case fails under the Second Circuit's bright line test. Even under the substantial participation test, however, Lead Plaintiffs' theory falls

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

short.

The crux of Lead Plaintiffs' argument is that Don Tyson and John Tyson should have been involved in the preparation and issuance of the press release, but instead went fishing. At oral argument, Lead Plaintiffs argue that this lack of participation amounts to recklessness. While recklessness may satisfy scienter, it does not relieve Lead Plaintiffs from the obligation to show participation in the conduct at issue here. Lead Plaintiffs' theory would, in effect, impose primary liability for substantial nonparticipation. If John Tyson and Don Tyson are liable for inaction, the remedy lies under state law. This, however, is not a theory upon which primary liability under § 10(b) and Rule 10b-5 may attach. See *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977). Consequently, with respect to defendants John Tyson and Don Tyson, the court finds they are entitled to summary judgment on the issue of primary liability.

2. Scienter

*9 Defendants assert that Lead Plaintiffs have failed to provide evidence showing that Baledge acted with scienter in issuing the termination letter containing the alleged misrepresentations. Scienter, of course, is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 426 U.S. 185, 193 n. 12 (1976). In the absence of indicia of an intent to deceive by the defendant, scienter requires proof of the following: (1) highly unreasonable conduct which represents an extreme departure from the standards of ordinary care; and (2) a danger of misleading buyers which is known to the defendant or so obvious that the defendant must have known of the risk. *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir.2000). Highly unreasonable conduct is neither simple nor even inexcusable negligence. *See id.* Therefore, claims predicated upon "corporate mismanagement are not actionable under federal law." *In re Craftmatic Securities Litig.*, 890 F.2d 628, 638-39 (3d. Cir.1989).

Statements of opinion, if false, may form the basis for a securities fraud claim if made either knowingly or recklessly. See *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.1985). A statement of opinion is not actionable if it's proven to be inaccurate or if its falsity is the result of mere

negligence. *Id.* Instead, only an opinion which "has been issued without a genuine belief or reasonable basis" is actionable. *Id.* See also *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 (3d Cir.1993). It may be inferred that a statement of opinion is made without a genuine belief or reasonable basis where the defendant has notice of the unreliability of the underlying materials and fails to inquire further. *See id.* (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979)).

In its October 23, 2002 memorandum order denying defendants' motion to dismiss, the court found that two statements contained in the termination letter accompanying the press release were misrepresentations. (D.I. 25 at ¶ 14) Those statements were as follows:

1. "Unfortunately, we relied on that misleading information in determining to enter into the Merger Agreement."
2. "Consequently, whether intended or not, we believe Tyson Foods, Inc. was inappropriately induced to enter into the Merger Agreement."

(D.I. 25 at ¶ 12) While the court found these statements to constitute misrepresentations for the purpose of denying defendants' motion to dismiss, the court now reexamines these statements in light of a developed factual record and defendants' motion for summary judgment.

a. "We relied on that misleading information"

The first statement contains both a statement of fact (Tyson Foods "relied") and a statement of opinion (IBP provided "misleading" information). With respect to the factual component, Lead Plaintiffs must show evidence that when Baledge asserted that "we relied" he acted with scienter, to wit, they must show either that Baledge intended to deceive the investing public or that his conduct was so reckless, with respect to the danger that the investing public might be misled, that his conduct borders on intentional. See *In re Ikon*, 277 F.3d at 672 n. 16. In either regard, the court finds that there is not sufficient evidence to support Lead Plaintiffs' claim of scienter.

*10 Lead Plaintiffs make eight factual allegations which they assert prove scienter on the part of Baledge: (1) Baledge participated in drafting and disseminating the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                     Page 8
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

March 29 press release and termination letter without asking for the rationale and circumstances behind senior management's decision; (2) Baledge authorized a suit to be filed with the intent of depressing the market price of IBP shares in the event Tyson Foods sought to reprice the transaction; (3) Baledge knew that Tyson Foods did not have sufficient facts to allege fraudulent inducement; (4) Baledge instructed outside counsel to draft a complaint without explaining the business rationale, information which he indisputably did not have, for filing suit; (5) Baledge did not inform Tyson Foods' board of the decision to terminate; (6) Baledge did not attend the meeting where the termination decision was made; (7) Baledge did not give Don Tyson the memoranda prepared by outside counsel addressing Tyson Foods' options for terminating the transaction; and (8) Baledge did not discuss or attempt to dissuade Don Tyson from the decision to terminate once it had been reached. (D.I. 167 at 45-46) If true, the only allegation to support a finding of scienter is Lead Plaintiffs' claim that Baledge filed suit in order to depress the market price of IBP. This allegation, however, is wholly without support in the record. The remaining factual allegations at most allege negligence and possible breaches of fiduciary duty, which plainly are not actionable under § 10(b) and Rule 10b-5. See *Santa Fe Industries, 430 U.S. at 476; In re Advanta Corp. Securities Litig., 180 F.3d 525, 540 (3d Cir.1999)* ; *Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978)*.

With respect to the opinion component of Baledge's statement, Lead Plaintiffs lack evidentiary support for their allegation that the statement was false. In order to prove falsity, Lead Plaintiffs must show that Baledge either did not have a genuine belief that the referenced IBP information was misleading or that under the circumstances his belief was unreasonable. There is no record support for the proposition that Baledge's belief was not genuinely held. Further, the undisputed fact that Baledge consulted with outside counsel supports the reasonableness of his belief. Although Tyson Foods did not prevail on its claim in Chancery Court, that alone does not prove the unreasonableness of Baledge's belief. To the contrary, while the Chancery Court disagreed with Tyson Foods' interpretation of the relevant agreements, it specifically

indicated that Tyson Foods' interpretation was reasonable. *See In re IBP, 789 A.2d at 62; Shapiro v. Allen,* Civ. No. 18967, at 77-78 (Del. Ch. Mar. 19, 2003). Where, as here, there is no indication of bad faith litigation, a party's statement of opinion as to the veracity of its asserted claims is not made false simply because it proves unsuccessful. As Lead Plaintiffs have not shown that the statement of opinion is actionable, they likewise cannot prove scienter.

b. "We believe Tyson Foods, Inc. was inappropriately induced."

*11 This statement expresses an opinion which, to be actionable, Lead Plaintiffs must prove both falsity and scienter. To prove falsity, Lead Plaintiffs must show that Baledge did not genuinely believe that Tyson Foods was inappropriately induced or did not have a good faith basis for that belief. As discussed above, it is insufficient proof for Lead Plaintiffs to allege merely that Tyson Foods was unsuccessful in the assertion of its claims in Chancery Court.

In their brief, Lead Plaintiffs do not allege that the facts support the conclusion that Baledge did not have a genuine belief in the truth of his statement but instead allege the unreasonableness of that belief. (D.I. 167 at 45-46) As proof of this unreasonableness of belief, Lead Plaintiffs rely on Baledge's absence from the meeting where the final decision on termination was reached. Arguably, under some circumstances, this may amount to a breach of the duty of care owed to Tyson Foods shareholders. It has no logical bearing, however, on the reasonableness of Baledge's belief that Tyson Foods was inappropriately induced. The facts and events forming the basis for that belief occurred well before the March 28, 2001 meeting. Moreover, Baledge's belief was supported by the qualified opinions of two outside law firms. In light of these facts, the court finds that there is not a genuine issue of material fact as to the falsity of Baledge's statement of opinion.

c. Omission of Don Tyson's Motivations

Lastly, Lead Plaintiffs assert that Baledge's termination letter and press release were false because they failed to disclose Don Tyson's motivations for terminating the



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

Page 9

transaction. (D.I. 158 at 39) In order for an omission of fact to form the basis for a securities fraud violation, the speaker must have a duty to disclose the information. *See Chiarella v. U.S., 445 U.S. 222, 228 (1980).* Omission of the subjective motivations of corporate decision makers does not render an honest transaction fraudulent under federal law. *See Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978)* (failing to disclose the "unclean heart" of a director is not actionable). FN1

> FN1. *See also Vaughn v. Teledyne, Inc. 628 F.2d 1214, 1221 (9th Cir.1980)* ("Corporate officials are under no duty to disclose their precise motive or purpose for engaging in a particular course of corporate action, so long as the motive is not manipulative or deceptive and the nature and scope of any stock transactions are adequately disclosed to those involved."); *Alabama Farm Bureau Mut. Cas. Co., Inc. v. American Fidelity Life Ins. Co., 606 F.2d 602, 610 (5th Cir.1979)* ("Section 10(b) and Rule 10b-5 were promulgated to prevent fraudulent practices in securities trading and trading on inside information.... They were not intended to require, under normal circumstances, the disclosure of an individual's motives or subjective beliefs, or his deductions reached from publicly available information.").

After determining that the IBP transaction was no longer in the company's best interests, Don Tyson instructed his son John Tyson who, in turn, instructed Baledge to exercise whatever legal rights may exist to terminate the transaction and to mitigate losses. The information upon which Don Tyson relied in making his determination was publicly available, including economic conditions, industry specific conditions, and Tyson Foods' own economic performance. A reasonable investor could draw the conclusion from the termination letter and press release that Tyson Foods management, and by inference Don Tyson, viewed the IBP transaction as no longer in the company's best interests.

Further, the omission of the business rationale does not render the disclosure of Tyson Foods' legal rationale materially misleading. Business judgment necessarily underlies any decision by a company to exercise its legal

rights. Lead Plaintiffs' argument, that it was misleading to a reasonable investor to omit the fact that business considerations were involved in the decision to terminate, lacks merit.

*12 The heart of Lead Plaintiffs' argument is revealed in their brief. They argue that

> the entire process by which the termination decision was made and subsequently conveyed to the market was beyond reckless. Defendants must be held responsible for the consequences, whether intended or not, of their conduct. Each of the three individual defendants handled a massive corporate decision in so slipshod and haphazard a manner that was an extreme departure from the standards of ordinary care owed by top corporate executives.

(D.I. 167 at 44). At most, Lead Plaintiffs' allegations might amount to breaches of fiduciary duty owed to Tyson Foods shareholders; they do not, however, support a finding of securities fraud. *See In re Advanta Corp. Securities Litig., 180 F.3d at 540.* As there was no duty to disclose Don Tyson's rationale, the failure to do so, even if intentional, does not amount to securities fraud.

Therefore, having found that Lead Plaintiffs have failed to adduce evidence in the record that Baledge's statements are actionable under § 10(b) and Rule 10b-5, the court finds that defendant Baledge is entitled to summary judgment.

### 3. Primary Liability of Tyson Foods

For a corporation to have primary liability under § 10(b) and Rule 10b-5, scienter must be present with respect to at least one of the officers or agents who made a false or misleading statement. *See Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir.2004)* ; *Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir.1995)* ; *United States v. LBS Bank-New York, Inc., 757 F.Supp. 496, 501 n. 7 (E.D.Pa.1990)* ; *First Equity Corp. v. Standard & Poor's Corp., 690 F.Supp. 256, 260 (S.D.N.Y.1988), aff'd, 869 F.2d 175 (2d Cir.1989).* Having concluded that each of the individual defendants is entitled to summary judgment under § 10(b) and Rule 10b-5, as a matter of law, Tyson Foods can not be primarily liable and is entitled to summary judgment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                  Page 10
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

#### 4. Loss Causation

In the alternative, defendants contend that Lead Plaintiffs have failed to furnish evidence that the alleged misrepresentations at issue are the cause of injury. An essential element of a claim of securities fraud arising under § 10(b) and Rule 10b-5 is that the defendants' act or omission is the cause in fact of plaintiff's loss. 15 U.S.C. § 78u-4(b)(4) (2004). Loss causation requires proof that, but for the defendant's wrongful conduct, the plaintiff would not have incurred injury. See *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 177 (3d Cir.2001). The loss causation element is derived from " 'standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." ' *Id.* (quoting *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir.1990)). Nevertheless, as the price for securities on open markets is the function of numerous factors and participants, it is rarely possible to isolate a single event as the sole cause of a particular downturn or upturn in the security's price. Consequently, the law requires only that a plaintiff establish that defendant's wrongful conduct was a substantial factor in the market change. See *Semerenko v. Cendant Corp.*, 223 F.3d 165, 187 (3d Cir.2000). FN2

> FN2. Alleging causation under a substantial factor theory is hardly a novel concept. See Rest. (2d) Torts § 431.

*13 Defendants contend that the analysis of Lead Plaintiffs' damages expert is insufficient proof of loss causation because it fails to identify what portion of the plaintiffs' economic loss is attributable to the alleged actionable statements and what portion is merely attributable to the termination announcement itself. "To satisfy the loss causation element, a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value. Ultimately, however, a plaintiff will be allowed to recover only damages actually caused by the misrepresentation." *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir.1997). Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact. See *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3rd

Cir.2000). Where a plaintiff alleges a fraud-on-the-market theory based upon a public dissemination of misleading material facts, the causal nexus between the misleading statement and a plaintiff purchasing or selling that security may be presumed. See *Basic v. Levinson*, 485 U.S. 224, 242-47 (1988). As Lead Plaintiffs' theory does rest upon a fraud-on-the-market theory, the court finds that Lead Plaintiffs have met the loss causation element. FN3 Defendants, therefore, are not entitled to summary judgment on these grounds.

> FN3. The court notes that defendants' criticism of Lead Plaintiffs' damages expert has merit as it relates to proving actual damages. The defendants' motion and the court's decision concern only the issue of proof of loss causation and, in that regard, the evidence is sufficient.

#### D. Section 20(a)

Lead Plaintiffs allege that Don Tyson and John Tyson are also liable as controlling persons under § 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a (2004). To be liable under § 20(a), a plaintiff must prove the following: (1) the defendant is a controlling person within the meaning of the statute; (2) a primary securities violation by a third party within the gambit of defendant's control; and (3) culpable participation by the defendant. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 888, 890 (3d Cir.1975) ; *In re Digital Island Sec. Litig.*, 223 F.Supp.2d 546, 560 (D.Del.2002). As the court has granted summary judgment as to primary liability of each defendant, there is not a predicate primary violation of federal securities law to sustain a claim under § 20(a). Further, the court also concludes that Don Tyson and John Tyson are entitled to summary judgment because Lead Plaintiffs have failed to demonstrate the requisite level of culpable participation.

Third Circuit precedent requires that a plaintiff prove culpable participation, i.e., "deliberate and intentional[ ]" action or inaction by the defendant "to further the fraud." *Rochez Brothers*, 527 F.2d at 890. Even if the issued statements constituted misrepresentations, where, as here, the undisputed facts are that Don Tyson and John Tyson did not participate in the drafting and release of the issued

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
(Cite as: Not Reported in F.Supp.2d)

statements, did not dictate the specific content of the issued statements and did not review the content of the statements until they were publicly issued, Don and John Tyson cannot be said to have culpably participated. Lead Plaintiffs argue that this amounts to deliberate indifference. While deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another. *See Rochez Brothers, 527 F.2d at 890.* At most, the evidence of Don and John Tyson's conduct would amount to negligence in failing to oversee the actions of corporate officers but that, without more, does not sustain a finding of controlling person liability. Consequently, Don Tyson and John Tyson are entitled to summary judgment on Lead Plaintiffs' claim under § 20(a).

E. Lead Plaintiffs' Motion for Summary Judgment

**\*14** Having concluded that defendants are entitled to summary judgment on each of Lead Plaintiffs' claims, Lead Plaintiffs' motion for summary judgment will be denied. (D.I.157)

V. CONCLUSION

For the reasons discussed above, the court will grant defendants' motions for summary judgment (D.I.161, 163) and deny Lead Plaintiffs' motion. (D.I.157) An appropriate order shall issue.

ORDER

At Wilmington this 17th day of June, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. The motions of defendants Don Tyson, John Tyson, Les Baledge and Tyson Foods, Inc. for summary judgment are granted. (D.I.161, 163)

2. Lead Plaintiffs' motion for summary judgment is denied. (D.I.157)

3. The Clerk of the Court is directed to enter judgment in favor of defendants John Tyson, Don Tyson, Les Baledge and Tyson Foods, Inc. and against Lead Plaintiffs.

10 NO. 5 Andrews Sec. Litig. & Reg. Rep. 5 10 NO. 5 Andrews Sec. Litig. & Reg. Rep. 5 10 NO. 5 Andrews Sec. Litig. & Reg. Rep. 5 Related Andrews Newsletter Articles(Back to Top)10 NO. 5 Andrews Sec. Litig. & Reg. Rep. 5

D.Del.,2004.
In re Tyson Foods, Inc.
Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847

Briefs and Other Related Documents (Back to top)

• 2004 WL 1125187 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Opposition to Defendants' Motion for Leave to File Sur-Reply (May. 05, 2004)

• 2004 WL 869617 (Trial Motion, Memorandum and Affidavit) Defendants' Consolidated Reply Brief in Support of Their Respective Motions for Summary Judgment (Apr. 05, 2004)

• 2004 WL 874829 (Trial Motion, Memorandum and Affidavit) Defendants' Answering Brief in Opposition to Lead Plaintiffs' Motion for Summary Judgment (Mar. 22, 2004)

• 2004 WL 601957 (Trial Pleading) Lead Plaintiffs' Opening Brief in Support of Their Motion for Summary Judgment on Liability (Corrected Version) (Feb. 26, 2004)

• 2004 WL 601956 (Trial Pleading) Defendants Don Tyson and John Tyson's Brief in Support of Motion for Summary Judgment (Feb. 19, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.

# EXHIBIT K

Westlaw.

Not Reported in F.Supp.2d                                                                         Page 1
Not Reported in F.Supp.2d, 2003 WL 1824914
**(Cite as: Not Reported in F.Supp.2d)**

C
Not Reported in F.Supp.2d, 2003 WL 1824914
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
IN RE VIROPHARMA, INC., Securities Litigation
**No. CIV.A. 02-1627.**

April 7, 2003.

*OPINION*

NEWCOMER, S.J.

I. *Introduction*

**\*1** This is a class action securities fraud case against
Viropharma and its officers. FN1 Plaintiffs, purchasers of
Viropharma Securities, claim that the Defendants made
materially misleading statements regarding a drug that was
developed by Viropharma called Pleconaril. They allege
that these statements misled them as to whether Pleconaril
would be approved by the Food and Drug Administration
("FDA"). Eventually, the FDA rejected Pleconaril, and the
company's stock plummeted. Currently before the Court is
the Defendants' Motion to Dismiss the Consolidated Class
Action Complaint.

> FN1. The individuals named include: Claude H.
> Nash, Viropharma's co-founder, Chairman of the
> Board, former Chief Executive Officer and former
> President; Michel de Rosen, Viropharma's current
> Chief Executive Officer and President; Mark A.
> McKinlay, Viropharma's co-founder and Vice
> President of Research and Development; and
> Vincent Milano, Viropharma's Chief Financial
> Officer.

II. *What a Court may Consider when Deciding a Motion to
Dismiss*

As a preliminary matter the Court must decide what
materials are properly before it on the Defendants' Motion.
Both sides have filed no less than four briefs arguing their
respective positions. In support of these briefs, the
Defendants submitted a total of forty-seven exhibits spread

over four volumes and the Plaintiffs submitted several
exhibits including the nine-page declaration of a Robert
Makuch a biostatistician.

  A. *The Court Will Consider the Facts Alleged in the
  Complaint and Extrinsic Documents Either Explicitly
  Referenced in the Complaint or Integral to the Plaintiffs'
  Claims*

On a motion to dismiss, a court must accept all of the facts
pleaded in the Plaintiffs' Complaint as true and take all
reasonable inferences in favor of the Plaintiff. *Weston v.
Pennsylvania,* 251 F.3d 420, 425 (3d Cir.2001). A court is
not limited, however, to the four corners of the complaint. A
court may consider any document that is explicitly relied
upon in the complaint. *In re Burlington Coat Factory Sec.
Lit.,* 114 F.3d 1410, 1426 (3d Cir.1997). A court can also
consider the text of an undisputedly authentic document that
is integral to a plaintiff's claim, even if the document is not
attached to or named in the complaint. *Id.* This prevents a
plaintiff in a fraud case from pulling isolated statements
from a document which may appear fraudulent, but are not
so when viewed in context. *Id.* In such cases, a plaintiff is
not able to prevent a court from considering the full text of
the document just because the plaintiff chose not to attach it.
*Id.* Accordingly, the Court will consider the Defendants'
exhibits that were either referenced in, or integral to, the
Plaintiffs' Complaint. FN2

> FN2. These exhibits include the various press
> releases and other documents, which the Plaintiffs
> allege contain materially misleading statements.
> Although the Defendants did not submit all such
> documents, exhibits 11, 13, 16, 20, 24-28, and
> 31-33 were either explicitly referenced in the
> Plaintiffs' allegations or they are integral to the
> Plaintiffs claims.

B. *The Court Will Not Consider Statements in Public
Documents and Newspaper Articles for the Truth of the
Matter Asserted Therein*

In addition to documents relied on by a plaintiff in the
complaint, a court may can consider materials that are
public records and that may be judicially noticed under
Federal Rule of Evidence 201. *Oran v. Stafford,* 226 F.3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 1824914
**(Cite as: Not Reported in F.Supp.2d)**

275, 289 (3d Cir.2000). These materials, however, may only be considered for the limited purpose of showing that a particular statement was made by a particular person. They may not be considered for the truth of the matters stated within them. *Id.* (quoting *Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991)*). If a court adopted the approach of considering such documents for the truth of the matter asserted therein, it would be authorizing a trial by public documents, and thus imprudently expanding the scope of 12(b)(6) motions.

Generally, this Court will not consider the public documents and newspaper articles submitted by the parties for the truth of the matter asserted in the documents. FN3 Specifically, the Court will not accept as true the statements made by Viropharma in its SEC and FDA filings. It would be improper to accept these statements as true because the crux of the Plaintiffs' Complaint is that statements made by Viropharma were not truthful. In addition, the parties have submitted several public documents from the FDA which merely provide background on the process for testing and approving new drugs. FN4 Unlike the statements of Viropharma, the authenticity and accuracy of these documents cannot reasonably be questioned. Fed.R.Evid. 201(b)(2). In forming its opinion, the Court has relied on these documents only to this extent that they educate the Court in the FDA approval process, but has not made any specific factual conclusions about this case based on them.

> FN3. These include Defendants' exhibits 6, 14, 18, 19, 22, 23, 29, and 34-37 and Plaintiffs' exhibits B to their Supplemental Submission in Opposition to Defendants Motion to Dismiss.

> FN4. These include Defendants exhibits 1-5,7-10, 39, 40, 42-46, exhibits A and C to the Plaintiffs' Motion to Strike, and Plaintiffs exhibits C-G to the Plaintiffs' Supplemental Submission in Opposition to the Defendants' Motion to Dismiss.

**\*2 C. *Other Documents Submitted by the Parties***

The parties have also submitted several other documents that are not proper on a motion to dismiss. The Plaintiffs' submission of an expert report at this stage is entirely improper. *DeMarco v. DepoTech Corp., 149 F.Supp.2d 1212, 1219-22 (S.D.Cal.2001); See Visconti by Visconti v. United States Healthcare,* 1998 U.S. Dist. LEXIS 15691 at *12 (E.D.Pa. Sept. 28, 1998) (expert report is not a pleading). Besides being wholly outside of the pleadings, this expert report attempts to circumvent the usual procedures for allowing expert testimony. *See DeMarco, 149 F.Supp.2d at 1221.* The Defendants have not had the opportunity to examine Mr. Makuch or to challenge his qualifications and the methodology of his opinions. The Defendants have also submitted several documents that are neither suitable for judicial notice, nor integral to the Plaintiffs' Complaint. These documents will not be considered.

### II. *Factual Background*

#### A. *Background on the FDA Approval Process*

Every drug sold in the United States must first be approved by the FDA. Approval by the FDA requires preclinical trials usually done on animals, then at least three phases of clinical trials on humans (these trials are referred to as phases I, II, and III). Phase I trials are mainly aimed at determining if the metabolic and pharmacologic actions of the drug in humans are safe enough to proceed to Phase II studies. Phase II studies are controled clinical studies that involve a limited population infected with the disease the drug proposes to treat. Phase III studies usually involve many more people than Phase II studies and are intended to gather additional information on the drug's efficacy and safety that will be used in evaluating its overall risks and benefits.

After the completion of Phase III clinical trials, the drug company files a New Drug Application (NDA) with the FDA. A NDA should present information regarding the sub-groups that will eventually comprise the drug's market. If the application is not sufficient, the FDA will refuse to file it. If the NDA is accepted, the FDA may refer the application to an advisory committee of outside experts. The recommendations of these committees are not binding, but are almost universally followed. After making its decision, the FDA sends one of three letters: an approval letter, a not approvable letter, or an approvable letter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1824914
(Cite as: Not Reported in F.Supp.2d)

Page 3

### B. *History of Pleconaril*

*3 Pleconaril is a drug aimed at treating picornaviruses. Picornaviruses are the cause of over one-half of all common colds. Pleconaril was the first drug that was ever submitted to the FDA for the treatment of these viruses. The predicted affect of the drug was to shorten the duration of colds in adults.

Viropharma ran clinical trials on Pleconaril from the early 1990s until the rejection of the drug by the FDA in 2002. On July 13, 1999, Viropharma announced the results of one of its Phase II studies. Contrary to the statements made by Viropharma, the Plaintiffs allege that this study and all other Phase II trials showed no statistically significant effect. On April 11, 2000, Viropharma announced that a Phase III study had failed to show any significant treatment benefit. Despite these studies, however, Viropharma announced on March 15, 2001, that a later Phase III study had proven successful.

The Plaintiff alleges that this later Phase III study was lacking in several respects. First, the study showed that the drug had a negative impact on smokers. This negative effect was confirmed in three different trials. Also, those suffering from heart problems and other co-morbid conditions were wholly excluded from the study. Third, because minorities and the elderly were underrepresented no conclusions could be made about the drug's efficacy and safety in these groups. The Plaintiffs also allege that Pleconaril did not show a significant treatment effect in the male population. Because of these deficiencies, the Plaintiffs allege that the therapeutic profile for Pleconaril was extremely narrow, and therefore Defendants could not claim that it was marketable to all adults.

In the fall of 2001, after Viropharma submitted the NDA for Pleconaril, Viropharma did a six-week prophylaxis study to confirm the drug's efficacy and test the safety of the drug when interacting with other medications. This was the first time Viropharma had tested Pleconaril's interaction with other drugs. In this trial, several women who were taking oral contraceptives experienced menstrual difficulties. Although the preliminary results of the study were available to Viropharma by mid-February 2002, they were not released to the public until March 18, 2002. This study spurred Viropharma to undertake other studies to explore the side effects of Pleconaril, but before these studies were completed the FDA's Advisory committee rejected Pleconaril. The FDA sent a non-approval letter to Viropharma on May 30, 2002.

### C. *Allegedly Misleading Statements*

The Plaintiffs allege that several public statements made during the course of the clinical trial and approval process were material misrepresentations. These were statements made both by the Defendants directly and by analysts on behalf of the company. The crux of the Plaintiffs' Complaint is that these statements represented to the investing public that Pleconaril was effective at reducing the common cold, and that it was effective over the whole spectrum of adults. The statements are:

1) A July 13, 1999, press release stating that the Phase II trials were a success. In this release Viropharma stated that "Pleconaril-treated patients experienced a clinically and statistically significant reduction in time to complete resolution of all disease symptoms, as well as a reduction in the patient-reported time to return to feeling normal." FN5

> FN5. Viropharma made several similar statements touting the efficacy of Pleconaril. An August 14, 2000, statement in the Wall Street Journal claimed that: "In clinical studies to date, Pleconaril-treated patients have experienced a shortening in their disease duration and a decrease in the severity of their disease." A March 15, 2001, press release stated that results from clinical studies "demonstrated that patients with a VRI caused by picornavirus who were treated with Pleconaril experienced a statistically significant decrease in disease duration and in cold symptom severity." Defendant McKinlay was quoted in April 9, 2001, as saying that certain clinical studies showed that patients experienced a reduction in the severity and duration of their illness. Similar statements were also included in an allegedly misleading analyst report dated August 24, 2001 and an October 8, 2001, Morgan Stanley Dean Witter report based on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 1824914
(Cite as: Not Reported in F.Supp.2d)

a Viropharma presentation.

**\*4** 2) A February 24, 2000 report in the Dow Jones
Newswire repeated the statements of Defendant Milano that
"Pleconaril is a very exciting product.... We have received a
lot of interest from pharmaceutical companies."

   3) A February 28, 2001, issue of Bioworld published an
interview with a Viropharma spokeswoman who stated
that after reviewing previous clinical trials, the Company
"took several steps to try to increase the likelihood of
success."

   4) A March 15, 2001, interview with Defendant de Rosen
stated that Pleconaril "will probably be good for either
everybody or close to everybody" and that it should reach
approximately two-thirds of the colds in America. FN6

> FN6. Similarly, Defendant de Rosen allegedly
> exaggerated the scope of Pleconaril in an April 30,
> 2001, letter to stockholders by stating that every
> person is a potential patient and that millions of
> patients need the drug. In a Barron's article on May
> 7, 2001, he stated that "we need to market this as a
> scientific revolution because this is a disease that
> anyone can catch. Potentially every family in
> America could use it." On September 10, 2001, in
> discussing the collaboration between Viropharma
> and Aventis Pharmaceutical, the Company stated
> that the agreement "clearly represents a
> tremendous opportunity to potentially reach
> patients and physicians. The common cold is the
> number one reason for physician visits in the
> United States today."

5) A March 15, 2001, report by analysts based on
information disseminated by the Defendants stated that the
company believed "that Pleconaril's benefit, consistent
across endpoints and between studies, puts it on a strong
approval track as the first and only drug candidate to
effectively treat the cause and symptoms of VRI. VRI
results in 34 million U.S. physician visits each year."

   6) Defendant de Rosen stated in March of 2001 that the
completion of clinical studies was a "truly momentous
event in our history." He also claimed that the
achievement was all that more remarkable because
Viropharma had been forced to completely reshape its

clinical program after three successive studies had
produced negative results. FN7

> FN7. Defendant de Rosen also referred to the
> success of certain trials as a momentous event in an
> April 30, 2001, letter to stockholders. Similarly,
> Defendant Milano was quoted as saying that "[w]e
> believe this is going to be successful, and we're
> very passionate about making it happen."

7) On August 24, 2001, Defendants represented that
non-smokers simply "experienced greater reduction in
duration." Smokers who were treated with the drug actually
had the duration of their colds extended.

   8) On October 19, 2001 Form 8-K filed with the SEC
stated that Viropharma had submitted a NDA requesting
permission to market Picovir for the treatment of VRI in
adults.

### D. Viropharma's Securities

Viropharma's stock price rose and fell on the hopes for FDA
approval for Pleconaril. When Viropharma announced that
its July 13, 1999, Phase II study was a success, the
company's stock rose from $9.25 to $19.13 per share. Two
months later, the company announced a sale of three million
shares of stock priced at nineteen dollars a share. In
February of 2000, the Defendants announced the intent to
issue one-hundred-and-fifty million dollars in convertible
subordinated notes.

When the prospects for the success of Pleconaril
deteriorated, so did the stock price of Viropharma. When the
disappointing Phase III study results were announced on
April 11, 2000, the share price of Viropharma dropped from
$71.75 to $23.25 per share. When the Advisory Committee
recommended that the drug not be approved, the share price
dropped from $5.50 to $1.41. After Viropharma received the
non-approval letter for Pleconaril, the stock dropped to a
few pennies per shares.

### III. Discussion

**\*5** A. Securities Fraud Claims under Section 10(b) of The
Securities Exchange Act and Rule 10b-5

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1824914
**(Cite as: Not Reported in F.Supp.2d)**

The Complaint sets forth allegations against the Defendants under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the S.E.C. To state a claim under Rule 10b-5, the plaintiff needs to plead that: 1) the defendant made a materially false or misleading statement or omitted a material fact necessary to make a statement not misleading; 2) the statement was made in connection with the sale of securities; 3) the statement was made with scienter; 4) the plaintiff reasonably relied on the statement; and, 5) the misstatement proximately caused the plaintiff's injury. FN8 *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000).

> FN8. Although the Defendants state that the complaint does not meet any of these elements, they only offer argument on elements one and three. After evaluating the Plaintiff's Complaint, the Court concludes that it pleads sufficient facts to satisfy elements two, four, and five.

B. *While the Defendants' have Correctly Stated that They had no Duty to Predict the Advisory Committee's Decision, They did have a Duty not to Make Material Misstatements of Fact*

The Defendants claim that the Plaintiffs are seeking to impose a duty to predict the outcome of the FDA's decision. They further argue that they had no such duty under the securities laws. The Court soundly agrees that 10b-5 does not place an obligation to predict the FDA's decision. The thrust of the Plaintiffs' Complaint, however, is not seeking to impose such a duty. FN9

> FN9. One paragraph of the Plaintiffs' Complaint does allege that Viropharma materially misled investors by saying the Pleconaril was on the track to FDA approval. The Court finds this statement to be immaterial. *See* Section IV(D), *infra.*

The Plaintiff is alleging that the Defendants breached their duty to not make material misstatements. Whether the Defendants had to predict the FDA's decision is irrelevant. They are liable under 10b-5 if they made statements that a reasonable investor would consider in deciding whether to buy stock. All investing is based on investors' perceptions

about the future. The Plaintiffs in this case bought Viropharma securities based on their perception of whether Pleconaril would be approved by the FDA. Viropharma would not be responsible if its investors' perceptions were based solely on the company's predictions about the prospects for FDA approval. That is not the case, however. Rather the allegations in this case are that Viropharma made misstatements of fact which formed the basis for its investors' perceptions. *See In Re NAIIC, Inc. Sec. Litig.,* 2001 U.S. Dist. LEXIS 16754 at *35 (E.D.Pa. Oct. 17, 2001) (stating that while corporate officials do not need to be clairvoyant, they are responsible for revealing material facts known to them). Accuracy in these types of factual statements lies at the heart of what the securities laws are trying to protect.

C. *The Defendants did have a Duty to not Materially Mislead the Market when Making Statements About Pleconaril's Efficacy*

The Defendants argue that the failure to disclose efficacy data that was not considered fatal by the FDA does not render alleged statements materially misleading. In making this argument, the Defendants are asking the Court to make a determination as to the basis of the FDA's decision to deny the NDA for Pleconaril. At this stage in the litigation, it is simply not within the Court's purview to make such a determination. *In re Cell Pathways Inc. Sec. Litig.,* 2000 U.S.Dist. LEXIS 8584 at *28 (E.D.Pa. June 21, 2000) (holding that on a motion to dismiss it is inappropriate to dismiss a complaint based merely on a defendant's "insistence on their version of the contested issues in the case").

D. *The Defendants may have had a Duty to Disclose Drug Interaction Data*

*6 The Defendants claim that they had no duty to disclose drug interaction data from the six-week prophylaxis study conducted in late 2001. The Defendants argue that this information was preliminary and could not have altered the total mix of information in the market. Drug interaction data that is not statistically significant need not be disclosed in order to prevent prior statements about a drug's safety from becoming materially misleading. *Oran v. Stafford,* 226 F.3d 275, 284 (3d Cir.2000). At this stage in the litigation,

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1824914
(Cite as: Not Reported in F.Supp.2d)

Page 6

however, the Court is unable to determine whether the data from the six-week study was statistically significant, and therefore, the Court must reject this argument.

*B) Materiality of the Alleged Misrepresentations*

Only misrepresentations that are material are actionable. The test for determining the materiality of a statement is whether a reasonable investor would believe that it "significantly alter[s] the 'total mix' of information" available to that investor." *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000) (citing *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 714 (3d Cir.1996)). Certain types of "soft information" such as statements of subjective opinions and intentions are immaterial as a matter of law. *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 642 (3d Cir.1989). Similarly, the law considers vague and general statements of optimism as mere immaterial puffery. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525 (3d Cir.1999). To determine whether a statement is puffery, a court must examine the context in which the statement was made. *In re Lucent Technologies, Inc. Sec. Litig.,* 2002 U.S. LEXIS 11556 at *77 (D.N.J. June 26, 2002). Classic examples of puff include a broker calling a bond "marvelous," or saying a stock is so "red hot" that the investor "could not lose." *Newman v. L.F. Rothchild,* 651 F.Supp. 160, 163 (S.D.N.Y.1986).

Several of the Defendants' allegedly actionable statements are not material under the above legal analysis. The statements concerning the potential scope of Pleconaril, cited in Section 2(C)(4) above, like "everybody is potential patient" and referring to Pleconaril as "a scientific revolution," are simply not the type of factual statements upon which reasonable investors base their decisions. Similarly, the statements referring to successful clinical trials as a momentous event in Viropharma's history (Sec.II(C)(6) *supra* ) and the February 24, 2000, quote from the Dow Jones Newswire describing Pleconaril as a "very exciting product" (Sec.II(C)(2) *supra* ) must be dismissed as mere puffing. The March 15, 2001, report that merely stated the company's belief that Pleconaril was on a strong track to approval (Sec.II(C)(5) *supra* ) is also immaterial because investors should not rely on a company's prediction about the future actions of independent government agencies.

FN10 See *Epstein v. Washington Energy Co.,* 83 F.3d 1136, 1142 (9th Cir.1996) (finding no duty to predict action of public utility commission); *Fanni v. Northrop Grumman Corp.,* 2000 Dist. LEXIS 21626, at *32-37 (C.D. Cal. April 10, 2000) (finding no duty to predict whether Department of Justice would approve merger).

> FN10. The Court also notes that the allegedly misleading statement made in the February 28, 2001, issue of Bioworld (Sec.II(C)(3) above) is also not actionable. The statement only conveys the fact that Viropharma redesigned its clinical trials in an attempt to increase the likelihood of success. The Plaintiffs, however, have not pleaded that Viropharma did not redesign its clinical trials. Accordingly, the Complaint does not state sufficient facts to impose 10-b5 liability on the basis of this statement.

The remainder of the alleged statements cannot be disregarded as puffery or subjective opinions. Statements regarding the overall efficacy of the drug, the claim that smokers received a decreased benefit when in fact the data showed the drug extended the duration of their colds, and statements that the NDA for Pleconaril was aimed at seeking approval for all adults, cannot be simply dismissed as immaterial as the Defendants claim. Indeed, it would be sad day when court could determine that misstatements about a whether a company's primary product worked did not alter the 'total mix' of information available in the market. This is not a case where the Plaintiffs claim that the absence of information about a product renders a statement materially misleading. See *In re PLC Sys., Inc. Sec. Litig.,* 873 F.Supp.2d 106, 115-16 (D.Mass.1999) (finding that merely disclosing one fact about a product does not require the disclosure of all facts that may be of interest to the market). Rather, the Plaintiffs have pleaded that the statements made by Defendants were contrary to the then existing state of facts, for example, that Pleconaril was effective for all adults when it was not.

*7 F) The Safe Harbor for Forward-Looking Statements*

The Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA") provides a safe harbor for forward-looking statements. A forward looking statement is

Westlaw.

Not Reported in F.Supp.2d                                                                                                 Page 7
Not Reported in F.Supp.2d, 2003 WL 1824914
**(Cite as: Not Reported in F.Supp.2d)**

one whose truth or falsity cannot be determined until after the statement has been made. *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999). Forward looking statements include: (1) "a statement containing a projection of revenues" or other financial items; (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "a statement of future economic performance;" and (4) "any statement of the assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u-5(i)(1). Additionally, A forward-looking statement only qualifies for the safe harbor to the extent that it is:

(1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (15 U.S.C. § 78u-5(c)(1)(A)(i));

or

(2) the plaintiff fails to prove the forward-looking statement was made, or approved by an executive officer of the company, with actual knowledge that the statement was false or misleading. (15 U.S.C. § 78u-5(c)(1)(B)).

1) *The Statements found by the Court to be Material Misrepresentations are not Forward-Looking* FN11

> FN11. Because the Court has determined that the other four statements alleged by the Defendants to be forward-looking are not actionable because they are not material, the Court will not discuss whether they qualify for the safe harbor.

The Court finds that the material misrepresentations in the July 13, 1999, press release FN12 and in the October 19, 2001 8-K Filing under the heading "Have you submitted an NDA for Picovir(TM)?" are not forward-looking. FN13 They do not fall into any of the categories of forward-looking statements listed above. Rather, these statements when read in the context are statements conveying to the market the current status of clinical trials and the NDA for Pleconaril. The truth or falsity of both of these statements was determinable at the time they were made.

> FN12. The challenged sections of this press release are as follows:
> Trial results indicate that Pleconaril-treated patients experienced a clinically and statistically significant reduction in time to complete resolution of all disease symptoms, as well as a reduction in the patient-reported time to returning to feeling normal, as measured by a global assessment score.... We've seen excellent results with Pleconaril in patients with viral respiratory infection, a disease for which there are no available antiviral treatments. Our plan is to continue the path towards regulatory approval of this important new therapy.

> FN13. In the 2001 8-K Filing, the Plaintiffs challenge the same statement-"we submitted an NDA to the FDA requesting permission to market Picovir for the treatment of VRI in adults"-which appears under two different headings. The first heading-"What will be the primary indication for Picovir(TM)?"-could render the first resuscitation of the above quote forward-looking. The heading asking specifically about whether the Defendants had submitted a NDA, however, is clearly a statement of fact, and therefore, does not qualify for protection under the safe harbor. Accordingly, whether the first statement does or does not qualify for the safe harbor is irrelevant.

In their argument, the Defendants pull isolated forward-looking statements out of the documents at issue in this case. The Defendants do not point out, however, that included in these documents are assertions of then-existing fact. The Plaintiffs are not alleging that the forward-looking portions of the documents are false and misleading, but instead point to the statements of fact. Simply because material misrepresentations appear in the same document as a forward-looking statement does not make the statements of fact eligible for the safe harbor. In fact, the very case on which the Defendants rely, *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir.1999), stated that if smaller non-forward-looking statements contained within the larger

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2003 WL 1824914
**(Cite as: Not Reported in F.Supp.2d)**

document are challenged as false, it is easily concluded that they fall outside the safe harbor. *Harris*, 182 F.3d at 806. *See, also, In re Penn Treaty American Corp. Sec. Litig.*, 202 F.Supp.2d 383, 393 (E.D.Pa.2002) (rejecting a defendants' attempt to pull isolated forward-looking portions out of a document while ignoring the statement of fact).

*\*8 2) The July 13, 1999, Press Release and The October 19, 2001 8-K Filing do Not Include Meaningful Cautionary Language*

Even if the two material misrepresentations discussed above were forward looking, they would not qualify for the safe harbor because they are not accompanied by meaningful cautionary language as required by 15 U.S.C. § 78u-5(c)(1)(A)(i). FN14 Meaningful cautionary language must be substantive and tailored to the specific predictions made in the allegedly misleading statement. *In re Donald J.Trump Casino Sec. Litig.*, 7 F.3d 357, 371-372 (3d Cir.1993). "A vague or blanket disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.*

> FN14. The Court also finds that the second part of the safe-harbor, that the Plaintiffs must have failed to allege that the statements were made with actual knowledge of their falsity is not met. As explained in the discussion of scienter Section IV(E), infra., the Plaintiffs did plead that the these statements were made with actual knowledge of their falsity.

The language that the Defendants cite as cautionary is verbose, and more importantly it falls far short of advising investors about any specific risks. This language would not discourage reliance on the statements of fact in the July 13, 2000, press release and the Form 8-k. The "cautionary language" in the July 13 press release only states that future clinical trials may fail, this does not caution investors that the results of the clinical trial reported in the press release could be interpreted to show that the drug was ineffective. Moreover, a defendant may not use cautionary language to protect himself when he is already aware that the risks he is cautioning against have come to fruition. *In re Cell Pathways, Inc. Sec. Litig.*, 2000 U.S.Dist. LEXIS 8584 (E.D. Pa. June 21, 2000); *see, also, In re World Access, Inc. Sec. Litig.*, 119 F.Supp.2d 1548 (N.D.Ga.2000) ("[N]either

the safe harbor provision nor the bespeaks caution doctrine are applicable when defendants are aware ... of the facts that render their statements untrue when made").

E) *The Plaintiffs' Pleadings have Created a Reasonable and Strong Inference of Scienter*

*\*9 scienter is a required element of a cause of action under the Securities Act of 1934 and Rule 10b-5. Scienter requires a plaintiff to prove that a defendant possessed a mental state embracing intent to deceive, manipulate or defraud. *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Since the adoption of the PSLRA, a plaintiff's scienter allegations must create a reasonable and strong inference that the required intent is present. *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 534-35 (3d Cir.1999).

A plaintiff may plead scienter by alleging particular facts that are circumstantial evidence that a defendant acted recklessly or with conscious disregard to the truth of his statement. *Advanta*, 180 F.3d at 534-5. A reckless statement is one made with "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the Defendant or is so obvious that the actor must be aware of it." *Mclean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977).

The Plaintiffs have sufficiently alleged that the Defendants either knew that their statements were false or acted with reckless disregard for the truth of those statements. According to the allegations in the Plaintiffs' Complaint, the Defendants were aware of the lack of efficacy shown by the Phase II trials, the lack of sufficient data to make any conclusions regarding the efficacy and safety of Pleconaril in significant subgroups, and the negative drug interaction between Pleconaril and oral contraceptives. Knowledge of these facts can be imputed to the Defendants for several reasons. First, because Pleconaril was Viropharma's leading product and Defendants were the highest ranking members of the company, it can be assumed that the Defendants were aware of these facts. *See In re Aetna Sec. Litig.*, 34 F.Supp.2d 935, 953 (E.D.Pa.1999); *In re Tel-Save Sec.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2003 WL 1824914
(Cite as: Not Reported in F.Supp.2d)

*Litig.*, 1999 U.S. Dist. LEXIS 16800 at *14 (E.D.Pa.1999) ; *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998). Second, because of the Defendants' positions in the company they had access to several documents which contained the facts that allegedly made the Defendants' statements materially misleading. *See In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J.2001) (stating that a claim of recklessness can be based on allegations that defendants had access to information which contradicted their public statements). Here the Defendants had access to non-public annual reports which contained the results of the clinical trials, the NDA for Pleconaril which contained data from the Phase II and III trials, and the Case Report Forms prepared during the clinical trials. It is even more clear that the Defendants were aware of data that contradicted their statements regarding subgroups because the FDA mandated that data be reported separately based on age and race. Further, the harmful effect on smokers was evident to the Defendants because smokers were stratified in the Phase III trails. Based on these allegations, the Court concludes that there is strong and reasonable inference that the Defendants knew their statements were misleading or that they acted with an extraordinary lack of care when making the statements.

The Defendants argue that the Complaint lacks sufficient allegations of scienter based on recklessness because the Defendants were not aware of the materiality of their statements. In order to be held liable under 10b-5, the plaintiffs must clearly show that the Defendants either were aware or should have been aware of the materiality of the facts they were misrepresenting. *See City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir.2001). The Defendants once again attempt to argue that they could not have known their statements were material because the FDA usually considers drug interaction and subgroup limitations as labeling issues and not barriers to approval. Again, the Defendants ignore the reality of Plaintiffs' decision to buy Viropharma stock. In making this decision, the efficacy of the drug in general and in large subgroups is obviously material.

### V. *Conclusion*

*10 For the reasons stated above, the Defendants' Motion to Dismiss the Consolidated Class Action Complaint is granted in part and denied in part. An appropriate Order will follow.

E.D.Pa.,2003.
In re Viropharma, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2003 WL 1824914

Briefs and Other Related Documents (Back to top)

• 2:02CV01627 (Docket) (Mar. 26, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.