**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE VERITAS SOFTWARE CORP. SECURITIES LITIGATION | ) ) ) ) Case No: 04-CV-831 (SLR) Consolidated Action |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

OF COUNSEL:
WILSON SONSINI
   GOODRICH & ROSATI, PC
Nina F. Locker, Esquire
Peri Nielsen, Esquire
650 Page Mill Road
Palo Alto, California 94304-1050
Tel: (650) 493-9300

POTTER ANDERSON & CORROON LLP
Peter J. Walsh, Jr. (DSBA No. 2437)
Hercules Plaza, Sixth Floor
1313 North Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000

*Attorneys for Defendants VERITAS
Software Corporation, Edwin J. Gillis,
Gary L. Bloom and John Brigden*

Dated: October 11, 2005

702480v1/28298

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 3

I.      APPLICABLE LEGAL STANDARDS ........................................................... 3

II.     PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE STATEMENT
REGARDING THEIR FORECAST ALLEGATIONS ...................................... 3

III.    PLAINTIFFS FAIL TO PLEAD ADEQUATELY A CLAIM BASED ON
VERITAS' GUIDANCE FOR THE SECOND QUARTER 2004 ..................... 5

        A.    Plaintiffs Fail To Plead Facts Demonstrating That VERITAS' Guidance
For Q2 2004 Was False When Made ..................................................... 6

        B.    Plaintiffs Fail To Plead Adequately That Defendants "Actually Knew"
The Q2 2004 Guidance Was False When Made ..................................... 9

IV.    PLAINTIFFS FAIL TO PLEAD ADEQUATELY LOSS CAUSATION WITH
RESPECT TO THEIR ACCOUNTING CLAIMS ........................................ 11

V.     PLAINTIFFS FAIL TO PLEAD ADEQUATELY A CLAIM BASED ON
ALLEGED IMPROPER REVENUE RECOGNITION ................................. 14

VI.    PLAINTIFFS FAIL TO PLEAD ADEQUATELY FACTS RAISING A
STRONG INFERENCE OF FRAUDULENT INTENT ON THE PART OF ANY
OF THE DEFENDANTS ............................................................................ 17

CONCLUSION ........................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**<u>Cases</u>**

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) ..................................... 7

*Asher v. Baxter Int'l, Inc.*, 377 F.3d 727 (7th Cir. 2004) ................................................................ 4

*Bell v. Fore Sys., Inc.*, 17 F. Supp. 2d 433 (W.D. Pa. 1998) ........................................................ 18

*California Public Employees' Retirement System v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ........................................................................................ 3, 7, 16

*Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627 (2005) ....................................................... 11, 12, 14

*Freed v. Universal Health Services, Inc.*,
    No. 04-1233, 2005 WL 1030195 (E.D. Pa. May 3, 2005) ...................................................... 7

*GSC Partners CDO Fund v. Washington*
    368 F.3d 228 (3d Cir. 2004) ............................................................................................... 4, 6

*Gavish v. Revlon, Inc.*,
    No. 00 Civ. 7291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ....................................... 14

*Gruntal & Co. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y. 1995) ................................. 13

*Herman v. Legent Corp.*,
    No. 94-1445, 1995 U.S. App. LEXIS 5568 (4th Cir. Mar. 20, 1995) ................................... 11

*Holzman Trust v. Coopers & Lybrand, L.L.P.*, No. 95-678, 1998 U.S. Dist.
    LEXIS 14535 (D.D.C. Sept. 10, 1998) ............................................................................... 14

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) .................................................. 3, 17

*In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999) ................................................ 10

*In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004) ................................................ 15, 17

*In re Apple Computer, Inc. Sec. Litig.*, No. 03-16614, 2005 U.S. App. LEXIS
    5511 (9th Cir. April 4, 2005) ...................................................................................... 7, 9, 10

*In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001) .................................... 15

*In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999) ..................................................... 18

*In re Cross Media Marketing Corp. Sec. Litig.*, 315 F. Supp. 2d 256
    (S.D.N.Y. 2004) ................................................................................................................... 10

ii

**Page(s)**

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357
(3d Cir. 1993) ........................................................................................................... 5

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680 (E.D. Pa. 2001),
*aff'd*, 277 F.3d 658 (3d Cir. 2002) ........................................................................ 12

*In re MSC Indus. Direct Co., Inc. Sec. Litig.*, 283 F. Supp. 2d 838
(E.D.N.Y. 2003) ..................................................................................................... 16

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) ........................... 15, 18

*In re NUI Sec. Litig.*, 314 F. Supp. 2d 388 (D.N.J. 2004) ........................................................ 12, 15

*In re Oracle Corp. Derivative Litig.*, 867 A.2d 904 (Del. Ch. 2004), *aff'd mem.*,
872 A.2d 960 (Del. 2005) ...................................................................................... 11

*In re PDI Sec. Litig.*, No. 02-C 2005 WL 2009892 (D.N.J. Aug. 17, 2005) .................................. 4

*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001) ........................................... 4, 14

*In re Ravisent Techs., Inc. Sec. Litig.*,
No. 00-1014, 2004 WL 1563024 (E.D. Pa. July 13, 2004) ................................... 10, 18, 20

*In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002) ..................... 15

*In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 WL 1824914
(E.D. Pa. Apr. 7, 2003) .......................................................................................... 10

*In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348 (N.D. Ga. 2000) ............................ 16

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, No. 94-5522, 2005 WL 1541062
(D.N.J. Jun. 30, 2005) ............................................................................................ 12

*Medtronic Ave., Inc. v. Boston Scientific Corp.*, No. 98-478-SLR, 2001 WL
652016 (D. Del. Mar. 30, 2001) ............................................................................ 15

*Montoya v. Mamma.com, Inc.*,
No. 05 Civ. 2313, 2005 WL 1278097 (S.D.N.Y. May 31, 2005) .................................... 12

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ....................................................................... 10

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001) ........................................................................ 17

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ...................................................................... 7

*Roots P'ship v. Land's End, Inc.*, 965 F.2d 1411 (7th Cir. 1992) .............................................. 7

*SEC v. Lipson*, No. 97 C 2661, 1997 WL 452701 (N.D. Ill. Aug. 6, 1997) ............................... 19

iii

**Page(s)**

*Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301 (D. Del. 2001) .................................. 5, 17

*Sorkin, LLC v. Fischer Imaging Corp.*, No. 03-cv-00631, 2005 U.S. Dist. LEXIS
    19934 (D. Colo. June 21, 2005) ....................................................................................... 16

*Weiss v. Mentor Graphics Corp.,* No. 1999 WL 985141
    (D. Or. Oct. 6, 1999) ....................................................................................................... 11

*Zouras v. Hallman*, No. 03-240, 2004 WL 2191034
    (D.N.H. Sept. 30, 2004) .................................................................................................. 10

## Statutes

15 U.S.C. § 78u-4(b)(1)(B) ......................................................................................................... 3

15 U.S.C. § 78u-4(b)(2) ........................................................................................................... 3, 9

15 U.S.C. § 78u-4(b)(3)(A) ......................................................................................................... 3

15 U.S.C. § 78u-5(c)(1)(B)(i) ..................................................................................................... 5

15 U.S.C. § 78u-5(e) .............................................................................................................. 5, 6

**INTRODUCTION**

1.    Plaintiffs have all but abandoned their initial forecast case, premised on VERITAS' announcement that it fell short of its projection for the June 2004 quarter (the "Second Quarter 2004") because of customer spending constraints.  Plaintiffs concede that VERITAS' cautionary statements apprised investors of the precise risk that materialized in the Second Quarter 2004, namely that VERITAS' revenue could fluctuate because "customers may cancel, defer or limit purchase as a result of reduced IT budgets."  Plaintiffs complain that this warning was ineffective because it was issued five months before the quarterly guidance was given.  Plaintiffs ignore that the guidance explicitly directed investors to the SEC filing containing the warning.  The "bespeaks caution" doctrine also protects defendants where warnings were part of the total mix of information available to investors.

2.    Plaintiffs also downplay their fraud-by-hindsight allegations, i.e., that the factors VERITAS' CEO said contributed to the shortfall were known to exist at the time the guidance was given.  Instead, plaintiffs rely on confidential witnesses who observed alleged challenges that VERITAS was facing that had nothing to do with those factors.  Four out of five of plaintiffs' witnesses did not even work at VERITAS during the Second Quarter 2004.  None of them purports to have known when U.S. enterprise software license sales diverged from the forecast, let alone contradicting the total revenue guidance.  In addition, not one of plaintiffs' confidential sources offers any information demonstrating that the individual defendants actually knew that VERITAS would fall short of its guidance when the guidance was given.

3.    Recognizing the weakness of their forecast allegations, plaintiffs devote the bulk of their Answering Brief to their revenue recognition allegations, which they contend comprise the "essence" of this case.  The essence of this case does not state a claim for securities fraud.  At the outset, VERITAS' July 6, 2004 announcement, which precipitated plaintiffs' alleged losses, did not concern revenue recognition.  It did not even concern VERITAS' prior financial statements.  It concerned a forecast.  Plaintiffs attempt to cure this fatal defect by arguing that VERITAS missed its guidance because it could no longer recognize revenue improperly.  This

argument not only fails to make sense (revenue allegedly recognized in 2003 would have, if anything, improved VERITAS' 2004 results), but also undermines the purpose of the loss causation requirement.  Investors who suffer losses after an earnings shortfall cannot simply blame those losses on fraud, regardless of the contents of the corrective disclosure.  Plaintiffs fail to allege loss causation under these circumstances.

4.     Plaintiffs do not even attempt to supply any factual details to support their revenue recognition allegations.  They do not allege a single customer or identify a single contract where revenue was allegedly recognized in the absence of a customer signature or an essential term.  Nor do plaintiffs allege which, if any, quarters were affected and by what amount. Plaintiffs do little more in their Answering Brief than repeat their insufficient allegations and cite to a host of cases, not one of which sustains a revenue recognition claim where plaintiffs fail to specify a single customer or the amount at issue.

5.     Plaintiffs also fail to put forth any facts that would rescue the CAC from dismissal for failure to plead facts raising a "strong" inference of fraudulent intent.  Plaintiffs rely on defendants' positions at VERITAS – an argument that has been rejected by courts in this Circuit and across the country.   Mr. Brigden, the only defendant allegedly involved in the improper revenue recognition, did not sign any financial statements, is not alleged to have an accounting background, and did not sell any stock.  Plaintiffs argue that the CEO's (Mr. Bloom) and CFO's (Mr. Gillis) Class Period sales, which were executed pursuant to 10b5-1 trading plans, raise a strong inference because neither defendant sold stock *before* the Class Period.   Mr. Gillis was not even employed at VERITAS before the Class Period.  Plaintiffs fail to explain how Mr. Bloom's lack of sales in 2001 and 2002 is unusual or suspicious given that he sold only 1.71% of his total VERITAS stockholdings in 2003 and 2004.

Plaintiffs' CAC does not remotely satisfy the pleading requirements imposed by the Reform Act, Rule 9(b) or Section 10(b), and defendants respectfully request that the CAC be dismissed against them.

**ARGUMENT**

### I.    APPLICABLE LEGAL STANDARDS

Defendants established that the applicable pleading standard for this securities class action is found in the Private Securities Litigation Reform Act ("Reform Act"). Def. Br. at 10-12. Plaintiffs mention the Reform Act only *once* in their Answering Brief because they fail to comply with it. Plt. Br. at 2.

The Reform Act requires plaintiffs to "state with particularity *all facts*" supporting their allegations of fraud and "with respect to each act or omission, . . . state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1)(B), 78u-4(b)(2) (emphasis added).  Under both the Reform Act and Rule 9(b), plaintiffs are not permitted to rely simply on "inferences flowing from vague or unspecific allegations."  *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004) (citation omitted).  They must plead facts to support their assertions of falsity, which facts, at a minimum, must include "who, what, when, where, and how."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (citation omitted).  Moreover, to the extent that 9(b)'s allowance of general pleading with respect to mental state "conflicts with the Reform Act's requirement . . . the Reform Act *supersedes* Rule 9(b)."  *Id.* at 531 n.5 (emphasis added).

Since plaintiffs fail to satisfy the Reform Act, Rule 9(b) or Section 10(b), their claims must be dismissed.  15 U.S.C. §78u-4(b)(3)(A) ("In any private action arising under this title, the court *shall*, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) [falsity] and (2) [scienter] are not met.") (emphasis added).

### II.    PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE STATEMENT REGARDING THEIR FORECAST ALLEGATIONS

Defendants established that they are protected from liability for the Second Quarter 2004 guidance because it was accompanied by warnings that apprised investors of the precise risk that materialized.  Defendants warned investors that VERITAS' revenue could fluctuate because "customers may cancel, defer or limit purchases as a result of reduced IT budgets."  VERITAS

fell short of its revenue projection because of weakness in U.S. enterprise sales owing to customer spending constraints. The judicially-created "bespeaks caution" doctrine, as well as the Reform Act's "safe harbor" codifying it, shield defendants from liability. Def. Br. at 12-15.

Plaintiffs acknowledge that defendants' guidance was forward-looking and, thus, subject to protection. Plt. Br. at 25-28.[1] Their principle challenge to the warnings is that they were issued on November 14, 2003, five months before the guidance was given (on April 21, 2004). Plaintiffs contend that this lapse in time means that the warnings did not "accompany" the guidance and were ineffective in dispelling the guidance's materiality. Plt. Br. at 26-27. Plaintiffs ignore that the earnings release containing the guidance specifically referred investors to the Form 10-Q for a description of risks and uncertainties that could cause actual results to differ. Ex. G. There is no doubt that the warnings "accompanied" the guidance by virtue of this reference. *See, e.g., GSC Partners CDO Fund v. Washington* 368 F.3d 228, 243 n.3 (3d Cir. 2004) ("meaningful cautionary statements" do "not have to actually accompany the alleged misrepresentation") (citation omitted); *In re PDI Sec. Litig.,* No. 02-CV-0211, 2005 WL 2009892, at *13 (D.N.J. Aug. 17, 2005) (reference to cautionary language in an SEC filing filed almost seven months before the press release was sufficient to invoke safe harbor protection).[2]

---

[1]    Plaintiffs argue that the safe harbor does not protect the oral statements made during the May 5, 2004 Analyst Day Conference because Renee Budig, the Director of Investor Relations, did not identify each particular forward-looking statement when it was made. Plt. Br. at 28. Taken literally, plaintiffs' argument suggests that Ms. Budig should have interrupted the conference each time a presenter made a forward-looking statement so she could "identify" it as forward-looking and invoke safe harbor protection. Plaintiffs cite no authority for this absurd proposition. Nor would it apply to the "bespeaks caution" doctrine, which can be invoked regardless of whether a forward-looking statement was identified at the time it was made. *See* Plt. Br. at 28 (citing *Asher v. Baxter Int'l, Inc.,* 377 F.3d 727, 731-32 (7th Cir. 2004) (court considered risk factors in a Form 10-K although executives did not direct investors to the filing during their analyst call).

[2]    *See also In re Party City Sec. Litig.,* 147 F. Supp. 2d 282, 310 (D.N.J. 2001) (invoking safe harbor where press release identified statements as forward looking and referred investors to certain risk factors in SEC filings); *Asher,* 377 F.3d at 731 (same).

Plaintiffs also argue that VERITAS' warnings were not specific enough because they did not, for example, caution investors that VERITAS had to enter into an "unprecedented" number of sales transactions to meet its projections. Plt. Br. at 24. Plaintiffs have no support for the assertion that VERITAS' sales goals were "unprecedented."[3]  Furthermore, VERITAS made clear that its revenue was subject to uncertainties over which it had no control, such as customers' budgetary constraints. It was under no obligation to disclose exactly how many contracts it had to close to meet its estimate. *See In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371, 374-75 (3d Cir. 1993) (bespeaks caution doctrine protected statements that casino would be able to service its debt where prospectus warned of risk of non-payment; warnings did not have to include disclosure that casino required $1.3 million per day in "casino win[s]" to service its debt).

Plaintiffs also argue that whether the warnings were meaningful raises a question of fact. Plt. Br. at 25. The Reform Act plainly requires this Court to make this assessment at the pleading stage. 15 U.S.C. § 78u-5(e).[4]

## III.  PLAINTIFFS FAIL TO PLEAD ADEQUATELY A CLAIM BASED ON VERITAS' GUIDANCE FOR THE SECOND QUARTER 2004

Defendants established that plaintiffs failed to plead facts demonstrating that the guidance for the Second Quarter 2004 was false or that defendants actually knew it was false at the time it was given. Def. Br. at 16-24; 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiffs essentially

---

[3]  In fact, plaintiffs' own arguments contradict this assertion. Plaintiffs contend that VERITAS had to enter into well over 246 transactions over $100,000 to achieve its guidance. Plt. Br. at 9. Yet, VERITAS entered into 246 transactions over $100,000 in the first quarter of 2004 when it reported $487 million in revenue – only $3 million below the low end of the guidance it gave for the Second Quarter 2004's projected results. Def. Br. at 8, n.5. Consequently, VERITAS' sales goals were not "unprecedented."

[4]  This Court's decision in *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 312 (D. Del. 2001) is inapposite because the Court was not charged with assessing the meaningfulness of cautionary language. The Court was asked to determine the materiality of an alleged omission.

concede the weakness of their forecast claim by the limited space devoted to it in their Answering

Brief. They offer little more than a repetition of the CAC's insufficient allegations and legal

authority that does not begin to support their claims.

### A.    Plaintiffs Fail To Plead Facts Demonstrating That VERITAS' Guidance For Q2 2004 Was False When Made

Defendants established that plaintiffs have no facts to support their allegation that the

Second Quarter 2004 guidance was inaccurate when given. Def. Br. at 16-22. Plaintiffs

essentially abandon their fraud-by-hindsight allegations that the factors Mr. Bloom attributed to

the shortfall existed at the time the guidance was given.[5] Rather than trying to support this

theory, they rely on their confidential witnesses who offer only observations of alleged challenges

VERITAS was facing prior to the Second Quarter 2004. Since none of the witnesses links there

observations to the quarterly shortfall, their observations do not suffice to plead a claim. Def. Br.

at 18-20.

In their Answering Brief, plaintiffs focus on CW#2 – the only individual who allegedly

worked at VERITAS in the Second Quarter of 2004. Plt. Br. at 17-18. CW#2, however, merely

contends that VERITAS was not successful in renewing existing business with major customers

in 2003 and 2004 – an assertion contradicted by VERITAS' year-over-year revenue growth.

---

[5]    Plaintiffs devote only two sentences in their Answering Brief to these allegations. Plt. Br. at 17. First, they argue that Mr. Bloom "admitted" on July 27, 2004 that demand had dropped between the fourth quarter of 2003 and the first quarter of 2004. Yet, VERITAS publicly disclosed that its revenue declined between these two quarters and that this decline was consistent with the seasonal trend VERITAS had historically experienced. Def. Br. at 8, n.3. Plaintiffs offer no facts that would demonstrate that this Q4 to Q1 decline was out of the ordinary. Second, plaintiffs refer to Mr. Bloom's "admission" that demand for licenses had slowed during the Second Quarter 2004. Plt. Br. at 17. Mr. Bloom said that VERITAS saw a "softening in our U.S. enterprise business, and a number of deals that we expected to close in the second quarter did not, leading to our pre-announcement." Ex. K at 3. Plaintiffs offer no facts demonstrating that the "softening" had materialized when the guidance was given. *GSC Partners,* 368 F.3d at 239 (affirming dismissal where plaintiffs failed to plead facts demonstrating that the defendants had "'actual knowledge' that their public statements were false and misleading at the time in which they were made.").

¶45(d). CW#2 attributes this alleged lack of success to "lack of integration of customer service effort into the sales effort," and to "large customers . . . experiencing fiscal difficulties." *Id.* Importantly, CW#2 does not claim that defendants did *not* take these alleged problems into account when they were developing the Second Quarter 2004 guidance. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 361 (5th Cir. 2002) (dismissing forecasting claims where plaintiffs failed to plead that "growth predictions did not account for known problems" at company).[6] Nor does CW#2 claim that these problems rendered the Second Quarter 2004 guidance false when made. *See In re Apple Computer, Inc. Sec. Litig.*, No. 03-16614, 2005 U.S. App. LEXIS 5511, at *16 (9th Cir. April 4, 2005) ("Because design, marketing and manufacturing problems are common to business, a securities fraud claim must do more than allege the existence of such problems; plaintiffs must allege with particularity that a speaker knew that the severity, timing and extent of such problems rendered the statement false when made.").

The remainder of plaintiffs' CWs left VERITAS *before* the Second Quarter 2004 even began. Def. Br. at 16-18. None of them professes to know why VERITAS fell short of its goals for that quarter. Defendants demonstrated that CW#1 is not remotely reliable because, among other things, he was a sales manager for the "southeast region" and had no information concerning VERITAS' worldwide revenue forecast. Def. Br. at 18-20 (citing *Chubb Corp.*, 394 F.3d at 146).[7] CW#1's account does not support plaintiffs' allegations in any event. CW#1

---

[6]    *See also Roots P'ship v. Land's End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (plaintiffs failed to allege that operational problems, including decreasing demand, precluded company from achieving forecast); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements.").

[7]    Plaintiffs attempt to distinguish *Chubb* by claiming the confidential witnesses in *Chubb* worked in different businesses or worked in local branch offices and would not have knowledge of nationwide information. Plt. Br. at 19, n.7. Yet, plaintiffs' confidential sources here suffer from the same infirmities. Plaintiffs fail to explain how a "sales manager for the southeast region" differs from a "local branch" employee. Neither would have information related to company's overall ability to achieve its worldwide revenue forecast for the quarter. *See also Freed v. Universal Health Services, Inc.*, No. 04-1233, 2005 WL 1030195, at *8 (E.D. Pa. May 3, (continued...)

claims that the "Company" instructed sales people that consulting services should comprise 10% of sales in 2003; claims that consulting services fell short of that percentage in 2003; and speculates that consulting services "must have been [some unidentified] part of the revenue estimates." ¶45(c). VERITAS, however, specifically acknowledged that the growth rates for consulting services in 2003 fell below its objectives. Def. Br. at 20, n.14. Plaintiffs fail to explain how CW#1's account would demonstrate that the Second Quarter 2004 guidance was false, particularly given that the quarterly shortfall was in user license fees, not consulting services.[8]

The remaining confidential witness accounts are equally unavailing. CW#3 left VERITAS in 2003, and CW#4 left in the first quarter of 2004. Both of them worked in the legal department, not in finance or sales. Def. Br. at 20-21. Plaintiffs highlight CW#3's assertion that demand for software licenses dropped in 2003 and did not recover. Plt. Br. at 19. Yet, CW#3 does not offer any basis for this assertion, which is contradicted by VERITAS' financial results, that reflected a $300 million increase in revenue between 2003 and 2004. Similarly, plaintiffs recite CW#4's unsupported assertion that people who left in the first quarter of 2004 were never replaced because of the alleged decline in demand. Plt. Br. at 19. Plaintiffs are silent as to how CW#4 (who also left in the first quarter) would know that employees were never replaced. Nor does CW#4 provide the number of employees at issue, what department they worked in or any other information that would make this vague assertion necessarily render the Second Quarter 2004 guidance false when made.

---

(...continued from previous page)

2005) (complaint failed to allege how confidential witnesses "would have had access to information regarding [the company]'s operations nationwide.").

[8]    Of the $485 million ultimately reported, $270 million was from user license fees, down from $302 million in the prior quarter. *See* Q2 2004 10-Q at 22 (Ex. E); Q1 10-Q at 22 (Ex. C). By contrast, VERITAS reported an increase in services revenue (from $183,338 to $215,118). *Id.*

**B.     Plaintiffs Fail To Plead Adequately That Defendants "Actually Knew" The Q2 2004 Guidance Was False When Made**

Defendants also established that plaintiffs fail to plead adequately that defendants actually knew that the Second Quarter 2004 guidance was false when made. Def. Br. at 16-23. Since VERITAS projected it would earn between $490 and $505 million for this quarter and ultimately earned $485 million, the notion that defendants could have actually known that VERITAS would miss the low end of its guidance by 1% strains credulity. Plaintiffs claim (without support) that the proper analysis should be with respect to the high end of the guidance range. Plt. Br. at 21, n.10. Yet, VERITAS fell short of the high end by only 5%. Percentages of this magnitude are not indicative of actual knowledge of falsity. *Cf. Apple Computer*, 2005 U.S. App. LEXIS 5511, at *20 ("companies should be given leeway when their forecasts are evaluated because by their very nature, forecasts are imprecise . . . projections which are missed by 10% or less are not generally actionable.") (citation omitted).

Because they have no facts demonstrating actual knowledge, plaintiffs rely entirely on inferences, none of which meet the Reform Act's "strong inference" requirement. 15 U.S.C. § 78u-4(b)(2). None of their confidential sources ties any of the individual defendants to the alleged problems they recount, let alone the actual reasons for the Second Quarter 2004 shortfall.[9] None of the individual defendants sold any stock between the time the guidance was given and the time the shortfall was announced. Def. Br. at 23. Plaintiffs do not even try to cobble together any "motive and opportunity" allegations to plead actual knowledge with respect to the guidance. Instead, they respond by asking this Court to infer that defendants must have actually known the Second Quarter guidance was false when made because "the alleged fraud relates to the core business of the Company." Plt. Br. at 22. This inference cannot be drawn. Assuming the "core business" plaintiffs are speaking of is software license sales by U.S. enterprises, plaintiffs'

---

[9]    Plaintiffs' allegations concerning Mr. Brigden and their supposed relation to the earning shortfall are discussed in Sections III through IV below.

proposition would hold defendants responsible for predicting whether and when their customers were going to buy VERITAS' products -- precisely what defendants warned investors they were unable to do. *See infra* at 3. It is well-established that "[c]orporate officials need not be clairvoyant." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Indeed, in the cases plaintiffs cite concerning "core business" allegations, knowledge was only imputed as to contemporaneous information, not predictions. *See, e.g., In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (imputing knowledge of the outcome of Phase II trials concerning leading product in evaluating statements about efficacy and safety); *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (imputing knowledge of merger integration problems affecting key component of business, the processing of medical claims).[10]

Plaintiffs also read much into the fact that VERITAS reaffirmed its guidance on June 14, 2005, only two weeks before the Second Quarter 2004 ended. Plt. Br. at 23-24. This temporal proximity does not raise a strong inference that defendants actually knew of the shortfall beforehand. *See, e.g., In re Cross Media Marketing Corp. Sec. Litig.*, 315 F. Supp. 2d 256, 269 (S.D.N.Y. 2004) (scienter not adequately alleged where CEO stated company was "absolutely on track" 13 days before end of quarter); *Apple Computer*, 2005 U.S. App. LEXIS 5511, at *21 (scienter not adequately alleged although CEO reaffirmed sales projection for particular product

---

[10]  In the one case involving a forward-looking statement, the court found knowledge sufficiently pleaded with respect to a CFO who expected revenue to increase in the next two years. Six months after he made this prediction, the company restated its financial results. The court concluded that the CFO's statements, which were not accompanied by any warnings, were not entitled to safe harbor protection and that plaintiffs had adequately alleged scienter in light of his position, as well as his educational and employment background. The court did not mention any "core business." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2004 WL 1563024, at *12 (E.D. Pa. July 13, 2004); *see also Zouras v. Hallman*, No. 03-240, 2004 WL 2191034, at *7 (D.N.H. Sept. 30, 2004) ("Plaintiff also fails to allege any concrete knowledge, or a basis for inferring knowledge, on [CEO]'s part concerning the link between production/performance issues and revenue.").

just 17 days before end of quarter and projection fell short 30%). This is especially true for a software company, which frequently does most of its business in the last two weeks of a quarter. *See In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 910 (Del. Ch. 2004) (noting analysts are "well aware" of the "hockey-stick effect," which describes the back-loaded nature of the software industry and results in "the potential that many deals might fall through right before quarter's end or slip into later quarters if buyers are experiencing budget pressure"), *aff'd mem.*, 872 A.2d 960 (Del. 2005).[11]

## IV.  PLAINTIFFS FAIL TO PLEAD ADEQUATELY LOSS CAUSATION WITH RESPECT TO THEIR ACCOUNTING CLAIMS

Defendants established that the revenue recognition allegations are fatally flawed because plaintiffs fail to allege a causal link between these allegations and their economic losses. Since the July 6, 2004 announcement precipitating the stock price decline did not concern revenue recognition – or the accuracy of any of VERITAS' prior financial results – plaintiffs cannot plead loss causation as a matter of law. Def. Br. at 24-27 (citing *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005).

Plaintiffs offer a few feeble arguments in response to this clear weight of authority. First, they argue that loss causation is a fact-intensive inquiry not proper for the pleading stage. The U.S. Supreme Court unequivocally disposed of this argument. *Dura*, 125 S. Ct. at 1634 (finding "plaintiffs' complaint legally insufficient" based on failure to plead loss causation). Second, plaintiffs insinuate that news of alleged revenue recognition improprieties was disseminated on July 27, 2004 and that defendants timed the disclosure. Plt. Br. at 33 ("[defendants] argue investors could not have reasonably linked this news to improper revenue recognition because the

---

[11]  *See also Herman v. Legent Corp.* No. 94-1445, 1995 U.S. App. LEXIS 5568, at *4 (4th Cir. Mar. 20, 1995) ("the market was well aware that companies like Legent [an international software company] are subject to [the hockey stick] effect.") (citation omitted); *Weiss v. Mentor Graphics Corp.*, No. CV-97-1376, 1999 WL 985141, at *8 (D. Or. Oct. 6, 1999) ("Typical of many companies in the software industry, Mentor Graphics' quarterly revenues generally follow a "hockey stick" pattern.").

Company did not admit that information until later"). VERITAS, however, did not disclose that its prior financial results were misstated on July 6 or July 27, 2004.

Third, plaintiffs argue that loss causation does not require "full" disclosure but can somehow be pleaded sufficiently by "*partial* disclosure during the class period which causes the price of shares to decline." Plt. Br. at 34 (citing *Montoya v. Mamma.com, Inc.*, No. 05 Civ. 2313, 2005 WL 1278097 (S.D.N.Y. May 31, 2005)). According to plaintiffs, they have adequately pleaded loss causation because they "relate the July 6, 2004 disclosures to both the broader allegations in the Complaint and the substantial stock drop on July 7, 2004." Plt. Br. at 34. The *Mamma.com* case, however, offers no analysis, either factual or legal, to explain the holding regarding "partial" disclosure. Nor do plaintiffs offer any basis for their expansive interpretation, which contradicts the Supreme Court's precedent. It is clear under *Dura* that the announcement precipitating the stock price decline must contain the negative disclosure on which plaintiffs premise their claims. *See Dura*, 125 S. Ct. at 1630, 1634 (dismissing claims based on FDA rejection of asthma spray device where announcement concerned only lower than expected drug sales).[12]

Even if this "partial" disclosure argument were valid, plaintiffs fail to identify any "partial" disclosure that was made during the class period and caused the price of their shares to decline. While they repeatedly mention VERITAS' March 14, 2004 announcement of its intention to restate its financial results, plaintiffs do not contest that the restatement did not involve revenue recognition and that they did *not* incur any losses from the announcement since

---

[12] *See also In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 401-02 (D.N.J. 2004) (dismissing retermination claims where announcement only concerned increase in bad debt); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 689-91 (E.D. Pa. 2001) (dismissing claims based on alleged accounting misstatements where announcement focused on business conditions and operational problems), *aff'd*, 277 F.3d 658 (3d Cir. 2002); *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, No. 94-5522, 2005 WL 1541062, at *9 (D.N.J. Jun. 30, 2005) (finding that a "lack of disclosure is tantamount to a lack of loss causation" and dismissing plaintiffs claims where the announcements that triggered the stock decline did not concern alleged false statements).

they purchased their stock *after* it was made.   Def. Br. at 26, n.17.   In their Answering Brief, plaintiffs seize on a single sentence in VERITAS' 2003 Form 10-K (filed on June 14, 2004) relating to approximately $5 million worth of adjustments, which were unrelated to errors in prior periods and which VERITAS expected to recognize as revenue in 2004.   Plt. Br. at 8; ¶38. Plaintiffs do not explain how this disclosure relates to the losses they allegedly incurred on July 6, 2004.   Nor do they claim to have incurred any losses when this disclosure was made.   ¶38.

Finally, plaintiffs try to connect their revenue recognition allegations and their losses by arguing that the Second Quarter 2004 shortfall was caused by "incomplete sales contracts for which revenue had already been recognized." Plt. Br. at 17.[13]   According to plaintiffs, "the only way to meet Veritas' anticipated earnings was to make more sales than had been made during the first quarter (due, in part, to the revenue previously recognized on improper contracts)." *Id.*   In other words, plaintiffs' argument is that VERITAS missed its forecast (and their losses were incurred) because it could no longer recognize revenue improperly.   At the outset, this argument makes no sense.   If VERITAS recognized revenue prematurely in 2003, as alleged, then the revenue would have to move to future quarters to be recognized properly.   Thus, if plaintiffs' allegations were accepted as true, VERITAS' Second Quarter 2004 financial results would have, if anything, improved as a result of VERITAS' no longer being able to recognize revenue improperly.

More fundamentally, plaintiffs' argument must fail because it undermines the purpose of the federal securities law pleading requirements.   The argument would allow investors who suffered losses after an earnings shortfall to allege that the stock price decline was caused by

---

[13]  Plaintiffs' contention that defendants have conceded that plaintiffs adequately alleged defendants' earnings guidance was false by virtue of having not addressed this allegation in the Opening Brief is unfounded.   The only case they cite stands for the proposition that a court need not address *elements* of a claim that have not been challenged.   *See Gruntal & Co. v. San Diego Bancorp.*, 901 F. Supp. 607, 615 (S.D.N.Y. 1995) (not addressing reliance and the "in connection with" elements).   Here, defendants have challenged the falsity, as well as the scienter and causation elements, of plaintiffs' Section 10(b) claim.   Therefore, no concession has been made.

fraud regardless of the content of the corrective disclosure precipitating their losses.   This is precisely the type of pleading the laws were designed to prevent.  *See Dura*, 125 S. Ct. at 1633-34 (securities laws are not intended to "provide investors with broad insurance against market losses" or to "transform a private securities action into a partial downside insurance policy").

## V.    PLAINTIFFS FAIL TO PLEAD ADEQUATELY A CLAIM BASED ON ALLEGED IMPROPER REVENUE RECOGNITION

Defendants established that plaintiffs fail to plead adequately a claim based on alleged improper revenue recognition because they fail to allege any details, such as dates, amounts, customers, or financial impact.  Def. Br. at 27-31.   Plaintiffs mount very little challenge to defendants' argument except to repeat their inadequate confidential source allegations and cite cases which do not begin to support their pleading.

Plaintiffs, in their Answering Brief, fail to identify a single customer or transaction where revenue was recognized improperly.  They also fail to offer dates or allege what, if any, financial impact the allegedly improper revenue recognition had on VERITAS' financial results.  Def. Br. at 28-29 (citing *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004)).[14]  In fact, plaintiffs do not even explain what principles of GAAP were allegedly violated.   *See Party City,* 147 F. Supp. 2d at 301 (granting motion to dismiss because the complaint failed to specify which generally accepted accounting principle or principles the defendant failed to observe); *Holzman Trust v. Coopers & Lybrand, L.L.P.*, No. 95-678,  1998 U.S. Dist. LEXIS 14535, at *19 (D.D.C. Sept. 10, 1998) (granting motion to dismiss because the complaint failed to specify how GAAP was violated, and finding that "if the allegation is that the

_____

[14]  Plaintiffs attempt to distinguish *Revlon* by arguing that it concerned materiality, which defendants are not challenging here. Plt. Br. at 15, n.5. The *Revlon* court, however, found the revenue recognition allegations lacking for a variety of reasons, including the failure to include any "specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements." 2004 WL 2210269, at *16. The *Revlon* court went further and also found the plaintiffs' failure to satisfy the pleading requirements extended to the "materiality" prong of Section 10(b). *Id.*

financial statements do not conform to GAAP, then the complaint must specify the accounting principle violated").

Instead of supplying any of these missing details, plaintiffs merely argue that they do not have to provide specifics such as dates, transactions, customer names and amounts by which revenue was allegedly misstated because Rule 9(b) does not require that exhaustive level of detail. Plt. Br. at 11-12. Plaintiffs are wrong. Rule 9(b) requires plaintiffs to plead "who, what, when, where, and how," which they have not done. Def. Br. at 9, n.6; *In re Alpharma, Inc. Sec. Litig.,* 372 F.3d 137, 148 (3d Cir. 2004); *In re Rockefeller Center Properties, Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir. 2002).[15]  Plaintiffs' own cases prove this point.

In *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620 (E.D. Va. 2000), for example, the complaint identified three multi-million dollar contracts that had not been finalized prior to revenue recognition. The allegations included customer names, the quarters at issue, and the financial impact of the recognition. For instance, the *MicroStrategy* plaintiffs alleged that a contract with NCI accounted for 50% of MicroStrategy's license revenues in the third quarter of 1999, although it was not finalized until the fourth quarter of 1999. This contract's inclusion in third quarter revenue meant that MicroStrategy reported a profit of $0.09 per share, rather than a loss of $0.30 per share. *Id.* at 638-39.[16]

---

[15]  Plaintiffs argue they have satisfied Rule 9(b) and cite to this Court's holding in *Medtronic Ave., Inc. v. Boston Scientific Corp.,* No. 98-478-SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001). *Medtronic,* however, was not a securities class action. It involved an alleged violation of Section 2 of the Sherman Act. This Court found that Rule 9(b) had been satisfied in connection with an alleged fraud on the Patent Office based on the plaintiff's failure to identify other inventors of the subject matter claimed in the patents. 2001 WL 652016, at *1. This allegation was based on two pending state court actions where the question of inventorship was at issue. The Court declined to require more specificity, finding that "a claimant is free to use alternative means of injecting precision and some measure of substantiation into its allegations of fraud." *Id.* at *2. No such precision or substantiation appears here.

[16]  *See also* NUI, 314 F. Supp. 2d at 401-02 (identified two non-paying customers by name, the amounts they had not paid, and the impact on the quarter, namely, if these amounts had been counted, NUI's losses would have doubled); *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 581, 592-93 (D.N.J. 2001) (head of marketing said he was given revenue targets, which guided improper product "loading," and sent a memo

(continued...)

Instead of supplying facts to support their claims, plaintiffs only repeat the account of their three confidential witnesses, focusing primarily on CW#3. CW#3 is the alleged former legal department employee who claims that Mr. Brigden, the General Counsel, approved contracts that were unsigned or lacked essential terms "knowing that they would therefore be included in revenue recognition." Plt. Br. at 6, 13; ¶41(b). When CW#3 complained about Mr. Brigden's approval of an incomplete contract, he allegedly responded, "What's the difference? We already know what the numbers for the quarter are." ¶41(b). Plaintiffs also repeat CW#4's unfounded conclusion that VERITAS' legal department was responsible for deciding when revenue was recognized. Plt. Br. at 14.

CW#3 and #4 worked in the legal department and do not profess to have had any accounting responsibilities. This alone dooms their accounts. *Chubb Corp.*, 394 F.3d at 152 (rejecting confidential witness allegations because they "held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting.").[17] CW#3 fails to offer details, such as the quarter or contracts at issue or the reason they were was incomplete. Notably, CW#3 does not even claim that Mr. Brigden made this statement *before* VERITAS' quarter closed. Nor does CW#3 claim that revenue from any of the contracts Mr. Brigden allegedly approved was recognized improperly. Without these critical details, CW#3's account, standing alone, cannot support a claim of securities fraud.

_____

(...continued from previous page)

requiring his approval on "guaranteed sales" because return levels were so high); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) (identified two multi-million dollar customers by name who were experiencing product performance issues).

[17] *See also In re MSC Indus. Direct Co., Inc. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003) (dismissing accounting claims because confidential witness did not have "any connection with MSC's accounting department or that their work responsibilities would provide them a basis for knowing the details of the accounting at MSC"); *Sorkin, LLC v. Fischer Imaging Corp.*, No. 03-cv-00631, 2005 U.S. Dist. LEXIS 19934, at *19-20 (D. Colo. June 21, 2005) (dismissing accounting claims where plaintiff "provided no facts showing how these sources would have had access to first-hand information about Fischer's accounting procedures.").

Plaintiffs also rely on the contention of CW#5, a sales staff administrator, that sales people would write up and "process" contracts without essential terms "all the time." Plt. Br. at 13; ¶41(c). [18]    Plaintiffs contend CW#5 is reliable because, "[h]e or she did not have to be involved in the revenue recognition process to provide information about treating the unsigned or incomplete contracts as revenue." Plt. Br. at 15.  This argument is tantamount to saying that confidential witnesses do not have to know what they are talking about before they speak. Defendants have cited substantial authority that stands for just the opposite. Def. Br. at 17-22.

## VI.    PLAINTIFFS FAIL TO PLEAD ADEQUATELY FACTS RAISING A STRONG INFERENCE OF FRAUDULENT INTENT ON THE PART OF ANY OF THE DEFENDANTS

Defendants established that plaintiffs fail to plead facts raising a strong inference that defendants knew, or were reckless in not knowing, that revenue had been recognized improperly. Def. Br. at 31-36.  Plaintiffs allege no specific factual allegations tying any of the defendants to the allegedly improper accounting practices.  Ignoring a host of authority to the contrary,[19] plaintiffs respond by arguing that scienter should be inferred from defendants' positions at the company. Plt. Br. at 34-35.

Plaintiffs' sole support for this proposition comes from this Court's holding in *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 312 (D. Del. 2001).  The *Little Switzerland* case is inapposite because it involved a major corporate event (a merger) in which each of the defendants (the CEO, CFO and Chairman) personally participated.  *Id.* at 304-05.  The plaintiffs challenged various press releases and SEC filings regarding the merger because they failed to disclose that the financing commitment letters needed to consummate the merger had an expiration date.  This

---

[18]    Plaintiffs provide no explanation of how the "processing" of contracts by sales personnel relates to revenue recognition.

[19]    *See Alpharma*, 372 F.3d at 149 (scienter is not inferred based solely on defendants' positions in the company); *Advanta Corp.*, 180 F.3d at 539 (same); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 617-18 (D.N.J. 2001) (same).

Court found that the complaint alleged scienter sufficiently for each defendant because he signed either the merger agreement or statements incorporating it. *Id.* at 312-14. The Court presumably inferred knowledge of the terms of the financing commitment letters from knowledge of the terms of the merger.

No such direct line can be found here. The only defendant connected to plaintiffs' revenue recognition allegations is Mr. Brigden. Mr. Brigden, however, did not sign any of VERITAS' financial statements. He was also the General Counsel, not the CFO, and is not alleged to have any background in finance or accounting.[20] Mr. Brigden's only alleged participation in revenue recognition comes from CW#3's unsupported assertion that Mr. Brigden knew his approval would be used to recognize revenue improperly from contracts. Plt. Br. at 35.

Plaintiffs argue their assertions against Mr. Brigden are sufficient to infer scienter under *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999). Yet, the officer in *Cendant* was not only a very high-ranking official but also allegedly knew of specific improper journal entries. *Id.* at 370. Plaintiffs fail to identify any improperly recorded transactions at VERITAS, let alone transactions of which Mr. Brigden was aware. *Compare Bell v. Fore Sys., Inc.*, 17 F. Supp. 2d 433, 440 (W.D. Pa. 1998) (CFO allegedly flew to Hong Kong to arrange for a phony order of $3 million and gave two named distributors 20% price concessions in return); *see also* Def. Br. at 32-34. Further, the officer in *Cendant* sold $15.9 million worth of stock during the class period. 60 F. Supp. 2d at 370. Mr. Brigden, by contrast, did not sell *any* stock. Thus, the only defendant who allegedly participated in the purported fraud did not derive any benefit from it.

Plaintiffs argue that Mr. Bloom's and Mr. Gillis's stock sales are enough to infer scienter because their sales were made in 2003 – at a time when VERITAS was conducting an internal

---

[20] *Compare Ravisent Techs.*, 2004 WL 1563024, at *12 (inferring scienter from CFO's background); *see also MicroStrategy*, 115 F. Supp. 2d at 640-41 (inferring scienter where CEO's own public statements revealed cavalier and manipulative attitude towards disclosure, as well as particularized awareness of the importance of timing in accounting for contract revenues).

investigation into its financial results. Plt. Br. at 36-37. This argument, however, ignores that both defendants were parties to 10b5-1 trading plans. Def. Br. at 33-34. Such plans negate any inference of scienter because they require sales to be executed based on a pre-designed schedule, rather than at the instruction of a defendant. *Id.*[21] Defendants also demonstrated that the Class Period sales were executed shortly after earnings releases were issued, which evidences compliance with federal securities laws. Def. Br. at 34.[22]

Plaintiffs respond by arguing that the existence of these trading plans does not negate scienter because neither Mr. Gillis nor Mr. Bloom sold stock *before* the Class Period. Plt. Br. at 37. This argument is disingenuous. Mr. Gillis did not even join VERITAS until November 2002 (two months before the Class Period began). ¶9(a). Plaintiffs do not explain what inference is to be drawn from Mr. Bloom's lack of stock sales in 2001 and 2002 when Mr. Bloom sold only 1.71% of his stock during the Class Period. Plt. Br. at 37 n.19. The difference is hardly unusual and suspicious, particularly when Mr. Bloom retained approximately 3.75 million stock options, which declined in value by approximately $36 million after the Second Quarter 2004 shortfall was announced.

Defendants also established that this Court cannot infer knowledge of alleged revenue recognition fraud from defendants' motivation to enter into change of control agreements or the acquisition of Precise Software Solutions, Inc. Def. Br. at 29. Plaintiffs respond by asserting that defendants entered into the change of control agreements "in the midst of accounting investigations" to protect themselves in the event VERITAS' low stock price resulted in a hostile acquisition. Plt. Br. at 38. Yet, these agreements were entered into in March 2004 when

---

[21] Defendants' lack of control over the timing of their sales is also what distinguishes their 10b5-1 trading plans from the plans at issue in *SEC v. Lipson*, No. 97 C 2661, 1997 WL 452701 (N.D. Ill. Aug. 6, 1997).

[22] Plaintiffs appear to have misinterpreted this argument as relating to sales made after the July 6, 2004 earnings release. Plt. Br. at 37.

VERITAS publicly disclosed that it would be restating its financial results and VERITAS' stock price declined, as a result. If anything, the change of control agreements demonstrate that defendants understood that the March 2004 announcement would cause VERITAS' stock price to decline. The agreements demonstrate nothing about their alleged knowledge of improper revenue recognition that has never been disclosed or impacted VERITAS' stock price.

Plaintiffs also argue that motive to commit accounting fraud is sufficiently alleged by the June 2003 Precise Software acquisition even though VERITAS paid for only a portion of Precise in stock. Plt. Br. at 38. In the case they cite, however, the company used $13.2 million of stock in a deal valued at $17 million (or 78% stock). Plt. Br. at 38 (citing *Ravisent Techs.*, 2004 WL 1563024, at *10). VERITAS, by contrast, used only $210.6 million of stock in a deal valued at $715.1 million (or 29% stock). Nor do plaintiffs explain how the use of $210.6 million in stock raises a "strong" inference of fraudulent intent when VERITAS reported having cash and cash equivalents of over $2.5 billion in the year this acquisition was consummated. *See* Ex. G.

## CONCLUSION

For each of the foregoing reasons, defendants respectfully request that the Court grant their Motion to Dismiss the CAC.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:
WILSON SONSINI
  GOODRICH & ROSATI, PC
Nina F. Locker, Esquire
Peri Nielsen, Esquire
650 Page Mill Road
Palo Alto, California 94304-1050
Tel: (650) 493-9300

By: _____
    Peter J. Walsh, Jr. (DSBA No. 2437)
    Erica L. Niezgoda (DSBA No. 3986)
    Hercules Plaza, Sixth Floor
    1313 North Market Street
    Wilmington, Delaware 19801
    Tel: (302) 984-6000

    *Attorneys for Defendants*
    *VERITAS Software Corporation,*
    *Edwin J. Gillis and Gary L. Bloom*

Dated: October 11, 2005

702480v1/28298

20

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Peter J. Walsh, Jr., hereby certify that on October 11, 2005, I caused true and correct copies of the foregoing REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT to be electronically filed with the Clerk of the Court using CM/ECF which is available for public viewing and downloading, and which will send notification of such filing to the following counsel of record:

> Norman M. Monhait, Esquire (DSB ID No. 1040)
> ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
> 919 Market Street, Suite 1401
> Post Office Box 1070
> Wilmington, Delaware  19899-1401
> Tel:  (302) 656-4433
> Email:  nmonhait@rmgglaw.com

I hereby further certify that on October 11, 2005, I have caused the foregoing document to also be delivered by FedEx/Next Business Morning delivery to the following non-registered participant:

> Christopher J. Keller, Esquire
> GOODKIND LABATON RUDOFF & SUCHAROW LLP
> 100 Park Avenue
> New York, New York  10017

> Peter J. Walsh, Jr. (DSB ID No. 2437)
> POTTER ANDERSON & CORROON, LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, Delaware 19801
> Tel: (302) 984-6000
> Email:  pwalsh@potteranderson.com

702480v1/28298