IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE VERITAS SOFTWARE CORP.  )   Civ. No. 04-831-SLR
SECURITIES LITIGATION       )   Consolidated Action

---

Norman M. Monhait, Esquire of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware. Counsel for Lead Plaintiffs. Of Counsel: David J. Goldsmith, Esquire of Goodkind Blabaton Rudoff & Sucharow LLP, New York, New York; Andrew M. Schatz, Esquire and Barbara F. Wolf, Esquire of Schatz & Nobel, P.C., Hartford, Connecticut; Robert I. Harwood, Esquire and Jeffrey M. Norton, Esquire of Wechsler Harwood LLP, New York, New York.

Peter J. Walsh, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Nina F. Locker, Esquire and Peri Nielsen, Esquire of Wilson, Sonsini, Goodrich & Rosati, PC, Palo Alto, California.

---

**MEMORANDUM OPINION**

Dated: May 23, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

Plaintiff Paul Kuck filed this securities class action against Veritas Software Corporation, Gary L. Bloom and Edwin J. Gillis on July 7, 2004 alleging they issued a materially misleading press release regarding expectations on revenue and earnings for the second quarter of 2004, in violation of the Securities Exchange Act of 1934, 15 U.S.C. Chpt. §§ 78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (D.I. 1)  Several lawsuits were filed shortly thereafter and, on March 3, 2005, the court consolidated these lawsuits and appointed Tay Siew Choon and Mark Leonov as co-lead plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "Reform Act").  (D.I. 44)  On May 27, 2005, plaintiffs filed a consolidated amended class action complaint ("CAC")  against Veritas, Bloom, Gillis and John Brigden (collectively called "defendants").  (D.I. 52)  In addition to the original forecast allegations, plaintiffs' CAC extends the putative class period back a year to claim that each of defendant Veritas' financial statements filed between April 23, 2003 and April 21, 2004 were false because defendants had recognized revenue improperly on sales transactions.  (D.I. 52)

Before the court is defendants' motion to dismiss the CAC pursuant to the heightened pleading requirements imposed by the

Reform Act and Rules 9(b) and 12(b)(6) of the Federal Rules of
Civil Procedure.  (D.I. 53)   The court has jurisdiction under
Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §
1331.

## II.  BACKGROUND

Defendant Veritas is a Delaware corporation headquarted in
Mountain View, California that provides storage management
software for data protection, application availability and
disaster recovery.  (D.I. 52 at ¶ 7)   Defendant Veritas describes
itself as one of the ten largest software companies in the world.
(Id.)   Defendant Bloom joined defendant Veritas in 2000 and was,
at all relevant times, the company's Chairman of the Board,
President and Chief Executive Officer.  (D.I. 52 at ¶ 8)
Defendant Gillis has been the Chief Financial Officer since
November 2002 and defendant Brigden has been the Senior Vice
President, General Counsel and Secretary since November 2001.
(D.I. 52 at ¶¶ 9, 10)

Plaintiffs bring this class action on behalf of a class
consisting of all persons and entities that purchased or
otherwise acquired Veritas common stock during the period between
April 23, 2003 and July 6, 2004, inclusive (the "Class Period").
(D.I. 52 at ¶ 17)   Lead plaintiffs Tay Siew Choon and Mark Leonov
allege that they purchased shares of Veritas common stock during
the Class Period at artificially high prices.  (Id. at ¶ 7)

2

## A. Public Announcements

On April 23, 2003, defendants issued a press release announcing, inter alia, Veritas' financial results for the first quarter of 2003 (the "First Quarter 2003 Press Release"). (D.I. 52 at ¶ 24) The First Quarter 2003 Press Release stated that "revenue for the quarter ended March 31, 2003 was $394 million, compared to revenue of $370 million for the same period a year ago. Generally accepted accounting principles ("GAAP") net income for the quarter ended March 31, 2003 was $43 million, or $0.11 per share, diluted . . . Non-GAAP diluted earnings per share for the quarter ended March 31, 2003 was $0.17." (Id. at ¶ 24) The price of Veritas stock increased from a closing price of $20.28 on April 23, 2003 to $22.15 on April 24, 2003. (Id. at ¶ 24) On May 14, 2003, defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the first quarter of 2003. The 10-Q reported the financial results set forth in the First Quarter 2003 Press Release. (Id. at ¶ 25) The 10-Q was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations. (Id.)

On July 23, 2003, defendants issued a press release announcing, inter alia, Veritas' financial results for the second quarter of 2003 (the "Second Quarter 2003 Press Release"). It stated that "[r]evenue for the quarter ended June 30, 2003 was a record $413 million, compared to revenue of $365 million for the

3

same period a year ago, representing 13% growth year over year." (Id. at ¶ 26) GAAP net income was $49 million, or $0.11 per diluted share, compared to GAAP net income of $26 million, or $0.06 per diluted share, for the same period a year ago. Non-GAAP diluted earnings per share was $0.19, compared to $0.14 for the same period a year ago. (Id.) The price of Veritas stock increased from a closing price of $27.91 on July 23, 2003 to $30.20 on July 24, 2003. (Id.) On August 19, 2003, defendants filed with the SEC a Form 10-Q reporting Veritas' financial results for the second quarter of 2003 consistent with the Second Quarter 2003 Press Release. (Id. at ¶¶ 26-27) The second quarter 2003 10-Q was signed by defendant Gillis and defendants Bloom and Gillis signed certifications as to the truth of the representations.

On October 22, 2003, defendants issued a press release announcing, inter alia, Veritas' financial results for the third quarter of 2003 (the "Third Quarter 2003 Press Release"). It stated that "[r]evenue for the quarter ended September 30, 2003 was a record $451 million, compared to revenue of $366 million for the same period a year ago, representing 23% growth year over year." (Id. at ¶ 28) GAAP net income was $77.6 million, or $0.18 per diluted share, compared to GAAP net income of $36.2 million, or $0.09 per diluted share, for the same period a year ago. (Id.) The price of Veritas stock closed at $33.94 on

4

October 22, 2003 and $35.70 on October 23, 2003.  (Id.)  On

November 14, 2003, defendants filed with the SEC a Form 10-Q

reporting Veritas' financial results for the third quarter of

2003 consistent with the Third Quarter Press Release.  (Id. at ¶

29)  The Third Quarter 2003 10-Q was signed by defendant Gillis

and defendants Bloom and Gillis signed certifications as to the

truth of the representations.  (Id.)

On January 28, 2004, defendants issued a press release

announcing, inter alia, Veritas' results for the fourth quarter

of 2003 and year-end 2003 (the "Fourth Quarter and Annual 2003

Press Release").  (D.I. 52 at ¶ 30)  It stated:

Veritas . . . today announced financial results for the
quarter ended December 31, 2003.  Revenue for the
quarter ended December 31, 2003 was a record $513
million, compared to revenue of $406 million for the
same period a year ago, representing 26 percent growth
year over year.  Revenue for the year ended December
31, 2003 was $1.77 billion, compared to revenue of
$1.51 billion for the same period a year ago,
representing 18 percent growth year over year.

(Id. at ¶ 30)[1]  Defendants disclosed that they expected first

---

[1]Defendant Bloom was quoted as saying:

Our outstanding fourth quarter performance is a
culmination of a record-breaking year.  We attribute
this success once again to our focused execution on our
growth strategy of expanding our product portfolio,
delivering these products on a broad range of hardware
and software platforms to further our heterogeneous
advantage, and extending our reach worldwide by
investing in sales and service capacity around the
globe.

(Id. at ¶ 30)

5

quarter 2004 earnings to decrease. (Id. at ¶ 30) The price of
Veritas stock dropped from a closing price of $36.47 on January
28, 2004 to $32.24 on January 29, 2004, on substantially higher
volume. (Id.)

On March 15, 2004, defendants issued a press release (the
"March 15, 2004 Press Release") announcing that its previously
reported financial results had been overstated throughout 2003 as
a result of management misconduct in earlier years and would be
restated. (Id. at ¶ 32) The realization of the overstatements
was a result of an internal investigation that "identified
certain accounting practices not in compliance with generally
accepted accounting principles during 2002, 2001 and prior
periods under the direction of former financial management."
(Id. at ¶ 32) The price of Veritas stock dropped from a closing
price of $31.01 on March 12, 2004 to $29.14 on March 15, 2004 and
$27.29 on March 16, 2004 on substantially higher volume. (Id.)

On April 21, 2004, defendants issued a press release
announcing, inter alia, Veritas' financial results for the first
quarter of 2004 (the "First Quarter 2004 Press Release"), which
stated:

Veritas . . . today announced financial results for the
quarter ended March 31, 2004. Revenue was $487
million, compared to revenue of $394 million for the
same period a year ago, representing 24 percent growth
year over year. GAAP net income for the quarter ended
March 31, 2004 was $103 million, or $0.23 per diluted
share, compared to GAAP net income of $42.5 million, or
$0.10 per diluted share, for the same period a year

6

ago.

(Id. at ¶ 34)[2]  On April 21, 2004, during a conference call (the "April 21, 2004 Conference Call") with analysts and inventors, defendant Gillis stated that "Veritas won 246 deals worth more than $100,000, averaging about $190,000, in the quarter."  (Id.) The price of Veritas stock increased from a closing price of $27.82 on April 21, 2004 to $29.42 on April 22, 2004 on substantially higher volume.  (Id.)

On May 5, 2004, at the Veritas Analyst Day in Las Vegas in conjunction with its annual users conference, Veritas announced to analysts its second quarter earnings guidance of $490 MM - $505 MM.  (Id. at ¶ 36)  On June 14, 2004, Veritas issued a press release announcing the filing of its delayed annual report on Form 10-K for the year ended December 31, 2003 and its delayed quarterly report on Form 10-Q for the quarter ended March 31, 2004 (the "June 14, 2004 Press Release").  Defendants stated:

Veritas . . . today announced that it has filed its Form 10-K for the year ended December 31, 2003, including restated financial statements for 2002 and 2001, the corresponding interim periods for 2002 and 2001 and the interim periods ended March, June and September 2003.  The company has also filed its Form

---

[2]Defendant Bloom was quoted saying:  "Our strong first quarter financial results demonstrate the fundamental strength of our business strategy and the benefit of an improvement in IT spending."  (D.I. 52 at ¶ 34)  Defendant Gillis was quoted saying:  "Building on the strength of a solid first quarter, we continue to view 2004 as an important growth year for Veritas and expect revenue for our second quarter to be in the range of $490 million to $505 million . . .."  (Id.)

7

10-Q for the quarter ended March 31, 2004.  The company
announced on March 15, 2004 that these filings would be
delayed as a result of the restatement of its financial
statements for 2002 and 2001 and the revision of its
previously announced financial results for 2003.
As a result of the restatement, the company has
adjusted its financial results as follows:
For the quarter ended March 31, 2004, the company
reported revenue of $486 million, a decrease of $1
million from the previously announced $487 million.
Net income for the quarter was $100 million, a decrease
of $3 million from the previously announced $103
million.
For the year ended December 31, 2003, the company
reported revenue of $1.747 billion, a decrease of $24
million from the previously announced $1.771 billion.
Net income for 2003 was $347 million, an increase of
$73 million from the previously reported $274 million.
Excluding the effect of the Seagate tax settlement,
which increased net income by $95 million, net income
would have decreased by $22 million.
The company also confirmed its previous guidance for
the quarter ending June 30, 2004.  The company expects
revenue to be in the range of $490 million to $505
million and GAAP earnings per share to be in the range
of $0.21 to $0.23.

(Id. at ¶ 37)

On June 14, 2004, defendants filed with the SEC Veritas'

Form 10-K Annual Report for 2003 (the "2003 10-K").  (Id. at ¶

38)  The 2003 10-K reported the financial results set forth in

the June 14, 2004 Press Release and also stated that adjustments

to 2003 were made that were unrelated to errors in prior periods.

"The 2003 adjustments, which related primarily to the deferral of

revenue associated with several multiple element arrangements,

decreased user license fees and services revenue by $4.4 million

and $0.7 million, respectively.  The adjustments unrelated to

errors in prior periods are expected to be recognized as revenue

8

in 2004." (Id. at ¶ 38)  Defendants Bloom and Gillis signed the
2003 10-K and also signed certifications as to the truth of the
representations.  (Id.)  On June 14, 2004, defendants also filed
a Form 10-Q reporting Veritas' financial results for the first
quarter of 2004 (the "First Quarter 2004 10-Q").  (Id. at ¶ 39)
It reported the financial results announced in the June 14, 2004
Press Release.  (Id. at ¶ 39)  The First Quarter 2004 10-K was
signed by defendant Gillis and defendants Bloom and Gillis signed
certifications as to the truth of the representations.  (Id. at ¶
39)

On July 6, 2004, three weeks after the company confirmed its
second quarter 2004 expectations of revenue in the range of $490
million to $505 million and GAAP earnings per share in the range
of $0.21 to $0.23, Veritas announced that the company's second
quarter 2004 revenues would actually be "in the range of $475
million to $485 million" and that its GAAP earnings per share
would "be in the range of $0.17 to $0.19."  (Id. at ¶ 44)  On
July 7, 2004, the company's share price dropped 36% from $26.55
to $17.00 on heavy trading volume.  (Id.)

## B. Confidential Witness Allegations

Plaintiffs reference five confidential witnesses ("CW") in
the CAC.  CW #1 was an inside sales manager for the southeast
region and was so employed at Veritas during the Class Period
until the end of the first quarter of 2004.  (D.I. 52 at ¶ 23(a))

9

CW #2 was part of sales management at Veritas during the Class
Period through most of the second quarter of 2004. (Id. at ¶
23(b)) CW #3 worked in the legal department at Veritas
throughout 2003 and had contract review responsibilities. (Id.
at ¶ 23(c)) CW #4 worked in the legal department at Veritas
during the Class Period, had responsibilities related to the
negotiation of licenses, and had regular interaction with the
finance department throughout the Class Period until the end of
the first quarter 2004. (Id. at ¶ 23(d)) CW #5 was a sales
staff administrator at Veritas during the Class Period until the
end of 2003 and was involved with new contracts. (Id. at ¶
23(e))

     The witnesses allege that the legal department was
responsible for deciding when revenue could be recognized and
reported. (D.I. 52 at ¶ 41(a)) According to these witnesses,
defendant Brigden approved contracts knowing they would be
included in revenue recognition despite the fact that they lacked
essential terms such as price and signatures by the customers.
(Id. at ¶ 41(b)) Furthermore, booking revenues on contracts that
had not been signed, or lacked essential terms such as the price,
was standard practice at least through 2003. (Id. at ¶ 41(b) CW
#5 stated that, during the Class Period at least through 2003,
there was pressure from Veritas' management to report revenue
sufficient to meet earnings estimates and, as a result, sales

                               10

personnel would "all the time" write up and process contracts without essential terms and customer signatures in order to meet revenue targets. (Id. at ¶ 41(c))

CW #1 established that a key part of Veritas' financial condition deteriorated due to diminishing demands and sales. (Id. at 45) A key part of Veritas' strategy during the Class Period was to convince existing customers to purchase upgrades, renew their maintenance licenses and buy consulting services. (Id. at 45(a)) CW #1 states that, to obtain new products to use as upgrades, Veritas was forced to buy small companies who had products that could be used as upgrades to Veritas' software products. (Id.) According to CW #1, in 2003 and 2004, Veritas had seven major upgrades, but they sold poorly, resulting in sales that were only a small fraction of what Veritas had projected internally would sell. (Id. at 45(b)) Defendant Bloom's business model also depended on increased revenue from consulting services, which CW #1 states never materialized. (Id. at 45(c)) According to CW #2, Veritas was also unsuccessful in many of its attempts to renew existing business in 2003 and 2004, including efforts to renew contracts with its large company clients. (Id. at 45(d)) According to CW #3, demand for new licenses also dropped in 2003 and did not recover during the Class Period. (Id. at 45(e)) At the end of the first quarter of 2004, "practically none of the sales people had met their quotas

11

for the quarter," according to CW #1.  (Id.)

## C.  Allegations Set Out In Complaint

Based upon the public announcements of record and the confidential witness information asserted, plaintiffs allege that, during the relevant time period of April 2003 through June 2004, defendants' representations regarding Veritas' revenue, net income and earnings per share were materially false and misleading because "these financial results included revenue that had been recognized from purported contracts which had not been signed, and for which actual terms were not agreed at the time the revenue was recognized, in violation of GAAP." (D.I. 52 at ¶¶ 31, 33, 35, 40, 43) In addition, plaintiffs allege that defendants' representations were materially false and misleading by attributing accounting errors to prior management "when, in fact, current management were continuing to engage in accounting improprieties." (Id. at ¶¶ 33, 40)

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable

inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."  Id.  Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiffs cannot demonstrate any set of facts that would entitle them to relief.  See Conley v. Gibson,355 U.S. 41, 45-46 (1957).  The moving party has the burden of persuasion.  See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

In order to state a claim under the Reform Act, plaintiffs must first plead the "circumstances constituting the fraud or mistake" with particularity.  See In re Advanta, 180 F.3d 525, 531 (3d Cir. 1999).  Conclusory allegations are unacceptable under the Reform Act's heightened pleading requirements.  See In re Milestone Scientific Sec. Litig., 103 F. Supp.2d 425, 453 (D.N.J. 2000).  Plaintiffs must set forth "with particularity all facts on which that belief is formed."  In re Advanta, 180 F.3d at 530.  However, this rule has been relaxed in situations where the factual information is peculiarly within a defendant's knowledge or control.  See In re Burlington Coat Factory, 114 F.3d 110, 1418 (3d Cir. 1997).  Indeed, in those situations, courts should apply the rule with "some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants."  In re Cendant Corp. Litig., 60 F. Supp. 2d 354, 368-69 (D.N.J. 1999)(internal quotations omitted).

13

## IV. DISCUSSION

It is clear that all of plaintiffs' claims stem from their assertion that defendants inflated Veritas' financial condition by including, as revenue, contracts that were not yet finalized; i.e., defendants are alleged to have improperly recognized revenue, thereby knowingly misrepresenting Veritas' current and forecast revenue, net income and earnings per share. Although defendants argue that plaintiffs have not adequately pled their allegations, the court finds that the allegations contained in the CAC are sufficient to pass muster under the Reform Act.

### A. Forecast Allegations

Opinions, predictions, and other forward-looking statements are not actionable unless the speaker does not genuinely and reasonably believe them when they are made. See In re Donald J. Trump Sec. Litig., 7 F.3d 357, 368 (3d Cir. 1993). The Reform Act provides a safe harbor for forward-looking statements which are identified as such and are accompanied by a meaningful cautionary statement detailing important factors which could result in actual results differing materially from those statements presented. See 15 U.S.C. § 78u-5(c)(1)(A). "A statement is forward-looking if it is a 'statement containing a projection of revenues, income [], earnings [], per share, capital expenditures, dividends, capital structure, or other financial items,' 'a statement of the plans and objectives of

14

management for future operations' or 'a statement of future economic performance.'" In re Party City Sec. Litig., 147 F. Supp. 2d 282, 309 (D.N.J. 2001). The proper inclusion of a cautionary statement in connection with a forward-looking statement renders the alleged omissions or misrepresentations immaterial as a matter of law. See In re Donald J. Trump Casino, 7 F.3d at 371.

The safe harbor will not apply if the statement was made with the actual knowledge that it was false or misleading. See In re Advanta, 180 F.3d at 536. In other words, the safe harbor provision does not afford corporations a free pass to lie to investors. Further, a purposeful omission of existing facts or circumstances does not qualify as a forward-looking statement and is not protected by the safe harbor of the Reform Act. See In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998).

Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made. See In re Burlington Coat Factory, 114 F.3d at 1428. Here, plaintiffs have alleged that the earnings forecasts were false or lacked a reasonable basis when made because they were related to improper revenue recognition. No manner of cautionary language can cure false statements knowingly made. Therefore, defendants' motion to dismiss is denied in this regard.

**B.    Guidance for Second Quarter 2004**

15

Plaintiffs allege that defendants knew, at the time guidance for the Second Quarter 2004 was issued, that the range of $490-$505 million was not achievable and the statements announcing the guidance were knowingly false and misleading because: (1) the guidance was premised upon a base of revenue that included revenue from contracts that had not been signed; (2) defendants knew that domestic direct enterprise transactions worth over $100,000 each were a critical measure for Veritas' business, those transactions had decreased from 286 for the quarter ended December 31, 2003 to 246 for the quarter ended March 31, 2004, and the projections were dependent upon closing more of such direct enterprise transactions than Veritas had closed in the prior quarter; (3) problems stemming from the restatement and accounting issues required "significant time and attention from [the] executive team" and, therefore, was having an effect on sales; and (4) during the second quarter, customer buying patterns became more cautions leading to longer sales cycles and smaller deal sizes. (D.I. 52 at ¶ 43) As a result of the above alleged facts, plaintiffs claim that defendants knew Veritas would need over 246 direct enterprise transactions worth over $100,000 in the United States in the Second Quarter 2004 to achieve the forecast, and that the forecast goal was

16

unattainable.[3]   (Id. at ¶ 43(e))

Plaintiffs have alleged with sufficient particularity that defendants knew that Veritas' earnings guidance for the Second Quarter of 2004 was unattainable and, therefore, the statements contained in the guidance were knowingly false and misleading. See In re Aetna, Inc. Sec. Lit., 34 F. Supp.2d 935, 953 (E.D. Pa. 1999) (allegations of fraud and widespread problems relating to Aetna's "core business" when individual defendants were top executives "provide strong circumstantial evidence that [defendants] . . . had knowledge of undisclosed facts[.]").

### C.  Loss Causation

Defendants argue that plaintiffs have failed to adequately plead loss causation because at no point did defendants disclose any alleged improper revenue collection and, therefore, plaintiffs cannot now show that the share price fell significantly after the "truth" became known, as required by Dura Pharmaceuticals, Inc. v. Broudo v., 544 U.S. 336 (2005).  In order to establish or allege loss causation, the law requires only that a plaintiff establish that defendants' wrongful conduct was a substantial factor in the market change.  See Semerenko v. Cendant Corp., 223 F.3d 165, 187 (3d Cir. 2000)  The Third Circuit precedent instructs that loss causation is a fact

---

[3]Defendants only achieved 201 of these transactions during the Second Quarter 2004.  (Id. at ¶ 43(3))

intensive inquiry which is best resolved by the trier of fact.
See EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d
Cir. 2000). Where a plaintiff alleges a fraud-on-the-market
theory based upon a public dissemination of misleading material
facts, as plaintiffs do here, the causal nexus between the
misleading statement and a plaintiff purchasing or selling that
security may be presumed. See Basic v. Levinson, 485 U.S. 224,
242-47 (1988).

The court finds that plaintiffs have adequately alleged that
they purchased Veritas shares at an artificially inflated price
and, when the truth became known (i.e., when the real revenue and
earnings were announced), Veritas stock dropped to its true
value. (D.I. 52 at ¶¶ 44, 52) See Semerenko, 223 F.3d at 185
("Turning to the complaint at issue in this case, we are
persuaded that the Class has alleged sufficient facts to show
that the alleged misrepresentations proximately caused the
claimed loss. The Class contends that it purchased shares of ABI
common stock at a price that was inflated due to the alleged
misrepresentations, and that it suffered a loss when the truth
was made known and the price of ABI common stock returned to its
true value."). As discussed below, plaintiffs allege that the
misrepresentations made about the higher revenue expectation
resulted from improper revenue recognition. While the July 6,
2004 statement did not specifically disclose the improper revenue

18

recognition, it did disclose that the guidance would be less than
anticipated.  Plaintiffs have asserted that, because defendants
used improper revenue recognition, they knew that the original
guidance was false and misleading and the real revenue and
earnings would never be that high.

## D.   Improper Revenue Recognition

Plaintiffs allege that defendants fraudulently recognized
revenue by approving contracts that were incomplete, lacked
essential terms and were unsigned by Veritas customers.  (D.I. 52
at ¶ 41(b)-(c))  Defendants assert plaintiffs have not pled fraud
with adequate specificity because no "dates, transactions,
customer names and amounts by which revenue was allegedly
misstated" were disclosed.

The requirement for particularity in pleading fraud does not
demand an exhaustive cataloging of facts, but only specificity
sufficient to provide assurance that plaintiffs have investigated
the alleged fraud and reasonably believe that a wrong has
occurred.  Resource Ventures, Inc. v. Resources Management Int'l,
Inc., 42 F. Supp.2d 423, 441 (D. Del. 1999)(denying motion to
dismiss where pleading described the act of fraud, but not
specifics such as the date, place or time).  Moreover, "[t]he
Third Circuit has cautioned that courts should 'apply the rule
with some flexibility and should not require plaintiffs to plead
issues that may have been concealed by the defendants.'"  In re

19

Cendant Corp. Litig., 60 F. Supp.2d at 368-69 (quoting Rolo v. City Inv. Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998)).

The court concludes that plaintiffs have adequately pled facts regarding improper revenue recognition. The complaint, based in part on former Veritas employees with personal knowledge of the wrongdoings, alleges a scheme by defendants to inflate the company's revenue numbers by including "sales" from contracts that had not been signed by the customer or that were missing essential terms such as price. The complaint alleges that these fraudulent activities were "standard practice" at the company, that they happened "all the time," and that incomplete or unsigned contracts were personally approved by defendant Brigden who, when confronted about this practice, stated, "What's the difference? We already know what the numbers for the quarter are." (D.I. 52 at ¶ 41(b)-(c)) Under the circumstances, the court finds the pleading is adequate to withstand a motion to dismiss.

**E. Facts Raising a Strong Inference of Fraudulent Intent**

Defendants assert that plaintiffs did not adequately plead scienter with respect to all defendants. Allegations that defendants participated in the drafting, preparation, and/or approval of the public representations complained of adequately alleges scienter. See Sheehan v. Little Switzerland, Inc., 136

20

F. Supp.2d 301, 313 (D. Del. 2001) (concluding that a complaint
that generally alleged that defendants (1) filed and signed a
company's Form 8K incorporating a merger agreement and (2)
cosigned and sent a letter to shareholders advising them of a
merger agreement, specifically alleged conduct giving rise to a
strong inference that each of the defendants acted with the
requisite state of mind). Plaintiffs allege that defendants
Bloom and Gillis signed materially false statements filed with
the SEC, reviewed and approved materially false and misleading
Veritas press releases and made numerous materially false and
misleading statements about Veritas that were incorporated into
analyst reports and news letters. (D.I. 52 at ¶¶ 8, 9)
Plaintiffs alleged that defendant Brigden "had specific
responsibility for . . . determining whether, and how much,
revenue could be properly recognized and included in the
financial results issued during the Class Period and described
[in the complaint]." (D.I. 52 at ¶ 10(b)) The court concludes
that plaintiffs have adequately pled facts raising a strong
inference of fraudulent intent.[4]

## V.   CONCLUSION

For the reasons discussed above, defendants' motion to
dismiss the consolidated amended class action complaint (D.I. 53)
is denied. An order consistent with this memorandum opinion

_____

[4]The court need not reach the evidence of stock sales.

21

shall issue.