## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**IN RE VERITAS SOFTWARE CORP.**  :   **Case No: 04-CV-831 (SLR)**
**SECURITIES LITIGATION**   :   **Consolidated Action**

:

:

**This Document Relates to:**   :

:

**ALL ACTIONS**   :

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION
## FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT

ROSENTHAL, MONHAIT & GODDESS, P.A.
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
(302) 656-4433
E-mail: nmonhait@rmgglaw.com

*Liaison Counsel for Lead Plaintiffs*
*Tay Siew Choon and Mark Leonov*

Robert I. Harwood                                   Ira A. Schochet
Jeffrey M. Norton                                   David J. Goldsmith
HARWOOD FEFFER LLP                                  LABATON SUCHAROW LLP
488 Madison Avenue                                  140 Broadway
New York, New York 10022                            New York, New York 10005

Jeffrey S. Nobel
Seth R. Klein
Andrew M. Schatz (of counsel)
IZARD NOBEL LLP
One Corporate Center
20 Church Street, Suite 1700
Hartford, Connecticut 06103

*Co-Lead Counsel for Lead Plaintiffs Tay Siew Choon and Mark Leonov and the Class*

Dated: July 24, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................ 1

II.   SUMMARY OF THE ARGUMENT ................................................................... 1

III.  STATEMENT OF THE FACTS ........................................................................... 2

IV.   LEGAL STANDARD GOVERNING FINAL APPROVAL ................................ 6

      A.    Notice To The Class Complied With Due Process ...................................... 6

      B.    The Proposed Settlement is Fair, Reasonable and Adequate ...................... 7

            1.    The Settlement Is Presumptively Fair ............................................. 8

            2.    The *Girsh* Factors .......................................................................... 9

                  a.    Continued Litigation Would Be Long, Complex
                        And Expensive .................................................................. 10

                  b.    The Reaction Of The Class Supports The
                        Settlement ......................................................................... 12

                  c.    The Parties Completed Significant Discovery And
                        Understood The Merits Before Negotiating ..................... 13

                  d.    Plaintiffs Faced Considerable Risk In Establishing
                        Liability At Trial ............................................................... 14

                        (i)    Establishing Liability for the Accounting
                               Claims Would Have Been Difficult ...................... 16

                        (ii)   Plaintiffs Faced Risks Establishing
                               Liability for the Forecast Claims .......................... 19

                        (iii)  Plaintiffs Faced The Risk of Establishing
                               Loss Causation ...................................................... 21

                        (iv)   The Settlement Forestalls a Potential Battle
                               of the Experts and a Lengthy Appeals
                               Process .................................................................. 21

                  e.    Plaintiffs Faced Considerable Risk In Establishing
                        Damages ............................................................................. 22

|  |  | f. | The Risks Of Maintaining The Class Action Through Trial ..................................................................... 24 |

|  |  | g. | Defendants' Ability To Withstand Greater Judgment, And Reasonableness Of The Settlement In Light Of The Best Possible Recovery And All Attendant Risks Of Litigation ........................................... 25 |

|  | C. | The Proposed Plan of Allocation of the Net Settlement Fund is Fair, Reasonable and Adequate .................................................................. 27 |

| V. |  | CONCLUSION ...................................................................................................... 29 |

## TABLE OF AUTHORITIES

### CASES

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)........................................................................................................16

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990).......................................................................................................15

*Baker v. MBNA Corp.*,
    2007 U.S. Dist. LEXIS 48892 (D. Del.) ..................................................................................20

*Bentley v. Legent Corp.*,
    849 F. Supp. 429 (E.D. Va. 1994),
    *aff'd without op. sub nom.*, 50 F.3d 6 (4th Cir. 1995)...............................................................15

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)............................................................................................ *passim*

*Clarion Corp. v. Am. Home Prods. Corp.*,
    494 F.2d 860 (7th Cir. 1974) ...................................................................................................22

*Clark v. Lomas & Nettleton Fin. Corp.*,
    79 F.R.D. 641 (N.D. Tex. 1978),
    *vacated on other grounds*, 625 F.2d 49 (5th Cir. 1980) ..........................................................22

*In re Datatec Sys. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 87428 (D.N.J.) ..............................................................11, 13, 23, 24

*Eisen v. Carisle & Jacquelin*,
    417 U.S. 156 (1974)...................................................................................................................7

*In re Elec. Carbon Prods. Antitrust Litig.*,
    447 F. Supp. 2d 389 (D.N.J. 2006) ..........................................................................................13

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)............................................................................................. *passim*

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)............................................................................................ *passim*

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000).........................................................................................20, 23

*In re Initial Pub. Offering Sec. Litig.*,
    243 F.R.D. 79 (S.D.N.Y. 2007) ............................................................................................26

*Lake v. First Nationwide Bank*,
    900 F. Supp. 726 (E.D. Pa. 1995) ........................................................................................10

*Lazy Oil Co. v. Witco Corp.*,
    166 F.3d 581 (3d Cir. 1999).................................................................................................13

*Levinson v. Prentice-Hall, Inc.*,
    868 F.2d 558 (3d Cir. 1989).................................................................................................15

*In re Linerboard Antitrust Litig.*,
    321 F. Supp. 2d 619 (E.D. Pa. 2004) ...................................................................................24

*In re Lupron Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005).............................................................................................27

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ..........................................................................................26

*In re NASDAQ Market-Makers Antitrust Litig.*,
    2000 WL 37992 (S.D.N.Y.)...................................................................................................28

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y.), *aff'd,* 117 F.3d 721 (2d Cir. 1997) ...................................27, 28, 29

*In re Portal Software, Inc. Sec. Litig.*,
    2007 WL 4171201 (N.D. Cal.) ..............................................................................................26

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)......................................................................................7, 12, 24

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    2001 WL 1568858 (N.D. Ill.) ...............................................................................................28

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
    74 F.R.D. 337 (N.D. Tex. 1976) ...........................................................................................22

*S.C. Nat'l Bank v. Stone*,
    139 F.R.D. 335 (D. S.C. 1991) .............................................................................................15

*In re Safety Components, Inc. Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) ...................................................................................10, 24

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)............................................................................................16, 21

*In re Veeco Instruments, Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y.)...............................................................................................26

*W. Va. v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd,* 440 F. 2d 1079 (2d Cir. 1971) ...............................15

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004) ................................ *passim*

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)..............................................................................7, 8, 11, 12, 25

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
    899 F. Supp. 1297 (D.N.J. 1995) *aff'd without op.,* 66 F.3d 314 (3d Cir. 1995).........12, 14, 15

*William v. First Nat'l Bank*,
    216 U.S. 582 (1910)..................................................................................................................7

## OTHER STATUTES AND AUTHORITIES

Private Securities Litigation Reform Act of 1995,
    Pub. L. No. 104-67, 109 Stat. 737 (1995)........................................................................3, 7, 19

Securities and Exchange Act of 1934,
    Section 10(b), 15 U.S.C. § 78j(b) ...........................................................................................15

15 U.S.C. § 78u-5 .........................................................................................................................20

17 C.F.R. § 240.10b-5....................................................................................................................16

Fed. R. Civ. P. 9(b) .........................................................................................................................3

Fed. R. Civ. P. 12(b)(6)....................................................................................................................3

Fed. R. Civ. P. 23.............................................................................................................................7

Fed. R. Civ. P. 23(e) .................................................................................................................1, 6, 8

Laura E. Simmons & Ellen M. Ryan,
    *Securities Class Action Settlements: 2007 Review and Analysis*
    (Cornerstone Research 2008)............................................................................................26, 27

## I.   NATURE AND STAGE OF THE PROCEEDINGS

Lead Plaintiffs Tay Siew Choon and Mark Leonov ("Plaintiffs") move the Court for final approval of: (i) the proposed $21.5 million settlement, as set forth in the Stipulation of Settlement (the "Settlement") dated April 8, 2008; and (ii) the proposed plan of allocation (the "Plan of Allocation").

## II.   SUMMARY OF THE ARGUMENT

1.   The Settlement reflects a significant achievement that surpasses the approval requirements of Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Through their efforts, Plaintiffs have obtained a recovery of $21,500,000 in cash, or approximately 13% of the Class's potential recoverable damages. Subject to final approval, the Settlement (less attorneys' fees, expenses and costs) will be distributed to members of the Class pursuant to the Plan of Allocation, which, as explained below, is consistent with the theories that Plaintiffs would proffer at trial. To date, not a single member of the Class has filed an objection to the Settlement or the Plan of Allocation.

2.   As explained herein, had Plaintiffs continued to prosecute this complex class action through summary judgment and trial, they would have incurred sizeable expenses, while facing the very real possibility that the Class would not ultimately recover anything at all. Indeed, as Plaintiffs learned throughout the course of this litigation—and as they confirmed through additional discovery—they would have faced significant risks persuading a jury that defendants acted with scienter, and in proving loss causation with respect to certain of the alleged stock drops.

3.   Accordingly, for all of the reasons set forth below, Plaintiffs respectfully request that the Court finally approve the Settlement and the Plan of Allocation as fair, reasonable and adequate.

## III.    STATEMENT OF THE FACTS[1]

### Procedural History

This federal securities class action was commenced on July 7, 2004 against Veritas Software Corporation ("Veritas" or the "Company"), Gary L. Bloom ("Bloom"), the Company's Chief Executive Officer ("CEO"), President and Chairman of the Board, and Edwin J. Gillis ("Gillis"), the Company's former Chief Financial Officer ("CFO") and Executive Vice President ("Defendants"). Several other similar lawsuits were filed shortly thereafter, and on March 3, 2005, the Court consolidated the actions, appointed Tay Siew Choon and Mark Leonov as Co-Lead Plaintiffs, and approved Plaintiffs' selection of Harwood Feffer LLP, Labaton Sucharow LLP and Izard Nobel LLP as Co-Lead Counsel ("Lead Counsel").

On May 27, 2005, following a lengthy investigation that included interviews of numerous former Veritas employees, Plaintiffs filed a Consolidated Amended Class Action Complaint ("Amended Complaint") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of a class of purchasers of Veritas securities between April 23, 2003 through July 6, 2004 (the "Class Period"). The Amended Complaint charged Defendants with making a series of material misrepresentations during the Class Period concerning Veritas's business and financial results in violation of Generally Accepted Accounting Principles ("GAAP") and issuing financial projections Defendants knew to be false in order to prop up the price of Veritas stock. The Amended Complaint alleged that Bloom and Gillis profited handsomely from

---

[1] A detailed description of Plaintiffs' claims, the history of the litigation, discovery and settlement negotiations, as well as the terms of the Settlement is set forth in the accompanying Declaration of Robert I. Harwood (the "Harwood Declaration").

2

their misrepresentations by selling large amounts of their Veritas shares at inflated prices during the Class Period.

On July 20, 2005, Defendants moved to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and various provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995).

By Order dated May 23, 2006, the Court denied Defendants' motion to dismiss in its entirety. Defendants answered the Amended Complaint on June 7, 2006 and, thereafter, the parties commenced discovery.

On September 5, 2006, Plaintiffs filed a Second Amended Class Action Complaint ("Complaint") amending the definition of the Class. The Complaint was otherwise similar to the Amended Complaint in all material respects. Defendants answered the Complaint on September 22, 2006.

On October 25, 2006, the Court entered an Order pursuant to a stipulation by the parties conditionally certifying the action as a class action on behalf a class ("Class") of all individuals and entities that purchased or otherwise acquired positions in Veritas's publicly traded securities, including, but not limited to, those individuals and entities that sold put options and bought call options during the Class Period.

### The Mediation and Settlement

While class certification discovery was ongoing, the parties agreed to pursue mediation. The mediation process was long and complex and involved substantial discovery, an in-depth development of the issues, and the exchange of numerous detailed settlement memoranda. For example, a two-day mediation session was initially scheduled for December 12th and 13th, 2006. In connection therewith, the parties

3

negotiated the production of documents focused on Plaintiffs' false financial projections claim. As a result of those negotiations, Defendants produced over 800,000 pages of documents, all of which Plaintiffs reviewed in preparation for mediation. The parties then exchanged detailed mediation statements, and submitted responsive memoranda.

After reviewing the parties' submissions, the mediator cancelled the December mediation session in the belief that the parties needed to further develop the issues and proof for the mediation to be productive. Over the subsequent months, the parties participated in *many* telephone calls, at times with all parties and the mediator, and other times just Plaintiffs and the mediator or Defendants and the mediator. Through this process, the parties vetted the issues, and potential sources of proof. Numerous discovery disputes arose and the mediator intervened to resolve the disputes. As a result of the process, Plaintiffs received and reviewed a production of hundreds of thousands of additional documents.

The two-day mediation session was rescheduled for August 2007. Despite all of the advance preparation, the parties failed to reach a settlement. However, the mediator continued to speak with the parties in an effort to forge a compromise.

On September 19, 2007, Defendants moved for summary judgment on Plaintiffs' revenue recognition claims. Defendants argued that there was no factual basis for those claims, and that the Court should dismiss the Complaint in its entirety.

With the summary judgment motion pending, the parties agreed to participate in further mediation. A final mediation session was held on November 12, 2007, during which the parties reached a settlement subject to Plaintiffs' satisfaction with the settlement after obtaining and reviewing testimony the SEC had obtained from Veritas's

4

employees and the opportunity for Plaintiffs to conduct interviews of present and former employees of Veritas. The Settlement provides for a cash payment of $21.5 million. The balance of the Settlement after any attorneys' fees, expenses and costs the Court may award, will be distributed to members of the Class who file valid proofs of claim.

Following agreement on the settlement amount, Plaintiffs then engaged in substantial additional discovery to confirm that the terms of the Settlement were fair, reasonable and adequate. Plaintiffs' efforts included interviewing eight current and former employees of Veritas, including Bloom and Gillis, and examining the testimony provided to the SEC by eleven current and former employees of Veritas regarding, *inter alia,* the accounting issues. Lead Counsel completed confirmatory discovery on March 26, 2008.

### Preliminary Approval and Notice

On April 16, 2008, the Court entered an order granting preliminary approval of the Settlement ("Preliminary Approval Order") and allowing Plaintiffs to provide notice to the Class of the material terms of the Settlement and their rights in connection therewith ("Notice"). The Preliminary Approval Order: 1) approved the Notice; 2) approved a proposed Summary Notice for publication; 3) approved the proposed Proof of Claim form to be submitted by Class members; 4) appointed Berdon Claims Administration LLC ("Berdon"), a nationally recognized settlement administrator, as claims administrator; 5) directed that Notice be given to the Class in the time and manner set forth therein; 6) set further dates for the litigation, including the dates by which Class members could either object or opt-out of the Settlement and submit Proofs of Claims; and 7) scheduled a fairness hearing to consider any further comment on the Settlement and whether to grant final approval thereof.

Notice was given to the Class in the form and manner approved by the Court beginning immediately after preliminary approval. On April 30, 2008, Berdon caused the Notice to be mailed, by first class mail, to members of the Class that had been identified from Veritas's transfer records. In total, Berdon identified 220,987 potential Class members. On May 14, 2008, the Summary Notice was published in the national edition of *The Investors' Business Daily*, and on *PR Newswire* and *Bloomberg News Service*. Class members were given until June 30, 2008 to lodge any objections to the Settlement. Significantly, no objections were received. To date, Berdon has received four (4) requests for exclusion, totaling under 10,000 shares.

## IV.   LEGAL STANDARD GOVERNING FINAL APPROVAL

### A.   Notice To The Class Complied With Due Process

Fed. R. Civ. P. 23(e) provides that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs." *In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir. 2001). *See In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 252 (D. Del. 2002) (Robinson, D.J.), *aff'd,* 391 F.3d 516 (3d Cir. 2004) ("*In re Warfarin*"). In accordance with the Preliminary Approval Order, Plaintiffs executed a Court-approved notice program including the mailing of individual Notice and claim forms to 220,987 putative Class members and publication of the Summary Notice in the national edition of *Investors' Business Daily* and on *PR Newswire* and *Bloomberg News Service. See* Affidavit of Michael Rosenbaum, Managing Director of Berdon Claims Administration LLC, the Claims Administrator in this Action (the "Rosenbaum Affidavit"), ¶¶ 3, 5-6.[2]

---

[2] The Notice program was carried out by the Court-appointed Claims Administrator, Berdon, under the supervision of Lead Counsel. *See* Rosenbaum Affidavit at ¶¶ 2-9. Berdon is a

6

This program clearly meets the requirements of the PSLRA and Fed. R. Civ. P. 23, which calls for "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See Eisen v. Carisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis omitted); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 326 (3d Cir. 1998); *In re Warfarin*, 212 F.R.D. at 253 (notice found adequate because it provided "potential class members with the information necessary to make an informed and intelligent decision whether to participate in the class and whether to object to the Proposed Settlement.") (internal quotations omitted).

In this regard, members of the Class have been provided with the Court-approved Notice that: 1) describes the terms of the Settlement; 2) the Class members' rights in connection therewith; 3) sets forth the dates and procedures by which Class members can either object to or opt-out of the Settlement; and 4) sets forth the time and place of the final hearing at which the Class members have an opportunity to be heard. Accordingly, the Notice satisfies the requirements of due process.

## B. The Proposed Settlement is Fair, Reasonable and Adequate

It is long established that courts strongly favor settlement of disputed claims. *William v. First Nat'l Bank*, 216 U.S. 582, 595 (1910). This policy of encouraging settlements is especially strong in the case of complex and expensive class action lawsuits. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("*Warfarin Sodium*") ("there is an overriding public interest in settling class action

---

nationally recognized notice and claims administration firm. Its staff consists of experienced CPA's, IT specialists and various other professionals with substantial experience in notice and claims administration.

7

litigation, and it should therefore be encouraged"); *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

Pursuant to Fed. R. Civ. P. 23(e) a court should approve a class action settlement when it is "fair, reasonable and adequate." *See Warfarin Sodium*, 391 F.3d at 534; *Cendant*, 264 F.3d at 231. The decision whether to approve a settlement of a class action is left to the sound discretion of the trial court. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). In exercising its discretion, a trial court is charged with examining whether the settlement is within a range of reasonableness experienced attorneys would accept considering all relevant circumstances. *See Gen. Motors*, 55 F.3d at 806. A trial court's approval of a class settlement will not be reversed absent a clear abuse of discretion. *Girsh*, 521 F.2d at 157 n.7.

### 1.    The Settlement Is Presumptively Fair

Indeed, this Court has recognized that "[a]n initial 'presumption of fairness for the settlement is established if the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re Warfarin*, 212 F.R.D. at 254 (quoting *Cendant,* 264 F.3d at 232 n.18).

The proposed Settlement satisfies each of the factors listed above. The settlement negotiations in this action were conducted over a lengthy period of time at arms-length before an experienced third-party mediator. The negotiations were hard-fought and included substantial back-and-forth over a period of many months where, at times, progress was made, and at other times the parties would find themselves at an impasse

before progress was made again.    Throughout the negotiations, the parties were represented by experienced and competent lawyers who have successfully represented clients in many similar cases. Moreover, Lead Counsel was thoroughly familiar with the claims and proof before entering into the settlement negotiations based on their detailed investigation prior to filing the Amended Complaint, and having reviewed over 1.2 million pages of Defendants' documents relating to the merits of the claims prior to conducting the mediation.   In addition, before Plaintiffs finally agreed to the settlement, Plaintiffs and their counsel assured themselves of the fairness of the Settlement through substantial post-mediation discovery which included the review of testimony given under oath and further interviews with important potential witnesses. Significantly, not one objection to the Settlement has been received.

For the above-reasons, the Court may approach the fairness determination with the presumption that the Settlement is fair.

### 2.    **The *Girsh* Factors**

The Court of Appeals for the Third Circuit has adopted a set of nine factors to be considered in determining whether a proposed settlement is fair, reasonable and adequate:

> (1) the complexity and duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the
> proceedings; (4) the risks of establishing liability; (5) the
> risks of establishing damages; (6) the risks of maintaining a
> class action [through trial]; (7) the ability of the defendants
> to withstand a greater judgment; (8) the range of
> reasonableness of the settlement in light of the best
> recovery; and (9) the range of reasonableness of the
> settlement in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157; *In re Warfarin*, 212 F.R.D. at 254. Courts in this Circuit look to these factors as "a guide and the absence of one or more does not automatically render

9

the settlement unfair." *See, e.g., In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp.

2d 72, 93 (D.N.J. 2001).

Based upon the *Girsh* factors, the Settlement is fair, reasonable and adequate, and

should be approved.

### a. Continued Litigation Would Be Long, Complex And Expensive

"This factor captures 'the probable costs, in both time and money, of continued

litigation.'" *In re Warfarin,* 212 F.R.D. at 254 (quoting *Cendant,* 264 F.3d at 233). As

the Court recognized in *In re Warfarin:*

> Settlement is particularly favored in a complex class action such as this. Although significant discovery has already taken place, to continue this litigation through trial would require additional discovery, extensive pretrial motions addressing complex factual and legal questions, and a complicated, lengthy trial. The costs would significantly increase the substantial costs already incurred. In addition, any addition, any judgment would likely be the subject of post trial motions and appeals, further prolonging the litigation and reducing the value of any recovery to the class.

*Id.*

Other courts in this Circuit are in accord. *See, e.g., Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("due to the relative complexity of the issues involved and the amount of data that would need to be processed, the costs of litigating this matter through trial would likely be high" and, due to the thousands of class members involved, "the task of poring through the relevant records would clearly be a significant undertaking."); *see also Gen. Motors*, 55 F.3d at 812 (concluding that lengthy discovery and ardent opposition from the defendant with "a plethora of pretrial motions" were facts favoring settlements, which offer immediate benefits and avoid delay and expense).

10

Here, due to the factual and legal complexities involved in this case, continued litigation would necessarily be extremely expensive and time-consuming. This case is based on alleged violations of federal securities laws – a complex area of legal practice. *See In re Datatec Sys. Sec. Litig.*, 2007 U.S. Dist. LEXIS 87428, at *8 (D.N.J.) (approving a securities fraud class action in part due to the complexity of the financial and accounting issues). The substantive issues presented in this case are no exception. A jury would have been required to learn and understand complex legal theories and accounting principles in order to determine whether the Defendants violated the federal securities laws. Moreover, the difficult issues surrounding the business and accounting principles at issue would necessarily have been presented through substantial expert testimony. Substantial expert testimony would also be required to assess the amount of any damages. Therefore, the complexity of this action supports granting approval of the Settlement. *See Warfarin Sodium*, 391 F.3d at 536 (settlement approved where "complex factual and legal questions" controlled the dispute); *In re Datatec Sys.*, 2007 U.S. Dist. LEXIS 87428, at *8 ("This securities fraud class action involves accounting and damages issues, the resolution of which would likely require extensive and conceptually difficult expert economic analysis.").

The anticipated duration of the litigation and its accompanying expense also weigh in favor of approval of the parties negotiated Settlement. *See Warfarin Sodium*, 391 F.3d at 535 (settlement encouraged with complex litigation "that otherwise could linger for years.") (internal quotation omitted). The parties have already expended a significant amount of monetary and other resources in contesting the claims before this Court, as well as during mediation sessions and settlement negotiations. Absent a

11

settlement, the Defendants would continue to vigorously defend themselves in proceedings before this Court and/or the Third Circuit that could last for years. The extensive preparation necessary to try the securities action would require substantial additional expense and effort for all parties. A trial of liability could have lasted for several weeks, required the introduction of extensive documentary evidence and involved numerous factual and expert witnesses.

Moreover, given the nature of Plaintiffs' claims, litigation of this action was not likely to have ended with a trial. Regardless of the outcome, the parties would likely have engaged in expensive and time-consuming post-trial and appellate practice. Such appeals could have caused class members to wait several years for a reduced recovery, if any. *See id.* at 536 ("Moreover, it was inevitable that post-trial motions and appeals would not further prolong the litigation but also reduce the value of any recovery to the class."); *Weiss v. Mercedes-Benz of N. Am., Inc.,* 899 F. Supp. 1297, 1301 (D.N.J. 1995) *aff'd without op.,* 66 F.3d 314 (3d Cir. 1995) ("Given the crowded state of this Court's calendars, the case would not be tried prior to 1997 [opinion dated May 11, 1995]. It is not unrealistic to predict that, if fully litigated, the present class action would not be concluded before the end of this decade…").

The proposed Settlement, on the other hand, will provide the Class with an immediate recovery of $21.5 million in cash. Accordingly, this factor strongly supports approval of the proposed Settlement. *See In re Warfarin,* 212 F.R.D. at 254 ("In sum, this factor strongly supports settlement.").

### b. The Reaction Of The Class Supports The Settlement

"This factor attempts to gauge whether members of the class support the settlement." *Id.* at 254 (quoting *In re Prudential,* 148 F.3d at 318).

Pursuant to the Preliminary Approval Order, the deadline for Class members to object to the Settlement was June 30, 2008. Although Berdon disseminated 220,987 Notices to potential class members, remarkably, not a single class member has objected to the Settlement. This fact, alone, provides a strong indication that the settlement is fair, reasonable and adequate. *Id.* at 254-55; *see also, e.g.*, *In re Datatec Sys.*, 2007 U.S. Dist. LEXIS 87428, at *9 (lack of objections from the class members "weighs strongly in favor" of approval of the settlement); *see also In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 399 (D.N.J. 2006) (same).

Plaintiffs also note that, to date, only four (4) members of the Class, representing less than 10,000 shares of Veritas, have requested to be excluded from the Settlement.

### c.     The Parties Completed Significant Discovery And Understood The Merits Before Negotiating

The stage of the proceedings and the amount of discovery completed is another factor that courts consider in determining the fairness, reasonableness and adequacy of a settlement. *Gen. Motors*, 55 F.3d at 785; *Girsh*, 521 F.2d at 157. This factor "captures the degree of case development that class counsel have accomplished prior to settlement." *Gen. Motors*, 55 F.3d at 813. "Through this lens," the Third Circuit has written, "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.; In re Warfarin,* 212 F.R.D. at 255. *See also Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588 (3d Cir. 1999) ("Post-discovery settlements are more likely to reflect the true value of the claim and be fair.") (citation omitted).

Here, over a period of nearly four years, Plaintiffs pushed this case forward in a manner favorable to the Class, positioning themselves to obtain a strong Settlement. As

13

explained in the Harwood Declaration, Plaintiffs were familiar with the merits before discussing settlement having (1) conducted a lengthy investigation prior to filing the Amended Complaint, one that included interviews of sixteen former Veritas employees, and (2) as noted, through the mediation process, Defendants produced and Plaintiffs reviewed over 1.2 million pages of documents related to their false financial projection and accounting claims prior to entering into mediation.

Even after reaching the settlement in principle, Plaintiffs conducted significant additional discovery to confirm that the Settlement was fair, reasonable and adequate for the Class. Such discovery included a review and examination of additional documents produced by Defendants related to Plaintiffs' claims, including but not limited to the testimony that eleven current and former employees of Veritas provided to the Securities and Exchange Commission ("SEC") concerning, *inter alia*, the accounting issues involved in this litigation, as well as the interviews of eight current and former employees of Veritas, including defendants Bloom and Gillis.

Accordingly, the proposed Settlement is the product of informed negotiations, and this factor strongly weighs in favor of approval of the proposed Settlement. *See In re Warfarin*, 212 F.R.D. at 255.

### d.    Plaintiffs Faced Considerable Risk In Establishing Liability At Trial

In assessing the fairness, reasonableness and adequacy of the Settlement, the Court must balance the risks of establishing liability and damages against the benefits afforded to the members of the Class, and the immediacy and *certainty* of a substantial recovery against the risks of continuing litigation. *Girsh*, 521 F.2d at 157. In *Weiss*, the Court noted in its discussion of this factor that: "the risks surrounding a trial on the merits

14

are always considerable." *Weiss*, 899 F. Supp. at 1301. As another court has noted, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F. 2d 1079 (2d Cir. 1971).[3] The risks that Plaintiffs face in establishing liability clearly demonstrate that the Settlement provides the Class with a substantial benefit that is not only fair, reasonable and adequate, but an excellent result.

Here, Plaintiffs acknowledge that they would have faced considerable risks in establishing liability. As a preliminary matter, Defendants' Motion for Summary Judgment was outstanding at the time the parties reached the Settlement. Plaintiffs faced a substantial risk that the Court would have granted part or all of Defendants' motion, thereby severely curtailing, if not eliminating, Plaintiffs' claims.

Even if Plaintiffs survived Defendants' motion (in whole or in part), the arguments raised in Defendants' motion to dismiss and motion for summary judgment, as well as the arguments advanced by Defendants at mediation, highlight the potential arguments that Plaintiffs would face at trial. Even after nearly four years of litigation, the relative strength of Plaintiffs' claims and Defendants' defenses thereto have been—and would continue to be—the subject of substantial dispute between the parties. *See S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 340 (D. S.C. 1991) (noting that such a risk militates in favor of settlement).

---

[3] Other decisions that demonstrate the enormous risks of litigation include: *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd without op. sub nom.*, 50 F.3d 6 (4th Cir. 1995); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (after jury verdict in favor of plaintiffs and the Class, reversing the district court's denial of judgment n.o.v. for defendants and remanding with instruction to dismiss the complaint); *Levinson v. Prentice-Hall, Inc.*, 868 F.2d 558, 564-65 (3d Cir. 1989) (jury award of $2.3 million in punitive damages overturned).

15

For example, the instant lawsuit involves, *inter alia*, federal securities claims against defendants under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. To prove their Rule 10b-5 claim, Plaintiffs would have the heavy burden of demonstrating that Defendants were responsible for material misstatements or omissions of fact in connection with public statements about Veritas' financial results; that the Class justifiably relied upon Defendants' misconduct; and that the Class suffered damages as a result of Defendants' conduct. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir. 2000).    Moreover, Plaintiffs would have had to establish their case almost exclusively through documents that they identified during discovery, and through the testimony of hostile witnesses. However, the documents reviewed by Plaintiffs failed to support at least some of Plaintiffs' claims. *See* Harwood Declaration ¶ 32.

Plaintiffs would also have had the difficult burden of proving that Defendants acted with scienter—actual knowledge of their misrepresentations and omissions or a reckless disregard of the truth. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir. 1999). As set forth below, while Plaintiffs believe that discovery has lent some support to their scienter allegations, they recognize that proving Defendants' scienter to a jury would have posed a particularly significant hurdle in this case.

### (i)    Establishing Liability for the Accounting Claims Would Have Been Difficult

Plaintiffs' accounting claims center on allegations that Defendants intentionally manipulated Veritas's earnings by deferring revenue and accelerating expenses, in violation of GAAP, once market expectations for a given quarter had been met in order to provide a "cushion" for shortfalls in future quarters and to allow the Company to show

16

slow, steady growth.   As discussed below, discovery did not significantly bolster Plaintiffs' assertion that Bloom and Gillis had acted with scienter. In fact, Plaintiffs uncovered some facts that lend support to the competing inference—that once Bloom and Gillis learned about the Company's improper accounting, they promptly took steps to correct it.

For example, one of Plaintiffs' theories relates to improper revenue deferral *before* the Class Period, under the direction of Veritas' *former* CFO. Plaintiffs' claim is that Veritas improperly failed to restate its financial results immediately when Gillis was apprised, upon joining the Company as CFO in late 2002, that the prior CFO had been stopping the billing of professional services revenue prior to the end of each quarter. However, the evidence indicates that Gillis instructed his staff to cease that practice immediately.   Although Plaintiffs would argue that Gillis's scienter is supported by his decision not to restate the Company's financials as soon as he first learned of this improper accounting, Defendants have argued – and the Court or factfinder could accept – that an immediate restatement would have been necessary only if the original improper accounting had been intentionally fraudulent or if the amount at issue was material. The extensive discovery conducted by Lead Plaintiffs did not uncover any evidence that Gillis definitively knew or should have known, during the time in question, that that former CFO's actions had been intentional.   Moreover, the amount of revenue at issue is small enough to be arguably immaterial to Veritas' financial results.[4]   Accordingly, based on Lead Counsel's analysis of the evidence to date, including their interviews with Gillis and

---

[4] The evidence obtained by Plaintiffs indicates that the roll-forward of professional services revenue was a small amount and had been the same every quarter since the practice began in 2000. As a result, Defendants will have a strong argument that the only quarter actually *misstated* was back in 2000, before the Class Period, and that the misstatement had no impact on Veritas' stock price by 2003 (*i.e.,* during the Class Period).

17

other involved Veritas employees, Plaintiffs respectfully submit that a jury would have been hard-pressed to conclude that Gillis acted with scienter.

Similarly, Plaintiffs would have had a very difficult time establishing Gillis's scienter with regard to another theory of liability: that Defendants should have restated Veritas's previously reported financial results immediately to correct for improperly accelerated expense accruals taken by the former CFO. According to Plaintiffs' forensic accountants, it would have been proper under GAAP (and thus *not* fraudulent misconduct) for Defendants to have left the accruals on the books for a reasonable period, even if the accruals were no longer proper, *unless* Defendants knew that the former CFO had *intentionally* engaged in improper accelerated expense accrual. The documents obtained and interviews conducted by Plaintiffs lend support to Defendants' argument that, at the time in question, Gillis did *not* know – and was not told – that the excess accruals had been intentionally incorrect at the time they were created. Indeed, some evidence indicates that Gillis had reason to believe the accruals were proper: for example, KPMG (Veritas's auditor) knew of the existence of the accruals and had not objected.

Likewise, establishing defendant Bloom's scienter would have also posed substantial risks. During discovery, Plaintiffs identified at least two instances where Bloom received e-mails that, in Plaintiffs' estimation, supported a finding that Bloom either knew or recklessly disregarded that the former CFO was intentionally accelerating expense accruals. Defendants, on the other hand, would have argued that the issues presented in those e-mails did not alert Bloom to any wrongdoing, particularly considering that he does not have a background in accounting or finance. Indeed, Defendants would have argued that Bloom had no reason to doubt the integrity of the

18

CFO, and that he largely relied on his CFO's expertise when it came to the Company's accounting. As with Gillis, Bloom's scienter would have likely turned on his credibility with the jury. After interviewing Bloom and other former Veritas employees, Lead Counsel concluded that, based on the evidence to date, proving Bloom's scienter would have also posed a significant hurdle.[5]

Plaintiffs also note that their ability to establish scienter as to Gillis and Bloom is undercut by the SEC's decision not to press charges against them in connection with its investigation into Veritas's restatement.

### (ii)     Plaintiffs Faced Risks Establishing Liability for the Forecast Claims

Plaintiffs' financial forecast claim alleges that, on four occasions, Defendants made false and misleading projections of revenues and earnings for Veritas' 2004 second quarter. As an initial matter, Plaintiffs face a hurdle in that the law restricts the basis upon which investors can assert liability for false forecasts or projections. Specifically, Section 21E of the PSLRA provides, in pertinent part, that:

> [A] person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that -- (A) the forward-looking statement is -- (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward looking statement – (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading. . .

---

[5] Moreover, as with the professional services issue discussed above, Plaintiffs would have a very difficult time establishing that the improper expense accruals were material. Indeed, when Veritas disclosed the restatement of its financial results (which included a restatement for this issue) on March 15, 2004, Veritas's stock dropped by only $0.56 (when adjusted for overall market movement), even though the restatement also addressed several other issues for which Plaintiffs have made no claim whatsoever.

19

15 U.S.C. § 78u-5. *See also Baker v. MBNA Corp.*, 2007 U.S. Dist. LEXIS 48892 (D. Del.). Defendants would certainly argue that the challenged false and misleading statements are, in fact, forward-looking and protected by the statutory safe harbor. Accordingly, had this case gone forward, Plaintiffs would have likely needed to prove that Defendants had *actual knowledge* that these statements were false or misleading when made, rather than relying upon a showing of recklessness.

Plaintiffs conducted extensive discovery regarding the Company's forecasting process. In short, the Company's forecasting depended upon a series of calculations, analyses and reviews by numerous departments, which were ultimately converted into a revenue forecast by the Company's senior staff. Needless to say, the forecasting process is fairly complex, and would not have been easily accessible to a jury.

For example, discovery shows that the guidance at the beginning of the second quarter of 2004 was based on several different numbers, the interpretation of which could cut in several different ways. Plaintiffs respectfully submit that it would have been an extremely difficult and complex task to prove that the April 21 and May 5-6, 2004 guidances were knowingly misleading, particularly because it was so early in the quarter, and because so many factors affected the forecast. *See In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (complexity of proof supports settlement noting "any trial on these claims would rely heavily on the development of a paper trail through numerous public and private documents").

Finally, although discovery reflected that Veritas was doing much worse than expected in its bookings of new orders by late May or the beginning of June 2004, establishing liability on this basis would have been very difficult. Defendants argued,

and the documents and witnesses supported, that the Company's guidance was always based on revenues and earnings, not bookings, and that there were additional revenues which emerged in late May or early June which more than offset any expected loss in revenue from new bookings. Indeed, Defendants would argue that, if anything, revenues appeared to be *above* guidance in the beginning of June. Perhaps most importantly from a jury perspective, the ultimate revenue reported for the second quarter of 2004 was \$485 million, only \$5 million below the public projection. All of these facts would have posed significant issues had the case gone forward.

### (iii) Plaintiffs Faced The Risk of Establishing Loss Causation

The Third Circuit has said that a plaintiff alleging claims under § 10(b) and Rule 10b-5 must prove that he or she suffered an actual economic loss; that an investor must also establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation. *Semerenko*, 223 F.3d at 185. Defendants would certainly challenge Plaintiffs' ability to establish loss causation with respect to the accounting claims and argue that the price of Veritas stock dropped only \$.56 on the date the restatement was announced. Plaintiffs acknowledge the hurdle this issue creates.[6]

### (iv) The Settlement Forestalls a Potential Battle of the Experts and a Lengthy Appeals Process

Another risk facing Plaintiffs relates to the need for expert witnesses. To establish liability and damages (discussed below), expert testimony would have been necessary. The acceptance of expert testimony by a jury is always far from certain,

---

[6] Although Plaintiffs think that there are no serious loss causation issues in connection with their forecast claims, Plaintiffs recognize that liability for those claims would be difficult to establish.

21

regardless of how distinguished the source. Further, divergent expert testimony leads inevitably to a "battle of [the] experts." *See generally Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D. 337, 345 (N.D. Tex. 1976); *Clarion Corp. v. Am. Home Prods. Corp.*, 494 F.2d 860, 863-64 (7th Cir. 1974). Settlement of this action avoids the risks and costs of competing experts that could result in a finding against Plaintiffs at trial.

Further, even if Plaintiffs succeeded at trial, Defendants would almost certainly appeal. Defendants are represented by experienced counsel who would continue to mount a zealous, thorough and no-holds barred defense to Plaintiffs' claims for relief not only before and during a full trial on the merits, but afterwards, through post-trial motions and appeals. Perhaps that is why, as one court aptly noted, "no contested lawsuit is ever a 'sure thing.'" *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 651 (N.D. Tex. 1978), *vacated on other grounds*, 625 F.2d 49 (5th Cir. 1980).

### e.    Plaintiffs Faced Considerable Risk In Establishing Damages

Even if Plaintiffs succeeded in establishing liability, Plaintiffs would have faced substantial risks establishing the existence and amount of damages.

Specifically, Plaintiffs would have had the difficult task of proving the true value of Veritas's securities in the absence of the alleged fraud. *See Cendant*, 264 F.3d at 239 n.21 ("[T]he damages determination involves calculating the 'true value of [defendant's] stock for any given day during the class period, *i.e.*, the value that the stock would have had if the fraud had not been committed, which requires a complex and conceptually difficult damages determination."). Further, the parties would have likely disagreed on the appropriate economic model for determining the amount by which Veritas securities were allegedly inflated during the Class Period; the effect of various market forces

influencing the trading price of Veritas securities at various times during the Class Period; the extent to which external factors, such as general market conditions, influenced the trading price of Veritas securities at various times during the Class Period; and the extent to which various matters the Plaintiffs alleged were materially false and misleading influenced the trading price of securities at various times during the Class Period. *See, e.g., Ikon*, 194 F.R.D. at 183 (finding fact that relationship between decline in price and defendants' conduct would be hotly contested supported settlement).

Inevitably, the question of damages would have led to sharp disagreement between the parties' respective experts. *See In re Warfarin,* 212 F.R.D. at 256 ("Damages would likely be established at trial through 'a 'battle of experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe.'") (quoting *In re Cendant*, 264 F.3d at 239); *In re Datatec Sys.,* 2007 U.S. Dist. LEXIS 87428, at *11 (finding that the "risks [of a battle of the experts with regards to damages] are avoided . . . by Settlement"). The unpredictability of the battle of damage experts thus weighs in favor of settlement. *See In re Warfarin,* 212 F.R.D. at 256; *Cendant*, 264 F.3d at 239 ("Were a jury confronted with competing expert opinions of corresponding complexity, there is no compelling reason to think that it would accept Lead Plaintiff's determination rather than [defendant's] which would post a much lower figure for the Class's damages."); *Ikon*, 194 F.R.D. at 183 ("On both the causation and the estimate of damages, the parties would have to submit expert testimony. Regardless of the strength of Plaintiffs' position, a jury might reject their expert witnesses.").

This uncertainty, as well as the need to rely on experts, lends clear support to Plaintiffs' belief that a $21.5 million cash recovery is fair, reasonable and adequate. Under these circumstances, this factor very strongly weighs in favor of Settlement.

### f.    The Risks Of Maintaining The Class Action Through Trial

The sixth *Girsh* factor is the "risks of maintaining the class action through trial." *Girsh*, 521 F.2d at 157; *In re Datatec Sys.*, 2007 U.S. Dist. LEXIS 87428, at *11. Even when class certification has been granted, risks abound that the class may present "intractable management problems" that create a risk of class decertification. *Safety Components Int'l*, 166 F. Supp. 2d at 91; *In re Warafin*, 212 F.R.D. at 256. Regardless, the level of risk of class decertification is not a basis to disapprove the proposed Settlement. Even when decertification is a relatively low risk courts approve settlements under the weight of the remaining *Girsh* factors. *See Safety Components Int'l*, 166 F. Supp. 2d at 91; *In re Linerboard Antitrust Litig.*, 321 F. Supp.2d 619, 631 (E.D. Pa. 2004) (approving settlement where "the parties do not identify any particular issue or circumstance in this case that might lead to a particular risk of decertification").

The Court approved a stipulation of class certification on October 26, 2006. There is always a risk, however, that the action, or particular claims in the action, might not be maintained as a class through trial. *In re Warfarin*, 212 F.R.D. at 256 (citing *Prudential*, 148 F.3d at 321). Thus, the risks of failing to maintain class certification through trial in this case favor approval of the Settlement.

g.    **Defendants' Ability To Withstand Greater
Judgment, And Reasonableness Of The Settlement
In Light Of The Best Possible Recovery And All
Attendant Risks Of Litigation**

The last three *Girsh* factors are the reasonableness of the settlement in light of

(i) the Defendants' ability to withstand a greater judgment, (ii) the best possible recovery,

and (iii) all the attendant risks of litigation. Like the previously addressed factors, these

factors support approval of the Settlement.

Arguably, Defendants would be able to withstand a judgment higher than $21.5

million.    Nevertheless, countless settlements have been approved where a settling

defendant has had the ability to pay greater amounts, particularly in view of the Third

Circuit's finding that this fact alone does not weigh against settlement approval. *See,

e.g.*, *Warfarin Sodium*, 391 F.3d at 538.

More importantly, the court must "measure[] the value of the settlement itself to

determine whether the decision to settle represents a good value for a relatively weak

case or a sell-out of an otherwise strong case." *Gen. Motors*, 55 F.3d at 806. The Court

further stated in *Gen. Motors*:

> [I]n cases primarily seeking monetary relief, the present value of the
> damages plaintiffs would likely recover if successful, appropriately
> discounted for the risk of not prevailing, should be compared with the
> amount of the proposed settlement ... The evaluating court must, of course,
> guard against demanding too large a settlement based on its view of the
> merits of the litigation; after all, settlement is a compromise, a yielding of
> the highest hopes in exchange for certainty and resolution.

*Id.* (citations omitted).

Here, Plaintiffs recovered a substantial cash amount for their claims, in excess of

the average recovery in typical cases. As such, the $21.5 million Settlement amount is

well within a range of reasonableness in light of the best possible recovery at trial and the

risks of continued litigation. Plaintiffs estimate that the Class, assuming a finding of liability on all claims asserted, suffered recoverable damages of approximately $163 million. Thus, the $21.5 million Settlement represents a recovery of approximately 13% of the Class's recoverable damages. This percentage, particularly in view of the risks and uncertainties discussed above, falls well within the range of possible approval.

A statistical study published earlier this year by Cornerstone Research found that post-PSLRA securities class action settlements overall through 2006 (812 settlements) recovered a median of 3.6 percent of plaintiffs' estimated damages. *See* Laura E. Simmons & Ellen M. Ryan, *Securities Class Action Settlements: 2007 Review and Analysis*, at 6 (Cornerstone Research 2008), annexed hereto as Exhibit A.[7] All Settlements during 2007 (111 settlements) recovered 2.9 percent of damages. *Id.*

Cornerstone also found that settlements between 1996 and 2007 in cases involving a restatement (286 settlements) recovered 4.5 percent of damages. *Id.* at 8. Settlements between 1996 and 2007 where the case was accompanied by SEC action (217 settlements), defined as a "corresponding SEC filing of litigation release or administrative proceeding," recovered 4.4 percent of damages. *Id.* at 12.

---

[7] Several courts have relied upon the Cornerstone Research study, or earlier versions of it, in approving securities class action settlements. *See In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (court relying upon 2008 Cornerstone Research study in approving a $4.9 million settlement noting that "the estimated recovery of three percent of the total damages estimated by plaintiffs, does not meaningfully diverge from the reasonableness for settlements of similarly sized securities class actions.); *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal.) (court cited Cornerstone's 2006 Review and Analysis in approving a settlement representing 25 percent of plaintiffs' maximum recovery at trial, stating that "[t]he settlement…exceeds the median percentages for all securities class action in 2005 and 2006, which were approximately 3.1% and 2.4% respectively."); *see also In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 94 n.120 (S.D.N.Y. 2007); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115809, *12 & n.12 (S.D.N.Y.).

Viewed as a percentage of the best possible recovery at trial, this Settlement comfortably exceeds each of these benchmarks.[8] Plaintiffs submit that a settlement of such magnitude is clearly within the range of reasonableness in light of the best possible recovery and the risks of litigation. *See Cendant,* 264 F.3d at 242 n.22 (noting that approved settlement recoveries in securities class actions typically range from 1.6% to 14% of claimed damages); *cf. In re Lupron Mktg. & Sales Practices Litig.,* 228 F.R.D. 75, 98 (D. Mass. 2005) ("The evaluating court must . . . guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise . . . for certainty and resolution.") (quoting *Gen. Motors,* 55 F.3d at 806).

In light of all the factors discussed above, including the risks and costs associated with litigating Plaintiffs' claims through trial and appeals, Plaintiffs respectfully submit that the Settlement falls well within a reasonable range from the perspective of all parties. Accordingly, the *Girsh* factors militate strongly in favor of approving the Settlement.

## C.     The Proposed Plan of Allocation of the Net Settlement Fund is Fair, Reasonable and Adequate

Review of the Plan of Allocation falls within this Court's broad supervisory power over the Settlement, its proceeds, and their ultimate disposition. *See In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 132 (S.D.N.Y.), *aff'd,* 117 F.3d 721 (2d Cir. 1997). ("The review of the plan of allocation is squarely within the discretion of the district court."). In assessing a plan of allocation, "[t]he same standards of fairness, reasonableness and adequacy that apply to the settlement apply to the Plan of

---

[8] The Cornerstone study also examined securities class action settlements by judicial circuit. There were 76 settlements approved by the courts within the Third Circuit through 2006, and 11 during 2007. *See 2007 Review and Analysis,* annexed hereto as Exhibit A, at 15. The median settlement among the group of 76 settlements was $5.8 million, and the median settlement amount among the group of 11 settlements was $7.0 million. *Id.* This Settlement is significantly larger than both median amounts.

27

Allocation." *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568858, at *3 (N.D. Ill.).

In determining the fairness, reasonableness and adequacy of a proposed plan of allocation, courts give great weight to the opinion of qualified counsel. *See PaineWebber*, 171 F.R.D. at 126, 133; *In re NASDAQ Market-Makers Antitrust Litig.*, 2000 WL 37992, at *2 (S.D.N.Y.) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' Class Counsel").

Here, the Plan of Allocation is derived from analysis by Plaintiffs' damages expert, taking into account the strengths and weaknesses of the claims. Specifically, the three market-adjusted declines covered by the Plan of Allocation include: (i) a drop of $0.56 per share on March 15, 2004, upon disclosure of the accounting restatement; (ii) a drop of $0.11 per share on June 14, 2004, upon disclosure of the actual terms of the restatement; (iii) a drop of $8.50 per share on July 6, 2004, upon disclosure that Veritas failed to meet its revenue and earnings guidance. Based upon Lead Counsel's analysis of the likelihood of success of proving the claims related to the drop on July 6, 2004, Lead Counsel reduced the adjusted price drop by 50% to $4.25 per share.

To date, no member of the Class has objected to the Plan of Allocation. Plaintiffs are not aware of any similar securities fraud case in which the court has rejected the Plan of Allocation under these circumstances. Thus, Plaintiffs respectfully submit that the proposed allocation is fair to the Class in its entirety, and is based on the same principles that were approved in *PaineWebber*:

28

> The Court's review of the proposed Plan of Allocation is informed not only by the goal of matching each plaintiff's recovery to the strength of his or her claim, but also "by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *Chicken Antitrust*, 669 F.2d at 238. . . . Based on the extensive record in this case, a pro rata distribution of the Settlement on the basis of Recognized Loss will provide a straightforward and equitable nexus for allocation and will avoid a costly, speculative and bootless comparison of the merits of the Class Members' claims. Accordingly, the Plan of Allocation is fair and reasonable and is approved.

171 F.R.D. at 135.

## V.    **CONCLUSION**

For all of the reasons set forth above and in the accompanying declarations, Plaintiffs respectfully request that this Court finally approve the Settlement and the Plan of Allocation as fair, reasonable and adequate.

Dated:  July 24, 2008

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _____

Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, Delaware  19899-1070
(302) 656-4433

> *Liaison Counsel for Lead Plaintiffs*
> *Tay Siew Choon and Mark Leonov*
>
> Robert I. Harwood
> Jeffrey M. Norton
> HARWOOD FEFFER LLP
> 488 Madison Avenue
> New York, New York 10022
>
> Ira A. Schochet
> David J. Goldsmith
> LABATON SUCHAROW LLP
> 140 Broadway
> New York, New York 10005
>
> Jeffrey S. Nobel
> Seth R. Klein
> Andrew M. Schatz (of counsel)
> IZARD NOBEL LLP
> One Corporate Center
> 20 Church Street, Suite 1700
> Hartford, Connecticut 06103
>
> *Co-Lead Counsel for Lead Plaintiffs Tay*
> *Siew Choon and Mark Leonov and the Class*